UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARY SESSION, | CIVIL ACTION NO. |
| Plaintiff | 3:03-cv- 00943 (AWT) |
| V. | |
| EDWIN RODRIGUEZ, ET AL. | JANUARY 12, 2007 |
| Defendants | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**OBJECTION TO MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

This is an action for damages brought pursuant to 42 U.S.C. §1983 alleging violations of the Plaintiff's rights under the Fourth, Fifth and Eight Amendments to the United States constitution and for false imprisonment, malicious prosecution and negligent and intentional infliction of emotional distress under Connecticut law. Plaintiff claims that the Defendants, New Haven police officers Edwin Rodriguez (hereinafter "Rodriguez") and Stephen Coppola (hereinafter "Coppola") recklessly, knowingly, deliberately and wrongfully accused him of having committed a murder. As a result, Plaintiff was arrested and incarcerated for nearly one (1) full year before all charges against him were dropped. On August 15, 2006, the Defendants moved for summary judgment on all claims. For the reasons that follow, summary judgment is inappropriate in this case.

## FACTUAL BACKGROUND

### A. The Shooting

On July 25, 1999 at approximately 1:50 a.m., Anthony Lucky, Jr. (hereinafter "Lucky") was a rear seat passenger in a 1998 Suzuki Samurai motor vehicle (hereinafter

the "Samurai") being operated by his cousin Albert McCann on Columbus Avenue in New Haven, Connecticut. Plaintiff's Local Rule 56(a)(2) (hereinafter "L. R. 2"), Exhibit M, p. 7. Juan Scruggs (hereinafter "Scruggs') was the front seat passenger in the Samurai. Id. Shots were fired at the Samurai from a blue Honda when the Samurai was in the intersection of Columbus and Howard Avenues. Exhibit M, pp. 11-12; Exhibit N, p. 10. Scruggs then retrieved a gun belonging to McCann from beneath the driver's seat. L. R. 2, Exhibit N, p. 12-13. Scruggs claimed that the gun discharged when he released the safety and that the bullet struck Anthony Lucky. Id. Scruggs stated that he fired the gun out the window at the retreating Honda while the Samurai continued eastbound on Columbus Avenue. L. R. 2, Exhibit N, p. 13. Lucky then stated that he had been shot. L. R. 2, Exhibit N.

The police stopped the Samurai several blocks away and Lucky was transported to Yale New Haven Hospital where he underwent emergency surgery. Lucky was pronounced dead at Yale New Haven Hospital. A subsequent autopsy concluded that he had died as the result of internal trauma caused by a single gunshot and his death was classified as a homicide. The medical examiner concluded that the fatal bullet had entered Mr. Lucky's back and had traveled out through his chest. Id. However, the medical examiner noted that it was impossible to determine exactly as a result of changes was ever charged with causing the death of Lucky.

The Defendants were assigned to investigate the Lucky shooting. They claimed that the on going investigation uncovered three witnesses who tied Plaintiff to the killing. The first witness was Sharon Adkins, (hereinafter "Adkins") In a statement dated

November 7, 1999 Adkins admitted having been arrested two (2) months before giving the statement. Local Rule 56(a)(2) Statement, 1; Exhibit A, p. 30.

At the time of her statement on November 7, 1999, Adkins took Depakote. Exhibit A, pp. 2-3. Depakote is a prescription medication approved for three (3) uses: (1) for treatment of acute or manic episodes in bipolar disorder; (2) for certain seizure disorders; and (3) for migraine headaches. L.R. 56(a)(2) Statement, 3; Exhibit B. Bipolar disorder is also known as manic depression and persons suffering from it often have difficulty distinguishing fantasy from reality. Exhibit C, pp. 3-6 . Adkins stated she took Depakote for" memory" and "mental disorder." Exhibit A, p. 3. She had not taken her Depakote on November 7, 1999 and her said she felt "lousy." Id. Adkins admitted to using crack cocaine during the time period of the Lucky shooting and to being addicted to crack cocaine at the time of her statement. Exhibit A, p. 26.

