Westlaw.

Not Reported in F.Supp.2d                                                                                                  Page 1

Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Briefs and Other Related Documents
DeMaine v. SamuelsD.Conn.,2000.Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.
Ronald DEMAINE
v.
Paul SAMUELS, et al.
No. 3:99CV34 (JBA).

Sept. 25, 2000.

Jon L. Schoenhorn, Law Offices of Jon L. Schoenhorn, Hartford, CT, Tracey Melinda Lane, Schoenhorn & Assoc., Hartford, CT, for Ronald Demaine, plaintiff.
US Court of Appeals, Office of the Clerk U.S. Courthouse, Foley Square, New York, NY, for U.S. Court of Appeals, notice only.
Robert Bishop Fiske, III, Jane B. Emons, Attorney General's Office, Hartford, CT, for Paul Samuels, defendant.
Robert Bishop Fiske, III, Jane B. Emons, (See above), for Edmund Brunt, defendant.
Robert Bishop Fiske, III, Jane B. Emons, (See above), for Marcia Youngquist, defendant.
Robert Bishop Fiske, III, Jane B. Emons, (See above), for George Battle, defendant.
Robert Bishop Fiske, III, Jane B. Emons, (See above), for Robert Carona, defendant.
Robert Bishop Fiske, III, Jane B. Emons, (See above), for Peter Wack, defendant.

*Ruling on Motion for Summary Judgment [Doc. # 35]*
ARTERTON, J.
*1 This case is a civil rights action alleging violations of plaintiff Ronald DeMaine's Fourth Amendment rights by six members of the Connecticut State Police Division of Internal Affairs. DeMaine, a Connecticut State Police detective, claims that defendants Paul Samuels, Edmond Brunt, Marcia Youngquist, George Battle, Robert Corona and Peter Wack illegally searched his desk, day planner, computer and state-police-issued car without a warrant or probable cause, and illegally seized him by detaining him for two hours during the search in violation of the Fourth Amendment, and seeks damages under 42 U.S.C. § 1983 (Count 1). DeMaine also asserts state law claims of false arrest and imprisonment, and intentional infliction of emotional distress (Count 2).

I. Factual Background

The following summary is taken from defendants' Rule 9(c) Statement of Undisputed Facts [Doc. # 35] and plaintiff's Local Rule 9(c) Counter-Statement of Undisputed Facts [Doc. # 40]. FN1 For purposes of this motion for summary judgment, defendants have accepted as true all of the factual allegations set forth in DeMaine's amended complaint. *See* Doc. # 35, at ¶ 21.

> FN1. Although **Local Rule 9(c)2** clearly requires the opponent of summary judgment to "state[ ] in separately numbered paragraphs corresponding to the paragraphs contained in the moving party's Local Rule 9(c)1 **Statement** whether each of the **facts** asserted by the moving party is admitted or denied" and to "include in a separate section a list of each issue of **material fact** as to which it is contended there is a genuine issue to be tried," plaintiff here submitted only a "Counter-Statement of Undisputed **Facts**," which does not admit or deny any of the **facts** alleged in defendants' 9(c)1 **Statement** and fails to separately identify any issues of **material fact** that remain to be tried. Plaintiff's "Counter-Statement" does not contest any of the facts asserted in the defendants' Statement, and the sole fact

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

contested by DeMaine's affidavit supporting his Counter-Statement, regarding whether he was offered union representation, is not material to the dispute at hand. This Court therefore treats the facts contained in defendants' 9(c)1 Statement of Undisputed Facts as admitted, and assumes that there are no genuine issues of material fact in dispute.

At the time of the events giving rise to this action, DeMaine was a Connecticut State Trooper First Class, with the rank of detective. He was assigned to the New Haven office of the Statewide Cooperative Crime Control Task Force ("SCCCTF") gang unit. DeMaine has been employed as a state police trooper in the Connecticut Department of Public Safety for at least thirteen years. *See* Doc. # 35, at ¶ 22.

The SCCCTF is governed by the Connecticut State Police Administration and Operations Manual ("A & O Manual"). *Id.* at ¶ 4. The A & O Manual in effect from May 1, 1998 provides that "[t]roopers and other employees of the department are subject to all applicable manual directives, state laws and regulations." *Id*., Def. Ex. A. DeMaine possessed a copy of the A & O Manual, and signed a receipt form indicating that he was issued a copy of the current manual on August 5, 1998. *Id.* at ¶ 20; Def. Ex. J. The A & O Manual provides for regular inspections of issued equipment and that:
The Department reserves the right to inspect issued equipment at any other time for reasonable purposes.
* * *
Any personal item located in or on department property shall be so kept at the risk of the person keeping it there. (1) The department is not responsible for loss or damage to personal property. (2) The personal property of a trooper located on department property or within a department vehicle is subject to inspection or seizure without notice even if the trooper has locked any container or place where the property is kept.

Def. Ex. A, §§ 13.2.1d and 13.2.2a(1)-(2). DeMaine's affidavit states that prior to December 1, 1998, he was unfamiliar with § 13.2 .2, and his deposition testimony indicates that he was not familiar with either §§ 13.2.1d or 13.2.2a. *See* Doc. # 40, DeMaine aff. at ¶ 4; Deposition of Ronald DeMaine ("DeMaine dep.") at pp. 95-96.

