Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 230139 (S.D.N.Y.)
**1992 WL 230139 (S.D.N.Y.)**

Page 1

C
Wallace v. Hano
S.D.N.Y.,1992.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Cynthia WALLACE, Plaintiff,
v.
Michael HANO and the City of New York, Defendants.
No. 90 Civ. 2064 (WK).

Sept. 3, 1992.

MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.
*1 The complaint in this action alleges claims of false arrest, false imprisonment, assault, battery, excessive use of force, malicious prosecution, and intentional infliction of emotional distress, in violation of 42 U.S.C. § 1983 and New York state law. These claims arise out of the September 1, 1989 arrest of plaintiff by defendant Michael Hano, a Parks Enforcement Patrol Officer employed by defendant New York City's Department of Parks and Recreation.

By Stipulation and Order dated November 6, 1990, we directed that the trial of the claims against the City of New York be stayed pending a final disposition of the claims against Hano. The claims against the City of New York arise out of the allegation that the City had knowledge of a pattern of unconstitutional conduct by Hano, but knowingly failed to take remedial steps to correct such behavior.

Defendants now move for partial summary judgment, dismissing plaintiff's claims for false arrest, malicious prosecution and false imprisonment. Defendant Hano also moves, *in limini,* for an order excluding from the trial against him certain evidence concerning his past conduct. For the reasons that follow, we deny the motion for partial summary judgment, and grant the motion *in limine.* As these motions are logically distinct, we address each separately.

*The Summary Judgment Motion*

BACKGROUND

On September 1, 1989, at approximately 6:00 p.m., plaintiff took a walk in Carl Shultz Park with her dog. At some time during this walk, she permitted her dog to roam near her without its leash. Compl. ¶ 11. Witnessing this event, defendant Hano approached plaintiff and informed her that he intended to issue her a summons for violating the leash law. He then requested that plaintiff produce identification. When plaintiff began to walk away, Hano informed plaintiff he would have to arrest her and subsequently attempted to take control of her dog's leash. When plaintiff attempted to regain control of her dog, Hano grabbed her arm and tried to handcuff her. A struggle ensued, and ultimately plaintiff was thrown to the ground and handcuffed.

Plaintiff was then taken to the 19th Police Precinct and charged with the following crimes and violations: assault in the third degree, a violation of § 120.00(1) of the Penal Law; resisting arrest (Penal Law § 205.30); two counts of harassment (Penal Law § 240.25(1)); two counts of "Failure to Comply", a violation of the Parks Department Rules and Regulations No. 5(a); and one count of "Animals at Large" (Parks Department Rules and Regulations No. 14). The last charge is commonly referred to as the leash law, and is a class A misdemeanor that carries a maximum penalty of 90 days imprisonment and/or a fine of $1,000. *See* Amended Balin Affid., Exh. C; New York City Department of Parks and Regulations § 45 [FN1]. Although we may assume that a person can be arrested, rather than served with a summons, for a violation of the leash law, in response to an interrogatory, defendants admit that they are unable to establish that any person

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 230139 (S.D.N.Y.)
**1992 WL 230139 (S.D.N.Y.)**

Page 2

has ever been so arrested based solely on a charge of violating the leash law. *See* Amended Balin Affid., at Exh. P.

*2 Plaintiff was arraigned on the above-described charges at approximately 8:00 p.m. on September 2, at which time she entered a plea of not guilty on all counts. During the period between arrest and arraignment, plaintiff spent approximately 26 hours in custody, 15 of which were spent in a holding cell. Compl. ¶¶ 10, 23-24.

On November 1, plaintiff pled guilty to violating the leash law. In connection with this plea, plaintiff was represented by Richard Emery, Esq., who is her attorney in this action; the state was represented by Assistant District Attorney Steve Krantz. The minutes of the plea allocution reveal the following (Amended Balin Aff., Ex. E, at 2-5) (emphasis supplied):

EMERY: ... At this time we are prepared to plead to charge five, animals at large [leash law], with a specific understanding that it's the only matter that she's pleading to, that she denies all culpability and responsibility for any of the other charges *that remain against her* in this incident.

KRANTZ: Judge, the People have made such an offer on the additional condition that the defendant would allocute on that charge, that there would be a sentence of a hundred dollars fine and that the record would not be sealed.

THE COURT: Miss Wallace, I understand that you wish to plead guilty to that charge, is that correct?

EMERY: To just that charge, that's correct.

THE COURT: Miss Wallace, I understand that you wish to withdraw your previously entered plea of not guilty and plead guilty to the misdemeanor park rules and regulations 14, animals at large, is that what you want to do?

WALLACE [plaintiff]: Yes, your Honor, my dog was off the leash for a time before the officer attacked me. I do plead guilty to my dog being at large.

THE COURT: I didn't hear what you said, it's very noisy in this courtroom.

WALLACE: I said my dog was off the leash for a time before the officer attacked me. So I am pleading guilty to dog at large and *I am completely innocent of any other charges* that have been lodged against me.

THE COURT: Has anyone made any threats to you to get you to plead guilty today.

WALLACE: No.

THE COURT: Has anyone made any promises to you other than the promise that you will be sentenced to a fine of one hundred dollars. If you fail to pay the find of one hundred dollars, I will impose a jail alternative of fifteen days. Have any other promises been made to you?

WALLACE: *No promises other than the fine of one hundred dollars* which is acceptable to me [FN2].

THE COURT: Is this plea acceptable to the People?

KRANTZ: Yes Judge.

Immediately after the court accepted her plea, plaintiff paid the $100 fine. Plaintiff was never prosecuted in connection with the remaining criminal charges.

In support of their motion for summary judgment, defendants contend that plaintiff's November 1 guilty plea forecloses the possibility that she can here maintain either a federal or state claim for false arrest, malicious prosecution, or false imprisonment. In opposition, plaintiff argues that: her plea did not encompass the charges of assault, resisting arrest, harassment, or failure to comply; she received a favorable disposition on these charges;

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 230139 (S.D.N.Y.)
**1992 WL 230139 (S.D.N.Y.)**

Page 3

the facts underlying these charges are distinct from the facts to which she plead guilty; and accordingly she can state a cognizable claim for relief with respect to these charges. In support of this position, plaintiff submits the affidavit of her counsel, Emery, wherein he recites his recollection of the precise content of the negotiations entered into between himself and A.D.A. Krantz in connection with plaintiff's plea. In particular this affidavit provides (Emery Affid., at ¶¶ 2-3):

*3 I ... informed the ADA that plaintiff was innocent of all ... charges [apart for the Animals At Large charge] ... and that plaintiff intended to fully contest those other charges ... The ADA thereafter indicated that the District Attorney's office would dismiss outright all remaining charges against plaintiff with the understanding that plaintiff denied all culpability and responsibility on the unrelated charges ... The plaintiff's guilty plea was in no way the product of any agreement or plea bargain with the District Attorney's office.

