CR01-0497231      ✳      SUPERIOR COURT

STATE      ✳      JUDICIAL DISTRICT

VS      ✳      AT NEW HAVEN

GARY SESSIONS      ✳      MARCH 1, 2001


BEFORE:  THE HONORABLE ROBERT J. DEVLIN, JUDGE


APPEARANCES:


CHRISTOPHER A. ALEXY, ESQ.
For the State


JOHN R. WILLIAMS, ESQ.
For the Defendant


WENDY IOVENE
Court Recording Monitor

1          THE COURT:  All right.  This is the matter of State

2     of Connecticut versus Gary Sessions.  It's docket number

3     CR01497231.  The State's here represented by Attorney

4     Alexy, and Mr. Sessions, you're represented by Attorney

5     Williams.  Are the parties ready to proceed on the

6     hearing on probable cause?

7          MR. ALEXY:  Yes, your Honor.

8          MR. WILLIAMS:  Yes, your Honor.

9          THE COURT:  Any preliminary matters that we need to

10     take up on this matter?

11          MR. ALEXY:  Yes, briefly.  The State's first witness

12     is being brought over from the lockup in GA6.  She's en

13     route right now.  In the meantime, I would offer the

14     autopsy report in this case, which has been premarked as

15     State's Exhibit 9 for identification, as an exhibit for

16     the probable cause hearing.  I believe Counsel already

17     has a copy of that, if not, I have an extra.

18          MR. WILLIAMS:  If I can just have an extra, that'll

19     be fine.  No, I have not seen this before.  I have no

20     objection.

21          THE COURT:  All right.  Exhibit 9 may be a full

22     exhibit for this hearing.

23          (State's Exhibit 9 marked for identification

24     received in evidence as a full exhibit.)

25          MR. ALEXY:  May Counsel approach?

26          (Off record discussion.)

27          THE COURT:  Step forward up here ma'am.  Right here

1                    ma'am.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

3

1                           M Y R A   M E R C A D O ,

2      of 156 West Street, New Haven, Connecticut, having been first duly

3      sworn, was examined and testified under oath as follows:

4                          THE CLERK:  Please state your full name and address

5                  for the record.

6                          THE WITNESS:  Myra Mercado.  Address:  156 West

7                  Street.

8                          THE MONITOR:  What's your name?

9                          THE WITNESS:  Myra.

10                         THE CLERK:  Can you spell your last name, please?

11                         THE WITNESS:  M-e-r-c-a-d-o.

12                         THE COURT:  Okay.  Ms. Mercado, please have a seat.

13                         THE WITNESS:  Thank you.

14                         THE COURT:  I'm going to ask you to please keep your

15                  voice up during your testimony.

16                         THE WITNESS:  Yes.

17     **DIRECT EXAMINATION BY MR. ALEXY:**

18          Q    Ms. Mercado, I'm going to start by asking you -- first of

19     all, do you recognize the defendant in the courtroom today?

20          A    Yes, I do.

21          Q    How do you know him?

22          A    I used to work for him on Hallock Street.

23          Q    Do you have children by him?

24          A    Yes.

25          Q    How many?

26          A    One.

27          Q    Now, directing your attention back to July, 1999.

1        Q    Now, was this -- was the defendant -- was he working for

2  somebody else?

3        A    The defendant, no.

4        Q    Okay.   Who was in charge?

5        A    He was.

6        Q    That's Gary Sessions?

7        A    Yes.

8        Q    Now, in July of 1999, do you know a person named DeShawn

9  Johnson?

10       A    Yes.

11       Q    Did he have any relationship to this -- the drug selling

12  business?

13       A    Yes.

14       Q    What was his relationship to that?

15       A    He used do everything for him.

16             THE COURT:   For whom?

17             THE WITNESS:   For Shabazz.

18       Q    And when you say "Shabazz," who are you referring to?

19       A    Gary.

20       Q    Shabazz is Gary Sessions's nickname?

21       A    Yes.

22       Q    And when you say, DeShawn Johnson used to do everything

23  for Shabazz, what do you mean by that?

24       A    He used to hand bag it there for him, for his business.

25       Q    Did he handle money?

26       A    Yes.

27       Q    Would handle the drugs himself?

```
1        A    Yes.

2        Q    Would he collect money?

3        A    Yes.

4        Q    I'm going to show you a picture that's been marked as

5    State's Exhibit 1 for identification, and I'm going to ask you to

6    look at the one in the top, from your side, right-hand corner.

7        A    Uhm-hmm.

8        Q    It has the writing on it.  Do you recognize who that is?

9        A    Yes.

10       Q    Who is that?

11       A    DeShawn.

12       Q    DeShawn Johnson?

13       A    Yes.

14            MR. ALEXY:  I'm going to offer this, just for

15            that --

16            MR. WILLIAMS:  No objection.

17            MR. ALEXY:  -- purpose.

18            THE COURT:  It's accepted Exhibit 1, for this

19            hearing.

20            (State's Exhibit 1 marked for identification

21            received in evidence as a full exhibit.)

22   BY MR. ALEXY:

23       Q    I'm also going to show you State's Exhibit 5 for

24   identification, ask you to look again at the photograph in the top

25   right-hand corner.

26       A    Uhm-hmm.

27       Q    Is that the same photograph of DeShawn Johnson?
```

1        A    Yes.

2                    MR. ALEXY:  Offer that as well.

3                    MR. WILLIAMS:  No objection.

4                    THE COURT:  Okay.  Number 5 is a full exhibit.

5                    (State's Exhibit 5 marked for identification

6        received in evidence as a full exhibit.)

7    BY MR. ALEXY:

8        Q    I'm going to show you now, a picture that's been marked

9    State's Exhibit 2 for identification.  And this the third from left

10   on the top row.  The one with the writing on it.

11       A    Yes.

12       Q    Do you recognize that picture or the person in that

13   picture?

14       A    I recognize the person.

15       Q    Okay.  How do you know that person?

16       A    That kid's cousin.

17       Q    Okay.  You're going to have to speak up a little bit

18   louder.

19       A    Yes.

20       Q    And when you say "that kid," who are you referring to?

21       A    Lucky's cousin.

22       Q    Lucky's cousin?

23       A    Yes.

24       Q    And how did you -- how are you familiar with Lucky's

25   cousin?

26       A    I don't know him like that.  I just seen him on the

27   street.

1       Q     Just seen him what?

2       A     I used to see him around -- around the street.

3       Q     Was he in any way involved, do you know, with the

4    defendant's drug selling?

5       A     Yeah, he used to sell for Shawn and him.

6             MR. WILLIAMS:  Can I have that back?  I can't hear

7       what she's saying.

8             THE MONITOR:  I can't hear what she's saying.

9             THE COURT:  Okay.

10            THE WITNESS:  He used to sell narcotics for Shawn.

11   **BY MR. ALEXY:**

12      Q     When you say "Shawn," is that the Shawn in the two

13   pictures --

14      A     Yes.

15      Q     -- I showed you earlier?  And who would Shawn get the

16   narcotics from?

17      A     Gary.

18      Q     The defendant?

19      A     Yes.

20            MR. ALEXY:  I'm going to offer this as a full

21      exhibit, as well.  State's Exhibit 2.

22            THE COURT:  Okay.

23            MR. WILLIAMS:  Could I -- could I just voir dire on

24      that briefly, your Honor?

25            THE COURT:  Go ahead.

26   **VOIR DIRE EXAMINATION BY MR. WILLIAMS:**

27      Q     What's the name of this person, ma'am?

1    A    I don't know his name.

2    Q    You don't know his name?

3    A    No.

4    Q    How do you know he used to sell drugs for Shawn?

5    A    'Cause I seen him one time.

6    Q    Shawn doing what?

7    A    Passing him drugs, packages.

8    Q    Okay.  And was Mr. Sessions anywhere around when that --

9    when you made that observation?

10    A    No.

11    Q    So, you don't have -- don't see any connection -- you

12    didn't see any connection between that incident and Mr. Sessions,

13    did you?

14    A    No.

15        MR. WILLIAMS:  Object.  It's not related to this

16    case.

17        THE COURT:  The purpose of the offer was to

18    authenticate the picture on the photo board?

19        MR. ALEXY:  Correct.

20        THE COURT:  Is there any more to it than that, at

21    this point?

22        MR. ALEXY:  Not at this point, your Honor.

23        THE COURT:  All right.  Given the nature of this --

24    limited nature of this proceeding, I'll overrule the

25    objection.  It may be accepted as Exhibit Number 2.

26        (State's Exhibit 2 marked for identification

27    received in evidence as a full exhibit.)

1      DIRECT EXAMINATION BY MR. ALEXY (Continuing):

2          Q      Now, again in July of 1999.

3          A      Uhm-hmm.

4          Q      I'm going to ask you if you were aware of any problems

5      that developed between --

6                    MR. ALEXY:  May I have that last exhibit?

7                    THE COURT:  Yes, sure.

8          Q      Any problems that developed either between or as a result

9      of this person you identify as Lucky's cousin --

10         A      Uhm-hmm.

11         Q      -- and Shawn?

12         A      From what I heard, it was a sad --

13                   MR. WILLIAMS:  Objection, hearsay.

14         A      There was a packet --

15                   THE COURT:  Hold on a second.  Hold on a second.

16                   The objection's sustained based on the answer thus far.

17                   I'm going to rephrase the question, but the objection's

18                   sustained based on what she heard.

19     BY MR. ALEXY:

20         Q      Did you hear the defendant discussing a problem with this

21     person?

22         A      The defendant.  He bought a package --

23         Q      It's a yes or no answer.

24         A      Yes.

25         Q      And I'll -- just to be more specific, on July 16th of

26     1999, were you at the defendant's house when he was discussing being

27     short money from this person?

