SUPERIOR COURT

JUDICIAL DISTRICT OF NEW HAVEN COUNTY, AT NEW HAVEN


STATE OF CONNECTICUT                           CR-9-497231

VS.

GARY SESSIONS                                  MARCH 8, 2001



B E F O R E:

The Honorable Robert J. Devlin, Judge


A P P E A R A N C E S:


ATTORNEY FOR THE STATE OF CONNECTICUT

Christopher Alexy, Esquire, ASA


ATTORNEY FOR THE DEFENDANT:

John Williams, Esquire



Transcript:
Therese Sandoval
Court Monitor
235 Church Street
New Haven, CT 06510

1

1     THE MARSHAL:  Good afternoon, Your Honor.

2         THE COURT:  Good afternoon.  We are resuming now the

3     hearing in probable cause on the matter of State against Gary

4     Sessions.  And Mr. Sessions is here, Mr. Williams, and

5     Assistant State's Attorney Alexy.

6         So is the state ready to continue with its presentation

7     of evidence?

8         ATTORNEY ALEXY:  Yes, Your Honor.

9         THE COURT:  All right.  Please call your next witness.

10        ATTORNEY ALEXY:  The next witness is Mr. Martin.

11    Mr. Martin.

12        THE COURT:  He's right here, Marshall, he's inside.

13        THE MARSHALL:  Sit here and face over towards the clerk.

14        (MR. MARTIN TAKES THE WITNESS STAND).

15        THE CLERK:  Raise your right-hand.  Do you solemnly

16    swear the evidence you shall give concerning the case now in

17    question shall be the truth, the whole truth, and nothing but

18    the truth, so help you God?

19        MR. MARTIN:  I do.

20        THE CLERK:  Please state your name and your address for

21    the record, spelling your last name.

22        MR. MARTIN:  Larkland Martin, 191 Whalley Avenue, New

23    Haven.

24        THE COURT:  Will you spell your last name?

25        MR. MARTIN:  M-a-r-t-i-n.

26        THE CLERK:  Thank you.  Please be seated.

27        THE COURT:  Would you please keep your voice up, Mr.

2

1        Martin, so we can all hear you?  Just pull your chair a

2        little closer as you speak into the microphone, we'll be all

3        set.

4              MR. MARTIN:  Okay.

5    DIRECT EXAMINATION OF MR. MARTIN BY ATTORNEY ALEXY:

6    Q   Mr. Martin, I'm going to stand back here and if you'd try and

7    keep your voice up so I can hear you, I'm sure everyone else can

8    too.  Start off by telling us where you were living back in July of

9    1999.

10   A   360 Howard Avenue.

11   Q   What's the address again?

12   A   I think it's 360.

13   Q   Howard Avenue?

14   A   Yeah.

15   Q   What's the closest intersecting street?

16   A   Columbus.

17   Q   And what floor did you live on?

18   A   Third floor.

19   Q   On July 25 of 1999, about one thirty or quarter of two in the

20   morning, something unusual happen outside your house?

21   A   Yes.

22   Q   What happened?

23   A   I heard some shots.

24   Q   And what did you do when you heard the shots?

25   A   I looked through my window, I saw three person, three male.

26   Q   Now you said you saw three persons, what was the lighting

27   like outside your house?

3

1     A    Fairly good, it's good.

2     Q    Were there any street lights out there?

3     A    Yes there were street lights, but I also have a light on my

4     porch.

5     Q    Were you able to see the faces of the three men outside?

6     A    Yes, I did.

7     Q    Can you describe, describe the three men for us.

8     A    Two Hispanic and one African American, Black.

9     Q    What were the three men doing?

10    A    One hold with the gun and the other two were outside a car.

11    Q    Do you remember what kind of car that was?

12    A    I think it was a little blue car, I don't know the model, but

13    it was little, it was a blue car.

14    Q    Okay, and where was that car when you saw the three men?

15    A    It was right at my gate.

16    Q    At your gate in front of your house?

17    A    Yeah.

18    Q    Did you see any other cars on the street at that time?

19    A    Yeah, there were a lot of parked cars, but that was where

20    they, they came from.   The three guys came out of that car.

21    Q    All right, I'm going to show you a picture.   This has been

22    marked State's Exhibit-10 for identification.   Do you recognize the

23    intersection in that picture?

24    A    Yes, this is Howard and Columbus.

25    Q    So that's Columbus and Howard Avenue?

26    A    Yeah.

27         ATTORNEY ALEXY:   I'm going to offer that as a full

4

1        exhibit, Your Honor.

2                THE COURT:  Okay.

3                ATTORNEY WILLIAMS:  I have no objection.

4                THE COURT:  Exhibit 10, a full exhibit.

5    BY ATTORNEY ALEXY:

6        Q    Now showing you State's Exhibit-10, do you recognize Bernie's

7    Pharmacy in this picture?

8        A    I think think this is Bernie's right here.

9        Q    Okay, with sort of the orangish colored front?

10       A    Yeah, I think so, yeah.

11       Q    On the left-hand side of the photo, on the picture?

12       A    Yes.

13       Q    Or I'm sorry, right-hand side.

14       A    Right, yeah.

15               THE COURT:  Speak a little louder, Mr. Martin, okay,

16       please.  Speak louder.

17               MR. MARTIN:  Okay, Your Honor.  This is Bernie's right

18       here.

19   BY ATTORNEY ALEXY:

20       Q    And is your house, can you see your, your apartment in this

21   photograph?

22       A    Somewhere over here.

23       Q    That's on the bottom, that would be on the bottom left-hand

24   corner, is that right?

25       A    Yes, that's right.

26       Q    So that's at a diagonal from Bernie's Pharmacy.

27       A    Excuse me, could you repeat that?

5

1    Q   That diagonal from Bernie's Pharmacy?

2    A   Yes, sir.

3    Q   Where was the little blue car that you saw?

4    A   It was like right here in front of my gate.

5    Q   Now in this photograph there is a, a white car or at least

6  part of a cab of a white truck on the left-hand side, is that, where

7  was the blue car in relationship to that?

8    A   Somewhere here.  Somewhere.

9    Q   On the edge of the photograph?

10    A   Yeah.

11    Q   I'm going to show you State's Exhibit-5.  You had indicated

12  that one of the three people you saw was African American, is that

13  right?

14    A   Yes, that's right.

15    Q   Okay, what was, where did you see him first?

16    A   He was in the car, he was the driver, he was driving the car,

17  he was the driver, he was round the driver's seat, in his seat.

18    Q   Okay, so the driver's seat?

19    A   Yeah.

20    Q   All right, now showing you State's Exhibit-5, do you

21  recognize, do you recognize where your signature is on this

22  photograph?

23    A   Yes.

24    Q   That's on the top right-hand corner?

25    A   Yes sir.

26    Q   And who is that person there on the top right-hand corner?

27    A   This one was the one that was on the driver's seat of the

6

1   car.

2     Q    This is the one that was in the driver's seat.

3     A    Yes sir.

4            ATTORNEY ALEXY:  I don't know if Attorney Williams saw

5        which one --

6            ATTORNEY WILLIAMS:  I can see that.

7   BY ATTORNEY ALEXY:

8     Q    I'm going to show you State's Exhibit-4, and can you

9   recognize part of your signature on top of this?

10    A    Yes, yes sir.

11    Q    And apparently you signed your name above the photograph on

12  the top right-hand corner, is that right?

