UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

.....................................................

GARY SESSION,                          CIVIL ACTION NO.
          Plaintiff              303-CV- 00943 (AWT)

V.

EDWIN RODRIGUEZ                         AUGUST  28, 2008

         Defendants

.............................................................

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

**I. INTRODUCTION AND ARGUMENT:**

      This Court has had, since May, 28, 2003, the date of the filing of Plaintiff's original

complaint, and does maintains subject matter jurisdiction to hear Plaintiff's case against

Defendant Rodriguez, for Section 1983 claims, predicated on the facts that Defendant,  and

former Defendants, willfully, maliciously and with wanton disregard coerced false statements for

use in Plaintiff's Warrant Application (**Exhibit A**),  gathered statements, which would have

exculpated Plaintiff,  but  conveniently left the exculpatory portions thereof out of the Murder

Warrant Application.

      Further, Plaintiff maintains that the Defendant's filing of the instant motion is a dilatory

tactic made in a desperate attempt to again delay the case at bar.  "Motions under 12(b)(1)

1

"technically" should be raised before the filing of a responsive pleading." Wiacek Farms, LLC v. City of Shelton, 2005 WL 2850154 (D. Conn.) (citing Elvig v. Calvin Presbyterian Church, 375 F.3d 951, 955 n. 2 (9th Cir. 2004). This motion should have been raised before the Answer was filed. It is being filed now at the eleventh and a half (11 1/2) hour.

Additionally, Plaintiff needs to correct several errors and inaccuracies addressed by Defendant in it's "Memorandum in Support of Support of Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction. (**Exhibit B**):

Defendant attempts to rely on the Rooker-Feldman Doctrine, stating, "The Rooker Feldman Doctrine prevents a plaintiff who receives an unfavorable ruling in the superior state court from seeking review of the state court's decision by utilizing federal courts and setting forth federal claims, which are intrinsically intertwined with plaintiff's state court's ruling." Exhibit B at Page 8.

Therefore, Defendant claims that, pursuant to said Doctrine, the Court has no subject matter jurisdiction over the instant case. However that argument fails, as follows:

In Rooker v. Fidelity Trust Company, 263 U.S. 413, 416, 68 L. Ed. 362, 44 S. Ct. 149 (1923), 68 L. Ed. 362, 44 S.Ct. 149 (1923), the Supreme Court held "that no federal court, besides the Supreme Court of the United States, can consider a claim to reverse or modify a state court judgment. The Court in District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983), concluded that "where a Plaintiff's claims in federal court are 'inextricably intertwined' with a state court's determinations, the district court lacks jurisdiction

2

to entertain those claims." *Id.* at 483 n. 16.

"The Supreme Court has not explained exactly when a claim is inextricably intertwined with a state court determination. Plainly, Rooker-Feldman bars claims raised in a state court proceeding that are then raised in a subsequent federal proceeding." <u>Moccio v. New York State Office of Court Admin.,</u> 95 F. 3d 195, 199 (2d Cir. 1996).

Rooker-Feldman does NOT bar claims that were *never presented* in a state court proceeding and could not have been presented in that proceeding (Emphasis added). <u>Moccio,</u> 95 F. 3d at 199. *Plaintiff's claims were never presented in a state court proceeding* and *could not have been presented in that proceeding* for a multitude of reasons (Emphasis supplied):

1. Connecticut General Statutes §54-46a provides "that the probable cause hearing  is a **preliminary hearing** to determine whether there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. "(Emphasis added.)

The probable cause hearing is not a forum in which Plaintiff could have litigated the issues raised in his Revised Complaint (**Exhibit C**).  It is a *limited*  hearing for the specific purpose of determining probable cause.

2. Defendant insinuates that Plaintiff should have participated more actively in his probable cause hearing,  at Exhibit B, Page 11:

"At that hearing, the prosecution submitted testimony and evidence consistent with the evidence set forth in the arrest warrant.  The Plaintiff was given the opportunity to lodge

3

objections, cross examine prosecution's witness, specifically Mercado and Martin.  In addition, the Plaintiff was afforded the opportunity to proffer his own witnesses and offer his own evidence.  At that time, the Plaintiff did not present any evidence to counter the evidence set forth by the prosecution..."

First, Plaintiff attended the probable cause hearing in order to learn the name of the person that police claimed was their criminal informant.   In fact, the New Haven Police Department was refusing to have their "criminal informant", now known to be Mayra Mercado, testify at Plaintiff's probable cause hearing.   When the Judge threatened to drop the charges against Plaintiff,  Defendants had no choice but to produce the alleged criminal informant.   In fact, on February 28, 2001, at approximately 7:30 p.m, on the eve of Plaintiff's probable cause trial a courier delivered Mayra Mercado's statement, leaving Plaintiff no time to review said statement, which was approximately twenty-three (23) percent redacted.

