1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


GARY SESSION          )
    Plaintiff         ) 3:03-cv-00943 (TLM)
                      )
VS                    )  May 20, 2013
EDWIN RODRIGUEZ   ) Federal Building
    Defendant         ) Hartford, Connecticut


VOLUME 1

TRIAL HELD BEFORE
THE HONORABLE TUCKER L. MELANCON, U.S.D.J.

Reporter:  WENDY J. ALLEN, RPR, CRR, LSR #00221

2

Representing the Plaintiff

John Pinheiro, Esq.
374 Whalley Avenue
New Haven, CT  06511
Pinheirojohna@gmail.com

Representing the Defendant

Thomas Katon, Esq.
Sussman, Duffy & Segaloff
P.O. Box 1684
New Haven, CT  06507
Tkaton@sussmanduffy.com

Jeffrey R. Zehe, Esq.
Nielson, Zehe & Anas, P.C.
55 W. Monroe Street
Chicago, IL  60603
Jzehe@nzalaw.com

THE COURT:  So we are on the record in civil action number 03-00943, Gary Session versus Edwin Rodriguez.  At this time -- and the case is set for trial on the merits for jury selection to start in about 40 minutes.

At this time I'd ask the attorneys involved in the case to go ahead and identify themselves for the record purposes, starting first with Plaintiff's counsel.

MR. PINHEIRO:  Good morning, Your Honor. John Pinheiro on behalf of the Plaintiff, Gary Session.

MR. KATON:  Morning, Your Honor, Thomas Katon on behalf of Defendant, Edwin Rodriguez.

MR. ZEHE:  Morning, Your Honor.  Jeff Zehe, Z-E-H-E, on behalf of the Defendant, Edwin Rodriguez.

THE COURT:  And my hearing is not what it used to be.  I guess this is one of those courtrooms, I remember I had a hard time hearing in here, and this is the second most important person in the courtroom first, this lady.  So come up here and just take a minute.

Make sure -- because my hearing -- my recollection is it's Zehe, right?

4

MR. ZEHE: Yes, Your Honor.

THE COURT: Because you said something back and I said I didn't think it was Zehe.

MR. ZEHE: It's Zehe.

THE COURT: I've been wrong an awful lot more often than I've been right.

Now, let me say this -- and I just kind of said it fast when I walked in here -- it seemed like I know you all better than I know most lawyers for cases, unless I've had lawyers numerous occasions, which has happened a little bit in the district, but not that much, because you've been in the case for a good while.

So Hurricane Sandy interrupted trial, and -- but we did -- because of the good work of the lawyers, we got through a lot of stuff. This ought to be a pretty clean trial. Except for the exhibits, everything from my perspective is done and no objections to, with a couple reservations. And I'm talking about as it relates to the jury instruction, the jury verdict form, the special verdict, or the special questions, factual questions that we'll ask for the qualified immunity issue, and as well as the punitive damages jury verdict form, and instructions in the event that there's a Plaintiff verdict and it

5

goes back and the jury is presented with the issue of punitive damages.

And I think the only exception to that would be there was a reservation -- which I'm not sure what that means, because I guess good lawyers are anal lawyers, I guess good lawyers are anal -- whatever it means. Isn't that what the Judge's order said?

But anyhow, we got through that, but there's I think that the Defendant's issues is that there might be, I believe, probable cause, may want to revisit that issue, which I think my ruling was, if memory serves me correct, was that was covered by what is in there, and the case law and all the other stuff wasn't necessary. I think that's what I said at the time, but there was some kind of reservation, if you had to revisit, you'd revisit.

And the other thing is in the event at the close of Plaintiff's case there's a Rule 50 motion, it might be something around intervening cause, which again, I don't remember the particulars, but I see defense counsel nodding. Have I stated those more or less correctly?

MR. KATON: Yes, Your Honor.

THE COURT: And have I stated everything else from Mr. Pinheiro, your position? I mean the

6

jury instructions, interrogatories, we have plowed all that ground, so we're in good shape to go for it, right?

MR. PINHEIRO: Yes, sir.

THE COURT: Same thing for Mr. Katon, is that right?

MR. KATON: Yes, Your Honor.

THE COURT: Okay. Now, it is my intention today to try to do all of these objections -- and it may not be possible -- to the exhibits. And I will say that good and anal, both being the same, when it comes to lawyers. Sometimes you just make objection, and then in the light of calm and material reflection maybe not only made objections, they think about introducing exhibits, trying to get exhibits in, after calm and material reflection maybe they otherwise would not have done it. And I'm not going to suggest that some of them -- some of the objections I'm going to consider out of --

How many do we have, Brendan? Do you remember?

It's a bunch of them. And some of them I think we can dispose of summarily. Some other ones I may want to talk back and forth with you, but probably not much. And other ones we'll talk about if we get

to the third level, and maybe I just have to see it in realtime before I can rule.  I don't think there'll be a lot of those, but maybe, and so we'll just go through it.

So I would appreciate you guys -- and just sit down.  I'm sorry.  Of course naturally when you address the Court I expect you to stand.  Particularly -- I mean always, but particularly in the presence of the jury.

And I'm going to ask you, too -- each us try cases a little differently -- try not to be walking around the courtroom.  Come up -- I used to have what I call the one arm rule.  You had to be within one arm of that little lectern, microphone there.  I've kind of loosened up a little bit, but it's distracting to the jury, it's distracting to everybody, the witness.  So when you're at bat, be up there at the table, at the lectern.

When you're in your chair, it doesn't help when you're going back and forth all the time looking for exhibits, so try to keep that at a minimum.  Sometimes you got to do what you got to do, but be cognizant of that.  But jurors tell me, after the trial, boy, that lawyer, those lawyers weren't prepared, strumming through papers and stuff.  So

anyhow, I'd appreciate that.

So let's start going -- and the way I'm going to do it, I'm going to -- and I have to assume before we start, you all have all your -- you knew we were going to do this this morning -- that you got all your exhibits in chronological order, so when I go through you can just look at them and know what I'm talking about.

And the first thing I'm going to do, if I could make sure I got my notes right here, this will be the first rule I think that really takes very little effort, from me.  The first one will be Exhibit number 2.  Excuse me, 22.  And I think that objection should be sustained.

And I'd like to hear -- I guess this is a Plaintiff's document.  I don't think there's any witness that could identify any of that, about this confidential informant list, why the list was prepared, when the list was prepared, and what the names on the list indicate.  The list itself gives no indication of its purpose or its preparer or even the date, and even the date is cut off.

Now, because you have the opportunity to speak, you don't need to, but it sure doesn't seem like to me there's any basis for that to get in, but

counsel?

MR. PINHEIRO:  If I may, Your Honor.

THE COURT:  You may, but very quickly.

MR. PINHEIRO:  Your Honor, this was given to us during discovery by the Defendants.  It's the list that is generated within the New Haven police department of confidential -- registered confidential informants.

THE COURT:  I got that, counselor, but if you're going to say gee, they gave it to us, it may mean something, that's the point; what does it mean, what was the purpose of it, and how does it relate to this case.  There's nobody that's going to testify to that based on the record I have, I think, isn't that true?

MR. PINHEIRO:  Respectfully, Your Honor, we have Captain Joanne Peterson, I'm going to subpoena.

THE COURT:  So you know from deposition that this witness will know what this is about and why?

MR. PINHEIRO:  From deposition we have Officer Redding also, who's unavailable, but we have his deposition.  We agreed on excerpts of that deposition.

THE COURT: But is this your representation, counsel -- because that's not my recollection -- as an officer of this court, that you're going to have live witnesses here or witness testimony, deposition, that's been agreed to that's going to bring this list into having answered the questions that I just said, I mean about when it was prepared, what the names on the list indicate, what its purpose was, or even the day it was prepared? You got somebody that's going to say that, is that what you're telling me as an officer of the court.

MR. PINHEIRO: I do not have anything on the day it was prepared, but I believe, Your Honor, he would be able to say that it was generated in the normal course of -- it was the normal course of business to generate this.

THE COURT: So it's a business record, you want to say it's in the file, so let the jury see it, is what you're saying?

MR. PINHEIRO: In addition, Your Honor, it shows that Mayra Mercado was not a confidential informant at the time the warrant was --

THE COURT: I sustained the objection, okay?

MR. PINHEIRO: Thank you.

11

THE COURT:  Number 25.  That seems to me relevance -- excuse me, I'm sorry, back off.  You watch me, because I'm sure as likely to mess up on this this morning.

Number 32, again, I'm trying to -- I don't think it has any relevance at all to the Plaintiff's claims.

MR. PINHEIRO:  If I may, Your Honor.

THE COURT:  Just a minute.  Let me finish, counselor.  I started to say this before, I really want to let you guys try your cases, and right now we don't have a jury here, and I really like all of you.  I have noted in the past that sometimes, with all of you, but particularly Mr. Pinheiro, I started thinking it was just my accent, that we didn't understand each other, but I promise you, I'm going to let you talk, if you must.  These are the easy ones.  But I got to finish saying what I got to say, and then let me get it in.  I know you're not trying to be rude, I know you weren't doing it intentionally, and it doesn't matter because there's no jury here, I don't want you to be offended, but I can't let you do that in front of the jury.  I will have to be the judge.

So okay.  So let me just see, this is 32.

And like I say, you don't have to speak just because you may, unless you got a real shoot 'em in the eyes.

Brendan, I'm trying to get the latest list of exhibits. I'm going back and forth. This exhibit, for the record, so we're all on the same page is -- it's got a Bates stamp 207 to 208, a motion for speedy trial dated October the 25th, 2001. The purpose, Plaintiff's attempt to get a speedy resolution of his criminal charges. What's that got to do with the price of tea in China as it relates to this case, counselor?

MR. PINHEIRO: You're absolutely right, and we agreed to omit that exhibit, Your Honor. And if I may take a moment I'll let Your Honor know what exhibits that we have agreed upon to omit that perhaps you have no knowledge of.

THE COURT: Great. And again, I just had two lists, and I saw one was admitted, so -- and again, I said earlier, and I meant that, you guys have done probably a lot more work than you have to do on the cases because of the delays and the age of this. You all have done good work to get it teed up. I'm not trying to make it harder for of any us, I promise you.

So go ahead, tell me which ones. Go

13

slowly so I'll know.

MR. PINHEIRO:  This weekend we did work together to admit other documents.

Your Honor, after 32 the Plaintiff is -- if I may, Your Honor.

THE COURT:  Yes, sir.

MR. PINHEIRO:  Plaintiff's 35 is omitted.

THE COURT:  35?

MR. PINHEIRO:  Yes, sir.

THE COURT:  What else?

MR. PINHEIRO:  Plaintiff 36.

THE COURT:  What else?

MR. PINHEIRO:  Plaintiff 37.

Plaintiff 38, which I believe was already recorded.

Plaintiff 47.

THE COURT:  Hang on just a second.

MR. PINHEIRO:  Yes, sir.

THE COURT:  Okay.

MR. PINHEIRO:  Plaintiff 50.  I think you have that, Your Honor.

THE COURT:  I'm sorry, sir, I didn't hear you.

MR. PINHEIRO:  Plaintiff 50.

THE COURT:  Okay.

14

MR. PINHEIRO: 78 and 79 was previously withdrawn, I believe.

THE COURT: If it's not on the list, that's what it means, right, Brendan?

MR. PINHEIRO: Yes.

THE COURT: Go ahead.

MR. PINHEIRO: That's it, Your Honor.

THE COURT: Let me tell you what, you're hitting a hundred on what I was going to do, or thinking I was going to do after giving you guys a chance.

So let's go back. The first one that -- I think that would be number 39, Brendan, that's one we need to -- here we go. Yes. This was the medical records that are the total records of the Plaintiff while he was incarcerated for roughly 11 months, or thereabouts, if memory serves correct. I may be wrong.

MR. PINHEIRO: That's correct.

THE COURT: And the records are voluminous or for the most part entirely illegible, and the jury would have no idea how to read, interpret or use the records without expert testimony to introduce and explain them. The likelihood of jury confusion is extremely high if this pile of records

were dropped en masse for them to sort through.  And again, with no disrespect to Mr. Pinheiro, it doesn't appear to the Court that there has been any attempt to separate the pages that are entirely irrelevant.

Some of the records do not even possibly relate to damages.  For example, Plaintiff's history of immunizations.  Further, without the associated bills as to treatment, the records do not add anything to Plaintiff's own testimony to the medical conditions he suffered while he was incarcerated.

So under 403, your confusion and waste of time, but mainly the juror confusion, I don't see -- there's no way this exhibit can go in as is.  And I will say, if Plaintiff's counsel wants to go through and say Judge, consider these pages, 1 through 4, or 18 through 22, and ask me to look at it, you know, tomorrow or the next day, let's do it by Wednesday, I'd be happy to do that, but other than that, I'm going to sustain the objection.

Counselor?

MR. PINHEIRO:  Thank you for the opportunity, Your Honor.  And if I just may, there were no medical bills because it was treatment at Department of Correction, but I thank you, Your Honor.

THE COURT:  What I was trying to do, Mr.

16

Pinheiro, was tie the loop around so any reviewing court would understand the court wasn't completely off the ranch when he --

MR. PINHEIRO:  Thank you.

THE COURT:  Thank you.

Now, I think 43 -- and, let's see, these would be, as I understand, it's production of -- production of studio jewelry, and the purpose is to establish Plaintiff damages.  And I think the objection, as I appreciate it, is that the Plaintiff presents the assortment of receipts ranging from a 1998 purchase of duct tape to automobile repairs -- that's Bates stamped 335 and 365 -- as somehow evidence of the value of recording equipment he allegedly sold as a result of his incarceration.  And the objection is that each receipt is unauthenticated hearsay documents.

The receipts are, further, irrelevant evidence of purchases in 1998 and do not reflect any value at the time after Plaintiff sold -- after Plaintiff's incarceration in 2001.  Nothing shows any of the property was sold.  No amount has ever been disclosed in discovery.

To the extent the documents are evidence of his recording work, they've been precluded by the

Court's order and Defendant's motion in limine, that the more speculative evidence of lost income and lost business opportunities; that ruling dated October 7, 2011.

Further, the evidence will confuse and mislead the jury.  It sure seems to me that the receipts should not be presented to the jury, and there's no indication of how the receipts are relevant to Plaintiff's damages.

There's numerous issues with the receipts.  Just as an initial matter, most, if not all, receipts were paid for in cash.  There's no verification Plaintiff purchased all of these items. Further, many of the receipts are illegible or too dark to read.  And if, as the Defendant appears to believe, the receipts would go to Plaintiff's claims he sold off -- to what Plaintiff sold off as a result of his incarceration to pay legal fees, there were no other way -- there are other ways to prove attorney fees paid that do not involve receipts of items previously owned, let alone the fact that some listed items clearly were not sold off.

There are too many items to list and many examples, but several include fire extinguisher, that's Bates stamp number 337; screwdriver, Bates

stamp 337; life vest, 338; and surge strip, 345.

Moreover, there's no indication of the present value, if the Plaintiff even still owned these items at the time of his arrest, filing charges, or the hiring of defense counsel, as many, if not all, of these purchases were nearly three years old.

Plaintiff will be permitted to testify to his claimed losses as a result of his incarceration, including the payment of attorney fees and other legal costs. But again, there is -- to me, I can't -- there's not conceivably any reason to allow this, so I'm going to sustain the objection, unless Mr. Pinheiro needs to speak to it and can convince me in about three sentences why I'm wrong.

MR. PINHEIRO: I'll try to do it in three, Your Honor.

When he was incarcerated he lost his home and lost all these possessions in his home, and he did the best he could to reconstruct and find these receipts for the loss.

THE COURT: I appreciate that, and the Court will sustain the objection.

And again, the only comment I make in that regard is that, you know, my duty as the gatekeeper is to make sure we have a fair proceeding,

fair both to the Plaintiff and to the Defendant, and in my view it's unconscionable for me to allow that kind of "throw some spaghetti on the wall and hope something sticks" approach to the jury, but that's the best I can do with what I got.

Number 44.  I think that's been omitted, so I'm through with that.

And number 68 -- and I think that was -- I got to say, I think this is the first time that this -- if this is the right one -- that I've ever had that request in 20 years of being a judge, or ever seen it.  Well, they didn't have Westlaw when I was a lawyer, not in my little part of the world.  That's a Westlaw case, Brendan?  Yes.

I'm not going to let a printout of a Westlaw case go to the jury.  My job is to instruct them on the law, not to say here's a case, you all go read it and figure it out, guys.  So I'm going to sustain that.  And I don't know, Mr. Pinheiro, but if you had to say anything I guess it wouldn't be much, but I'm not going to do that.  Understood, sir?

MR. PINHEIRO:  No, Your Honor.

THE COURT:  I mean you do understand?

MR. PINHEIRO:  I do, Your Honor.

THE COURT:  You have nothing to say?

20

MR. PINHEIRO:  I don't, Your Honor. Thank you.

THE COURT:  Okay.  Number -- I think the easy ones to me, this would be Plaintiff's objections to Defendant's exhibit, that would be A-10, I think. And --

MR. ZEHE:  Your Honor?

THE COURT:  Hang on just a minute.  Let me refresh my recollection.  Unless you're saying I'm withdrawing it, then -- let me say what I got to say and then you can respond.

MR. ZEHE:  Thank you.

THE COURT:  Let's go ahead.  I intend at this juncture to sustain that objection, so far as it appears that the case incident report is a hearsay exception under Federal Rule of Evidence 803-A, and any conclusory statements in public records are omitted under Second Circuit case law.

The document is rife with multiple levels of hearsay.  Under Rule 805 each hearsay level needs its own exception to make the statement admissible. Defendant has not offered the exceptions for the letters to Ishmael Mercado, Rosa Mercado, Sergeant Canning, Defendant, or even from Ishmael to Rosa to Defendant.  Without Defendant offering a hearsay

exception, any statements in the report of multilevel hearsay I think clearly need to be excluded.  But I'll listen to you, Mr. Zehe.

MR. ZEHE:  Your Honor, the note that's referred to in the report, and it's also in part of his -- Plaintiff's objection to A-40, it's referred to again in C-24, C-25, YY and ZZ.

The reason that we see this note so often is because it is the basis for the conduct, the reason why police officers and state's attorneys took certain actions with regard to the witness, the material witness, Mayra Mercado.  This note isn't being offered for the truth of the matter contained within the note. It's being offered only to show why the officers acted in a certain way, why they took certain actions.

THE COURT:  So you're saying it's not hearsay at all.

MR. ZEHE:  No, it's to show the state of mind of the officers.  It's no different than an anonymous phone call as to why an officer went into a house.  Those are -- that's not considered hearsay. It's just to show the state of mind.

THE COURT:  Now, let me interrupt you. Mr. Pinheiro, you need to be thinking about what they just said.  And Brendan, could you get a copy of that?

22

Let me look at it while Mr. Pinheiro's thinking about what he said.

What else you got to say, Mr. Zehe?

MR. ZEHE:  I just wanted to explain that actual context because the Mayra Mercado was a material witness that came forward to tell the police about a drug hit by the Plaintiff.  She reported how it happened, and why it happened.  When she was in custody, right after giving the oral statement -- right after giving the oral statement her mother received this threatening note, which she turned over to the police department.  The police then made arrangements because of the threatening note to put that material witness into witness protection, a unit of the state's attorneys office.  Without the note the reason for the police officers actions in putting her in witness protection remains a mystery to the jury.  That is, she was threatened, she was afraid for her life, she --

THE COURT:  I got all of that, but we're talking -- we're going far afield now.  At least for the reason, I understand -- and I think you're right on it not being hearsay, for the limited purpose that you're -- you want to use it, but we're going all over the ranch on this.  That's not going to come in in

this trial.

MR. ZEHE:  I understand, Judge.  Well, she was -- this note is simply to put -- to --

THE COURT:  State of mind.

MR. ZEHE:  State of mind of the police officers and the state's attorneys for dealing with this witness, Mayra Mercado.  So it's not hearsay, and we'd ask that it be used only for that limited purpose.

THE COURT:  And if I instruct you to work with your noble adversary here on some kind of limiting instruction I could give when it comes up, when information comes in, through whatever -- which witness is going to bring this in?

MR. ZEHE:  Your Honor, the officer who got the note initially, Detective Rodriguez, and the -- primarily through Detective Rodriguez and state's attorneys.

THE COURT:  That acted on that.

MR. ZEHE:  That acted on the notes.

THE COURT:  Based on what was in the file.

MR. ZEHE:  Yes.

THE COURT:  Okay.  Now, Mr. Pinheiro, it looks to me like, one, it's not hearsay, under that

24

limited purpose; two, that -- and you guys, I think it's the third time I said it, really work well together. With the limited instruction before the witness would go into it, I would ask both lawyers to remind me, need to have total sidebar on this, when we got to sidebar you all would say this is the time you need to let them know. You could ask about this, and once it's asked you say Judge, read the instruction, that you guys have agreed to. So it's two-prong.

You understand why I'm saying it's not hearsay under the federal rules of evidence?

MR. PINHEIRO: I understand. I respectfully disagree, Your Honor.

THE COURT: Respectfully disagree?

MR. PINHEIRO: Yes, sir.

THE COURT: Okay. State your basis concisely, why it is hearsay.

MR. PINHEIRO: Well, these documents are referring to a separate document, and the separate document is that Junito note. Now, that note in and itself is hearsay.

THE COURT: But you've got to address the state of mind and what I said. I was with you, and Mr. Zehe straightened me out, and well he should. I want you to respond to what he said and where I am

now, not going off on the hearsay, because again, I mean, it's a state of mind situation, and with a proper instruction -- I mean, this is how we try cases. It's not being offered for the truth of the matter asserted. It's just what were you thinking when you did what you did, officer.

MR. PINHEIRO: If I may, it's a state of mind -- the police report is referring to a note that has no author, no one to authenticate it. Now, if the police report made reference to John Doe said this and that was his state of mind and that is the state of mind of the investigators and officer as a result of what John Doe said, I understand, but this is referring to a document that I think is not going to be in evidence in and of itself, we don't have any author, we don't have anyone to testify as to receiving it, no one's going to be receiving -- the person who received it is not testifying in this trial.

THE COURT: Just a minute. Mr. Zehe, correct me, because I'm going down another road here. Mr. Pinheiro says -- I asked you how are you going to get it in, and you said Rodriguez, and I've forgotten who else you said, state's attorney. But does it just fall into the file?

26

MR. ZEHE:  Your Honor, he picks it up from the person who received the note.

THE COURT:  That's what I thought you said.

MR. ZEHE:  And that's what he --

THE COURT:  Okay.  I'm going to allow it to be used for the limited purpose subject to you guys working out a proper limiting instruction that I will read before anybody utters a word about it.  And Mr. Zehe, don't let it get close before you got it up here and we've gone over the limiting instruction that the two of you agreed on and I let the jury know.  I know you won't intentionally, but don't try.  And Mr. Katon, make sure it doesn't happen unintentionally. And Plaintiff counsel, I want you to be put on notice, too.  Let's stop everybody.  It wouldn't be necessarily a mistrial, but I'd be kind of upset with me for figuring you guys could handle it and not remind me.

MR. PINHEIRO:  If I may, Your Honor, a clarification?

THE COURT:  All right.

MR. PINHEIRO:  Defendant's Exhibit A-10 is admitted with that instruction.  But the actual note in and of itself, correct me if I'm wrong, is

that you withdrew that?

MR. ZEHE:  No.

MR. PINHEIRO:  So there's a note that's going to be coming in that we haven't addressed.

THE COURT:  And wait a minute, I'm getting, Mr. Pinheiro, because I thought that was the subject we were just discussing, in essence, but let me just see.

Okay.  Well, that note's going to come up as he generated this report that is the official record that was made based on the note that -- and we've already had testimony, I mean representation that Rodriguez picked it up from the lady that received the note.

MR. ZEHE:  Yes, Your Honor.

THE COURT:  And it's the subject of another objection later, so I'll address that when I get to it.  Okay?  So you guys do your best to get a good limiting instruction on that, how we use it.

I think what was A-40 is moot, you-all withdrew that.  And that's true, is it not?

MR. PINHEIRO:  If I may, Your Honor.  The exhibit's withdrawn.

THE COURT:  I may be getting off the form here.

28

Okay, as to -- I'm sorry.  A-4, that page, Defendant's withdrew A-4 of its exhibit.  So the objection --

MR. ZEHE:  Your Honor, if I might.

THE COURT:  Just a minute, counsel, please.  We obviously aren't going to succeed in what I hoped to do, so we're going to have to stay late tonight, I guess, and we'll do it when we get through with the jury.

If I appreciate what I thought I knew at some point in this case, Defendant, these are a set of state court official documents with the exception of that one page that was withdrawn, A-4.  Is that true?

MR. ZEHE:  We withdrew A-4.

THE COURT:  A-4 is out.  But the rest of it you want in.  A-4 is one page, is what my perception was.

MR. ZEHE:  A-40 we wanted one page out.

THE COURT:  I'm sorry, A-40.

MR. ZEHE:  Right.

THE COURT:  But which page of A-40 did you withdraw?

MR. ZEHE:  274.

THE COURT:  Bates stamp 274?

MR. ZEHE:  Yes, Your Honor.

THE COURT: But you want everything else in?

MR. ZEHE: Yes, Your Honor.

THE COURT: State briefly and concisely what those records are, because all I think I have -- Mr. Pinheiro, you listen to what he's going to say. I got a general -- is it a hearsay objection? This is all hearsay, which I need something more than that, and I'm not sure what these records -- what you're trying to get out of these records, Mr. Zehe.

MR. ZEHE: Your Honor, these are all part of the homicide book that the officers will testify that formed the basis for what they submitted to the state's attorneys office for approval of probable cause. Each one of these pages in A are reports made by them or relied upon them to formulate their probable cause and was submitted for the --

THE COURT: To proceed with the prosecution that ultimately ends in favor of Mr. Session, but that's what they were thinking when they were thinking.

MR. ZEHE: That's what they put together.

THE COURT: Mr. Pinheiro, as an officer of the court, tell me how in the world can they get up there and defend themselves by what they did if they

got contemporaneous business records and this is what they were thinking?

MR. PINHEIRO:  If I may, Your Honor, if I direct Your Honor's attention to Bates 282, and 283.

THE COURT:  I'm at 282.

MR. PINHEIRO:  And 282 is the police report that says "note", which states "Junito is a good target, Mayra better keep her mouth closed, the letter was then signed Rosa, you know who."

THE COURT:  Okay.  That's the subject of what we were talking about in that 283 is the note, right?

MR. PINHEIRO:  Correct.

THE COURT:  So your statement is?

MR. PINHEIRO:  Well, now that Your Honor has the note before you, you can see that it's clearly hearsay, not signed.  And if I may, Your Honor, if the defense wanted this they could have had Rosa Mercado appear in court to testify that she did receive the note and gave it to whatever officer is going to authenticate the receiving of the note.  They failed to do so, Your Honor.  The note is prejudicial, inflammatory, to the Plaintiff.  And there's repeating of the note from the previous exhibit, Your Honor. It'll confuse the jury, and it's a cumulative effect

that would be unduly prejudicial to the Plaintiff.

THE COURT:  Mr. Zehe, address that specifically, and let's go.

MR. ZEHE:  Your Honor, exactly what we talked about before, it's not hearsay, it's the basis on which the officers formulated their state of mind. They --

THE COURT:  So this would be covered, in your view, because it's not being offered for the truth of the matter asserted by the limiting instruction that you and Mr. Pinheiro are going to work out.

MR. ZEHE:  Yes, Your Honor, exactly.

THE COURT:  That's the Court's ruling. And again, I mean again, the posture of this, my role is the gatekeeper, make sure it's fair to both sides. I want Plaintiff to have every opportunity to present his case.  He's made allegations.  But the defense counsel -- I mean the Defendant needs every opportunity to present from his perspective what it is that was motivating him at the time he did whatever it was that he did.  And these are contemporaneous records that during the process, with the proper cautionary instruction about this is not being asserted for the truth of it, 24 is what was in the

file, and he's going to get up there and say what he's going to say, and I'm sure the Plaintiff is going to get up and say exactly what he thinks Rodriguez was doing to him and why. And I don't know how else we can have a trial unless we proceed that way.

And to the extent -- and like that old saying goes, all evidence is prejudicial to somebody, but to the extent that this evidence is prejudicial to the Plaintiff's case, I find that the probative value for the very issue that Plaintiff put at issue, the Defendant's motivation and pursuing the charges against him, the probative value outweighs the prejudicial effect. And again, I think the proper limiting instruction's going to be something which we normally don't even do. I think that's the -- to the extent they can be prophylactic and still have a fair proceeding to both the Defendant and the Plaintiff, that's the Court's ruling. Understood, Plaintiff's counsel?

MR. PINHEIRO: I understand. I respectfully disagree, Your Honor.

THE COURT: Okay. I note your objection for the record, and so it serves any future occasion may require.

MR. PINHEIRO: Thank you.

33

THE COURT: Now, let's talk about C-30, I guess.

MR. ZEHE: Your Honor, we're withdrawing C-30.

THE COURT: Thank you.

And Brendan, under our form YY, ZZ, 7 and 8. What else needs to be done at this juncture to bootstrap what we've done already today with these? Anything?

My student legal eagle points out correctly here that these two exhibits are related to what I've done previously with the note and the record document that was generated as an official record. Is that right, Mr. Zehe?

MR. ZEHE: That's right, Your Honor.

THE COURT: That's your understanding, Mr. Pinheiro?

MR. PINHEIRO: Yes, sir.

THE COURT: And it would be covered by the Court's previous ruling subject to the limiting instruction that you guys are going to agree to that I'll give before any testimony about it.

Okay. Now, let me just say -- what do we need to do? Can you get Cheryl up here with the jurors? How long does that take?

34

Meantime we'll keep on keeping on.

MR. ZEHE:  Your Honor?

THE COURT:  Yes, sir.

MR. ZEHE:  If I might, there was --

THE COURT:  I'm going to have this off the record.

(Off record)

THE COURT:  Back on the record.

MR. ZEHE:  Your Honor, there are a few Plaintiff's Exhibits that the objections were stated and haven't been ruled on.  I didn't know if you wanted to wait.

THE COURT:  Here's the deal.  I thought I was doing the easy one.  This was the first layer of things, and it's taken this -- I've got a second layer, then I've got a third layer.  So that's why I suggested we're going to be here late tonight, because we got to get it finished.  And but no, I think we need to pick our jury and get them in here, pick our jury and then just do the best we can to start up.

And big man, you got the record of what we've done here?  Because my notes are omitted and withdrawn.  Always like to use one term or I get confused.

Okay, if you could bring the jury in.  I

suggest anybody that's been in here -- let me ask you, do you know what used to be Judge Hall's chambers is open?

THE CLERK:  It can be opened.  I have a key for it.  The problem is we have to jimmy the door because if it closes it'll lock and you'll never be able to get in and out.  I have a key for it, but I don't have a way of keeping that door unlocked.

THE COURT:  You have the key with you?

THE CLERK:  I do.

THE COURT:  I need to talk Robin because I'm going to be living here the next five weeks.

Let's go ahead and we'll break for two minutes.  You can bring them in and we'll all come in and you can do the dog and pony show, whatever else we got to do.

THE CLERK:  Yes, Your Honor.

THE COURT:  Lawyers, thank you for your patience with me.  I'm going to try not be quite as lame as you may have observed already this morning. I'm going to try to the best of my ability to let you guys really try your cases, and if I have a hard time communicating, you say Judge, let's have a sidebar. I'm not going to take it disrespectful if you just don't understand what I'm saying.  Again, I used to

blame it on the accent, but I think maybe I'm not that smart, I don't know.  So anyhow, okay.