There is a high degree of correlation between cocaine abuse and bipolar disorder. Cocaine abuse is associated with a several-fold increase in incidence of bipolar disorder; the rate of bipolar disorder in cocaine abusers may be higher than in any other category of substance abuse. Exhibit C. Adkins admitted to the police that she earned her income from selling drugs namely crack. Exhibit A, pp. 4-5.

Adkins told the Defendants that she began selling crack cocaine for DeShawn Johnson (hereinafter "Johnson") on or about August 8, 1999 and that Johnson worked for the Plaintiff. Exhibit A, p. 29. Adkins stated that on August 16, 1999, she learned from "Bono" that "E"(Albert McCann) had stolen $3000 in cash and crack cocaine from Shawn (Johnson) and that Shawn was looking for "E". Id. at pp. 11-12. "Bono" told Adkins that "E" had stolen the money and drugs from 'Shawn" because Bono was a new

partner with 'Shawn" and Adkins was in possession of crack cocaine she received from "E" that she was supposed to sell. Id. at pp. 10, 11.

On August 16, 1999, Adkins spoke to "Shawn" who told her to call him if she saw "E. Exhibit A, p. 12. On August 16, 1999, "E" came to Adkins's house and Adkins then called "Shawn" from a pay phone to tell him that. Id. at pp. 13, 15. After calling "Shawn" on August 16, 1999, Adkins went to Church Street South "to cop", that is, to buy crack cocaine with her girl friend, Dorie Cash.. Id. at pp. 16-17. None documents received in discovery from the Defendants contain any reference to any interviews or attempted contact by the Defendants with Dorie Cash. On her return from Church Street South on August 16, 1999, Adkins claimed to have heard 8 or 9 gunshots but could not determine their location. Exhibit A, p. 17. When asked by Rodriguez if she was sure of the date, Adkins stated that it was August 16, 1999. Id. at p. 13.

In response to very specific questioning, Adkins confirmed that she made the telephone call to Shawn on August 16, 1999. Id. at 21. She did not give a further statement changing the August 16 date to any date in July, 1999. Her statement bears the initials "S.L.A." and "E.R." and "11/8/99" next to the August 16 dates in nine (9) different places in the statement. Exhibit A, pp.12, 13, 14, 20, 28, 29 31. There is no statement from Adkins indicating that she placed the initials "S.L.A." on the statement or authorized anyone to do so.

On November 8, 1999, Mayra Mercado (hereinafter "Mercado") was arrested and taken to the New Haven Superior Court and placed in a basement jail cell. L. R. 2, Exhibit D, p. 2; Exhibit E, pp. 2-3. Late that afternoon she was taken to a conference room within the courthouse to meet with Rodriguez and other officers. Exhibit F, ¶, 9.

4

She did not approach Rodriguez to volunteer information about Plaintiff or the Lucky shooting on November 8, 1999. Exhibit E, p. 3. On November 8, 1999, Mercado was addicted to the use of crack cocaine and Rodriguez knew that. Id. at p. 6. During the interview, Mercado was displaying obvious symptoms of withdrawal from crack cocaine including shakes, sweats and chills. Exhibit E, p. 5. She stated: "My head was hurting, my stomach was turning, I had the shakes, I was cold, sweating and I was tired. I was tired and I wanted to go to sleep." Id.. Rodriguez did not report any of these readily observable facts in the arrest warrant affidavit. Exhibit F.