*2 On the morning of December 1, 1998, two of the defendants, Lieutenant Brunt and Sergeant Wack of the Connecticut State Police Division of Internal Affairs ("IA"), interviewed Connecticut State Police ("CSP") Sergeant Crawford as part of an on-going IA investigation of suspected overtime abuses by certain officers assigned to the New Haven SCCCTF gang unit. This investigation had been started after IA received a complaint from Lieutenant Sweetman, the SCCCTF commanding officer. DeMaine was not a subject of this investigation because he had not been working the day of the suspected overtime abuses. Doc. # 35, at ¶ 6.

IA has authority to conduct administrative investigations into alleged misconduct by employees of the Department of Public Safety; it does not have authority to investigate criminal behavior or misconduct, and does not have the authority to arrest or issue warrants. If IA discovers information or evidence of criminal wrongdoing during the course of its investigation, it may notify the Bureau of Criminal Investigations, which will conduct an independent criminal investigation if necessary. *Id.* at ¶ 3.

During his interview, Sergeant Crawford told defendants Brunt and Wack that DeMaine had been keeping notes regarding the activities of other members of the SCCCTF unit. Sergeant Crawford was a supervisor in the Bridgeport SCCCTF unit, and had information about other task force units because detectives were regularly shared between the units; in particular, a Detective Azzaro who had previously worked in the New Haven office with DeMaine had recently been transferred to Crawford's unit in Bridgeport. *Id.* at ¶ 8. Crawford told Brunt and Wack that both Azzaro and DeMaine's supervisor, Sergeant Luther, had spoken to him about DeMaine's note-keeping, and that it was "common knowledge" that DeMaine kept notes of the times of other people's comings and goings. Crawford also said that he had discussed DeMaine's note-taking with Lieutenant Sweetman. *Id.* at ¶ 9.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 3

Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d)

FN2

> FN2. Although Sweetman stated in his deposition that prior to Dec. 1, 1998, he had spoken with DeMaine's supervisor Luther about DeMaine's note-keeping, and that Luther told Sweetman it was taken care of, *id.,* there is no evidence about whether Crawford was aware that DeMaine had been instructed to stop keeping notes.

Based on this information from Crawford, Lieutenant Brunt believed that the notes DeMaine allegedly had taken about his co-workers' comings and goings could be helpful to IA's investigation of possible overtime abuses at the New Haven SCCCTF. *Id.* at ¶ 10. Brunt also believed the fact that DeMaine was keeping such notes indicated that there might be other problems with the unit. *Id.* Because of the potential importance of DeMaine's notes, Brunt notified Captain Samuels, his commanding officer, and told him about the notes. *Id.* at ¶ 11. Samuels and Brunt then scheduled a meeting with Major Wheeler, the Commanding Officer for the Bureau of Criminal Investigations, and Lieutenant Sweetman. *Id .* at ¶ 12.[FN3] Before leaving the office, Brunt instructed Youngquist, Battle and Corona to go to the New Haven SCCCTF office, secure it, and await further instructions. *Id.* at ¶ 13. Brunt believed it necessary to immediately secure the office to prevent the destruction or removal of relevant evidence; he also wanted assistance at SCCCTF if a large amount of material was discovered. *Id.* at ¶ 13.

> FN3. Samuels testified that he informed Captain Wheeler of the need to search for DeMaine's notes out of courtesy, because the SCCCTF is ultimately under the control of the Bureau of Criminal Investigations, and Wheeler was thus DeMaine's commanding officer. *See* Deposition of Paul Samuels ("Samuels dep.") at pp. 23-24.

*3 Later that morning, Samuels and Brunt met Sweetman at Major Wheeler's office. They discussed the information they had learned from Crawford about DeMaine's note-taking. *Id.* at ¶ 14. During the meeting with Wheeler, they contacted Colonel Bardelli, and informed him that they believed it was necessary to search for DeMaine's files or notes, and asked for his permission. Bardelli gave them permission to search for DeMaine's notes, after concluding that it was within their authority to do so under the provisions of the A & O Manual. *Id.* at ¶ 15.

The defendants had no interest in any of DeMaine's personal belongings or information; they were searching only for any information pertaining to the comings and goings of Sergeant Luther (one of those suspected of overtime abuses), and any files concerning investigations or other reports by other detectives in the unit that DeMaine might have kept in his desk. *Id.* at ¶ 16.

DeMaine was on duty on Dec. 1, 1998, and was working the day shift in the New Haven SCCCTF office. *Id.* at ¶ 17. DeMaine was inside the SCCCTF unit building when defendants Youngquist, Carona and Wack arrived and ordered members of the unit, including the plaintiff, to leave the building.[FN4] They complied. Samuels and Battle arrived while DeMaine and the other members of the unit were waiting outside. They instructed all members of the SCCCTF unit to return to the unit office. *Id.* at ¶ 23. All the defendants were inside the office when Samuels ordered all members of the unit, except DeMaine, to again exit the building. Samuels then announced to DeMaine's co-workers that DeMaine was a witness to their alleged misconduct, and ordered DeMaine to remain in the unit. DeMaine was surrounded by the defendants who were all superior ranking officers in possession of weapons. *Id.* at ¶ 24.[FN5] DeMaine was detained by the defendants. *Id.* at ¶ 25.