In reply, defendants offer the affidavit of Krantz, which provides, in relevant part, that plaintiff's plea of guilty to the count of Animals at Large was intended to be in satisfaction of the entire complaint. Krantz Affid. ¶ 5, annexed to Plaintiff's 2/28/92 Reply Affid. More particularly, Krantz asserts (*Id.* at ¶ 7):

I never agreed to "dismiss" any charges in the case against Ms. Wallace, and none of the charges ever were dismissed. I consented to her pleading guilty to the Animals at Large count in full satisfaction of the misdemeanor complaint. That consent was not based on any determination by the People that the other charges against the defendant lacked support in the evidence. Rather, the People agreed to the disposition in Ms. Wallace's case as part of a plea bargain ... based on the People's determination that it was an appropriate one under all the circumstances relevant to such bargains.

## DISCUSSION

It is well settled that when a person is arrested and charged with several offenses arising from differing facts, a negative disposition on one offense does not necessarily preclude a subsequent malicious prosecution claim on the other offenses. *See Janetka v. Dabe* (2d Cir.1989) 892 F.2d 187, 189-90. However, to state a cognizable claim for malicious prosecution in connection with the charges of assault, resisting arrest, harassment and failure to comply, plaintiff must here demonstrate that she received a favorable disposition of these charges. *See id.* at 189 (noting that the requirement of a favorable termination ensures against inconsistent judgments, and "it is a prerequisite to commencement of the [malicious prosecution] action"). Accordingly, the question before us is whether or not, on the basis of the facts presented, plaintiff can show this requisite favorable disposition.

Three things are obvious from the recorded proceedings in criminal court, and from the affidavit of the prosecutor, Krantz. (1) The plaintiff made crystal clear that she was not conceding guilt on any charge but the leash law; (2) the recorded plea was unambiguous and made clear that the other charges were in no way affected by the plea; and (3) the prosecutor had not the slightest intention of ever prosecuting plaintiff with respect to the remaining charges, and has, in effect, granted plaintiff a favorable disposition on those charges by abandoning them [FN3].

*4 Defendant argues that since there is no formal record dismissing these charges, plaintiff cannot establish their "favorable disposition". This is a vein attempt to exact form over substance. Should the state now move any of those charges to trial they would be dismissed for violation of plaintiff's right to a speedy trial, either by the court in which they had been filed or-after state rights had been exhausted-by a federal court.

This ruling is consistent with the observation of the Appellate Division, Second Department, in *Loeb v. Teitelbaum* (2nd Dept.1980) 77 A.D.2d 93, 432 N.Y.S.2d 487,*amended on other grounds*(2nd

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                  Page 4
Not Reported in F.Supp., 1992 WL 230139 (S.D.N.Y.)
**1992 WL 230139 (S.D.N.Y.)**

Dept.1982) 80 A.D.2d 830, 439 N.Y.S.2d 300, where the court held that a dismissal of criminal charges brought about by the prosecutor's failure to prosecute, uninduced by any conduct of the parties, constituted a favorable termination for purposes of a malicious prosecution claim. As the court there observed (432 N.Y.S.2d at 494):

While there certainly is a distinction between a voluntary or formal abandonment by a prosecutor and a dismissal brought about by his neglect or unexcused failure to proceed, the difference is more apparent than real, for in both circumstances the criminal charges have been terminated by the prosecutor's nonpursuit of the charges against the accused.... [in such circumstances] the failure to proceed to the merits compels an inference of such an unwillingness or inability to do so as to imply a lack of reasonable grounds for the prosecution.

The *Loeb* court also ruled that the question of "favorable termination" is one for the court unless there is "a factual controversy" as to the circumstances of a dismissal. *Id.* at 489-90; *see Janetka*, 892 F.2d at 189. We having ignored the only evidence submitted by the plaintiff there can not be said to be any such factual controversy. Accordingly we rule as a matter of law that the criminal charges of assault, resisting arrest, harassment, and failure to comply asserted against plaintiff have been disposed of in her favor, and that there is no need to disqualify her counsel. We therefore deny defendants' motion for summary judgment on plaintiff's malicious prosecution claims.

With respect to plaintiff's claims of false arrest and false imprisonment, we conclude that summary judgment on these claims is also not appropriate. In the instant circumstances, it is uncontroverted that there is no mandatory arrest policy with respect to violations of the leash law. Indeed a question of fact exists as to whether or not anyone has ever been arrested for such a violation. Accordingly, we can not say that no reasonable juror could find that it was more probable than not that plaintiff's arrest and subsequent imprisonment were caused solely by the charges on which she has received a favorable disposition, and that the leash law was in no way involved in the arrest. We therefore decline to dismiss plaintiff's false arrest and false imprisonment claims [FN4].

*Hano's Motion in Limine*

### BACKGROUND

*5 Pursuant to Fed.R.Evid. 404, defendant Hano seeks to have excluded from the trial of the claims against him all evidence relating to prior complaints lodged against him by persons other than the plaintiff. More specifically he seeks an order excluding the testimony of Ann Wild, Mary Lou Meyer, and Francis L. Heilbut, and any documents concerning the allegations of misconduct asserted by these persons. Briefly summarized, the substance of this evidence is as follows.

Wild filed a complaint with the Parks Department against Hano in connection with two separate events; one on March 16 and the other on April 2, 1989. On both these occasions she was approached by Hano for having her dog unleashed, and on both occasions a confrontation resulted. In the former instance, Hano grabbed Wild's arm, and in the latter he prevented her from walking away by holding her dog's leash and threatening arrest. By affidavit Wild informs that with respect to the April 2 event, she was issued two summonses, one for Animals at Large and the other for Failure to Comply, and that the latter charge was ultimately dismissed as having no merit by a criminal court judge. *See* Exhibit C to the March 20 1992 Reply Submission of Richard Emery.

Records of the Parks Department reveal that pursuant to its review of Wild's complaint, on April 12 Hano was given a Supervisory Conference, and he was advised that "he should never place his hands on a respondent unless an arrest takes place or a criminal summons is issued." In addition, he was

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00943-AWT    Document 200-3    Filed 08/05/2008    Page 5 of 18

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 230139 (S.D.N.Y.)
**1992 WL 230139 (S.D.N.Y.)**

Page 5

advised that "his actions put both him and the department at risk of a harassment complaint as well as placed him ... in a possible dangerous position". *See id.* at Exh. B.

Meyer's complaint against Hano arises from events which transpired on March 19, 1989, while she was walking her dog in Carl Shultz Park. By affidavit, she informs that on that date Hano approached her and demanded to see some identification. She states that her dog was on its leash at the time, and when she requested why identification was necessary, Hano was rude, however, he ultimately informed her that he had spotted her dog off its leash the previous week, and he was issuing a summons for violation of the leash law in connection with that incident. Meyer states that during the course of this confrontation Hano grabbed her dog's leash by the collar, refused to let her leave the park, and threatened to arrest her if she failed to comply with his orders. *See Id.,* at Exh. D. The Parks Department records document that pursuant to Meyer's complaint, Hano was informed that "he was not dealing with hardened criminals and discretion is always an option when dealing with these [leash law violations]". *See* Balin Affid., at Exh. G. p. 2. These records also reveal that pursuant to this complaint, one E. Burgos, Hano's supervisor, recommended that Hano be sent to the academy for retraining in Conflict and Mediation. *Id.* at Exh. I, p. 4.