1    A    Yes.

2    Q    You heard what the defendant said on it?

3    A    Uhm -- yes.

4    Q    Who was he talking to?

5    A    To DeShawn.

6    Q    And what did the defendant tell DeShawn?

7    A    Something about a package being messed up.

8    Q    What kind of package?

9    A    Drug package.

10    Q    And what did he say about it being messed up?

11    A    The money wasn't -- didn't come back right.

12    Q    How much money?

13    A    900.

14    Q    $900?

15    A    Yes.

16    Q    Were you supposed to do something with that $900?

17    A    Supposed to go to New York.

18    Q    Keep your voice up, please.  Okay?

19    A    Yes.

20    Q    What were you supposed to do in New York?

21    A    Cop drugs.

22    Q    $900 worth?

23    A    No, 10,000.

24        THE COURT:  How much?

25        THE WITNESS:  About 10,000.

26        THE COURT:  10,000?

27        THE WITNESS:  Yeah.

**BY MR. ALEXY:**

Q    And how much, you know, quantity or weight is $10,000 that you would buy?

A    It depends.

THE COURT:  You have to speak louder, ma'am.

THE WITNESS:  It depends.

Q    Did you have the full $10,000?

A    No.

Q    How much were you short?

A    900.

Q    And is this what this conversation was about with the defendant and DeShawn?

A    Yes.

Q    Did the defendant say anything about how to collect this money?

A    To have him work it off.  If not, then just to see him.

Q    Okay.  And you're familiar with the defendant's running of his drug operation, correct?

A    Yes.

Q    If he said, Work it off, what did that mean?

A    Pay him back.

Q    And if he didn't pay him, what did it mean then to "go see him?"

A    Go see him kind of meant a lot things at that time.  I really didn't know at that time.

Q    Okay.  Was -- was he calm when he said these things?

A    He was kind of angry.

1      Q    Without the $900, you were not able to go to New York to

2  buy the drugs, is that right?

3      A    Yes.

4      Q    And that would be drugs for resale?

5            MR. WILLIAMS:  Objection, your Honor, leading.

6            THE COURT:  Objection sustained.

7            THE WITNESS:  Yes.

8            THE COURT:  The answer's stricken.

9  **BY MR. ALEXY:**

10     Q    What would you do with those drugs when you brought them

11  back from New York?

12     A    Bag it up and sell it.

13     Q    Now, we're going to move ahead a few days to July 25,

14  1999, about one or two o'clock in the morning.

15     A    Uhm-hmm.

16     Q    Where were you at that time?

17     A    About -- the post office.

18     Q    You got to speak up, please.

19     A    I was by the post office.

20     Q    Which post office?

21     A    By Six Corners.

22     Q    Where is Six Corners?

23     A    Columbus -- Columbus, Hallock and I don't know that other

24  side street.

25     Q    That's in the Hill Section of New Haven?

26     A    Yes.

27     Q    What were you doing at the post office at 1:00 or 2:00 in

```
1        the morning?

2            A    Waiting.

3            Q    For whom?

4            A    For Shawn.

5            Q    Why were you waiting for Shawn?

6            A    To get a package.

7            Q    What package were you expecting?

8            A    Money.

9            Q    From what?

10           A    The drugs.

11           Q    And did Shawn show up at the post office?

12           A    Yes.

13           Q    Was he by himself?

14           A    Yes.

15           Q    Were there -- were you in a car when you were there?

16           A    Yes.

17           Q    What kind of car?

18           A    A blue truck.

19           Q    A blue truck?

20           A    Yes.

21           Q    Anybody else with you at the time in the blue truck?

22           A    No.

23           Q    Where were your children at this time?

24           A    My daughter was with me.

25           Q    How old was your daughter at that time?

26           A    3 years -- 2 years old.

27           Q    Was this the daughter that you had with the defendant?
```

```
 1      A    Yes.

 2      Q    Now when Shawn arrived, what happened?

 3      A    He asked to use to the phone.

 4               THE COURT:  Speak louder.

 5               THE WITNESS:  He asked to use the phone.

 6      Q    Whose telephone?

 7      A    Mine.

 8      Q    Is that a cell phone?

 9      A    Yes.

10      Q    And what did he do?

11      A    He called the defendant.

12      Q    Called Shabazz?

13      A    Yes.

14      Q    And did he place this telephone call, you know, in front

15  of you?  Was he in front of you when he called?

16      A    Yes.

17      Q    And what happened then?

18      A    He called to tell him to call him, to say that he seen

19  them Getty, Kimberly.

20      Q    You have to -- say the last part louder.

21      A    He said he seen the guys on Kimberly, Getty Gas Station.

22      Q    Did you know what guys he was talking about?

23      A    No.

24      Q    How was Shawn acting or behaving at this time when he was

25  calling?

26      A    Excited.

27      Q    He was calling Shabazz, he was excited?
```

1      A    Uhm-hmm.

2      Q    And what happened after he called Shabazz and said he saw

3  the -- did he say "guys," is that the word he used?

4      A    Yeah.

5      Q    When he said he saw the guys at the Getty Gas Station --

6      A    Yeah.

7      Q    -- what happened next?

8      A    Nothing.  He just said, Whatever.  The other truck came

9  rumbling and jumbling, and he hung up the phone.

10     Q    Okay.  After Shawn hung up the phone, what happened after

11  that?

12     A    I had got out of the truck.  His two friends pulled up in

13  a CRX.

14     Q    These are two friends of Shawn's?

15     A    Yeah.

16     Q    That CRX, what kind of car is that?

17     A    I don't really know.  I know it's just a blue CRX, two-

18  door, blue.

19     Q    Blue CRX, two-door?

20     A    Yes.

21     Q    Is that a Honda CRX?

22     A    Yeah.

23     Q    Now, the -- did you know the two people that pulled up in

24  the car?

25     A    Yes.

26     Q    Who were they?

27     A    Efrain and Moleto.

1    THE COURT:  Say that again.

2    THE WITNESS:  Efrain and Moleto.

3    Q    Efrain, is that spelled E-f-r-a-i-n?

4    A    Yes.

5    Q    And Moleto is the second person, right?

6    A    Yeah.

7    Q    I'm going to show you State's Exhibit 6 for

8    identification.  Ask you to look at the person in the top right-hand

9    corner.  Do you recognize who that is?

10   A    Yes.

11   Q    Who is that?

12   A    Efrain.

13   MR. ALEXY:  I'd offer that.

14   MR. WILLIAM:  No objection.

15   THE COURT:  Full exhibit Number 6.

16   (State's Exhibit 6 marked for identification

17   received in evidence as a full exhibit.)

18   **BY MR. ALEXY:**

19   Q    Now, do you know if Efrain or Moleto worked for, first of

20   all, Shawn?

21   A    Yes.

22   Q    And if they worked for Shawn, that meant they worked for

23   who?

24   A    They didn't work for the defendant, they worked for

25   Shawn.

26   Q    Okay.  Worked for Shawn?

27   A    Yes.

1   Q   So would Shawn give them narcotics to sell?

2   A   Yes, I think.

3   Q   For his own?

4   A   Yes.

5   Q   Just so we understand, Shawn worked for the defendant?

6   A   Yes.

7   Q   Is that right?

8   A   Yes.

9   Q   But he sold some on his own, is that right?

10  A   Yes.

11  Q   Did -- withdrawn.  And Efrain and Moleto just sold for

12  Shawn, is that right?

13  A   Yes.

14  Q   What areas did the defendant sell in?

15  A   On Hallock.

16  Q   On Hallock Street?

17  A   Yes.

18  Q   Any place else?

19  A   That's it.

20  Q   Now what happened after Efrain and Moleto pulled up in

21  the blue Honda CRX?

22  A   They pulled up.

23          THE COURT:  Speak louder.

24  A   They had pulled up and was talking to Shawn.  Minutes

25  later, the defendant pulled up in his truck.  I was --

26  Q   What kind of truck -- what kind of truck did the

27  defendant have?

```
1        A    An Expedition.

2        Q    Do you remember what color?

3        A    Gold.

4        Q    What did he do when he pulled up?

5        A.   Him and Shawn was talking.

6        Q    Did you hear the conversation?

7        A    Yes.

8        Q    What did the defendant say?

9        A    He really didn't, basically, say much.  Shawn was really

10   the one talking.

11       Q    And what did Shawn say?

12       A    That he seen them.  He said, What up?

13       Q    That he seen them?

14       A    That he seen them and he said, What to do?

15       Q    What happened next then, when -- after he asked, What to

16   do?

17       A    The defendant said, Do what you got to do.

18       Q    Then what happened?

19       A    The defendant passed a gun and that's it.

20       Q    Where was the defendant sitting when he told them, Do

21   what you got to do?

22       A    In his passenger side of his truck.

23       Q    Of the Expedition?

24       A    Yes.

25       Q    Where were you sitting or where were you when he said

26   that?

27       A    I was in the passenger side; he was in the driver's side.
```

1    Q    So, you're in the defendant's Expedition?

2    A    Yes.

3    Q    Passenger seat?

4    A    Yes.

5    Q    In the front?

6    A    Yes.

7    Q    And where is Shawn?

8    A    In the window by the door.

9    Q    Whose window?

10    A    My door in the passenger side.

11    Q    So this conversation is going on across you, right?

12    A    Yes.

13    Q    Now, the defendant says, Do what you got to do.  And then

14    what does the defendant do?

15    A    Pass him a gun and that's it.

16    Q    Did you see where the gun came from?

17    A    It left from the defendant's hands to Shawn's hands.

18    Q    Did the defendant have the gun in his hands the whole

19    time before that?

20    A    No, I didn't -- no, he didn't.  He pulled it out from

21    somewhere.

22    Q    Pulled it out from somewhere --

23    A    In his truck.

24    Q    -- in the vehicle?

25    A    Yes.

26    Q    And passed it to --

27    A    Shawn.

1       Q     -- Shawn, is that right?

2       A     Yes.

3       Q     Did this gun -- Shawn was at your window and the

4   defendant was on the driver's side, this gun passed in front of you?

5       A     Yes.

6       Q     Do you remember what color it was?

7       A     Black.

8       Q     How was Shawn behaving at this time?

9       A     Excited.

10      Q     What did Shawn do then after -- did he take the gun,

11  first of all?

12      A     Yes, he did.

13      Q     What did he do?

14      A     Nothing.  That's when Bebe came up on a scooter.

15      Q     Okay.  You said Bebe, right?

16      A     Yes.

17      Q     I'm going to show you -- this is State's Exhibit

18  Number 3.

19      A     Uhm-hmm.

20      Q     Look at the person in the top right-hand corner, and do

21  you recognize who that is?