13    A    Yes sir, right.

14    Q    And why did you sign your name there next to that photograph?

15    A    This was one of the other guy.

16    Q    You have to speak up a little louder so they can hear you.

17    A    This was one of the other guy that was, he was, he had the

18  gun.

19    Q    This guy here was the one with the gun.

20    A    Yeah, that guy.

21           ATTORNEY WILLIAMS:  Can I see that?  Top right-hand

22       corner?

23           ATTORNEY ALEXY:  Yes, the state's --

24           ATTORNEY WILLIAMS:  Funny how they're all in the same

25       spot.

26  BY ATTORNEY ALEXY:

27    Q    And I show you State's Exhibit-6, recognize your signature on

1   there?

2     A   Yes, sir.

3     Q   Okay, and you signed your name next to this photograph, and

4   who is that person?

5     A   That person's one of the other guy, this one.

6     Q   Did this guy have a gun?

7     A   No, he didn't have a gun.  I didn't saw him with the gun.  I

8   don't know if he had one, but I didn't saw one.  He didn't have one

9   in his hand.

10    Q   Okay, you didn't see him with a gun.

11    A   No, I didn't see him with a gun.

12    Q   The person with the gun, what was he doing with it?

13    A   He was going towards Bernie.  He was shooting towards Bernie.

14    Q   Did you actually see him fire shots?

15    A   Yes.

16    Q   And so can you show us here on State's Exhibit-10 which

17  direction he was shooting at?

18    A   Toward the pharmacy in the intersection right up here.

19    Q   Can you show us where he was, did he stay still the whole

20  time he was shooting?

21    A   No, he didn't stay still, he was walking towards the

22  intersection shooting.

23    Q   Shooting over towards the direction of the pharmacy?

24    A   Correct, yes.

25    Q   Could you see anybody over in the direction of the pharmacy?

26    A   No, I didn't see nobody over there at the time.  But it was

27  during the shooting.  There was nobody over there except a truck, he

8

1  was shooting at a truck.

2    Q    And you say he was shooting at a truck?

3    A    Yes.

4    Q    What kind of truck?

5    A    A red truck.  I didn't know what model, it was a red truck.

6    Q    And were you able to see anybody inside the red truck?

7    A    I think maybe about two persons was in the truck I saw, not

8  sure.

9    Q    Did you see, did you see their faces?

10   A    No, I didn't see their faces.

11   Q    Now just one last question, do you know a person by the name

12  of Myra Mercado?

13   A    No, sir.

14   Q    Thank you, nothing further.

15          THE COURT:  Okay, cross examination.

16          ATTORNEY WILLIAMS:  Thank you, Your Honor.

17  CROSS EXAMINATION OF MR. MARTIN BY ATTORNEY WILLIAMS:

18   Q    Now, I'm going to hand you this photo, sir, which is State's

19  Exhibit-10, and I'm going to ask you if you can indicate on this

20  photograph where your house was located at that, at the time of this

21  incident.

22   A    Where my house is located?

23   Q    Correct.  Can you see it on this picture anywhere?

24   A    No, I haven't seen the house in the picture, but it's right

25  over here.

26   Q    Well, obviously you gestured towards the middle of the street

27  and it's not there, so I want you to take this pen.  Better yet, is

9

1   it, is it somewhere off the edge of the photograph?

2   A   Somewhere over here is my house.

3   Q   All right, I want you to put an "H" on the photograph with

4   this pen where you claim your house was located at the time.

5           ATTORNEY ALEXY:  Object, Your Honor.  He's indicated

6       that it's not on the photograph.

7           ATTORNEY WILLIAMS:  But he said that it is here.

8           MR. MARTIN:  I didn't say my house is there, it's

9       somewhere over here.

10  BY ATTORNEY WILLIAMS:

11  Q   Well, where is it in relationship to this picture, where is

12  your house?

13  A   360 Howard Avenue.

14  Q   360 Howard Avenue.

15  A   Yeah.

16  Q   Okay.  And I guess we agree that this street here running

17  left and right on the picture is Howard Avenue.  So you're saying

18  that your house was somewhere off to the left side of this photo, is

19  that right?

20  A   Yeah, in this corner over here somewhere.

21  Q   Well is your house visible in this picture?

22  A   No.

23  Q   Okay, which side of the street was your house on as you look

24  at this picture, the side closer toward the bottom or the side

25  closer toward the top?

26  A   I couldn't say because this, it's kind of blurry.

27  Q   Well, in other words you don't even know which side of the

10

1    street your house was on.

2    A   My house is on the right side of the street.

3    Q   The right side facing which direction?  When you're facing

4    which direction is it --

5    A   If I'm going towards Columbus coming from like Congress

6    Avenue, my house is on the right side.

7    Q   Okay, well then in fairness to you I think we'd have to agree

8    that that means that it's towards the bottom of this picture.  If

9    you're coming from Congress Avenue, which is down off to the left of

10    the picture.  This is Columbus Avenue here, isn't it?

11    A   I couldn't tell from this picture, this Columbus over here.

12    Q   All right, well, can you see anywhere on this picture the

13    place where the that little blue car was located?

14    A   It was located right to the side, right in front of my house.

15    Q   In other words you can't see in this picture where it was, or

16    can you?

17    A   Somewhere here.  If this is a street, it was somewhere here

18    on the right-hand side.

19    Q   But you said your house isn't visible on this, in this

20    photograph.  That's what's got me confused.

21    A   Right, my house isn't visible, but I can see those car, if

22    that's the street.

23    Q   If that's the street.  Okay.  And where were these three men

24    that you said you saw that you identify in those other pictures?

25    Where were those three men located when you saw them?  Where were

26    they?

27    A   One was sitting in the driver's seat and one was outside.

1   Q   And where was the third one?

2   A   In the back seat, he was about to come out the car.

3   Q   How do you know he was about to come out of the car?

4   A   Because he stepped out.

5   Q   I see.  Which side of the car did he step out of?

6   A   On the left-hand side.

7   Q   The side going towards the street away from where you were?

8   A   The left-hand side of the car.

9   Q   Okay, would you agree that the left-hand side is the side

10  that the driver sits on?

11  A   Yeah, that's the same side.

12  Q   And you'd agree that you were sitting, I mean, that your

13  house was located to the right of that blue car, wouldn't you?

14  A   Yeah, my house is on the right side, the same right side.

15  Q   So therefore, this person in the back seat who was starting

16  to get out of the car was getting out in such a way that the car was

17  between him and you, correct?

18  A   Could you repeat that?

19          ATTORNEY ALEXY:  Objection, that mischaracterizes the

20          testimony.

21  A   Could you repeat that, please?

22          THE COURT:  The objection's overruled.

23  A   Could you repeat that, please?

24  BY ATTORNEY WILLIAMS:

25  A   Yes.

26  Q   So this man that you say you saw getting out of the back of

27  the, back seat of the car on the left side of the car was actually

12

1   getting out in such a manner that the car was between, the blue car

2   was between him and you, isn't that right?

3       A   I was on the third floor of my house.   I could see

4   everything.

5       Q   I see, so you were looking down.

6       A   Yeah, I could see everything that's going on out there.

7       Q   Okay, and what you saw was the top of his head.

8       A   The top of his head.

9       Q   Right?

10      A   They all came out of the car.   All three of them came out.

11      Q   Oh, they came out of the car?   I'm sorry, I thought you said

12  one of them stayed in the car, one of them started to get out and

13  one of them was out.   They all got out of the car.