Also, Plaintiff had been made aware  that he could face the death penalty, so he felt it important to attend, having had nothing to do with the alleged incident and the charges against him.   In fact the only "informative" document Plaintiff had been provided with subsequent to his arrest, was the Arrest Warrant Affidavit.

Obviously, Plaintiff did not "fail to act" at  his probable cause hearing, as insinuated by the Defendant, supra.   Plaintiff was merely avoided jeopardizing his murder defense and his Fifth Amendment right to remain silent.  In other words, Plaintiff did not make a strategic decision based exclusively on the outcome of the probable cause hearing;  he chose to preserve his murder

defense and other defenses.

3. Further, State's Attorney, Christopher Alexy, Esq., indicated, under oath, in his

deposition (**Exhibit D** , relevant part thereof),  that the statements of Juan Scruggs (**Exhibit E**  )

and Albert McCann (**Exhibit F**), which turned out to be exculpatory in nature, were *not available*

*for the probable cause hearing* (Emphasis supplied).

Therefore, Plaintiff was denied the opportunity to read statements of witnesses that

should have been offered as evidence at his probable cause hearing.

4. As to Defendants claim (Exhibit B, Page 12), "The Plaintiff has neither alleged, nor has

the discovery of facts revealed the same reported 'taint' to the arrest warrant was present at the

probable cause hearing."

This is just boldly wrong.  Plaintiff has consistently argued that there was exculpatory

information and/or evidence withheld from him since the inception of  the case, and certainly at

the point of the probable cause hearing, up to and including the present date.   In fact, the only

copy provided to Plaintiff, of Mayra Mercado's statement, was twenty-three (23) percent

redacted.  Mr. Session has consistently and persistently sought an unredacted copy of said

document, but has never received one.  At the very least, Plaintiff should have been provided with

that document, and is still seeking same.

5. Defendant  grossly mis-characterized  Plaintiff's probable cause hearing as "pristine" ,

indicating " (a) a neutral magistrate was afforded the opportunity to review the facts contained in

the arrest warrant."  (b) "the Plaintiff was afforded the opportunity to object to evidence and cross

examine witnesses. Exhibit B, Page 12.  That is simply not true.  As indicated, supra, the

exculpatory statements of Juan Scruggs and Albert McCann were not available for the neutral

magistrate's review of the facts contained in the arrest warrant.  Nor were said statements

available for Plaintiff's objection or cross-examination at his probable cause hearing.  That is far

from "pristine".

     6.  Defendant purports (Exhibit B, Page 12) that the instant matter is similar to the

situation encountered in <u>Brown v. D'Amico</u>, 35 F.3d 97 (2d. Cir., 1994).  While Plaintiff in that

case claimed that Defendant had omitted certain facts from the warrant application, said case is

clearly distinguishable from the case at bar.  The principles set forth in <u>Brown</u> do not apply to

Plaintiff's case in that the grand jury testimony in <u>Brown</u>, occurred prior to the issuance of an

arrest warrant, and Plaintiff's warrant was issued prior to his arrest.

     While Defendant proffers that Plaintiff's probable cause hearing offered him an

opportunity to be heard not offered to the Plaintiff in <u>Brown</u>,  , the circumstances surrounding

such a hearing did not offer Mr. Session  a full and fair opportunity to present his claims.  In

order for Defendant to effectively utilize <u>Brown</u> to his advantage in the case at bar, Defendant

would have to effectively ignore caselaw  to the contrary, discussed infra, pages 9 and 10.

     The Court in <u>Brown</u> indicates, "Because the challenged conduct took place pursuant to

facially valid warrants, the Fourth Amendment right at issue is the right to be free from searches

and seizures conducted pursuant to warrants that would not have been issues if the officers

seeking them had disclosed to the magistrate information within their knowledge negating

probable cause." *Id.* at 99.  "To prove this right has been violated, the plaintiff must show that defendants knowingly and deliberately, or with reckless disregard of the truth, made material statements or omissions in the warrant affidavit that were necessary to the finding of probable cause." Franks v. Delaware, 438 U.S. 154, 155-56 (1978).  "If the corrected affidavit (omitted information included and false statements omitted) still establishes probable cause, no Fourth Amendment violation has occurred." Smith v. Edwards, 175 F.3d 99, 105 (2d Cir. 1999).

In the instant case, Plaintiff maintains that a "corrected" affidavit would most certainly not warrant a finding of probable cause, as discussed herein.

7.  Defendant states (Exhibit B, Page 9):  "The Rooker Feldman bar applies when four elements exist. 'First, the federal Plaintiff must have lost in state court.  Second, *the plaintiff must complain [ ] of injuries caused by [a] state court judgment...*"  (Emphasis added.)  In the case at bar, Mr. Session has complained of no injuries caused by a state court judgment.