One of the issues we got here with lawyers in our district is we use too many -- we waste too many jurors, so I'm trying to do it the old way that I was taught by the AL when I first got to be a judge 20 years ago, to make sure my numbers are down, and I'll be shocked if we don't have four to five wasted jurors in this trial.  But anyhow, we're supposed to have 17 or 18, that's all you need to pick eight in a normal case, but we're going to have -- we'll see.  So now you-all know we can see how many wasted jurors we get.

(Off record)

THE COURT:  Again, good morning.  The matter before the Court today is civil number 03:943, Gary Session versus Edwin Rodriguez.

And are the parties ready to proceed, Plaintiff's counsel.

MR. PINHEIRO:  Yes, we are, Your Honor.

THE COURT:  Defense counsel?

MR. KATON:  Yes, Your Honor.

THE COURT:  I want each member of the jury panel to know how much the Court appreciates your individual sacrifices in coming here today as

prospective jurors. I assure you that we appreciate your service, and I hope that you will not view your role as inconsequential. Believe me, we would not disrupt your lives except for a matter of a most serious nature, the trial of a civil case in the United States District Court for the District of Connecticut.

I know that some of you are apprehensive about being here and I understand that. I assure you that all of us, the court personnel, the lawyers, the parties and I will do everything in our power to inconvenience you as little as possible, but as I've said, these are serious matters that we're here today concerned with, so we ask for your patience, attention and indulgence.

First let me introduce myself. My name is Tucker Melancon. I'm a United States District Judge for the Western District of Louisiana, and I am sitting here in the District of Connecticut by designation of the Chief Justice of the United States. So not that it matters a whole lot, I live in Norwalk now, so I guess I am a fixture in this court.

My law clerk, Brendan Clegg, is the law clerk assigned to this case. This is Mr. Clegg here, this gentleman seated looking like he's doing

something important.  He is from Boston, and a graduate of the William and Mary Law School.  He helps me with questions of law.  During the course of the trial you may be -- you may see me handing notes to him.  Mostly they will be concerned with questions of law or of procedure.

Kenneth Ghilardi is my courtroom deputy, who would swear the witnesses and take care of the jury, accept documents that I allow to be admitted into evidence.  So you'll notice this is Ken and my first time to work together, and I think it'll go really smoothly.  He's been around doing his job as long as I've been doing mine.  But there may be a few glitches and you may observe it's not a well-oiled machine, so forgive us for that.  We'll be better on the next one that starts in a couple of weeks.

At least eight of you will be ultimately selected to serve as jurors to decide the case for which we are selecting the jury today.  We will now begin the process of picking the jury.  The process is known by two French verbs, voir dire.  Voir to see, dire to speak.  That is, the parties, lawyers and I want to see you and to speak to you.  We also want to listen to you.  This is part of how we get fair trials.

39

Different people have different views of things, and some are more able to make a fair and impartial examination of a topic than are others. There are many reasons for this, none of them bad or embarrassing. The kind of life someone has lived, the type of work they do, all color in great or small ways their ability to assess things. The goal in a courtroom is to get each claim judged on the merits of the case, not to predispositions or opinions of the jurors.

With that in mind, I'm going to ask you some questions about yourselves. I do not mean to pry into your lives, but we need to get to know a little about you. This helps us make sure that we have a jury that can judge this case fairly.

You're asked to help by thinking about yourself and what your reactions are to the case and to the people involved in it. If your response is strongly positive or negative to something, let me know. That is the right thing to do. Sometimes the fairest and best thing you can do is to disqualify yourself as a juror even if you really want to serve. On the other hand, if you're confident that you can be a neutral juror in this case, you're really making a contribution to our system of laws by staying and

serving.

Our system depends on a broad cross-section of our community. If you're thinking that you don't want to be here, don't judge so quickly. Most people will say that serving on a jury is one of the most satisfying things they ever did. It is one way to really make a difference. Don't waste your chance.

One more very important point, you're not to talk to your fellow prospective jurors about this case or the procedure we'll be using to pick the jury. I ask this of you because some of you may have very definite ideas about how things should proceed, and if you discuss these ideas or the case with your fellow prospective jurors, we'll have a difficult time picking the jury. So I ask you, please don't discuss the case, or your opinions of the law, with any of your fellow prospective jurors.

Would you go ahead and administer the voir dire oath for the jury.

THE CLERK: Yes, Your Honor.

Could I have everyone please stand and raise your right hand.

(The jurors were sworn by the clerk.)

THE COURT: You may be seated.

41

And Ken, I also assume that you have previously assembled the jury by their randomly assigned juror numbers, is that correct?

THE CLERK:  Correct.  That list is a random assignment.

THE COURT:  Now, I'm going to ask some general questions, and then I'm going to ask you to ask you some specific questions.

And I don't recall the procedure we have here, Ken, but do we have a microphone that we hand out to the jurors so we can all hear them?  Because they're a good distance away from us.

THE CLERK:  They don't have that system in this courtroom, I'm sorry to say.  At least I'm not aware of it.

THE COURT:  I said I'm fixture here.  I thought we had such, and I don't know if you could maybe just check with Eric to make sure, because it's going to make it very difficult for us all to hear each other.

And again, this is what I was talking about a well-oiled machine, and give us time to get it together.

So these are general questions.

First of all, if you cannot hear me

42

clearly, please raise your hand.

If you cannot read or write the English language, please raise your hand.

If you cannot see well, please raise your hand.

If any of you have been convicted of a felony in state or federal court and have not received a pardon, please raise your hand.

The parties and the attorneys in this case can challenge your becoming a member of the jury that will try the case for several reasons or for reasons that may not be easily explained. To intelligently challenge you need to know something -- we need to know something about you. So starting with juror number 1, I want each of you to stand when your number is called. And juror number 1, I'm not sure how loudly --

I apologize, I was looking to the gentleman to my right. Again, I usually have a short list, got the numbers on here, but since Ken didn't know that's what I do I'm going from the list.

I'm going to ask you to speak as loudly as you can, and if we all can't hear you, the court reporter, the lawyers and the judge -- I want you to know my ears are getting not as good as they used to

43

be -- but if we can't hear you, then I may ask you to come up here.  And I hate to impose, because again, this is not a test, ladies and gentlemen, we just need to get to know a little bit of information.

So starting with you, can you tell us where you live?

JUROR #1:  Wilton, Connecticut.

THE COURT:  And how long have you lived in Wilton?

JUROR #1:  15 to 20 years.

THE COURT:  And who lives there with you in Wilton?

JUROR #1:  My wife and my stepson.

THE COURT:  And what type of work do you do, sir?

JUROR #1:  I'm retired.

THE COURT:  What did you do?

JUROR #1:  I was a partner in a major accounting firm.

THE COURT:  So give us a little more background.  Accounting, you're a CPA?

JUROR #1:  I am an inactive CPA, yes.

THE COURT:  Probably the best kind.

And what about your wife, is she employed outside the home?

44

JUROR #1:  She's retired, also.

THE COURT:  What did she do?

JUROR #1:  She was in office administration.

THE COURT:  Not to get too personal, what does that mean?  What kind of business was she in office administration with?

JUROR #1:  She worked for the Alzheimer's Association.

THE COURT:  You say you have a stepson who lives at home?

JUROR #1:  That is correct.

THE COURT:  Is he employed?

JUROR #1:  Yes, he is.

THE COURT:  What does he do?

JUROR #1:  He works for the Jewish Community Center of Stamford.

THE COURT:  Do you have any other children or stepchildren that are grown and gone, living away?

JUROR #1:  Yes.

THE COURT:  Start -- your children --

JUROR #1:  I have a son and a daughter.

THE COURT:  And starting with the oldest one, tell us how old, and what they do.

JUROR #1:  My daughter is 33.  She's a teacher in the Bridgeport schools.  She's actually a reading interventionist, not a classroom teacher.

THE COURT:  And the son?

JUROR #1:  My son is 30, and he's a mechanic.

THE COURT:  And what about stepchildren, you got any other stepchildren?

JUROR #1:  No, I don't.  I do have a son-in-law and two grandchildren.

THE COURT:  And let me ask you, what does the son-in-law do?

JUROR #1:  He works for Pitney Bowes in office administration, managing outsourcing contracts.

THE COURT:  And what type of recreational activities or hobbies do you engage in?

JUROR #1:  Exercise, bicycle, water sports, boating, golf.

THE COURT:  And what's your educational level, sir?

JUROR #1:  I have a master's degree in finance from the University of Michigan.

THE COURT:  All right.  Thank you very much.

And juror number 2, if you would, please,

46

stand, and as loudly as you can so we can all hear you, please tell us where you live.

JUROR #2:  I live in Bridgeport.

THE COURT:  And how long have you lived in Bridgeport?

JUROR #2:  Four years.

THE COURT:  And who lives in Bridgeport with you?

JUROR #2:  My wife.

THE COURT:  And do you have any children?

JUROR #2:  Not yet.

THE COURT:  And what do you do for a living, sir?

JUROR #2:  I'm a driver for Universal Business Equipment here in Bridgeport.

THE COURT:  Universal Business Equipment?

JUROR #2:  Yes.

THE COURT:  What about your wife, is she employed outside the home?

JUROR #2:  Yes.  She's a supervisor for Lacey Manufacturing in Bridgeport, also.

THE COURT:  I'm going to ask the court reporter that anytime you have a hard hearing, you tell us.  Some court reporters do that as a matter of course, and some of them will never open their mouth

47

until the judge says open your mouth.  This court reporter has never worked with me, either.

And what type of recreational hobbies or activities do you enjoy?

JUROR #2:  Baseball.

THE COURT:  Yankees, Mets or Red Sox.

JUROR #2:  Mets and Red Sox.

THE COURT:  You know we're in that kind of fringe area, Yankee mainly or Mets, but sometimes you get some Red Sox, like this guy over here, but he's from Boston.

JUROR #2:  I like the Mets.

THE COURT:  And what's your educational level?

JUROR #2:  High school.

THE COURT:  Thank you very much.

And juror number 3, would you please stand, and do the best you can so we can all hear you.

Where do you live?

JUROR #3:  Ridgefield, Connecticut.

THE COURT:  And how long have you lived in Ridgefield?

JUROR #3:  10, 11 years.

THE COURT:  And who lives in Ridgefield with you?

48

JUROR #3:  My husband, and my two children.

THE COURT:  Are you employed outside of the home?

JUROR #3:  Yes, I am.

THE COURT:  What do you do?

JUROR #3:  I am associate manager and realtor for a company in town.

THE COURT:  And what about your husband, what type of work does he do?

JUROR #3:  He works in Manhattan.  He's a project manager for a Local 3 electrical company.

THE COURT:  And you say you have two children at home?

JUROR #3:  Yes.

THE COURT:  A how old are they?

JUROR #3:  One is 20.  He's in college, but he's home on spring break, or summer break.  And then I have a 16 year-old in high school.

THE COURT:  And where does the 20 year-old go and what's he or she studying?

JUROR #3:  He is studying history at Roanoke College in Salem, Virginia.

THE COURT:  And what type of recreational activities or hobbies do you engage in?

JUROR #3:  Gardening, and taking care of my family.

THE COURT:  And what's your educational level?

JUROR #3:  I have a marketing degree from Duxbury College, I'm sorry, from Mercy College in Duxbury, so a four-year degree.

THE COURT:  Thank you very much.  You may be seated.

Juror number 4, if you would please tell us where you live.

JUROR #4:  I live in Stamford, Connecticut.

THE COURT:  And how long have you lived there?

JUROR #4:  Eight years.

THE COURT:  Who lives there with you?

JUROR #4:  My husband, and my 25 year-old son.

THE COURT:  And are you employed outside of the home?

JUROR #4:  I am.

THE COURT:  What do you do?

JUROR #4:  I am a director of a summer day camp on Long Island, and in the winter I manage a

dental practice in Greenwich.

THE COURT:  I'm sorry, what in Greenwich?

JUROR #4:  A dental practice.

THE COURT:  And what about your husband, what type of work does he do?

JUROR #4:  He works in advertising in New York City.

THE COURT:  And you say you have a 25 year-old son?

JUROR #4:  He lives at home, yes.

THE COURT:  And what does he do?

JUROR #4:  He is a production assistant for Glenn Beck Television in New York.

THE COURT:  And do you have any other children that are grown and gone?

JUROR #4:  I have a 28 year-old daughter. She lives in the city, and she is a Stamford public schoolteacher.

THE COURT:  And what type of recreational activities or hobbies do you engage in?

JUROR #4:  I play golf; not well, but play golf; and I play tennis; and that's pretty much it, I think.

THE COURT:  What's your educational level?

51

JUROR #4:  I have a phys ed degree, four-year degree.

THE COURT:  Thank you very much.

And juror number 5, give us your place of residence.

JUROR #5:  Stamford, Connecticut.

THE COURT:  And how long have you lived in Stamford?

JUROR #5:  39 years.

THE COURT:  And who lives there with you?

JUROR #5:  My son.

THE COURT:  And are you employed outside the home?

JUROR #5:  Yes.

THE COURT:  What do you do?

JUROR #5:  I'm a hair stylist.

THE COURT:  And you say you have a son at home, and how old is he?

JUROR #5:  Seven.

THE COURT:  And what type of recreational activities or hobbies do you engage in?

JUROR #5:  Pretty much taking care of my son.  He keeps me busy.  He's seven.

THE COURT:  What's your educational level?

52

JUROR #5:  High school.

THE COURT:  Thank you very much.

Juror number 6, where do you live, sir?

JUROR #6:  Monroe, Connecticut.

THE COURT:  And how long have you lived in Monroe?

JUROR #6:  About 22 years.

THE COURT:  And who lives there with you?

JUROR #6:  My wife.

THE COURT:  And what type of work do you do, sir?

JUROR #6:  I'm a lawyer.

THE COURT:  And can you tell us, where is your office?

JUROR #6:  In Bridgeport.

THE COURT:  And do you practice with a firm, or are you a solo practitioner?

JUROR #6:  Firm, small firm.

THE COURT:  What's the name of the firm?

JUROR #6:  Green & Gross.

THE COURT:  And what type of practice do you guys do; criminal, civil, general?

JUROR #6:  General practice.  I personally do real estate development, construction, and some business litigation, and we do not do

53

criminal.  We do other civil.

THE COURT:  So you are litigator?

JUROR #6:  Yes.  It's part of my practice.

THE COURT:  Right.  And how long have you practiced?

JUROR #6:  Since 1979, with a little break.

THE COURT:  And where did you go to law school?

JUROR #6:  Western New England College.

THE COURT:  And how long have you been with the firm that you're in now?

JUROR #6:  Since 2000.

THE COURT:  And prior to that, could you tell us where you practiced?

JUROR #6:  It was another small firm in Bridgeport.

THE COURT:  By the name of?

JUROR #6:  Lesser & Sobel.

THE COURT:  And were you doing basically the same kind of work you do now?

JUROR #6:  Yes.

THE COURT:  And you're married, and I forgot, I'm sorry, what does your wife do?

54

JUROR #6:  I live at home with my wife. She is a registered nurse.

THE COURT:  And do you have any children?

JUROR #6:  Two children.

THE COURT:  And how old are they?

JUROR #6:  I think 22 and 20.

THE COURT:  What do they do?

JUROR #6:  One of them graduated from college last year as a mechanical engineer.  He works for a printing company in Memphis, Tennessee.  The other one is on a co-op.  He's still in college, and he's taking a semester off to work for Intel Corporation, just south of Seattle.

THE COURT:  And what type of recreational activities or hobbies do you engage in?

JUROR #6:  Golf once in a while, skiing, woodworking, and I've been building a stone wall lately.

THE COURT:  You'd get along with my wife. She's a big stone wall fan.

All right, thank you very much.

And juror number 7.  Where do you live, sir?

JUROR #7:  I live in Bethel, Connecticut.

THE COURT:  And how long have you lived

55

in Bethel?

JUROR #7:  40 years.

THE COURT:  And who lives there with you?

JUROR #7:  My wife and three children.

THE COURT:  And what type of work do you do, sir?

JUROR #7:  I'm an attorney.

THE COURT:  You know, ladies and gentlemen, you-all may not know this, and maybe the attorneys don't know this, but maybe they do, it's unusual to get one attorney; when you get two of them and they're sitting next to each other, it's really unusual.

All right.  So where is your practice?

JUROR #7:  My practice is in Danbury. It's a 12-person law firm.  We do everything, basically everything.

THE COURT:  So civil and criminal?

JUROR #7:  Correct.

THE COURT:  And plaintiff or defendant? Are you primarily plaintiff or defendant counsel when you're doing litigation?  I assume you do everything.

JUROR #7:  We do both.

THE COURT:  And I didn't ask, and if you don't mind I'm going to, I didn't ask juror number 5,

56

excuse me, 6, but do you do primarily plaintiff or defense, your firm or you individually and your firm?

JUROR #6:  On my personal practice I represent both, in civil.  I would say it's mainly business litigation, so it's not --

THE COURT:  But you have plaintiff and defendant, the sue-er and sue-ee?

JUROR #7:  Yes.

THE COURT:  And do you guys, you particularly and the firm, mainly represent the plaintiffs or defendant, or you cannot categorize it that way?

JUROR #6:  If it's personal injury, it would be plaintiff, but otherwise I don't think you can categorize it.

THE COURT:  Okay, thank you.  I'm sorry to interrupt, juror number 7, but you made me think about something I should have asked.  And I think you said that you-all do both at your firm?

JUROR #7:  Correct.

THE COURT:  And you personally do both?

JUROR #7:  I'm mainly a transactional lawyer.

THE COURT:  So you have a litigation section, if you would, but you're a transactional

57

lawyer, generally?

JUROR #7: Correct.

THE COURT: And what is the firm?

JUROR #7: It's Collins Hannafin, formerly known as Collins Hannafin & Garamella.

THE COURT: And I'm going to ask, because I'm not -- I think this court reporter's really good. Both of you guys have cards, so before you leave today, you can just leave the cards for the firm name if you have them with you. Or is that necessary?

Not necessary.

So how long you been with the firm?

JUROR #7: This firm, 15 years. Before that I had my own firm. It was a three-person firm.

THE COURT: And where was your firm?

JUROR #7: It's in Danbury, Connecticut.

THE COURT: And right now your firm is in Danbury?

JUROR #7: Danbury.

THE COURT: And where did you go to law school?

JUROR #7: I went to Rutgers Law School in University of Notre Dame undergraduate.

THE COURT: And is your wife employed outside the home?

58

JUROR #7:  She's a teacher.

THE COURT:  And you have children?

JUROR #7:  Three daughters.

THE COURT:  And how old are they?

JUROR #7:  One's 39, she's a doctor; one's 35, she's a homemaker; and the other's 30, she's a lawyer.

THE COURT:  And where does she practice?

JUROR #7:  She's in Jersey.

THE COURT:  And what kind of practice is she in?

JUROR #7:  She's a trust officer, trust department of Bank of America.

THE COURT:  And what type of recreational activities or hobbies do you engage in?

JUROR #7:  Sports, a little golf now and then.

THE COURT:  And what's your educational level?

JUROR #7:  Law school, JD.

THE COURT:  Thank you very much, and you may be seated.

Juror number 8.  And we're getting a little further away, so try to speak as loudly as you can so we can hear you.

59

Where do you live, sir?

JUROR #8:  Shelton.

THE COURT:  And how long have you lived in Shelton?

JUROR #8:  About seven years.

THE COURT:  And who lives there with you?

JUROR #8:  My wife, couple dogs.

THE COURT:  And what type of work do you do?

JUROR #8:  I'm semi-retired.

THE COURT:  And what are you semi-retired from?

JUROR #8:  I was a welder fabricator.

THE COURT:  And what about your wife, is she employed from outside the home?

JUROR #8:  No, she isn't.  She's retired.

THE COURT:  What did she do?

JUROR #8:  She's worked in a bank for a while, and then she got on disability.

THE COURT:  And do you have children, you and your wife?

JUROR #8:  Yes.

THE COURT:  And how old are they and what do they do, starting with the oldest?

JUROR #8:  I have one daughter.  She's

60

36, and she works for -- she's an accountant.

THE COURT:  Okay.  And what type of recreational activities or hobbies do you engage in?

JUROR #8:  Fishing and boating.

THE COURT:  And let me just ask you, Louisiana brings mainly saltwater, so saltwater or freshwater?

JUROR #8:  Saltwater.

THE COURT:  And what's your educational level?

JUROR #8:  High school and trade school.

THE COURT:  Thank you.

JUROR #8:  Also, I'm also -- I work part-time as a security officer, too.

THE COURT:  Okay.  Well, who do you work for?

JUROR #8:  Ace, Ace Security.

THE COURT:  And how long have you done that?

JUROR #8:  About a year now.

THE COURT:  And did you -- before you got that position -- and I assume security officer, you correct me if I'm wrong, you're kind of like the night watchman or the weekend watchman?

JUROR #8:  16 hours a week.

THE COURT: And is it generally during the daytime or nighttime?

JUROR #8: Second shift. I ride around in a car in a parking lot.

THE COURT: And when you got this position, did you have to have any specialized law enforcement or security training?

JUROR #8: I worked security part-time on and off during my years, part-time basis.

THE COURT: Well, let me ask you this: Would the fact that -- and you don't know this yet, but I'll just ask you -- that this case involves allegations by the Plaintiff against the Defendant, who is a law enforcement officer. With your background in security, would that, as far as you know, going to ask you a question, would that in any affect your ability to be a fair and impartial juror in this case? And by that I mean obviously fair to both the Plaintiff and the Defendant, and not be -- have preconceived notions about things and who ought to win or not win.

And that's just -- there's no right or wrong answer, it's just in your thought process from your background in security.

JUROR #8: I'd have to see it, you know.

62

THE COURT: Well, the question, again, probably wasn't very articulate the way I said that or asked that, would be the fact that you have the security background that you have -- and I take it you literally -- it's not really extensive, but that's what you do. It's the right thing to tell us you do it. But would you tend to be -- because of your experiences, tend to believe -- if there was a conflict in the testimony or evidence -- believe what law enforcement said over what a non-law enforcement party would say just because you dealt with law enforcement before, you've seen whatever you've seen in your security experience?

JUROR #8: I really can't answer that question.

THE COURT: In other words, before you -- the question is -- what I think you're saying, but you correct me if I'm wrong, is that Judge, I have to see the facts. But the question I'm trying to understand is before you heard anything, do you have a preconceived notion that generally if you had a law enforcement versus non-law enforcement, that it ought to go one way for law enforcement if there's a conflict in testimony or against it? Because some people are just against law enforcement. So could you

63

start with a clean slate for both the Plaintiff and Defendant, or would your life experience cause you to say gee, I probably ought not to be on the jury?

And there's no right or wrong with that. I'm just trying to understand, as feebly as I speak the Queen's English, to get my head to your head so we all understand.

JUROR #8:  I don't know.

THE COURT:  You don't know, that's the answer.  Okay, fair answer.

And let me ask you this:  I don't know if I've asked you, but I think I have.  Your wife -- you told us about everything and you just brought that up on the tail end, so I got to -- what's your educational level, sir?

JUROR #8:  High school and trade school.

THE COURT:  Okay.  Well, thank you very much.  Now, I'm not trying to confuse you.  I was confusing myself so I might have confused you, too, so forgive me for that.

JUROR #8:  You confused me, yes.

THE COURT:  I apologize.

The next juror would be -- is that number 9?

JUROR #9:  Yes.

64

THE COURT:  And where do you live, sir?

JUROR #9:  I live in Norwalk, Connecticut.

THE COURT:  And how long have you lived in Norwalk?

JUROR #9:  25 years.

THE COURT:  And who lives there with you?

JUROR #9:  My mother.

THE COURT:  And what do you do for a living, sir?

JUROR #9:  Auto mechanical engineer for an aircraft company.

THE COURT:  And you say you live with your mom?

JUROR #9:  Yes.

THE COURT:  Is she employed outside the home?

JUROR #9:  No.  She's retired.

THE COURT:  What did she do before she retired?

JUROR #9:  She was a director of housing authority in Darien, Connecticut.

THE COURT:  And do you have any siblings?

JUROR #9:  Yes.  I have a sister.

THE COURT:  And how old are they, what do

65

they do?

JUROR #9:  My sister is 28 years old, and she recently got her master's degree from University of Bridgeport.  She's trying to become a teacher.

THE COURT:  And what about your dad, is he still alive?

JUROR #9:  Yeah, he's alive.

THE COURT:  What does he do?

JUROR #9:  He manages an autobody shop in Norwalk.

THE COURT:  And what type of recreational activities or hobbies do you engage in?

JUROR #9:  All kinds of stuff.  I like golf, boating, fishing, hockey, football.

THE COURT:  And what's your educational level?

JUROR #9:  Bachelor's in science from UConn.

THE COURT:  Well, thank you very much. If you'd be seated.

And juror number 10.  Where do you live, sir?

JUROR #10:  Stamford, Connecticut.

THE COURT:  And how long have you lived in Stamford?

JUROR #10:  13 years.

THE COURT:  And who lives at Stamford with you?

JUROR #10:  My wife and three kids.

THE COURT:  And what type of work do you do, sir?

JUROR #10:  I'm an ETL, executive team leader, for Target.

THE COURT:  And what about your wife, is she employed outside the home?

JUROR #10:  Yes, she is.

THE COURT:  What does she do?

JUROR #10:  She's a software developer for RBS.

THE COURT:  And you say you have three children?

JUROR #10:  Yes.  My oldest is 13, a girl; the other is a girl, 10; and my son is 6.

THE COURT:  And what type of recreational activities or hobbies do you engage in?

JUROR #10:  I exercise, and I play soccer.

THE COURT:  Well, I can believe both of those statements by looking at you.  What's your educational level?

JUROR #10:  Bachelor of science from CUE University of New York.

THE COURT:  Thank you very much.  You may be seated.

Juror number 11.  And where do you live, sir?

JUROR #11:  Ridgefield, Connecticut.

THE COURT:  And how long have you lived in Ridgefield?

JUROR #11:  44 years.

THE COURT:  Who lives there with you?

JUROR #11:  My wife and two children.

THE COURT:  And what type of work do you do, sir?

JUROR #11:  I'm the third attorney on the panel, second from the same firm.

THE COURT:  I got to tell you, I've never seen anything like this.

So you're the third attorney, second what?

JUROR #11:  Juror number 7 is my partner.

THE COURT:  Ladies and gentlemen, we rarely get people that know each other.

Okay.  And so just refresh all our recollection, your office is where?

JUROR #11: Danbury, Connecticut, from Collins Hannafin.

THE COURT: And that's a 12 person firm, as I recall.

JUROR #11: Yes.

THE COURT: And you do all type of work, but what type do you do within the firm? What do you do?

JUROR #11: I do commercial real estate, real estate development.

THE COURT: And what about your wife, is she employed outside the home?

JUROR #11: Yes. She's a dental hygienist.

THE COURT: And where did you go to law school?

JUROR #11: I went to law school at New England School of Law in Boston.

THE COURT: And how long have you been practicing?

JUROR #11: 23 years.

THE COURT: And how long have you been with the firm that you're with now?

JUROR #11: 23 years.

THE COURT: And what type of recreational

69

activities or hobbies do you engage in?

JUROR #11:  Golf, boating, skiing.

THE COURT:  And your educational level?
Is a JD your highest degree?

JUROR #11:  Correct.

THE COURT:  Okay.  Thank you very much.

Juror number 12, if you'd please stand
and tell us where you live.

JUROR #12:  Danbury, Connecticut.

THE COURT:  And how long have you lived
there?

JUROR #12:  42 years.

THE COURT:  And who lives there with you?

JUROR #12:  I'm currently separated, so I
live by myself.

THE COURT:  And are you employed outside
the home?

JUROR #12:  I am.

THE COURT:  What do you do?

JUROR #12:  I am a contract specialist
for a logistics firm.

THE COURT:  I'm sorry, contract --

JUROR #12:  -- specialist for a logistics
firm.

THE COURT:  I don't need to know what

that means, but I don't have a clue what you do.  But it sounds really important.  And interesting.  So I hope so.

JUROR #12:  Very important.

THE COURT:  And let me ask you, just because you mentioned you were separated, what does your separated husband do?

JUROR #12:  He's currently unemployed.

THE COURT:  And do you and he have children?

JUROR #12:  I have a son.  He's 25.

THE COURT:  And the separated husband, what did he do when he was last employed?

JUROR #12:  He worked for a relocation firm in Danbury.

THE COURT:  And what type of recreational activities or hobbies do you engage in?

JUROR #12:  Reading, gardening, watching sports.

THE COURT:  What kind of reading do you enjoy?

JUROR #12:  Any kind of novel.

THE COURT:  What's your educational level?

JUROR #12:  High school.

THE COURT: Next would be, I think, juror number 13. And where do you live?

JUROR #13: New Fairfield, Connecticut.

THE COURT: And how long have you lived in New Fairfield?

JUROR #13: Seven years.

THE COURT: And who lives there with you?

JUROR #13: My husband and my son.

THE COURT: And are you employed outside the home?

JUROR #13: Yes.

THE COURT: What do you do?

JUROR #13: I am an insurance coordinator for a dental office.

THE COURT: I'm sorry?

JUROR #13: An insurance coordinator for a dental office.

THE COURT: And what about your husband, what's he do?

JUROR #13: He works in New Canaan, Connecticut. He manages an IT department.

THE COURT: How old is your son?

JUROR #13: My son is 24.

THE COURT: What's he do?

JUROR #13: He's in the Army National

Guard, but he also -- he's home now, and he works for a company that they sell, like, parts to airplanes and helicopters and army parts and things like that.

THE COURT:  What type of recreational activities or hobbies do you engage in?

JUROR #13:  Gardening, boating, reading, and being a grandparent.

THE COURT:  That can be as full-time as you want to make it.

And what's your educational level?

JUROR #13:  I have a degree in computer science.

THE COURT:  Thank you very much.  You may be seated.

Juror number 14.  Where do you live?

JUROR #14:  Ridgefield.

THE COURT:  How long have you lived in Ridgefield?

JUROR #14:  15 years.

THE COURT:  And who lives there with you?

JUROR #14:  My husband and my 12 year-old son.

THE COURT:  And are you employed outside the home?

JUROR #14:  I have a temp assignment

73

part-time with Save the Children in Westport.

THE COURT:  I'm sorry, one more time.

JUROR #14:  I'm a temp with Save the Children in Westport.

THE COURT:  And what about your husband, what does he do?

JUROR #14:  He is a manager at Swiss Re Insurance Corporation.

THE COURT:  What does he do for Swiss Re?

JUROR #14:  He's a manager for the claims accounting and liability management group.

THE COURT:  So he manages the adjustors for the company?

JUROR #14:  Technical accounting.  It's a hodgepodge group.

THE COURT:  Let me ask you this:  Does he have anything to do with the adjustment of claims for damages, when claims are brought, to your knowledge?

JUROR #14:  He works with the claim analysts who review and pay the claims.  I don't think he works for the adjustors.

THE COURT:  And does he, to your knowledge, ever have to appear in court to testify in proceedings?

JUROR #14:  No.

74

THE COURT:  When he's denied a claim?

JUROR #14:  No.

THE COURT:  He does not, okay.

And how old is your -- you have a 12 year-old, you said?

JUROR #14:  Yes.

THE COURT:  Any other children?

JUROR #14:  No.