In her November 8, 1999 statement, Mercado referred to Plaintiff as "Shabazz" and said she had been at his house in West Haven on July 24, 1999 counting drug trafficking proceeds, that she had been given $10,000 by the Plaintiff to purchase cocaine in New York City the next day and that some "black kids" (names unknown) had stolen some of "Shabazz's" money. Exhibit D. She further stated that she heard Shabazz arguing with Jose Santiago and could hear Shabazz saying they find him, hit him up, pistol whip him or whatever. Exhibit F, ¶ 10. She stated that Shabazz wanted the kids who stole the money to work it off penny by penny or otherwise be killed. Id. She further stated that on September 24, 1999 (later corrected to July 24, 199) she was with Shabazz when he received a call from DeShawn Johnson telling him that three guys were on Kimberly Avenue in New Haven. Exhibit F, ¶ 11. She stated she heard the entire call from Shabazz's cell phone because he was using a hand's free function. She stated she worked for Shabazz dropping off drugs and picking up cash. Exhibit D.

Mercado further stated that in the early morning hours of July 25, 1999, while she was on a payphone at the corners of Hallock Street, Columbus Avenue and Washington

5

Street, Johnson came up to her and told her Shabazz would be arriving soon. Exhibit D, p. 11. While they were waiting, a woman named Sharon called Johnson to say the black kids who stole Shabazz'z money were on the block. Exhibit D, p. 14. . She said Shabazz then pulled up in a vehicle and handed a gun to Santiago and told her to give him his daughter. Exhibit D, pp. 16, 21. Mercado claimed to be the mother of one of Plaintiff's children. Exhibit D, p. 16. She said Santiago then got into a Honda CRX driven by Johnson. Exhibit D, p. 21. . In a second statement on December 4, 1999, Mercado said that on December 3, 1999, Santiago approached her on the street and stated that he had killed a black kid on Howard Avenue.

On March 1, 2001 Mercado gave testimony at a Hearing in Probable Cause (hereinafter "HPC") in Plaintiff's criminal case substantially at odds with her prior statements. Mercado's HPC testimony contradicted her prior statements in numerous ways. Among the more critical were:

    a.    She claimed she was at Plaintiff's house on July 16, 1999 when the loss of money was discussed. In her statement it was July 20. Exhibit G, p. 10; Exhibit D, p. 3.

    b.    She stated on July 24, 1999, she and DeShawn Johnson were at the post office at 6 Corners when Johnson called Plaintiff from her cell phone to tell him he had seen the people who stole the money at the Kimberly Street Getty Station. Exhibit G, pp. 13-15. In her 11/8/99 statement, she said Johnson called Plaintiff from the gas station. Exhibit D, p. 9.

    c.    At the HPC, Mercado said Johnson made the call to Plaintiff who was at another location. Exhibit G, p. 15. In her statement, she said she was with Plaintiff when he received the call from Johnson. Exhibit D, p. 10.

6

      d.     At the HPC, Mercado testified that she was sitting in the Plaintiff's vehicle, a gold colored Expedition, that the Plaintiff was in the driver's seat and the Plaintiff reached across her and handed a handgun to DeShawn Johnson. Exhibit G, p. 20. In her statement, Mercado said she saw Plaintiff standing next to a Honda CRX and give a handgun to someone named "Bebe". Exhibit D, p. 20.

      In a sworn statement given on December 5, 2006, Mercado repudiated her prior statements to the defendants, claiming that she had been threatened and coerced into making them and that they were "all lies." See Exhibit E, pp. 21, 22.. Mercado did not volunteer to meet with the Defendants and did not give them information respecting the Plaintiff; instead, it was Rodriguez who broached the subject and repeatedly referred to Plaintiff as "Shabazz" throughout the interview. Exhibit E, pp.-5-8. During the interview, Mercado denied any knowledge of the Plaintiff, the Lucky shooting or who Lucky was. Id.

      At the time of the meeting with Mercado on November 8, 1999, Rodriguez knew that Mercado had a younger brother named Ishmael with whom she was very close. Exhibit E, p. 7. When Mercado continued to deny any knowledge of Plaintiff or the Lucky shooting, Rodriguez threatened her with never seeing her brother again. Exhibit E, p. 7. Rodriguez told Mercado that she would be put away and that she would never see Ishmael again if she did not cooperate. Exhibit E, pp. 6-7.