> FN4. There is some minor disagreement over the sequence of events that followed. This Court accepts plaintiff's version of the events, as true for purposes of this motion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00943-AWT    Document 101-3    Filed 02/05/2007    Page 4 of 13

Not Reported in F.Supp.2d                                                                                                Page 4

Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d)

> Although plaintiff claims that Youngquist, Carona and Wack arrived together, defendants' version of the events is that Battle, not Wack, arrived with Youngquist and Carona, and that Wack and Brunt, not Battle, arrived later to meet Samuels. This discrepancy is not material.
>
> FN5. According to defendants' Rule 9(c) statement, when Samuels arrived at the SCCCTF unit, he saw DeMaine waiting outside. He informed DeMaine that he was a witness to an IA investigation, and asked DeMaine to go back inside the building; DeMaine complied. *Id*. at ¶ 17. Sweetman and Brunt then arrived, and they entered the unit with Samuels. *Id.* at ¶ 18. Samuels, Brunt and Sweetman were all in plainclothes, and neither Brunt or Samuels were armed, although DeMaine and the other defendants were armed. *Id.* at ¶ 18. After defendants Samuels and Brunt and Lieutenant Sweetman entered the SCCCTF unit, they again told DeMaine that he was a witness, and they offered him an opportunity to request union representation numerous times, but DeMaine declined after each offer. *Id.* at ¶ 19.
> As noted above, defendants have indicated that they accept as true for purposes of this motion for summary judgment all of DeMaine's factual allegations in his amended complaint, and DeMaine has identified no material facts in dispute. Where there are contradictions, however, this Court accepts DeMaine's version of the events as true.

Samuels then informed DeMaine that he intended to search DeMaine's desk, day planner, computer and car, despite DeMaine's objections that defendants were not to search his personal belongings. When DeMaine attempted to observe the scope and extent of the search of his personal belongings, Samuels ordered Brunt and Carona to take DeMaine outside. Once outside, DeMaine was detained by Brunt and Carona, and was escorted to a rear wall while he was not permitted to leave or move about freely. *Id.* at ¶ 26. DeMaine was then ordered to return to the SCCCTF building, where he observed defendant Youngquist reviewing his employment evaluations and other personal items that he had in his desk. DeMaine's personal day planner was also seized and searched at Samuels' order. *Id.* at ¶ 27.

DeMaine's vehicle was issued by the state police to him, and he was exclusively assigned to it. DeMaine stored personal effects and clothing in the vehicle. *Id.* at ¶ 28. While DeMaine was outside with the defendants, they searched his CSP-issued car. After the search of the vehicle failed to uncover any relevant material, plaintiff was again ordered to return to the SCCCTF unit office, where he was questioned about notations on his day planner. *Id.* at ¶ 29.[FN6]

> FN6. DeMaine testified in his deposition that he was asked about his day planner while the defendants were searching his desk, and he told Samuels that it was in his car. At that point, Samuels ordered two of the defendants to take DeMaine outside to the car to search for the day planner. DeMaine unlocked the car at their request, and they searched the car. Before they started searching, DeMaine picked up his day planner and his son's employment application and told them these were personal. One of the defendants looked through the employment application, despite DeMaine's protests. They then returned to the building, with DeMaine carrying a bag with his day planner inside. When he was asked to turn over the day planner, DeMaine stated that it was personal, but eventually turned over the day planner to Sweetman for him to review because he felt that he had no choice other than to comply with Samuels' request for the day planner. *See* DeMaine dep. at pp. 54-65.

*4 After approximately two hours, defendants released DeMaine and departed. *Id.* at ¶ 30. None of the defendants physically restrained DeMaine or threatened him with administrative sanctions or arrest. *Id.* at ¶ 31. DeMaine was never arrested or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

charged with any crime. *Id.*

Defendants have moved for summary judgment on DeMaine's § 1983 count, and have asked this Court to dismiss the remaining state law claims. Defendants argue that DeMaine had no objectively reasonable expectation of privacy in the places and things searched, or alternatively, that the search was an administrative or workplace search conducted for the purpose of investigating work-related misconduct by officers other than DeMaine and thus subject to a lower standard of "reasonableness" than probable cause or a warrant. Finally, defendants argue that to the extent their actions did violate the Fourth Amendment, they are protected by qualified immunity.

## II. Discussion

In a motion for summary judgment under Fed.R.Civ.P. 56, this Court must resolve any factual ambiguities and draw all factual inferences in favor of the non-moving party. *See Gottlieb v. County of Orange,* 84 F.3d 511, 519 (2d Cir.1996). However, the opposing party may not simply rely on the allegations in his pleading, conclusory statements, or mere assertions that the affidavits supporting the motion for summary judgment are not credible. *See Knight v. Fire Ins. Co.* 804 F.2d 9, 12 (2d Cir.1986); *cert. denied,* 480 U.S. 932 (1987). Instead, the non-moving party is required to come forward with materials "setting forth specific facts showing that there is a genuine issue of material fact to be tried." *Gottlieb,* 84 F.3d at 518.

The Supreme Court has indicated that in any § 1983 action, whether the plaintiff's constitutional rights have in fact been violated should be decided before turning to the issue of qualified immunity for the alleged violations. *See Wilson v. Layne,* 526 U.S. 603, __, 119 S.Ct. 1692, 1696-97 (1999); *County of Sacramento v. Lewis,* 523 U.S. 883, 842 n.5 (1998); *Siegert v. Gilley,* 500 U.S. 226, 232 (1991); *X-Men Security Inc. v. Pataki,* 196 F.3d 56, 66 (2d Cir.1999). As the Supreme Court explained in *Sacramento v. Lewis,* "if the policy of [avoiding unnecessary constitutional questions] were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals." 523 U.S. at 842 n.5.