*6 The complaint by Heilbut consists of a letter which he sent to the Commissioner of the Parks Department on July 2, 1989. In that letter, Heilbut informs that on June 29, while he was attempting to drive a station wagon with props into Central Park, he was stopped by Hano and informed that he could not enter the park at that time due to a race which was scheduled for that day. The letter further asserts that when Heilbut attempted to explain that he had a permit for his actions, Hano became rude and ultimately grabbed his arm and threatened arrest. *Id.* at Exh. J. Pursuant to this letter, the Parks Department conducted a series of interviews with all persons involved in the incident. In an internal memorandum summarizing the content of these interviews, the Department concluded that Hano's statements explaining the event were verified by others, and that "Officer Hano followed all proper procedures". *Id.* at Exh. K.

In support of this motion *in limine* Hano contends that the above-described evidence is offered for the impermissible purpose of showing that he has a violent character and that he acted in conformity therewith on September 1, 1989 when he arrested the plaintiff. In opposition plaintiff argues that this evidence does not fall within the proscriptions of Rule 404(b), as it is offered to show a "pattern of conduct" by Hano, namely threatening arrest and "grabbing the arms and/or leashes of individuals who do not instantly bow to his authority". *Id.* at 47. Alternatively, plaintiff contends that the evidence of these complaints is admissible to show both defendant's "intent to use excessive force" and the "motive" for his behavior on September 1. With respect to its claim that the evidence goes to demonstrate "motive", plaintiff explains that it will demonstrate at trial that as a result of the complaints lodged by Meyer and Wild, Hano was reprimanded by his superiors for having been overzealous in the performance of his duties in connection with leash law violations. *See* Balin Affid., at Exh G. Accordingly, plaintiff argues that these prior events support the conclusion that, although there was no basis in fact for the charges of assault, etc., Hano had a powerful motive to add these "trumped-up charges" to the allegations lodged against her on September 1 in an attempt to justify his use of force on that occasion. *See* Pl.Mem. at 47-48.

DISCUSSION

In relevant part, Fed.R.Evid. 404 provides:

(a) ... Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion ...

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 230139 (S.D.N.Y.)
**1992 WL 230139 (S.D.N.Y.)**

Page 6

(b) ... Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*7 The Advisory Committee notes explain that the proscriptions of the rule are founded on the rationale that:
Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trial of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man, to punish the bad man, because of their respective characters despite what the evidence in the case shows actually happened.

Notes of Advisory Committee on 1972 Proposed Rules, Rule 404(a).

Having reviewed the evidence concerning the complaints by Wild, Meyer and Heilbut, we agree with Hano that this evidence is not properly admissible in the action against him [FN5].

At the outset we note that to the extent plaintiff argues that this evidence is relevant to show Hano's "intent" to use excessive force on September 1, 1989, we agree with Hano that this is *de facto* character evidence, and precluded by the Rule. *See Berkovich v. Hicks* (2d Cir.1991) 922 F.2d 1018, 1022 (noting that the proffer that prior complaints showed defendant's "malicious" state of mind "amounts to no more than a veiled attempt to do what Rule 404(b) expressly prohibits-introducing evidence of bad acts to show the defendant's propensity to commit such acts").

Turning to plaintiff's claim that this evidence is admissible to show a "pattern of conduct" by Hano, it is well settled in this Circuit that to merit admission under this theory, "the extrinsic acts must share 'unusual characteristics' with the act charged or represent a 'unique scheme' ". *Id.; see United States v. Benedetto* (2d Cir.1978) 571 F.2d 1246, 1249 (to prove alleged similar acts shared "unusual characteristics", "much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature" (citation omitted)). Although it is obvious that there are some similarities between the manner in which Hano allegedly treated Meyer, Wild and Heilbut, and his alleged treatment of plaintiff in September 1989, namely his touching of the accused's arm and his threatening arrest, we are not persuaded that these similarities amount to characteristics of a signatory quality in the circumstances of this case. Certainly, threatening arrest is hardly an uncommon event for a law enforcement officer; and although the decision physically to touch the arm of a citizen who is questioning your authority might demonstrate poor judgment, we can not say that it represents the type of *modus operandi* contemplated by Rule 404(b). Relatedly, we note that serious distinguishing characteristics exist between the pre-September 1989 incidents and the events giving rise to this suit. First, and most significantly, none of the pre-September 1989 incidents involved an arrest or a use of force similar to the extent alleged in the instant case. Second, the incidents involving Wild and Meyer occurred within seventeen days of each other and resulted in Hano's receiving instructions from his superiors concerning appropriate procedures in connection with leash law violations. On the other hand, the incident with plaintiff occurred more that five months later, and after Hano had received such instruction. Relatedly, the events giving rise to the complaint by Heilbut are factually distinct from any of the leash law violation complaints, and the Parks Department affirmatively found that Hano's actions with respect to this incident were "in accord with all proper procedures". Amended Balin Affid., at Exh. K.

*8 As to plaintiff's remaining claim that the Meyer/Wild complaints are admissible to show "motive", we find that even if a colorable argument can be

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 7
Not Reported in F.Supp., 1992 WL 230139 (S.D.N.Y.)
**1992 WL 230139 (S.D.N.Y.)**

made that the manner in which the Parks Department reprimanded Hano in connection with these complaints instilled in him the idea that he would have to assert "trumped up" charges against plaintiff on September 1 to justify his use of force on that occasion, the danger of unfair prejudice which would result from the admission of this evidence outweighs its probative value, if any. *See* Fed.R.Civ.P. 403.

In the first place, there can be no doubt that substantial prejudice to Hano will result from the introduction of this evidence: on the basis of these "prior acts" the jury might conclude that Hano is a malefactor, and that he acted in conformity with his character as such on September 1. As to probative value, it appears to us that it is just as logical to assume that the Department's April 12 instructions to Hano would deter his use of force in circumstances which did not warrant force, as it is to assume that these instructions would cause him to assert "trumped up" charges to justify his use of force on September 1, 1989. In addition, on the basis of the facts presented, we are confident that plaintiff has ample evidence available to her to persuade a jury that Hano did not have probable cause to assert charges of assault, resisting arrest, harassment and failure to comply on September 1, without relying on this "other act" evidence.

CONCLUSION

Defendants' motion for summary judgment on plaintiff's claims of false arrest, malicious prosecution and false imprisonment is denied. Defendant Hano's motion to exclude from the trial against him the testimony of Mary Lou Meyer, Ann Wild, or Francis Heilbut, and all evidence concerning complaints against Hano brought by these persons, is granted. The parties shall appear for a pre-trial conference on Thursday, September 24, 1992 at 4:30 p.m.

SO ORDERED.

FN1. The New York City Department of Parks and Recreation Rules and Regulations define the leash law as an unclassified misdemeanor, *see* § 45, however, New York Penal Law § 55.10(2)(b) provides, in relevant part, that: "[a]ny offense.... which is declared by law to be a misdemeanor without specification of the classification thereof shall be deemed a class A misdemeanor".

FN2. It will be observed that this exchange between the court and plaintiff [Wallace] specifically reserved to the prosecutor the right to proceed with the prosecution of the other charges.