22      A     Bebe.

23      Q     Okay.  That's Bebe?

24      A     Yes.

25      Q     And while I'm here, I'm going to show you also State's

26  Exhibit 4.  Again, same picture, top right-hand corner.

27      A     Yes.

1      Q     Who is that?

2      A     Bebe.

3                 MR. WILLIAMS:  I have no objection.

4                 THE COURT:  Okay.  Exhibits 3 and 4 are full

5      exhibits.

6                 (State's Exhibits 3 and 4 received in evidence as

7      full exhibits.)

8    **BY MR. ALEXY:**

9      Q     Now, you said Bebe pulls up or drives up on a scooter?

10     A     Yes.

11     Q     Okay.  Is that a -- like a motor scooter or --

12     A     Yeah, a motor scooter.

13     Q     And what happens now that you have -- Bebe is there,

14     correct?

15     A     Yep.

16     Q     DeShawn Johnson?

17     A     Yep.

18     Q     Is Efrain still there?

19     A     Yes.

20     Q     Is Moleto still there?

21     A     Yes.

22     Q     And you're still in the car with -- in the Expedition

23     with the defendant, is that right?

24     A     Yes.

25     Q     Okay.  What happens next?

26     A     Nothing.  They get in the car, we drive off.

27     Q     Who get -- okay.  Stop right there for a second.

1      A      All right.

2      Q      Who gets in which car?

3      A      Bebe gets in the CRX with DeShawn, Efrain and Moleto.

4   After that, there was just shots fired and I don't know nothing

5   else.

6      Q      Okay.  So Bebe gets in the car with Efrain, Moleto and

7   DeShawn, right?

8      A      Yes.

9      Q      Does DeShawn still have the gun?

10     A      Yes.

11     Q      And this is the gun that the defendant gave him, correct?

12     A      Yes.

13     Q      And they pull off and you don't see them after that, is

14   that right?

15     A      Yes.

16     Q      Okay.  How long after they pull off is it until you hear

17   shots?

18     A      I don't remember.

19     Q      Were you still in the Expedition?

20     A      Yes.

21     Q      Were you still parked at the same place?

22     A      No, we was driving off.

23     Q      You were driving off?

24     A      Yes.

25     Q      Was it say, less than an hour?

26     A      No.

27     Q      More than an hour?

1       A     Seconds.

2       Q     I'm sorry.  I can't hear your answer.

3       A     About minutes.

4       Q     Minutes?

5       A     Well, yeah, about a minute, two minutes.  I don't know.

6  I wasn't timing it.

7       Q     But you're saying it was --

8       A     I would assume it was not -- it wasn't no half an hour

9  later.

10       Q     It was not a half-hour later, it was within a few

11  minutes?

12       A     Yes.

13       Q     And did the defendant say anything to you after the shots

14  were fired?

15       A     No.

16       Q     At some point did you learn that Anthony Lucky was killed

17  that night?

18       A     Yes.

19       Q     Did the defendant say anything to you about that?

20       A     No.

21       Q     After the shots were fired that night of the 25th, did you

22  run into Bebe?

23       A     I ran into him on Congress Avenue, the 24-hour store.

24       Q     And what happened when you ran into him?

25       A     Nothing.  He was just acting like he was a big man now,

26  now that he popped somebody.

27       Q     Did he show you anything?

1      A    Yep, he showed me a gun.

2      Q    Do you remember what color it was?

3      A    It was the black one.

4      Q    And when you say, He was acting like a big man 'cause he

5  had popped someone, what do you mean by that?

6      A    Just thought he was big and bad now.

7      Q    And did you know which -- which shooting he was talking

8  about?

9      A    Yeah.

10     Q    Which one?

11     A    The one that happened on Howard Street.

12     Q    On Howard Street?

13     A    Yes.

14     Q    And that's the one you learned that Anthony Lucky was

15  shot, right?

16     A    Yes.

17               MR. ALEXY:  Thank you.  I have nothing further.

18               THE COURT:  Okay.  Cross.

19  **CROSS-EXAMINATION BY MR. WILLIAMS:**

20     Q    The first thing I'm going to ask you, Ms. Mercado, is to

21  look at me when I talk to you, please.  It's much more difficult to

22  understand what you're saying when you insist on looking at the

23  floor.  Would you turn around and face the audience?

24     A    Yes.

25     Q    All right.  How old are you, Ms. Mercado?

26     A    23.

27     Q    25?

1    A    23.

2    Q    And where were you born?

3    A    New Haven.

4    Q    When did you first meet Mr. Sessions?

5    A    Couple of years ago.

6    Q    And when you say, Couple of years ago, do you mean

7    specifically 1999?

8    A    Yes.

9    Q    When in 1999?

10   A    I don't remember exactly.

11   Q    Do you remember what month?

12   A    No.

13   Q    Do you remember what season of the year it was?

14   A    It was summer time.

15   Q    In the summer time?

16   A    Yes.

17   Q    So you first met him in the summer of 1999, is that

18   right?

19   A    I don't remember what year.

20   Q    Well, that's what I asked you first.  You said it was a

21   couple of years ago.  A couple of years ago would be '99, but are

22   you saying now maybe it wasn't '99?

23   A    Yes.

24   Q    When was it?

25   A    I told you I don't remember.

26   Q    Well, was it -- was it 1998?

27   A    I don't remember.

1    Q    All right.  How old were you when you met him?

2    A    About 20.

3    Q    And you're how old now?

4    A    23.

5    Q    23.  What's your date of birth?

6    A    2/19/78.

7    Q    2/19/78.  And you say you were 20 when you met him?

8    A    Yes.

9    Q    So that might the summer of 1998.  Now, you say he's the

10   father of one of your children?  Did you hear my question?

11   A    Yes, I did hear your question.

12   Q    Well, you got to answer it.

13   A    Yes.

14   Q    And is the answer:  Yes, he's the father of one of your

15   children?

16   A    Yes.

17   Q    How many children do you have?

18   A    I have two now.

19   Q    Okay.  Which one is he the father of?

20   A    My daughter.

21   Q    Is she the first born or the second born?

22   A    The first.

23   Q    When was your daughter born?

24   A    My daughter was born.

25   Q    When was your daughter born?

26   A    '99.

27   Q    When in '99?

1    A    November.

2    Q    When in November?

3    A    17th.

4    Q    November 17, 1999?

5    A    Yes.

6    Q    Okay.  Now, how old is your second child?

7    A    My son is three months old.

8    Q    Three months old.  You indicated that your address is

9    West Street?

10    A    Yes.

11    Q    Where is West Street?

12    A    Off of Columbus.

13    Q    Okay.  Here in New Haven?

14    A    Yes.

15    Q    And do you live at West Street in New Haven, at this

16    time?

17    A    No.

18    Q    Where do you live at this time?

19    A    I don't have a prior address.

20    Q    Well, where did you spend last night?

21    A    I'm incarcerated.

22    Q    Where are you incarcerated?

23    A    In York CI.

24    Q    All right.  And how long have you been incarcerated at

25    York CI?

26    A    I've been there since December.

27    Q    Since when?

1     A    Since December.

2     Q    All right.  So your child was born at York, or when you

3 were at York?

4     A    No, my son was born outside.

5     Q    Before you went to York?

6     A    Yes.

7     Q    Are you serving a sentence at York?

8     A    Yes.

9     Q    What sentence are you serving?

10     A    Eight years, suspended after a four-year cap, with three

11 years probation.

12     Q    And when were you given that sentence?

13     A    On January 10th.

14     Q    Who gave you that sentence?

15     A    The judge.

16     Q    Where?

17     A    GA6 Court.

18     Q    Okay.  And what were you sentenced for?

19     A    I was sentenced for possession of narcotics, destruction

20 of evidence, and interfering with a search warrant, with two failure

21 to appears on it, and a breach of peace.

22     Q    Were you represented by a lawyer?

23     A    Yes.

24     Q    Who represented you?

25     A    I don't know his name.

26     Q    All right.  Public Defender?

27     A    Yeah.

1       Q    Are you represented by a lawyer at this time, today?

2       A    No.

3       Q    Have you been represented by a lawyer since the day you

4  were sentenced?

5       A    No.

6       Q    Now, these crimes that you were sentenced for, did you

7  commit them all at the same time or were they at different times?

8       A    I committed them at the same time.

9       Q    All right.  And when was that?

10      A    I don't even remember when I committed, to tell if I had

11  a failure to appear or not.

12      Q    Would it be correct to say that you committed those

13  crimes on the 2nd of September, 1999?

14      A    I don't remember the date.

15      Q    Does that sound about right?

16      A    No.

17      Q    It does not?

18      A    No.

19      Q    Okay.  You think it was before then?

20      A    No, most likely after.

21      Q    Now, you gave a sworn written statement about these

22  matters to the -- to the police, didn't you?

23      A    Yes.

24      Q    And you gave that statement over at the courthouse across

25  the street here, didn't you?

26      A    Yes.

27      Q    And you did that in November of 1999, isn't that right?

1    A    Yes.

2    Q    Have you had a chance to look that statement over

3    sometime today before coming here to testify this afternoon?

4    A    Yes.

5    Q    And did somebody go over that statement with you?

6    A    I went over it myself.

7    Q    But just you alone?

8    A    Yes.

9    Q    Okay.  And how did you get that statement?

10    A    The prosecutor.

11    Q    Brought it over to you?

12    A    Yes.

13    Q    All right.  And you -- because you were in a lockup

14    across the street, is that right?

15    A    Yes.

16    Q    All right.  Now, when you gave that statement, was that

17    part of some kind a deal that you were making with the police and

18    the prosecutor?

19    A    No, because I was already given into sentencing.  I was

20    already entered a plea.

21    Q    All right.  But, you just never showed up for sentencing,

22    is that the --

23    A    My first plea was a five-year, suspended after a three

24    year cap, with two years probation.  I failed to use that one.

25    Q    What do you mean, Failed to use it?

26    A    I failed to come to court for that.

27    Q    Okay.  Now, was that a plea that you made around the same

1      time that you gave that statement?

2          A    No, I actually -- I plead before.

3          Q    Before?

4          A    Yes.

5          Q    So what were you doing in court in November of '99, on

6      the day that you made this written statement?