14      A   They all get out.

15      Q   I see.   And were they all out before you heard any shooting?

16      A   Excuse me?

17      Q   Were they all out of the car before you heard any shooting?

18      A   When I heard shooting one got out, one was out, and then the

19  other two get out.

20      Q   Got out, okay, afterwards.

21      A   Right.

22      Q   So you heard the shooting and that's the reason you went and

23  looked was because you heard the shooting, right?

24      A   Right.

25      Q   And so what you saw, the first thing you saw when you looked

26  out of your window was that one of those people was outside of the

27  car, one of them was in the process of getting out of the car, and

14

1  down on them and they're moving, they're all three moving, right?

2  A   Right.

3  Q   Now are they, so when you see them they're in motion.  Now,

4  are they in motion away from you or towards you when you look down?

5  A   Away from me, going towards the object that they were

6  shooting at.

7  Q   Okay, so what you saw was basically the back of their heads.

8  A   They got the turn it, when they turn around I saw them, I saw

9  the face.

10  Q   I see, okay.  And this one was shooting a gun as he walked,

11  is that right?

12  A   Yeah.

13  Q   And the other two were walking behind him?

14  A   A little way, and they were proceeding to come along.

15  Q   Okay.

16  A   Let's go, you know, let's go.

17  Q   Okay, and did you say that you thought they were shooting at

18  a red truck?

19  A   Yeah.

20  Q   Where was the red truck?

21  A   It was on the intersection of Columbus and Howard, right

22  there, bearing east.

23  Q   Okay, as you look at this picture here, Exhibit-10, can you

24  see where that red truck was located at the time?

25  A   It was at the intersection at a stop light.

26  Q   Right under the stop light?

27  A   Not right under the stop light.

13

1   one of them was still in the car, but you later saw him get out. Is

2   that it?

3     A   Yeah, that, yeah.

4     Q   Okay, so that one that was already out of the car you don't

5   really know whether he had ever been in the car or not, do you?

6     A   Excuse me?

7     Q   That one that was out of the car when you first looked --

8     A   Um hum.

9     Q   You don't know whether or not he was ever in the car, do you?

10     A   They were all, they, he was in the car, they all drove away.

11     Q   Oh, you saw them get back into the car later, is that right?

12     A   Yeah, and they all sped away in the same car.

13     Q   Oh, all right, now, where were they standing?  Were they on

14   the sidewalk, in the street, or where?

15     A   They were standing, they were proceeding towards Columbus.

16     Q   Columbus, okay.

17     A   Like they were, the one that was shooting, they were like

18   telling him to come on, come on, let's go, let's go.

19     Q   Okay, and he was shooting as he was walking.

20     A   Yeah.

21     Q   Okay.  And were they walking toward you or away from you?

22     A   I was upstairs in my apartment.

23     Q   Right, that's correct.  And as you looked out the window were

24   they coming towards you from your left or were they going away to

25   your right?

26     A   Could you repeat that, please?

27     Q   Yeah, when you looked out of your window, and you're looking

15

1    Q    All right, but can you see the spot?  You're looking at this

2    picture and obviously --

3    A    It's a little difficult right now for me to tell where the

4    truck was at the time, you know.

5    Q    Why is it difficult?

6    A    It's dark up there.

7    Q    I beg your pardon?

8    A    It's dark over here.

9    Q    It's dark.

10    A    Yeah.

11    Q    Well, this picture seems to have been taken in broad --

12    A    This is Columbus, maybe the truck was somewhere over here.

13    Right, somewhere around here.

14    Q    And you say maybe it was there?

15    A    Yeah, right over here.

16    Q    Okay, was it there or are you just speculating?

17    A    It was there.

18    Q    Okay, I want you to put a "T" where you say the truck was.

19    A    Okay.

20    Q    Now, I'm going to hand you exhibits 5, 4, 2, and 6.  I

21    believe you testified that somewhere on some of these exhibits your

22    signature appears.  Would you point out to me where your signature

23    appears on these?

24    A    This is my signature, right here.

25    Q    And that refers to Exhibit-6, the photo on the top right-hand

26    corner, correct?

27    A    Yes sir.

16

1    Q    Okay, which one was that?

2    A    This one.

3    Q    Okay, which, what role was that person playing, of the three

4    men, which one was he?

5    A    He was the one who sit in the back seat.

6    Q    He was the one sitting in the back seat.

7    A    Right, he was passenger.

8    Q    Okay, okay, show me where else your signature appears in

9    these exhibits.  I'm sorry, I didn't mean to block you.  Is it on

10   this one here?  Showing you State's Exhibit-2.  Is your signature

11   anywhere on there?

12   A    No.

13   Q    Okay.  Is your signature here on State's Exhibit-4?

14   A    No, sir.

15   Q    It's not?

16   A    No.

17   Q    Is your signature here on State's Exhibit-5?

18   A    Yes.

19   Q    The one on the top right-hand corner here?

20   A    Yes sir.

21   Q    Which one was he?

22   A    He was the driver.

23   Q    He was the driver.

24   A    Yeah.

25   Q    Okay, so in fact you've only identified two of the three

26   people out of these sets of photos, is that right?

27   A    That's my signature here too.

17

1    Q   Oh, okay, and that refers to Exhibit-4.  And which one was

2    he?  That's again the one in the upper right-hand corner.

3    A   He was the shooter.  He was the one --

4    Q   Okay, all right.  So in fact it is true, isn't it, that you

5    were shown three photo spreads, each one containing eight pictures.

6    And in each and every one of those instances, the one you picked out

7    was the one in the top right-hand corner, correct?

8    A   Yeah, correct.

9    Q   Okay.  And these things are dated, sorry, just let me, strike

10   that.  On Exhibit-4 you said your signature is on the upper right-

11   hand photograph.  Where is it?

12   A   Well, my signature, this is not my signature, but this is one

13   of the guy.

14   Q   So how do you know that if you don't see your signature on

15   it?

16   A   His face.

17   Q   I see.  Have you ever seen this picture before?

18   A   This one?

19   Q   Um hum.

20   A   Yeah.

21   Q   When?

22   A   I identified him with the detective.

23   Q   Okay, was that at the very same time that you identified

24   these other two pictures?

25   A   Same time.

26   Q   Okay, let me ask you something.  Referring to Exhibit-6,

27   where's your signature on that one?

18

1    A    Right there.

2    Q    Right on the side.   Okay.   And that's dated March 5th of

3    2000, correct?

4    A    Yeah, that's what I see there, March 2000.

5    Q    So was that the same day that you identified all three of

6    these of pictures, March 5th of 2000?

7    A    Yeah.

8    Q    You did them all on the same day, is that right?

9    A    Yeah.

10   Q    Okay, you didn't identify any pictures before that day, did

11   you?

12   A    I'm not sure, I went to the police in more than once.   I'm

13   not sure.

14   Q    I see.   Let me show you Exhibit-5, do you see your signature

15   on that exhibit at all?

16   A    No, my signature, not, no.

17   Q    You signature's not there.

18   A    No.

19   Q    And you've already told us that your signature's not on

20   Exhibit-4, isn't that right?

21   A    No.

22   Q    Okay, so the only one of these pictures that you signed was

23   the one that you signed on March the 5th of 2000, which in fact is

24   the picture in the upper right-hand corner of Exhibit-6, is that

25   correct?