The Court in Todd v. Weltman, Weinberg & Reis CO., L.PA( attached hereto as **Appendix A**, at Page 5) declined to apply Rooker Feldman where Defendant's Plaintiff's claim federal claim is inextricably intertwined with the Ohio state court decision that Defendant's affidavit was valid, stating:

"This argument ignores the fact that Plaintiff here does not complain of injuries caused by this state court judgment....Instead, after the state court judgment, Plaintiff filed an independent federal claim that Plaintiff was injured by Defendant when he filed a false affidavit."

Similarly, Plaintiff is not and has not complained of injuries caused by a state court

judgment.  He is complaining of a multitude of injuries caused by Defendant Rodriguez, Detective Coppola and City of New Haven, including the filing of false affidavits.

     8.  Defendant states (Exhibit B, Page 8):

"The Rooker Feldman Doctrine prevents a plaintiff who receives an *unfavorable ruling in the superior state court* from seeking review of the state court's decision by utilizing federal courts and setting forth federal claims, which are *intrinsically intertwined with plaintiff's state court's ruling.*"(Emphasis added).

     The Court in the instant case has previously stated in it's Order Re Stephen Coppola and Edwin Rodriguez's Motion for Summary Judgment" (**Exhibit G** ) at page 3:

     **"The court also rejects the individual defendants' argument that there is no genuine issue of material fact as to whether there was a disposition in favor of the plaintiff because the case against the plaintiff was disposed of by a nolle prosequi.  As the court discussed in Holman v. Cascio, 390 F. Supp. 2d. 120, 123 (D. Conn. 2005), 'the majority of decisions applying Connecticut law ...hold that a nolle of the criminal charge may still permit the plaintiff to satisfy that element if the circumstances of the nolle satisfy the See v. Gosselin test of 'an abandonment of the prosecution without request from or by arrangement with [the defendant].**"(Emphasis added).   The defendant referenced by the Court being the Plaintiff in the instant civil action.

     The Court continued (Exhibit G ) at page 4:

"Furthermore, '[t]he factual circumstances surrounding the nolle are material and when disputed, must be resolved by the trier of fact.' <u>Holman</u>, 390 F. Supp. 2d at 124. In this case, there is a genuine issue of material fact as to whether there was a disposition in favor of the Plaintiff. The nolle prosequi was not the result of any agreement between the plaintiff and the State; the stated reason for the nolle prosequi was the invocation of the Fifth Amendment privilege by two witnesses." (Emphasis added).

In light of the above, Defendant's contention that Plaintiff received an unfavorable ruling in the superior court is without merit. The Court, supra, already addressed that issue, and ruled that there is a genuine issue of material fact with regard to whether Plaintiff received a favorable disposition in the underlying criminal matter.

It should be noted that Plaintiff's case did not actually end in a nolle prosequi, it ended in a dismissal with prejudice (**Exhibit H**). Also, the reason for Plaintiff's nolle prosequi was not invocation of Fifth Amendment privilege by witnesses, it was a nolle prosequi for missing witnesses. Nonetheless, Plaintiff did not either win or lose in state court. A finding of probable cause is not a final judgment, to which the Rooker-Feldman doctrine would apply. Even in the face of an argument that Rooker-Feldman was applicable , Plaintiff was not afforded a full and fair opportunity to litigate his claims at said probable cause hearing (supra, Page  ). Therefore, Defendant's argument (Exhibit B, Page 1) that "If this Court were to find in favor of the Plaintiff that the Plaintiff was arrested, imprisoned and prosecuted without probable cause, this Court

would be undoing the finding of probable cause by a Connecticut Superior Court Judge," does not hold water.

As discussed below, in <u>SEC v . Monarch Funding Corp.</u>, 192 F. 3d 295 (2d Cir. 1999), Plaintiff has identified "circumstances which may have had the practical effect of discouraging or deterring [him] from fully litigating the determination which is now asserted against" him. <u>Ryan v. New York Tel. Co. et al;</u>, , 62 N.Y. 2d 494, 501, 478 N.Y.S.2d 823, 827, 467N.E.2d 487 (1984).

In <u>Monarch Funding Corp.,</u> the question presented was whether findings in a criminal sentencing proceeding may preclude relitigation of an issue in a later civil case. The Court stated that "the incentive to litigate a sentencing finding is frequently less intense, and certainly more fraught with risk , than it would be for a full-blown civil trial." *Id.* at 305.

This same logic is clearly applicable to a probable cause hearing, as in the case at bar, because participation by defendant at a criminal hearing, could result in dire legal consequences if the defendant violates his Fifth Amendment rights. As indicated, Mr. Session, the Plaintiff herein, did not participate  in his probable cause hearing so that he would be able to preserve any and all defenses to the murder case being brought against him. As the court in <u>Monarch Funding</u> noted "a criminal defendant will often choose not to challenge sensitive issues during sentencing." *Id.* at 305.