THE COURT:  And what type of recreational activities or hobbies do you engage in?

JUROR #14:  Reading, cooking, and hiking.

THE COURT:  And what do you enjoy reading?

JUROR #14:  A little bit of everything. I'm in a book club, so every month we have a book that I have to read.

THE COURT:  Where is the best hiking in this area?

JUROR #14:  Well, we hike trails in Ridgefield, but we also like to go up to the Mohawk area in Little Falls.  We do a camping trip every year and go someplace different.

THE COURT:  What's your educational level?

JUROR #14:  I graduated from the

University of Buffalo with a four-year Bachelor of Science degree.

THE COURT:  Thank you very much.  You may be seated.

And then juror number 15.  Where do you live?

JUROR #15:  Fairfield.

THE COURT:  And how long have you lived in Fairfield?

JUROR #15:  Just two years.

THE COURT:  And who lives there with you?

JUROR #15:  Just my dog.

THE COURT:  And where did you live before you lived in Fairfield?

JUROR #15:  Trumbull, Connecticut.

THE COURT:  And are you employed outside the home?

JUROR #15:  Yes.

THE COURT:  What do you do?

JUROR #15:  I'm a behavior therapist.

THE COURT:  Behavior therapist?

JUROR #15:  Correct.

THE COURT:  Does that mean you're a psychologist?

JUROR #15:  No.  I do APA therapy for

76

children and adolescents on the autism spectrum.

THE COURT:  And how long have you done that?

JUROR #15:  Four years.

THE COURT:  And are you employed by a hospital or doctor facility?

JUROR #15:  I worked for a company that was contracted through a school system until recently, and now I work for a private autism center in Stamford.

THE COURT:  Private what center?

JUROR #15:  Autism center.

THE COURT:  And what type of recreational activities and hobbies do you engage in?

JUROR #15:  I love hiking, I love cycling, baking, singing.

THE COURT:  And what's your educational level?

JUROR #15:  I have a bachelor's degree in psychology from the University of Connecticut.

THE COURT:  Thank you very much.  You may be seated.

Juror number 16.  Where do you live?

JUROR #16:  Stamford.

THE COURT:  And how long have you lived

77

in Stamford?

JUROR #16:  32 years.

THE COURT:  And who lives there with you?

JUROR #16:  My husband.

THE COURT:  And are you employed outside the home?

JUROR #16:  Yes.

THE COURT:  What do you do?

JUROR #16:  I'm a medical laboratory technologist.

THE COURT:  And what about your husband, what's he do?

JUROR #16:  He's a pet store manager.

THE COURT:  And do you and your husband have children?

JUROR #16:  No, we don't.

THE COURT:  What type of recreational activities or hobbies do you engage in?

JUROR #16:  Just running.

THE COURT:  And what's your educational level?

JUROR #16:  Bachelor's of science in biology from New Rochelle College in New Rochelle, New York.

THE COURT:  Juror number 17.

78

JUROR #17:  Hi.

THE COURT:  Where do you live?

JUROR #17:  I live in Darien, Connecticut.

THE COURT:  How long have you lived in Darien?

JUROR #17:  Seven years.

THE COURT:  Who lives there with you?

JUROR #17:  My wife and two daughters, nine and five.

THE COURT:  And what type work do you do, sir?

JUROR #17:  I'm work for a private equity firm in White Plains, New York.

THE COURT:  And I'm sorry, White Plains?

JUROR #17:  White Plains.

THE COURT:  And what about your wife, is she employed outside the home?

JUROR #17:  She is.  She's a real estate broker in Darien.

THE COURT:  And you have three children, I think you said?

JUROR #17:  Two children, two daughters, ages nine and five.

THE COURT:  And what type of recreational

79

activities or hobbies do you engage in?

JUROR #17:  Golf.

THE COURT:  What's your educational level?

JUROR #17:  I have an MBA from Columbia University.

THE COURT:  And according to your best judgment based on your wife's conversation, what's the real estate market doing around here?

JUROR #17:  Under a certain level it's moving, and if it's over a certain level it goes pretty tough, at least in Darien.

THE COURT:  Well, I don't have to worry about that.

JUROR #17:  I was supposed to be out of town for next week.

THE COURT:  We'll talk about that in due course.

JUROR #17:  Fair enough.  Just want to let you know.

THE COURT:  All right, juror number -- is it 18?  Where do you live?

JUROR #18:  New Fairfield, Connecticut.

THE COURT:  And how long have you lived in New Fairfield?

80

JUROR #18:  25 years.

THE COURT:  And who lives there with you?

JUROR #18:  My husband and two out of my three children.

THE COURT:  Are you employed outside the home?

JUROR #18:  I am.  I'm a waitress for Frank Pepe Pizzeria.

THE COURT:  And what about your husband?

JUROR #18:  My husband is a graphic designer for NBC News.

THE COURT:  I'm not sure what that means, but that sounds important, too.

JUROR #18:  Has to do with art.

THE COURT:  I kind of figured something like that.  So what about the children?  You have two at home.  How old are they.

JUROR #18:  My son is 22.  He just graduated from WestConn last weekend, and he's also employed by NBC as a graphic designer.  And my youngest attends high school.  She's in tenth grade.  She's 15.

THE COURT:  And what about -- I guess the oldest is grown and gone?

JUROR #18:  My oldest daughter, she's a

recovering addict.  She's trying to get her life together in New Haven.

THE COURT:  Good luck with that, good luck to her.

What about recreational activities, hobbies, what do you like to do?

JUROR #18:  I enjoy theatre, whether performing in it or attending performances.  I like to exercise.  I like to eat out.

THE COURT:  What's your educational level?

JUROR #18:  Associate's degree in communication arts.

THE COURT:  Well, thank you very much. You may be seated.

Is this juror number 19 now?

JUROR #19:  Yes, Your Honor.

THE COURT:  Where do you live, sir?

JUROR #19:  Danbury, Connecticut.

THE COURT:  And how long have you lived in Danbury?

JUROR #19:  25 years.

THE COURT:  Who lives there with you?

JUROR #19:  My family; mother, father, brother.

THE COURT:  What do you do for a living?

JUROR #19:  Legal assistant, office manager, at Cohen and Wolf, PC.  It's a law firm.

THE COURT:  Which is the firm?

JUROR #19:  Cohen and Wolf, PC.

THE COURT:  Where are they located?

JUROR #19:  My branch is located in Danbury, right down the street from juror 7 and 11.

THE COURT:  All right.  Now, let me ask you, let me ask, is anybody else I haven't questioned a lawyer, have anything to would with law firm?  We got another one?  My gosh.

Okay.  So tell me, so I'll know again, you're in Danbury, I believe?

JUROR #19:  Yes, Your Honor.

THE COURT:  What do you do for the firm.

JUROR #19:  I'm a legal assistant and office manager.

THE COURT:  So legal assistant, that's like a paralegal?

JUROR #19:  Yes.

THE COURT:  And but office manager, you do the finance and the billing?

JUROR #19:  I do some billing, all of the suppliers that have to go in and out of the office and

all the files.

THE COURT:  And how long have you worked with that particular firm?

JUROR #19:  Seven years.

THE COURT:  And you said that you're -- what's the name of the firm again?

JUROR #19:  Cohen and Wolf, PC.

THE COURT:  This is one of their branches?

JUROR #19:  Yes, sir.

THE COURT:  How many lawyers work at your branch?

JUROR #19:  Nine.

THE COURT:  And how many branches does the firm have?

JUROR #19:  Four.

THE COURT:  And where are the other three offices?

JUROR #19:  Bridgeport, Orange and Westport, all in Connecticut.

THE COURT:  And let me ask you this:  At your particular branch, what kind of practice do they have?

JUROR #19:  General.  We do real estate, litigation, both corporate and personal, we do some

intellectual property.

THE COURT:  And you do the personal injury mainly on the plaintiff or defense side?

JUROR #19:  A little bit of both, Your Honor.

THE COURT:  Both?

JUROR #19:  Yes, sir.

THE COURT:  And can you -- would it be your appreciation, if you know, after having been there for seven years, that the other three branches of the firm, is their practice pretty much the same as yours, your branch?

JUROR #19:  Yes.

THE COURT:  And what's your educational level?

JUROR #19:  I have a bachelor's in legal studies.

THE COURT:  Where from?

JUROR #19:  Western Connecticut.

THE COURT:  And you say you live with your folks?

JUROR #19:  Yes.

THE COURT:  And what's your dad do?

JUROR #19:  He is a retired marketing director for Playtex, when it was Playtex.

85

THE COURT:  I'm sorry, for whom?

JUROR #19:  Playtex, when it was Playtex.

THE COURT:  What about your mom, does she work outside the home?

JUROR #19:  Yes.  She teaches in Ridgefield.

THE COURT:  How many siblings do you have at home?

JUROR #19:  Just one, my younger brother.

THE COURT:  What's he do?

JUROR #19:  He works at a golf course.

THE COURT:  And how old is he?

JUROR #19:  He is 23.

THE COURT:  Do you have any other siblings that are grown and gone?

JUROR #19:  No.

THE COURT:  And do you actually have anything to do -- I mean I understand paralegal, I understand administrator, but do you wear both hats within the branch, so you're actually assisting lawyers on cases?

JUROR #19:  Yes, I assist different lawyers for either real estate or litigation when they need the assistance, and along with that I was also hired to do the office manager work, so I'm kind of

86

working both.

THE COURT: Do you do legal research for the lawyer, the assigned lawyer for a case?

JUROR #19: Yes, to an extent I do.

THE COURT: And I don't think I asked you, I got out of order, but what type of recreational activities or hobbies do you engage in?

JUROR #19: I play golf, and I hike a lot.

THE COURT: Okay. Well, thank you very much. You may be seated.

And I think this would be juror number 20. Where do you live, sir?

JUROR #20: Bridgeport, Connecticut.

THE COURT: How long have you lived in Bridgeport?

JUROR #20: 28 years.

THE COURT: And who lives there with you?

JUROR #20: My wife, two kids, my brother, my sister-in-law and their two kids.

THE COURT: Sorry?

JUROR #20: Their two kids. My brother, sister-in-law, my two nephews.

THE COURT: What type of work do you do?

JUROR #20: Technician for Mercedes Benz

of Fairfield, mechanic.

THE COURT:  And what about your wife, is she employed outside the home?

JUROR #20:  She's a stay-at-home mom right now.

THE COURT:  What about your brother?

JUROR #20:  He's a correction officer for State of Connecticut.

THE COURT:  And what about your sister-in-law?

JUROR #20:  She's an accountant.

THE COURT:  And how old are the children that live in the household?

JUROR #20:  One, two, eight and nine.

THE COURT:  And what type of recreational activities or hobbies do you engage in?

JUROR #20:  Right now just working and spending time with the kids.

THE COURT:  And what's your educational level?

JUROR #20:  High school diploma and trade school.

THE COURT:  Okay, thank you very much.

Juror number 21.  Where do you live?

JUROR #21:  I live in Brookfield.

THE COURT:  And how long have you lived in Brookfield?

JUROR #21:  For 16 years.

THE COURT:  And who lives there with you?

JUROR #21:  I live with my mother and my father and my brother.

THE COURT:  And are you employed outside the home?

JUROR #21:  Yes.

THE COURT:  What do you do?

JUROR #21:  I am a development associate and database manager at Kids in Crisis, it's a nonprofit in Cos Cob.

THE COURT:  And I think you said you live with your mom and dad?

JUROR #21:  Yes.

THE COURT:  What's your dad do?

JUROR #21:  My dad is a sales manager at Volvo.

THE COURT:  And your mom, does she work outside the home?

JUROR #21:  Yes.  She's an interior designer at Ethan Allen.

THE COURT:  And what about your siblings, I think you said you had siblings there?

JUROR #21:  Yes.  My brother owns a custom frame shop in Ridgefield.

THE COURT:  So it's just a brother?

JUROR #21:  Yes.

THE COURT:  Do you have any other brothers or sisters not at home?

JUROR #21:  I do I have a sister who lives in Boston, and a brother-in-law.

THE COURT:  And what do they do?

JUROR #21:  They both work for nonprofits.

THE COURT:  What type of recreational activities or hobbies do you engage in?

JUROR #21:  I play soccer, and I run.

THE COURT:  And what's your education level?

JUROR #21:  I am currently finishing my master's in global development and peace.

THE COURT:  Thank you very much.  You may be seated.

Juror number 22.  Where do you live, please?

JUROR #22:  I live in Cos Cob.

THE COURT:  And how long have you lived there?

90

JUROR #22:  Five years.

THE COURT:  And who lives there with you?

JUROR #22:  My husband and two children.

THE COURT:  And are you employed outside the home?

JUROR #22:  I'm not.  I work at home.

THE COURT:  Sorry, you're not employed outside the home?

JUROR #22:  I'm a stay-at-home.

THE COURT:  And what about your husband, what's he do?

JUROR #22:  He works for a hedge fund.

THE COURT:  What does he do for State Farm, to your knowledge?

JUROR #22:  Hedge fund.

THE COURT:  I'm obviously not hearing right.

JUROR #22:  What's your question?

THE COURT:  I'm sorry, would you mind -- we don't have a microphone, right?  Would you mind, so we can hear you, it's really important, would you mind -- I really hate to ask you to do that.  I just can't understand.  So if you'd come on up here and right to this microphone here.  I regret that.  I'm going to try to work on that so the next jury panel

that comes in here doesn't have to do that.

But anyhow, you said your husband works for?

JUROR #22:  Hedge fund.

THE COURT:  A hedge fund, okay.  I'm sorry.  I thought you said State Farm.  And in this area, or in the city?

JUROR #22:  In Norwich.

THE COURT:  And so you're -- you have children at home, you said?

JUROR #22:  Yes.  I have one 18, one 12.

THE COURT:  The 18 year-old, what does he or she do?

JUROR #22:  What do they do?

THE COURT:  Still in school?

JUROR #22:  Yes.  One graduate this year high school, one in middle school.

THE COURT:  What type of recreational activities or hobbies do you like or you enjoy or engage in?

JUROR #22:  I play badminton, and hiking.

THE COURT:  And what's your educational level?

JUROR #22:  Bachelor's from Columbia.

THE COURT:  Thank you so much.  Again, I

92

apologize for having had you come up here.  You may be seated.

Juror number 23, please.

JUROR #23:  Hi.

THE COURT:  Where are you from, sir?

JUROR #23:  Cos Cob, Connecticut.

THE COURT:  And how long have you lived there?

JUROR #23:  Six years.

THE COURT:  And who lives there with you?

JUROR #23:  My wife and my son.

THE COURT:  And what type of work do you do, sir?

JUROR #23:  I'm an attorney.

THE COURT:  Bingo, bingo, bingo, bingo and bingo.  Okay.  So where is your practice?

JUROR #23:  I've practiced in New York City for eight years now for a private equity fund, general counsel, private equity fund.

THE COURT:  So you're out of the practice?

JUROR #23:  I practice law at a private equity fund.

THE COURT:  Okay, I'm sorry.  Tell us right now, before you got in there, you were in the

city, you said, with a firm?

JUROR #23:  Yes.

THE COURT:  And how long were with you them?

JUROR #23:  Six years.

THE COURT:  And what kind of work did you do?

JUROR #23:  Mergers and acquisitions.

THE COURT:  And where did you go to law school?

JUROR #23:  SMU.

THE COURT:  And how long have you been with the equity fund, you said?

JUROR #23:  Five years.

THE COURT:  And so what do you do in your current practice?  Are you a litigator, too, or just you do deals?

JUROR #23:  I'm general counsel for the fund.  I handle all legal work, whether it's executing deals or managing litigation, for five offices worldwide.

THE COURT:  And in your practice before you went with the -- with your current position, did you actually try cases?

JUROR #23:  I did not, no.

THE COURT:  But now you supervise the people that are trying cases?

JUROR #23:  That's correct.

THE COURT:  And again, this would just be -- you guys are either the plaintiff or the defendant, and you're just up there trying to make sure your field lawyers or in-house counsel are doing what it is that they should be doing, something like that?

JUROR #23:  Correct.

THE COURT:  Okay.  And what about your wife, is she employed outside the home?

JUROR #23:  She's a contractor, yes.

THE COURT:  She's a contractor?

JUROR #23:  Yes.  She's employed outside the house.

THE COURT:  What does she do?  I'm sorry?

JUROR #23:  She's a banker, investment banker.

THE COURT:  And you say you have children?

JUROR #23:  I have one child, yes.

THE COURT:  How old is he or she?

JUROR #23:  Four years old.

THE COURT:  And what type of recreational

activities or hobbies do you engage in?

JUROR #23: Travel.

THE COURT: And what's your educational level?

JUROR #23: I have a JD and MBA in engineering.

THE COURT: Thank you very much, and I'm sorry, I'm getting -- the further you guys get back there the harder time I'm having hearing.

Juror number 24, where are you from, sir?

JUROR #24: I'm from Bridgeport, been there about 30 years, live with my girlfriend, I have a son that's 20 years old, goes to WestConn, in his sophomore year. Next question?

THE COURT: That's the benefit and pain of being the last one. How long did you say you'd been there, 22 years?

JUROR #24: I been living here about 30 years.

THE COURT: And what do you do?

JUROR #24: I work for a company that makes electric equipment for different companies and I deliver it.

THE COURT: And you do what besides that?

JUROR #24: Deliver the oil treatment.

96

THE COURT:  What about your girlfriend, what does she do?

JUROR #24:  She works for City of Stamford, police department.

THE COURT:  For which city?

JUROR #24:  Stamford.

THE COURT:  Police department you said?

JUROR #24:  Yes.

THE COURT:  What does she do?

JUROR #24:  She's like clerk typist.

THE COURT:  How long has she been doing that kind of work?

JUROR #24:  About 30 years.

THE COURT:  30 years?

JUROR #24:  Yes.

THE COURT:  And in the course of your normal day do you talk about what she does down there?

JUROR #24:  No.  We try not to get into that.

THE COURT:  And do you have any children, you said?

JUROR #24:  I have a -- yes.  We have a 20 year-old son who just finished his sophomore year at WestConn.

THE COURT:  And what type of recreational

activities or hobbies do you engage in?

JUROR #24:  I love movies, and every chance I get to take a nap I do that.

THE COURT:  I just started learning how to do that, after all my years on the planet.  It really helps.  And what kind of movies do you like?

JUROR #24:  Science, anything, anything that's fun, gets me out of the house.

THE COURT:  Okay.  And your education level?

JUROR #24:  High school and trade school.

THE COURT:  What did you take at trade school?

JUROR #24:  Electrician, refrigeration and heat.

THE COURT:  Thank you very much, sir. Have a seat.

Have you -- and I guess the way we ought to do it is row by row, because we got so many of you in different rows, but so the people in the first row, have you ever served as a juror in a criminal or civil case or as a member of a grand jury in either the federal or state courts?  If you have, please raise your hand.

Nobody on row one.

Row two?

Row three?

Row four?

And then lastly, I think that's row five, or is that row four?

Well, I got to tell you, I've got four lawyers, never thought I'd say that. I've never had a panel that's never served on a jury. Just goes to show you, you're all really special.

Other than the -- I believe this to be true, and I'll stand to be corrected -- the two attorneys who practice together, and the gentleman whose practice -- whose office where he works, the branch of his office, the office manager paralegal, whose offices are right down the street from that firm, do any of you know each other on this panel? If so, please raise your hand.

In connection with your employment -- and each of you have told me what it is that you do -- do you have anything to do with the adjustment of claims or the settlement of claims for damages? I think not, but I want to make sure I ask that question.

Have you or any member of your immediate family have had a claim against anyone for damages or has such a claim been asserted against you or any

member of your immediate family?  So that would be -- the question would be directed to those of you in the first row first.  Anybody have such a claim?

All right, that would be first juror number 1.  Could you tell us when that was, and a little more information about that?

JUROR #1:  Could we discuss that privately?

THE COURT:  You may very well.

If I ask anybody that would like to do it that way, we absolutely can.  And so -- okay, yes.  That's juror number one, two, three, four, five.

JUROR #5:  I just got hit the day after Christmas, so I'm in the process of going to the chiropractor now, so I'm suing somebody.

THE COURT:  So as the result of an automobile accident?

JUROR #5:  Yes.

THE COURT:  And when did the accident occur?

JUROR #5:  Christmas 2012, Christmas just past, the day after.

THE COURT:  So you retained a lawyer and actually filed a lawsuit?

JUROR #5:  Yeah, but I'm still going to

the chiropractor, so nothing actually has happened.

THE COURT:  I understand.  And do you know where that suit was filed?

JUROR #5:  Stamford.

THE COURT:  So it's in state court?

JUROR #5:  Yes.

THE COURT:  Okay.  And so at this process -- at this point in the process do you have any strongly negative or positive feelings about the litigation process and how things proceed?

JUROR #5:  I guess I'd have to say I don't really know.

THE COURT:  Would your experience, the fact that you have a pending matter in state court, would that in any way affect your ability to be a fair and impartial juror in this case if you were selected to serve?  Would you be fair about both plaintiff and defendant, or would you be prejudiced towards one or the other?

JUROR #5:  It would depend on the case.

THE COURT:  But again -- I'm making the same mistake I made with the other gentleman.  I apologize in advance.  What we're trying to do is get, as I said earlier, a jury of eight people that has no preconceived notions but based on their own life

experience.  The question that I ask you is that you've had this accident, you've got this litigation going.  Would that life experience prevent you from being fair and listening to the evidence that was presented by the plaintiff and any evidence that may be presented by the defendant to reach a decision in this case, or would it be, because of your wreck and your lawsuit, that you wouldn't be able to do that?

JUROR #5:  I don't think I'd be able to do that.  I think I'd be -- I might -- I don't know. I might be more on one side than the other.

THE COURT:  Okay, I'll ask you about that up here at sidebar in just a minute, okay?  Thank you for your candor.

Who else in the first row?  Okay.  Is this something we can talk about here, or you'd rather have something else?

JUROR #7:  It was a personal injury car accident about 15 years ago.

THE COURT:  Plaintiff or defendant?

JUROR #7:  Plaintiff.

THE COURT:  And did the matter go through trial or was it settled?

JUROR #7:  It was settled.

THE COURT:  And would your experience in

that case in any way affect your ability to be a fair and impartial juror in this case, if you were selected?

JUROR #7:  Not at all.

THE COURT:  You could be fair to both the plaintiff and defendant?

JUROR #7:  Correct.

THE COURT:  All right.  Second row. Anybody ever have such a claim?

All right, let's start -- that would be juror number 12.  10, I'm sorry.  So if you would --

I'm sorry, the last juror we had in the first row, you're juror number 5, I believe, is that right?

JUROR #7:  7.

JUROR #5:  I'm 5.

THE COURT:  Yes, I'm sorry.  My new system is not working too well.  I apologize for being so slow.

So I'm on juror number 10 right now. What type of situation was that?  Unless you'd rather do it at sidebar.

JUROR #10:  No.  It was about 20 years ago or so.  It was an automobile accident.  We settled.

THE COURT: Were you the plaintiff, the one that brought the suit, or the defendant?

JUROR #10: Plaintiff.

THE COURT: And you actually brought suit and filed a lawsuit?

JUROR #10: Yes.

THE COURT: Did the case go to trial, or was it settled?

JUROR #10: Settled.

THE COURT: And was the case resolved in a manner that you thought was satisfactory?

JUROR #10: Yes.

THE COURT: And the fact that you had had that experience those years ago, would that in any way affect your ability to be a fair and impartial juror in this case if you were selected to serve?

JUROR #10: No.

THE COURT: It wouldn't prejudice you for or against the plaintiff or for or against the defendant?

JUROR #10: Not at all.

THE COURT: Thank you very much.

Juror number 12. Can we talk about that now, or would you like to have a sidebar?

JUROR #12: No. It was a car accident,

about four years ago.

THE COURT:  Were you plaintiff or defendant?

JUROR #12:  Plaintiff.

THE COURT:  Did you file a lawsuit?

JUROR #12:  Yes.

THE COURT:  But it was settled?

JUROR #12:  It settled.

THE COURT:  And was that case resolved to your satisfaction?

JUROR #12:  Yes, it was.

THE COURT:  And would that experience those years ago have any effect on your ability to be a fair and impartial juror in this case if you were selected to serve?

JUROR #12:  No, it would not.

THE COURT:  Thank you very much.

Anybody else in the second row?

Juror number 13.  May we speak now, or would you like a sidebar?

JUROR #12:  My son was killed in a car accident in 2003.

THE COURT:  Okay, we'll have a sidebar with your permission.

Anybody else on that second row?

All right, third row.

Okay, let's start with the first juror to my left, which would be --

JUROR #19:  19.

THE COURT:  Okay, juror 19.  And can we talk about what your experience was, or would you rather a sidebar?

JUROR #19:  Sidebar, please.

THE COURT:  Okay.

And then anyone -- okay, yes.  May we speak, or would you like a sidebar?

JUROR #20:  Number 20.  Sidebar.

THE COURT:  Okay.

Yes, ma'am.  May we speak now, or would you like to have a sidebar?

JUROR #22:  I had a car accident.  I hit a car, so we --

THE COURT:  I tell you what, because I had to ask you before, I had a hard time hearing, you're slight of voice, I'll bring you up later at sidebar if that's okay.  All right?  Thank you.

Anyone else raise your hand?  Okay.

The Plaintiff in this case is Gary Session.  The Plaintiff's attorney is Mr. John Pinheiro.  Mr. Pinheiro, would you please stand,

introduce yourself, your client, tell the jury where you practice, and with whom you practice.

MR. PINHEIRO:  Thank you, Your Honor.

Good morning, ladies and gentlemen.  I'm John Pinheiro, an attorney.  My office is at 374 Whalley Avenue.  I'm a sole practitioner.  I'm on my own.  My client, Gary -- please stand.  My client is the Plaintiff.  His name is Gary Session, and he lives in New Haven, Connecticut.

THE COURT:  Thank you very much, sir.

MR. PINHEIRO:  Thank you Your Honor.

THE COURT:  The Defendant in this case is New Haven police officer Edwin Rodriguez.  The Defendant's attorneys are Mr. Thomas Katon, Mr. Jeffrey Zehe, and Ms. Megan Gallagher.

Mr. Katon, would you please stand and introduce yourself, your client, and the individuals seated at your table, and tell the jurors where you practice and whom you practice with.

MR. KATON:  Thank you, Your Honor.

Good morning, ladies and gentlemen.  My name is Tom Katon.  I represent Defendant Edwin Rodriguez.  I practice law in New Haven with a law firm called Sussman Duffy & Segaloff.  I practice with an individual named Michael Sussman, who's from New

Haven, Connecticut; James Segaloff, who's from New Haven, Connecticut; Joseph Faughnan, he's from North Branford, Connecticut; Laura Sklaver from Hamden, Connecticut; Karen Baldwin Kravetz, who's from Woodbridge, Connecticut.  I myself am from North Branford, Connecticut.  Seated here is Meghan Gallagher, who's an associate in my office, and other associates in my office are Greg Muccilli from Gilbert, Connecticut, and Philip Kent from Hamden, Connecticut.  I'm here with Jeff Zehe, who also represents the Defendant, and he is from Chicago, Illinois.  Thank you.

THE COURT:  And did you want to introduce your colleague?

MR. KATON:  I did actually introduce him.

THE COURT:  I apologize.  I'm sitting there looking and not seeing it.

And are you acquainted with or do you have any relationship with either of the parties in this case, the parties?  If so, please raise your hand.

Have you ever been employed by or worked with the Plaintiff or the Defendant, or has any member of your immediate family to your knowledge been employed by or worked with the Plaintiff or the

108

Defendant in this case?  If so, please raise your hand.

Do you know or are you related by blood or marriage to the attorneys for the Plaintiff or the Defendant in this litigation?  If so, please raise your hand.

All right, that's juror number?

JUROR #6:  6.

THE COURT:  6.  Who do you know, sir?

JUROR #6:  I've had transactions with attorneys from the Sussman law firm.

THE COURT:  With these individual lawyers?

JUROR #6:  None of the individual lawyers, no.

THE COURT:  But with the firm?

JUROR #6:  Yes.

THE COURT:  And let me ask you the fact, when was the last time you had such a business, professional transaction?

JUROR #6:  I have one ongoing matter presently.

THE COURT:  Okay.  Do you actually know any of the lawyers --

JUROR #6:  I do not.

THE COURT:  -- that are in this case?

JUROR #6:  The matter that I have is a tax assessment being handled by another member of the law firm.

THE COURT:  Well, let me ask you this: Would the fact that you have an ongoing piece of business with a member of the firm and that it's going on and you don't know these lawyers, would that in any way affect your ability to be a fair and impartial juror in this case if you were selected to serve?

JUROR #6:  It would not.

THE COURT:  It wouldn't prejudice you either for or against the Defendant's client?

JUROR #6:  It would not.

THE COURT:  Okay, thank you.

Anybody else know any of the lawyers in the case?

To your knowledge, have the attorneys in this case or any members of the firms in which they practice with, this counsel, acted as your attorney in any legal matter or the attorney for any of your immediate family?  If so, please raise your hand.

This is a civil case commenced by the Plaintiff, Gary Session, against the Defendant, Officer Edwin Rodriguez.  Between July 1999 and

110

January 2001 Defendant Rodriguez conducted a criminal investigation of Plaintiff concerning the murder of Anthony Lucky that occurred in New Haven on July 25th, 1999.  On January 4th, 2001, Defendant Rodriguez applied for an arrest warrant for the arrest of the Plaintiff, and the warrant was granted by a Connecticut state judge.  Plaintiff was later arrested on January the 8th, 2001.

Plaintiff alleges that the Defendant Rodriguez intentionally violated the Constitution of the United States and the Constitution of the State of Connecticut by depriving him of his right to be free from false arrest and malicious prosecution.

Defendant Rodriguez denies Plaintiff's allegations and maintains that at all times his actions were lawful under the circumstances of his ongoing criminal investigation.

This is the factual dispute in this case that the jury we select today will be asked to resolve.  Do you of your own knowledge have any information about the facts of this case?  If so, please raise your hand.

Have you any opinion whatsoever about this case as you sit here this morning?

Have you read anything about this matter

coming up for trial or have you heard any discussions concerning it?  If so, please raise your hand.

Has anyone talked to you about this case?

Now, this is something that I didn't do earlier, but I would ask now -- and I suspect the lawyers, I don't know, do we have a witness list?  I was going to let Ken read that out.

Usually, ladies and gentlemen, this is my fault, if we don't have such a list, I ask the lawyers to give me the names of the people who may be witnesses, not necessarily all going to be, but may be, so we can make sure that you don't know any of them, or if you do know any of them how do you know them.

Do we have that list or not?

I apologize to the jurors, and also counsel.

Plaintiff, would you please read off the names and tell the jurors, prospective jurors, where these potential witnesses live so they can answer the question, which I'll ask you all, ladies and gentlemen, after the lawyers have read the names, if you know any of the potential witnesses.  Go ahead, counsel.

MR. PINHEIRO:  If I may, Your Honor, I

will have to get the subpoena for their address.  I just have their names.  If I may have 30 seconds.

THE COURT:  Sure.  I apologize again. It's my fault.  And defense counsel, you've been forewarned, so I hope you're forearmed and you'll be ready.

So when you're ready to proceed counsel, why don't you come up to this microphone so to make sure I can hear you.  You speak into that microphone at the lectern.

Must be that accent why I keep messing it up, ladies and gentlemen.

Go ahead.

MR. PINHEIRO:  Brandon Canning, and he lives in Hamden, Connecticut.