      During the interview, Mercado repeatedly told Rodriguez that she was tired and wanted to go back downstairs to sleep. Exhibit E, p. 5-8. Mercado continued to tell Rodriguez that she did not know the answers to the questions he was asking about Plaintiff and the shooting. Exhibit E, p. 8. Mercado repeatedly told Rodriguez that she

7

was tired and wanted to go back downstairs to sleep. Id. at 8. Rodriguez told Mercado that all she had to do for him to leave her alone so that she could go back downstairs to sleep was to say that Plaintiff shot Lucky. Id.

Mercado finally agreed to tell Rodriguez whatever he wanted to hear about Plaintiff in order to be left alone. Exhibit E, p. 9. Contrary to what she said in her November 8, 1999 statement, Mercado did not know where Plaintiff lived., if he lived in a house or in an apartment and was never at Plaintiff's house. Exhibit E., pp. 12, 14. She never counted drug money with Plaintiff or saw him do so. Id. Mercado did not have $10,000 on July 24, 1999 and never had $10,000 in her entire life. Exhibit E, p. 17. Rodriguez told Mercado to state that Plaintiff was the father of her child. Exhibit E, p. 13. Mercado did not have a child at the time. Id. All of the information about Plaintiff that Mercado provided in her statement was given to her by Rodriguez. Exhibit E, pp. 11, 12, 14. All of Mercado's statements to the police about the Plaintiff were lies. Exhibit E, pp. 21, 22.

After the meeting with Rodriguez, Mercado was taken to an office or conference room in the courthouse where she met with Rodriguez and Sergeant Norwood. Exh. E, pp. 10-11. There was a tape recorder in the room where Mercado met with Rodriguez and Norwood. Exh. E. Before the tape recorder was turned on, Rodriguez and Norwood told Mercado what to say. Exh. E, p. 11. She was told to say that Plaintiff killed Lucky and to name the other people involved. Exh. E, p. 11-12.

The third witness in the case was Mr. Larkland Martin (hereinafter "Martin"). According to the Defendants' Memorandum of Law, "While investigating a different murder on December 4, 1999, Rodriguez came upon Larkland Martin . . . ". Defendants'

8

memorandum of Law, p. 5. Martin told Rodriguez that in the early morning house of July 25, 1999, he had witnessed a shooting from the window of his third floor apartment at 630 Howard Avenue in New Haven. L. R. 2, Exhibit H, p. 2-3. 630 Howard Avenue is located on the west side of Howard Avenue, north of Columbus Avenue. Martin stated that after hearing 4-6 gunshots, he looked out the third floor window of his apartment. Exhibit O. He claimed to have seen a green car, maybe a Honda on Howard Avenue. Exhibit H, p. 2. Martin stated he saw a black male standing on the driver's side of the green car and two Hispanic males standing on the passenger side of the vehicle. Exhibit H, p. 3-4.

    Martin stated that he saw one of the Hispanic males shooting a hand gun at a jeep located to the right of Beirne's Pharmacy at the corner of Howard and Columbus Avenues. Beirne's Pharmacy is located at 615 Howard Avenue on the east side of Howard Avenue, south of Columbus Avenue at the southeast corner of Howard Avenue at Columbus Avenue. Exhibit O. Beirne's Pharmacy is located diagonally across Howard Avenue and south of 630 Howard Avenue. In order for Martin to have seen the intersection of Howard and Columbus Avenues from his third floor window, he would have to have looked to his right. Exhibits K, O. Martin stated that he had no difficulties seeing the events he described in his statement claiming there was sufficient lighting in the area for him to see what he claimed to have seen. Exhibit H, p. 12.