However, the Second Circuit found that the Supreme Court did not "intend[ ] to command the lower courts to abandon a widespread practice and a generally recognized precept of avoiding unnecessary constitutional adjudication." *Horne v. Coughlin,* 191 F.3d 244, 248 (2d Cir.), *cert. denied,* 120 S.Ct. 594 (1999). In *Horne,* the Second Circuit stated that "lower courts must be mindful of factors and circumstances that often justify addressing the merits of constitutional claims, even though qualified immunity would supply a sufficient ground for decision." *Id.* at 249. The key factors to consider are the likelihood that the question will escape federal review for a significant period of time and the egregiousness of the conduct at issue. *Id.* Moreover, the Second Circuit noted, "where defendants are entitled to qualified immunity, it is more consistent with traditional principles of restraint to reach the merits when the constitutional right in question does not exist than when it does; in the former circumstance, the finding of no right is the holding, and the court is not declaring new constitutional rights in dictum that cannot be appealed." *Id.*

*5 Because this Court concludes that Mr. DeMaine's opposition to summary judgment does not demonstrate any violation of his constitutional rights by the defendants, the analysis here begins, and ends, with that issue.

### A. *The search*

DeMaine argues that the warrantless search of his desk, computer, police-issued car and day planner violated the Fourth Amendment. Defendants claim that DeMaine's expectation of privacy in the places searched was not objectively reasonable. In addition, they argue that the search was an investigative search related to workplace misconduct, and thus not subject to the warrant and probable cause standard.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d)

*1. DeMaine's expectation of privacy*

Before turning to the question of which standard applies to the searches at issue here, this Court must first determine whether DeMaine had a reasonable expectation of privacy in the places searched. *See Smith v. Maryland,* 442 U.S. 735, 739 (1979). This expectation must be both subjectively and objectively reasonable. *See id.* "Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." *O'Connor v. Ortega,* 480 U.S. 709, 718 (1987) (plurality op.).

Defendants concede that DeMaine had a subjective expectation of privacy in the places that they searched-his desk, computer, CSP-issued car and day planner. *See* Doc. # 35. However, they argue that this expectation was not objectively reasonable because through his receipt of the A & O Manual, DeMaine had notice of the CSP regulations providing that the department reserves the right to inspect issued equipment at any time for reasonable purposes and that any personal property located on or within department property, including a state-issued automobile, is subject to inspection or seizure without notice. Defendants further argue that DeMaine's subjective expectation of privacy in his workplace, state-issued car and any personal property kept there is not objectively reasonable because an employee has a reduced expectation of privacy in his work-place from work-related searches by his or her employer.

DeMaine does not contest the fact that he received the A & O manual, but states that he did not read it and was thus unaware of the policy. *See* Doc. # 40, at ¶ 2; DeMaine Aff. at ¶ 4. Although government employees do not lose their Fourth Amendment rights merely by virtue of the fact that they work for the government, "[p]ublic employees' expectations of privacy in their offices, desks, and file cabinets ... may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *O'Connor,* 480 U.S. at 717.

In *Security and Law Enforcement Employees, Dist. Council 82 v. Carey,* 737 F.2d 187 (2d Cir.1984), the Second Circuit considered whether warrantless strip searches and visual body-cavity searches of prison guards in an effort to stem the flow of contraband into the prison violated the Fourth Amendment. Noting first that "correction officers, as non-convicted, non-detained and unincarcerated individuals, surely possess expectations of privacy," *id.* at 201, the court found that the fact that each correction officer had received a rule book which provided that " 'All persons on institution property and any employee while on duty shall be subject to search,' " *id.* at 193, meant that "their subjective expectations necessarily were diminished significantly." *Id.* at 202. However, the court went on to reject the argument that accepting employment and receipt of the rule book constituted consent to an otherwise unlawful search. *See id.* at 202 n. 23 (noting that the burden of proving that consent to a search was voluntarily and freely given lies with the person asserting consent as a defense).

*6 Defendants' argument that by accepting employment with the department and using department property DeMaine "voluntarily relinquished" his rights to object to the searches at issue here thus must be rejected because the defendants have not offered any specific evidence that DeMaine voluntarily and freely consented to the search of his desk, computer, car and day planner, as required under *Security and Law Enforcement Employees.* Indeed, as noted above, DeMaine stated that he was unaware of the regulations because he did not read the entire manual. However, while receipt of the manual and the existence of the policy providing for searches does not prove that DeMaine consented to the search, these are nonetheless "appropriate ... factors to be taken into account in determining" whether DeMaine's expectation of privacy was objectively reasonable. *Id.* at 202 n. 23.

Where a regulation provided notice that the locations might be searched, many courts have found that employees' subjective expectations of privacy in their desks, offices or lockers at work are not objectively reasonable. *See, e.g., Los Angeles Police Protection League v. Gates,* 579 F.Supp. 36, 44 (C.D.Cal.1984) (police trooper has no reasonable expectation of privacy in station locker

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 7
Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

where California regulation provides that locker can be searched under various circumstances); *Shaffer v. Field,* 339 F.Supp. 997, 1003 (C.D.Cal.1972) (deputy sheriff had no reasonable expectation of privacy in his department locker where the lockers were owned by the department, the locks given to the sheriffs had both keys and combinations but the commander kept a master key and the combination to all locks, the lockers and locks could be changed at will, and on at least three occasions in the past, deputies' lockers had been searched without permission); *see also United States v. Bunkers,* 521 F.2d 1217, 1220-21 (9th Cir.1975) (postal worker had no reasonable expectation of privacy in her locker where employee was aware of postal regulations providing that lockers were subject to search by supervisors and inspectors); *American Postal Workers Union, Columbus Area Local AFL-CIO v. United States Postal Service,* 871 F.2d 556, 560-61 (6th Cir.1989) (no reasonable expectation of privacy in postal employees' lockers where employees had signed waiver forms acknowledging right to search, collective bargaining agreement provided for right to inspect lockers, and the fact that this was the first time the supervisors had implemented this authority did not create a reasonable expectation of privacy).