FN3. Krantz's affidavit statement that he consented to the leash law plea "in full satisfaction" of the other charges is utterly inconsistent with the recorded plea agreement, and therefore must be ignored as impermissible parole. *See Sabo v. Delman* (1957) 3 N.Y.2d 155, 161, 164 N.Y.S.2d 714, 717 ("The parole evidence rule forbids proof of extrinsic evidence to contradict or vary the terms of a written instrument ..."); *cf. Centronics Financial Corp. v. El Conquistador Hotel Corp.* (2d Cir.1978) 573 F.2d 779, 782 (noting that the parole evidence rule is a rule of substantive law). However, in so far as the affidavit demonstrate Krantz's intention to abandon further prosecution, it is competent evidence.

> With respect to the affidavit submitted by Emery, in so far as it attempts to explain the plea agreement we strike it from the record as impermissible parole, and we otherwise ignore it as unnecessary and confusing.

FN4. Contrary to the position asserted by plaintiff in its brief, *see* Pl. Brief at 34, we express no view as to whether or not *any*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00943-AWT    Document 200-3    Filed 08/05/2008    Page 8 of 18

Not Reported in F.Supp. Page 8
Not Reported in F.Supp., 1992 WL 230139 (S.D.N.Y.)
**1992 WL 230139 (S.D.N.Y.)**

plaintiff could prove the requisite causation with respect to a false arrest or false imprisonment claim, if a plea to a charge which mandated arrest had been entered. *Cf. Janetka,* 892 F.2d at 189-80 (holding that where a plaintiff could demonstrate that it had been acquitted on a misdemeanor charge which arose out of facts distinct from the criminal violation charges on which it had been convicted, it could establish the requisite "favorable termination" for a malicious prosecution claim; the Court expressed no view as to whether or not a plaintiff could demonstrate damages resulting from false imprisonment or false arrest in such circumstances); *Broughton v. State* (1975) 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 93 (noting that to state a claim for false arrest or false imprisonment a plaintiff must show, *inter alia,* that the confinement complained of was not otherwise privileged).

FN5. We, of course, express no view as to whether or not it will be admissible in subsequent proceedings, if any, against defendant City of New York.

S.D.N.Y.,1992.
Wallace v. Hano
Not Reported in F.Supp., 1992 WL 230139 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 187352 (S.D.N.Y.)
**1997 WL 187352 (S.D.N.Y.)**

Page 1

C
Shaw v. City of New York
S.D.N.Y.,1997.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
James SHAW, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.
No. 95 Civ. 9325 (AJP).

April 15, 1997.

### OPINION AND ORDER

PECK, United States Magistrate Judge:
*1 Plaintiff James Shaw brings this action under 42 U.S.C. § 1983 and state law for alleged use of excessive force, false arrest and malicious prosecution by three police officers and the City. Presently before the Court is a motion for partial summary judgment by defendant Police Officers Graham and Fitzgibbons. Also before the Court is defendants' motion in limine to exclude from trial: (1) an Internal Affairs investigative file as to Officer Graham, (2) defendants' interrogatory responses and (3) portions of the Mollen Commission Report. (Plaintiff Shaw has cross-moved for admissibility of the Mollen Commission Report excerpts.)

The parties consented to disposition of this action by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

For the reasons set forth below, defendants' motions are granted and plaintiff's cross-motion in limine is denied.

### FACTS

This action arises from the October 22, 1994 arrest of plaintiff James Shaw and his prosecution for assault, reckless endangerment and resisting arrest. (Pretrial Order Stipulations ¶ 5.) What initially happened between Shaw and Police Officer Charles Kicki is disputed, and the City has not moved for summary judgment as to Officer Kicki. (*Compare* Shaw Dep. at 26-44 & Pretrial Order, Plf's Contentions of Fact ¶¶ 2-5 *with* Pretrial Order, Defs' Contentions of Fact ¶¶ 2-4.)

During the incident, Officer Kicki pulled Shaw out of his car and handcuffed him; Officer Kicki was injured in the process. (City 3(g) ¶¶ 3, 7, 8; Shaw 3(g) ¶ 3; Shaw Dep. at 29-30; Fitzgibbons Dep. at 95.)

Officer Fitzgibbons approached and asked Officer Kicki what had happened. (City 3(g) ¶ 4; Shaw Dep. at 39-44; Fitzgibbons Dep. at 58-60, 70-71, 96-100; Tanya Shaw Dep. at 16-17.) Officer Kicki told Officer Fitzgibbons that he had instructed Shaw to pull his car over, Shaw did not, and Shaw grabbed Kicki, causing him to injure his arm and shoulder. (City 3(g) ¶¶ 7-8; Shaw Dep. at 42-44; Fitzgibbons Dep. at 96-100; Kicki Dep. at 8-9, 21-22; Roman Dep. at 21.)

Because Officer Kicki went to the hospital, Officer Fitzgibbons processed Shaw's arrest, including providing an affidavit to the District Attorney's Office based on the information Officer Fitzgibbons had received from Officer Kicki. (City 3(g) ¶ 10; Fitzgibbons Dep. at 95-96, 141; Kicki Dep. at 8-9, 21-22; Handke Aff. Ex. H: 10/23/94 Felony Complaint Affidavit.) Officer Fitzgibbons' Felony Complaint Affidavit clearly stated that "Deponent is informed by P.O. Charles Kicki that ..." (Handke Aff. Ex. H.)

Shaw contends that at the precinct, Officer Graham assaulted him by tightening the handcuffs to increase his pain and by pushing him into walls. (Shaw Dep. at 72-74, 77, 85-88.) Officer Graham denies that he even was at the precinct when this occurred. (*See* Pretrial Order, Defs' Contentions of Fact ¶ 8; *see also* Shaw In Limine Br. at 4.) Officer Graham does not move for summary judgment on

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 187352 (S.D.N.Y.)  
**1997 WL 187352 (S.D.N.Y.)**

Page 2

the excessive force-assault claim against him.

### ANALYSIS

I. *DEFENDANTS' PARTIAL SUMMARY JUDGMENT MOTION*

A. *Summary Judgment Standards*

*2 Summary judgment is appropriate when "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *see, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing that there is no material fact in issue. *See, e.g., Gallo v. Prudential Residential Serv. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *Celotex Corp. v. Catrell,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).

To defeat a motion for summary judgment, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, e.g., Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine the existence of any disputed issues of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *E.g., Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment [,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see also, e.g., Knight,* 804 F.2d at 11-12.

B. *Officer Graham*

Officer Graham has moved for partial summary judgment dismissing all false arrest and malicious prosecution claims against him (while leaving the excessive force claims for trial) (*See, e.g.,* City SJ Br. at 1, 7-8.) In response, plaintiff has agreed to "voluntarily withdraw[ ]" those claims against Officer Graham. (*See* Shaw SJ Br. at 1 n.*.)

Accordingly, Shaw's claims for false arrest and malicious prosecution against Officer Graham are dismissed with prejudice pursuant to Rule 41, Fed.R.Civ.P.

C. *Officer Fitzgibbons*

Officer Fitzgibbons has moved for summary judgment dismissing all claims against him.