7          A    I came here.  I had came back to enter the plea.  I

8      already -- they offered it to me.  I didn't enter it at that time,

9      and I was brought back from York CI to enter that plea.

10         Q    And that's 'cause you were -- you were at York, because

11     you couldn't put up -- you couldn't come up with the bond?

12         A    Yes.

13         Q    All right.  So you were brought back in and you entered

14     the plea that day?

15         A    Yes.

16         Q    And your bond was reduced that day and you got out?

17         A    My bond was reduced, yes.

18         Q    And you got out?

19         A    Yes.

20         Q    What was it reduced to that day?

21         A    I don't even remember how --

22         Q    Did you put up any money to get out that day?

23         A    My family did.

24         Q    Your family did?

25         A    Yes.

26         Q    Okay.  And then you just didn't come back?

27         A    Yes.

1    Q    Okay.  Where did you go?

2    A    To my mother's house.

3    Q    Which is where?

4    A    On West Street.

5    Q    All right.  In other words, you didn't leave New Haven,

6    you just went back to West Street?

7    A    Yes.

8    Q    And they didn't come -- the police didn't come for you?

9    A    No.

10    Q    I see.  And then the reason you eventually got caught was

11    because you committed another crime, is that right?

12    A    Yes.

13    Q    What was that one?

14    A    Breach of peace.

15    Q    Okay.  Where did that occur?

16    A    On Congress.

17    Q    And when did that occur?

18    A    December 19th of 2000.

19    Q    Of just this past December?

20    A    Yes.

21    Q    And that's when they caught you, and you've been in jail

22    ever since, right?

23    A    Yes.

24    Q    Okay.  Now, at the time that you got pregnant with your

25    first child, what was your relationship to Mr. Sessions?

26    A    It wasn't a relationship.

27    Q    Okay.  You weren't working for him?

1    A    No, not at the time.

2    Q    And you weren't going out with him?

3    A    No.

4    Q    And you weren't living with him?

5    A    No, not like that.

6    Q    Okay.  Just one of those one time things that sometimes

7    happen?

8    A    Yeah.

9    Q    Oh, okay.  And you got pregnant?

10   A    Uhm-hmm.

11   Q    Where did you get pregnant?

12   A    I can't say where I got pregnant, I just ended up

13   pregnant.

14   Q    Okay.  So you -- you only had sex with him once though,

15   is what you're saying, right?

16   A    Couple of times.

17   Q    Couple of times.  And I'm just asking you where that was.

18   A    Hotels.

19   Q    Hotels.  Okay.  Not at this apartment you were telling us

20   about?

21   A    No.

22   Q    So it was sometime after that, that you're saying you

23   were selling drugs for him?

24   A    Yes.

25   Q    When did you start doing that?

26   A    I don't remember exactly a day or a time.

27   Q    Well, can you tell us what time of the year?

1     A   I don't even remember.

2     Q   I think you told us that the child you had with Mr.

3 Session was born in November of '90 -- did you say '98 or '99?

4     A   '99.

5     Q   '99.  November of '99.  That's right around the same time

6 that you made that statement to the police, wasn't it?  Ma'am?

7     A   Yes.

8     Q   Was it before you made that statement or after you made

9 that statement?

10    A   I had my daughter after.

11    Q   So in other words, it was after you got out --

12    A   Yep.

13    Q   -- on bond, is that right?

14    A   Yes.

15    Q   But you were -- you were, obviously, just about ready to

16 have your baby when you gave that statement, right?

17    A   Yes.

18    Q   I see.  Now, did -- have you ever told anybody before

19 that Mr. Session was the father of that child?

20    A   No.

21    Q   Is today the first time you've ever told anybody that?

22    A   Yep.

23    Q   I see.  Is that because it's not true?

24    A   Whatever.

25    Q   I'm sorry.  I didn't hear your answer.

26    A   I didn't say nothing.

27    Q   Could you answer that, please?

1    A    I don't know.  She's mine, that's all.

2    Q    Right.  But my question is:  She isn't really Mr.

3    Sessions's, is she?

4    A    No, she's not Gary's.

5    Q    Why did you say she was?  I didn't hear your answer.

6    A    I didn't say one.

7    Q    Why did you say she was?

8    A    That was the last man I was with.

9    Q    I see.

10        THE COURT:  Hold on a second, Mr. Williams.  No

11   communication, Mr. Sessions, with people in the audience.

12   People in the audience, no communication with Mr.

13   Sessions.  None.  Marshal, no communication, please.

14        THE MARSHAL:  You got it, your Honor.

15        MR. SESSIONS:  I'm sorry.

16   **BY MR. WILLIAMS:**

17        Q    When you say he's the last one you were with, the last

18   one you were with when?

19        A    The time that I recall that I was last with a man.

20        Q    Okay.  You mean there wasn't anybody else between then

21   and the time the baby was born?

22        A    I was with somebody.

23        Q    I'm sorry?

24        A    I with somebody during my pregnancy.

25        Q    Okay.  And that was not Mr. Sessions?

26        A    No.

27        Q    Who was that?

1          MR. ALEXY:  Object as to relevance on that point,

2      your Honor.

3          THE COURT:  Claim that, Mr. Williams.

4          MR. WILLIAMS:  Okay.  Let me -- I'll withdraw that

5      now.

6  **BY MR. WILLIAMS:**

7      Q    Was it one of the people who's names you gave us during

8  your direct testimony this afternoon?

9      A    No.

10     Q    All right.  Now, you testified that at some time in July

11 of '99, you were in Mr. Sessions apartment and heard him make some

12 statements, is that right?

13     A    Yes.

14     Q    Where was the apartment located?

15     A    West Haven.

16     Q    I'm sorry?

17     A    West Haven.

18     Q    Where in West Haven?

19     A    I don't know the street.  I know the house, that's it.

20     Q    I'm sorry, I didn't hear your last sentence.

21     A    I said I don't know which address, I'm saying, but I know

22 it was in West Haven.

23     Q    Was -- was that the first time you'd ever been in that

24 apartment?

25     A    Yes.

26     Q    Were you ever in the apartment after that date?

27     A    No.

1    Q     Okay.  Now, what day was it in July that you say that you

2  were in that apartment?

3    A     I don't remember.

4    Q     You really don't remember what day it was?

5    A     No.

6    Q     Okay.  And if you have, at any time in the past,

7  including today, said that it was on a particular date, you really

8  don't know that that was the date, do you?

9    A     No.

10   Q     Okay.  How did you happen to be in his apartment on that

11  day, whenever it was?

12   A     I had went out there with Shawn.

13   Q     All right.  So, you were with Shawn that day?

14   A     Yeah, we was all out there.

15   Q     And whose idea was it to go there, yours or Shawn's?

16   A     Shawn's.

17   Q     And I guess that he must have been driving some kind of a

18  car with you in it?

19   A     Yes.

20   Q     What kind of a car was that?

21   A     CRX.

22   Q     Is that the same CRX that you were talking about?

23   A     Yes.

24   Q     Okay.  Now, was there anything about that CRX that was

25  different from other CRXs, or was it sort of a basic standard CRX?

26   A     It was a five speed standard.

27   Q     And at the time that you say you heard Mr. Session making

1    some statements in this apartment, whenever that day was, was Shawn

2    there in the apartment at that same time?

3    A   Yes.

4    Q   And you were there?

5    A   Yes.

6    Q   And Mr. Session was there?

7    A   Yes.

8    Q   Anybody else?

9    A   No.

10    Q   And was Mr. Session making those statements to Shawn?

11    A   They were talking.

12    Q   Okay.  Was he on the telephone when he was talking?

13    A   No, they was in person.

14    Q   I'm sorry, I didn't hear that.

15    A   They was face to face.

16    Q   That was face to face.  Okay.  And what is it that you

17    are telling us that Mr. Sessions said to Shawn that day?

18    A   To get his money.

19    Q   To get his money?

20    A   Yep.

21    Q   Okay.  Now, did he say anything else, that you can

22    recall, that day?

23    A   No.

24    Q   All right.  And did Shawn say anything to Mr. Session at

25    that time?

26    A   Told him what to do.  Asked him what to do.

27    Q   Do you want to say that again?  I can't hear you.

1    A    He asked him what to do.

2    Q    And what did -- what did Mr. Sessions say?

3    A    Nothing.  Just to get his money.

4    Q    Okay.  And did Shawn then turn around and leave?

5    A    They was talking for a few and then they left.

6    Q    And when he left, did you leave with him?

7    A    Yes.

8    Q    Were you involved with Shawn in some way?

9    A    No.

10   Q    Did you work for Shawn?

11   A    No.

12   Q    How come you were with him?

13   A    'Cause we used to a lot together.

14   Q    You used to what?

15   A    We used to make money together.

16   Q    Okay.  And how did you do that?

17   A    Selling drugs.

18   Q    The two of you were like business partners?

19   A    We're no business partners.  I didn't make money like

20   that.

21   Q    I can't understand what you're saying.

22   A    I said we ain't like that.  I'm saying we just sold drugs

23   together.

24   Q    And that's why you were with him that day?

25   A    Yes.

26   Q    That's why you also left with him that day?

27   A    Yes.

1    Q    Now when you left with him, where did the two of you go?

2    A    We drove around.

3    Q    All right.  In that CRX?

4    A    Uhm-hmm.

5    Q    Just the two of you?

6    A    Yep.

7    Q    And did you do anything other than just drive around?

8    A    That's it.  I went to my mother's house, and he went

9    picked up his girl.

10    Q    Now, you told us that there was some incident at the post

11    office at Six Corners.

12    A    Yes.

13    Q    How long after the -- this conversation at the apartment,

14    did that incident occur at Six Corners?

15    A    About a couple of days.

16    Q    Couple of days?

17    A    Yes.

18    Q    And when you say, Couple of days, do you mean exactly two

19    days, or something else?

20    A    I don't remember.

21    Q    All right.  And it was sometime at night you said?

22    A    Yes.

23    Q    About when at night?

24    A    About -- nighttime.  I don't remember what time.

25    Q    Well, would it have been very late or in the early

26    evening?

27    A    I don't remember.

1    Q    I guess it was sometime in July, is that right?

2    A    Yes.

3    Q    And you're saying that Shawn made a phone call on your

4    cell phone, is that right?