26   A    My signature on this one.

27   Q    Correct.   And that's the only one of these --

19

1    A    He's not the only one that I identified.

2    Q    But it's the only one that you signed, isn't it?

3    A    Could be.

4    Q    Well is it or isn't it?

5    A    I'm not sure.

6    Q    Do you see your signature on any of these four photo spreads

7    except for that one spot?

8    A    No.

9    Q    Okay.  So then I guess it would be the case that you didn't

10    make this identification until months after the event, is that

11    correct?

12    A    No sir.

13    Q    No, you didn't?  Or, no, it's not correct?

14    A    No, is wasn't months after.

15    Q    Well, March 5th is three and a half months after the date of

16    this incident.  Am I getting my dates wrong?  Everybody's shaking

17    their head, I must have a bad memory today.  Oh it's, it's a lot

18    more than that.  Because you said the incident happened at the end

19    of July.  I was wrong, I was thinking November.  It was in July.

20    A    I don't remember exactly when, when it took place.

21    Q    Well, but you testified, you testified, you testified here

22    this afternoon that it was July 25th.  Are you saying now that you

23    were wrong about that?

24    A    I'm not saying that I'm wrong about it.  But it's a long

25    time.

26    Q    Okay, would it be fair to say, sir, that whatever the exact

27    date was, it was in the summer?

1    A    Yeah, it was in the summer.

2    Q    Okay, and you certainly agree that you signed this photograph

3    the following March, because that's the date that you wrote on it,

4    isn't it?

5    A    Well, if that's the date then it, that's the time I signed

6    it.

7    Q    Yeah, I mean, you're the one who wrote this date, aren't you?

8    It's right next to your name, 3/5/00.

9    A    Yeah, could be.

10    Q    That's your, that's your handwriting, isn't it?

11    A    Yeah.

12    Q    Okay, so, August, September, October, November, December,

13    February, March.  It's a little more than eight months later that

14    you made this identification, right?

15    A    Eight months?

16    Q    Yeah.

17    A    I don't think so.

18    Q    Well, where did we go wrong?  You dated it March 5th.  You

19    dated the photo March 5th.  You testified that you saw these people

20    in the summer.  And at one point you testified it was in July, end

21    of July.  So how is that not the case then?  What am I missing?

22    A    Well, it could be eight months.  You know because, you know,

23    you could be right.

24    Q    Now let me ask you about how your attention was drawn to

25    this.  At that time, this was, I think you said some time between

26    1:30 and 1:45 in the morning, right?

27    A    Yes.

21

1    Q    Okay.  Were you asleep at the time?

2    A    No, sir.

3    Q    You were up, yes?

4    A    Yes, sir.

5    Q    Were you working at that time?

6    A    No, sir.

7    Q    You were unemployed.

8    A    Yes, sir.

9    Q    And how was it that you were up that hour of the night?

10   A    Because it's summer, you know, you don't, it's hard to go to

11   sleep, you know.

12   Q    Were you alone or were you, did you have friends over?

13   A    I was alone.

14   Q    Okay, were you drinking?

15   A    I don't drink.

16   Q    Okay, so what were you doing before you heard the shots?

17   A    I was downstairs and then I went up, that was before the

18   shots.

19   Q    Okay, in other words you'd been downstairs.

20   A    Right.

21   Q    What, visiting with friends or something?

22   A    No, that's where I live.

23   Q    Oh, you live downstairs.

24   A    I live upstairs, but I was downstairs.

25   Q    Okay, downstairs visiting with friends.

26   A    No, just hanging out.

27   Q    Hanging out.

22

1   A   Sitting down on my stoop.

2   Q   Oh, on the front stoop.  Okay.

3   A   Right.

4   Q   All right, and then you decided to go upstairs.  You went

5   upstairs, and you heard the sound, you looked out the window.  Is

6   that it?

7   A   No, that was about a hour after or so.

8   Q   Oh, so what had you been doing during that hour?

9   A   You mean while I was downstairs?

10  Q   No, before you got, but between you get--  strike that.

11  Between the time you got upstairs--

12  A   Uh huh.

13  Q   --and the time you heard the sound of the shooting, which you

14  said was about an hour.

15  A   Right.

16  Q   What were you doing?

17  A   I watching TV.

18  Q   Watching TV?

19  A   Yeah.

20  Q   Okay.  And you heard the sound, you got up and you looked out

21  the window.

22  A   Yes.

23  Q   Okay.  And then a little better than eight months later you

24  identified some pictures.

25  A   Yes, sir.

26  Q   Now, it seems a little unusual that each of the pictures that

27  you identified just happens to be in the upper right-hand corner of

23

1   each of the three exhibits.  And I wanted to ask you --

2                   ATTORNEY ALEXY:  Objection, it's argumentative.

3                   THE COURT:  Objection sustained to the argumentative

4        form of the question.

5   BY ATTORNEY WILLIAMS:

6       Q   Did the, did the police, policeman when he showed you these

7   pictures, did he say anything to you?

8       A   About what, sir?

9       Q   About the pictures that he was showing you.

10      A   Pertaining to?

11      Q   Yeah, did he say, do you recognize the person in the upper

12  right-hand corner, for instance?

13      A   No, he didn't say that.

14      Q   Or, did he point to the picture and say, do you know who this

15  is?

16      A   No, he didn't say that.

17      Q   Okay, what did he say?

18      A   Just asked me if I could identify, person that I saw.

19      Q   Oh, did you know any of the other people in these, that are

20  pictured here?  I see we've got, in those three we've got a total

21  of--

22      A   No, I don't know any of those people.

23      Q   Oh, you don't know any of them.

24      A   No.

25      Q   All right, now, that car that you described, was that a car

26  that you'd seen before?

27      A   No, I've never seen the car before.

24

1   Q   Okay, and have you seen it any time since then?

2   A   No, sir.

3   Q   Was there anything distinctive or unusual about the car?

4   A   I wasn't penetrating the car.  I was watching those people,

5   you know with -- I wasn't--

6   Q   Okay, fair enough.  You say only one of them had a gun?

7   A   Yeah, only one of them I saw with the gun.

8   Q   All right, and can you describe the gun?

9   A   No, I can't describe the gun.

10   Q   Okay, you didn't get a good enough look at that.

11   A   I know it's a gun.  I don't know what kind of gun it is.

12   Q   Fair enough.  Just some kind of a gun.

13   A   It's a gun.

14   Q   Okay, do you have any idea how many shots were fired?

15   A   Well, as far as, maybe about six, seven or so.

16   Q   Okay, but you weren't counting the shots?

17   A   No, I wasn't counting.

18   Q   That's all I have, no further questions.

19           THE COURT:  Okay, redirect examination.

20           ATTORNEY ALEXY:  May I have this marked for

21       identification?

22           THE COURT:  Okay, 11, 12, and 13, okay.

23   REDIRECT EXAMINATION OF MR. MARTIN BY ATTORNEY ALEXY:

24   Q   Mr. Martin, I'm going to show you what's been marked State's

25   Exhibit-11 for identification.  Does that look familiar?

26   A   Yes, sir.

27   Q   And of these exhibits up here in front of you that Attorney

25

1    Williams put up here, what, what does that look familiar to?

2      A    This one and this one.

3      Q    So that would be State's Exhibit-5, right?

4      A    Yes, sir.

5      Q    And can you see your signature here on State's Exhibit-11 for

6    identification?