8. Defendant states that:  "Plaintiff was afforded a hearing in probable cause, where, after two days of testimony, a Connecticut Superior Court Judge, Devlin, *J.*, made a finding of probable cause." Exhibit B, Page 1.

While it is true that there was a probable cause hearing, Plaintiff chose not to challenge sensitive issues during his probable cause hearing, due to the legal consequences he might have faced as a result. Clearly, the circumstances did not offer Plaintiff a full and fair opportunity to litigate the issues raised in his Revised Complaint, dated July 29, 2005 (**Exhibit C**), discussed supra.

## II. BACKGROUND AND ARGUMENTS RELATED THERETO

### A. The Shooting of Anthony Lucky, Jr. and related argument

Plaintiff, in his Revised Complaint, dated July 29, 2005, avers, as follows:

On July 25, at approximately 1:50 a.m., Anthony Lucky, Jr. ("Lucky") was a rear passenger in a 1998 Suzuki Samurai being operated by his cousin Albert McCann. One Juan Scruggs was seated in the front passenger seat of the vehicle (See Exhibit C, Revised Complaint at ¶ 7.) While in the vicinity of Columbus and Howard Avenues in New Haven, Connecticut, the Samurai came under gunfire from a passenger in a nearby vehicle, a light blue Honda. McCann and Scruggs identified the driver of this vehicle and his passengers as Hispanic in appearance (Exhibit C, ¶ 8).

McCann informed Scruggs that he had a pistol, a Beretta, in the back seat of the Samurai, which Scruggs then retrieved and used to return fire. During the ensuing gun battle, Lucky was struck by a bullet and died shortly thereafter at Yale-New Haven Hospital. (Exhibit C, ¶ 9). Scruggs stated to police that he had accidentally shot Lucky in the chest when attempting to remove a tee shirt, which McCann had wrapped around the gun. He described to police feeling

the pistol recoil as he brought the pistol forward to the front seat. He further stated that he subsequently saw Lucky holding his chest and observed blood on the front of Lucky's shirt. (Exhibit C, ¶ 10)

The opinion of the Chief Medical Examiner for the State of Connecticut was that Lucky had actually died from a gunshot wound originating in the lower back. Ballistic tests performed by the City of New Haven Police Department concluded that a single bullet had penetrated the rear mounted spare tire, passed through the tailgate and struck Lucky. The bullet that killed Lucky was never located. (Exhibit C, ¶ 11). (**Exhibit I,** Report of Chief Medical Examiner).

Defendant claims (Exhibit B, Page 2) "Ballistic tests performed by the City of New Haven Police Department concluded that a single bullet had penetrated a spare tire mounted on the tailgate of the Samurai and struck Lucky." This information, obtained from Plaintiff's revised complaint, was the only information available to Plaintiff regarding ballistic testing at that time, and is only partially correct. The findings obtained by the coroner (See Exhibit I), might have been significantly different, for the following reasons:

1. The coroner had been told by Defendant Rodriquez that a bullet hole was discovered in the rear tailgate, first entering the tread of the mounted spare tire that exited the side wall of the steel belted radial tire. The coroner used this information to make a "ballpark" determination that the bullet must have entered his back, exited his chest, continuing out the half-open side window. As indicated, this alleged bullet has never been recovered.

2. The coroner was not told of the confession given by Juan Scruggs, the front seat

passenger of the vehicle occupied by the victim, indicating he fired a gun from within the vehicle, feeling the gun jerk, and seeing a chest wound before the officers approached the vehicle.

3. Also left out of the report to the coroner is the fact that Defendant Coppola told Juan Scruggs, Lucky was shot in the "right nipple", which Scruggs then referred to in his statement (Exhibit E at Page 4 ). This information would have made the coroner rethink her unqualified determination of entry and exit wounds.

4. Suspiciously not mentioned by Defendants, was the fact that Detective Shelton had conveyed to the coroner that the emergency room doctor, Dr. Spector, indicated that the victim was shot in the chest/abdomen region.

5. The coroner made the determination of the entry/exit finding with a lack of information, which was withheld by Defendants. Without this information, Dr. Shah's determination of entry/exit theories were speculative, at best. At Dr. Shah's deposition, (**Exhibit J**), she had corrected detective Shelton's alleged "wrong information" and also indicated that the operating doctor was wrong.

6. Due to the incorrect information given to her by Defendant Rodriguez, the coroner never questioned the whereabouts of the shirt/clothing. In fact, the "missing" or destroyed shirt was one of the most important items of exculpatory evidence. It would have allowed the coroner to rule out scenarios, other than the *one* provided by Defendant, through powder burn and/or residue analysis.