Eugene Calistro.  He's a state's attorney.  His office is in New Haven, Connecticut.

Robert Lawlor.  His office is in New Haven, Connecticut.

A Robert Lucky.  He lives in New Haven, Connecticut.

Mary DeLeon.  She lives in New Haven, Connecticut.

Assistant Chief Denise Blanchard for the New Haven Police Department, New Haven.

Officer Omega Nieves.  She's a police officer in New Haven, Connecticut.

Possibly Captain Joanne Peterson, police officer, New Haven, Connecticut.

Steven Coppola.  He currently works at the Office of the Chief State's Attorney in Rocky Hill, Connecticut.

Patrick Redding, New Haven, Connecticut.

Lisa Dadio, Seymour, Connecticut.

Lily DeJesus, Branford, Connecticut.

George Shelton, Hamden, Connecticut.

We have Albert McCann and Juan Scruggs, both of New Haven, Connecticut.

Mayra Mercado.  It's either New Haven or East Haven, Connecticut.

A Sharon Adkins, Hartford.

And Mr. Mahon, I believe his first name is Christopher, Mahon, and he is in New Haven, Connecticut.

State's Attorney Christopher Alexy.  His office is in Rocky Hill Connecticut.

My client, Gary Session, will testify.

And also Defendant will testify.

Thank you, Your Honor.

THE COURT:  All right.  Defense counsel,

if you'd come up and read the names of the witnesses who may testify.

MR. KATON:  Thank you, Your Honor.

Good morning once again.

In addition to all of those people that were named by the Plaintiff I expect that I may call in some capacity regarding their testimony, I intend to call these additional people.

Michael Dearington, who's the State's Attorney for the Judicial District New Haven.

Bryan Norwood, who's in Richmond, Virginia.

THE COURT:  Would you get closer to that microphone?

MR KATON:  That was Bryan Norwood from Richmond, Virginia.

Mike Dearington, the state's attorney from New Haven Judicial District.

And Detective Christopher Sudock.

Thank you very much for your time.

THE COURT:  Do any of you know any of the individuals whose names have just been read, starting on the first row?  If so, please raise your hand.

Second row.

Third row.

Fourth row.

Have you -- other than the prospective jurors mentioned doing the security work part-time, and who does not have to answer again, have you or any member of your immediate family been employed as a law enforcement officer?  And starting in the first row, if you had raise your hand, please.

Second row.

Third row.

Okay, that's juror number?

JUROR #20:  Number 20.

THE COURT:  Who was employed, you or somebody else?

JUROR #20:  My brother's a correctional officer for the State of Connecticut.

THE COURT:  I'm sorry?

JUROR #20:  My brother's a correction officer for the State of Connecticut.

THE COURT:  Does that mean he works in a prison?

JUROR #20:  Yes.

THE COURT:  How long has he done it?

JUROR #20:  He's been doing it for a year now.

THE COURT:  Let me ask you this:  The

fact that your brother works as a state correctional officer, if you were selected to serve as a juror in this case, would that in any way affect your ability to be a fair and impartial juror in this case, judging the case only on the evidence that comes out in court?

JUROR #20:  It could.

THE COURT:  Okay, we'll talk to you at sidebar.  I'm sorry, your juror number?

JUROR #20:  Number 20.

THE COURT:  I apologize, I should have remembered that.

Do any of you have a problem with the concept that a person who feels he or she has been treated illegally in an encounter that he or she has had with a law enforcement officer -- as the Plaintiff in this case has alleged -- has a right to file a civil suit, such as the Plaintiff in this case has done?  Anybody think that's not right?  And by "not right," I didn't mean to confuse the issue.  That one ought to have a right to bring it and have the case judged by a jury.

Do any of you believe that merely because someone brings a lawsuit, an accusation of a law enforcement officer of violating his or her constitutional right -- as the Plaintiff has done in

this case -- that the Defendant is probably guilty of something? Anybody believe that just because a law enforcement officer has been sued, he or she must have done something?

Would you tend to believe the testimony of a witness who was a law enforcement officer over that of a witness who was not a law enforcement officer if there was a conflict in the testimony merely because the witness was a law enforcement officer?

Would you tend to disbelieve the testimony of a witness who was a law enforcement officer over that of a witness who was not a law enforcement officer if there was a conflict in the testimony merely because the witness was a law enforcement officer?

Have you or any member of your immediate family been arrested, charged with or convicted of a crime or been the victim of a crime?

And let me just say, we'll do this on the first row, and if you would like we'll do that at sidebar, because sometimes I think it's appropriate, and sometimes it may not matter.

But so starting on the first row, anybody answer yes to that question?

Second row.

Juror number 10, right?  Sidebar.

Anybody else on number two?

Okay, number three.

And jury number, first on the left is?

JUROR #18:  18.

THE COURT:  So it would be 17 before you and 18, right?  Okay.  I'm sorry.

And on the last row.

If you were one of the parties in this case, do you know of any reason why you would not be content to have this case tried by someone in your present frame of mind?  If so, please raise your hand.

If you were selected to sit as a juror in this case, will you be unable to or unwilling to render a verdict solely based on the evidence presented at the trial and the law as I give it to you in my instructions at the end of the trial, disregarding any other ideas, notions or beliefs about the law you may have encountered in reaching your verdict?

Have any of you ever had an encounter with a law enforcement officer or agency in which you believe you were treated inappropriately, or has a member of your immediate family or close personal

119

friend had such an experience?  If so, please raise your hand.

All right, and that's juror number?

JUROR #19:  19.

THE COURT:  Have you or anyone close to you ever witnessed the commission of a crime or the arrest of an individual by a law enforcement officer?  If so, please raise your hand.

All right, let me go ahead, unless when I ask someone feels they want to do it at sidebar.  Juror number 1, could you tell us about that?

JUROR #1:  My wife and I were on the way to Florida for the winter and stopped at a stopover night, and she waited outside in front of a grocery store in Lumberton, North Carolina, and she was waiting for me.  I went and got food.  We had our dog with us.  I went and got food or dinner, because we were staying across the way, and she observed somebody being arrested for shoplifting or something.

THE COURT:  Well, let me ask you, if you're selected to serve in this case as a juror, would that affect your ability to in any way be fair and impartial about both the Plaintiff and Defendant?

JUROR #1:  Not at all.  I didn't even see it.

THE COURT:  Second, next person on the first row.

Okay, juror number 4.  Could you tell us your experience, or would you rather do it at sidebar?

JUROR #4:  No, it's fine.  I was in South Carolina, and some police officers had pulled over a car of young kids, and I assume they were arresting them.  They were putting them in handcuffs.  That was about it.

THE COURT:  Would that -- what you observed driving by, would that in any way affect your ability to be a fair and impartial juror in this case if you were selected to serve?

JUROR #4:  No.

THE COURT:  You'd be fair to both Plaintiff and Defendant.  Thank you.

Anybody else in the first row?

Second row.

All right, juror number 10.  You want to have a sidebar?

JUROR #10:  Not really.  My sister was a witness of a crime back in the Bronx, and she had to move because of that.

THE COURT:  Well, let me ask you, she was a witness so you say she had to move?

121

JUROR #10:  Yes.

THE COURT:  Would that affect your ability to be a fair and impartial juror in this case if you were selected to serve, being fair to both the Plaintiff and Defendant?

JUROR #10:  No.

THE COURT:  So whatever bad experience she had in having to move from the neighborhood would not affect your ability to be fair and impartial?

JUROR #10:  No.

THE COURT:  Anybody else on that row?

Juror number?

JUROR #13:  13.  Sidebar.

THE COURT:  Okay.  I'm sorry, it was 15, right?

JUROR #13:  13.

THE COURT:  Who else may have been a witness to a crime?

That's juror number?

JUROR #19:  19.

THE COURT:  Let's go back.

JUROR #17:  Sidebar, please.

THE COURT:  And juror number?

JUROR #19:  19.  I'd like a sidebar.

THE COURT:  What's your number, sir?

JUROR #17:  Mine is 17.

THE COURT:  17 sidebar, 19 sidebar, got it.

Anyone else?

Have any of you heard or read anything about the City of New Haven Police Department or its officers or heard or read anything about police officers in general which would in any way interfere with your ability to be completely objective and impartial concerning the evidence in this case?  If so, please raise your hand.

All right, I see -- what's your juror number, sir?

JUROR #20:  20.

THE COURT:  20?

JUROR #20:  Yes.

THE COURT:  We'll do this at sidebar.

Have you or anyone close to you ever had your or their lives affected by the consumption, sale or use of illegal drugs?  And I know we have one child, I think, of one of the jurors that was mentioned previously.  But anyone else besides that?

JUROR #5:  What was the question?

THE COURT:  Has anyone close to you ever had their lives affected by the consumption, sale or

use of illegal drugs?

JUROR #5:  Yes.

THE COURT:  We had one person who's already volunteered that information, during the general voir dire, but I think the oldest daughter, if I remember that right, so it's not necessary to go back and do that again, but has anyone else?

We can talk at sidebar about that, in that first row.  Just state your juror number so I can make sure I got it right.

JUROR #5:  I'm 5.

THE COURT:  All right, juror number 5.

Okay, that same row, anybody else in the first row?

Second row.

All right.  Juror number?

JUROR #13:  13.

THE COURT:  Next row?

All right.  Juror number?

JUROR #20:  20.

THE COURT:  All right.  And juror number?

JUROR #18:  I'm 18.  I was the one with the daughter.

THE COURT:  Right, okay, thank you.

Anyone else folks?

Have you or anyone close to you worked for a federal, state or local government agency that you haven't already told us about?

Okay, first row.  That's juror number 6.

JUROR #6:  Many years ago I worked for the United States Patent and Trademark Office.

THE COURT:  I don't want to say the wrong thing, the lawyers in the group will understand, but God bless you.

Okay.  Yes, sir, number 7.

JUROR #7:  My brother's a retired parole probation supervisor for New Haven County, retired about ten years.

THE COURT:  Thank you.

Second row.

Yes, sir.  Juror number?

JUROR #11:  11.  Not a paid position, but I was on the Ridgefield Police Commission as a police commissioner for several years.

THE COURT:  What does the commissioner do in Ridgefield?

JUROR #11:  Basically we deal with officer malfeasance or complaints, traffic issues, that type of thing.

THE COURT:  Well, let me ask you --

JUROR #11:  Disciplinary hearings on officers.

THE COURT:  Let me ask you that, if your experience over those seven years had affected --

JUROR #11:  Several years, not seven.

THE COURT:  Several I'm sorry.

Well, over those several years -- how long ago was that?

JUROR #11:  2001, around there.

THE COURT:  And would your experience during that service and the fact that there's an allegation made by Plaintiff about -- against the Defendant, a police officer, would that affect your ability to be fair and impartial, either be prejudiced toward the Plaintiff or against the Plaintiff for the Defendant or against the Defendant?

JUROR #11:  I don't think it would.

THE COURT:  Well, there's lawyers that would ask you, "I don't think so," I perceive that to be, No, Judge, It wouldn't.  Is that what you're saying?  Or you don't know?

JUROR #11:  No, Judge, it wouldn't.

THE COURT:  Okay, that's what I thought you were saying, but I just wanted to make sure.  Thank you so much.

126

Anybody else on that second row?

Juror number 10.

JUROR #10:  I have two cousins who are police officers.

THE COURT:  Where?

JUROR #10:  New York.

THE COURT:  And would the fact that you have two cousins who are police officers and this case involves someone making an allegation against a police officer, would you tend to be prejudiced against the Plaintiff, for the Plaintiff, against the police officer, or for the police officer?

JUROR #10:  Not at all.

THE COURT:  Thank you.

Anyone else on the third row?

All right, juror number?

JUROR #21:  21.

THE COURT:  And could you tell us your --

JUROR #21:  I was a U.S. Peace Corps volunteer for two and a half years.

THE COURT:  I'm sorry, U.S. what?

JUROR #21:  Peace Corps volunteer.

THE COURT:  Again, I should have thanked other people for their service, but thank you for that service.

All right.  Would that affect your ability to be fair and impartial in this case if you were selected to serve?

JUROR #21:  No.

THE COURT:  Anyone else in the fourth row?

Okay, I think we've gotten everybody.

Other than what you may have brought to our attention before, if anything, have you ever had any training or instruction in law enforcement, criminal justice, or justice administration?  And I exclude the four lawyers and the office manager paralegal from that because they've had the experience that they have, and the lawyers in this case know what that is in a general sense, and probably a specific sense.  Anybody else have such training?  Education?

Do you believe or have any strong feeling that because of the difficulty of a law enforcement officer's job, that a person who alleges that his or her rights have been abused by a law enforcement officer should not have the right to file a lawsuit against a law enforcement officer as the Plaintiff has done in this case?  Anybody believe that?

Have you ever lived in New Haven?

JUROR #7:  I grew up in North Branford.

Went to school in West Haven.

THE COURT:  Thank you.

As you have been previously told, in this case the Plaintiff alleges that the Defendant falsely arrested him for murder in connection with the death of Anthony Lucky on July 25th, 1999, at 1:50 a.m. as he rode in a vehicle traveling in the vicinity of Columbus and Howard Avenues in New Haven.  Do you recall reading any news reports, viewing any television coverage or having any discussion regarding Mr. Lucky's death and/or this case?

If the evidence justifies it, would anything prevent you from making a substantial award? Or if the evidence justifies it, would anything prevent you from making a low award or no award?

We all know that sympathy is an admirable quality, but if the Court instructs you that it has no place in this courtroom or in the trial, do you think you can keep this quality out of your deliberation? Would you be unable or unwilling to firmly put aside any feelings or sympathy or compassion for the Plaintiff or the Defendant and decide this case solely on its merits and according to the law as I will explain it to you?

Do you know of any reason why you think

you could not sit in this case and render a just, fair, honest, impartial verdict?

All right, that's juror number 20?

JUROR #20:  That's correct.

THE COURT:  Now, let me say -- I'm going to tell you a little bit more about the procedure we'll follow here, and the time frame that we estimate.  And I want you to know it's a good faith estimate on the part of the lawyers who are involved in this case, as well as the Court.  And sometimes the estimate are longer than need be, and sometimes they could be shorter.  At this stage of the proceeding we all try to make it a little bit longer just so we don't impose on those eight of you who will be selected to serve.  But sometimes we may miss it, a day or so, not much.  So that's the caveat to what I'm about to say.

This trial will start this afternoon, and it is estimated, as I said, by the attorneys and the Court, that the trial should be completed by Wednesday, May 29th.  That is our best estimate.  But it could be, as I said earlier, a day or so shorter, or longer.  In any event, the trial will be completed no later than May 31st.  Court will not be held on Memorial Day, Monday, May 27th.  Now, court will start

each day no later than 10 a.m. and -- no earlier, rather, than 10 a.m., and conclude no later than 5 p.m.

Now, I'm going to say something generally to you. And for of any those of you that you may raise your hand, we'll call you up and we'll have a sidebar about it. I'm going to make a general statement. And I believe it to be true to my very core. And I think those of you who are lawyers or have legal background understand it's true.

Our country is just getting out of a war, got out of one a couple years back, and it really doesn't ask a whole lot of us to do things as citizens, but one of the things that it does ask is that when we're called, is to serve on a jury. And it's not to say that it isn't inconvenient, it is; it's not to say it won't cost some of you some money, in all likelihood it will; it's not to say it won't inconvenience other people who count on you in your lives, I trust it will with a group of this size; but it is critically important that we have this system.

So it's the kind of system you'd want if you were either a plaintiff or defendant or somebody you loved was a plaintiff or defendant, wanted to have the case judged fairly and appropriately under the

law.  You wouldn't want to get a bunch of jurors who just had nothing better else to do.  It's really serious what we're doing here.

So that's the prelude to the question I'm going to ask.  And again, we'll bring you up to sidebar, and if you feel compelled because you just need to bring something to my attention, it's the right thing to do.  I'm not trying to discourage you to do that, but I want you to think about your answer to this next question.

Do any of you have anything else on your mind or in your life that's going on which would affect your ability to serve on this jury during that period of time which was not previously covered by any of the questions I asked?  If so, I would ask you to raise your right hand starting on row number one, as I look at you please give me your juror number.  That would be 4, right?

JUROR #5:  5.

THE COURT:  Second row?

All right, juror number 10.

Your number, sir?

JUROR #8:  8.

THE COURT:  Yes, ma'am, your number?

JUROR #15:  15.

THE COURT:  Third row.

I'm sorry, number 13?

JUROR #13:  13.

JUROR #17:  17.

JUROR #20:  20.

THE COURT:  Last row.  Juror 24?

JUROR #24:  Yes.

THE COURT:  All right.  Let me say -- I tell you what we're going to do now, and so you'll know.  I guess you-all have been with us -- with me since roughly 10 o'clock, and it's a little after 12 now.  Normally we break for lunch at 1 o'clock, and we break for an hour.  Let me -- if you would all just wait here for just a moment, let me think for a moment.

Get the lawyers, if the lawyers would come on up here at sidebar.

(Off record)

THE COURT:  All right.  After conferring with the attorneys for the parties, we're going to go ahead and break for lunch now.  I want to remind you, please, it's very important, that you not discuss this case or the procedure we're using to pick the jury among yourselves or with anybody else.  It's really important, and I hope you believe that, how important

the matter is both to the Defendant and Plaintiff in this case and how hard that all of us, the lawyers for both sides and the Court, are trying to make sure we get a fair and impartial jury. So it's really --

I'm going to ask you to be back here at 1:15. We're going to do a little bit more business outside of your presence. When you come back we're going to go ahead and we're going to start talking to some of you individually. That's going to take a little while. And if I were really much better than you-all observed that I'm not to be as a judge I could say first row, you be back at 1:15, second row, you be back at 1:45, but I'm just not that good, so we need all of us together, and I apologize for that in advance.

I hope you have a good lunch, and if you're not familiar with the eating places around the courthouse, the court security officers downstairs will be happy to assist you. Keep your juror badges on at all the times you're in the courthouse. Okay. Thank you so much, hope you have a good lunch.

One other thing. These are real nice fellows, the lawyers for all of them. I don't know the Plaintiff or the Defendant, but I suspect they're real nice people, but the lawyers I know. When you're

coming in and going out of the courthouse and this courtroom, if you get to the elevator at the same time, they're supposed to let you go up or down. They don't ride with you. Same thing with the parties. They're not going to acknowledge your existence. So they won't nod at you and say hey, how you doing. Don't hold that against them. That's the rules they live by, and that's just so not only that we won't have any impropriety, but even the appearance of an impropriety. So don't hold it against them. They'd be breaking the rules if they did anything else.

Okay. Thank you all. You're excused for lunch.

(Jurors excused)

THE COURT: Let me just say I think -- and again, I told the attorneys at sidebar, off the record, that I thought we would get at least through the openings, and I was asked if you think will get to any witnesses, and it doesn't look like it, but we'll just see. This might go quicker than I think, but the --

And I'm going to ask you -- I guess you got a list. I usually have a little chart. I'm sorry I don't have that here. But at any rate, you got your own system I'm sure, but the people that I want to

call back --

Do they have a list of the prospective jurors or not.

THE CLERK:  They have the same list you have, Your Honor, and if you need extra for any purposes, I have it.

THE COURT:  No, I think we're okay for now.  But I'm going to -- I'm not going to say the reasons right now.  I just need to go back.  I'd written my questions down by number so I know what I'm bringing them back for, and I'll compare notes with Brendan over lunch.  But juror number 1, juror number 4, 5, 6 -- excuse me -- 5, and I guess you-all are going to ask -- we need to talk to the lawyers at sidebar?  I don't think I need matter of factually to do that, but maybe I should.  So I'll bring all the lawyers back, and I'll have a couple questions that I'll ask them as a general matter, and you guys will do what you think is appropriate.  So that would be number 6, number 7, number 8, number 10, number 11, number 13, number 15, number 17, number 18, number 19, number 20, number 23, and number 24.

Now, if there's anybody from either your perspective that you think you ought to bring in addition to that, please give me the juror number and

tell me why.  Plaintiff?

MR. PINHEIRO:  Your Honor, the jurors that you're bringing back you're bringing back for you to be considering to serve, correct?

THE COURT:  No, sir.

MR. PINHEIRO:  These --

THE COURT:  The jurors that I'm going to bring up is because I said I would have them at sidebar, whether it was involving a crime or some other answer that peaked my interest that I thought I ought to ask more questions about.

MR. PINHEIRO:  Oh, I understand.

THE COURT:  And it would be done at sidebar.  And the way it works, so you understand, after I get through -- and you-all need to listen up on this.  Lawyers?  When I bring -- let's say we bring juror number 1 up, and he had a matter he wanted to talk to me about at sidebar.

When I get through, I will ask, starting with Plaintiff, then Defendant, whether there are any challenges for cause on this juror based on what we just learned.  That's going to be yes or no.  I suspect most of them will be no because it's just personal stuff they're telling us, but maybe not.  And if, for instance, if Plaintiff says yes, and I say

137

okay, what's the basis, and then I'll say Defendant, do you agree or not, and you'll say what the basis is, I'll rule on the challenge for cause right there on the spot.  Okay?  So on your little list as I rule you need to scratch him or her off.

And when we get through that process, we'll see how many are standing.  And when we go to pick, when you get your juror strikes, the three that you each get, don't strike somebody that's already been struck for cause.  Some lawyers do that.  I don't know what they were thinking, but they sure wasted it, but it'll count against you.

So in other words, let's suppose we've had out of the first 15 people, let's say we've had four people struck for cause.  So that means we've got -- and if all of them were within the first ten, that means that we've got 20 left.  Well, we're not going to get past the eight we want to select for a total of six, so that's 14, so you don't need to go past striking somebody that's 22.  We won't get to them.  Under the system that I use because we already got rid of your challenges for cause.  Okay?

And so keep your thinking cap on.  It will be real simple when we get into it.  If there's confusion, again, I don't mean to.  It'll be simple.

But you'll know who's standing because you will have struck the person when I -- you may agree, or say I'm striking -- I'll do it on my own if I don't think they'll be fair or impartial, you both all object, which is rare, but it can happen, and usually lawyers, officers of the court, even though they're trying to get an advantage, understand why this person could be prejudiced one way or another, wouldn't be a good juror, or because they don't want to be here so bad, and none of us want them in here.  I get really upset with it in my heart.  I'm sure you guys do, too.

Anyhow, understood, Counsel?

MR. PINHEIRO:  Cause first, you rule, and then we use our challenges, peremptory challenges.

THE COURT:  We okay, defense?

MR. KATON:  Absolutely, Your Honor.

THE COURT:  So you got anybody else that you want to bring up here that I didn't mention by jury name?  And if you do, tell me why.  And I'm not saying I got it all right, but I think I got everybody that peaked my interest.  Counselor?

MR. PINHEIRO:  Your Honor, I'm looking at the list.

THE COURT:  Okay.  Defendant -- while you're looking at the list, Defendant, you got anybody

139

else you want to call?

MR. KATON:  Your Honor, thank you.  One other person, number 22, I believe it was from Cos Cob.

THE COURT:  What would be the reason?

This is the lady -- I'm bringing her up.  I didn't mention her, but I should have.  Yes.  She had -- I forgot.

MR. KATON:  It was 22, Your Honor, there seemed to be some difficulty in terms of expression.

THE COURT:  I'm not worried about that, but there was a reason she was trying to tell me something.  She raised her hand.

MR. KATON:  She did ask for a sidebar on an accident, Your Honor.

THE COURT:  Accident, that was it, that's right.  And I had a hard time hearing her.  I think she speaks English well, she's got an accent, but maybe understood, but she -- I think she's plenty able to comprehend.  I just couldn't hear her, is my old failing years.  Thank you.

Mr. Pinheiro?

MR. PINHEIRO:  No, Your Honor.

THE COURT:  Okay.  Well, listen, you guys.  Get back here at -- I think I said 1:15.

That'll give us 55 minutes.

And follow my admonition.  Don't make yourselves look bad in front of these jurors that you be breaking the rule by riding the elevator with them or smiling at them or acknowledging their existence. That goes for both the parties, too.  That's the rule we all go by.  Thank you very much.  We'll see you back here at 1:15.

(Recess taken from 12:17 p.m. to 1:17 p.m.)

THE COURT:  Let me ask the jury, do we have anybody that's supposed to be here that's not here?  Well, thank you all for doing that.

What we're going to do now, I'm going to ask the court reporter to relocate.  As your number is called, I'm going to ask you to come on up here, and the lawyers are going to be here, and I'm going to ask some questions based on the responses you gave to some of the questions I asked earlier.

And this part will take a little while. I promise you I'll go as quickly as I can, consistent with what we need to find out.  So please be patient. You-all can keep doing what you were just doing.  When you get on a jury, since you haven't been on a jury before, you see a bonding between the jurors after three or four days or a week or whatever it is.  I

don't think I've ever seen the whole jury venire having as much fun as it sounds like you-all were having, so you-all keep doing it.  Talk about anything except the case.

(Sidebar)

THE COURT:  If juror number 1 could come on over.

(Juror #1 present at sidebar)

THE COURT:  How you doing?

JUROR #1:  I'm doing well.

THE COURT:  You raised your hand in connection with a question I asked, Judge, can I talk to you at sidebar about that.

JUROR #1:  Right.

THE COURT:  What were you talking about?

JUROR #1:  It was litigation.

THE COURT:  Okay.  That's right.  Let me see.  So tell me about the litigation.

JUROR #1:  As I said, I'm a retired Ernst & Young partner.  I was involved -- I'm one of the partners -- I was one of the partners involved in a major piece of malpractice litigation, named personally as well as the firm.  We paid out big dollars in settlements.

THE COURT:  That's what killed the deal

almost, huh?

JUROR #1:  Which deal?

THE COURT:  Number five?  Which one was it?

JUROR #1:  There are a number of them, but I mean this was, you know, there was a major -- people went to jail and all.

THE COURT:  I remember.  I went to a seminar in San Francisco about you guys and somebody was talking about what the field could do.  Anyhow, that's another story.  So let me ask you -- well, did you come out relatively unscathed, or was it --

JUROR #1:  Well, I was censored by the SEC for five years.  The firm was great to me.  I was never hurt financially.  I retired, you know, full retirement and all.  So my family and I are personally all very fine.

THE COURT:  Understood.  Now, let me ask you this.

JUROR #1:  It was painful.

THE COURT:  Sure.

JUROR #1:  Took ten years.

THE COURT:  Let me ask you this.  With your background, you know how important this case is to both the Plaintiff and Defendant, and what we're

trying to do is to really make sure the jury that's going to sit and judge the evidence is fair, to both sides. Now, there's no right or wrong answer to this. I'm looking you in the eye right now, and I believe you're honest and honorable. Is this going to affect your ability to be fair and impartial? Think about it before you answer.

JUROR #1: I thought about it before because I've actually been interviewed on the state level, also, for state cases. It's gotten me jaded against undue enrichment. I believe people need to work for what they get. They need to deserve it and earn it. It doesn't mean if somebody was done unjustly they shouldn't get compensated, but I don't believe in people just being compensated for the sake of being compensated, and I think lot of people in this society try to be.

THE COURT: Let me say this to you. I've been a judge for almost 20 years. I've been a lawyer for more than 20 years before that. I agree with you a hundred percent. After having said that I agree with that, as a general proposition, the specifics of this case -- and I guess this is about the best way I can ask the question -- if you were either the defendant or the plaintiff in this case, and we were

trying to pick the jury, doesn't matter if you're the plaintiff or the defendant, we were trying to pick the jury in your case, and we had someone who really was like you as far as his life experience and state of mind, whether either plaintiff or the defendant, you know we don't know what's in your head, would that person who's just like you be the kind of person you'd want on your own jury?

JUROR #1:  It's a very hard question. Because I can relate to the police officer, having been on the defendant side in a professional behavioral matter, did you do the right things professionally, and the things that the professionals require.  I'd like to believe that I could be fair and assess the facts.

THE COURT:  Based on --

JUROR #1:  Based on the evidence and based on the law as you would describe it.  I don't know if you ever -- having gone through ten years of depositions and never going to court, having it settled but being deposed probably 20 times for many hours -- if you ever lose -- entirely can lose the bias that you develop that the legal profession is trying to prove a point for their side, and how I would interpret that information as it's presented.

145

THE COURT:  So the question back that I asked you, if you were picking your jury, somebody you love's jury, either the plaintiff or defendant, either one of them, both the same answers, whether you identify with the plaintiff or identify with the defendant, would we want a person with your life experience and frame mind on that jury?

JUROR #1:  I would probably prefer somebody that has never been through the process on either side, because I don't think they come in with any taint, whether intentional or not.  Having said that, if I didn't have the option of having somebody that's never been through the process, I think I would be fine.

THE COURT:  Well, to me now --

JUROR #1:  It's hedged, I know.

THE COURT:  It's contradictory, because you say gee, in a perfect world nobody would go through the crap I went through, is what your saying.

JUROR #1:  Right.

THE COURT:  But on the other hand, you know, we got to have a jury system, I mean you didn't say this, I'm saying it, that's life not fair, stuff happens.

JUROR #1:  It does.

THE COURT:  And the question is, again, for these two folks, plaintiff or defendant, doesn't matter which side, is what you experienced over that period of time, is that going to so jade you that you're not going to be fair, you're not going to listen to the evidence, you're not going to give them the day in court that they here for after all these years that you didn't get?  You couldn't do that?

JUROR #1:  I think so.  No, I think I would be able to listen.

THE COURT:  You think you would?

JUROR #1:  I would be able to listen and I think I would be able to assess.

THE COURT:  Well, with what you know --

JUROR #1:  But it doesn't mean the bias, you know, the deep down bias, isn't going to surface, isn't going to permeate as you listen.

THE COURT:  But does that mean you would or would not be able to?

JUROR #1:  I believe I would.

THE COURT:  Well, they would want to know if they could ask you -- believe is a maybe.  Do you think -- I mean again, there's no right or wrong answer.

JUROR #1:  I understand.

THE COURT:  You're the only one that knows.  And I want you to know, first of all, I perceive you to be completely candid and honest with me, you're trying to explain as best you can respond to my inarticulate questions, but this is dead serious for both the plaintiff and defendant.

JUROR #1:  I understand, and I think what I'm trying to -- and this may still be a hedge response, but what I'm trying to say is I believe in my heart I could be completely open and honest and listening and totally unbiassed, but after being -- from 1997 to 2007 being beat up by the legal system on and off, you know, depositions and things of that nature in a civil matter, I don't know if those wounds ever close a hundred percent and you -- something is not going to -- the little guy on your shoulder.

THE COURT:  If I could just say this, though.  I don't know what they tell you, because all of a sudden, matter of fact, you are the legal system.  You're the only jury that's going to make a decision.  You're the one to make sure it's fair.  If you can just judge the evidence based on what comes out in court, you become the legal system, so --

JUROR #1:  I think I could.  That's my best judgment.

THE COURT:  Okay.  I appreciate your candor.  I mean that very sincerely.

JUROR #1:  Okay, thank you.

THE COURT:  Whether you serve on this jury or not, you know, that's what they say, that's why they make the bumper sticker, it just happens sometimes.

JUROR #1:  It does.  Thank you.

(Juror #1 excused from sidebar)

THE COURT:  Challenge for cause?

MR. PINHEIRO:  I would request challenge for cause, Your Honor.

THE COURT:  What do you say?

MR. KATON:  I say that his answers were totally appropriate with one that can be fair and balanced.