    Martin stated that the light sources were a light on the front porch of 630 Howard Avenue and several streetlights. Exhibit H, p. 12. On July 25, 1999, there were several tall trees covered with leaves grew in front of and to the south of 630 Howard Avenue. Exhibit K. The above-described trees blocked Martin's view of Howard Avenue in front

of his apartment and of the intersection of Howard and Columbus Avenues. Exhibit K. Because of the location of the trees, Martin could not have seen what he claimed to have seen.   The closest street lights on Howard Avenue to 630 Howard Avenue are located approximately 70 feet across Howard Avenue and 70 feet north of 630 Howard Avenue Exhibit L, ¶¶ 7-9. The front porch of 630 Howard Avenue is nearly 40 feet from the curb in front of 630 Howard Avenue. Exhibit L, ¶ 8.

On January 5, 2000, the Defendant Rodriguez submitted an arrest warrant application for the Plaintiff on charges of murder, conspiracy to commit murder, criminal possession of a firearm and unlawful possession of a pistol. Exhibit F. Rodriguez signed the affidavit in support of the arrest warrant application. According to the Rodriguez, Plaintiff ordered the death of McCann and Lucky was shot as a result by Santiago.

Upon information and belief, the January 5, 2000 arrest warrant application was the second such application made by the police. Some time prior to January 5, 2000, Rodriguez submitted another application for the Plaintiff's arrest for the Lucky murder. All attempts by the Plaintiff to obtain the first warrant application from the Defendants have been unsuccessful.

On January 8, 2001, Gary Session was arrested on the warrant. Exhibit P, ¶ 3. He remained incarcerated until November 15, 2001 when the state entered a *nolle prosequi* to the charges. Exhibit P, ¶ 21, 22. On August 12, 2002, the charges were dismissed. Id. ¶ 26 . Santiago and Johnson were both arrested and charged with murder and conspiracy to commit murder in the Lucky case. The charges against both were subsequently dismissed.

At the time of his arrest on January 8, 2001, Gary Session was the Plaintiff in a pending civil rights case alleging unreasonable use of force by members of the New Haven Police Department. Exhibit P, ¶38. His deposition in that case had been scheduled for January 8, 2001. Id.

## **LAW AND ARGUMENT**

The individual defendants claim that summary judgment should enter as to counts four (4) and seven (7) because the Plaintiff cannot prove a lack of probable cause to arrest, cannot establish claims for false arrest, false arrest, false imprisonment or malicious prosecution because he cannot prove that the underlying prosecution terminated in his favor and that they are entitled to qualified immunity. The Defendants further argue they are entitled to summary judgment on the Plaintiff's state law claims because he cannot establish a lack of probable cause to arrest to support his claims for false arrest, false imprisonment or malicious prosecution under Connecticut law, that this Court should decline to exercise its supplemental jurisdiction of Plaintiff's state law claims if it disposes of the Section 1983 claim, that they are immune from liability for their discretionary acts and that Plaintiff has failed to establish a claim for either intentional or negligent infliction of emotion distress. Each of those arguments will addressed in turn.

**A.    Standard for Summary Judgment.**

Motions for summary judgment are governed by Fed. R. Civ. P. 56. A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c) . See also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F. 3d 77, 82 (2d Cir. 2004). "[I]n assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought[.]" See Security Ins., 391 F.3d at 83, citing Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed 2d 202 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryan v. Maffucci, 923 F.2d 979, 982 (2d Cir.) citing Anderson, 477 U.S. at 250-51.

While the initial burden of demonstrating the absence of a genuine issue of material fact falls upon the moving party, once that burden is met, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," see Koch v. Town of Brattleboro, Vermont, 287 F.3d 162, 165 (2d Cir. 2002), citing Fed. R. Civ. P. 56(c), by a showing sufficient to establish the existence of every element essential to the party's case, and on which that party will bear the burden of proof at trial, see Peck v. Public Serv. Mut. Ins. Co., 326 F.3d 330, 337 (2d Cir. 2003), cert. denied, 540 U.S. 1005, 124 S. Ct. 540, 157 L. Ed. 2d 410 (2003).