In contrast, a small number of cases have found an expectation of privacy by government employees in their offices, desks or person, notably in cases where there was no regulation providing notice that searches might occur. *See, e.g., United States v. Taketa,* 923 F.2d 665, 672-73 (9th Cir.1991) (reasonable expectation of privacy in airport DEA agent's office despite the fact that some other employees had access to the office, where no regulation provided for a right of inspection, and the "office was not open to the public, and was not subjected to regular visits of inspection by DEA personnel"); *United States v. Speights,* 557 F.2d 362, 363-64 (3d Cir.1977) (reasonable expectation of privacy in police locker where no regulation or notice stated that lockers might be searched, officers were permitted to use personal locks to secure their lockers, and no regulations forbade officers to keep personal items in their lockers); *Security and Law Enforcement Employees, Dist. Council 82,* 737 F.2d at 208 (concluding that "given the magnitude of the indignity involved" in visual body cavity searches, even the existence of a regulation did not overcome the prison guards' objectively reasonable expectations of privacy). In *Speights,* the Third Circuit explicitly distinguished the cases finding that officers had no expectation of privacy in their police lockers as all relying "on specific regulations and practices" to support their "finding that an expectation of privacy was not reasonable." *Id.* at 365.

*7 Thus, the fact that the A & O Manual authorizes searches of police-issued equipment at any time for reasonable purposes and any personal property located on or within department property, including a state-issued automobile, weighs heavily in the determination of the reasonableness of the search here. However, the existence of the policy does not, on its own, dispose of the question. *See Chenkin v. Bellevue Hospital Center,* 479 F.Supp. 207, 213 (S.D.N.Y.1979) ("the mere announcement ... that packages are subject to search is not enough either to change the plaintiff's expectations or to legitimate the inspection system"). As the court noted in *Chenkin,* "[i]f this argument were accepted, the government and quasi-public institutions would gain broad power to refashion the contours of the Fourth Amendment merely by proclamation." *Id.*

Here, the defendants searched DeMaine's desk, computer, personal day planner, CSP-issued vehicle and various personal items in it. *See* Doc. # 39 at p. 10. Although some of the defendants apparently told DeMaine that they were not interested in any of his personal belongings, they nonetheless continued to search items that DeMaine identified as personal and private, such as an envelope containing his son's employment application and his day planner.

With respect to the search of DeMaine's desk and computer, this Court finds that his expectation of privacy was not objectively reasonable. First, DeMaine himself has conceded that "his computer and even his regularly locked desk may not fall within the ambit of a reasonable expectation of privacy." Doc. # 39, at p. 10. Moreover, DeMaine's own testimony indicates that he shared his computer with other detectives, *see* DeMaine dep. at pp. 23-24, and defendants have submitted an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00943-AWT    Document 101-3    Filed 02/05/2007    Page 8 of 13

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
(Cite as: Not Reported in F.Supp.2d)

uncontroverted exhibit indicating that all state employees had notice that their use of state computers was subject to monitoring. [Defendant. Ex. I]. The only evidence provided by DeMaine to support his claim of an objective expectation of privacy in his desk is his claim that he locked it regularly. *See* DeMaine dep. at 26-28. Given the regulation and the fact that the desk was state property, this Court finds that the expectation of privacy in DeMaine's desk is analogous to that of other officers' in their police lockers, and, as those cases found under similar circumstances, was not objectively reasonable. *See Los Angeles Police Protection League v. Gates,* 579 F.Supp. 36, 44 (C.D.Cal.1984); *Shaffer v. Field,* 339 F.Supp. 997, 1003 (C.D. Cal.1972); *see also Gossmeyer v. McDonald,* 128 F.3d 481, 490 (7th Cir.1997) (state child protection investigator's expectation of privacy in her desk was not reasonable despite the fact that she locked her desk because the desk was " part of the 'workplace,' not part of [her] personal domain"); *see also Sheppard v. Beerman,* 18 F.3d 147, 152 (2d Cir.) (law clerk's expectation of privacy in office desk not objectively reasonable because nature of employment relationship calls for free flow of information), *cert. denied,* 513 U.S. 816 (1994).

*8 With respect to the search of the CSP-issued car, this Court similarly finds that DeMaine's expectation of privacy was not objectively reasonable. According to DeMaine's testimony, he had been instructed to use his CSP-issued car during non-work times for his personal use, not simply for police business. Doc. # 39, at p. 11. The car was not his personal car, however, and the A & O regulation clearly provided that the car and all items within it were subject to search at any time. Moreover, as the Supreme Court has held, all automobile drivers "possess a reduced expectation of privacy with regard to the property that they transport in cars, which travel public thoroughfares, seldom serve as the repository of personal effects, are subjected to police stop and examination to enforce pervasive governmental controls as an everyday occurrence, and, finally, are exposed to traffic accidents that may render all their contents open to public scrutiny." *Houghton v. Wyoming,* 526 U.S. 295, 303 (1999) (internal quotation marks and citations omitted). Under all these circumstances, DeMaine's expectation of privacy with respect to the CSP-issued car was not objectively reasonable.