#### 1. *Excessive Force*

In response to defendants' motion, plaintiff has offered to voluntarily withdraw his excessive force claim against Officer Fitzgibbons without prejudice (*see* Shaw SJ Br. at 2, 15-16), while defendants seek it to be with prejudice.

*3 Shaw testified that he was handcuffed by Officer Kicki, and that Officer Fitzgibbons did not touch him. (Shaw Dep. at 34, 37-40; Roman Dep. at 21; Tanya Shaw Dep. at 16-17.) In response to the City's Local Rule 3(g) statement that "P.O. Fitzgibbons did not assault plaintiff," Shaw responded

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00943-AWT   Document 200-3   Filed 08/05/2008   Page 11 of 18

Not Reported in F.Supp. Page 3
Not Reported in F.Supp., 1997 WL 187352 (S.D.N.Y.)
**1997 WL 187352 (S.D.N.Y.)**

that he "does not dispute" that statement and it is "not in issue." (City 3(g) ¶ 11; Shaw 3(g) ¶ 11.) Contrary to Shaw's testimony, however, Officer Fitzgibbons testified that he assisted Officer Kicki in handcuffing Shaw; nevertheless, there is no evidence that Officer Fitzgibbons used excessive force on Shaw. (*See* Fitzgibbons Dep. at 70-71, 132-33.) Thus, Officer Fitzgibbons is entitled to summary judgment dismissing the excessive force claim with prejudice.

Plaintiff Shaw fears that a dismissal with prejudice could be used by defendants at trial to benefit Officer Kicki. Shaw argues:

Because Fitzgibbons *really* did not do what he swore he did, plaintiff will voluntarily withdraw his claims of excessive force against Fitzgibbons. However, in order to insure that defendants do not benefit from their untruthfulness, the claim should not be dismissed by the Court. If it were, defendants might be in a position to present testimony at trial that Kicki and Fitzgibbons did indeed subdue, restrain and handcuff Shaw (though they now deny it-sort of-in the context of this motion) and advise the jury that the Court has dismissed excessive force claims against Fitzgibbons, thereby suggesting that the jury should do the same as to Kicki. This would be misleading and prejudicial and should not be allowed.

(Shaw SJ Br. at 16.)

The "solution" to plaintiff's supposed dilemma is quite easy-while the Court dismisses with prejudice the excessive force claim against Officer Fitzgibbons, the parties are ordered not to refer to the dismissal at trial in front of the jury.

The Court therefore grants summary judgment to Officer Fitzgibbons dismissing Shaw's excessive force claims with prejudice.

### 2. *The False Arrest and Malicious Prosecution Claims*

" 'Section 1983 itself' ...'creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere.' " *Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at *4 (S.D.N.Y. March 24, 1997) (Peck, M.J.) (quoting *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994)). Shaw's § 1983 false arrest and malicious prosecution actions therefore are governed by state law. *See, e.g., Singer v. Fulton County Sheriff,* 63 F.3d 110, 114 (2d Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996); *Posr v. Doherty,* 944 F.2d 91, 90 (2d Cir.1991); *Woo v. City of New York,* 93 Civ. 7007, 1996 WL 457337 at *7 (S.D.N.Y. Aug.14, 1996) (Peck, M.J.) (citing *Russell v. Smith,* 68 F.3d 33, 36 (2d Cir.1995)).

If the arresting officer had probable cause, that defeats both false arrest and malicious prosecution claims. *See, e.g., Singer v. Fulton County Sheriff,* 63 F.3d at 118 ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."); *Bernard v. United States,* 25 F.3d 98, 102, 104 (2d Cir.1994) ("the existence of [probable cause] is a complete defense to an action for false arrest."); *Woo v. City of New York,* 1996 WL 457337 at *7 (under both § 1983 and under " 'New York law, a plaintiff suing for malicious prosecution must establish'... (3) lack of probable cause for commencing the proceeding ...' ") (quoting *Russell v. Smith,* 58 F.3d at 36; *Miloslavsky v. AES Eng'g Society, Inc.,* 808 F.Supp. 351, 354 (S.D.N.Y.1992) ("under New York law, 'probable cause serves as a complete defense to the charges of false arrest and malicious prosecution.' "), *aff'd mem.,* 993 F.2d 1534 (2d Cir.)*cert. denied,* 510 U.S. 817, 114 S.Ct. 68, 126 L.Ed.2d 37 (1993).

*4 A police officer has "probable cause" to make an arrest when that officer has " 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00943-AWT   Document 200-3   Filed 08/05/2008   Page 12 of 18

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 187352 (S.D.N.Y.)
**1997 WL 187352 (S.D.N.Y.)**

Page 4

be arrested.' " *Singer v. Fulton County Sheriff,* 63 F.2d at 119 (quoting *O'Neil v. Town of Babylon,* 986 F.2d 646, 650 (2d Cir.1993)). Absent circumstances that raise doubt as to their veracity, an officer is entitled to rely upon the statements of victims and witnesses-including, of course, fellow police officers. *E.g., Singer v. Fulton County Sheriff,* 63 F.3d at 119; *Bernard v. United States,* 25 F.3d at 103; *Augustine v. Reed,* 882 F.Supp. 50, 53 (E.D.N.Y.), *aff'd mem.,* 99 F.3d 402 (2d Cir.1995); *Furlow v. City of New York,* 90 Civ. 3956, 1994 WL 714340 at *5-6 (S.D.N.Y. Dec.21, 1994) (officers had probable cause to arrest plaintiff when another officer reported that suspect fitting plaintiff's description had committed crime); *Mendoza v. City of Rome, N.Y.,* 872 F.Supp. 1110, 1116 (N.D.N.Y.1994) (under the "fellow officer rule," "arresting officers may rely upon information or direction from another officer because the directing officer is presumed to possess probable cause."); *Miloslavsky v. AES Eng'g,* 808 F.Supp. at 355; *Thomas v. Culberg,* 741 F.Supp. 77, 80 (S.D.N.Y.1990).[FN1]

> FN1. Some cases appear to require "independent corroboration" or hold that if the fellow officer lacked probable cause, then the arresting officer also lacked probable cause. *See, e.g., Wu v. City of New York,* 934 F.Supp. 581, 587 (S.D.N.Y.1996) (while under New York case law "a police officer can find probable cause to arrest based solely upon the complaint of an alleged eyewitness or victim, ... [federal decisions] also require some independent corroboration before elevating the word of an eyewitness or victim to the status of probable cause."); *Mendoza v. City of Rome, N.Y.,* 872 F.Supp. at 1116 ("where the directing officer does not have probable cause, the arrest is unlawful regardless of the good faith of the arresting officer"). The Court need not resolve this issue, however, because even if Officer Fitzgibbons did not have probable cause, he is protected by qualified immunity, as discussed in text.

Here, Officer Fitzgibbons had probable cause to arrest plaintiff Shaw based on the information he received from Officer Kicki. Shaw, however, claims that Officer Fitzgibbons lacked probable cause because Officer Kicki lied and Officer Fitzgibbons knew it. (*See* Shaw SJ Br. at 9-14.) While Shaw's version of what lead up to his arrest differs significantly from Officer Kicki's version, Shaw has presented no evidence that Officer Fitzgibbons was aware of Shaw's version or that Officer Kicki lied. Officer Fitzgibbons therefore is entitled to summary judgment.