5    A    Yes.

6    Q    And that was because Shawn didn't have a cell phone, or

7    didn't have it with him, or didn't want to use it or what?

8    A    He didn't have his on.

9    Q    He didn't have it on him?

10    A    No.

11    Q    So, he used yours?

12    A    Yes.

13    Q    Now your cell phone -- what was your cell phone number?

14    A    776-8920.

15    Q    That was your cell phone?

16    A    Yes.

17    Q    And do you still -- well, I guess you don't have any cell

18    phones at Niantic.  Did you still have --

19    A    No.

20    Q    -- that cell phone at the time that you got arrested last

21    December?

22    A    My phone got confiscated.

23    Q    Okay.  When was that?

24    A    When I got arrested.

25    Q    In December or when you got arrested in November of '99?

26    A    It was way back then when I lost my phone.

27    Q    Who confiscated it?

1    A    The police.

2    Q    As far as you know, they still have it?

3    A    I don't know what happened to that phone.

4    Q    They never gave it back to you?

5    A    No.

6    Q    All right.  And what you're saying is that Shawn used

7  your phone with the number you gave us, to make a call --

8    A    Uhm-hmm.

9    Q    -- to Mr. Sessions, is that right?

10    A    Yes.

11    Q    Did you dial the number for him?

12    A    No.

13    Q    Okay.  How do you know he called Mr. Sessions?

14    A    'Cause he said his name.

15    Q    Okay.  And you didn't watch him -- I mean, you didn't

16  watch what numbers he punched in?

17    A    No.

18    Q    Would have heard him calling him what, Shabazz?

19    A    Yes.

20    Q    All right.  And you didn't hear Mr. Sessions end of that

21  conversation, did you?

22    A    No.

23    Q    Now, while Shawn was talking on the cell phone that

24  was  -- it was while he was on the phone that these other two

25  fellows pulled up, Moleto and Efrain, is that right?

26    A    Yeah.

27    Q    Okay.  And they were --

```
1    A    Uhm-hmm.

2    Q    -- driving Shawn's CRX?

3    A    Yes.

4    Q    Was that unusual for other people to drive Shawn's car?

5    A    Not that I know of.

6    Q    All right.  Okay.  And then -- so when they pulled up,

7  they pulled up to Six Corners, right?

8    A    Yes.

9    Q    Okay.  And was it there and then, according to you, that

10  Mr. Session then pulled up in this Expedition?

11    A    No.

12    Q    That was another time?

13    A    It was a few -- a few later, like, I don't know.  About a

14  half an hour, 45 minutes later.

15    Q    At the same location or some place else?

16    A    In the same location.

17    Q    So you just, basically, hung around Six Corners until --

18    A    Yes.

19    Q    -- Mr. Session came?

20    A    Yes.

21    Q    And they were all sitting there with the -- I'll strike

22  that.  They were there, those two fellows -- three fellows were

23  there and you and the CRX, right?

24    A    Yes.

25    Q    And was anybody in the CRX, or were you all standing

26  around?

27    A    I don't remember.  And I know they was there.
```

```
1          Q    Okay.  You remember the CRX was there, you remember

2     Efrain, you remember --

3          A    Yes.

4          Q    -- Moleto, and you remember DeShawn --

5          A    Yes.

6          Q    -- were all there, but you don't know who -- who was --

7     whether anybody was in the car or not?

8          A    They were in the car.

9          Q    When you say "they," you mean?

10         A    Efrain and Moleto was in the car.

11         Q    All three of them?

12         A    All three of them?  I just said two.

13         Q    I'm sorry, I thought you said all three of them.   Efrain

14    and Moleto?

15         A    Yes.

16         Q    Okay.  But not Shawn?

17         A    Yes.

18         Q    Okay.  So Efrain and Moleto stayed in car?

19         A    Yep.

20         Q    And Shawn and you were standing there?

21         A    Yep.

22         Q    And were you talking with them?

23         A    Shawn was talking to me for about something.

24         Q    What were you doing?

25         A    I was talking to Efrain about something and --

26         Q    What were you doing?

27         A    I was just standing there.
```

```
1        Q    And then after -- what did you say, 45 minutes, Mr.
2    Session pulled up in his Expedition?
3        A    Yes.
4        Q    Okay.  And then you say there was a conversation between
5    Mr. Session and Shawn, is that right?
6        A    Yes.
7        Q    And where was Shawn when -- while that conversation was
8    going on?
9        A    He was talking to them about his truck.
10       Q    Whose truck?
11       A    Sebastian.
12       Q    So was Shawn then standing on the street?
13       A    Sidewalk.
14       Q    Standing on the sidewalk.  And where was Mr. Session?
15       A    In his truck.
16       Q    And where were you?
17       A    I was on the sidewalk.
18       Q    During that whole conversation?
19       A    Yes.
20       Q    And it was in that conversation, according to you, that
21   Shawn said:  What should I do?
22       A    I was standing there for a few minutes.
23       Q    Yeah.
24       A    I got in his truck.
25       Q    Oh, you did?
26       A    Yes.
27       Q    You didn't tell us that.
```

1    A    You didn't ask probably.

2    Q    I see.  Well, were you in the truck or outside that truck

3    when that conversation --

4    A    I told you I was outside the truck for a few minutes

5    while they was talking, then I got in the truck.

6    Q    Then you got in the truck?

7    A    Yes.

8    Q    So this conversation where, according to you, Shawn said:

9    What should I do?  And Mr. Session said:  Do what you got to do.

10   A    Yes.

11   Q    When that supposedly was taking place, were you on the

12   sidewalk or were you in the truck?

13   A    Inside the truck.

14   Q    You were inside the truck by that time?

15   A    Yes.

16   Q    Where were you sitting inside the truck?

17   A    Passenger side.

18   Q    In the passenger side in the front.  In the front?

19   A    Yes.

20   Q    And Mr. Session was talking through the window on the

21   driver's side, right?

22   A    He was talking over me.

23   Q    Over you?

24   A    Yes.

25   Q    Okay.  And was there anybody else in the Expedition but

26   the two of you?

27   A    My daughter.

1    Q    Your daughter. And where was she?

2    A    On my lap.

3    Q    On your lap. When did you say your daughter was born?

4    A    '99, I told you.

5    Q    You said your daughter was born in November of '99?

6    A    Yes.

7    Q    And this conversation took place in July of '99, is that

8    right? Is that right?

9    A    Yes.

10   Q    And where was your daughter? Ma'am?

11   A    Yes.

12   Q    Can you answer that question?

13   A    Not right now.

14   Q    Would it be fair to say that you, actually, are very

15   confused about what did or did not happen out there at Six Corners

16   that night?

17   A    No.

18   Q    You're not confused?

19   A    No.

20   Q    You're just confused about who was there?

21   A    I wasn't confused about --

22   Q    I beg your pardon?

23   A    I'm not confused of who was there.

24   Q    But you're saying your daughter was there.

25   A    Yes.

26   Q    Even though she had not yet been born? Right? Ma'am, I

27   wonder if you'd try to look at me and give me an answer to that

1    question.  Can you answer that question?

2       A   I answered it.

3       Q   I didn't hear it.  Would you answer it again, please?

4       A   I said right now I can't.

5       Q   You can't what?

6       A   I can't answer it.

7       Q   Why not?

8       A   I don't know.

9       Q   Is it because you don't, in fact, remember?

10      A   Yeah.

11      Q   I'm sorry?

12      A   Yes.

13      Q   And, in fact, you don't remember much of anything about

14   what actually happened?

15      A   I remember, quite frankly.

16      Q   I see.

17      A   And I answered your questions.  I just saying -- I

18   answered to the prosecutor.  Just because I get some dates mixed up,

19   you know what I'm saying?  That doesn't mean I'm not going to

20   change.

21      Q   What is --

22          THE WITNESS:  I know what I said to you, and I've

23        answered your questions, your Honor.  That's the same way

24        I have answered to the prosecutor.

25          THE COURT:  Okay.  Just listen to Mr. Williams's

26        question and answer it, please.  Continue your question,

27        Mr. Williams.

**BY MR. WILLIAMS:**

1        Q    You said you were confused about dates.  What dates are you confused about?

A    I'm confused about the dates.  I'm confused of everything, but I'm not confused about what I said.

Q    But you are confused about what happened, aren't you?

A    I'm not confused of what happened.

Q    I see.  Now, you're claiming that out there in front of Six Corners that night, while -- that night, that Mr. Session somehow pulled out a gun from someplace in this Expedition --

A    Yes.

Q    -- and handed it to Shawn, is that right?

A    Yes.

Q    And where were you when that happened?

A    On the passenger side.

Q    And was your daughter there?

A    Yes.

Q    Where?

A    On my lap.

Q    Okay.  Was she asleep or awake?

A    She was up.

Q    Okay.  And about how old was she at that time?

A    She was about a year.

Q    About a year old?

A    Yes.

Q    Okay.  What's her name by the way?

A    Tiasia.

1      Q    And can you spell that for us, for the record?

2      A    T-i-a-s-i-a.

3      Q    Okay.  Where was it that Mr. Session produced this gun

4  from?

5      A    I don't remember.

6      Q    Did you see him get it from some place inside the

7  Expedition?

8      A    Yes, he passed over my head, passed it over my face.

9      Q    But you don't know where it came from?

10     A    No.

11     Q    And I guess if it was over your head, you don't know what

12  it looked like, is that right?

13            MR. ALEXY:  Objection.

14     A    I meant my face.

15            MR. ALEXY:  Mischaracterizes the testimony.

16            THE COURT:  Objection sustained.  Objection

17           sustained.  Go to your next question, please.

18  **BY MR. WILLIAMS:**

19     Q    Well, where actually was it in relationship to your eyes

20  when it was passed?

21     A    In front of my face.

22     Q    In front of your face?

23     A    Yes.

24     Q    And Shawn was standing there by the window, is that it?

25     A    Yes.

26     Q    And Mr. Session leaned over and handed it to him,

27  according -- according to you, is that right?

1       A    Yes.

2       Q    What did it look like?

3       A    A black gun.  I don't know what kind of gun.

4       Q    Just black?

5       A    Yes.

6       Q    Okay.  You don't know anything else about it's physical

7    appearance?