7      A    No, my signature's not there.

8      Q    How about on the top right-hand corner?

9      A    Oh, yeah, that's my signature, I'm sorry.

10     Q    And what, what does your signature come after?  What comes

11   before your signature?  It's in front.

12     A    12/4/99.

13     Q    All right, and what's 12/4/99?

14     A    That's a year.

15     Q    Is that when you signed your name?

16     A    Yeah --

17              ATTORNEY WILLIAMS:  These are new exhibits?

18              ATTORNEY ALEXY:  It's the original of what I already

19          introduced.

20              ATTORNEY WILLIAMS:  Okay.  I have no objection.

21              THE COURT:  Exhibit-11 is a full exhibit.  Just 11, you

22          just offered 11, right, just that?

23              ATTORNEY ALEXY:  Yes

24   BY ATTORNEY ALEXY:

25     Q    I'm going to show you State's Exhibit now 12 for

26   identification.  Does this look familiar?

27     A    Yes, sir.

26

1    Q    And does your signature appear on here?

2    A    Yes, sir.

3    Q    And what's in front of your signature?

4    A    Four, two, ninety-nine.  Twelve, two, ninety-nine.

5    Q    And is that, what's the date again?

6    A    This, what, it's cross up right there, I don't if it's, it

7    look to me like twelve, four, ninety-nine.

8    Q    All right, but that's your signature on --

9    A    Yeah, that's my signature, yeah.

10    Q    And of the others that Attorney Williams was showing you that

11    you have up here in front of you, what does this, does this resemble

12    one of those?

13    A    This one is my signature.

14    Q    Okay, well let me show you State's Exhibit-4.  In fact,

15    State's Exhibit-12 and State's Exhibit-4 are the same thing.

16    A    Yes, sir.

17    Q    And one shows your signature and State's Exhibit-4 your

18    signature is partially cut off, right?

19    A    Yeah, I don't see my signature up there.

20          ATTORNEY ALEXY:  I'll enter that as a full exhibit, sir.

21          ATTORNEY WILLIAMS:  No objection.

22          THE COURT:  Full exhibit, number 12.

23    BY ATTORNEY ALEXY:

24    Q    And State's Exhibit-13, do you recognize that?

25    A    Yes, sir.

26    Q    And is your signature on that?

27    A    Yes, sir.

27

1    Q    And I'm going to show you State's Exhibit-6, are these in

2  fact the same thing?

3    A    Yes, sir.

4    Q    And your signature appears on both, is that right?

5    A    [No audible response.]

6    Q    Let me put these down.  State's Exhibit-6, do you see your

7  signature on there?

8    A    Yeah, that's my signature there.

9    Q    And it appears on State's Exhibit-13 as well.

10   A    Yes, sir.

11           ATTORNEY ALEXY:  And that is a full exhibit.

12           ATTORNEY WILLIAMS:  No objection.

13           THE COURT:  Full exhibit, number 13.

14  BY ATTORNEY ALEXY:

15   Q    While this person here in State's Exhibit-4 that you

16  identified as, as the shooter, is that right?

17   A    Yes, sir.

18   Q    While he was shooting over towards the red truck, do you know

19  if the red truck was still or if the red truck was moving?

20   A    The red truck was still.

21   Q    Thank you.  Nothing further.

22           THE COURT:  Further questions?

23           ATTORNEY WILLIAMS:  Yes.

24  RECROSS EXAMINATION OF MR. MARTIN BY ATTORNEY WILLIAMS:

25   Q    So in fact, sir, you made your first identifications on

26  December the 4th of 1999, is that right?

27   A    Yes, sir.

28

1   Q   Which was more than four months after the incident, correct?

2   A   Correct.

3   Q   And that time in December of 1999 was the first time that you

4  ever identified anybody as being somebody that you saw two stories

5  down that night in late July of '99.

6   A   Could you repeat that, please?

7   Q   Yeah, that time on December 4, 1999 was the very first time

8  that you had ever identified anybody as being among that group of

9  people involved in the incident in July of '99, correct?

10   A   Yeah, it's correct.

11   Q   Okay.  And it's also true, is it not, that when you

12  identified those two people on December 4th of 1999, you gave a tape

13  recorded statement to the police.

14   A   Yes, I did.

15   Q   And did you later sign that statement, sir?

16   A   Yes, sir.

17   Q   You did.

18        ATTORNEY WILLIAMS:  Can I have the one with the

19       signature on it?  I was only given an unsigned copy.

20        ATTORNEY ALEXY:  I gave you the copies that I had.

21  BY ATTORNEY WILLIAMS:

22   Q   Well, let me ask you this, sir, it is true, is it not, that

23  on December 4th of 1999 when you were identifying those two people

24  you also said that the car was green, not blue?

25   A   Could be, it was night, became, it get a little complicated

26  with the colors.  It could be green, it could be blue.

27   Q   In fact it was green, wasn't it?

29

1    A    Like I said, maybe it could be green.

2    Q    Yes.

3    A    I wasn't really watching the color, you know, I was

4    concentrating on what was going on.

5    Q    Well, in fact today on March the 8th, 2001, more than a year

6    and a half after the incident, is the very first time that you've

7    ever said that it was blue.  Isn't that so?

8    A    Come to think of it, it was a green car.

9    Q    Is was green, wasn't it?

10   A    A little green car.

11   Q    All right, no further questions.

12             THE COURT:  Okay, further questions?

13             ATTORNEY ALEXY:  No, Your Honor.

14             THE COURT:  Thank you, sir.  You may step down.

15             MR. MARTIN:  Thanks.

16             (MR. MARTIN EXITS THE WITNESS STAND.)

17             ATTORNEY ALEXY:  The next witness is Officer Theodore

18   Forbes.

19             THE COURT:  Okay, Mr. Forbes.

20             THE MARSHAL:  Right this way, sir.  Face the clerk and

21   raise your right hand.

22             (MR. FORBES TAKES THE WITNESS STAND.)

23             THE CLERK:  Do you solemnly swear that the evidence you

24   shall give concerning the case now in question shall be the

25   truth, the whole truth, and nothing but the truth, so help

26   you God?

27             MR. FORBES:  Yes.

30

1          THE CLERK:  Please state your name and address for the

2     record and spell your last name.

3          MR. FORBES:  Officer Forbes, Theodore, F-o-r-b-e-s.  And

4     it's One Union Avenue, New Haven.

5          THE CLERK:  Do you have a badge number?

6          MR. FORBES:  950.

31

1    DIRECT EXAMINATION OF OFFICER FORBES BY ATTORNEY ALEXY:

2        Q    Officer Forbes, how long have you been with the New Haven

3    Police Department?

4        A    Approximately five years.

5        Q    And were you on duty back on July 25th of '99?

6        A    Yes.

7        Q    Do you recall which shift you were on?

8        A    Midnights, which is 11 to 7.

9        Q    And between 1:30 and 2:00 in the morning did you receive a

10    dispatch to go to some place?

11        A    Yes.

12        Q    Can you recall that, where did you go, what did you see?

13        A    It was at College and South Frontage.

14        Q    And what was the reason for going there?

15        A    Gun shot.

16        Q    When you arrived there who was at the scene, at that scene?

17        A    There was two officers there, Officer Losty and Officer

18    Freeman.  And there was a Suzuki maroon in color Jeep with three

19    people in it.  One was Lucky, one was McCann, and the third, I can't

20    recall.