7. The defendants never told the coroner of the misfiring of the gun from within the

vehicle. Nor did the defendants inform the coroner that the bullet entry from the rear made a one (1) inch jagged hole and the trajectory could not have entered the victim at that angle, exiting the chest to continue out the half-open passenger window. Also, the bullet that allegedly entered Lucky's back was a perfect circled hole, with a heat abrasion around the hole, with no jagged edges or deformities. The coroner also said that the bullet point of emphasis was from the gun directly to the body from 10-15 inches away. That means the bullet could not have come from outside the car as sworn to by the defendants.

8. The coroner also did not question the Shelton chest claim after speaking to Rodriquez who untruthfully said he was not present at the autopsy. The coroner also untruthfully said Rodriquez did not attend the autopsy. However, the Affidavit of Detective Shelton (**Exhibit K**) clearly shows the police personnel who attended the autopsy, and Defendant Rodriguez was amongst those Detective Shelton identified in his affidavit as being present.

For some strange and currently unknown reason, Defendant Rodriquez and the coroner apparently thought it would be better for both of them to say Defendant Rodriquez was not at the Lucky autopsy. It is shocking and disturbing, that two public officials responsible for providing truthful information, would blatantly tell untruths, which are now documented for all to see.

9. Defendants, including Defendant Rodriguez, never corroborated their theory of the incident involving the death of Anthony Lucky, Jr. The Defendants did, however, have the New Haven Police Department Crime Scene Investigation Unit conduct its re-creation of the crime. In complete contradiction, Defendants claimed (**Exhibit L** ) that the *State Crime Unit* did the

re-creation.  (Emphasis supplied.)  This account is false and misleading and, until now,  has never been questioned.

10.  Defendant has never pointed to an incident report in this investigation which would corroborate their theory of the Lucky case.  The report taken by Officer DeJesus (**Exhibit M** ) was dismissed by Defendants as unreliable.  That report, taken the night of the shooting, accurately matches the fact witnesses' claim the incident was a road rage incident.

### B.  Witness Interviews/Investigation and related argument

Plaintiff must point the Court to several inaccuracies in Defendant's "version" of events, as set forth in his "Memorandum in Support of Defendant's Motion to Dismiss for Subject Matter Jurisdiction" (see Exhibit B)  of witness interviews and the investigation of the murder of Anthony Lucky, Jr.:

**1.**  Defendant indicates in Exhibit B, at Page 3, that Sharon Adkins was interviewed on November 7 , 1999.

Plaintiff maintains that waiting over three (3) months after an incident to question a possible witness is highly suspect, along with many other aspects of the "investigation" into Plaintiff's underlying criminal case.

It is the usual practice for police, detective sand crime scene investigators to gather the most critical evidence within the first forty-eight (48) hours after the alleged crime.   Defendant Rodriguez failed to interview Ms. Adkins, and Ms. Mercado,  for approximately three and one

half (3 1/2) months after the incident.

At that point, a person who does not use drugs, as opposed to Ms. Adkins, a known crack addict, may have forgotten much of what had happened, and would be much less likely to provide detailed information. Procuring a statement from a crack addict nearly four (4) months after the crime is, at best, bad policing, and at worst, intentional. This would also apply with regard to Defendant's "interview" of Ms. Mercado, an admitted crack addict, "interviewed" on November 8, 1999.

Pointing to the statement of Sharon Adkins (**Exhibit N**), Defendant claims at Exhibit B, Page 3 that, "On November 7, 1999, Defendants interviewed Sharon Adkins... Adkins stated that she sold crack for DeShawn Johnson (hereinafter, "Johnson")... and that Johnson worked for the Plaintiff (aka "Shabazz")...Adkins indicated that McCann had stolen money and crack from Johnson...As a result of McCann's alleged theft, Johnson told Adkins to call him if McCann came to her house. In July, 1999, McCann came to her house so Adkins called Johnson from a pay phone...After calling Johnson, Adkins went to sell some drugs and, on her way back, she heard gunshots near her home...Adkins identified Johnson, Scruggs, and McCann on photoboards..."

Plaintiff notes that there is a footnote 1, indicating "Through a corrected report, she states that she believes that happened in July of 1999..." Defendant's foregoing statement is inaccurate. Ms. Adkins never mentioned in her statement, (See Exhibit N ) or ever inferred any dates other than August 16, 1999 and August 8, 1999, which is the first time Ms. Adkin's allegedly met DeShawn Johnson.

Further, Adkins never said she went to sell drugs as indicated by the Defendants. Without meaning any disrespect to Ms. Adkin's character, she is a well-known crack addict, who said in her statement that she and a woman named Dory went to Church Street South to buy some crack, not sell crack. They allegedly heard some gunshots and dove to the ground. They then proceeded home without further incident. Again, for no apparent reason, the Defendants have severely stretched the truth, beyond recognition.