THE COURT:  I got to tell you that was my gut.  I wanted to see if I was the only one, but I mean, I think he couldn't have been more honest.  And I jammed him as much as I could jam without ruining what I think the line is.  And I think he struggled, but he thought it through, and that was my perception three feet from him, that he ended up -- I'm not saying he may not be -- if you or the other side firmly don't want him, but I don't think challenge for

149

cause, so I'm going to overrule the challenge.

Now, the next one I believe is number 4, and this person's got somewhere else to be, I believe. You have something else on your mind that would affect your ability to serve, other than you have somewhere else to be?  Okay, juror number 5.  4, I apologize, juror number 4.

(Juror #4 present at sidebar)

THE COURT:  Okay.  You know from sitting here throughout this proceeding this morning, you realize how important it is what we're trying to accomplish?

JUROR #4:  Absolutely.

THE COURT:  To get a completely fair and impartial jury, to judge the merits of the Plaintiff's claim against the Defendant.  And I think you heard my little spiel that I really give, but I believe it from my heart, that, you know, our government, country, constitution, doesn't ask a whole heck of a lot, but on occasion they ask us to serve on a jury.  I'm still amazed nobody in this panel ever served on a jury, but --

JUROR #4:  I know.

THE COURT:  That's good.  But I think you raised your hand in my asking a question.

150

JUROR #4:  I did.

THE COURT:  What's going on in your mind that's so important that we ought to consider -- again, I'll tell you this, I've been doing this over 20 years, and I have on occasion had to shut down a mom and pop store because when they serve there's nobody else to open the door.  I didn't shut it down, but you need to do it.  What's going on in your life we ought to consider excusing you?

JUROR #4:  Right, and I do agree with what you said.  I'm director of a summer camp for 1,200 kids on Long Island, and so what I'm just saying is this season is my -- this is when I work the hardest.  Tomorrow I'm interviewing three nurses, I start orientation for the new counselors tomorrow night at 7 o'clock, and then Wednesday I meet with Sysco, who does our food service.  Come September I have my daughter's wedding, which is in September.  After that is when I am free to do my civic duty right until the following May again.  May to August is my crazy time.

THE COURT:  Let me ask you this.  Now, heaven forbid you're driving home tonight and you get in an accident; it's not life-threatening, but you knocked out your knee for four months and you can't

151

get out of bed for the first three weeks.  What happens to the camp?

JUROR #4:  They'll make me work from my bed on a computer.

THE COURT:  Seriously?  You understand --

JUROR #4:  No, I absolutely do.

THE COURT:  And again, I'm not making light of it, but I mean, you know, I don't know how many other people raised their hands for this question, but I bet there's going to be some equally good reasons, certainly from their individual perspective, people that count on them.

JUROR #4:  Right.

THE COURT:  Now, here's the question.  And I can't get in your mind, the lawyers can't get in your mind, we don't know.  If you are selected to serve, and you got to just do whatever you got to do to make it work, which would be a real pain, which might be besides just a pain, it might be really tiresome and you'd get less sleep than you should and you may not take care of some other personal stuff that you really want to, if you're selected and you're sitting in that jury box, are you going to give this case the attention it deserves?

JUROR #4:  Yeah.  I would never want to

152

think that I wouldn't do that.

THE COURT: Could you decide the case simply on the evidence here and say, crummy I'm here, I'm supposed to be doing that?

JUROR #4: Will my mind be elsewhere? Yes, I'll be honest, because I'm responsible for other things, but if I, you know, was chosen and this was what I had to do, I would do it.

THE COURT: Well, when you say "I'd do it," I know you would, but would you just go through the motions, or would you give it the attention that you'd want?

JUROR #4: I think the defendant and the plaintiff deserve to have my utmost attention, right.

THE COURT: So would you give it the kind of attention you'd want if it was you or your daughter's or your husband's?

JUROR #4: Yes, I would give it, you know, I would give it that attention, yes, I would think that I am the type of person that would.

THE COURT: I don't mind telling you this, you're the kind of person that I interview frequently that makes me proud. Thanks for being so.

JUROR #4: Thank you. Am I done?

THE COURT: You can go have a seat.

(Juror #4 excused from sidebar)

THE COURT:  Challenges?

MR. PINHEIRO:  If I may, Your Honor.

THE COURT:  You may.

MR. PINHEIRO:  This is her busiest time of work, she has 1,200 children, she's interviewing employees, she's free later months other than these four months.  I think that we're best served if she wouldn't serve as a juror for cause, I think.

THE COURT:  Well, what do you think?

MR. KATON:  I think that she clearly indicated that even though this was going to be a difficulty, it wasn't going to impair her ability to sit fairly and weigh the evidence.

THE COURT:  Well, the magic question that she answered for me, when I told her that she makes me proud, could you give it the kind of attention that you'd want to your case or your daughter's case.

MR. PINHEIRO:  Your Honor, when you give people a question, I mean --

THE COURT:  I'm just -- but trying to go -- I can't get to anybody's soul, but all I can do is talk.  But I believed her.  And I think she will do that.  Is she going to be -- have to make a lot of arrangements?  Yes, I think she will.  But I don't

think it raises to the level of a cause for challenge, and I'm going to overrule the challenge.

All right, next person.

I'm just thinking about this out loud. I guess different judges do it different ways, but, you know, if I ruled every time everybody wanted me to rule I can see why you'd want to get 50 people in here or something. That's just never how I've done it. Hope I'm doing it right. Not saying I am.

Now we got the next guy is our lawyer. Juror number 5. She's got a couple of issues.

(Juror #5 present at sidebar)

THE COURT: Hi, how you doing?

JUROR #5: Good.

THE COURT: You raised your hand to at least one question, I think a couple questions.

JUROR #5: Yes. I have a seven year-old son. I'm the sole provider of him. I'm a single mother, sole provider. His father got arrested and is in federal prison. They put him in California. My son's having the toughest time not having his dad around. And he got arrested -- I think you asked if anybody was arrested for drugs and stuff. His father got arrested.

THE COURT: How long has he been gone?

JUROR #5:  Since my son was four, so 2009.  Got arrested in 2009.

THE COURT:  What do you do?

JUROR #5:  Hair stylist.  Hairdresser.

THE COURT:  You work from home?

JUROR #5:  No, in a salon.  I do like 30 hours a week, I do.

THE COURT:  Who takes care of your son when he's not in school?

JUROR #5:  Daycare.

THE COURT:  And is that a paid daycare, I assume, part of your work.

JUROR #5:  It's my cousin's daycare, so she picks him up from the bus stop, and then my mother gets out -- he gets off the bus at like 3:45, 4 o'clock.  My mother gets out of work at 4:30, then picks him up from the daycare, so he's not really there that long.

THE COURT:  And let me ask you this.  As inconvenient as it would be for your mom and your cousin --

JUROR #5:  Yeah.

THE COURT:  -- and whatever additional expense it might be for you -- I assume it would be.

JUROR #5:  Yeah, because I pick him up

Monday, Tuesday and Thursday.  It's like -- because of my work schedule.

THE COURT:  I understand.  I understand. But if you are chosen to serve on this jury -- first of all, I mean I think it goes without saying, you realize how important it is to both the plaintiff and defendant that we get a jury.

JUROR #5:  Absolutely.

THE COURT:  It's the kind of jury that you wanted if it was your day, or your husband, father of your child, or your child one day, not just people that oh, I'm so busy I can't do this and it would inconvenience me.  And I'm not suggesting any of those.

JUROR #5:  No.

THE COURT:  But I hear a lot of things as a judge presiding, and I'm just trying to -- the most important thing for me is, is that if you are selected to serve, and you're sitting in a jury box, are you going to able to give this case the attention you would want if it was your kids, or the father of your son's case?

JUROR #5:  Probably, because you know what, if I was sitting, if I was sitting in the courtroom, I would want somebody like me on the jury.

THE COURT: That's a pretty good answer.

JUROR #5: You know what I mean? It's true.

THE COURT: So the answer is, Judge, much as it would be a pain, as much as I really wish I could take this cup and pass it down the road to somebody else, if I'm selected, I'll give this case the attention I want for my kids.

JUROR #5: Yes, my listening ears would be on.

THE COURT: Thank you so much. Have a seat.

(Juror #5 excused from sidebar)

MR. PINHEIRO: No challenge.

MR. KATON: Your Honor, I think the issue of the drug arrest is quite too close for that juror.

THE COURT: I'm sorry?

MR. KATON: The issue of the drug arrest on her husband is way to close for the jury. There is going to be substantial evidence in this case regarding drug activity and the actions of the New Haven Police Department to try to quell it, and I think.

THE COURT: Let me ask her about that, I forgot.

Juror number 5, I apologize, could you come back up here?  There's something I meant to ask you and I didn't.

MR. ZEHE:  She also has a pending civil case.

THE COURT:  Thank you.

(Juror #5 present at sidebar)

JUROR #5:  Yes?

THE COURT:  Some other things.  First of all, you got this civil suit.

JUROR #5:  Yes.

THE COURT:  And I think you said that -- I think you said that wouldn't affect your ability to be fair in this case, is that right?

JUROR #5:  Yes, it wouldn't.

Also, I forgot to tell you, because I'm under a chiropractor's care, I eventually have to stand up because I can't sit for too long.

THE COURT:  If you're selected, you can stand up whenever you want to.

JUROR #5:  Okay.

THE COURT:  The other thing is, and I meant to ask you about this, when the question was asked about drugs, you mentioned your husband. There's going to be some information in this case

about drug use, or alleged drug use, other drug activity. Now, because of the situation you've experienced, through the father of your child, your husband, and he's actually in a federal penitentiary, do you think that would affect your ability to listen to the evidence that the Plaintiff puts on?

JUROR #5: No.

THE COURT: Or the Defendant puts on?

JUROR #5: No.

THE COURT: The drug issue doesn't cut one way or the other?

JUROR #5: No, I would be fair and impartial.

THE COURT: And in your view, you told me a while ago, you may have all this horrendous schedule, inconvenience, you'd give the case the same kind of attention you'd want your case to have?

JUROR #5: Yes, yes, like I said, because I'd want someone like me.

THE COURT: And let me ask you this. You're the only one that can know this. Whatever your life experience, with through your husband, and whatever drug issues he had, or has, or had, you think, regardless of how the evidence comes in about drug use here, you can give us that kind of statement,

that you'd give it the same attention you'd want if it was your day or somebody you loved's day in court?

JUROR #5:  Yes.

THE COURT:  You were pretty emphatic about that.

JUROR #5:  No, because I would definitely listen.

THE COURT:  Okay.  Thank you.

(Juror #5 excused from sidebar)

MR. KATON:  No challenge for cause.

MR. PINHEIRO:  No challenge.

THE COURT:  Now is a lawyer, right?  Juror number 6.

(Juror #6 present at sidebar)

JUROR #6:  Hello.

THE COURT:  Hello, counselor.  I got to tell you, I might live to be a hundred years old, I'll never see three.

JUROR #6:  And two from the same firm.

THE COURT:  Let me just ask you this.  I mean I know you know the drill, I know you know the duty of a juror, I know you understand what we're trying to do here, just get a fair and impartial jury to sit and judge this case.  Based strictly on the evidence that I allow in, testimony or documents, and

161

other than asking you, well, gee, can you do that, be fair to both sides, I'm going to ask you if you were one of the parties in this case, and we were trying to pick your jury and we had somebody with exactly your life experiences and proclivities toward whatever you got proclivities toward, and maybe this is even a worse question, but would you be satisfied to have such a person sit on your jury in judgment of your claim?

JUROR #6:  I would.

THE COURT:  You want to ask him anything? Mr. Pinheiro?

MR. PINHEIRO:  I know you're busy at work, aren't you?

JUROR #6:  Pretty busy, yes.

MR. PINHEIRO:  Would that interfere with your ability to serve?

JUROR #6:  I could probably move things around.

MR. PINHEIRO:  All right.  No further questions.

MR. KATON:  No further questions, Your Honor.

THE COURT:  Thank you so much, counselor.

(Juror #6 excused from sidebar)

THE COURT:  Challenge for cause?

MR. PINHEIRO:  No, Your Honor.

THE COURT:  Cause?

MR. KATON:  No, Your Honor.

THE COURT:  Juror number 7.

(Juror #7 present at sidebar)

THE COURT:  Welcome, counselor.

JUROR #7:  Hi.

THE COURT:  Let me ask you -- this is pretty much what I'm going to say to you as to juror number 6.  I know you know, understand the drill, what we're doing here, you understand how the system's supposed to work.

JUROR #7:  Yes.

THE COURT:  Trying to pick a fair and impartial juror for the case on the evidence that comes out through the evidence of the witnesses or documents.  And with that being said, I'm going to ask you as best you can, suppose we were picking a jury for you, you were either the plaintiff or the defendant, or your wife or somebody that you loved, and that somebody with exactly your life experience, education, experience, proclivities -- and this may be a terrible way to ask the question, I don't know how else to get it to you, because I know you know what

we're trying to do, you understand -- would a person with your exact life experience and qualities, would that be a person that you'd be satisfied to have sit on your jury?

JUROR #7:  I would.

THE COURT:  And a question that came up previously is that one of the attorneys asked, which was a good question, I have to assume, like most lawyers, you have a pretty full schedule.

JUROR #7:  Yes.  I'm the managing partner at the firm, too.

THE COURT:  And the question becomes, if you are selected to serve, can you devote the attention to this case that, again, you'd want on your case or your wife's case or somebody you love's case and let the second guy come in or second person come in, take care of it, however it would work, or work nights, do whatever you got to do to do justice?

JUROR #7:  It would work.

THE COURT:  You got any questions?

MR. PINHEIRO:  If I may, Your Honor.

You ever do any criminal work?

JUROR #7:  Yes.

MR. PINHEIRO:  How long ago?

JUROR #7:  I did a lot of juvenile court

164

work and --

MR. PINHEIRO:  GA?

JUROR #7:  GA.  Up until 15 years ago I did everything criminal.

MR. PINHEIRO:  So you went to Waterbury GA, too?

JUROR #7:  I went to Waterbury, I went to Stamford.

MR. PINHEIRO:  Never a prosecutor?

JUROR #7:  Never -- well, I prosecuted a couple juvenile court cases, but mostly public defender time.

MR. PINHEIRO:  You see what's going on here?

JUROR #7:  I understand.

MR. PINHEIRO:  Can you be fair to both sides?

JUROR #7:  I could.

MR. PINHEIRO:  Because you're going to know certain affirmative defenses, what they mean.

JUROR #7:  Right.

MR. PINHEIRO:  Elements to prove.

THE COURT:  Again, besides knowing your legal background and whatever your education and experience, the law that you would follow would be the

law that I give to you.

JUROR #7:  I understand that.

THE COURT:  And you could do that?

JUROR #7:  Find the facts, yes.

MR. PINHEIRO:  Thank you.

JUROR #7:  You're welcome.

MR. KATON:  No questions, Your Honor.

THE COURT:  Thank you very much.  Have a seat.

(Juror #7 excused from sidebar)

THE COURT:  Challenge?

MR. PINHEIRO:  No.

MR. KATON:  No challenge.

THE COURT:  Okay.  The next one is juror, I think, number 8.  He's got somewhere else to be, I think.

Juror number 8.

MR. KATON:  I believe this was the security guard, Your Honor.

THE COURT:  I think he's got a couple issues, seemed to me, but I don't know.  We'll see.

(Juror #8, present at sidebar)

THE COURT:  How you doing, sir?

JUROR #8:  How you doing, Judge?

THE COURT:  I want to apologize, I was

going around in a circle.

JUROR #8:  I got to tell you the truth, I'm a security guard, and I got a tendency to favor the cop, I guess.

THE COURT:  Be hard for you to sit here and listen to both sides?

JUROR #8:  Yes.  I'm going to favor the cop.

THE COURT:  Okay.  Well, I thank you very much.

JUROR #8:  The police officer, because I work with them and stuff.

THE COURT:  I got you.  Thank you very much for your candor.  Have a seat.

JUROR #8:  Okay, thank you.  I also have a pinched nerve, too, bothers me sometimes.

THE COURT:  Okay.

(Juror #8 excused from sidebar)

MR. KATON:  Forgive me, I couldn't hear a word he said.

THE COURT:  He said he favored the cops. He's got a pinched nerve.  He didn't really want to be here, and he would be a terrible juror, in my view. Does anybody object to him being struck for cause? Plaintiff?

MR. PINHEIRO:  No, Your Honor.

THE COURT:  Defendant?

MR. KATON:  No, Your Honor.

THE COURT:  Okay.  The next one would be juror number 10.

Juror number 10.

THE CLERK:  He had several things, Judge.

THE COURT:  Yeah, he did.

(Juror #10 present at sidebar)

THE COURT:  How you doing?

My knees are not too good getting up and down.  You wouldn't understand that.

JUROR #10:  I do.  I do.  I had some knee issues, too.

THE COURT:  There used to be a saying, I wouldn't want to run into somebody like you in a dark alley because you'd beat the hell out of me.  You serious?

JUROR #10:  I might have a back issue, so I'm not as good as you think.

THE COURT:  You look like you're in good shape.  Let's see, you talked about I think you or a member of your immediate family having been arrested. Can you tell us what that's about?

JUROR #10:  Yeah, my brother-in-law.  He

was arrested.  He was in a car and got picked up by the cops, and there was some substance in the car, and no one wanted to own up to it, so they took him in, and he was arrested, and they asked for if he had any additional, like, case, like someone he knows that may be doing something illegal, and he didn't, so they kept him.

THE COURT:  In other words, they were trying to get him to make the case against somebody else.

JUROR #10:  Right.

THE COURT:  Was that the feds or state?

JUROR #10:  State, Stamford.

THE COURT:  So they do that in Connecticut, like they do in the feds?

JUROR #10:  Yes.  And I had to bail him out.

THE COURT:  Okay.  Let me ask you this: He may be your brother on some level, but I mean, do you think he was mistreated, handled inappropriately, or do you have a clue?

JUROR #10:  Because I know him, he definitely didn't have anything that he could, you know --

THE COURT:  He couldn't make a case

against somebody else?

JUROR #10:  No, he didn't.  He just -- he didn't know the friends as well, either.  He just happened to be walking and his friends said I'll pick you up and drive you around the street.

THE COURT:  Let me ask you this:  Did he end up going to jail because of that, or being convicted?

JUROR #10:  Yeah, he was convicted.

THE COURT:  At a trial?

JUROR #10:  For probation, he just got probation.

THE COURT:  But he had a trial or pled guilty?

JUROR #10:  He pled guilty, got probation.

THE COURT:  Let me ask you this:  The fact that he pled guilty and he went through what he went through and got probation, do you think the case was handled appropriately?

JUROR #10:  In terms of the court, I don't think he was handled inappropriately, it was handled inappropriately, but I think with the law enforcement I think it was handled inappropriately.

THE COURT:  Let me ask you this:  Because

170

the Defendant in this case is a law enforcement
officer.

JUROR #10:  That's why I brought it up,
because of that.

THE COURT:  Do you think that would
affect your ability to be fair to the Defendant?

JUROR #10:  I have to be honest, it may,
because it was a very traumatic time.  Because I had
to put up the money for his bail, also.

THE COURT:  Did you ever get it back?

JUROR #10:  No.  No, I didn't.

THE COURT:  Okay.

JUROR #10:  I had to put it on a credit
card.

THE COURT:  I understand.  Well listen, I
appreciate your candor.  There may have been something
else I asked you about, about the time we were going
to be here.  It's important what we're doing here.

JUROR #10:  Yes.

THE COURT:  If it was your day or your
cousin's day, you'd want --

JUROR #10:  Quite honestly, I would love
to serve, to be honest, but you asked me to be as
candid as I can, and I don't want to be -- I want to
do justice, and I want my conscience to be clear.

THE COURT:  I appreciate it.

JUROR #10:  To know that I am pure in terms of what my issues are going to be.

THE COURT:  I appreciate it.  Thank you. You have a seat.

JUROR #10:  There was one thing about my childcare issues, too.

THE COURT:  What?

JUROR #10:  Childcare.

THE COURT:  That's why I asked you about during the time period, if you were selected you could make arrangement if you had to.

JUROR #10:  I honestly took time off this week because I am on vacation because of that, because of childcare issues I had.  My backup for childcare is on vacation, so I had to fill in now.  I mean if it were worst come to worst I would.  It would be very difficult at the short notice.  If I had a couple days --

THE COURT:  If you had to do --

JUROR #10:  I would try.

THE COURT:  Okay.  Well, thank you very much.  We appreciate it.

(Juror # 10 excused from sidebar)

THE COURT:  Challenge for cause?

MR. PINHEIRO:  No, Your Honor.

MR. KATON:  Yes, Your Honor.

THE COURT:  He said he would tend to favor, be against the cop.

MR. KATON:  Used the words "very traumatic experience."

THE COURT:  That's exactly what he said. He wanted to tell me about his childcare issue, but he had me before it when he said I'd tend to be against the cop, so I'll sustain that challenge.

Is that the first one I sustained?

THE CLERK:  Second.  8 and 10 are struck.

THE COURT:  The next one would be juror number 13?

THE CLERK:  11.

THE COURT:  11, the lawyer, right.

Juror number 11.

THE CLERK:  Unpaid he worked for the police commissioner.

THE COURT:  Yeah, yeah.

(Juror #11, present at sidebar)

THE COURT:  How you doing, counselor?

JUROR #11:  Good.

THE COURT:  I think you've answered this, but this unpaid work commission, whatever it was you

said, it wouldn't affect --

JUROR #11:  Correct.

THE COURT:  Let me ask you, because we all know you know what we're trying to do.

JUROR #11:  Um-hmm.

THE COURT:  The process.

JUROR #11:  Yes.

THE COURT:  I don't know to what degree you believe this, but I believe it to be true, no matter whether you or any other lawyers in the case, this is what makes us, I want to say better, I don't mean to better, but different, because we do have the rule of law, critical, in these disputes, particularly the nature of this type.  It's an important case.  To the parties for sure.  We need to get a good jury.

And I'm going to ask this in a way that might be a little inarticulate, you notice I'm pretty inarticulate this morning, today, but knowing what you know about the system, how it's supposed to work, and we were picking a jury that would sit in a case in which you were either a plaintiff or a defendant, you know these facts, you being the defendant or the plaintiff, or if it was your wife, jury working on the case, if we had someone who had all of your life experiences, education, background, it was you, in

174

fact, would a person with the proclivities you have, if you have any, would be the kind of person that you would want on your jury or your wife's jury or somebody you love?

JUROR #11:  Yes, yes, of course, yes.

THE COURT:  If they could ask you, you've thought about it, they saw you reflecting, you could be fair to both sides?

JUROR #11:  I think I could, yes.

THE COURT:  You would base your decision strictly on the evidence that came out.

JUROR #11:  Um-hmm.

THE COURT:  Testimony of witnesses, the documents I admit, and the law as I give it you to you?

JUROR #11:  Um-hmm.

THE COURT:  I mean, I know you know about the law, you've been to law school, but in this case you would decide it based on the law I gave to you, as I give it to you?

JUROR #11:  Yes.

THE COURT:  Okay.  Now, the other thing, one of the lawyers asked one of our previous colleagues was, I got to assume you're a pretty busy fellow.  If you get selected to serve, you going to be

able to a take care of your business and make arrangements so you could give the case the kind of attention we'd want a jury in your case, your wife's case, to give it to make sure the case was decided on the evidence?

JUROR #11:  I don't understand that.  If I'm on the jury, I got to be here, so --

THE COURT:  I'm saying that you have work that you might have on your mind so you wouldn't give us your full attention or you be able to give attention to it.

JUROR #11:  No.  If I'm here, of course it's got my attention.

THE COURT:  Pretty articulate.  Thank you for your candor.

MR. PINHEIRO:  If I may, Your Honor.

THE COURT:  You may.

MR. PINHEIRO:  You were on the police commission, right?

JUROR #11:  Yes.

MR. PINHEIRO:  How many years

JUROR #11:  Two.

MR. PINHEIRO:  Any time that you have to decide issues of police misconduct?

JUROR #11:  Yes.

MR. PINHEIRO:  You could be fair to both sides?

JUROR #11:  I think I could be, yes.

MR. PINHEIRO:  Did you do any criminal work at any time in your career?

JUROR #11:  I don't.  Lawyers in my firm do, but I don't.

MR. PINHEIRO:  Never been to the GA or anything like that, doing criminal work?

JUROR #11:  Not criminal work.  Been to the GA, but not criminal.

MR. PINHEIRO:  You never were a police officer yourself?

JUROR #11:  No.

MR. PINHEIRO:  Now, I don't know anything about your particular cases when you were a police commissioner, I suppose there were times you found in favor and not in favor of the police officer, it varied of course.  Do you have any possible internal bias one way or the other for a police officer, give him the benefit of the doubt or any swaying one way or the other, you could be fair to both sides?

JUROR #11:  I understand that, and, you know, one of the reasons I brought it up was I thought both sides would want to know about it.  I mean I

believe I could sit there and be impartial.  Having said that, I mean I was affiliated with a law organization, so that's just a fact.  I'll leave it to you guys to decide how much of an impact you think that has on my life experiences, but, you know, I think I could be impartial.

MR. PINHEIRO:  Thank you.

THE COURT:  Question?

MR. KATON:  No questions, Your Honor.

THE COURT:  Thank you very much.  Have a seat.

(Juror #11 excused from sidebar)

THE COURT:  Challenge?

MR. PINHEIRO:  No challenge.

MR. KATON:  No challenge.

THE COURT:  Next we got -- this would be -- that's number 13.  This is the lady that lost her son.  She's also got somewhere else to be.  She's got a number of issues.  Matter of fact, drugs; also being witness to a crime, I think.

Juror number 13.

(Juror #13 present at sidebar)

THE COURT:  First of all, let me say this to you.  It's going to be real easy here, okay?  So be as relaxed as you can be.

JUROR #13:  Okay.

THE COURT:  Just a couple little things I need to ask you.

JUROR #13:  Okay.

THE COURT:  I don't need more detail than I need.

JUROR #13:  Okay.

THE COURT:  But I think you said you lost a son?

JUROR #13:  Yes.

THE COURT:  And could you just tell us just briefly, quickly, just was it an accident?

JUROR #13:  A driver.  He was walking and the driver hit him.

THE COURT:  And you also raised your hand I think in connection with drugs, correct?

JUROR #13:  My sister.  She abuses prescription drugs.

THE COURT:  She still does that?

JUROR #13:  Yes.

THE COURT:  And let me ask you this: There's at least some mention in this case about drugs.  I'm not sure exactly how it'll come in, but regardless of how it comes in, with your experience with your sister, would that in any way, small, large,

affect your ability to be fair and impartial to both sides?

JUROR #13:  Well, in fairness, I have a thing about that.  I don't smoke, I don't drink, I kind of -- yeah, I have a thing against people who --

THE COURT:  But you see, the issue here would be -- I don't know how it's going to be -- the facts about the arrest of the plaintiff by the defendant --

THE WITNESS:  Right.

THE COURT:  -- on the charge of murder.

JUROR #13:  Right.

THE COURT:  How that's going to play or not, but the question would be -- and there's no right or wrong answer, just what you can tell us, if it's in your head especially.

JUROR #13:  I do not like people who do drugs.  No, I would probably be -- I don't have any sympathy for people -- if I find that they do drugs, I have a thing about it.

THE COURT:  And if there was an allegation somebody did but that wasn't central to your decision about whether there was a reason to arrest the Plaintiff, you would not be able to block that out, is what you're saying?

JUROR #13:  I guess I'm old and crotchety, but as soon as I heard it, I have to be honest with what I thought, I thought it was kind of, you know, absurd.  That's my thought.

THE COURT:  The suit was absurd?

JUROR #13:  I thought it was absurd, you know, because I think that law enforcement -- I'm not saying that they're always right, but if you're going to get sued every time you do something, how are you suppose to -- my personal opinion, I think the world is going to hell in a hand basket.  So to me, if you don't respect the system, then -- but I'm old and getting old and crotchety.  I'm older than I look.

THE COURT:  I was about to say, you must be a lot older than you look.

JUROR #13:  I'm 58 years old.  I'm older than I look, and I'm getting older, and I want it the way it was, and it's not.

THE COURT:  That ain't gonna happen.

JUROR #13:  No, it ain't gonna happen.

THE COURT:  And dependent on, you know, what color, what sex, what bunches of things were back in the good old days.

JUROR #13:  In the good old days.

THE COURT:  But with --

JUROR #13:  And when Ronnie Reagan was President.

THE COURT:  I'm not supposed to go there so I won't.

JUROR #13:  Okay.

THE COURT:  Well, thank you for your candor.

JUROR #13:  Thank you.

(Juror #13 excused from sidebar)

THE COURT:  This is off the record.

(Off record discussion)

MR. PINHEIRO:  Absolutely challenge for cause.

MR. KATON:  We're not going to fight that.

THE COURT:  I was going to say, if anybody here -- she's out.

Number 15.  We got somebody that wants to be somewhere else, I think.

Juror number 15.

Juror #15 present at sidebar)

THE COURT:  How are you?

JUROR #15:  Good.  How are you?

THE COURT:  I think you realize how important it is what we're trying to do here.

JUROR #15:  Absolutely.

THE COURT:  It's terribly important not just to the plaintiff and the defendant, but to the system.  This is how we, you know, resolve these issues.

JUROR #15:  Right.

THE COURT:  Heaven forbid, but some day you or somebody you love may be sitting in one of those two chairs as a plaintiff or a defendant.  And what we're trying to do, as I said earlier, is to get a broad cross-section from our community, not just people who don't have anything better to do.

JUROR #15:  Right.

THE COURT:  And I did also say, and I really believe this more than I can express in words, this country really doesn't ask a lot out of us.  On rare occasion it asks us to have jury duty.  And like I said, it's not convenient, there may be some other people who count on you.  With that being said, what's going on in your life over the next couple of weeks or so that we ought to possibly consider excusing you?

JUROR #15:  I just want to -- I work as a behavior therapist and I work with children in the autism spectrum who have severe behavioral issues, and I've been working with these individual clients for

months and months now, and have yet to take any sort of vacation or leave of absence because my role with them is to vastly important, and any absence from their therapy session could result in huge regression. I literally have the bruises to prove that I work there.

THE COURT:  You're representing to me, Judge, if I'm out of here for a week, seven, eight days, it could really affect their lives.

JUROR #15:  Absolutely.

THE COURT:  Okay.  Well, thank you.  Have a seat.

JUROR #15:  Thank you so much.

(Juror #15 excused from sidebar)

THE COURT:  Challenge?

MR. PINHEIRO:  I think it speaks for itself, Your Honor.

MR. KATON:  I think she's got to go.

THE COURT:  She's got to go.  She's out.

That's 15, right?

THE CLERK:  That was 15, yes.

THE COURT:  The next one is 17, got somewhere else to be, got an immediate family member or him being arrested, her being arrested, and witness to a crime.

184

Juror number 17.

(Juror #17 present at sidebar)

THE COURT:  How you doing?

JUROR #17:  Good afternoon.

THE COURT:  You know some people look taller or shorter when they're seated, but you end up being taller than I thought you were.

JUROR #17:  Really?  Okay.  Being five-nine I have never been accused of being tall.

THE COURT:  I used to be five-nine until I got to be five-seven-and-three-quarters and gravity and everything with age.

All right.  You indicated I think that you had -- you or somebody in your immediate family had been arrested or charged with a crime or been the victim of a crime.  Could you tell us --

JUROR #17:  Yeah, victim of a crime.  I got mugged, or jumped, outside of a bar, a kid.

THE COURT:  Where?