**B.    42 U.S.C. § 1983 Generally**

In order to prevail on a claim under 42 U.S.C. § 1983, a plaintiff must establish the violation of a right secured by the Constitution and laws of the United States, and that the violation was committed by a person acting under color of state law.

### C. False Arrest and Imprisonment

Under the Fourth Amendment to the United States constitution, a person has the right to be free from an arrest not supported by probable cause. <u>Oliviera v. Mayer</u>, 23 F.3d 692 (2d Cir. 1994). In order to prevail on a claim for false arrest under 42 U.S.C. §1983, a Plaintiff must prove that (1) the defendant intentionally arrested him or had him arrested; (2) that the plaintiff was aware of the arrest; (3) that there was no consent to the arrest; and (4) that the arrest was not supported by probable cause. <u>Shattuck v. Town of Stratford</u>, 233 F. Supp. 2d 301, 306 (D. Conn. 2002). A § 1983 claim for false arrest and imprisonment derives from the "Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest without probable cause. In analyzing § 1983 claims for unconstitutional false arrest, [the Second Circuit has] generally looked to the law of the state in which the arrest occurred." <u>Jaegly v. Couch</u>, 439 F.3d 149, 152 (2d Cir. 2006). In order to establish a claim for false arrest and/or imprisonment under Connecticut law, a plaintiff must show that the defendant intentionally confined him without his consent and without justification. False imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another. <u>Green v. Donroe</u>, 186 Conn. 265, 267, 440 A.2d 973 (1982).

### D. Malicious Prosecution

Although § 1983 provides plaintiffs with a federal cause of action, [the Second Circuit] borrow[s] the elements of the underlying malicious prosecution from state law." <u>Washington v. County of Rockland</u>, 373 F.3d 310, 315 (2d Cir. 2004). In order to prevail in an action for malicious prosecution in Connecticut a plaintiff must prove that: (1) the defendant initiated or procured the institution of criminal proceedings against the

13

plaintiff, (2) the criminal proceedings have terminated in favor of the plaintiff, (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." McHale v. W.B.S. Corp., 187 Conn. 444, 448, 446 A.2d 815 (1982). "In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment . . . and establish the elements of a malicious prosecution under state law." Fulton v. Robinson, 289 F. 3d 188 (2d Cir. 2002) (internal citations omitted. [a plaintiff] must assert, in addition to the elements of malicious prosecution under state law, that there was . . . a sufficient post-arraignment liberty restraint to implicate the plaintiff's fourth amendment rights." Rohman v. New York City Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000) citing Murphy v. Lynn, 118 F.3d 938, 944-46 (2d Cir. 1997).

Plaintiff agrees with the Defendants that the threshold issue for the court is whether the Plaintiff's right to be free from arrest without probable cause has been violated. Plaintiff further agrees that this question is primary for a §1983 claim for false arrest, false imprisonment and malicious prosecution because the existence of probable cause to arrest is an absolute defense to false arrest and malicious prosecution claims. Vandersluis v. Weil, 176 Conn. 353, 356, 407 A.2d 982 (1978). On the other hand, "when the facts themselves are disputed, the court may submit the issue of probable cause . . . to the jury as a mixed question of law and fact." DeLaurentis v. New Haven, 220 Conn. 225, 253-54, 597 A.2d 807 (1991). In this case, the pleadings, affidavits and other documents clearly show a genuine dispute over the existence of probable cause to

arrest the Plaintiff, precluding summary judgment.

### 1. The Plaintiff Can Establish a Lack of Probable Cause to Arrest

The Defendants base their probable cause claim upon the issuance of an arrest warrant for the Plaintiff. Ordinarily, the issuance of an arrest warrant constitutes a probable cause finding by a neutral magistrate, thereby shielding the Defendants from any liability for false arrest or false imprisonment. However, when, as in this case, the Defendants deliberately omitted material information from the warrant application or knowingly included false information in the application, then the warrant will not protect them and they may be found liable for false arrest.