The only remaining issue is whether the search of DeMaine's personal day planner violated an objectively reasonable expectation of privacy. DeMaine testified that he informed the defendants that the information they were looking for was not in his day planner, and that it contained only personal information. *See* DeMaine dep. at 62-63. Although "the workplace includes those areas and items that are related to work and are generally within the employer's control ..., not everything that passes through the confines of the business address can be considered part of the workplace context ." *O'Connor,* 480 U.S. at 715-16. As an example, the Court stated that a closed piece of personal luggage or a briefcase or purse that an employee brings to work remains personal property, and the standard for a "workplace search does not necessarily apply." *Id*. at 716.

This Court finds, therefore, that DeMaine may have had an objectively reasonable expectation of privacy in his personal day planner. Even assuming that this expectation was objectively reasonable, however, because this Court concludes in the following analysis that the defendants' search of the day planner was reasonable under the circumstances, the search did not violate the Fourth Amendment.

*2. Reasonableness of the search*

The Fourth Amendment prohibits "unreasonable searches and seizures" and requires that any search warrant be supported by probable cause. *See Gudema v. Nassau Cty.,* 163 F.3d 717, 721 (2d Cir.1998). While probable cause and the warrant requirement are generally relevant to the determination of reasonableness, "in certain limited circumstances neither is required." *New Jersey v. T.L.O.,* 469 U.S. 325, 340 (1985) (quotations omitted).

In *O'Connor v. Ortega,* a plurality of the Supreme

Not Reported in F.Supp.2d    Page 9
Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

Court held that non-criminal searches investigating work-related misconduct did not require either a warrant or probable cause. 480 U.S. 709 (1987). In balancing the privacy interests of government employees with the government's need for supervision, control and the efficient operation of the workplace, the Court noted that while "the legitimate privacy interests of public employees in the private objects they bring to the workplace may be substantial, ... the realities of the workplace ... strongly suggest that a warrant requirement would be unworkable." *Id.* at 721.

*9 The Supreme Court distinguished work-place searches from police "searches to obtain evidence for criminal or other enforcement proceedings," noting that "requiring an employer to obtain a warrant whenever the employer wished to enter an employee's office, desk or file cabinets for a work-related purpose would seriously disrupt the routine conduct of business and would be unduly burdensome." *Id.* at 722. It also noted that unlike police, who are "in the business of investigating the violation of criminal laws," civilian supervisors are unfamiliar with warrant procedures and "the subtleties of the probable cause standard." *Id.* at 722, 724-25. Based on these distinctions, as well as on the latitude necessary to ensure efficient operation of the government agency and the agency's interest in prompt investigation and prevention of work-related misconduct by government employees, the plurality concluded that the appropriate standard for "searches conducted pursuant to an investigation of work-related employee misconduct ... should be judged by a standard of reasonableness under all the circumstances. Under this reasonableness standard, both the inception and scope of the intrusion must be reasonable." *Id.* at 724-25.

The *O'Connor* plurality noted that "[t]he operational realities of the workplace ... may make some employees' expectations of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official." *Id.* at 718. The "supervisors" in *O'Connor* were hospital personnel assigned responsibility for investigating alleged wrongdoing by Mr. Ortega. Plaintiff makes much of this distinction between a search by civilian supervisors and one by law enforcement officials. Here, the "supervisors" were members of IA responsible for non-criminal administrative investigations of wrongdoing within the police force. The fact that these investigators are also law enforcement officials is not enough to take this case outside of *O'Connor*'s purview. *See Gudema,* 163 F.3d at 722-23 (applying *O'Connor* standard to non-criminal investigation of county police officer by superior officers). The critical issue here is not the status of the supervisors, but rather the distinction between criminal and non-criminal investigations. *Cf. Cerrone v. Cahill,* 84 F.Supp.2d 330, 334-36 (N.D.N.Y.2000) (where targeted police misconduct relates to a criminal investigation, even if it arises out of work-related misconduct, probable cause is the appropriate standard).

Although DeMaine attempts to argue that there is a dispute as to the purpose of the search, he submits no evidence to support this claim.[FN7] The uncontroverted testimony of the defendants indicates that the search of DeMaine's day planner was part of a non-criminal investigation of work-related misconduct by Sergeant Luther and other state police officers. DeMaine was never a target of any criminal investigation or charges. In fact, he was never even a subject of the administrative investigation, but was instead just a witness.[FN8] Therefore, *O'Connor* provides the appropriate standard to judge the search of DeMaine's day planner.

> FN7. First, Plaintiff claims that because defendants Rule 9(c) Statement states that Brunt believed both that the notes would be relevant to the overtime abuse investigation *and* that they indicated that other violations might be occurring, the purpose of the search is in dispute, and summary judgment is thus inappropriate. *See* Doc. # 39, at p. 21. Contrary to the plaintiff's position, this Court does not see " an inherent factual conflict between the defendants' stated positions as to why they" searched DeMaine's desk, car and day planner. *Id.* Second, plaintiff argues that defendants' explanation of the purpose for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                               Page 10
Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

the search "is a ruse" because defendants relied on information that Sweetman had obtained from Luther, and Sweetman previously had told Luther to take care of the issue of DeMaine's note-taking. According to plaintiff, the explanation given for the search must therefore be untrue, since otherwise "Sergeant Luther-one of the very police officers suspected of internal misconduct-would never have been allowed to 'take care of that issue' of the plaintiff's alleged recording of the Sergeant's (and other's) misdeeds." *Id.,* at p. 19.