Moreover, Officer Fitzgibbons enjoys qualified immunity for his actions. Judge Wood summarized the qualified immunity doctrine in a similar case involving an arrest by an officer based on information from other officers:

Government officials such as police officers are entitled to qualified immunity for discretionary acts performed within the scope of their employment. *See Neu v. Corcoran,* 869 F.2d 662, 665 (2d Cir.), *cert. denied,* 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989). Where, as here, an officer is charged with an arrest without probable cause, qualified immunity shields the officer from suit if "a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officer[ ] possessed." *Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (per curiam) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The availability of qualified immunity does not turn on whether probable cause in fact existed. "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Id.* In the Second Circuit, an officer seeking qualified immunity must show either: "(a) that it was objectively reasonable ... to believe that probable cause existed, or (b) that officers of reasonable competence could disagree on

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 187352 (S.D.N.Y.)  
**1997 WL 187352 (S.D.N.Y.)**

Page 5

whether the probable cause test was met." *Robison v. Via,* 821 F.2d 913, 921 [ (2d Cir.1987) ]. To defeat an officer's motion for summary judgment as to qualified immunity, "the record must show it to be 'obvious that no reasonably competent officer would have concluded that a[n arrest] should issue.' " *Thomas v. Culberg,* 741 F.Supp. 77, 81 (S.D.N.Y.1990) (quoting *Robison,* 821 F.2d at 921).

*5 *Beal v. City of New York,* 92 Civ. 0718, 1994 WL 163954 at *4 (S.D.N.Y. April 22, 1994), *aff'd,* 89 F.3d 826, 1995 WL 722263 at *2 (2d Cir. Nov.21, 1995); *see also, e.g., Miloslavsky v. AES Eng'g,* 808 F.Supp. at 355.

Absent any evidence tending to show that it was objectively unreasonable for Officer Fitzgibbons to believe Officer Kicki, Officer Fitzgibbons could rely on what Officer Kicki told him. While plaintiff Shaw refers to the blue "code of silence" and backing up fellow officer's lies, he has presented no evidence, as opposed to speculation, from which a jury could find that Officer Fitzgibbons had reason to doubt what Officer Kicki told him. Officer Fitzgibbbns therefore is entitled to qualified immunity. *See, e.g., Signorile v. City of New York,* 887 F.Supp. 403, 417-20 (E.D.N.Y.1995) ("a law enforcement officer can take action based on the representations of other officers, without personal knowledge of the facts of the case if it seems reasonable to believe that the other officers are telling the truth"); *Beal v. City of New York,* 1994 WL 163954 at *4; *Miloslavsky v. AES Eng'g,* 808 F.Supp. at 355; *Kaufman v. City of New York,* 87 Civ. 4492, 1992 WL 247039 at *5 (S.D.N.Y. Sept.17, 1992) ("Whether or not probable cause existed to charge [plaintiff] as he was charged, [the arresting officer] did no more than prepare the arrest report and charge [plaintiff] as he was directed to do by superiors. Relying on information provided by these superiors, it was objectively reasonable for [the arresting officer] to believe that probable cause for the arrest and the charges existed and that his acts did not violate [plaintiff's] constitutional rights. Accordingly, [the arresting officer] is entitled to qualified good faith immunity."); *see also, e.g., Vela v. White,* 703 F.2d 147, 152 (5th Cir.1983) (police officer who arrested plaintiff at superior's directions entitled to qualified immunity); *Rivera v. Granucci,* Civ. No. N-87-480, 1993 WL 76202 at *5 (D.Conn. March 12, 1993) ("A law enforcement officer can make ... an arrest based on the representations of other officers, without personal knowledge of the facts of the case.").

Accordingly, defendant Officer Fitzgibbons is entitled to summary judgment dismissing all claims against him.

II. *THE CROSS-MOTIONS IN LIMINE*

Defendants have moved in limine to exclude the following evidence proposed to be offered into evidence by plaintiff Shaw: (1) PX 20, an Internal Affairs Division report of allegations, found by IAD to be "unsubstantiated," that Officer Graham had pushed a handcuffed prisoner into a wall; (2) defendants' initial interrogatory responses (since amended), identifying Officer Fitzgibbons as the officer who took Shaw to the precinct holding cell; and (3) excerpts of the Mollen Commission Report as to a police "code of silence" that causes certain officers to lie to protect fellow officers. Plaintiff Shaw cross-moves as to the Mollen Commission Report's admissibility.

A. *The IAD Report is Inadmissible*

*6 Federal Rule of Evidence 404(b) provides that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 187352 (S.D.N.Y.)  
**1997 WL 187352 (S.D.N.Y.)**

Page 6

Rule 404(b) requires a two-part analysis: first, whether the proposed evidence fits within one of the "exceptions" provided by the Rule, and second, even if it does, whether under Rule 403 the evidence's probative value is substantially outweighed by the potential for jury confusion or prejudice. *See, e.g., Advisory Committee Notes to Fed.R.Evid. 404(b); United States v. Benedetto,* 571 F.2d 1246, 1248 (2d Cir.1978); *United States v. Brennan,* 798 F.2d 581, 589 (2d Cir.1986); *United States v. Margiotta,* 662 F.2d 131, 142 (2d Cir.1981); *Berkovich v. Hicks,* 922 F.2d 1018, 1022 (2d Cir.1991); Wright & Graham, Federal Practice & Procedure: Evidence § 5240 at 472 ("even if the evidence falls within one of the traditional exceptions [in Rule 404(b) ], the trial judge may still exclude it on the discretionary grounds listed in Rule 403.").

Here, plaintiff Shaw has not established (indeed, has not claimed) that the LAD Report shows motive, opportunity, intent or the like. Shaw contends that Officer Graham assaulted him in the precinct. There is no issue of intent, accident, etc.-Officer Graham denies it occurred at all. Thus, the only purpose of the LAD material can be to show that because Officer Graham previously was investigated for assaulting a prisoner, plaintiff Shaw should be believed and Graham disbelieved as to the claim here that Graham assaulted Shaw. That is the very use of this evidence, however, that Rule 404(b) is designed to prevent. *See, e.g., Berkovich v. Hicks,* 922 F.2d at 1022-23 (upholds trial court's exclusion of evidence of prior civilian complaints against officers charged with false arrest and use of excessive force); *Lewis v. Velez,* 149 F.R.D. 474, 479-81 (S.D.N.Y.1993) (evidence of inmate's prior violent episodes excluded in case involving inmate-guard altercation); *Wallace v. Hano,* 90 Civ.2064, 1992 WL 230139 at *7-8 (S.D.N.Y.1992) (motion in limine granted to exclude records of prior complaints against defendant in § 1983 case for false arrest and use of excessive force); *see also, e.g., Donald v. Rast,* 927 F.2d 379, 381 (8th Cir.) (evidence of officer's prior reprimand for untruthfulness in account of earlier vehicular accident not admissible in trial concerning a vehicular accident; the officer's "character was not at issue and ... the admission of previous reprimands would only go to prove conformity with a certain character trait on the date of the collision" at issue, which is prohibited by Rule 404(b).), *cert. denied,*502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 68 (1991).[FN2]

> FN2. The Court notes that since plaintiff Shaw does not allege a *Monell* claim against the City, the evidence is not relevant to show the City's knowledge of any prior allegations of Officer Graham's use of excessive force.