8       A    No.

9       Q    And it -- was it at that time that this fellow, Bebe,

10   drove up on the scooter or was that before?

11      A    Bebe drove up at that time.

12      Q    On his scooter?

13      A    Yes.

14      Q    And he left his scooter there?

15      A    He parked it around the school.

16      Q    Parked it around the school?

17      A    Yeah.

18      Q    'Cause there's a school right there at Six Corners?

19      A    Yes.

20      Q    And then he and DeShawn got into the car with Efrain and

21   Moleto?

22      A    Yeah.

23      Q    And they -- all four drove off in that car?

24      A    Yeah.

25      Q    And that's the CRX you're talking about?

26      A    Yes.

27      Q    Did you notice who was sitting where in the CRX?

1        A    No.

2        Q    Who was driving it?

3        A    Efrain.

4        Q    Was driving the CRX?

5        A    Yes.

6        Q    And so the other three were all sitting on top of each

7    other in the passenger seat?

8        A    They was not sitting in the front, 'cause it did have a

9    back seat to it.

10        Q    There's a back seat in the CRX?

11        A    Yes.

12        Q    Okay.  Who was sitting in the front seat?

13        A    I don't remember.

14        Q    Okay.  But is it your claim that there was one in the

15    front and two in the back?

16        A    Yes.

17        Q    I see.  And they -- they drove off?

18        A    Yes.

19        Q    And did you see any of them later that night?

20        A    No.

21        Q    Okay.  And you, at that point, are still sitting with

22    your daughter in the Expedition?

23        A    No.

24        Q    Okay.  Where are you at that point?  When they drive off

25    in the CRX, where are --

26        A    We're pulling off and I'm going to my mother house.  And

27    that's that.

1      Q    Okay.  What happened?  Did you get out of the Expedition?

2      A    Yes.

3      Q    And told Mr. Session you were going to your mother's

4    house?

5      A    Yep.

6      Q    And you had your daughter with you?

7      A    Yes.

8      Q    And you and your daughter walked off?  Or you walked off

9    with your daughter?

10     A    Yep.

11     Q    And what did Mr. Session do?

12     A    He left.

13     Q    He drove off?

14     A    Yes.

15     Q    Now, you testified, at some point, you saw somebody who

16   was acting like a big man.

17     A    On Congress Avenue.

18     Q    I beg your pardon?

19     A    Finish what you was gonna say.

20     Q    You see, I can't understand you.

21          THE COURT:  You have to speak louder, ma'am, please.

22     Q    Could you answer that?

23     A    Go ahead.

24     Q    I beg your pardon?

25     A    I said:  You're question to me was?

26     Q    Was there some point later when you claim that you saw

27   somebody who was acting like he was somebody important?

1      A    Bebe.

2      Q    That was Bebe?

3      A    Uhm-hmm.

4      Q    When was it that you saw him?

5      A    About a couple of days.

6      Q    A couple of days later?

7      A    Yeah, I don't remember.

8      Q    And where was it that you saw him?

9      A    On Congress Avenue.

10     Q    And was that out on the street or inside someplace?

11     A    On the streets in front of the pay phone.

12     Q    In -- in front of what?

13     A    In front of the pay phone.

14     Q    On Congress Avenue?

15     A    Yes.

16     Q    Near what street?

17     A    Congress.

18     Q    Yeah, Congress is a long street.

19     A    Congress and West.

20     Q    Congress and West.  Okay.  All right.  And was anybody

21  with Bebe when you saw him that time?

22     A    No.

23     Q    Were you with anybody?

24     A    No.

25     Q    Did you have your child with you?

26     A    No.

27     Q    Okay.  So you're alone out there, and he's alone out

1          there, correct?

2          A     There's a bunch of people around, but everybody --

3          Q     Were they -- were they just there or with one of the two

4          of you?

5          A     No, they was out there, just out there.

6          Q     Okay.  Was DeShawn one of them?

7          A     No.

8          Q     Efrain?

9          A     No.

10         Q     Moleto?

11         A     No.

12         Q     Mr. Session?

13         A     No.

14         Q     And what was Bebe doing that makes you say that he was

15         acting like he was important?

16         A     'Cause he said popped a nigger.

17         Q     He what?

18         A     He said he popped a nigger.

19         Q     A nigger or the nigger?

20         A     A nigger.

21         Q     Okay.  Did he say anything else?

22         A     Then he say he want a teardrop on his eye.

23         Q     Do you want to say that again?

24         A     That he wanted a teardrop tatooed on his eye.

25         Q     He -- Bebe -- or Bebe wanted a teardrop tatoo on his eye?

26         A     Yes.

27         Q     Did he say there was a -- why he wanted to?

```
1        A     Yeah, because he murdered the nigger.

2        Q     'Cause he what?

3        A     'Cause he killed a person.

4        Q     Okay.  And is that what people do when they kill

5   somebody, is they get a teardrop tattooed on them?

6        A     Yep.

7        Q     And how many other people do you know that have had that

8   done?

9        A     People that are serving life in prison right now.

10       Q     How many of them do you know?

11       A     Only one.

12       Q     Who's that?

13       A     This lady.

14       Q     One of your fellow inmates at Niantic?

15       A     Yeah.

16       Q     And she has a teardrop tattooed on her?

17       A     I don't see her no more.  She's on the same facility that

18   I'm on.

19       Q     And how do you know she has the teardrop tattoo?

20             MR. ALEXY:  Objection to the relevance of this.

21             MR. WILLIAMS:  Credibility.

22             THE COURT:  Credibility.  I'll permit it.  One

23       more -- one more question on this.  The question's:  How

24       do you know?

25             THE WITNESS:  Because I was -- you hear stuff on the

26       streets, and I've been around there.  So I know, maybe,

27       about tattoos on the eyes, tattoos on your hand.
```

**MR. WILLIAMS:**

1    Q    You've never actually seen somebody with a tattoo like that, have you?

    A    Yes, I have in the --

    Q    Who?

    A    -- facility.

    Q    Who?

    A    I seen Lasette (phonetic).

    Q    I didn't hear your answer.

    A    I seen Lasette in York CI.

    Q    Oh, she's the one you were telling us about before?

    A    Yes.

    Q    Did Bebe ever get this tattoo?

    A    I don't know.  I haven't seen him since.

    Q    You mean, in other words, that day out there at the corner of Congress and West was the last time you've ever seen Bebe?

    A    Yes.

    Q    Okay.  Did you ever tell the police that Mr. Session gave the gun to Bebe instead of to Shawn?

    A    I don't remember.

    Q    If you did, it would not have been correct, is that so?

    A    I don't remember.

    Q    I understand that you don't remember, but I'm saying:  If by chance you did say, that would not be correct, is that so?

    A    Yes.

    Q    You told me a little bit earlier about giving a statement over at the courthouse in November of 1999, the day that your bond

1        was reduced and you got out, do you remember that?

2            A    Yes.

3            Q    Did you then go down sometime later that year, go down to

4        the police station and give a second statement?

5            A    Yes.

6            Q    And would it be correct to say that it was sometime in

7        December?

8            A    I don't remember.

9            Q    Okay.  Well, why did you do that?

10           A    They called me.

11           Q    They called you up on the phone at your house?

12           A    No, they came to my house.

13           Q    Came to your house on West Street?

14           A    Yes.

15           Q    And asked you to go downtown with them right then?

16           A    Yes.

17           Q    And you did.

18           A    Uhm-hmm.

19           Q    I'm sorry?

20           A    Yes.

21           Q    Okay.  And you stayed with them until you had given up

22       this second statement, is that right?

23           A    Yes.

24           Q    And then what did they do, take you back home?

25           A    I went home by myself.

26           Q    I'm sorry?

27           A    I went home by myself.

1    Q    How did you get home?

2    A    I walked.

3    Q    All the way from Union Avenue?

4    A    Yes.

5    Q    Was your -- was your child with you?

6    A    No.

7    Q    Okay.  Were you given a copy of that statement to review

8    today, also?

9    A    No.

10   Q    No?

11   A    No.

12           MR. WILLIAMS:  I have nothing further.

13           THE COURT:  Further questions?

14           MR. ALEXY:  Yes, your Honor.

15   **REDIRECT EXAMINATION BY MR. ALEXY:**

16   Q    Ms. Mercado, have you received any threats about either

17   testifing here today, or for having giving statements against

18   Shabazz while you've been in --

19           MR. WILLIAMS:  Objection, beyond the scope.

20           THE MONITOR:  I didn't get the question.

21           THE COURT:  What's that?  Did not get the question?

22           THE MONITOR:  I didn't get the full question.

23           THE COURT:  All right.  Restate the question please.

24           MR. ALEXY:  Have you received any threats about

25           testifing or giving statements against Shabazz, since

26           you've been in York CI?

27           THE COURT:  Okay.  There's an objection to that

1    question.

2              THE WITNESS:  Yes.

3              THE COURT:  And what's the -- what's the claim on

4    that, Mr. Alexy?

5              MR. ALEXY:  Because the defendant was making some

6    claims about that he was asking questions regarding

7    credibility, and I think this goes to credibility, too,

8    as to whether or not she's been making any threats -- if

9    any threats have been made against her for testifing

10   here.

11             THE COURT:  Well, is it your -- it's your duty to

12   connect these threats back the accused.  Is that where

13   this is going?

14             MR. ALEXY:  I said:  Yes.  We're testifying here.

15   We're giving statements against the defendant.

16             THE COURT:  I'll overrule the objection.  The

17   answer's:  Yes.  Next question.  You answered, right, to

18   that question?

19             THE WITNESS:  Yes.

20   **BY MR. ALEXY:**

21        Q    After the shooting that occurred on Howard Avenue, the

22   night that you heard the shots --

23        A    Yes.

24        Q    -- did you ever hear the phase, "You mess with me, you

25   mess with death?"

26             MR. WILLIAMS:  I'm going to object that, both

27   because it's leading and because it's beyond the scope.

1          THE COURT:  Well, it's not leading.  It's assertion

2     that she either accept or not.  I'll overrule the

3     objection as to whether she's heard that -- that

4     expression.