21        Q    Was one of the people from the Jeep, what condition were they

22    in?

23        A    Lucky had a gun shot to the abdomen region.

24        Q    And what did you do then after you arrived at the scene?

25        A    I followed AMR, the ambulance, with Lucky to 20 York, Yale

26    Hospital.

27        Q    What did you do at the hospital?

32

1    A    As soon as they got there they immediately brought him up to

2    the O.R. because of his condition.  And I notified my supervisor and

3    I waited for his clothing.

4    Q    Did you obtain his clothing?

5    A    Yes, from the head nurse.

6    Q    After you received his clothing, what was the next thing that

7    you, you did, the next step?

8    A    I went back to the scene, I picked up McCann and transported

9    him to the third floor to have the detective speak with him.

10   Q    When you were at the scene, were you able to, or did you

11   attempt to talk to Mr. Lucky at all?

12   A    Yes, that was once, not at the scene, no.

13   Q    Okay.

14   A    Sorry.

15   Q    When, when did you attempt to do that?

16   A    When, when I got to the hospital and they were taking him out

17   of the ambulance.

18   Q    Was he able to respond to you at that point in time?

19   A    No.

20   Q    Nothing further.

21          THE COURT:  Cross examination.

22   CROSS EXAMINATION OF OFFICER FORBES BY ATTORNEY WILLIAMS:

23   Q    Yeah, you say Officer Freeman was at the scene?

24   A    Yes.

25   Q    Okay, and this scene was located where, sir?

26   A    College and South Frontage.

27   Q    And this was on the 25th of July, '99, correct?

33

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | About what time? |
| 3 | A | Approximately 1:53. |
| 4 | Q | Okay, you're consulting something to refresh your memory, |

5   aren't you?

| | | |
|---|---|---|
| 6 | A | Yes, my report. |
| 7 | Q | Could I see it? |
| 8 | A | Yes. |
| 9 | Q | That's your report. |
| 10 | A | Yes. |

11          ATTORNEY WILLIAMS:  Okay, could we mark that for

12          identification?

13          THE COURT:  Defense Exhibit-A for identification.

14          ATTORNEY WILLIAMS:  No further questions.

15          THE COURT:  Any questions from the state?

16          ATTORNEY ALEXY:  No, Your Honor.

17          THE COURT:  Thank you, Officer, you may step down.

18          (OFFICER FORBES LEAVES THE WITNESS STAND).

19          ATTORNEY ALEXY:  Detective Edwin Rodriguez, please.

20          (DETECTIVE RODRIGUEZ TAKES THE WITNESS STAND).

21          THE CLERK:  Do you solemnly swear the evidence you shall

22          give concerning the case now in question shall be the truth,

23          the whole truth, and nothing but the truth, so help you God?

24          DETECTIVE RODRIGUEZ:  I do.

25          THE CLERK:  Please state your name and your business

26          address for the record, and spell your last name.

27          DETECTIVE RODRIGUEZ:  The name's Edwin Rodriguez.  Last

34

1      name spelled R-o-d-r-i-g-u-e-z.  And One Union Avenue is the

2      address.

3              THE CLERK:  And do you have a badge number?

4              DETECTIVE RODRIGUEZ:  Yes, it's 509.

5              THE CLERK:  Please be seated.

6              DETECTIVE RODRIGUEZ:  Thank you.

35

1    DIRECT EXAMINATION OF DETECTIVE EDWIN RODRIGUEZ BY ATTORNEY ALEXY:

2       Q    Detective Rodriguez, how long have you been with New Haven

3    Police Department?

4       A    Going on nine years now.

5       Q    And how long have you been a detective?

6       A    About four.

7       Q    Back in July, in particular July 25th of 1999, you were

8    involved in investigating a shooting that occurred at Howard and

9    Columbus Avenues in New Haven.

10      A    That's correct, sir.

11      Q    How did you become involved in investigating that?

12      A    I was assigned to the case by my supervisor.

13      Q    And as part of your responsibilities in investigating that

14   case, did you have occasion to speak with a Myra Mercado?

15      A    That's correct, sir.

16      Q    When you spoke to Myra Mercado, did you show her any photo

17   boards?

18      A    At the time it was Detective Copolla, who was taking a

19   statement from Myra Mercado.  I was just present.

20      Q    You were present during the taking of the statement?

21      A    That's correct, sir.

22      Q    I'm going to show you State's Exhibit-2, and ask you to take

23   a look at that and tell us if you recognize that.

24      A    Yes, this is a photo board that was shown to Myra Mercado

25   during her statement.

26      Q    All right, and there's some signatures surrounding the third

27   from the top photograph.

36

1   A   That's correct.

2   Q   Is your signature on there?

3   A   Yes it is.

4   Q   And do you know who the person is in that photograph?

5   A   Yes, that's Albert McCann.

6   Q   Is the, Myra Mercado, who signed this as well?

7   A   That's correct, sir.

8   Q   And did you also have occasion to speak to Mr. Larkland

9   Martin?

10  A   That's correct, sir.

11  Q   And how did you, how did you come to speak to Mr. Martin?

12  A   What happened was I was investigating another homicide, which

13  occurred on Norton and Chapel, and I was speaking, myself and

14  Detective Velleca, John Velleca, went to go speak with a subject who

15  had information regarding this homicide.  Mr. Larkland happened to

16  be present at this apartment.  He asked myself and Sergeant Veleca,

17  who was working on the Howard and Columbus homicide.  And I told him

18  it was myself and a couple of other detectives, at which time he

19  said he witnessed the shooting.

20  Q   And did you then take a statement from him or assist--

21  A   Correct, we, Detective Velleca and myself brought him up to

22  third floor to see what type of information he had or what he saw,

23  and he gave a statement afterwards regarding the homicide.

24  Q   Now I'm going to show you State's Exhibit-11, and do you

25  recognize that?

26  A   Yes, this is one of the photo boards we showed that day to

27  Larkland.

37

1    Q    And does you signature appear on there?

2    A    That's correct, on the bottom.

3    Q    And who is the person who appears where your signature is?

4    A    That's Deshawn Johnson.

5    Q    And Mr. Martin signed that photograph as well?

6    A    That's correct, sir.

7    Q    And the date there is December 4, '99?

8    A    That's correct.

9    Q    And I'm going to show you State's Exhibit-12.  Do you

10   recognize that?

11   A    Yes, this is another photo board that we had Mr. Larkland

12   view.

13   Q    And does your signature appear on that?

14   A    That's correct.

15   Q    And does Mr. Larkland's?

16   A    That's correct.

17   Q    And who is the, the subject in that photograph with the

18   signatures on it?

19   A    He's known as Bebe.  I would have to look at the report to

20   get his full name.

21   Q    Would that refresh your recollection?

22   A    Yes.

23         ATTORNEY ALEXY:  Just a moment, please, Your Honor.

24   Q    Just take a look at this document and let me know if that

25   refreshes your recollection.

26   A    Yes it does.  And that's Jose Santiago, known as Bebe.

27   Q    Showing you State's Exhibit-13, do you recognize what this

38

1    shows?