With regard to Defendant's allegation regarding the photoboard identifications of Johnson, Scruggs and McCann, Adkins may have identified Johnson from knowing him; however, Scruggs was identified as "Buddaman" and McCann identified as "E."

It is almost beyond belief that, in a murder investigation where Plaintiff herein was facing the death penalty, Defendants relied on an identification where two (2) of the parties identified were identified only by nicknames. There was no connection made between the nicknames and the names of the two occupants, McCann and Scruggs, in the vehicle with Lucky,    The two Defendants, Rodriguez and Coppola, never bothered to question McCann and Scruggs, who could have corroborated the nicknames or any personal knowledge of the statements given by Mercado and Adkin's. Defendants were either negligent or willful in failing to investigate and corroborate statements given four (4) months after the Lucky incident. In fact, Defendants were either grossly negligent, acting with wanton disregard, or intentionally botching the investigation, by disregarding and/or failing to corroborate evidence collected in the first forty-eight (48) hours after the crime occurred, including but not limited to:

a)  Statements from fact witnesses McCann and Scruggs;

b)  A statement from a anonymous fact witness, who left an address and gave a statement that Defendants chose to disregard this statement in favor of Larkland Martin's statement.

**2.**  With regard to Mayra Mercado:

a)  Defendant's characterization of Mayra Mercado as a confidential informant (Exhibit B at Page 3) is not accurate.

Ms. Mercado was never a confidential informant, and neither Defendant Rodriguez nor Coppola or City of New Haven has ever produced a single document indicating that she was. Further, for the purposes of securing the arrest warrant, the Defendant relied heavily on Ms. Mercado's statement , dated November 8, 1999 (**Exhibit O** ), to establish probable cause.

b)  Ms. Mercado's probable cause testimony did not corroborate her November 8, 1999 statement, which was heavily redacted, missing entire words, questions, answers, etc. (**Exhibit P**, relevant probable cause testimony).

c)  It appears, however, that Defendant Rodriguez has less than clean hands with regard to the procurement of the November 8, 1999 statement.  Please see Statement of Mayra Mercado, incorporated herein as **Exhibit Q,** Detective Rodriguez being the police officer referenced, which reads in part:

> "MR. RUSSELL:  And before that meeting, before they turned the tape recorder on, did they interview you first and then turn the tape recorder on?
> MS. MERCADO:  Yes.  They told me what to say.
> MR. RUSSELL:  Tell me what they said to say.
> MS. MERCADO:  They just told me to say that, you know what I'm saying, Shabazz [1]

killed the kid, whoever them other kids are."

      d) Referring to Defendants Exhibit B, Page 3, it states, "...the Defendant's superiors, Sergeants Canning and Norwood, put Rodriguez in touch with a confidential informant (hereinafter "Mercado")...At the time that Mercado gave her statement...she claimed that she was fearful of the Plaintiff and she accepted a referral to the witness protection program."

Once again, this is incorrect. First, Plaintiff was provided with witness protection documents regarding Ms. Mercado on February 9, 2008. That is, Plaintiff was provided with these documents nearly nine (9) years after they were allegedly signed by Ms. Mercado.

Further, Officer Canning offered in his deposition ( **Exhibit R** , relevant part) that Ms. Mercado was neither an informant, nor in the Witness Protection Program. Ms. Mercado, herself, when asked at her deposition (**Exhibit S** , relevant part) if she was ever a criminal informant, she replied, "never". When asked at her deposition if she was ever in the witness protection program, she replied, "never".

      3. Defendant indicates (Exhibit B, Page 4-5) that "On or about December 4, 1999, while investigating a different murder, Rodriguez was approached by Larkland Martin ("Martin")...and provided a statement to Rodriguez" (**Exhibit T**, December 4, 1999 "Statement of Larkland Martin") regarding the Lucky incident, nearly four (4) months after same. Defendant avers that Martin "testified in a manner consistent with his original statement" at Plaintiff's March 1, 2001 probable cause hearing. The Defendants, unfortunately relied on Mr. Larkland's statement,

given months after the Lucky incident, to the exclusion of McCann's and Scruggs's statements, and the statement of an anonymous witness (discussed infra) taken with in the first forty-eight (48) hours after the incident. Plaintiff maintains that this was either grossly negligent or intentional on the part of Defendants.

### C. Application for the Arrest Warrant and Related Argument

1. With regard to Defendant's Exhibit B (Memorandum in Support) it should be noted that the correct date for the warrant application signature was January 5, 2001, not January 5, **2007**, as indicated therein at Page 5. Similarly, and the date of Plaintiff's arrest was 2001, not **2007.** (Emphasis added.)

2. Also, Plaintiff finds it alarming and disturbing that Defendant filed a "Memorandum in Support of the Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction" (**Exhibit B**"), and left out four (4) entire pages of "Defendant's 'Exhibit I'", which was Plaintiff's Arrest Warrant Application. The four (4) missing pages (Pages 4, 5, 8, 10), all mention Plaintiff's name, and are attached hereto as **Exhibit b1**.