JUROR #17:  Long Island, where I grew up.  It was about -- I was a senior in college, so 22.  And I got hit over the head with a golf club.  Could show you the scar.  Right there.  Started running, ran and hid behind a building, and coincidentally the police were right around the corner.

185

THE COURT:  Get the guy?

JUROR #17:  They did.

THE COURT:  That's good.  So let me ask you, would that affect your ability to be fair and impartial in this case?

JUROR #17:  No, I could be fair, but I will tell you I was happy they got the guy.

THE COURT:  Well, I was happy for you when you told me that.  So that wouldn't affect your ability.

Now, the other thing, I think you indicated that you had --

JUROR #17:  I'm supposed to be out of town for work.  I was the person who was going to be out of town, scheduled to be out of town.

THE COURT:  Let's talk about that.  Because I have to believe that you realize how important it is what we're trying to do here.

JUROR #17:  Absolutely.

THE COURT:  We're trying to pick the kind of jury you'd want if it was you or somebody you love's day in court, if they were the plaintiff or defendant.  And I have said from -- as I believe I mentioned, I've had people you should have heard some of stories we've already heard today, the lawyers have

already heard, it's going to be terribly inconvenient on anybody that serves, on the one hand.  On the other hand, it's going to cost most everybody some money.  But on the other hand, it's one of very few things we're ever asked to do for our country.  And I will tell you, and I look you in the eye and tell you if you're lucky enough to serve, it'll be one of the greatest experiences of your life, regardless of who comes out ahead on this.  And I wouldn't kid you when I said those eight people having got through this have a real bond, and it would be like, wow.

JUROR #17:  Sure.

THE COURT:  Having said all that, what's going on in your life that I ought to consider excusing you for this period of time?

JUROR #17:  For your consideration, I was going to be out of town for a conference for my job, so I was going to be down in Philadelphia for a student housing conference.  I work for a fund where we raise money from investors and we invest it.

THE COURT:  Sorry?

JUROR #17:  The company I work for, we have a half a billion dollar fund and we invest it in real estate across the U.S., and one of the areas we have invested in is student housing.  I have bought

three student housing projects.  They said Henry, we need you to go down and do this conference in Philadelphia.  That's Wednesday and Thursday of this week.

THE COURT:  If you go back tonight or call them today and say guess what, I was selected to serve as a juror --

JUROR #17:  They're not going to fire me.

THE COURT:  It's against the law to fire you, you'd have a legal case, but I suspect they'd probably have to get somebody else, or if there was nobody else they'd just have to miss out on this conference.

JUROR #17:  I'm sure they'd try and -- you know, it would cost me about 500 bucks.

THE COURT:  Here's the question, and this is -- there's no right or wrong answer.  You're only one that can tell us.

JUROR #17:  Right.

THE COURT:  Is that if you are selected, and they cancel or they have to send somebody else in your place -- and I love Philadelphia, by the way -- but could you give this case the attention that you'd want if it was your day.

JUROR #17:  I could absolutely give it

the attention it deserves, and I understand, I don't cure cancer for a living, but it is my job and I do take my work seriously.

THE COURT:  And I appreciate your candor. Thank you very much.

JUROR #17:  Thank you.

(Juror #17 excused from sidebar)

THE COURT:  You know what, of all the schmucks in the world, they got a lot of good people.

Mr. Pinheiro?

MR. PINHEIRO:  No cause.

MR. KATON:  No cause.

THE COURT:  All right.

I don't mind telling you, in fact I'm going to say this, these are some great folks you got out of this panel.  I don't know, I only say that because I get to choose various -- pick juries in a lot of places and I've picked a lot of jurors, but there's a common thread going through here today, it seems like.

Okay.  So he was number what?

THE CLERK:  That was number 17.  We want 18.

THE COURT:  Okay, number 18.

Juror number 18.

Yes, a drug issue.  That's the daughter.

THE CLERK:  Oldest daughter.

(Juror #18 present at sidebar)

THE COURT:  Hello.  How you doing?

JUROR #18:  I'm good.  How are you?

THE COURT:  I'm doing well.

You told us your son --

JUROR #18:  My oldest daughter.

THE COURT:  Daughter.

JUROR #18:  Yes.

THE COURT:  -- had some, I think you said addiction issues?

JUROR #18:  Yes.

THE COURT:  And what kind of drug issues does she have?

JUROR #18:  Heroin addiction.

THE COURT:  I'm sorry.

JUROR #18:  Heroin.  So I mean for ten years now she's been in and out of the court system.  She's been arrested, she's been to jail, I've been in and out of these places dealing with lawyers and public defenders, and enough to make you twitch.

THE COURT:  How's she doing right now?

JUROR #18:  She's clean, which is thank God.  She had court ordered rehab, which I wish had

gone on a little longer, but it was enough to at least take the edge off, and now she's re-enrolled back in college.

THE COURT:  How old is she?

JUROR #18:  She's 25.  So when she was not on drugs she was a dean's list student.  Anyway, so hopefully she's going to be back in school looking for a place to live, at New Haven, of all places.

THE COURT:  Well, good luck to her.  Let me ask you this:  You realize how important it is, what we're trying to do here?

JUROR #18:  Of course.

THE COURT:  It's very important to both the plaintiff and defendant.  We want to get a jury that doesn't have any preconceived notions of how things are and how they should be.  And the reason that's important in your case, because of your situation of your daughter, there's going to be some evidence, testimony about drugs, and drug related -- I'm not sure exactly how it's going to be, I don't know the facts.  But the question I have, it's very important to both the plaintiff and the defendant and these lawyers and to me, are you going to be able to listen to the evidence, from the witness stand, review the documents that I let into evidence, and decide the

case on the law as I give it to you, strictly on that evidence, or would any mention of drugs so impair your ability to use your judgment that you might not be a good person to have on this jury?

JUROR #18:  To be totally honest, I've seen my daughter lie through her teeth when she was on drugs.  So to answer your question, my judgment would be clouded because I have learned to be suspicious of everything that I've heard, if drugs were an issue I'm going to be completely suspicious of everything that I hear, whether the facts are there or not, because I've looked my daughter straight in the eye and she's looked me straight in the eye, swore up and down, and then I found out later that, you know, she's lying through her teeth.  So drugs, if it were anything other than drugs, I'd be like sure, I could sit, I could listen.

THE COURT:  I appreciate it, and I know these lawyers, if they could speak, appreciated your candor, so thank you so much.  You have a seat.

JUROR #18:  Certainly.  Thank you.

(Juror #18 excused from sidebar)

MR. PINHEIRO:  No challenge.

MR. KATON:  No challenge.

THE COURT:  Tell me how the drugs doesn't

interplay here.

MR. PINHEIRO:  Could go both ways, Your Honor.

MR. KATON:  Two witnesses who gave statements have a substantial connection to drug use, and drug sales.

THE COURT:  Well, I'm just trying to figure, with everything the Plaintiff's counsel knows and everything the defense counsel know about the facts, what I know about it, because I don't believe, correct me if I'm wrong -- because I've had this case long enough and looked at enough issues and I may not remember, but the reason it gets to be an issue is because one of the lawyers, whether the Plaintiff or Defendant, asked me to ask the question, that's how it got in there, so that's what I know about it.  Maybe I should know more.  But with all that you both know, neither one of you challenges, and you heard what the witness said.  That right, Plaintiff?

MR. PINHEIRO:  Yes, sir.

THE COURT:  That's right, Defendant?  I'm just asking you --

MR. KATON:  Your Honor, my understanding was that he was conceding that she was so biased that she should be excused.

MR. PINHEIRO:  No, I didn't make the challenge for cause.

MR. KATON:  That was my understanding. Then I would challenge for cause.  I'm sorry.

THE COURT:  I would grant that not knowing more than I know.

MR. PINHEIRO:  I didn't make a challenge.

THE COURT:  Got to grant that.  However, it cuts both ways.  It won't be based on the evidence, it would be based on her poor life experience.  So the challenge is granted.

That was number 18, right?

THE CLERK:  Yes.

THE COURT:  I thought that's what I said, too.  I understood.

Juror number 19.  A person who's been treated illegally on account of law enforcement bringing a case, an encounter with law enforcement.

(Juror #19, present at sidebar)

THE COURT:  How you doing, sir?

JUROR #18:  Well, sir.  How are you?

THE COURT:  Well, I'm doing pretty well.

Let me ask you this:  Tell me, did I get this right, that you have a problem with the concept that a person who feels he or she has been treated

illegally that he or she has had with law enforcement, as the Plaintiff in this case has alleged, has a right to file a civil suit such as Plaintiff, have you got a problem with that?

JUROR #18:  No.  The question I meant to answer I have a problem with, or the one that I should have raised my hand to was the one that I have a strong disbelief in law enforcement, mainly because my brother has had things stolen from him at a house where police officers stole money from -- literally stole money from his wallet.

Second of all, two of my friends have been brutalized by police, and the police were the scapegoat of the whole thing and were off scot-free.

THE COURT:  So I understand you, you're saying --

JUROR #18:  I have a problem --

THE COURT:  You'd have a hard time listening to the law enforcement officer?

JUROR #18:  And believing, yes.  Meaning I'll be sympathetic toward the Plaintiff in this case.

THE COURT:  So if you were the Defendant in this case, say, and were trying to pick your jury, and we had somebody who just felt the way you felt about everything and your life experiences, you

wouldn't want that person on your jury if you were the Defendant?

JUROR #18:  Right.

THE COURT:  Thank you very much.

(Juror #18 excused from sidebar)

THE COURT:  It's one of two things:  He either, you know, a little bit of knowledge is a dangerous thing, he knows enough about what to say to get out if he wants to get out, which shame on him, he shouldn't be on the jury, or, he's telling the truth and shouldn't be on the jury.  So that's the way I see it.  He's not going to believe anything the cops say.

MR. PINHEIRO:  You know what I would say, Your Honor.  Of course he can't be on the jury.

MR. KATON:  Agreed.

THE COURT:  All right.  But I got that lingering suspicion in the back of my mind that he knew just what to say.  That was 19, right?

THE CLERK:  Yes.

THE COURT:  20 we got a bunch of issues.

Juror number 20.

(Juror #20 present at sidebar)

THE COURT:  How you doing?

Let me ask you, did I get this right, that you got a problem -- you said you had a problem

with the concept of a person who feels he or she is being mistreated in an encounter with law enforcement officers such as Plaintiff has alleged in this case?

JUROR #20:  I have a friend of mine, a detective in the New Haven Police Department, and I know a lot of police officers in New Haven, so I hear stories about things that happen, you know, like police brutality, but, you know, a lot of times people don't get arrested unless they did something wrong.

THE COURT:  So you think that because someone's arrested they probably did something wrong.

JUROR #20:  Possibly, yes.

THE COURT:  Well, I just asked you.  And I think -- go ahead.

JUROR #20:  If it were me, you got to have probable cause to arrest somebody.  You can't arrest for no reason.

THE COURT:  That's kind of part of the issue that the jury is going to have to maybe figure out along the way.  But you said you and a member of your immediate family was employed as law enforcement?

JUROR #20:  My brother's a correctional officer for the State of Connecticut.

THE COURT:  That's right.  And then I think you said that you had -- did you say you heard

or read anything about this case?

JUROR #20:  No.

THE COURT:  You also had someone in your life that's been affected, you or someone in your life, by the consumption of drugs?

JUROR #20:  Yes.  My cousin's big time into drugs, messed up his life really badly.  But we kind of lost contact.  It's somebody that I grew up with, looked up to like an older brother to me.

THE COURT:  And you answered yes to the question about do you know any reason that you couldn't sit on a case and render a fair, just and impartial verdict.

JUROR #20:  Just because I know a lot of people in New Haven, you know, in the police department.

THE COURT:  And you'd favor the police, is what you're telling me?

JUROR #20:  I don't favor police, but I might have a bias, you know, perception.

THE COURT:  So you think you could not sit on this case and listen to the evidence, through the testimony of witnesses on the stand and the documents that I'm allowing in, to decide the case strictly on that and the law as I give it to you?

JUROR #20:  Possibly.

THE COURT:  Possibly you couldn't?

JUROR #20:  I couldn't, yes.

THE COURT:  Okay, thank you very much. Have a seat.

(Juror #20 excused from sidebar)

MR. PINHEIRO:  Why do I got to go first?

THE COURT:  That's the way they set it up in England, I guess.  I don't know.

Let me say this.  He doesn't want to be here.  I think he's -- I could say it dovetails with what came up after I made the grand statement about what a great bunch of people we got here.  He knows what to say, and he doesn't want to be here, or he really believes that he shouldn't be here.  So I think he should be struck, unless somebody wants to give me a reason why he shouldn't.  Plaintiff, you want to tell me?

MR. PINHEIRO:  I can't think of any, Your Honor.  It goes both ways.

MR. KATON:  No, Your Honor.

THE COURT:  All right.  He was number 20?

THE CLERK:  Yes.

THE COURT:  All right.  Next one would be number 22.  Had an accident, is that right?  That's

what I got written down here.

THE CLERK:  22 was the one who's difficult to understand.

THE COURT:  Right.

Juror number 22.

(Juror #22 present at sidebar)

THE CLERK:  She did have some kind of an accident.

THE COURT:  Hello.  I'm very sorry my hearing is so bad.  Your voice is very slight, at least for my ears.  But you started to tell me about having been in some litigation because of an accident, is that true?

JUROR #22:  Yes.

THE COURT:  Tell us, when was it?

JUROR #22:  2005.

THE COURT:  2005?

JUROR #22:  Yes, in Ridgefield.  My daughter from the daycare I was picking up, the car went by, just bumped me.

THE COURT:  Ran into the back?

JUROR #22:  Yes.

THE COURT:  And did you hire a lawyer after that?

JUROR #22:  Yeah, because I hit hard.

THE COURT: Did you go to court?

JUROR #22: No. We just settle before going to court.

THE COURT: Was the case settled to your satisfaction?

JUROR #22: Yeah, it's okay, yeah.

THE COURT: Did your experience through that accident and the lawsuit that was filed on your behalf and the settlement, did that make you in any way feel bad about the court system?

JUROR #22: No.

THE COURT: Would it in any way affect your ability to be fair and impartial in this case if you were selected to serve as a juror? Could you be a fair juror in this case, or would that accident affect your ability to be fair?

JUROR #22: Could be fair.

THE COURT: You could be fair?

JUROR #22: Yes.

THE COURT: And let me ask you this: It seems very much -- except for me being hard to hear I can understand you completely. You understand everything I've said, in asking my questions of you?

JUROR #22: I understand most, but I don't know the higher level, maybe, it's hard.

THE COURT:  But let me ask you this:  If you heard the testimony of witnesses about what happened --

JUROR #22:  This case?

THE COURT:  In this case, when you hear them, they will be talking about events that occurred as they remembered them, okay?  The witnesses will be doing that.  Are you going to be able to understand, do you think?

JUROR #22:  If they speak fast it's hard, with accent.

THE COURT:  Let me ask you this:  If that happens, and if you're on the jury, if someone starts speaking a little too fast, and I ask you, if that happens, if you could just raise your hand and say Judge, and I'd ask them to repeat the answer, could you do that for me?

JUROR #22:  For a lot of the things I can't understand, that hard for me, to raise my hand.

THE COURT:  But if the first time that you can't understand --

JUROR #22:  Yeah, yeah, I would.

THE COURT:  Would you raise your hand, and I could get the witness to repeat slowly?

JUROR #22:  Yeah.

THE COURT: Would you do that for me? Would you raise your hand? That's the only way I'll know you didn't -- they were speaking too fast.

JUROR #22: Sure.

THE COURT: Okay. Well, I thank you very much for answering my question. You can have a seat.

(Juror #22 excused from sidebar)

THE COURT: Mr. Pinheiro?

MR. PINHEIRO: I think we need to challenge for cause, Your Honor.

THE COURT: Based on?

MR. PINHEIRO: Her ability to understand English. She said higher level. We're going to be talking about qualified immunity, probable cause. Those legal terms aren't going to come out.

THE COURT: She won't have any more difficulty with those concepts than any other layperson, I would think; and two, I perceived her inability to understand was that when people spoke fast, it's kind of like -- and I don't speak any other language, regrettably, but some people when they speak Spanish very slowly I can maybe get a little bit, but when they start talking fast, I can't. That's my perception. Did you have a different perception?

MR. PINHEIRO: She said at a higher level

it's hard to understand.  In this case I think we need somebody's ability to understand English should be a priority.  I mean she understands, but I don't think it's to the level that's necessary to be on this case.  I think it would be hard for both parties.

THE COURT:  What's your view, Mr. Katon?

MR. KATON:  I don't think the quantum of understanding is the grounds for dismissing a juror.  She can clearly communicate in English.  She may have a meek voice, but there's certainly nothing to suggest that she can't --

THE COURT:  But my view was that when -- if she does what I say, raise your hand, if you're speaking too fast, now that's the only issue, and she said she would do that.  It seems to me -- and I was struck that, you know, she understood what I was saying, and of course I'm only three feet away from her, but still -- I'm going to deny the challenge.

MR. PINHEIRO:  Okay.

THE COURT:  Okay.  The last one we have, I believe, is number 24.

Excuse me, I apologize.  Well, come on up 24.  We'll get to 23 in just a moment.

(Juror #24 present at sidebar)

THE COURT:  How you doing?

JUROR #24:  My only issue is that I have some health issues and I got a colonoscopy scheduled for tomorrow, so cleaning my system out for tomorrow, not knowing that --

THE COURT:  You know what, my friend?

JUROR #24:  -- this thing's going be going the next three days.

THE COURT:  You know what?  Having been there and done that, I understand.  You go have a seat.

JUROR #24:  Thank you.

(Juror #24 excused from sidebar)

THE COURT:  I can't believe anybody that's had the honor to go through one of those procedures would say Judge, that wasn't absolutely the right thing to do.  Everybody okay with that?

MR. PINHEIRO:  I had one a month ago.  It was no big deal.

THE COURT:  But you wouldn't want to go through the prep again after you started, huh?

MR. PINHEIRO:  I was working on a case, Your Honor.

THE COURT:  Is that right, everybody is okay with him being struck?

MR. KATON:  That is agreed, Your Honor.

THE COURT:  Juror number 23.

(Juror #23 present at sidebar)

THE COURT:  How you doing, sir?

JUROR #23:  How are you?

THE COURT:  Good.  Let me just say that I know you know, like I told the other three lawyers that were up here, you know the drill, you know how the system works and is supposed to work, and I really do believe how it should work, but it's very important that we get a broad section of the community.

JUROR #23:  Sure.

THE COURT:  Not just people with nothing better to do, and people that don't come in with any preconceived notions.

JUROR #23:  Sure.

THE COURT:  Now, let's put it this way. If we were picking your jury, you were either the plaintiff or the defendant, doesn't matter which, your wife's jury, somebody loved's jury --

JUROR #23:  Sure.

THE COURT:  -- and we were trying to get somebody that could judge the merits of the case, whether it's the exact facts in this case or any other case you can conceive of, somebody you love, you or somebody you love, and that person had exactly the

same life experience, educational experience, and knowledge of how the system's supposed to work, the person was a carbon copy of you, all those representations, including your proclivities, if you have any, would that kind of person be the kind of person you'd want on your jury or your wife's jury or somebody who you loved's jury?

JUROR #23:  Sure.

THE COURT:  And you could put aside whatever ideas you got from your legal experience or law school experience and decide the case on the law that I give to you that applies to this case, whether you agree with it or not?

JUROR #23:  Yes.

THE COURT:  And one of the other lawyers was asked by one of the lawyers here, I got to assume you're a busy guy, and it's going to be inconvenient for you to shuffle stuff, but if you're selected to serve, would you be able to shuffle it around so that you could get that out of your mind and give this case while you were in this courtroom listening to the evidence the kind of attention you'd want a jury to give your case or your wife's case?

JUROR #23:  On Thursday afternoon I can change plans.  I was supposed to drop my wife off at

the airport.  But other than that, I own the company, so I can shuffle things around.

THE COURT:  Even if you had to get a car service, you could take care of it?

JUROR #23:  I could take care of it.

THE COURT:  So you could give the case the attention it deserves?

JUROR #23:  Yes.

THE COURT:  Do you have any questions?

MR. PINHEIRO:  If I may, Your Honor?

THE COURT:  You may.

MR. PINHEIRO:  I take it you've never had the pleasure of doing any criminal work?

JUROR #23:  No.

MR. PINHEIRO:  Or prosecuting?

JUROR #23:  Corporate only.

MR. PINHEIRO:  No civil?

JUROR #23:  Only corporate law.

MR. PINHEIRO:  You heard the preliminary issues by His Honor?

JUROR #23:  Yes.

MR. PINHEIRO:  Is there anything in your thinking why you maybe have a bias towards the Defendant or Plaintiff in this case, I mean in any way, shape or form whatsoever?

JUROR #23:  Not that I could think of.

MR. PINHEIRO:  Nothing further.

THE COURT:  Mr. Katon?

MR. KATON:  No questions, Your Honor.

THE COURT:  Thank you very much.  Have a seat.

(Juror #23 excused from sidebar)

THE COURT:  Challenge?

MR. PINHEIRO:  No challenge.

MR. KATON:  No challenge.

THE COURT:  Okay.

Now, how many have we struck for cause?

THE CLERK:  Eight.

THE COURT:  Eight.  So we had 24, that leaves 16.  If you each use your allotted three, and double strike counts, if you both strike juror number 3, you don't get another one.  So in other words, worst case scenario, we're going to have ten people to get eight from, so we have plenty of people.

And so what we're going to do now, remember who's been struck, think about it.  You don't -- I mean the point I was making earlier, you don't need to go all the way to the back end because the back end's not likely to get taken care of, but anyhow, we'll see how that works out.

So I'm going to ask Ken, would you give the lawyers their strike sheets?  What I'm going to ask you to do --

THE CLERK:  Do the single sheet where they go back and forth?

THE COURT:  No, they each get one.

THE CLERK:  I'll make a copy.

THE COURT:  How soon can you get the copy to us?

THE CLERK:  In about a minute.

THE COURT:  That's quick enough.

I don't know how the trial's going to go, but you guys are pretty much fun.

MR. KATON:  Thanks.

MR. PINHEIRO:  We'll see what you say about ten days from now?

THE COURT:  You know, I don't mean to make light of it, I know how important this case is to both of you, but two things, the process is the most important thing, at least from my perspective, and I hope for you-all too, in our search for the truth, but this is just our day job, guys, so you don't need to blow a gasket over it.  Just do the best you can, and hopefully we can -- the Judge doesn't screw it up too badly, or if he screws it up he didn't enough for the

210

Second Circuit to drive a Mack through it, which when I screw up, that's usually how I do it.

I'll let you relocate. I'll ask him to write the name down and juror number, so there's no question, on the line, and he may have one for both sides, Plaintiff uses the left, three lines on the left, you guys take the right. Okay? And then we might write on the top Plaintiff on your side and Defendant on your side.

MR. PINHEIRO: Write down the list from the top to the bottom.

THE COURT: Just the names you know from who you strike who's still alive.

MR. PINHEIRO: We could do it at counsel table with our clients?

THE COURT: Yeah, yeah.

MR. PINHEIRO: Just making sure.

THE COURT: Here he is.

THE CLERK: They might have their number, not the actual name.

THE COURT: But all have the names on your list, or not?

MR. KATON: We do on the sheets, actually.

(Conference at sidebar concluded)

THE COURT: All right, ladies and gentlemen -- the lawyers -- listen up, because I didn't tell you this. I didn't tell you this. The lawyers are making the final selection of the jury that'll hear this case. That process will be finished in about five minutes. I'm going to give them five minutes from now, starting right now, and then we'll announce who the jury is, and those of you who have not been selected will be dismissed and will be free to go. So keep enjoying your company of each other and talk about anything you want to except the case.

(Off record)

THE COURT: I'd like to see the attorneys for the parties over here at sidebar.

(Conference held at sidebar)

THE COURT: We're just putting the list together. What I'm going to do now is go ahead and read the names of the jury that's been selected, and then you guys -- we'll read the names of the jurors that's been selected to you guys, and then I'm going to announce it to them and excuse the other folks, and then we'll go into your opening. Now, how long do you need for an opening, counselor?

MR. PINHEIRO: Ten minutes.

THE COURT: How about you?

212

MR. KATON:  15, more or less the same.

THE COURT:  You got up to 15, then, right?  Everybody, you want warning before?

MR. PINHEIRO:  I'm all right, Your Honor. Mine's ten.

MR. KATON:  I wouldn't mind a warning.

THE COURT:  How many minutes before.

MR. KATON:  Three.

MR. PINHEIRO:  If I go long, give me three minutes.

THE COURT:  So if you're still going at 12.  Okay.  I'll make sure I tell Ken.

So you ready to announce the jury?  Okay, gentlemen, the first juror is juror number 2, juror number 3, juror number 6, juror number 9, juror number 11, juror number 12, juror number 14, and juror number 16.

Plaintiff, you understand who the jury is that's been selected?

MR. PINHEIRO:  Yes, I do.

THE COURT:  Defendant understand?

MR. KATON:  Yes, Your Honor.

THE COURT:  Are there any objections to the jury as constituted from the Plaintiff?

MR. PINHEIRO:  If I may make an

objection, Your Honor.  The time limitation we had in conferring with our clients for selecting the jury to five minutes I think was short.  That's all.

THE COURT:  Well, do you object to the jury now that's been selected?  That was another objection.  You asked for more time after I said five minutes and I said no.

MR. PINHEIRO:  Okay, no, I just --

THE COURT:  But there's no problem with the jury that has been selected, that's the question.

MR. PINHEIRO:  No.

THE COURT:  All right.  What about Mr. Katon?

MR. KATON:  No, Your Honor.

THE COURT:  Okay.

MR. PINHEIRO:  Your Honor, will the two alternates be selected at the end, or are they the last two?

THE COURT:  No, all we need is six to decide, by agreement you can go down to five, so I don't think we're going to have a problem.  Okay?

(End of conference at sidebar)

THE COURT:  All right, ladies and gentlemen.  At this time the clerk will go ahead and read names of those of you who have been selected to

serve as jurors in this case, after which I will excuse the rest of you.  And so with that, Ken, if you'd go ahead and read the names of the jurors.

THE CLERK:  Just the numbers, Your Honor.

THE COURT:  Excuse me, just the numbers.

THE CLERK:  The first juror is juror number 2, second juror is juror number 3, third juror is juror number 6, fourth juror is juror number 9, fifth juror is juror number 11, sixth juror is juror number 12, seventh juror is juror number 14, and the eighth juror is juror number 16.

THE COURT:  All right.  I'm going to -- first of all, I want to thank those of you who were not selected for your service here today.  I hope, as I said earlier, that you will not view your service as inconsequential.  Believe me, it's critical to our system of justice.  So I thank you very much.  And at this time you are free to go.

And Ken, let me ask you, are they through for the duration, or is there a time for them to come back?

THE CLERK:  They're done for today, and if they need to be called back the jury clerk will call them back.

THE COURT:  All right.  You may get

another notice, but you may be completely through. But thank you very much for the service you rendered for this case. All rise for those who'll be excusing themselves.

(Conference held at sidebar)

THE COURT: I don't think it makes a rat's, but there is a ruling in the district about not mentioning the jurors by name. You-all have their names, and that was at sidebar. But there will be an official transcript, possibly, of this case, and I think, unless anybody says Judge, I said it ought to be, I think we ought to delete the names and just put the juror number. That okay with you?

MR. PINHEIRO: Absolutely.

THE COURT: Okay with you?

MR. KATON: Absolutely.

THE COURT: That's all.

(End of conference at sidebar)

THE COURT: At this time I'd ask Ken, I'd like to seat the jury. I want to have four in the front row and four in the second.

THE CLERK: Okay, we'll do this real easy. Juror number 2, come sit here; juror number 3; juror number 6 next to that person in the third chair; juror number 9; first chair in the back -- I'm sorry,

216

you're fine.  Juror number 9, here; juror number 11, first chair in the back; juror number 12 next to him; and then 13 and 14 in that order.  Or 15 and 16, I'm sorry, in that order.  Thank you.

THE COURT:  Ken, if you would go ahead and administer the juror oath to the members of the jury.

THE CLERK:  Can I please have you all stand and raise your right hand.  It's a little be long, so be patient and respond "I will" or "I do" at the end.

(Jurors administered the oath)

THE COURT:  Please be seated.

Now, ladies and gentlemen, first, I want to congratulate you for being selected to serve on this jury, and I say that very sincerely, because what your selection means is that the lawyers for both sides, as well as the Court, believe that the eight of you can be fair and impartial jurors in this case, and by that I mean decide the case strictly from the testimony that comes out from the witnesses that will sit in this stand, or any documentary evidence that I allow into evidence, and that decision will be based on those facts and the law as I'll give it to you.

So I really do mean congratulations.  I

do mean thank you for the service you're rendering our country. And I reiterate what I said earlier today, that most people will say serving on a jury is one of the most satisfying things they've ever done. I truly believe that'll be your experience. I hope that that's borne out as time passes. And you will see a bonding that it's just amazing how it works. But it will be a good experience, I believe. I hope.

Now, I'm going to go ahead and give you some preliminary instructions what I will say is intended to give you an introduction to the case. This is not a substitute for the detailed instructions of law and evidence that I will give to you at the close of the case and before you retire to consider your verdict.

As I told you this morning, this is a civil case commenced by the Plaintiff, Gary Session, against the Defendant, Officer Edwin Rodriguez. Between July 1999 and January 2001 Defendant Rodriguez conducted a criminal investigation of Plaintiff concerning the murder of Anthony Lucky that occurred in New Haven on July 25th, 1999. On January 4th, 2001, Defendant Rodriguez applied for an arrest warrant for the arrest of the Plaintiff, and the warrant was granted by a Connecticut state court

judge. Plaintiff was later arrested on January the 8th, 2001.

Plaintiff alleges that the Defendant Rodriguez intentionally violated the constitution of the United States and the Constitution of the State of Connecticut by depriving him of his right to be free from false arrest and malicious prosecution. Defendant Rodriguez denies Plaintiff's allegations and maintains that at all times his actions were lawful under the circumstances of his ongoing criminal investigation. This is the factual dispute that you, the jury, are to resolve.

The trial will proceed in the following order: First, the Plaintiff's lawyer may make an opening statement. Next, the Defendant's lawyer may make an opening statement. What is said in the opening statements is not evidence. The statements simply serve the purpose of an introduction to the evidence which the party intends to produce, a kind of an outline to assist you to understand the testimony and documents that the lawyer says will be presented to you during the trial.

Second, after opening statements, the Plaintiff will be allowed to call witnesses and to present evidence.

Third, after the Plaintiff has presented his evidence, the Defendant will have an opportunity to present evidence.

Fourth, after the parties' main cases are completed, the Plaintiff may be permitted to present rebuttal evidence.

Fifth, at the conclusion of the evidence the lawyers for the parties will have the opportunity to present closing arguments in support of their cases. Just as what is said in the opening statements is not evidence, neither what is said in the closing arguments evidence. The arguments are designed to present to you the contentions of the parties as to what the evidence has shown and what inferences may be drawn from the evidence. The Plaintiff's lawyer has the right to open and to close the argument.

Six, I will then instruct you on the applicable law and will furnish each of you with a copy of those instructions. You will then retire to consider your verdict.

Your purpose as jurors is to find and to determine the facts. Under our system of civil procedure you are the sole judges of the facts. If at any time I should make any comment regarding the facts, you are at liberty to disregard it. It is

especially important that you perform your duty of determining the facts diligently and conscientiously.