"An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Jaegly, 439 F.3d at 152. "Probable cause is a justification for, and a complete defense to, a claim for false arrest and imprisonment under both § 1983 and Connecticut law." Jocks v. Tavernier, 316 F.3d 128, 134-35 (2d Cir. 2003).

An arrest pursuant to a warrant signed by a neutral judge or magistrate normally carries a presumption that it was made with probable cause. Artis v. Liotard, 934 F. Supp. 101, 103, (S.D.N.Y. 1996) ("A magistrate's finding of probable cause in issuing a warrant creates a presumption that probable cause existed."); see also United States v. Ventresca, 380 U.S. 102, 109, 13 L.Ed. 2d 684, 85 S. Ct. 741 (1965). ("Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely

determined by the preference to be accorded to [search] warrants."). And, a plaintiff who argues that a warrant was issued on less than probable cause faces "heavy burden." Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991), citing Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991). However, "a plaintiff can demonstrate that this right [not to be arrested without probable cause] was violated where the officer submitting the probable cause affidavit 'knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit' or omitted material information, and that such false or omitted information was 'necessary to the finding of probable cause'." Soares v. State of Connecticut, 8 F.3d 917, 920 (2d Cir. 1993), quoting Golino, 950 F.2d at 87-71; see also Artis, 934 F. Supp. at 103. (presumption of validity "is rebuttable only though proof of fraud, perjury or the misrepresentation or falsification of evidence"); Franks v. Delaware, 438 U.S. 154, 155-56, 57 L.Ed. 2d 667, 98 S. Ct. 2674 (1978). Recklessness may be inferred where the omitted information was critical to the probable cause determination. Golino, 950 F.2d at 871.

"The right to be free from arrest, in the absence of probable cause, encompasses the right to be free from an arrest based on a warrant that would not have been issued if the officer seeking the warrant had disclosed to the issuing magistrate information within the officer's knowledge that negated probable cause information within the officer's knowledge that negated probable cause." Smith v. Edwards, 175 F.3d 99, 105 (2d Cir. 1999) quoting Brown v. D'Amico, 35 F.3d 97, 99 (2d Cir. 1994). In civil rights cases involving the claim of false arrest or prosecution without probable cause, a court "put[s] aside allegedly false information, suppl[ies] any omitted information and determine[s] whether the contents of the corrected affidavit would have supported a finding of

16

probable cause." Soares, 8 F.3d at 920, citing Cartier v. Lussier, 955 F.2d 841, 845 (2d Cir. 1992) and Magnotti v. Kuntz, 918 F.2d 364, 368 (2d Cir. 1990). If probable cause remains, no constitutional violation of the plaintiff's Fourth Amendment rights has occurred. Id., citing Cartier, 955 F.2d at 845. However, where the officers were acting unreasonably from the start, by browbeating and intimidating an informant into supporting and repeating a story they knew to be false and deliberately omitted critical information that fatally undermined the credibility and reliability of the remaining witnesses, they cannot plausibly claim to have possessed probable cause.

The Motion for Summary Judgment must be denied. Plaintiff has produced sufficient facts to demonstrate that there are genuine issues of facts for trial. The withheld information concerning the "Big Three" witnesses, Adkins, Mercado and Martin, the facts showing the coercion and threats directed to Mercado and her repudiation of her prior statements established numerous, substantial questions regarding the existence of probable cause to arrest the Plaintiff that may only be resolved at trial. Those disputed issues include which version, if either, of the shooting is correct and which events, if any, described by Adkins, Mercado and Martin actually occurred.

Any probable cause to be found in the arrest warrant was based almost entirely upon the statements of Adkins, Mercado and Martin. However, when the court considers the withheld information, pertaining to each witness and excludes the false information from the warrant, it will be clear that the Defendants are not entitled to summary judgment or qualified immunity. Each Witness will be discussed in turn.