However, Plaintiff ignores the timing of these conversations: Sweetman spoke to Luther about DeMaine's note-taking prior to the incident involving suspected overtime abuses, and therefore at a time when there was no reason not to allow Luther to take care of the alleged problem. *See* Deposition of James Sweetman at p. 21. Plaintiff has submitted no evidence suggesting that the purpose of the search was other than as stated by Brunt. This Court therefore finds no material dispute as to the purpose of the search, which was to discover material relating to the suspected overtime abuses by members of the SCCCTF gang unit in New Haven. The fact that Brunt believed he might also find additional material relating to other wrongdoing is immaterial. *See Whren v. United States,* 517 U.S. 806, 811-17 (1996) (motive of the officers irrelevant to determining whether search was reasonable).

FN8. The Court agrees with DeMaine's contention that " 'it would be anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." ' Doc. # 39, at 20 (*quoting O'Connor v. Ortega* ). However, the Court disagrees with DeMaine's leap from that fundamental principle to the argument that it is therefore "intolerable to subject a mere witness to such intrusions based upon this same justification used to single out targets of an investigation." Doc. # 39, at 21. Because the risk of criminal prosecution is even lower for a "mere witness" than it is for the subject of an investigation, this Court believes that if anything, the fact that DeMaine is a witness offers further justification for the application of the lower standard from *O'Connor.*

*10 Under *O'Connor,* a search is reasonable at its inception when the supervisor has "reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a needed file." 480 U.S. at 726. A search is reasonable in its scope when the measures adopted are reasonable related to the objectives of the search, and are not excessively intrusive in light of the nature of the alleged misconduct. *See id.*

Based upon information they received from Sergeant Crawford and Lieutenant Sweetman, defendants had reason to believe that DeMaine had taken notes of his co-workers' comings and goings. If DeMaine had such notes, they were clearly relevant to the suspected overtime abuses, since they would provide evidence of when the officers in question were actually at work. Although Samuels testified that he did not consider whether Crawford was reliable, *see* Doc. # 39, at 22, and the testimony of Crawford and Sweetman was based on hearsay, the identity of the sources alleged to have personal knowledge was known to all the defendants. Courts have found reasonable belief based on "highly suspect evidence," *see Shields v. Burge,* 874 F.2d 1201, 1205 (7th Cir.1989) (discussing *Copeland v. Philadelphia Police Dep't,* 840 F.2d 1139, 1144 (3d Cir.1988), which found that uncorroborated testimony by an officer's ex-girlfriend, who was also a police officer, was enough to justify urinalysis of officer for suspected drug use), and on hearsay, *see Sponito v. City of New York,* No. 84 Civ. 3937(PKL), 1986 WL 6158,*1-2 (S.D.N.Y. May 28, 1986) (upholding as reasonable a seizure based on hearsay from woman alleging that her husband had been the victim of a police shakedown, where

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 11
Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

her husband initially refused to speak with the investigators and then denied her allegations). Here, defendants relied on statements by two officers that they were aware of DeMaine's note-taking because of information they had been given by two different officers, both of whom had first hand knowledge of the note-taking. Defendants would not be likely to ask Luther, one of the officers with first-hand knowledge, directly about the note-taking since he was the subject of the investigation. Under these circumstances, reliance on Sweetman and Crawford's information was reasonable.[FN9]

> FN9. Brunt stated in his deposition that they were concerned about possibly alerting the subjects of the investigation, including Sergeant Luther, to the fact that they were looking for DeMaine's notes, and that they moved to secure the SCCCTF unit immediately after learning of the possible existence of the notes in order to prevent possible destruction of the notes if there was a leak. *See* Brunt dep. at 35.

As to the scope of the search, defendants were clearly reasonable in believing that DeMaine might have recorded times of peoples' arrival and departure in his day planner.[FN10] *Cf. Shields,* 874 F.2d at 1204 ("one might reasonably suppose the desk could contain evidence of [plaintiff's] communications with the target he tipped off, such as phone messages, calendar entries, memoranda, or information concerning the investigation of the target"). Although DeMaine told them it was private, their decision to verify that there were no relevant notes contained in the day planner does not make the search unreasonable.

> FN10. As noted above, the only search that raises any constitutional questions is the day planner. Thus, any dispute as to whether defendants searched other items DeMaine identified as personal is irrelevant, and defendants do not contest that DeMaine's day planner was personal.

*11 Because the search of DeMaine's day planner was reasonable in both its inception and its scope, it did not violate the Fourth Amendment.

### B. *The seizure*

DeMaine also claims that he was seized in violation of the Fourth Amendment on two separate occasions: the first seizure occurred when the three officers surrounded him, escorted him outside to an area that was not near his vehicle, and pinned him against a wire fence. The second seizure occurred when two officers were ordered to 'take' the plaintiff outside to his vehicle, and while one officer searched the vehicle and the other officer stood in Mr. DeMaine's 'personal space' until the search was complete, and when the two officers thereafter escorted him downstairs to the unit office.... In total, the plaintiff was not permitted to leave for two hours.