In his brief in opposition to defendants' motion in limine, plaintiff Shaw for the first time seeks the name and address of the complainant in the LAD report. (Shaw In Limine Reply Br. at 9.) Discovery, however, is over. The Court notes, as well, that the proposed pretrial order identifies the LAD report as a plaintiff's trial exhibit, but does not list the LAD complainant as a trial witness, even by description as opposed to name. The request, therefore, is untimely. In addition, for the reasons discussed above as to the LAD report, the complainant's testimony similarly would not be admissible.

*7 Finally, in this regard, Shaw, argues that the information is relevant to Officer Graham's credibility, because in his deposition Graham testified that the LAD complainant was white, while a photograph shows that the complainant is not white. (Shaw In Limine Reply Br. at 10, 12 & Ex. 6.) If at trial Graham testifies as at his deposition, Shaw's counsel may impeach him by using the complainant's photograph. Shaw may not, however, refer at trial to the complainant's allegations or the LAD report.

**B. *The Interrogatory Answers Are Not Relevant***

In its original answers to interrogatories, the City identified Officer Fitzgibbons as the officer who es-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.   Page 7
Not Reported in F.Supp., 1997 WL 187352 (S.D.N.Y.)
**1997 WL 187352 (S.D.N.Y.)**

corted plaintiff Shaw from the patrol car to the precinct holding cell. The interrogatory responses were not sworn to by any of the defendant officers, but by Timothy Kerr, Deputy Managing Attorney of the Police Department Legal Bureau. Shaw testified at his deposition, however, that it was not Officer Fitzgibbons who escorted him to the cell, and defendants thereafter amended their responses to say they did not know who escorted plaintiff to his cell. Plaintiff later identified Officer Graham from a "photo array" as the officer involved.

While the original interrogatory answers are an "admission" of the defendant City, the Court fails to see the relevance of the now-corrected interrogatory, since plaintiff and the defendants all now agree that it was not Officer Fitzgibbons who escorted him to the holding cell. Accordingly, the original interrogatory response will not be admitted into evidence at trial.

C. *The Mollen Commission Report*

Plaintiff Shaw seeks to offer excerpts from the Mollen Commission Report to prove that there is a blue "code of silence" by which some police officers protect fellow officers, and lie if necessary to do so. (*E.g.,* Shaw In Limine Br. at 5, 7; Shaw In Limine Reply Br. at 1-8.) Plaintiff Shaw claims that "inferences that are fairly drawn from the record developed in pre-trial discovery show that defendants Kicki, Fitzgibbons and Graham have behaved in a manner consistent with the 'code of silence' and 'falsification of reports and testimony' among NYPD police officers which was documented by the (Mollen Commission) Report." (Shaw In Limine Reply Br. at 2.)

The Court finds it surprising that only a handful of cases have addressed whether the Mollen Commission Report is admissible. In *Bryant v. New York City,* CV-92-0960, slip op. (E.D.N.Y. Oct. 27, 1994), Chief Judge Sifton excluded the Mollen Commission Report in a case, like this, involving excessive force allegations. Judge Sifton found it "simply too great a logical leap to assume that civil rights violations also arise from the same sources that give rise to police corruption." *Id.,* slip op. at 9. *Bryant* involved a *Monell* claim; there is no *Monell* claim here. Even in connection with the *Monell* claim, Judge Sifton found the Mollen Report inadmissible. Judge Sifton noted that the Mollen Commission Report "addresses police corruption rather than police brutality. Since the institutional pressures that bring about corruption and tolerance of police corruption are so different from those that might encourage or tolerate police brutality, there is no basis for inferring one because of the existence of the other." *Id.,* slip op. at 10.

*8 In *Williams v. City of New York,* 94 Civ. 6234, unpublished transcript (S.D.N.Y. Sept. 6, 1996), the plaintiff wished to offer excerpts from the Mollen Commission Report as to the "code of silence" to go to the credibility of police officer witnesses. (*Id.,* tr. at 78-85.) Judge Preska excluded the Mollen Report, "find[ing] that the probative value of the Report is far outweighed by the extreme prejudice. The Report is relevant at best on general credibility issues.... It has no relationship to the specific issues or persons in this case. Its probative value is very, very slim, and its prejudicial value is very, very high. Accordingly, it will not be admitted." *Id.,* tr. at 85.

In *Jackson v. City of New York,* 93 CV 174, unpublished order (E.D.N.Y. April 24, 1996), Judge Dearie had bifurcated plaintiff's claims against the individual police officers from plaintiff's *Monell* claim against the City. Plaintiff proposed trying the two claims together and offered to limit his *Monell* proof to the Mollen Commission Report (and the Police Department's Patrol Guide). Judge Dearie rejected plaintiff's proposal, finding, *inter alia,* that "the admission of all or parts of the Mollen Commission Report could prejudice individual defendants in the upcoming trial." (Slip op. at 2.) FN3

> FN3. In *Domenech v. City of New York,* 919 F.Supp. 702 (S.D.N.Y.1996), Judge Sweet found it unnecessary to decide on

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 187352 (S.D.N.Y.)
**1997 WL 187352 (S.D.N.Y.)**

Page 8

> the admissibility of the Mollen Commission Report in a sexual discrimination suit by a female police officer. The Court granted summary judgment to the defendants, holding:
>
>> Defendants raise evidentiary objections to consideration of the Mollen Commission report and the testimony before the Mollen Commission. It is unnecessary to pass on these objections, however, because, even if fully considered, the Report fails to create a genuine issue of material fact as to the existence of a retaliatory custom or practice. The Mollen Commission Report did indeed find a culture of retaliation against those reporting criminal corruption within the NYPD, and some testimony was presented to suggest the existence of a "Blue Wall of Silence" within the Department. Even construing the Mollen Commission Report in its most favorable light, however, no reasonable finder of fact could deem it to demonstrate a culture of retaliation for non-criminal activity such as discrimination complaints so pervasive as to constitute a custom or usage amounting to tacit NYPD policy. Thus, Domenech has failed to establish a genuine issue of material fact as to the culpability of the Municipal Defendants under the Monell standard.
>
> *Id.* at 711.

The Court notes that three cases have admitted the Mollen Commission Report into evidence, but those cases all involved *Monell* claims, in which the City's knowledge of police misconduct and failure to correct it is an element of the *Monell* claim against the City. In *White-Ruiz v. City of New York,* 93 Civ. 7233, 1996 WL 603983 (S.D.N.Y. Oct.22, 1996), a female police officer sued the City, the Police Commissioner and various other police officials for retaliation for having disclosed corrupt behavior of another police officer. Magistrate Judge Dolinger denied the summary judgment motion of the City and Commissioner Kelly. In doing so, he found the Mollen Commission Report to be admissible in support of plaintiff's *Monell* claim. He distinguished *Bryant* and *Domenech:* "In contrast to those cases, plaintiff here complains of actions that fit squarely within the pattern of Departmental conduct addressed by the Mollen Commission." 1996 WL 603983 at *10.[FN4] This case, unlike *White-Ruin,* is not a *Monell* claim. Moreover, because he considered the Mollen Report in the context of a summary judgment motion, Magistrate Judge Dolinger did not perform a Rule 403 analysis.