5  BY MR. ALEXY:

6     Q     Have you heard that?

7     A     Yes.

8     Q     Who said that?

9     A     The defendant.

10         MR. ALEXY:  Thank you.  Nothing further.

11  RECROSS EXAMINATION BY MR. WILLIAMS:

12     Q     So when was that said?

13     A     I don't remember when it was said, but I've heard it's

14  been said.

15     Q     You've heard that it was said?

16     A     That has been said.

17     Q     In other words, you've never heard it said directly?

18     A     No.

19     Q     You've just -- somebody else told you they heard that

20  said, is that right?

21     A     Basically.

22     Q     I can't hear you.

23     A     Basically.

24     Q     Basically.  Okay.  And who was it that told you they

25  heard that said?

26     A     A lot of people.

27     Q     Okay.  But you, yourself, never heard that said, did you?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | You did?  When? |
| 3 | A | I told you. |
| 4 | Q | No, you didn't. |
| 5 | A | You didn't ask me to say it. |
| 6 | Q | Yes, and I said:  When? |
| 7 | A | I don't remember when. |
| 8 | Q | And you don't remember who said it? |
| 9 | A | No. |
| 10 | Q | Okay.  And you said something about being threatened? |
| 11 | A | Yes. |
| 12 | Q | At Niantic? |
| 13 | A | Yes. |
| 14 | Q | Who threatened you at Niantic? |
| 15 | A | Some girl. |
| 16 | Q | Some girl? |
| 17 | A | Uhm-hmm. |
| 18 | Q | Do you know her name? |
| 19 | A | Sharon. |
| 20 | Q | A girl named Sharon? |
| 21 | A | Yeah, she's incarcerated. |
| 22 | Q | Okay.  And do you know Sharon's last name? |
| 23 | A | No, I don't. |
| 24 | Q | Did you know her from the street? |
| 25 | A | Yes, I have. |
| 26 | Q | From New Haven? |
| 27 | A | Yes, I have. |

| | | |
|---|---|---|
| 1 | Q | Okay.  Where did she live when she was in New Haven? |
| 2 | A | I don't remember. |
| 3 | Q | Did you ever hang out with her in New Haven? |
| 4 | A | No. |
| 5 | Q | Did you ever sell drugs with her in New Haven? |
| 6 | A | I sold drugs to her. |
| 7 | Q | To her.  She was one of your customers? |
| 8 | A | Yes. |
| 9 | Q | Okay.  And is she in the same part of Niantic as you? |
| 10 | A | Yes. |
| 11 | Q | Okay.  And when was it that you had this conversation |

12    with her?

13          A    Yesterday.

14          Q    What did she say to you?

15          A    Nothing.  She was like people, is writing statements, and

16    that the defendant's crazy, and she heard it was me.  So they got me

17    on lockdown.

18          Q    They've got you on lockdown?

19          A    Yes, they do.

20          Q    Because you told somebody that she had said that she

21    heard you were going testify?

22          A    The DOC had heard her arguing with me in the facility.

23          Q    Somebody heard her?

24          A    The DOC.

25          Q    When you say --

26          A    The DO --

27          Q    You're -- you're talking about a correction officer?

1        A      Yes, I am.

2        Q      Heard the two of you having an agrument.

3        A      Argument and her threatening me.

4        Q      Okay.  Now, what did she say that was threatening?

5        A      She was like -- she heard that I supposedly suppose to

6    sign statements, and she said that she was about to see me, 'cause

7    I's her peoples from what she heard.  So, told her -- I told her in

8    the chow hall, said, Good luck, you could do this -- she started --

9                     THE COURT:  Speak -- speak louder and more slowly.

10                We're not getting what you're saying.  Speak into the

11                microphone.

12                     THE WITNESS:  She said, exactly -- we was in the

13                chow hall.

14                     THE COURT:  In the what?

15                     THE WITNESS:  In the chow hall.  And York CI is a

16                main dine in when you eat.

17                     THE COURT:  All right.

18                     THE WITNESS:  She was like, she heard supposedly

19                that I had those statements on the defendant.  So I told

20                her, Whatever.  And then she was like, you know what that

21                leads to, snitches get stitches.

22                     THE COURT:  Snitches get stitches.

23                     THE WITNESS:  Yes.

24                     THE COURT:  All right.

25                     THE WITNESS:  And she was like, you know what I'm

26                saying.  Why you going to have, you know what I'm saying,

27                sign statements over that man.  I told her to mind her

1          business.  She kept saying and she said -- I said me and

2          you about to go blow for blow, meaning she wanted to

3          fight me.  We was about to go -- we was about to have a

4          fight, but two of the lieutentants, one -- and one

5          captain and one of the majors, a DOC of York

6          Correctional, was there.  They arrested us -- they --

7          they put us on protective custody.  And they had me on

8          one room lockdown, with her up in the room.  We were

9          locked up, 'cause they heard from the start when she came

10         in the chow hall threatening me.

11                 THE COURT:  Okay.

12     **BY MR. WILLIAMS:**

13       Q    Okay.  And in any event, that was between you and her?

14       A    Yes.

15                 MR. WILLIAMS:  No further questions.

16                 THE COURT:  Okay.  Further questions from the state?

17                 MR. ALEXY:  No, your Honor.

18                 THE COURT:  Thank you, Ms. Mercado.  You may step

19          down from the witness stand.  We're going to take our

20          afternoon recess now.  We'll resume court at four

21          o'clock.

22                 (Recess.)

23                 THE COURT:  All right.  The State may call it's next

24          witness.

25                 MR. ALEXY:  My next witness is Detective Lisa Dadio.

26                 THE CLERK:  Just remain standing and raise your

27          right hand.

1                           L I S A   M .   D A D I O ,

2       of 1 Union Avenue, New Haven, Connecticut, having been first duly

3       sworn, was examined and testified under oath as follows:

4                       THE CLERK:  Please state your full name and business

5                   address for the record.

6                       THE WITNESS:  Lisa M. Dadio, D-a-d-i-o.  1 Union

7                   Avenue, New Haven.

8                       THE CLERK:  Thank you.

9                       THE WITNESS:  You're welcome.

10                      THE COURT:  Okay.  Please be seated.

11      **DIRECT EXAMINATION BY MR. ALEXY:**

12          Q       You're a detective with the New Haven Police Department,

13      is that correct?

14          A       Actually, I just got promoted to sargeant.

15          Q       Okay.  Now a sargeant?

16          A       Yes.

17          Q       Back in July of 1999, your rank was a detective?

18          A       Yes, sir.

19          Q       And on July 25th, early morning hours, were you working at

20      that time?

21          A       No, I was home.

22          Q       Did you get called to a scene on the morning of July 25,

23      1999?

24          A       Yes.

25          Q       And where was that?

26          A       It was a scene at Howard Avenue and Columbus.

27          Q       What were your responsibilities and -- and duties at that

1    time as a detective?

2        A    At that time, I was assigned to the Bureau of

3    Identification.  One of my responsibilities there was to process

4    crime scenes.  Crime scenes ranging from buglaries, robberies,

5    shottings, homicides, sexual assualts, so on and so forth.  Some of

6    the duties of processing the crime scene is collecting evidence,

7    photographing, documenting the scene.

8        Q    And so you were called from home to go to this location,

9    is that right?

10       A    Yes.

11       Q    I'm going to show you State's Exhibit 8 for

12    identification.  Do you recognize what that shows?

13       A    Yes.

14       Q    And what does that show?

15       A    This is showing, it would have been me, standing north of

16    the intersection of Howard and Columbus Avenue.  This is on Howard

17    Avenue, shooting north down to the intersection of Columbus, where

18    Beirne's Pharmacy is on -- if you look at the photograph -- on the

19    left side of the photograph, and there's number stantions there

20    which would depict some type of evidence.

21       Q    That's the location you were called to go to, is that

22    right?

23       A    Yes.

24       Q    And does that photograph fairly and accurately represent

25    what that area looked like at the time you were there?

26       A    Yes.

27           MR. ALEXY:  I'd offer that as a full exhibit.

1          MR. WILLIAMS:  No objection.

2          THE COURT:  Okay.  Eight is full exhibit.

3          (State's Exhibit 8 marked for identification

4          received in evidence as a full exhibit.)

5     **BY MR. ALEXY:**

6          Q     Do you -- do you recall what the lighting conditions were

7     like in this location that's shown in this State's Exhibit 8?

8          A     It's a -- it's a good lit area.  The lighting there's

9     provided by overhead street lights, neighboring houses, businesses.

10    It's -- it's not dark.  It's pretty well lit up for that part of the

11    city.

12         Q     And State's Exhibit 8 shows a business on the corner, is

13    that correct?

14         A     Yes.

15         Q     What business is that?

16         A     Beirne's Pharmacey.

17         Q     Now, what did you do when you arrived at the scene?

18         A     When I first arrived there -- and it's pretty much the

19    same through every scene.  You look around to see what the scene

20    entails, and you look for items of evidence.  In this case, there

21    was ballistic evidence.  Officers on the scene had stated that they

22    had located some items, which were shell casings and projectiles and

23    we walk it.  And it was me and, actually, Detective George Shelton

24    that responded.  And we just start making notes and looking and from

25    there.  Actually, I got pulled away, because there was a secondary

26    scene of a vehicle that was involved in this incident over at

27    College and South Frontage.

1          Q     I'm going to show you State's Exhibit 7 for

2     identification.   Do you recognize that?

3          A     Yes.

4          Q     Okay.   And does that show at least part of the vehicle

5     that you were just talking about?

6          A     Yes.

7                    MR. ALEXY:  I offer that as a full exhibit.

8                    MR. WILLIAMS:  No objection.

9                    THE COURT:  Seven is a full exhibit.

10                   (State's Exhibit 7 marked for identification

11               received in evidence as a full exhibit.)

12                   THE MONITOR:  Seven?

13                   THE COURT:  Seven.

14    **BY MR. ALEXY:**

15         Q     This a photo of a vehicle at South Frontage?

16         A     After -- yes.  A photograph that was taken afterwards.

17         Q     Right.  But this is the vehicle you -- you went to at

18    South Frontage?

19         A     Yes, sir.

20         Q     And I interrupted you.  You mentioned -- or had started

21    to say that you went to secondary scene, South Frontage and?