2    A    Yes, this is a photo board, which were shown that night.

3    Q    And does your signature appear on there?

4    A    That's correct, sir.

5    Q    And does Mr., did Mr. Martin sign that?

6    A    That's correct.

7    Q    And who is the picture, the subject shown in that?

8    A    That's Efraim.

9    Q    Efraim?

10   A    Uh huh.

11   Q    And last, I don't think I did this one, State's Exhibit-2, do

12   you recognize what this document is?

13   A    Yes, it's a photo board.

14   Q    And who was that shown to?

15   A    That was shown to Myra Mercado.

16   Q    And does your signature or --

17   A    Yes, it's on top.

18   Q    -- appear on that?

19   A    Yes.

20   Q    And who is the subject in that photograph?

21   A    That's Albert McCann.

22   Q    That's all the questions I have.

23        THE COURT:  All right, cross examination.

24        ATTORNEY WILLIAMS:  Yes.

25   CROSS EXAMINATION OF DETECTIVE RODRIGUEZ BY ATTORNEY WILLIAMS:

26   Q    You were, you were involved in the investigation of this

27   homicide from the beginning, is that correct?

1    A    That's correct, sir.

2    Q    Did you have occasion to visit the scene of the incident?

3    A    Yes.

4    Q    And would it be correct to say that the incident occurred

5    near the intersection of Howard and Columbus?

6    A    That's correct, sir.

7    Q    And one of the things that you did in pursuit of this

8    investigation you've indicated was to interview Mr. Larkland Martin,

9    correct?

10    A    That's correct, sir.

11    Q    Now I believe that interview took place in early December, is

12    that correct?

13    A    I would have to look at the statement.

14    Q    Sure.

15    A    Just showing you this piece of paper, does that refresh your

16    recollection?

17    Q    Yeah, 12/4/99, that's correct, sir.

18    A    And in the course of that you asked Mr. Martin to describe

19    the vehicle from which he said he had seen the assailants emerging,

20    isn't that right?

21    Q    That's correct, sir.

22    A    And he said it was a four door, didn't he?

23    Q    That's what he said, sir.

24         ATTORNEY WILLIAMS:  No further questions.

25         THE COURT:  Okay, are there questions by the state?

26         ATTORNEY ALEXY:  Yes, just a moment, please.

27    REDIRECT EXAMINATION OF DETECTIVE RODRIGUEZ BY ATTORNEY ALEXY:

40

1    Q    Do you recall if when you interviewed, or took the statement

2    from Mr. Martin, if he described the make of the car as well?

3    A    He was not that sure.  He said either a Honda, some type of a

4    foreign car.  I got to look at the statement.

5    Q    Would that refresh your recollection to see that?

6    A    Yes.

7    Q    I'm going to show you page 10 of that statement, see if that

8    refreshes your recollection.

9    A    Honda-type vehicle.

10   Q    Thank you, nothing further.

11                ATTORNEY WILLIAMS:  I have nothing further.

12                ATTORNEY ALEXY:  Nothing further.

13                THE COURT:  Thank you, Detective, you may step down.

14                DETECTIVE RODRIGUEZ:  Yes, Your Honor.

15                (DETECTIVE RODRIGUEZ LEAVES THE WITNESS BOX.)

16                ATTORNEY ALEXY:  No further witnesses, Your Honor.

17                THE COURT:  No further witnesses, all right.  Would the

18                state like to make any argument in support of the information

19                charging murder against Mr. Sessions?

20                ATTORNEY ALEXY:  Yes, Your Honor.  If I may briefly.

21                The court heard today the testimony from Larkland Martin, an

22                individual who by all accounts has no connection with anyone

23                else in this case.  He happened to hear a shot, looked out

24                his third floor apartment window, which overlooks the

25                intersection of Columbus Avenue and Howard Avenue in New

26                Haven.  And he testified it was bright out, and the street

27                lights, and there was also a light right in front of his

41

1      house on the porch.

2          What he sees then is a, a green or bluish colored

3      vehicle, as we just heard is a Honda-type vehicle, pull up in

4      front of his house within close proximity to his gate, I

5      believe he said.  When he looks out, one Hispanic male is

6      already out in the street proceeding towards the intersection

7      with a gun.  He sees a second Hispanic male get out of the

8      car, followed by the driver, who's an African American male.

9      He identified the pictures for Detective Rodriguez.

10     Detective Rodriguez, as he informed us, indicates that he

11     identified Jose Bebe Santiago as the shooter.  He identified

12     Efraim as the second Hispanic male who got out of the car.

13     And he identifies Deshawn Johnson as the driver of the car.

14         We know that one of those shots struck the red Suzuki

15     Samurai in the rear.  We heard that through Detective Dadio.

16     She qualified the photograph that was introduced and showed

17     the trajectory of a bullet passing through the tire and

18     through the rear tailgate, which then unfortunately struck

19     Anthony Lucky.  That shot proved to be fatal and that was

20     described in more detail in the autopsy report.

21         The question then is what happened before that.  And

22     we've heard, as, and each dovetails with the other, that is

23     the testimony of Myra Mercado and Larkland Martin.  Myra

24     describes how these same individuals, Efraim, Bebe, and

25     Deshawn Johnson got in a blue Honda CRX moments before, or

26     at the outside, minutes before she heard the shots,

27     approximately six shots, I believe she said.  I could be

42

1    wrong, which would be the same number as Mr. Martin heard.

2         They get in the vehicle, this defendant passes his gun

3    to Deshawn Johnson and essentially tells him to go take

4    care of business.  And the question is, what business was he

5    taking care of?  The business he was taking care of was the

6    fact that Albert McCann, who was driving that car, that red

7    Suzuki Samurai, had ripped him off of $900.  And that's what

8    his life was worth.  Albert McCann's life was worth $900

9    because that's what the people, Deshawn Johnson, Efraim and

10   Jose Bebe Santiago set out to do, was to even that score when

11   they got in that CRX with the defendant's gun.

12        Unfortunately, they didn't hit Mr. McCann.  They hit

13   someone who, from the state of the record, had no connection

14   with this matter, this dispute, at all, other than he

15   happened to be a friend of Albert McCann's, or at least an

16   acquaintance, an occupant in his vehicle.

17        And so that's what brings this here today.  The evidence

18   fits almost perfectly.  Mr. Martin had no knowledge of Myra

19   Mercado.  Apparently no knowledge of what she had described

20   had happened.  And vice versa.  She would have no way of

21   knowing what Larkland Martin was going to say several months

22   down the road.  So then I would submit to the court that the

23   state has in fact produced sufficient evidence to establish

24   probable cause that this defendant did aid and abet in the

25   commission of the murder.  And I think we can show intent on

26   the part of the shooter, that he did intend to kill him by

27   the number of shots, and the fact that they were fired into

43

1    the back of the vehicle at a fairly close range. And

2    apparently, according to Mr. Martin, it seems as though the

3    shooter, Mr. Santiago, was actually moving across the

4    intersection so he could get a better angle at what he was

5    trying to shoot at.

6        So, the state has established all the elements that are

7    necessary for the crime of murder.

8        THE COURT:  Okay, thank you very much, Mr. Williams.

9        ATTORNEY WILLIAMS:  I swear, Your Honor, I don't see it,

10   and I think the absence of evidence speaks pretty much for

11   itself.  There is absolutely no connection whatsoever that's

12   been drawn between that shooting and the man who stands

13   before you today.  He has, he's not identified as being at

14   the scene.  He's not identified as being in any way the

15   perpetrator, nor is the weapon that's described by the

16   witness last week in any way connected to this case.