This just seems to be further proof that, throughout this entire case, Defendant (and former Defendants) seem to produce the documents that they wish to, and proceeded to "hide" the others, depending on which would be more beneficial to them, at any given time during this case. Thus, the "missing" pages here, beg the question as to whether said pages were "missing"

from the *original* Arrest Warrant Application, which was rejected by the magistrate.

Plaintiff's Revised Complaint, continues as follows:

Notwithstanding the facts that a discrepancy existed in the statement of Scruggs to the police and the autopsy report, that the fatal bullet was never recovered, the identity of the shooter never ascertained, on January 8, 2001, Plaintiff was arrested by Defendants Rodriguez and Coppola, acting upon their authority as police officers for the Defendant City of New Haven, on the charge of conspiracy to commit murder (sic) Anthony Lucky. Plaintiff, however, had never met Lucky, never knew Lucky and never knew anyone who knew Lucky. Upon information and belief, no suspect was ever arrested for conspiring with Plaintiff to murder Anthony Lucky. (Exhibit C, ¶ 13).

In addition to being charged with conspiracy to commit murder, Plaintiff was charged with murder and weapons charges, which would have made him eligible for the death penalty. With regard to the conspiracy charges, it should be noted that Plaintiff was the first person arrested in connection with the Lucky homicide. It seems less than legally sound to base an arrest on a conspiracy charge, when there is no statement from an alleged shooter with whom one might have conspired. Additionally, the only statement relied, upon in Plaintiff's case, was given by an admitted drug addict, Mayra Mercado, who was allegedly a third party witness to the Plaintiff's alleged criminal acts and not involved in the murder.

Plaintiff's arrest warrant was based upon the affidavits submitted in support of the warrant signed by the Defendants Rodriguez and Coppola. The affidavits were based solely on

the uncorroborated statements of... Mayra Mercado, who claimed that she had witnessed Plaintiff

passing a pistol to one Jose Santiago, also know as "Bebe", on July 25, 1999.  Mercado, ...had

felony drug charges pending against her when she made these statements... These statements,

however, were not made until November 8, 1999, 3 1/2 months after the incident.  Within the

recorded statements reference is made to earlier conversations, however, these conversations

were not recorded, nor did they produce any reports, notes or documentation of any kind.

Additionally, the statements made by Mercado were in exchange for the Defendant Rodriguez

and Coppola's assistance in getting her bond reduced on the pending drug charges.  (Exhibit C, ¶

14).

　　　Of note here is that, at the time of the filing of the Revised Complaint, and at the time of

the probable cause hearing, there was no way for Plaintiff to know that Ms. Mercado had

significant inconsistencies in her statements to police:

　　　a)   In Ms. Mercado's statement dated, November 8, 1999, she indicated that Plaintiff,

while at his house, was conspiring with Jose Santiago, also known as "Bebe" about three (3)

individuals stealing money and drugs from Mr. Santiago.  Plaintiff allegedly passed a pistol to Jose

Santiago, also known as "Bebe."(Exhibit O, Page   )

　　　b)   At  the probable cause hearing,  on March 1, 2001, Ms. Mercado testified  that Plaintiff

was at his house with DeShawn Johnson, talking about Johnson's money being stolen by three (3)

"black kids", and Plaintiff's alleged reply was to Johnson was to get his money.  (Exhibit P, Mayra

Mercado testimony, relevant portion.)

c) Everything she said at the probable cause hearing and in her November 8,1999 statement was, essentially, vitiated by her Affidavit (see Exhibit Q ).

Defendant's never questioned these inconsistencies, despite knowing about them, and proceeded to proffer Ms. Mercado as their "star" witness during the probable cause hearing.

Also of interest is the fact that Ms. Mercado had been re-arrested for felony failure to appear in the first degree for missing court on drug charges. According to police records, she was released on a promise to appear as a deal for giving the statement against Plaintiff. After Ms. Mercado testified at Plaintiff's probable cause hearing, she was released on, yet another, promise to appear for felony failure to appear for the same charges from two (2) years prior.

Santiago was subsequently charged with Lucky's murder three months after Plaintiff was arrested. McCann had been shown three photo array's on March 5, 2000 with his attorney present and could not pick anyone out. That should have cast serious doubt regarding the veracity of the theory of the three witness, Mercado, Adkins and Martin...McCann was also shown another photo array prior to Plaintiff's criminal trial in September of 2001. McCann still could not identify anyone in the photo's. McCann then was requested to testify for the prosecution, however, testified that Johnson was not the driver and Santiago was not a passenger in the Honda that fired upon him. In July of 2002, the charges against Santiago were dismissed. (Exhibit C, ¶ 16).