On the other hand, and with equal emphasis, I instruct you that the law as given by the Court constitutes the only law for your guidance, and it is your duty to accept and to follow it.  It is your duty to follow the law as I give it to you even though you may disagree with it.

You are to determine the facts in the case solely from the evidence in the case, which consists of the testimony of witnesses and exhibits received in evidence.  Questions asked by the Plaintiff's lawyer and Defendant's lawyer are not evidence.  Evidence consists of the witnesses' answers to questions and documents allowed into evidence.  Statements and arguments are not evidence.

It is up to you to decide which inferences are to be drawn from the evidence and what facts are established by the evidence.  In so doing you're not to engage in guesswork or speculation.  Keep an open mind during the trial.  Do not decide any fact until you have heard all of the evidence, the closing arguments, and my instructions on the law.

Pay close attention to the testimony and evidence.  You cannot take notes during the trial.  On

the other hand, any exhibits introduced into evidence will be available to you during your deliberation.

Do not make any independent investigation of any fact or matter in this case. You're to be guided solely by what you see and hear in this courtroom. Do not learn anything about this case from any other source. You as jurors must decide the case based solely on the evidence presented here within the four corners of this courtroom.

This means that during the trial you must not conduct any independent research about the case, the matters in the case, the parties involved in the case. In other words, you should not consult dictionaries or reference materials, search the internet websites, blogs, or use any other electronic tools to obtain information about this case or to help you decide this case. Please do not try to find out information from any source outside the confines of this courtroom.

I know that many of you use cellphones, smartphones and other portable electronic devices, laptops and other computers, both portable and fixed, to access the internet and to communicate with others. You also must not use these tools to communicate electronically with anyone about the case during the

course of the trial.  This includes your family, and friends.  You may not communicate about the case during the course of the trial through cellphone, smartphone, e-mail, or any blogs or websites such as Facebook, Twitter, Google Plus, MySpace, Linked-In, or YouTube.

The lawyers may sometimes present an objection to some of the testimony or other evidence.  They have the right to object to evidence which they believe may not be properly offered, and you should not be prejudiced in any way against the party who makes an objection.  At times I may agree with the objection and direct that you disregard certain testimony or exhibits.  You must not consider any evidence or testimony which I have instructed you to disregard.  At other times I may over overrule the objection and allow the testimony or exhibit into evidence.

During the course of the trial I may ask a question of a witness.  If I do, that does not indicate I have any opinion about the facts of the case.  Nothing I say or do should lead you to believe that I have any opinion about the facts, nor should it be taken as indicating what your verdict should be.

During the trial it may be necessary for

me to confer with the Plaintiff's lawyer and the Defendant's lawyer from time to time out of your presence concerning questions of law or procedure. On occasion I may call the lawyers to sidebar and confer with them while you are in court.

On other occasions I may -- you may be excused from the courtroom as a convenience to you and to us as I discuss such matters with them. We will try to limit such interruptions as much as possible, but you should remember at all times the importance of the matter that you're here to determine and should be patient, even though the case may seem to be going slowly. You will be listening to the testimony of a number of witnesses. You will be the sole judge of the credibility or believability of each witness and the weight to be given to his or her testimony.

In considering the weight and value of the testimony of any witness, you may take into consideration the appearance, attitude and behavior of the witness; the interest of the witness in the outcome of the case, if any; the relation of the witness to any party in the suit; the inclination of the witness to speak truthfully or not; the probability or improbability of the witness's statements; and all other facts and circumstances in

224

evidence.  Thus, you may give the testimony of any witness just such weight and value as you believe the testimony of the witness is entitled to receive.

During the lunch breaks you need not remain together.  You may eat lunch wherever you please.  If you're unfamiliar with the eating places around the courthouse, Ken or the court security officers will be happy to assist you in finding a suitable place to eat.

This is not a sequestered jury.  You will be allowed to go to and from home each day, but it is important that you obey the following instructions during this proceeding:  First, do not discuss the case either among yourselves or with anyone else, including the people with whom you work and your family members when you go home at night, or during the course of the trial.

After all of the evidence is in, and you have heard the closing arguments and my introductions to you on the law, you will retire to consider your verdict.  During the trial you should keep an open mind and reach your conclusion only during your final deliberations, and this is why you should not discuss the case even among yourselves until you retire for final deliberation.

Second, do not permit any other person to discuss the case in your presence, and if anyone does so, despite your telling him or her not to, report that fact to the courtroom deputy or to Mr. Clegg as soon as you're able. You should not, however, discuss with your fellow jurors any fact that you feel necessary to bring to the attention of the Court.

Third, though it is a normal human tendency to speak with the people whom one is thrown into contact, please do not during the time you serve on this jury, whether in or out of the courtroom, speak with any attorney, party or witness. By this I mean not only do not talk about the case, but do not talk to them at all, even to pass the time of day. In no other way can all parties be assured of the absolute impartiality they're entitled to expect from you as jurors. You must base your verdict solely on what is brought out in court.

You should also wear the juror badges that Ken will give to you at the end of the day at all times while you're in the courthouse. And also, you don't know the witnesses that'll be called, so it's better when you're here -- and Ken will show you in a few minutes where the jury room is, and that's where you'll report tomorrow -- that you either be in the

226

jury room when you come here, not just be around the courthouse, because you don't know the people that you may be encountering or talking to, and they may be witnesses, I mean they might be witnesses, to who you don't know. And so it's very important for you to wear your badges, and that lets everybody know that you are a juror.

Fourth, this case may be the subject of news coverage. You're instructed that you're not to read, watch, or listen to any such coverage. I repeat yet again, your decision in this case can only come from what you see and hear in this courtroom.

Now, during the course of the trial we'll break at least once in the morning and at least once in the afternoon. However, should you need to break prior to the Court's normal recess, please raise your hand, and I will try to accommodate you.

Now, before I allow the lawyers to make their opening statements, would either Plaintiff or defense counsel or both like to invoke Federal Rule of Evidence 615 and exclude the witnesses from the courtroom? Plaintiff?

MR. PINHEIRO: Yes, Your Honor.

THE COURT: Defendant, you join in it?

MR. KATON: I agree, Your Honor.

THE COURT:  Are each of you willing to accept responsibility of your own witnesses and make sure that the witnesses remove themselves from the courtroom and refrain from talking to each other or anyone else but the lawyers involved in the case under the penalty of the witness not being allowed to testify, or do you require that I instruct your witnesses?  Mr. Pinheiro?

MR. PINHEIRO:  I will instruct my witnesses, Your Honor.

THE COURT:  All right.  Mr. Katon?

MR. KATON:  I will instruct mine as well, Your Honor.

THE COURT:  All right.

Now, ladies and gentlemen, as I said earlier, I just now reiterate, we've reached that portion of the trial where the lawyers will be allowed the make their opening statements.  The lawyers have been given up to 15 minutes to make their statements. Each lawyer has asked that they get a three minute warning.  So in other words, if they're still speaking at 12 minutes, and they may or may not be, I'm going to ask Ken to notify them, just say you got three minutes remaining, Mr. Pinheiro, Mr. Katon, as the case may be.

And you know, we've been here -- it's about ten after 3.  We got back here at 1.  Would you all like to take about a 15 minute break before we begin closing arguments, or not?  And if you're ready to go through, we'll break after that, and if anybody wants to, we will.

All right, everybody says keep on rocking, so we'll keep on rocking.

All right, Mr. Pinheiro, are you ready to proceed?

MR. PINHEIRO:  Yes, I am, Your Honor.

THE COURT:  You can speak from the lectern there.  I don't think we can move it around.  Can you work from there?

MR. PINHEIRO:  That'll be fine, Your Honor.

THE COURT:  All right.

So Ken, when he starts, if you go ahead and start his time, give him the 15 -- I mean the 12 minute warning if he's still speaking.

You may the proceed sir.

MR. PINHEIRO:  Thank you.

Good afternoon, jurors.  The Defendant, Edwin Rodriguez, is a former New Haven police detective.  The testimony you're going to hear is

straightforward and at times disturbing.

What is unique about this case is that the Plaintiff, we're going to use Detective Rodriguez, the Defendant's, own witnesses, his own documents, his own evidence that he actually used to prepare the arrest warrant that was used to have my client, Gary Session, arrested for the charge of murder. The arrest warrant is the tool that was used to arrest my client. The murder charge involved the death of a young man, Anthony Lucky, Jr., who at the time of his death on July 25th, 1999, was only 16 years old.

This is a case about a violation of my client's civil rights. Now, civil rights are available to everyone pursuant to the United States Constitution. When I say everyone, it doesn't matter your religious beliefs, your age, whether you're male or female, your race, everyone is protected pursuant to the United States Constitution, and everyone enjoys these rights.

The evidence will show that the Defendant showed a blatant disregard for law and order. He betrayed the oath he took as a police officer. He abandoned his duty to protect all. And most important, most important, he betrayed the public trust.

230

On July 25th, 1999, around 1:50 a.m. in New Haven, Connecticut, Anthony Lucky, Jr., a 16 year-old young man, was fatally shot while riding in the back seat of a Samurai Suzuki. I'm going to refer to him as Lucky. You will find many times throughout the course of the trial we'll refer to people as their last names.

Lucky was in the vehicle with his two best friends, his cousin, Albert McCann, who was driving, and Juan Scruggs, who was the front seat passenger.

There are two versions of the same event that occurred that summer night. The evidence that was gathered in the first 48 hours of the shooting told by two individuals in the vehicle with Anthony Lucky, and an anonymous witness which claimed a road rage incident for the reason for the shooting.

At that time at intersection of Columbus and Howard Avenues the vehicle that Lucky was riding in came under gunfire by somebody in another car, a Honda. McCann, the driver, Lucky's cousin, told Scruggs, his best friend, he had a pistol in the back under the seat wrapped inside a yellow T-shirt. He told Scruggs, get it. Scruggs reached for the pistol, and according to Scruggs' own sworn affidavit, his

statement, taken by the Defendant, just hours after the incident, Scruggs stated that he accidentally pulled the trigger and accidentally shot his best friend Lucky.

The young men suspected of being in the Honda, the other vehicle, were never identified by Albert McCann or Juan Scruggs.  However, two other people were arrested in connection with the shooting. Subsequently thereafter charges against them were dismissed.  The bullet that killed Anthony Lucky, Jr. Was never found.

The Defendant will give a different version that involves a murder for hire claiming the incident was due to Albert McCann and Anthony Lucky stealing drugs and money from a DeShawn Johnson and the Plaintiff.  This evolved four months after the incident based primarily on an alleged confidential informant, Mayra Mercado.

Ms. Mercado will testify as to her involvement in this case.  Remember, this version implicates Albert McCann and Anthony Lucky as the primary reason for this incident.

The Defendant, the detective, he had a duty to corroborate the alleged version; most importantly, by simply asking Albert McCann to

corroborate the Defendant's theory. This simple investigative tool would have discounted Mayra Mercado's statement and removed her as an alleged confidential informant witness.

The Defendant would tell you he doesn't have to corroborate every fact. However, looking back, corroborating the most obvious details that McCann and Lucky allegedly stole money and drugs to two individuals would have discredited Mayra Mercado's theory.

The Defendant's act was a reckless disregard for the truth. The lead detective was the Defendant. He was assigned to investigate Lucky's murder on the day of the incident.

The Defendant drafted the arrest warrant used to have my client, Gary Session, arrested. In Connecticut when you do not have an on-site arrest, an individual can only be arrested after an arrest warrant is written up, applied for, and after submitted to a judge. The judge must find probable cause, and then he signs it. Then the individual's arrested.

An arrest warrant in Connecticut is essentially the officer's sworn affidavit of the facts and circumstances of the incident. The officer then

submits the arrest warrant to a superior court judge. If after the judge reads the officer's affidavit and if the judge finds probable cause, the judge will sign the warrant, and then the individual's arrested.

In the arrest warrant the Defendant submitted in this case, Lucky's case, the Defendant referred to several witnesses and statements that Scruggs and McCann gave him the night of Lucky's murder. The Defendant failed to include in his arrest warrant the admission by Scruggs that he had accidentally shot Lucky and other information gathered within the first 48 hours of Lucky's murder. Scruggs' admission is called exculpatory evidence. Scruggs and McCann will testify in the trial, maybe this afternoon even.

Also the Defendant refers to other witnesses in the arrest warrant, Mayra Mercado, Sharon Adkins, Larkland Martin. Mayra Mercado and Sharon Adkins, they're not even witnesses to Lucky's murder and had no knowledge of that homicide.

When the Defendant approached Mayra Mercado and Sharon Adkins he coerced both of them into giving false statements. The Defendant specifically told Mercado and Adkins what to say. They will testify to that.

234

The Defendant did not conduct a proper and complete and thorough homicide investigation.  He failed to check into witnesses' backgrounds and accounts of the incident.

Furthermore, the Defendant stated in his arrest warrant that Mayra Mercado was a confidential informant.  It's important.  A person being a confidential informant means that person has given the police information in the past, and that information was reliable, credible, and useful, which was not true.  At no time, at no time was Mayra Mercado ever, ever a confidential informant for the New Haven Police Department.

There is nothing that will replace all that was lost and the indignity that my client, Gary Session, suffered as a result of the Defendant's errors, acts, omissions and intentional fabrication of evidence.  11 months of wrongful incarceration my client spent, 11 months of his life stolen from him and his family, time that cannot be returned, recovered or relived.  There is no other way to stop this type of misconduct other than our civil tort system.

The Defendant said, has said, that he did nothing wrong with the investigation in this case.

After this trial is over the Defendant will never -- will not be arrested, disciplined or even censored. My client's criminal case was nolled, but not until he lost 11 months of his life and eventually was dismissed on August 14th, 2002, 21 months after his arrest. There is nothing, nothing but the financial recourse from the federal court system to pursue a civil rights case to serve as a deterrent against this type of police misconduct by those in power.

The Defendant manufactured and falsified evidence against Gary Session, while ignoring evidence that was readily available to him that would have cleared my client and lead the detective to the arrest of the killer or killers of Anthony Lucky, Jr. The Defendant falsely arrested and subjected my client to malicious prosecution because of the errors and omissions in the arrest warrant that contain falsified, fabricated evidence.

Talk about the prosecutors for a second. The prosecutors role. A prosecutor's decision to charge an individual and a prosecutor's decision not to drop a charge but to proceed to trial, those decisions by a prosecutor will not shield a police officer who deliberately supplies misleading information that influence the prosecutor's decision.

236

It makes sense.  The prosecutor didn't know about the fabricated evidence.  That's why I say this trial is about trust.  The Defendant betrayed the public trust.

Fortunately the prosecutor in this case did dismiss the charges outright, and I say fortunately because my client -- the penalty for murdering a 16 year-old young man could be the death penalty, or life imprisonment.  And that's what my client was living with when he was incarcerated and in jail for 11 months, and then another subsequent ten months to see if his case is going back to trial.

At the end of this case the question that you are going to be asked to answer by the judge is very simple.  Did the Defendant falsely arrest and maliciously prosecute Gary Session without just cause, and have him knowingly wrongfully incarcerated for the murder of Anthony Lucky, Jr. In violation of his civil rights.

Thank you.

Thank you, Your Honor.

THE COURT:  All right.  Mr. Katon, you ready to proceed?

MR. KATON:  Thank you, Your Honor.

THE COURT:  You may proceed.  And Ken, he's got the same warning, three minutes.

237

THE CLERK:  Yes, Your Honor.

MR. KATON:  Good afternoon.  My name is Thomas Katon.  I represent the Defendant in this case, Edwin Rodriguez, seated over there, and I introduced him to you earlier.

Now, I believe the evidence is going to show you that on the evening of July 25th of 1999, very early hours, actually, in the morning, Anthony Lucky, Jr. Was shot and killed.  He was shot and killed at the intersection of Howard Avenue and Columbus Avenue in a section of New Haven that's known as The Hill.

I believe this case is about my client's evidence, excuse me, efforts to solve that murder and to bring Anthony Lucky, Jr.'s killers to justice.

Let me tell you a little bit about Ed Rodriguez.  Ed grew up in The Hill, and I believe the testimony you will hear is that it is one of New Haven's toughest.  It struggles, as so many urban areas do, with drugs and gun violence.  Ed, however, chose a career in law enforcement and spent a great deal of his time in the New Haven Police Department working on the crime problems that plague The Hill. He still has family that lives in The Hill.  He's now retired from the New Haven Police Department, but he's

employed as an inspector for the Chief State's Attorneys Office, and the evidence will show you that he is currently assigned to a special task force working in Hartford to stop shootings.

Now, the evidence, I'm going to bring you back in to the early hours of July 25th 1999, it was a warm summer night in New Haven. On the night of the shooting Ed was a detective in the New Haven Police Department. He was assigned to Squad B in the detective bureau, and that meant he worked the 4 to midnight shift.

After completing his shift he was driving home when a call came through that there had been a shooting in The Hill. Patrol officers located in the vicinity of Yale New Haven Hospital had spotted a red Suzuki Samurai which apparently had fled the scene.

Ed turned his car around, and after working a full shift reported back to the station at One Union Avenue. He joined his partner, Steve Coppola, and they were dispatched at that point to begin their investigation.

Ed first went to the scene where Anthony Lucky was found, where the red Suzuki Samurai was found. He then proceeded to Yale New Haven Hospital to ascertain information as to the cause of Anthony's

Lucky's death.  There he was informed by emergency room personnel that Lucky had succumbed to a gunshot in the stomach.

He then left with his partner to interview the driver of the Suzuki Samurai, Albert McCann, and the passenger, Juan Scruggs.  Both gave statements which detail that they were driving in a red Suzuki Samurai when an altercation occurred with Hispanic males in another vehicle at the corner of Howard and Columbus.

Scruggs claimed that it was an accidental shooting, that as he attempted to return fire toward the Hispanic males he reached underneath the driver's seat where Albert McCann was seated and operating the vehicle, unwrapped the gun from a T-shirt, pulled the safety, and struck Anthony Lucky, Jr. In the chest, accidentally, but discharging a weapon and ultimately killing him.

Now, that same day the Bureau of Identification for the City of New Haven Police Department, which is a division within the department that work at securing crime scene evidence, executes a search warrant that was initially applied for by Detective Coppola, Officer Rodriguez's partner.

McCann's Suzuki Samurai had been towed to

the city garage and effectively dismantled to search for evidence pertaining to the shooting, and in so doing the BFI, which is what we call it for shorthand, discovered a bullet hole in the tailgate of the Suzuki Samurai.

Upon further inspection they identify a split of the spare tire which sat on the tailgate, and using protrusion rods they could plot the entry of a bullet through the spare tire through the tailgate through the back seat.  The physical evidence that was discovered that day refuted Scruggs' statement accidental shooting.

And the day after the shooting a Lieutenant Bryan Norwood, a supervisor of Ed Rodriguez, and a Detective George Sheldon together with Ed Rodriguez attend the autopsy of Anthony Lucky, Jr.  The autopsy is performed by the chief medical examiner's office in the state of Connecticut, and the examiner who performed the autopsy was named Dr. Malka Shah, and she concludes that Anthony Lucky died of a gunshot wound of the abdomen entering the back and exiting the chest.  It's no longer a layup accidental shooting case.

At that point, however, the evidence trail began going cold.  Ed Rodriguez along with his

partner and along with other detectives continue to canvas the whole neighborhood in order to find any leads for witnesses, but no one is going to come forth and volunteer information.

That changes, however, on November 4th of 1999.  On November 4th of 1999 Sergeant Brendan, also his nickname's Mike, Canning is tasked with overseeing the execution of a search warrant at 156 West Street, a residence in The Hill.

In the process of executing that search warrant Canning comes upon a woman named Mayra Mercado who appears visually upset because she has outstanding warrants for her arrest.  She volunteers to Canning that she knows who is responsible for the death of Anthony Lucky, a person named Shabazz.

Canning brings her to Lieutenant Norwood, the supervisor of Ed Rodriguez, at the police station. Norwood contacts Ed Rodriguez and they conduct a preinterview with Mayra Mercado.  Mercado agrees to cooperate and provided information implicating Shabazz, a man which the evidence will show you is none other than Gary Session.  Mercado is held in custody over outstanding warrants.

Now, on November 7th of 1999 Ed Rodriguez and his partner, Steve Coppola, interview one Sharon

Adkins, a woman that Mercado claimed tipped off an individual named DeShawn Johnson, and that individuals, who would turn out to be Albert McCann, the driver, and Juan Scruggs, the passenger, were in The Hill neighborhood. McCann according to Adkins had apparently shorted Shabazz of money in a drug transaction. Adkins agrees to give a statement to the police on that date and she's brought to the police station where her statement is taken.

On November 8th, 1999 Mercado is brought to a woman's facility in Niantic, Connecticut, York, to the courthouse at 121 Elm Street, Connecticut. There she provides Ed Rodriguez with a taped statement confirming the information which she had previously provided.

The detectives were concerned based on what they heard for her physical safety out on the street, and they arranged with the state's attorneys office to have her accepted into the state's witness protection program.

In completing that application Mercado provides information on three dependants, a daughter named Taisha, a younger brother named Ishmael, and her mother Rosa. Mercado was then transported from the courthouse by Norwood and Canning to a motel in

Norwalk.  She soon leaves the program, however, and returns back to the streets of New Haven.

As valuable as Mercado's statement was, however, the investigation remained incomplete because she only witnessed the handoff of a gun to people identified as the eventual shooters.  No one had up to that point seen the actual shooting.  But on December 4th of 1999 while canvassing The Hill for witnesses to yet another homicide on The Hill Ed interviews a man named Larkland Martin.

Martin tells Ed that he witnessed Lucky's shooting from the third floor window of a house located virtually at the corner of Howard and Columbus.  Martin agrees to provide a statement and in the process independently corroborates information provided by the other witnesses, and he identifies one Jose Santiago, otherwise known on the street as Bebe, and DeShawn Johnson as his accomplice.

Now, on December 5th, 1999 Mercado comes back to the police department.  She says she has more information about the Anthony Lucky homicide.  She agrees to give a second statement to Ed Rodriguez, and she relates that she encountered Jose Santiago or Bebe, and he tells her -- while she was waiting for a bus on Congress Avenue -- that she encountered Jose

244

Santiago, and he indicates that he has earned his respect on Howard Avenue.  When she follows up, he indicates he's earned his respect by killing a Moreno on Howard Avenue, which I believe the testimony will show you that that means that he admitted to killing a black man.  Now, Mr. Santiago had previously been identified in Mayra Mercado's first statement, so this brings it full circle.

The final piece of evidence in the puzzle is supplied by the Connecticut State Police.  At the request of the New Haven Police Department the state police major crimes squad performed a shooting reconstruction at the site of the Lucky shooting. Locations of shell casings are plotted.  Bullet trajectories are plotted as well.

The state police concluded that the shot that entered the Suzuki Samurai was indeed from the outside and passed into the passenger compartment. And they also concluded that the shots originated from the general area where .9 millimeter bullet casings had been located.

Now, armed with that information and gathered through this investigation Mr. Rodriguez submits and drafts a warrant application for Mr. Session, Mr. Santiago and Mr. Johnson, and he submits

it to the state's attorneys office in the judicial district of New Haven. It's reviewed. It's not just flipped through. It's reviewed together with what's called the homicide book. It is a book that has each and every report that's been gathered by all the arms of the New Haven Police Department.

THE CLERK: Counsel, you have three minutes.

MR. KATON: Thank you.

And it is reviewed by Michael Dearington, the head state's attorney for the judicial district of New Haven. He signs the warrant. He finds probable cause. He submits it to a superior court judge, Judge Thompson. He review it. He finds probable cause.

And then after the arrest of Mr. Session, he hires John Williams, a notable defense attorney, and they exercise a statutory right to a hearing in probable cause. And that puts the burden on the state to establish the things that were alleged in the warrant. And the state calls Mayra Mercado, the state calls Larkland Martin, and they testify in the main consistently with the contents of their statements, and another judge who looked them in the eye, heard their testimony, heard them under cross-examination, finds probable cause yet again.

Now, why are we here?  After all these findings of probable cause, after all this evidence is gathered, when it came time to try Mr. Session, the witnesses decompensated.  She had -- Mayra Mercado had, from the testimony of Christopher Alexy, a mental breakdown.  And as a result the state could not pursue its charges against Session, and a nolle was entered.

Now after 12 years later Ms. Mercado's changed her story.  It was all fabrication, and she somehow didn't give the statement of her own free will.  Ms. Adkins is going to come in here and say it was all just a fabrication.  And there'll probably be some mention as to who's a confidential informant and who's a registered informant, but it's not the labels or tags for witnesses that matters here it's what they said and what they said 12 years ago and whether it was reasonable or not to believe it.

Ed believed it at the time.  The state's attorney reviewed it and believed it at the time.  Judge Thompson reviewed it and believed it at the time.  After a hearing, an evidentiary hearing, Judge Devlin reviewed it and believed it at the time.

Now, at the close of evidence I'm going to ask you to make a finding of probable cause and that everything that Ed Rodriguez did here was done in

good faith without malice or without ill will.  I'm going to ask you at the conclusion of this evidence to return a verdict in favor of Ed and against Mr. Session.  Thank you.

THE COURT:  I'd like to see the lawyers at sidebar off the record right quick.

(Conference held at sidebar off the record)

THE COURT:  Ladies and gentlemen of the jury, after conferring with the lawyers there's still several matters that I need to discuss outside your presence, and it makes sense to me -- it's 20 to 4 right now -- that I go ahead and release you for the day, and ask you to make sure you're back here tomorrow for 10 o'clock.  And let me try to -- so you'll know, not that it really matters a lot, we're going to be here at least by 9 o'clock tomorrow to make sure that we've got all of the preliminary stuff that we need finished up, so it doesn't delay the trial tomorrow, or any time after.

I want to thank you very much again for your patience with us today, and I want to remind you that you're not to discuss the case among yourselves or with anyone else, people you work with, your family, your friends, when you go home tonight, not to read, watch or listen to any news coverage that may be

generated about this case.

And remember, too, that we can't start until all of you are here, so do the best you can to put in a few extra minutes early so in case something comes up. And of course I don't know how much -- I don't really recall where everybody's from. This train situation hasn't helped a lot of folks coming from the south, so -- and I saw the Governor was on the radio this morning saying people, if you don't have to drive, don't drive, because the freeway won't be able to handle it. But any rate, just plan that in there.

And again, I want to thank you on behalf of the lawyers and the parties and certainly the Court for your service to our country in this case. I hope you have a good evening, and we'll see tomorrow morning here at 10 o'clock. And I think we'll start right at 10, and if for some reason it's three or four minutes late, it's because we were wrapping up something. We will have been here before you get here, I promise you. So I'm going to try to start right at 10 o'clock and do exactly what I say I was going to do every time, to the extent I can.

All rise for the jury.

Ken's going to take you to the jury room

now.  You got to give them their jury badges

THE CLERK:  Everything will be there for them when they get here in the morning.

THE COURT:  They don't have it now, so when they come in --

THE CLERK:  They won't need it.

THE COURT:  What I'm saying, as far as security officers knowing who they are and the witnesses.

THE CLERK:  If they want to take -- I can give them -- easily give them buttons, but not -- it is not necessary, but if that's what you want, Judge, that's what we'll do.

THE COURT:  Maybe you can show them the jury room, they could come down and you could give them to them there.

Yes, sir.

MR. ZEHE:  May release the witnesses?

THE COURT:  I'm sorry, yeah, go do that. I apologize.  Tell them we're all trudging along the best we can.

MR. PINHEIRO:  If I may, the two witnesses Albert McCann and Juan Scruggs, they may be a little upset that they didn't go on today.  Would it be improper for Your Honor to let them know, order

them back in here tomorrow?

THE COURT:  Get them in here.

MR. PINHEIRO:  Thank you.

THE COURT:  You need to release somebody you said?

MR. ZEHE:  There's a police officer out there.  I'll let him know.

THE COURT:  Just tell him to be back here tomorrow.

MR. ZEHE:  Thank you, Your Honor.

THE COURT:  Come on in, folks.

MR. PINHEIRO:  Your Honor, may I introduce --

THE COURT:  Get them to come on around here.

Tell you what we're going to do.  I'm going to -- these are our two witnesses?

MR. PINHEIRO:  The third is Officer DeJesus.

THE COURT:  Okay.  So come on in.  And first of all, if you would go ahead and introduce each of them to me.

MR. PINHEIRO:  I will, Your Honor.  This is Officer Lily -- former Officer Lily DeJesus.  She was my first witness.  This is Mr. Albert McCann, my

second witness.  This is Mr. Juan Scruggs, my third witness.  And they both work for McDonald's Corporation in New Haven.  Mr. Scruggs is in charge -- he's a district manager, I believe, and this is his fellow, I believe, manager, and they took the entire afternoon off to be here.

THE COURT:  All right.  Let me first of all, I'm going to go ahead and administer the oath to each of you at this time, and if you'd each raise your hand.

(Lily DeJesus, Albert McCann, Juan Scruggs,
                    sworn by the Court)

THE COURT:  Okay, all three witnesses have affirmatively answered the question.

Now, let me tell you this:  And again, I want you to know I'm -- hate to say it this way -- just a judge, but that's all, sometimes I'm just the judge, and I regret that the proceeding has gone slower than certainly Mr. Pinheiro could have thought or Mr. Katon and Mr. Zehe could have thought, and sometimes it just takes longer to select a jury.  So we weren't able to get to your testimony today, which means that you will be required to be here tomorrow, which I know is probably going to inconvenience you, hope it doesn't cost you any money or people that

count on you any too great inconvenience.  If I could make it so we could have done it today I would have, but I just couldn't.  So I would expect -- and I believe Ms. DeJesus is going to be the first witness.

MR. PINHEIRO:  Officer DeJesus.

THE COURT:  Officer DeJesus, I thought you were a former --

MR. PINHEIRO:  I'm sorry, former.

THE COURT:  I wasn't trying to give you a promotion or demotion -- but at any rate, will be the first witness, and I think from what I've been told her testimony will be an hour, thereabouts, direct and cross.  And your second witness would be?

MR. PINHEIRO:  Mr. Albert McCann.

THE COURT:  Mr. McCann, and then Mr. --

MR. PINHEIRO:  Scruggs.

THE COURT:  Scruggs, okay.  So I don't know how long your testimony will be, I'm not really sure, Ms. DeJesus's testimony will be, but I would ask the two of you gentlemen to be here at 10:30, and if you'll be here 10 o'clock, and that way it will be seamless.  And the subpoena, if you got a subpoena -- were subpoenas issued?

MR. PINHEIRO:  Yes, sir.

THE COURT:  The subpoenas are continued

253

until tomorrow.  If you need any written verification for purposes of employment or anything, let me know. I'll make sure the clerk issues something for you. And again, I regret it, and it's kind of a tacky way to say it, but the lawyers heard me say one time today at sidebar, you know, that's why they make the bumper sticker, sometimes it just happens, and it just happened today, so I apologize to you-all for that. Okay, thank you.  I hope you have a good evening. We'll see you at 10, and you guys around 10:30.

MR. PINHEIRO:  Thank you, Your Honor.

THE COURT:  Now, I'm not going to say that they're not mad at me, but Mr. Pinheiro, I don't think they're mad at you.

MR. PINHEIRO:  Well --

THE COURT:  I mean I couldn't --

MR. PINHEIRO:  What are we gonna do?

THE COURT:  I couldn't have covered you anyway better.

MR. PINHEIRO:  You did a wonderful job. Thank you, Your Honor.

THE COURT:  I thought I got about a C plus on it.