Doc. # 39, at 27.[FN11] Defendants contend that DeMaine was ordered to stay with the officers during the search, and that they wanted him present during the search of his desk and car in order to ask him which items were personal to avoid unnecessarily invading his privacy. The A & O Manual states that failure to obey an lawful order of a superior officer shall result in disciplinary actions. Def. Ex. A, at § 1.1a(3). DeMaine disputes that he himself was ever ordered to accompany the officers. As noted above, this Court accepts DeMaine's version of the facts as true for purposes of deciding this motion.

> FN11. The Court notes that plaintiff provides no cites to his deposition or any other evidence to support most of these allegations. However, assuming the events occurred as plaintiff alleges, as discussed below, this Court finds that this does not amount to an unreasonable seizure.

"It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime-'arrests' in traditional

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 12

Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio,* 392 U.S. 1, 16 (1968). Assuming that DeMaine was seized, therefore, the "question then becomes whether the seizure was reasonable under the circumstances." *Sponito v. City of New York,* No. 84 Civ. 3937(PKL), 1986 WL 6158, at *4 (S.D.N.Y. May 28, 1986); *see also Biehunik v. Felicetta,* 441 F.2d 228, 230 (2d Cir.), *cert. denied,* 403 U.S. 932 (1971). The reasonableness of a seizure under the Fourth Amendment depends on balancing the individuals' right to privacy with the government's need for the seizure, based on all the circumstances of the particular case. *See Maryland v. Wilson,* 519 U.S. 408, 411 (1997); *Biehunik,* 441 F.2d at 230.

In *Biehunik,* the Second Circuit upheld the warrantless seizure of sixty-two police officers as reasonable. There, the officers were ordered to appear at a line-up after the police department received allegations of police brutality by some officers. The court found that upon balancing the interests, the line-up was a reasonable seizure. In particular, the court emphasized the
substantial public interest in ensuring the appearance and actuality of police integrity ... moreover, it is a correlative of the public's right to minimize the chance of police misconduct that policemen, who voluntarily accept the unique status of watchmen of the social order, may not reasonably expect the same freedom from governmental restraints which are designed to ensure his fitness for office as from similar governmental actions not so designed.

*12 *Id.* at 230-31.

Although recognizing that the police should not "be required to tolerate invasions of their freedoms which are not reasonably related to the special considerations arising from their relationship of employment," the *Biehunik* court nonetheless concluded that:
The policeman's employment relationship by its nature implies that in certain aspects of his affairs, he does not have the full privacy and liberty from police officials that he would otherwise enjoy. So long as the actions of a policeman's superior remain within reasonable bounds, there can hardly be that affront to expectations of personal autonomy which marks the state's coercive power in the typical arrest case.

*Id.* at 231.

Similarly, in *Sponito,* the court concluded that requiring two officers suspected of wrongdoing to remain on duty within view of a superior officer pending the issuance of a search warrant was " reasonably related to the police officer's work" under *Biehunik* and thus consistent with the Fourth Amendment. 1986 WL 6158, at *5. The court noted that "reassignment to [a different station] and placement on overtime is reasonably related to plaintiffs' work as police officers. Police officers may be placed on overtime and reassigned on the direction of their superiors, which directions must be obeyed." *Id.* Although the court in *Sponito* also noted that the defendants did not search the officers' memo books while waiting for the issuance of the warrant, this fact was not dispositive to the finding that the seizure was reasonable. *See id.* at *6.

Plaintiff argues that the suspected overtime abuse " was not one of outrageous police abuses against the community," and that because DeMaine was only a witness to alleged abuses by his colleagues, the search did not relate to his employment. *See* Doc. # 39, at 28-29. While overtime abuse is admittedly far less outrageous than the shakedowns or police brutality at issue in *Sponito* and *Biehunik,* the corresponding infringement on DeMaine's autonomy was less substantial here than in either of those cases. DeMaine was never threatened with arrest or physically restrained. Moreover, DeMaine's contention that the search did not relate to his employment because he was not the subject of the abuse ignores the fact that the suspected abuses *did* relate to police employment, and that the officers were searching for notes that DeMaine allegedly took about his colleagues while at work. Therefore, this Court finds that under all the circumstances, the seizure of DeMaine for approximately two hours by his commanding officers while they searched for evidence of work-related misconduct by DeMaine's co-workers

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 13
Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

was reasonable, and thus did not violate the Fourth Amendment.

### C. *Qualified immunity*

Because the defense of qualified immunity only applies when a constitutional violation has in fact occurred, and this Court concludes that DeMaine's opposition to summary judgment has not established the violation of any of his constitutional rights, it is unnecessary to analyze defendants' claim of qualified immunity here.

### D. *DeMaine's state law claims*

*13 Because this Court has granted defendants' motion for summary judgment as to the federal § 1983 count, there are no remaining federal claims. This Court declines to exercise supplemental jurisdiction over DeMaine's remaining state law claims of false arrest, malicious prosecution, and intentional infliction of emotional distress, and grants defendants' motion for summary judgment as to this count as well. *See* 28 U.S.C. § 1367(c)(3).

### III. Conclusion

Defendants' motion for summary judgment [Doc. # 35] is GRANTED.

D.Conn.,2000.
DeMaine v. Samuels
Not Reported in F.Supp.2d, 2000 WL 1658586 (D.Conn.)

Briefs and Other Related Documents (Back to top)

• 2000 WL 34496278 (Trial Pleading) Affidavit of Ronald Demaine (Mar. 21, 2000)
• 1999 WL 33927871 (Trial Pleading) Amended Complaint (Jan. 14, 1999)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.