> FN4. Magistrate Dolinger found the report to be "presumably admissible under Fed.R.Evid. 803(8)(c),"*citing Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169, 109 S. Ct. 439, 449-50, 102 L.Ed.2d 445 (1988), and *Gentile v. County of Suffolk,* 926 F.2d 142, 148 (2d Cir.1991). *White-Ruiz v. City of New York,* 1996 WL 603983 at *8 n. 2; see also *Gentile v. County of Suffolk,* 129 F.R.D. 435 (E.D.N.Y.1990) (Weinstein, J.).

In *King v. City of New York,* 93 Civ. 7738, unpublished trial transcript (S.D.N.Y. Aug. 15-21, 1996), Judge Koeltl without explanation allowed plaintiffs to read into evidence a very small excerpt from the Mollen Commission Report. (*See* Tr. at 660.) Judge Koeltl instructed the jury that he was admitting this "solely as evidence that you can consider of any possible bias of any witnesses in the case, ... solely for the purposes of evaluating the credibility of the witnesses who testified." (*Id.*) The trial transcript does not disclose why the Court admitted the Mollen Report excerpts, but it appears that it was stipulated to by the parties. (*See id.*) Moreover, the officers involved were from the 30th Precinct-the very precinct at the center of the Mollen Commission's investigation. *See King v. City of New York,* 92 Civ. 7738, 1996 WL 737195 (S.D.N.Y. Dec.24, 1996).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00943-AWT    Document 200-3    Filed 08/05/2008    Page 17 of 18

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 187352 (S.D.N.Y.)
**1997 WL 187352 (S.D.N.Y.)**

Page 9

*9 Finally, in *Ariza v. City of New York*, No. CV-93-5287, 1996 WL 118535 (E.D.N.Y. March 7, 1996), Chief Judge Sifton denied summary judgment to the municipal defendants on a *Monell* claim by a police officer that he was harassed and retaliated against for complaining about discrimination within the department. *Id.* at *1-2. Judge Sifton relied on, *inter alia*, the proffered Mollen Commission Report in denying defendants' summary judgment motion. *Id.* at *3-5. Judge Sifton distinguished his prior *Bryant* decision:

[*Bryant*] spoke to the lack of evidence in the Mollen report demonstrating that incidents of excessive force and brutality were caused by corruption in the force. Plaintiff establishes the causal connection in this case. The code, by definition, chills speech, and the Mollen report contained evidence ... supporting plaintiff's claim that he suffered recriminations for breaking the code.

*Id.* at *5 n. 2.

Here, unlike those cases, this case does not involve a *Monell* claim against the City. Nor does it involve a suit by a police officer against the Police Department or the City. This case is most similar to *Bryant*, *Williams* and *Jackson*, which excluded the Mollen Commission Report.

If the Mollen Commission Report were held admissible here, it logically would be admissible in every suit, civil and criminal, in which a police officer was alleged to be lying to support the testimony of a fellow police officer. Indeed, it would be admissible in every civil and criminal case in which even a single police officer testified. The Court declines to establish such a precedent.

The Court also notes that in light of recent high profile cases such as the Rodney King and O.J. Simpson trials, it is highly unlikely that jurors today need to read the Mollen Commission Report to be aware that some police officers may be untruthful. *See, e.g.,* Lawrence C. Marshall, *In Spite of Meese*, 85 J.Crim. L. & Criminology 261, 272-75 (1994) (the Rodney King beating tapes "changed many people's sense of the possible, by exposing them to the fact that police can act viciously. In doing so, the effects of the tapes went far beyond Rodney King's case. All across the country, prosecutors and defense lawyers began reporting that jurors were treating police testimony with newfound skepticism because the jurors no longer believed the police were beyond misconduct: the tapes seemed 'to be undermining jurors' traditional presumption in favor of police in civil and criminal trials.' ") (fns.omitted); Deborah Hastings, *We've All Heard Fuhrman, Now Will We Ever Believe Another Cop?*, The Assoc. Press, 1995 WL 4404507, Sept. 3, 1995 ("Now that seemingly everyone except the O.J. Simpson jurors has heard Mark Fuhrman boasting of planting evidence and brutalizing minorities, will future jurors in other cases across the nation ever believe a police officer's testimony? Not easily, legal analysts say."); *Racial Divide Affects Black, White Panelists*, Nat'l L.J., Feb. 22, 1993 at S8 (following the Rodney King trial, "according to the poll results, the majority of jurors are skeptical of [police] testimony."); Emily Sachar, *Matter of Trust Race Fuels Doubt on Cops*, Newsday, Oct. 31, 1992 at 6 ("some legal observers believe the credibility of police officers has been eroding for several years, with jurors' suspicion of police intensifying since the Rodney King episode.... 'In Brooklyn and the Bronx, more than in any of the other counties, the juries readily accept that from time to time police do not testify truthfully,' said [a] defense attorney."); Rene Lynch, *King Beating Felt in Courtrooms*, L.A. Daily News, 1991 WL 7224219, March 31, 1991 at N4 ("Courthouse officials said the King case has deepened skepticism of police and prosecutors by jurors.").

*10 Current public perception, along with an appropriate jury instruction on witness credibility including that the credibility of the specific police officers who are defendants and/or witnesses is for the jury to determine, renders the Mollen Report superfluous in this case. *See, e.g., Therrien v. Vose*, 782

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00943-AWT   Document 200-3   Filed 08/05/2008   Page 18 of 18

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 187352 (S.D.N.Y.)  
**1997 WL 187352 (S.D.N.Y.)**

Page 10

F.2d 1, 4 (1st Cir.) ("where the prosecution relies heavily upon the testimony of police officers, the trial judge must be cognizant of the risk that juries might give more credence to witnesses called by the prosecution.... We conclude that the jury was properly instructed as to its role in weighing the witnesses' testimony...."), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 727 (1986); 1 L. Sand, *Modern Federal Jury Instructions,* Instruction 7-16 (1996). In any event, as in *Williams,* any probative value of the Mollen Report in this case is substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403.

Accordingly the Court will not permit plaintiff to introduce the Mollen Commission Report excerpts at trial. Defendants' motion in limine is granted and plaintiff's cross-motion is denied.

## CONCLUSION

For the reasons set forth above: (1) Officer Fitzgibbons' summary judgment motion is granted dismissing all claims against him; (2) Officer Graham's summary judgment motion dismissing all claims except the excessive force claims is granted; and (3) defendants' motion in limine is granted in all respects, and plaintiff's cross-motion in limine that the Mollen Commission Report be admitted is denied.

SO ORDERED.

S.D.N.Y.,1997.  
Shaw v. City of New York  
Not Reported in F.Supp., 1997 WL 187352 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.