22         A     And College.

23         Q     And what was your purpose of going there?

24         A     There had been a red Suzuki Samurai that had been a

25    vehicle where the victim had been in at that intersection, and I

26    went there to photograph the vehicle at that location.  And then the

27    vehicle was towed to our police garage, and then I went back to

1    Columbus and Howard to resume that primary crime scene.

2         Q    All right.  When you photographed the red Suzuki

3    Samurai --

4         A    Yes.

5         Q    -- at College Street, was there any items -- evidentiary

6    items, found by that car at that time?

7         A    I didn't find any.  There were -- I believe there was a

8    weapon that was found by officers on the scene prior to my arrival.

9    That was the only thing at that time that was taken from the

10   vehicle.

11        Q    As part of your investigation, were you made aware of

12   what caliber that weapon was?

13        A    Yes.

14        Q    What caliber was that?

15             MR. WILLIAMS:  Objection, hearsay.

16             THE COURT:  Well, why isn't that hearsay, Mr. Alexy?

17             MR. ALEXY:  I suppose technically it is.  I mean we

18        can expand this into a full trial, if you'd like me to

19        call in ballistics people just to identify the caliber of

20        the bullet or of a weapon, which was not the weapon used

21        to kill the victim.  I can certainly do that if Mr.

22        Williams would like, or I can ask this witness one

23        question.

24             MR. WILLIAMS:  Is that how we avoid the rules of

25        evidence?

26             THE COURT:  No, we don't need an argument on that.

27        The rules of evidence apply, the objection's sustained.

1    BY MR. ALEXY:

2        Q    At the primary crime scene, Howard and –

3        A    Columbus.

4        Q    -- Columbus.  What types of projectiles and what type of

5    shell casings were found?

6                MR. WILLIAMS:  Objection, unless she found them.

7                THE COURT:  Well, let's start there.  Let's restrict

8        the questions to items found by yourself.

9                THE WITNESS:  They were not initially found by me.

10        They were found by officers that arrived on the scene.

11        When I was there, they were marked for me already, so I

12        did find them, but it wasn't -- I wasn't the primary

13        officer at the scene.  I had gotten there almost an hour

14        later.

15    BY MR. ALEXY:

16        Q    So you were not the person who initially discovered the

17    evidence?

18        A    That's correct.

19        Q    But did you look at it?

20        A    Later I looked at them, not my first time at the scene,

21    no.

22        Q    How -- do you know how many shell casings were found?

23                MR. WILLIAMS:  Objection, hearsay.

24                THE COURT:  How many were recovered by her or – I

25        mean, does she know?  Objection overruled as to whether

26        she knows.  Objection's overruled.  You can answer that

27        question.  Do you know?

73

```
 1                    THE WITNESS:  Yes.

 2    BY MR. ALEXY:

 3         Q     How many?

 4                    MR. WILLIAMS:  Objection, hearsay.

 5                    MR. ALEXY:  I don't think that a number is hearsay.

 6         Is that an out of court statement?

 7                    MR. WILLIAMS:  How many did somebody else find?

 8                    THE COURT:  We're ruling on foundation as to how she

 9         knows.  The objection's sustained.

10    BY MR. ALEXY:

11         Q     What did you do at the scene?  Did you collect any

12    evidence?

13         A     Yes.

14         Q     What did you collect?

15         A     I collected spent cartridges casings and projectiles.

16         Q     And what types -- were they all -- withdrawn.  What types

17    of cartridge casings did you collect?

18                    MR. WILLIAMS:  Your Honor, I -- I'm going to object

19         because there isn't an adequate foundation.  In light of

20         her previous answers, it sounds like she collected them

21         from the hands of another police officer, and that I

22         think would not even be relevant.

23                    THE COURT:  Well, I'm going to overrule the

24         objection.  She can describe if this -- goes to the

25         weight of the evidence, and you'll certainly be allowed

26         to ask her questions on cross.  That objection's

27         overruled.  You can answer the pending question.
```

1          THE WITNESS:  Which was:  How many?  Is that -- what

2          was the pending question?

3    BY MR. ALEXY:

4       Q    What types of shell casings did you collect?

5       A    Okay.  380 and 9 millimeter caliber.

6       Q    How many of each?

7       A    Two 380-caliber cartridge casings were found on --

8          MR. WILLIAMS:  Objection.  It's not where they were

9          found.  The question is:  What did you collect?

10         THE COURT:  The question is:  What did you collect?

11         And then we can go into the rest of it, if the State

12         chooses to.

13         THE WITNESS:  I collected two 380 cartridge casings

14         on Columbus Avenue, and I collected four 9 millimeter

15         cartridge casings.  Two were in the intersection of

16         Howard and Columbus, and two were on Howard Avenue.  And

17         I also collected two projectiles.

18   BY MR. ALEXY:

19      Q    Start with the 9 millimeter shot gun.  Can you show --

20   does this State's Exhibit 8 show where they were?  Or roughly the

21   area where you found them, when you talk about Howard Avenue versus

22   Columbus Avenue?

23      A    Yes, you can see some of them.  The other one -- the

24   other two, actually, you can't see from this angle, but you can see

25   photo stantion Number 7 and 8 represent the 9 millimeter shell

26   casings and that's on Howard Avenue.  It would be north of the

27   intersection of Columbus.  So, if -- if this was Columbus Avenue, to

1    the left would be north, and that's were those -- what this

2    photograph is showing.  Number 7 and 9, which would be 9 millimeter

3    cartridge casings.

4          Q    Okay.  You've indicated there were two other 9 millimeter

5    cartridges?

6          A    Yes.

7          Q    And which part of Howard and Columbus Avenue were those

8    located?

9          A    I had collected them from the intersection are, almost

10    like where the cross walk is.  I mean there's other photographs that

11    show that.  You can't see them from here from this one.  But they

12    were -- they would have been found in the intersection of Howard and

13    Columbus.

14          Q    And the 380 shell casings, where were they -- what road

15    were they found on?

16          A    On Columbus Avenue to the left of Beirne's Pharmacy.  You

17    can't see them in the photograph, they're further down the street.

18          Q    With regards to the exterior of Beirne's Pharmacy, were

19    you able to note anything of evidentiary value regarding the outside

20    of that building?

21          A    Yes.

22          Q    What was that?

23          A    On -- during the nighttime when we had been there, there

24    had been three apparent bullet holes on the Columbus Avenue side of

25    Beirne's.  Two had been in like the wallboard, and one had entered

26    the store -- the pharmacy window glass.

27          Q    And you indicated at some point you, after that night

1     that early morning, you examined the Red Suzuki Samurai after it had

2     been towed somewhere?

3          A     Yes.

4          Q     Where was it towed to?

5          A     The police garage at 710 Sharon Parkway.

6          Q     And what was the purpose for examining the red Suzuki

7     Samurai?

8          A     To look for any items of evidence.

9          Q     And what did you find when you were examining this

10    vehicle?

11         A     Actually we found a couple things.  There were like

12    clothing and stuff in there that we had seized, but primarily we had

13    located a bullet hole that had entered the tailgate of the Samurai.

14         Q     And does State's Exhibit 7 -- can you point out on

15    here -- does that show where that bullet hole entered --

16         A     Yes.

17         Q     -- that you're talking about?  And where is that?  What

18    indicates that?

19         A     There is a, actually we had used a metal, I think it was

20    like a coat hanger for this photograph that we had spray painted.

21    It's coming through to show trajectory, which is the path in which

22    the bullet had gone from the spare tire that was on the back

23    tailgate, through the back of the tailgate.  And there's a rod

24    protruding from the hole in the tailgate.

25         Q     And do you recall, based on your examination of the car

26    at Frontage and College Street where the victim had been found in

27    this car?

1      A      Yes.

2      Q      In the red Samurai?

3      A      Yes.

4      Q      And where was that?

5      A      He was in the back seat.

6             MR. ALEXY:  Thank you.  I have nothing further.

7      **CROSS-EXAMINATION BY MR. WILLIAMS:**

8      Q      Can you clarify a couple points, Sargeant.  When -- when

9      you described these items being seized from the street, I take it --

10     am I correct in believing that -- that when you arrived, even though

11     it was -- whenever it was, the items, the shell casings and so forth

12     were actually still there on the street?

13     A      Yes, sir.

14     Q      Okay.  And when you say that something was located on

15     Columbus Avenue to the left of Beirne's, is that facing toward City

16     Point on Howard Avenue?

17     A      Actually, on Columbus Avenue left of Beirne's, like for

18     instance, the 380 shell casings.

19     Q      Yes.

20     A      Those would be east, which would be facing Church Street

21     South.

22     Q      Okay.  Got it.  Thank you.

23            MR. WILLIAMS:  Nothing further.

24            THE COURT:  Further questions?

25            MR. ALEXY:  No, your Honor.

26            THE COURT:  Thank you, Sargeant.  You may step down.

27            THE WITNESS:  Thank you, your Honor.

1    THE COURT:  Any more evidence, Mr. Alexy?

2    MR. ALEXY:  Not today, your Honor.  I do have

3    another witness that would be available Tuesday.

4    THE COURT:  All right.  Then as we discussed

5    earlier, the State has at least one additional witness

6    they choose to offer, so we're going to resume this

7    hearing on Tuesday, March 6th, at ten o'clock in the

8    morning with the continued presentation of the State's

9    evidence, and then we'll proceed from there.  So, any

10   further matters that we need to take up on this file at

11   all?

12   MR. WILLIAMS:  No.

13   MR. ALEXY:  No, your Honor.

14   THE COURT:  All right.  Adjourn court then, please.

15   (Court adjourned.)

16

17                          -O-

18

19

20

21

22

23

24

25

26

27

CR01-0497231          ✳          SUPERIOR COURT

STATE                ✳          JUDICIAL DISTRICT

VS                   ✳          AT NEW HAVEN

GARY SESSIONS      ✳          MARCH 1, 2001

## CERTIFICATION

I hereby certify that the foregoing is a true and accurate transcript of the tapes recorded in the above-entitled case, heard before The Honorable Robert J. Devlin, in the Superior Court, Judicial District, in New Haven, Connecticut, on the 1st day of March, 2001.

Dated this 1st day of May, 2001, at New Haven, Connecticut.

WENDY IOVENE

COURT RECORDING MONITOR