17       There is not even a description that's similar.  There

18   is nothing.  Of course, it's obvious that the automobiles are

19   different cars.  Mr. Martin is certain that it was a green

20   four door, which certainly doesn't come anywhere close to the

21   automobile that was described last week.  I submit, Your

22   Honor, that the state absolutely has not established the

23   charge of murder against Mr. Sessions.  It just isn't there.

24   There isn't probable cause, there isn't a scintilla of

25   evidence.  And it would be, it would be wrong to allow a

26   prosecution on murder to go forward with such an utter

27   absence of evidence.  There's no basis for a finding of

44

1    probable cause in this case.

2        THE COURT:  Okay, thank you very much.

3        The role of the court at this stage of the proceedings

4    is to determine whether there's probable cause to permit the

5    state to continue with the prosecution of murder as set forth

6    in Section 54-46a of our general statutes.  Probable cause,

7    so this is not a trial, it's not proof beyond a reasonable

8    doubt, it's not even proof by a fair preponderance of the

9    evidence.  It's probable cause.

10       Taking all the evidence presented before me and the

11   reasonable inferences that can be drawn from that evidence,

12   I find there does exist probable cause to permit the state to

13   pursue this theory of accessory to murder with respect to Mr.

14   Sessions.  And that's based on the testimony of Ms. Mercado

15   and Mr. Martin and the police testimony, which is to some

16   extent corroborative.  But to a large extent I see inferences

17   drawn from their, from their testimony.

18       So, I make that finding.  Based on that, the defense

19   has an option which they may or may not choose to exercise to

20   make a proffer.  Does the defense wish to make a proffer with

21   respect to this matter at all?

22       ATTORNEY WILLIAMS:  No, Your Honor.

23       THE COURT:  All right, fine, then the matter may,

24   probable cause is found.  Is your client prepared to enter a

25   not guilty plea to the charge at this time, Mr. Williams?

26       ATTORNEY WILLIAMS:  Oh, yes, Your Honor.

27       THE COURT:  All right, Mr. Sessions, could you please

45

1    stand up?  Okay, Gary Sessions, how old are you, sir?

2         MR. SESSIONS:  Thirty-three, four.

3         THE COURT:  Thirty-four, okay.  And where were you born?

4         MR. SESSIONS:  New York.

5         THE COURT:  New York City?  New York City, sir?

6         MR. SESSIONS:  Yeah.

7         THE COURT:  All right, Gary Sessions, on docket number

8    CR6-497231, on the charge of murder, how do you plead, sir,

9    guilty or not guilty?

10        MR. SESSIONS:  Not guilty.

11        THE COURT:  And do you elect to be tried by a court or

12   a jury of twelve?

13        MR. SESSIONS:  Jury.

14        THE COURT:  And with respect to the other charges,

15   conspiracy to commit murder and criminal use of a firearm,

16   is your plea guilty or not guilty to those charges, sir?

17        MR. SESSIONS:  Not guilty.

18        THE COURT:  And you elect to be tried by a court or

19   a jury?

20        MR. SESSIONS:  Jury.

21        THE COURT:  And the final count of carrying a pistol

22   without a permit.  Is your plea guilty or not guilty, sir?

23        MR. SESSIONS:  Not guilty.

24        THE COURT:  And you'd like to be tried by a jury, is

25   that right, sir?

26        MR. SESSIONS:  Yes.

27        THE COURT:  All right, not guilty pleas, jury election

46

1    will enter on all charges.  This matter is assigned a jury

2    pre-trial for the 29th, excuse me, not the 29th, the, let's

3    make it the first week in April there.  How about the first

4    Thursday in April, April 5th?  Pre-trial April 5th, 9:30 in

5    the morning.

6          ATTORNEY WILLIAMS:  Your Honor, would Your Honor

7    consider a bond motion at this time?  I think you're uniquely

8    placed to consider bonds, since you've heard the strength, if

9    that's the word, of the state's case.

10          THE COURT:  Sure, I'll hear a bond motion.

11          ATTORNEY WILLIAMS:  Your Honor, the bond in this case at

12    the moment, has been set at a million dollars.  It was set

13    subject to being reviewed following the probable cause

14    hearing by Judge Fasano when Mr. Sessions was presented

15    before him a couple of weeks ago.

16          I know Your Honor's found probable cause, but I think

17    that we all would have to agree that this is an awful thin

18    case.  And I really submit to Your Honor that there is no

19    justification for a bond in that amount, in a case as weak

20    as this.  And I would ask the court to set a bond in the

21    amount of, not greater than $100,000.

22          THE COURT:  All right, what's the state's position on

23    bond?

24          ATTORNEY ALEXY:  The state's position, Your Honor, is

25    that at this point in time, well, first of all, certainly the

26    state did not present its entire case.  The state was only

27    presenting evidence here on the question of probable cause.

47

1     Second of all, I don't see that any circumstances have

2     changed since the bond was originally set by the court at

3     this point in time.

4          It may be that that may change as the case goes through

5     the course of pre-trials, may change, well, I withdraw that.

6     I would submit then that the bond as it stands is

7     appropriate.  I think the defendant has indicated he does

8     have some connections at least out of state.  This is an

9     extremely serious charge.  I think crediting the information

10    that's been presented before the court that this defendant

11    would pose a risk of flight and would apparently have the

12    means to do so.

13         I think it also would be reasonable to infer that he

14    may pose a risk to other witnesses and people involved in

15    this case.  And I would ask the bond to remain at least at

16    this point as it's presently set.

17         THE COURT:  All right, well, based on the full record

18    as been presented to me, I believe some reduction of bond is

19    warranted.  I don't see this as a million dollar bond type of

20    case.  Not to say it's not a very serious case, it is.  I've

21    found probable cause to permit the state to pursue the most

22    serious charge against Mr. Sessions.  However, I do think

23    that some reduction in bond is warranted.

24         And so this is what I'm going to do, I'm going to reduce

25    the bond from one million dollars to five hundred thousand

26    dollars.  And if Mr. Sessions is going to post that bond,

27    that should be posted in open court so the state has an

48

1      opportunity to articulate whatever conditions they feel are

2      appropriate to protect their legitimate interests and the

3      interests of anyone connected with the case.  The defense

4      will certainly have an opportunity to be heard with respect

5      to that.  And Judge Fasano can, or myself, whomever, can

6      fashion appropriate conditions, if in fact that looks like

7      that bond is going to happen.  Okay, that's the order of

8      the court.

9          ATTORNEY WILLIAMS: Thank you, Your Honor.

10         ATTORNEY ALEXY:  Thank you, Your Honor.

11         ------------------------------------------

SUPERIOR COURT

JUDICIAL DISTRICT OF NEW HAVEN COUNTY, AT NEW HAVEN


STATE OF CONNECTICUT                          CR-9-497231

VS.

GARY SESSIONS                                 MARCH 8, 2001


I, Therese Sandoval, Court Monitor, certify that the foregoing is a
true and accurate transcript of the proceedings had in the above
entitled case, electronically recorded by me, heard in the Superior
Court, 235 Church Street, New Haven, Connecticut, before the
Honorable Robert J. Devlin, Judge.  This certification is invalid if
it does not contain an original signature.


This is the 22nd day of March, 2001.

*Therese Sandoval*

Therese Sandoval