Despite of an absence of any evidence, Mercado's complete unreliability as an informant and an asserted alibi supported by three (3) witnesses, Plaintiff was arrested and incarcerated for

a period of eleven (11) months. The charges against him were dismissed on August 14, 2002. (Exhibit C, ¶ 17). (Emphasis added).

Defendants Rodriguez and Coppola's actions in arresting Plaintiff were undertaken without probable cause and based upon unreliable information that in the exercise of reasonable care they would have known was unreliable. Defendants Rodriguez and Coppola knowingly permitted Plaintiff to be incarcerated and prosecuted on the charge of murder, all while knowing that no credible evidence existed that implicated him.(Emphasis added.) (Exhibit C, ¶18).

Defendant states in its Memorandum in Support, Exhibit B at Page 2, that:

"Homicide detectives, Coppola and Rodriguez, who worked for the New Haven Police Department, were assigned to investigate the shooting death of Lucky. As part of their investigation, Rodriguez and Coppola conducted interviews of persons who may have had knowledge concerning Lucky's death and reviewed police incident reports prepared by other officers."

While it is true that Detective Coppola and Defendant Rodriguez were homicide detectives for the New Haven Police Department, and were assigned to investigate the shooting death of Anthony Lucky , Jr., they hand-picked the information that they decided to use in their murder investigation, withholding exculpatory evidence, for which there is no acceptable excuse.

In addition, the Defendant Rodriguez  and Detective Coppola failed to interview an anonymous witness who gave a concise account totally consistent with the fact witnesses who occupied the Suzuki Samurai that contained the victim. This witness wanted to remain

anonymous but was known to Officer DeJesus and gave his address, and and anonymous statement (**Exhibit U**) to Officer Teague, so he could be contacted at a later date. The Defendant's response was shocking in that he made the determination not to follow that witness lead, indicating that the witness statement did not seem credible, based on his reliance on Martin's statement.

Lastly, Defendant Rodriguez disclosed at plaintiff's probable cause hearing, that Coppola had questioned Mayra Mercado on November 8, 2001. As a result of this information being withheld from the Court in Defendants' Coppola and Rodriguez' Motion for Summary Judgment, the Court granted summary judgment as to Defendant Coppola. (See Exhibit G), again leaving the Plaintiff herein at a disadvantage due to Defendants' failure to disclose the truth.

## IV. CONCLUSION:

In light of the foregoing, it is clear that the Court maintains subject matter jurisdiction, and Plaintiff's claims should not be dismissed for lack of subject matter jurisdiction.

THE PLAINTIFF
GARY SESSION


By:

John A. Pinheiro, Esq.
167 Cherry Street, PMB 314
Milford, Connecticut 06460
(203) 874-4477
Fax: (203) 882-0354
Cell: (203) 209-2449
Email: japinheiro@optonline.net
Fed. Bar. No. CT02977

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed first class, postage prepaid, to the following this August 28, 2008:

Thomas E. Katon, Esq.
Susman, Duffy & Segaloff, P.C.
55 Whitney Avenue
P.O. Box 1684
New Haven, Connecticut 06507

John A. Pinheiro, Esq.

[1] It should be noted Ms. Mercado was referring to Mr. Session, when she indicated the nickname Shabazz.

## EXHIBIT LIST (ROOKER FELDMAN)

A:  Plaintiff's Arrest Warrant Application
B:  Defendant's Memorandum in Support of Dismissal for Lack... dated August 1, 2008
b1:  Four missing pages of P's Arrest Warrant Application that D's submitted as their "Exhibit __".
C:  Plaintiff's Revised Complaint
D:  Relevant part of Deposition of Christopher Alexy (Statements missing for P.C. hearing)
E:  Statement of Juan Scruggs
F:  Statement of Albert McCann, Jr.
G:  Defendants Rodriguez and Coppola Order Re Summary Judgment
H:  Copy of Plaintiff's Dismissal w/prejudice
I:  Report of Chief Medical Examiner
J:  Deposition of Dr. Shah (relevant portion, where she corrects Shelton and ER doc)
K:  Affidavit of Detective Shelton (relevant portion, showing Rodriguez attended autopsy)
L : Doc where Defendant claims State Crime Unit did re-creation
M: Report of Officer DeJesus
N: Statement of Sharon Adkins
O: Mayra Mercado's Nov. 8, 1999 Statement
P: Mayra Mercado's Probable Cause Testimony (relevant part, where she says gun passed to DeShaun, not Bebe)
Q: Affidavit of Mayra Mercado, given to Phillip Russell, Esq.
R:  Detective Canning's deposition (relevant portion)
S: Deposition of Mayra Mercado
T: December 4, 1999 Statement of Larkland Martin
U: Anonymous Witness Statement

## APPENDIX LIST

Appendix A:  Todd v. Weltman, Weinberg & Reis CO., L.P.A.