MR. PINHEIRO:  It was an A minus, Your Honor.  What are we gonna do?

254

THE COURT:  All right.  Now, I think -- and the way I categorized these earlier, I thought it was going to go boom boom this morning, we were going to do all of them at once, my category number ones, and you guys went ahead and omitted some and withdrew, or effectively withdrew it.

I missed one, Brendan points out to me, and that would have been Exhibit number 44, I believe. And that would have been -- I thought it was omitted because I thought it was prohibited by a prior Court order.  And I think these are the phone records that the Court, December 19th, 2012, minute entry evidence, which prohibited all references to testimony and evidence related to claimant's claimed alibi from admission at trial.

Now, Brendan, refresh my recollection on that.  The minute entry evidence was a telephone conference on that day.  I know we had several telephone conferences where we did things.  Is that what you recall?  So I'm kind of at a loss.  I've already ruled on this one, so help me if I need to be helped, because I'm not going to reconsider.  I either got it right or I got it wrong, but I believe I got it right, or I'd have gone the other way.

MR. PINHEIRO:  Well, you got it right I

think partially, Your Honor.  I think that it goes to the issue of the continuing malicious prosecution that the Defendant failed to do a complete and thorough investigation when there is readily available evidence out there that could have been obtained by him and he failed to do so.  Because there was an alleged cellphone conversation, alleged from my client to an individual at the time of Mr. Lucky's murder.

THE COURT:  Well, the Court's going to stand by its previous ruling and Exhibit 44 is -- the objection to it is sustained.  Okay?

MR. PINHEIRO:  Thank you, Your Honor.

THE COURT:  And then so now we're going to move to what I think are -- and also that included -- number 47 was omitted.  That's the one I just read where we had it listed 44, 47.  Okay, we're all right.

So now I'm going to go to what I thought was my number two category, and I'm not sure, I don't think we've done any of those yet, have we?  Which one?

THE CLERK:  Number 22, number 1 on our list.

THE COURT:  Okay.  So, yeah, that was about the confidential informant list we took care of

this morning, okay.  Sustained that previously.

Number 25, this objection was relevance grounds, prohibited by prior Court order, so forth. Plaintiff cannot offer any rationale as to why the page on a detective information book Bates stamp number 190 has any relevance to the case.  And the March 8th, 2012, order, docket 324, prohibits Plaintiff from introducing any evidence related to the destruction of evidence in this case.  The page on the duties of the property clerk, that's Bates 191, has no other relevance to the case.

And just for the sake of the record, there was an order issued by a state court judge, where the state court judge pretty much followed the law in that the judge provided them with destruction of evidence after a certain period of time pursuant to Connecticut statute, as I recall.  I think I got that right.  And so at any rate, that was decided way back in March of 2012.  So Mr. Pinheiro, what's the point?

MR. PINHEIRO:  Your Honor, I understand Bates 191 will be excluded.  I'm concerned with Bates 190 as to it pertains to the detectives as the responsibilities and duties, and it has nothing to do with the destruction issue.  It has to do with the what is required --

THE COURT:  Let me -- Brendan, if you could get me that exhibit.  Tell me -- explain what you mean by that, because I want to look at it specifically, but that's not my recollection when I looked at it last.

MR. PINHEIRO:  If I may, Your Honor, Bates 190, there's a heading, "Detectives," and there's seven paragraphs, and the seven paragraphs outline what is expected of New Haven Police Department detectives, responsibilities and duties, such as number 2.  "A detective shall acquire a thorough knowledge of the criminal statutes and the elements that constitute criminal acts in violation of area sections thereof.  Must follow the fundamental rules of evidence, and that may enable him to present his case in court in an efficient intelligent manner.

"Number 4.  Each Detective will follow up each case assigned to him.  If there is an official disposition of such case, he will advise complainant that reasonable interviews of the status of the case of the investigation in which he engaged."

Number 6, Your Honor, particularly number 6, Your Honor, if I may, "Each detective shall submit a daily report of his activity which shall be kept on file in the division of detectives.  Such report shall

be open for inspection by the chief of police or the supervisors of the division detectives."  In particular, Your Honor, number 6 is directly relevant to the issues in this case.

THE COURT:  How?

MR. PINHEIRO:  Your Honor, we just heard through opening statement that Mr. Katon says that his client did an interview with Mayra Mercado on November 4th.  To my knowledge, there is no police report that was made contemporaneously on November 4th on that date to evidence this interview.  If there was such an interview, a report should have been made.  To my knowledge no report was made.

So he had the duty to make reports, and we believe he failed in that duty.  We don't even know if there was such an interview made that day.  We have to see how the witness comes across, but the information that we have is scant on that.  But he had a duty to make the report, and he made some reports in this murder investigation.  But Mr. Katon threw out November 4th.  We don't have a report that was dated November 4th.  If he had a duty to make a report, then he failed in that duty, if such a meeting did take place.

THE COURT:  So what does that establish

from your perspective and what you have to prove to the satisfaction of the jury here?

MR. PINHEIRO:  Well, what we intend to prove Your Honor, is that --

THE COURT:  How does that help you do anything other than you can argue and say, well, he obviously made all this up.  Is that your point?

MR. PINHEIRO:  Yes.

THE COURT:  So what you got to say about that, Mr. Katon, or Mr. Zehe?

MR. ZEHE:  Judge, counsel knows there is a report.  It wasn't made that specific date, on November 4th, but that's not what the rules require.

THE COURT:  What we're talking about here is an internal department policy directed toward in this case employees, but this case detective specifically, about this is how it's supposed to work.  You say the report was made not on November 4th, what date was it made on, Counsel?

MR. ZEHE:  Judge I believe --

MR. PINHEIRO:  December 5, Your Honor.

THE COURT:  So it was within a month or A day over a month.

MR. ZEHE:  It's difficult to state when.  It was made after the statement was given, but this is

a computer printout when it was printed out when Larkland came into the station in December, so the computer printed out another date, the December date rather than the November 4 date.

THE COURT:  So wait, tell me -- let's back up.  The statement is given, according to the Defendant, on November 4.

MR. ZEHE:  A pre-interview, oral interview on November 4th.

THE COURT:  Okay.  Then the next step is?

MR. ZEHE:  The next step is the taped statement on November 8th, which is referenced in the report, and then after the November 8th statement Larkland Martin comes forward on December 5th.

THE COURT:  Who comes forward?

MR. ZEHE:  Larkland Martin, the eyewitness to the shooting comes back in December, and that's when the November report is printed up and the computer printed up December 5, when he pulled the old report up off the computer, and that's the only copy we have, is the one that was printed up on the computer.  It shows December 5th.  The bottom line is, Detective Rodriguez did fill out a report regarding his interview of Mayra Mercado.

THE COURT:  But the report is dated,

because it's computer generated, December.

MR. ZEHE:  December 5th.

THE COURT:  Okay.  And whatever was taken down and handwritten, that was destroyed?  Was that -- where is it?

MR. ZEHE:  It's never been located.

THE COURT:  Okay.

MR. ZEHE:  This is the only record we have of that.

THE COURT:  And the tape that you mentioned just now having been taken four days later I think on the 8th of November.

MR. ZEHE:  Yes.

THE COURT:  Is that the tape that was found subsequent to the destruction of all the other evidence in the case?

MR. ZEHE:  Yes.

THE COURT:  And that's the tape that you-all had the opportunity to come to the courthouse here in Bridgeport and listen to, I think that's how we did it, or maybe it was given to one of the lawyers and sent back and forth.

THE CLERK:  It was here.

THE COURT:  It was done here.

MR. ZEHE:  Yes, Judge, it's the tape we

intend to play for the jury.

THE COURT:  That's the tape you had the opportunity to come here and listen to, right, Mr. Pinheiro?

MR. PINHEIRO:  Yes, sir.

THE COURT:  And that was taken on the 8th --

MR. ZEHE:  Yes, Your Honor.

THE COURT:  -- of November.  And again, help me, Mr. Pinheiro, about -- other than it's an internal document, this is what it's supposed to be, and this is how you supposed to do it, and the explanation would be pretty much what you just gave me.

MR. PINHEIRO:  If I may.

THE COURT:  Just a minute, Mr. Pinheiro.  When I get to you, I'll get to you.  But the explanation would be, I guess, if Mr. Rodriguez is asked about it, well, this is what I did, this is what happened, the jury's going to listen to it.  I mean help me understand the big issue here.

MR. PINHEIRO:  The big issue --

THE COURT:  Just a minute, Mr. Pinheiro.

MR. PINHEIRO:  I'm sorry.  I thought you stopped.

THE COURT: No. What's the big issue from your perspective? It's a deal he's going to argue until the cows come home, but what's the point about not letting this document in?

MR. ZEHE: Judge, other than the fact that it has not been authenticated as the rules in place at the time, but we don't have any argument that that's the rule of the department, we raise the objection primarily because of the property clerk references, which you've just ruled on.

THE COURT: But as far as the actual -- let's assume, one, that at the time in question when Officer Rodriguez did whatever he did as far as conducting the interview and whatever else, if those were the rules in effect at the time, do you have an objection, if those are the real rules?

MR. ZEHE: No, Your Honor.

THE COURT: Okay. So that's withdrawn. And the way it would come in would be that during his cross-examination at the hands of Plaintiff, if Plaintiff chooses to do this, he'll show him, so you recognize these as the rules, regulations, that you're supposed to do, you're a detective and you're supposed to do this process, did you in the instance of this particular witness, did you do that, and he's going to

say, well, this is what I did, yes, I think I did, or this is how it worked. I mean I don't see the harm.

Well, like I said, you've withdrawn the objection. And Mr. Pinheiro, that's how you could use it, but that's all the way you could use it, because in and of itself it doesn't prove anything, but that'll go toward your argument, say look, he obviously is not telling the truth on this one, too, because he's making this up. But if you got the tape, I don't know where it's going to end up at the end of day, but we just kind of tried that portion of the case, but --

MR. PINHEIRO: If I may, Your Honor.

THE COURT: You just won that part. He withdrew it. You understand?

MR. PINHEIRO: I understand, Your Honor, but I don't want to -- I want to be up front with the Court, because I believe there's an objection to Plaintiff's 24, which is the exhibit directly before this.

THE COURT: What is that?

MR. PINHEIRO: Well, that general order also has to do with case incident reports.

THE COURT: Case what?

MR. PINHEIRO: Case incident reports.

25, which was just covered, was for detectives, and Plaintiff's 24, which the defense hasn't objected to, that has to do with case incident reports.  So I thought since we were talking about reports --

THE COURT:  Case sensitive?

MR. PINHEIRO:  I'm sorry, case incident reports.  So since we're talking about reports from detectives and my exhibit --

THE COURT:  So you want to let the jury know the procedure that's supposed to be followed for case incident reports, and you're saying gee, there's no report on that one either, so you were wrong about the other report, what do you say about this one?

MR. ZEHE:  Your Honor, we didn't object to that.  We haven't objected to 24.

MR. PINHEIRO:  I thought they did.  I'm sorry, Your Honor.

THE COURT:  Of course, I was going down the path with you.  Don't let it happen again.  The lawyer went with me over the waterfall, I went down and got wet.

So which one is the next one that's still alive?

All right.  Brendan points out that we got the same issue I believe with Bates stamp 189.

266

Everybody on the same page?  It would be the same way to use it, the same ruling, I think, unless somebody can say boy, that would be a mistake.  I think it works the same way, though.  What do you guys say?

MR. PINHEIRO:  It works the same way in that it should be admitted into evidence.

THE COURT:  That's what I just said.

MR. ZEHE:  No objection, Your Honor.

THE COURT:  All right, great.

What's the next real live one, Brendan?  I think it's number 33.  Let me see.  We have omitted 32, that's been withdrawn, and then number 33.

MR. PINHEIRO:  If I may, Defendant withdrew the objection.

THE COURT:  Let me find my place.  You should notice by now how slow I really am.

This is this motion to dismiss that was apparently filed, I guess, by Mr. Pattis, on behalf of Mr. Session, with the State Board to dismiss the claim against Mr. Session based on the nolle that was entered, and this is because of the witness issue, is that right, defense counsel?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  Is there any doubt that this happened.

MR. ZEHE:  No, we're not arguing the case was dismissed.  This is just irrelevant.

THE COURT:  Don't we all agree -- and again, I think the jury instructions -- I don't remember how we handled it, but I mean you got the state's attorney and somebody from the state coming here, one of the attorneys, and there was a decision made by the district attorney's office, right?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  And the district attorneys say yeah, we had a witness that was MIA, or whatever we're going to have, right?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  And again, I mean, is everybody going to -- I mean Mr. Pinheiro, listen up.  Why do we even need to put this on before the jury?  Why couldn't you stipulate that yeah, if the DA came here he would testify they dismissed the case because there was a witness that was missing and that's why.  It doesn't prove that Mr. Sessions did or didn't do anything.  What's the point of putting the jury through that kind of torture?  And even if you can't do that, why do we need this document if you-all could all say yeah, the district attorney filed a motion to dismiss, and the DA gets up here, DA says this is why

I filed the motion.  Why do you need the paper?

MR. PINHEIRO:  It was defense counsel filed a motion to dismiss, and the witnesses that were not available were not Mayra Mercado, it was the Albert McCann, I'm sorry, Bebe and DeShawn Johnson, Your Honor.  Your Honor, I think it shows to the jury that the Defendant continued with the malicious prosecution.

THE COURT:  What does it got to do with Rodriguez if this is in the hands of the state attorney by now?

MR. PINHEIRO:  Mr. Rodriguez at any time could have told the state's attorney that -- with the falsifying of misleading evidence about his role in how he procured the evidence.

THE COURT:  But we've been through a couple times in this case, Mr. Pinheiro, once the process -- the investigating officer turns it over to the state's attorney, there's got to be some real serious direct involvement, continuous misleading of the prosecutor, to get to the officer, isn't that the law in Connecticut?

MR. PINHEIRO:  Yes, Your Honor.

THE COURT:  And you've got -- it seems to me you're trying to bootstrap what the prosecutor did

to say well, see, Rodriguez could have come and told him and he'd have quit earlier.

MR. PINHEIRO:  That's right.  That's exactly right, Your Honor.

THE COURT:  Well, I don't think he'd do that.

MR. PINHEIRO:  Mr. Rodriguez the whole time withheld this information from the state's attorney.  The state's attorney had no --

THE COURT:  What is the evidence going to show he withheld?  What is the evidence going to say?

MR. PINHEIRO:  That he essentially told Mayra Mercado and Sharon Adkins what to say.  He used Sharon Adkins to corroborate the information of Mayra Mercado and essentially told both of them what to say.  They gave false statements at the coercion of the Defendant.  And any time --

THE COURT:  How is this exhibit, which is, you know, this dismissal, how is that going to establish any of that?  Just they dismiss the charge.  How is that going to establish that to this jury?  I mean if you and defense counsel agree it was dismissed, you're still making the same argument.  You're going to call Mr. Rodriguez everything but a liar on the stand in front of the jury.  You're going

to make an argument that he was lying, or whatever you're going to say.  But what's this paper got to do with anything, other than it's another piece of paper?  Just trying to understand.

MR. PINHEIRO:  I see your point, Your Honor.  I'll withdraw the exhibit.

THE COURT:  Thank you very much.

MR. PINHEIRO:  Thank you, Your Honor.

THE COURT:  All right.  Now, let's -- it's getting late, and I may be getting fast and loose with my words.  I'm not accusing anybody of anything.  I'm just saying, not my first rodeo, either, so I kind of know how it's going to work, I think, but we'll see.

So which one's the next one, Brendan?

THE CLERK:  Number 40, our number 11.  Page 3.

MR. PINHEIRO:  Withdrawn, Your Honor.

THE COURT:  Great.  Okay.  Withdrawn.  40 is withdrawn.

Next one would be 41, our number 12, Brendan?

THE CLERK:  No, it's going to be --

THE COURT:  We just did 11 and 40, so now we're doing -- we're still in the number two category?

THE CLERK:  That's it for that category.

THE COURT:  We're done with two's?

THE CLERK:  Yes.

THE COURT:  Thank you.  All right.  We're going to go back to ones where I thought this morning we would probably be this afternoon or tomorrow morning, and maybe it'll go quicker.  I think that we can all get a little more sleep tonight.

Let's go to Exhibit 28.  That's our number 3, right?  All right, 28 is --

MR. PINHEIRO:  Withdrawn, Your Honor.

THE COURT:  All right, that's good, I like that.

And then the next one would be our number 4, Exhibit 30.  And this looks to me to be out of the state court criminal proceeding.

MR. PINHEIRO:  That's correct.

THE COURT:  Request for production at trial.  Now, what's the basis for this, so I can look at it?  I think you withdrew -- did you withdraw 28.

MR. PINHEIRO:  28 is withdrawn.

THE COURT:  Okay.  Tell me about number 30, the request for production at trial in the state criminal proceeding, right?

MR. PINHEIRO:  That's correct, Your

Honor.  Your Honor, we are not talking about the destroyed evidence.  We're talking about evidence that was available that wasn't destroyed.  My client made a proper pretrial motion for the production of these documents.  They were not produced.  And documents -- for instance, Your Honor, the two letters that Mayra Mercado wrote to Detective Rodriguez and Officer Canning that were not disclosed to us until two years ago, Your Honor.  Those are -- that was evidence that was received by the Defendant, was addressed to the Defendant, was received by the Defendant, it was not disclosed to us, and that information contains exculpatory information.

THE COURT:  Wait a minute.  Let me back up here, because, you know, I know Mr. Pattis, I know Mr. Pattis to be a good lawyer.  He's tried several things in front of me.  In fact, I say he's a hell of a lawyer.  And what does this establish about the procedural posture of the case once it's in court, in the state court, criminal case, with a heck of a good lawyer representing the Defendant at that time, Mr. Session, that the Defendant in this case, Officer, or Detective Rodriguez, had to do with them not producing anything?  Because it's directed not to Mr. Rodriguez but to the state attorney, who's already obviously

brought charges, right?

MR. PINHEIRO:  That's correct.

THE COURT:  So help me get the connection here.

MR. PINHEIRO:  My client requested information, documents, exculpatory information, the Defendant had in his possession -- for instance, those two letters, Your Honor, that were not produced -- without the knowledge of the prosecutor.  So my client made requests for documents and they weren't given to him.

THE COURT:  Okay.  What you got to say, Mr. Zehe?

MR. ZEHE:  What does the production of documents in the state criminal trial have to do with this trial?

THE COURT:  I thought that was my question to Mr. Pinheiro.

MR. ZEHE:  Well, it hasn't been answered, Judge.  You just have to -- one fact that you need to keep in mind, it may come up again, is Mayra Mercado was -- did not recant her statement until 2006, when Mr. Session's investigator tracked her down and got a statement from her, in 2006.  Her recantation wasn't even an issue then.  That's when it became an issue in

274

this case.  So those letters came forward as evidence after she became a witness to supporting the Plaintiff's theory of recantation.  Whatever happened in the criminal trial has nothing to do with this case.  In 2001 when this production was submitted in the criminal case, Detective Rodriguez had nothing to do with it anymore.  He didn't touch the case after the Plaintiff was arrested.  So this is just needless pleadings.

THE COURT:  Mr. Pinheiro, I got to tell you, that's pretty -- that was a good answer to the question I asked you earlier, about the relevance of it.  And you gave me the answer you gave.  But how do you get around the little fact that it wasn't until 2006 that there was a different statement made by the witness if you take the Defendant's position that he just said?

MR. PINHEIRO:  We don't need to get around that, Your Honor.

THE COURT:  No?

MR. PINHEIRO:  That is the truth.  I mean, that is the truth.  The search for the truth is that indeed in fact the Defendant coerced the witness into giving a false statement.

THE COURT:  But you're moving on again

somewhere else here.  We were just talking about these two letters, or whatever you say.

MR. PINHEIRO:  That's correct.

THE COURT:  And I mean, you can't do the scatter shout approach.  You can get me really confused, especially this time of day.  Probably getting pretty confused in the morning, too.

I'm just -- I don't know what the state attorney did or didn't do in the criminal proceeding in 2001, five years before it was an issue, how that could possibly be relevant.  Would you like to have that in here and argue until the cows come home?  I can see that, but it doesn't seem like me in the gatekeeper role I should allow that, but I don't -- there's no relevance at all, it seems to me.

MR. PINHEIRO:  I have nothing further to add, Your Honor.  I understand.

THE COURT:  All right.  Thank you very much.  We'll go ahead and sustain that objection.

Which one's the next one?

THE CLERK:  31.

THE COURT:  All right, that's our 31.

MR. PINHEIRO:  Same argument, Your Honor.

THE COURT:  It's a request for production of police report, and this is in the state criminal

276

proceeding again, right?

MR. PINHEIRO:  Same argument.

THE COURT:  All right, same ruling.

And next one, Brendan, would be?

THE CLERK:  Number 41, our number 12.

THE COURT:  This is a homeowners policy. I thought that was withdrawn.

MR. PINHEIRO:  We withdrew Plaintiff's 40, Your Honor.  Life insurance policy.

THE COURT:  Oh, okay.  Now, you want the homeowners policy in?

MR. PINHEIRO:  It's evidence of the home that he lost, Your Honor.  That he had ownership interest in the real estate that he lost.

THE COURT:  Well, let me say this:  Is the Defendant going to maintain that the -- not the Defendant, the Plaintiff.  Are you going to maintain the Plaintiff never owned any property?

MR. ZEHE:  He says he did.  We have no reason to contest it.

THE COURT:  When he gets on the stand and he starts talking about the tragic consequences that followed his 11 months of incarceration, I lost my house, you're not going to say you never owned a house?

MR. ZEHE:  We're not going to say you never owned a house.  He's going to say, I believe, consistent with his deposition testimony --

THE COURT:  That he lost it because --

MR. ZEHE:  He paid for a house and put it in his brother's name.  All this shows is that he paid for the insurance, and it's a 1996 document, which is four years before he was arrested, so I'm not sure what relevance this has.  In fact it's hearsay, but we're not -- Mr. Sessions says he paid for that house.

THE COURT:  And he lost the house because he was in jail for 11 months.

MR. ZEHE:  That's what he says.

THE COURT:  That's what I'm saying.

MR. ZEHE:  We can contest it.

THE COURT:  I understand you contest it, but you don't contest that -- well, you don't know if he owned a house with his brother in his brother's name.  He can get up here and say what he wants to say.

MR. ZEHE:  Exactly.

THE COURT:  And if he introduces -- if I allow this to come in -- because he said, I paid for it, that shows I must have owned it, rather than I was helping my brother pay whatever few hundred dollars or

whatever it was for the insurance.

MR. ZEHE:  He may have been paying it in 1996, but I don't know what that has to do with after his release.  But in either event, it doesn't show anything, so it's confusing to the jury.  We're not -- he can say whatever he wants to say about ownership of the house or how he lost it or who, you know, why he put it in his brother's name, he can explain whatever he wants, we'll cross him on it, but this doesn't show anything.  All this shows is he paid -- that he got a bill for insurance four years before he was arrested.  I don't know what relevance that has.

THE COURT:  Mr. Pinheiro, I'm trying to figure this one out, too.

MR. PINHEIRO:  I understand, Your Honor.  This is the time period my client purchased the house, and as Mr. Zehe stated, it was put into his brother's name.  And my client lived there, maintained the house, paid all the bills and the mortgage until the time of his incarceration, then he lost the house.  This is the only evidence that we have, document trail to tie my client to that real estate.

THE COURT:  But again, if he gets up on the stand and testifies this is -- I bought this house, I put it in my brother's name, you may not ask

him why he did that, you may -- I'm sure the defense counsel will ask why they did that.  But they're not even contesting that he owned it.  Their issue would be oh, you owned it and you lost it because of this 11 month incarceration, so you put it in our guy -- if you find liability -- on our guy.

MR. PINHEIRO:  I lost my train of thought.  Sorry, Your Honor.  But that essentially, yes, that's the sequence of events.

THE COURT:  But other than showing that he got a bill, this -- in your way of thinking four years before the fact he got a bill, nothing other than his testimony about why he got it.

MR. PINHEIRO:  He got it at the time that he purchased the home.  It's my only documentary proof that connects my client to real estate that which he lost.

MR. ZEHE:  And Judge, that's unfortunate, but this is irrelevant to that issue, and it just confuses the jury.  I mean it's -- it doesn't show anything, plus it's -- well, it's just irrelevant as to time and it's -- it actually doesn't even show -- it's misleading now that counsel has indicated that he admits that Mr. Session put the title in his brother's name, and it doesn't even show who owned title

correctly, so this is just a misleading document.

THE COURT:  Wait a minute.  You didn't mean -- I didn't take it that way.  You didn't say Mr. Pinheiro was misleading, were you?

MR. ZEHE:  No, this document misleads, because it doesn't even show who had title, according to Mr. Pinheiro and Mr. Session.  I apologize if it was taken out --

MR. PINHEIRO:  I didn't take it that way at all.

THE COURT:  So the policy actually is sent to Mr. Session, our Mr. Session, at his 98 Lee Street address.  And does the policy show who the owner is, Gary Session, 98 Lee Street?

MR. PINHEIRO:  It shows insured's name and address, and Your Honor, the year of this policy is 1998 through 1999.  I'm looking at Bates 312.

THE COURT:  Okay.  But what's that got to do with the brother?  What is the brother's name?  Where is that mentioned.

MR. PINHEIRO:  He didn't live at the property, Your Honor, and I don't have an explanation for that.

THE COURT:  That's why you thought the document was misleading, right?

MR. ZEHE:  Yes, Your Honor.

MR. PINHEIRO:  It's not uncommon for friends or relatives to purchase property, maybe to build --

THE COURT:  I'm not saying that, but four years or three years before the fact and for the purpose you're trying to use that, I don't think that's permissible, Mr. Pinheiro.  I'm not going to allow it.

MR. PINHEIRO:  Thank you.

THE COURT:  Sustain the objection.

All right, what's the next one there, Brendan?

THE CLERK:  42.  Our number 13.

MR. PINHEIRO:  Withdrawn, Your Honor.

THE COURT:  All right, that's good.

And the next one, Brendan?

THE CLERK:  48, our number 17.

THE COURT:  48 is a general order, Department of Police Service.

MR. PINHEIRO:  That's correct, Your Honor.  Emergency room procedures at Yale New Haven Hospital regarding securing the clothing.  The clothing was never secured, that the deceased wore at the time.

THE COURT:  You mean the clothing of the deceased?

MR. PINHEIRO:  That's correct, Your Honor.  We don't know what happened to it.  And a test of the clothing would have conducted a gunshot residue testing to determine whether the shot that killed the deceased came from within or outside the vehicle.

THE COURT:  You mean it might have.

MR. PINHEIRO:  That's right.  And the clothing just disappeared, not destroyed, according to destruction records, just disappeared.  And Officer Forbes who went to the hospital was asking questions about this general order, normal course of business, did he know about it and what happened to this clothing.

THE COURT:  Wait.  Do you have anything that would indicate that the Defendant in this case went over to that hospital and took those clothes, clothing, is that the point you're trying to make, and destroyed then or did something else with them?

MR. PINHEIRO:  Frankly, we don't know, Your Honor.  All's we know is that the clothing never turned up.  We don't know -- and the Defendant was assigned as lead detective on that night, the 25th.

THE COURT:  Well, do you think -- and I

don't know this, and I guess maybe you got some hospital personnel that would be able to answer the question, but do you think just because a guy walked in there with a shield of some kind, said I'm a detective, I want you to turn over these clothes to me right now, and that at that point you would have to impute a lot to Detective Rodriguez to get him to be thinking that quick, because this would have been the night that Mr. Lucky unfortunately passed away, right?

MR. PINHEIRO:  That is correct.

THE COURT:  So where are you going with this, Mr. Zehe?

MR. ZEHE:  Your Honor, the issue is the officer pursuant to policy went over and picked up the clothing from the emergency room, brought it back, all the clothing was inventoried, which is Defendant's Exhibit B-4, some 12 pieces of clothing.  It was discovered that the T-shirt that was likely cut off by paramedics treating the patient at the scene or by emergency room didn't get turned over by the hospital personnel to Officer Forbes, and it was later discovered that it wasn't there.  He went back and asked for it.  They said they didn't have it anymore.

THE COURT:  So the piece of clothing that's missing was the T-shirt?

MR. ZEHE:  Just a T-shirt.  They collected everything else, collected everything that the hospital personnel gave them and inventoried it.  And the inventory slip is B-4.

THE COURT:  What's all the general order stuff got to do with anything, Mr. Pinheiro?  I mean let's assume that's what the testimony's going to be.  You going to try to use the hospital record to show what?

MR. PINHEIRO:  It wasn't collected in the proper course, Your Honor.  We did not -- he did not get all the clothing.

THE COURT:  Who, the hospital?

MR. PINHEIRO:  The officer.

THE COURT:  And you would bootstrap with, You see, ladies and gentlemen, it would have had gunpowder on it, or some kind of powder on it, and that way he knew it was going to do that, would have that, that's why he didn't pick it up, that's what you're going to argue?

MR. PINHEIRO:  I think the jury should be entitled to hear all the evidence.

THE COURT:  I sustain the objection.

MR. PINHEIRO:  Thank you.

THE COURT:  All right.  We're going to

stop right now.  We'll be back tomorrow morning, I guess.  How many more of these we have, Brendan?  A good number, huh?  We've got Defendants to go through, too.  We got a couple.

We'll be here at 9 o'clock, then, guys.

MR. PINHEIRO:  Your Honor, may I ask a question?  During the course of the trial there's going to be referring to reports and witness reports in the witness statements, there's going to be profanity and racial slurs.  How do you want us to handle that?

THE COURT:  I just got to call them the way they were written.  I think that's all we can do.  And we can make a general statement if you want me to, that the lawyers indicated that there might be some profanity or racial slurs or something else and, you know, we don't want to offend anybody, but this is what the documents say, and that's what's going to -- that's what you're trying to say?

MR. PINHEIRO:  Yes, sir.

THE COURT:  That's the only way to do it, I think.  All right?

MR. ZEHE:  Your Honor, may I bring up one other point?

THE COURT:  Yes, sir.

MR. ZEHE:  Mr. Pinheiro and we had discussed many of the witnesses testifying in the Plaintiff's case are retired police officers, and have had some difficulty getting to court, arranging to be here.  We've agreed that when a witness is called, they'll be called just once, if it's all right, Your Honor.

THE COURT:  Absolutely.  I'll explain to the jury you're going to take them in what'll amount to your direct, cross, direct, whatever it is, calling your case.  I can do that.

MR. ZEHE:  Thank you, Judge.

THE COURT:  All right.  That's it, guys. Thank you very much.

MR. PINHEIRO:  Your Honor, can we leave exhibit books here?

THE COURT:  As far as I'm concerned you can, and I guess we can.  You can lock up the courtroom so nobody can steal all this stuff that nobody else would want.

THE CLERK:  True, Judge.  It will be locked.

THE COURT:  All right.  Thank you all, guys.

MR. PINHEIRO:  Thank you, Your Honor.

MR. ZEHE:  Thank you, Your Honor.

(Court adjourned)

288

CERTIFICATE OF REPORTER

I Hereby certify that the foregoing 287 pages are a complete and accurate computer-aided transcription of my original stenotype notes taken in the Matter of Gary Session VS Edwin Rodriguez, which was held before The Honorable Tucker Melancon, U.S.D.J., at U.S. District Court, 915 Lafayette Boulevard, Bridgeport, Connecticut on May 20, 2013.

Wendy Allen, RMR, CRR

Notary Public

My commission expires:  April 15, 2015