288

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


GARY SESSION        )
    Plaintiff       ) 3:03-cv-00943 (TLM)
                    )
VS                  ) May 21, 2013
EDWIN RODRIGUEZ     ) Federal Building
    Defendant       ) Hartford, Connecticut



VOLUME 2


TRIAL HELD BEFORE
THE HONORABLE TUCKER L. MELANCON, AND A JURY


Reporter:  WENDY J. ALLEN, RPR, CRR, LSR #00221

289

Representing the Plaintiff

John Pinheiro, Esq.
374 Whalley Avenue
New Haven, CT  06511
Pinheirojohna@gmail.com


Representing the Defendant

Thomas Katon, Esq.
Susman, Duffy & Segaloff
P.O. Box 1684
New Haven, CT  06507
Tkaton@sussmanduffy.com

Jeffrey R. Zehe, Esquire
Nielsen, Zehe & Antas, P.C.
55 West Monroe St., Suite 1800
Chicago, IL 60603
jzehe@nzalaw.com

290

I  N  D  E  X

WITNESSES:                                          PAGE:

Lily DeJesus
    Direct Examination by Mr. Pinheiro...........  336
    Cross-Examination by Mr. Katon...............  362
    Redirect Examination by Mr. Pinheiro........  372
    Recross Examination by Mr. Katon.............  373
    Redirect Examination by Mr. Pinheiro........  374
Albert Lucky
    Direct Examination by Mr. Pinheiro...........  380
    Cross-Examination by Mr. Zehe................  416
    Redirect Examination by Mr. Pinheiro........  433
Brendan Canning
    Direct Examination by Mr. Pinheiro...........  441
    Cross-Examination by Mr. Zehe................  485
    Redirect Examination by Mr. Pinheiro........  523
    Recross Examination by Mr. Zehe.............  529
    Redirect Examination by Mr. Pinheiro........  530
    Recross Examination by Mr. Zene.............  530
Juan Scruggs
    Direct Examination by Mr. Pinheiro...........  532
    Cross-Examination by Mr. Katon...............  557
------------------------------------------------------

THE COURT:  We're back on the record in Civil Action No. 03-00943, Gary Session versus Edwin Rodriguez.  And we are continuing the resolution, hopefully, of all of the objections to the exhibits that we started yesterday morning and finished yesterday afternoon after we discharged the jury for the day.

And one of the things that Brendan just reminded me of, there was an instruction -- or I instructed you all yesterday to come up with, I guess, a limiting instruction of sorts.  And I think defense counsel has prepared that in reference to one of the exhibits, the number of which escapes me now.  I think it was turned over to Plaintiff's counsel this morning, I think.

MR. PINHEIRO:  I haven't received it yet, Your Honor.

THE COURT:  Okay.

MR. KATON:  It was e-mailed, Your Honor.

THE COURT:  Okay.  Well, do you have a hard copy so he can look at it?

MR. KATON:  I don't have a hard copy.  I was hoping maybe Brendan might be able to print it out.

THE COURT:  We'll try to do that, and

292

where I was going, Mr. Pinheiro, is I was hoping you could look at it today. We'll give it to you after first break, I guess, or certainly after lunch. Look at it today, and maybe visit with your noble adversaries and see if we couldn't get an agreement now and get it to me so that's out of the way.

The other thing -- and Brendan and you and I had talked about this today, and I think we talked about it yesterday -- but these jury instructions -- jury interrogatories as it relates to the liability phase and if we get to the punitive damages phase and also the special interrogatories as relates to qualified immunity that have been approved by everybody. They've seen them.

I would like for you to go ahead if we can today or latest tomorrow sometime, just depending on what happens with the other things in our world, to make sure they have copies here or what we intend to do -- to use. And again, the door is closed on these, gentlemen, unless you see a mistake that I made when we --

But they've already seen all these, right?

But I want you to have a copy so everybody is clear that this is a done deal and put in

293

the oven and baked, and it's ready to eat.  Okay?

MR. KATON:  Your Honor, one other minor matter.  The warrants have been redacted in a way that complies with the Court's order with respect --

THE COURT:  I'm sorry.  The what has been redacted?

MR. KATON:  The warrant applications have been redacted.  Again, I would move to submit a limiting instruction to the Court so that the jury will understand that the redaction occurred at the behest of a court order.

THE COURT:  Yes.  Pursuant to court instruction, something like that -- whatever we did.  I don't remember the particulars.

Mr. Pinheiro, you got a puzzled look on your face that says -- it almost looks to me like, What the hell's he talking about, Judge?

MR. PINHEIRO:  Well, Mr. Katon, they redacted with the black Magic Marker.  What I did, I just cut that paragraph out and recopied it.  So it doesn't even look like there's a redaction.  And so...

THE COURT:  Well, this is a minor thing.  We'll figure it out.

But does it matter to you, Mr. Katon?  Is there something in that paragraph that ought to be in

294

that is...

MR. KATON:  The problem is, if it looks like it's inked out, it looks like -- there is a possibility to draw an inference that someone on this side of the aisle crossed something out.

THE COURT:  But I could still give that instruction, say Guys, when that comes up into evidence, that this has been redacted pursuant to the Court's instruction, and that's why you may see a line or whatever you see.

MR. PINHEIRO:  I don't think that's even necessary to give that instruction.

THE COURT:  But again, it doesn't matter, does it?

MR. PINHEIRO:  Well, I'd prefer the jurors not to even have any -- direct any attention to it, because when you speak, Your Honor, the jury's going to zero in on that.

THE COURT:  No.  I do understand that, but I also perceive, based on many years of experience not only as a judge but as a lawyer, that realizing when still like now, you guys -- you lawyers are all suspect to the jury.  I'm the only good guy in the courtroom, unless I really, excuse the expression, "peed in the gumbo" yesterday.  I don't think I did

295

but maybe I did.

But when I tell them something, they think I'm the neutral author of everything.  So I don't see that as a problem.  I really don't.  If I did, I wouldn't say a lot of things I say, but we'll just look at it.

When is that going to come up?  Early this morning?

MR. KATON:  Most likely.

MR. PINHEIRO:  I think the warrant will probably come up -- I'm not sure, Your Honor.  It may not even come up today.

THE COURT:  Okay.  Well, do you have readily available copies of both of them --

MR. PINHEIRO:  Yes.

THE COURT:  -- what you did and what you did so I can look at it and we can move on to the issue at hand?

MR. PINHEIRO:  Yes, Your Honor.

THE COURT:  Okay.  Good.

Brendan, before the jury comes in, just get their copies.  You guys can get them ready, and we'll look at it.  If it makes a tinker's dam difference, I'll do what I got to do to make sure it's the least objectionable.

Okay.  Now, where were we when we broke last night, Brendan?

THE CLERK:  Our Number 18.

THE COURT:  Our Number 18, their number...

THE CLERK:  Plaintiff's Exhibit 49.

THE COURT:  Let me see -- let me take a look at it.

MR. PINHEIRO:  Withdrawn, Your Honor.

THE COURT:  Okay, withdrawn.  Great. Dynamite.

And the next one would be?

THE CLERK:  Number 21 on ours, Plaintiff's 75.

THE COURT:  Okay.  Let me just look at that.

This is a motion for disclosure of records in -- again, in the state criminal court proceeding, which was the subject, I think, of at least two rulings yesterday.  And I think the issue -- again, I'll let both lawyers correct me -- the record's the record.  I said it's not relevant, and I think Mr. Pinheiro and I had an extended discussion, but I might be wrong.

So Mr. Pinheiro -- and I'll ask you

297

first -- and Mr. Zehe, is that -- my recollection correct about how I handled the other matters in the state criminal court proceeding yesterday?

MR. PINHEIRO: Your Honor, Plaintiff's 75 is Bates 472, and that is a --

THE COURT: It's 462, is what I got. No wonder I'm looking at the wrong thing. Excuse me. Thank you for straightening me out there, Mr. Pinheiro. And I expect you to keep doing that through the remainder of this trial.

MR. PINHEIRO: I don't take any pleasure in doing that, Your Honor.

THE COURT: You always do. I just happened to have been standing where lightning struck, and I happen to be the judge in this proceeding. But undoubtedly, as you noted, I'm -- there are a lot of challenges like we all do. So again --

MR. PINHEIRO: 472 Bates.

THE COURT: What is the exhibit number?

THE CLERK: 75.

THE COURT: And the Bates stamp number, Mr. Pinheiro, is --

MR. PINHEIRO: 472.

THE COURT: Okay. This is New Haven police department, evidence, found -- evidence, it

298

says, and there's something marked over it.  So found property, then safekeeping.  X is evidence.  And it looks like written on there is a -- like a number, and then underneath that in black bold is "homicide box."  And let's just see here what I thought about it whenever I thought about it before.  So give me just a minute.

All right.  Firstly, let me just say -- am I right, Mr. Zehe, that this was a -- a -- purports to be an official document of the New Haven Police Department?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  All right.  And help me with -- I think what was stated was that you-all hadn't reviewed this?  Did I get that wrong?

MR. ZEHE:  Your Honor, this is a document that marks a box that contained evidence that was --

THE COURT:  I'm sorry.  Could you speak up a little more loudly?

MR. ZEHE:  This was a document that marked the box that -- in which was kept evidence from the case that was ultimately destroyed.  This cassette tape of a 9-1-1 call that's mentioned in the exhibit is part of the destroyed evidence.  It has no relevance in this case.

299

THE COURT:  I got your point and, Mr. Pinheiro, help me understand.

First of all, first question:  Do you agree that that is what this purports to be, what Mr. Zehe just said?

MR. PINHEIRO:  That's correct, Your Honor.

THE COURT:  What's the relevance to this case now based on the Court's previous rulings about the destruction pursuant to the state statute and the state judge's law.

MR. PINHEIRO:  I agree, Your Honor.  The only reason why I bring it up is I want to know whether or not they have the tape, because I remember possibly seeing some e-mails that they may have the tape with the newly discovered --

THE COURT:  I'm sorry.  The tape --

MR. PINHEIRO:  Yes.  The 9-1-1 tape.  It makes reference to one cassette tape of a 9-1-1 call.

THE COURT:  Mr. Zehe is shaking his head. And that's a representation as an officer of this court, after whatever exhaustive search you guys have made, finding new stuff -- or let me rephrase the question.

Are you representing to me that anything

300

we found, that we thought had previously been destroyed, has been produced to the plaintiff counsel?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  All right.

MR. PINHEIRO:  If he says they don't have the 9-1-1 tapes, that's fine with me.

MR. ZEHE:  We do not.

THE COURT:  So you withdraw 75, Counsel?

MR. PINHEIRO:  Yes, sir.

THE COURT:  All right.  So what's the next one, Brendan?

THE CLERK:  Number 76, our 22.

MR. PINHEIRO:  Withdrawn.

THE COURT:  Okay.  76 withdrawn.

Next one, Brendan.

THE CLERK:  77, our 23.

THE COURT:  This says -- this is an inventory of property seized without a warrant.

MR. PINHEIRO:  This is the exact same document that the defendants are offering into evidence.  We went through it yesterday.

MR. ZEHE:  Judge, we withdraw the objection.

THE COURT:  Okay.  So there's no objection to Number 77, right, Mr. Zehe?

301

MR. ZEHE:  That's right, Your Honor.

THE COURT:  All right.  Next one would be our 24, 81, Brendan?

THE CLERK:  Yep.

THE COURT:  All right.  And --

MR. PINHEIRO:  If I may cut to the chase on this, Your Honor.

THE COURT:  Yes, sir.

Mr. Pinheiro:  Plaintiff's 81, we are interested in only Bates Number 498.

THE COURT:  Let me look at that, and then let me read what I thought about it at the time I thought about it -- 498.

MR. ZEHE:  Your Honor, if he's only interested in 498, we withdraw the objection.

THE COURT:  So this would be the new 88, or 81, right?  Is that right, Brendan?  81?

THE CLERK:  Yes.

THE COURT:  The new 81 would be -- consists of only one page, and it would be Bates Stamp Number 498, right, Mr. Pinheiro?

MR. PINHEIRO:  Yes, sir.

THE COURT:  All right.  You're going to redact whatever is in -- I say "redact."  You'll remove the other pages and make sure that's the only

302

thing.

Mr. Zehe, we're all on the same page, right?

MR. ZEHE: Yes, Your Honor. He may want to redact the rest of the entries because they have to do with other cases.

THE COURT: Say again? I'm looking at 498, and I didn't really pay much attention because you said if that's all he wants, no problem.

So in other words, what you're saying is on this page, 498 -- and then what it says: "Evidence log. Please print clearly. New Haven Department of Police Services," which line -- and I'm looking to the numbers on the left. I don't know...

MR. PINHEIRO: It would be the second column from the top where the columns start, Your Honor. It will be 2/28/01, the second column -- the second horizontal column.

THE COURT: Well, again, 498 -- page 498.

MR. PINHEIRO: Yes, sir.

THE COURT: I'm starting at the very top.

MR. PINHEIRO: Yes.

THE COURT: I see there's some kind of -- mine's cut off. And it's got numbers, and after that, "Arrest: yes or no."

303

MR. PINHEIRO:  The second one down.

THE COURT:  So that one starts on the left under the number that's cut off in 990?

MR. PINHEIRO:  I think that's 99 -- if I may, 9946990, C-O-N-P number.

THE COURT:  Well, see, I don't have -- my copy is cut off on the left, so I can't see that.  But under "Arrest:  yes or no," is "Y" for yes; and then under "Evidence Description:  Two handwritten letters."

Is that what we're talking about?

MR. PINHEIRO:  That's correct.  That's correct.

THE COURT:  And Mr. Zehe, you're talking about -- Judge, since that's all he wants, maybe it would be appropriate to redact the rest and just by drawing through it?

I mean, again, might be more appropriate just to highlight the yellow and say, This is all we're talking about on this exhibit.  The other ones are related to other matters.

MR. ZEHE:  However it's highlighted or redacted --

THE COURT:  Just go ahead with the marks -- highlight type thing, Mr. Pinheiro.  And

304

that's what the jury will get to see on the Elmo and take into the evidence -- the deliberations in the jury room if it's introduced.  Okay.

What's next, Brendan?

THE CLERK:  Plaintiff's Exhibit C-24.

THE COURT:  Now, I might need some help up here to get me resituated, because I think I'm moving to another book now, is that true?  You want to come get that for me, if you would?  Oh.  So we're on C-24 now, is that right?  Okay.

And let me just take a look at this and see.  I see what this is.  It's something from the Department of Public Safety, Division of Scientific Services.  It's got a laboratory case number, and it says the submitting agency:  New Haven State's Attorney's Office, the local case number -- gives that and the town, New Haven.

MR. ZEHE:  Your Honor, we'll withdraw that.

THE COURT:  Objection?

MR. ZEHE:  Well -- I'm sorry.  We'll withdraw the exhibit.

THE COURT:  You're withdrawing the document.

MR. ZEHE:  Yes, Your Honor.

305

THE COURT:  All right.  Got it.  Next --
the next one, Brendan.

THE CLERK:  Exhibit Number F.

THE COURT:  Our number?

THE CLERK:  5 on this section.

THE COURT:  I'm sorry?

THE CLERK:  5 on Your Honor's section,
the bottom of page 9.

THE COURT:  I don't understand your
system as well as I thought I did when we looked at it
together earlier.  All right.

So it's Exhibit F -- their Exhibit F, is
that right?

THE CLERK:  Yes.

THE COURT:  So let me just see -- well,
then I'm confused.  So help me.  I got numbers.  Do I
have letters, too?  All right.  I see it.  It was in
the back of the book.

And this is a Witness Protection Program
form, and it's from the Office of the Chief State's
Attorney.  I got to assume that's from the -- I'm not
sure what that means.

Is that the State's Attorney General, who
I thought was Senator Blumenthal before this.  But of
course, going back that far, maybe it predated

Senator Blumenthal, or is it another office that I'm just not familiar with because I'm not a native.

MR. KATON:  The Attorney General's Office, Your Honor -- if I may, since Mr. Zehe is from Illinois.  The Attorney General's Office is in charge of civil matters, and the State's Attorney's Office is in charge of the prosecution of criminal matters.

THE COURT:  I did not know that.  You know, I guess it's under this theory of sovereign concept of the states and federalism.  Boy, each of the states are so weird about how they do things, which is their right.  But their answer as to Why do you do it that way?  I'm sure just like all the judges that I've ever encountered as a visiting judge, Because we've always done it that way.

Of course, I know a lot about New York -- a lot more than I want to.  Boy, they are really weird how they do stuff.

Mr. Zehe, what do you think about a jury being picked in state court and some of my colleagues in federal court with the judge not being in the room and the law clerk kind of presiding over it?  You ever see that in the great State of Illinois?

MR. ZEHE:  I've heard of it.  It's not the way we do it in Illinois, that I'm aware of.

307

THE COURT:  I was flabbergasted. Nobody -- none of the judges or Louisiana lawyers work like that.

But anyway, it looks like Mr. Katon stood up.

MR. KATON:  Just picked one last week without a judge.

THE COURT:  Here in the state?

MR. KATON:  Here in the state.

THE COURT:  Oh, good Lord.

MR. PINHEIRO:  Very efficient, Your Honor.

THE COURT:  I imagine it is.

MR. PINHEIRO:  Not in criminal cases, just civil.

THE COURT:  Well, I got a son-in-law, a criminal defense lawyer here in the state.

MR. PINHEIRO:  I know him well.

THE COURT:  Dean?

MR. PINHEIRO:  Yes.

THE COURT:  Oh, you do, do you?

MR. PINHEIRO:  For years.

THE COURT:  But at any rate, he tells me how long it takes you guys to pick a criminal jury, and I guess an argument could be made that it's a

fairer process.  But I'll tell you what, I don't think it holds a whole lot of water.

MR. ZEHE:  Your Honor, I understand that the same process without a judge, it takes over a week to pick a jury without a judge sitting.

MR. KATON:  That's modest.

THE COURT:  My son-in-law has told me two to three weeks, you know, is not unusual.  You just shut down the whole federal judiciary if you got to do it that way.

I don't think you get any -- I mean, again, I guess I'm prejudice, and as a lawyer I always thought, you know, we have state voir dire in the state court proceedings in Louisiana and always did, but I didn't think about it twice.  And this is rhetorical question, or I'm going to make a statement -- and I did comment on the panel -- the jury veneer yesterday.  And the quality, until right at the end when a couple of them went south on us, I thought they just didn't want to be here.

But I think -- and the only questions you guys are allowed to ask, if you had any -- and I don't think the Defendant had any, but the Plaintiff did -- was each of the lawyers, because I wanted to make sure you-all had every shot.  I didn't know what you all

would do.

But I don't know what you all might have done differently. And you could say, Well, Judge, we don't have enough time to tell you this morning had you been allowed to go into -- if I gave you five minutes with each of them, that we didn't do.

And lawyers -- in my view, you have -- your highest duty is that of an officer of the court. And it's even -- there's -- not to say there's not tension between representing a Plaintiff or Defendant in the case, but your absolute obligation is to the tribunal, to make sure that, in our search for the truth, the rules are followed.

And I mean, I think -- I don't know how it is in Connecticut, but everywhere I've ever been, I think it's pretty much you get disbarred if you intentionally mislead a court on a matter of -- material matters. You just can't do that. And there's tension between representing a client and your duty as officer of the court.

And you may see in this case -- maybe I've done it before -- I say, Okay. Now, general fellows, put on your officer -- take off your advocate's hat, and put on your officer of the court hat. It's like a laser. I don't want any lawyer

310

mumbo jumbo on this.  Tell me.  And I may do it here, may not.  But when you're picking a jury, everybody tries for an advantage, and that's fair.  But the judge's role is to make sure it's as down the line as you can.

And in Louisiana, what they do, they read in the criminal case.  They read the statute -- DA gets up there and reads the statute.  And they do it maybe 40 times or whatever the jury demand is -- 50 times.

And I mean, by the time it's been pounded into the jury voir dire members, what this guy's charged with, it's real hard to do anything else.  To me, that's just insane and not fair.  But lawyers are trying to get their advantage.

And I apologize for rattling on.  I really do.  Brendan, remind me, one cup of tea.

THE CLERK:  Got it.

THE COURT:  So we're on -- again, it's a direct order, if I can order you to do anything.  Turn around and say, "Judge, you're doing it again."  I used to have a law clerk say, "Judge, you're talking like your daddy did."  All right?

THE CLERK:  That might take some getting used to, because it doesn't really bother me.

311

THE COURT:  I know.  But I mean, here -- we're sitting up here, and we got a lot of stuff to do.  We got 25 minutes and I think we'll finish this.  Maybe not.

So we're on Exhibit F.  This is the telecommunications memorandum, I believe.  And it's a Bates Stamp Number 867, and let me see what it is that I thought at the time.

All right.  The first issue -- Mr. Zehe, this is for you, is that -- is Mr. Pinheiro correct that this document, this Exhibit F, was not turned over to him prior to the close of discovery and the Court ruling on summary judgment?  And if that's true, why shouldn't the document be excluded under Federal Rule of Civil Procedure 37.

So first question:  Is that true?

MR. ZEHE:  Your Honor, it was disclosed after summary judgment in 2006, because at that time Mayra Mercado came forward and recanted.  Then a search went out for information regarding Mayra Mercado.  That was the first time it was disclosed that she was recanting her statement from November 4th, 1999.

This was located for the first time and is being offered to show that, contrary to the

Plaintiff's contention that she was forced or coerced or this statement was fabricated, she wasn't -- this is an activity of the police department and the state's attorney that treated her exactly the opposite of what the Plaintiffs contend.

THE COURT:  I understand your point.  Let me just say I think it's clear from the record -- it will be clear to any reviewing court, if anybody gets to review this record, that this case was reassigned to me.  And I forgot who was -- who the referring judge was, and it doesn't matter.

It seems like I've had it my whole career, because we've had a number of issues over the time and then Hurricane Sandy.  But within the last two years, I feel certain that's true.

Is that correct Mr. Zehe and Mr. Pinheiro?  I didn't get this case more than two years ago.

MR. PINHEIRO:  0'10.

THE COURT:  Sorry?

MR. PINHEIRO:  November 0'10 we first met you, Your Honor.

THE COURT:  So I've had it roughly two and a half years.  So I wasn't the judge at the time.  And whatever was done -- summary judgment ruling --

313

that was not the summary judgment I had anything to do with. That's Number 1.

But Number 2, Mr. Pinheiro, I'm not saying anything against your client's interest as it relates to the merits of your legal position or your factual position about Ms. Mercado and her being coerced to do whatever she did.

But is it a fact that, whether she was coerced or not, it wasn't until after the summary judgment ruling that she made what Mr. Zehe has characterized is a change from, even if it was a coerced statement, in her position as relates to what happened, is that true? As an officer of the court in question, I'll put it right there.

MR. PINHEIRO: Your Honor, I wasn't counsel at the time. I'll make that premise first.

THE COURT: Well, let me ask you this then: Do you have any reason to doubt what he just said based on your knowledge of the case?

MR. PINHEIRO: Not that. But if I may take a step further is that, prior to the summary judgment, prior counsel requested all information concerning all the witnesses in this case. This wasn't disclosed in a timely manner at that time.

Previous counsel did not even find out

314

that Mayra Mercado was in witness protection until well after the fact. This document could have and should have been disclosed prior to summary judgment, regardless of the witness changing or recanting or however you want to classify her testimony.

THE COURT: My issue now -- Mr. Katon just stood, and he's local counsel as the record should reflect already and I assume was the attorney back at that time, right?

MR. KATON: That's correct, Your Honor.

THE COURT: And, Mr. Pinheiro, my issue right now -- because there's several things I'm going to ask Mr. Zehe about -- it was just the Rule 37 sanction that I could impose and exclude on that basis.

But, Mr. Katon, why don't you elaborate on what you can about what Mr. Zehe and Mr. Pinheiro's said to me.

MR. KATON: I believe I can give a little insight. The motion for summary judgment was filed by the Defendant. And in response to that, no prior disclosure in discovery, a statement allegedly recanting Mayra Mercado's testimony, was the filed by the Defendant in opposition.

THE COURT: Wait a minute. You said the

315

Defendant filed summary judgment motion, and then you --

MR. KATON:  I'm sorry.  Defendant filed summary judgment motion, Your Honor.  The plaintiff, in response to that summary judgment motion, filed the statement from Mayra Mercado recanting her prior testimony in the case.

At that point in time, after Judge Thompson ruled that that created an issue of fact precluding summary judgment on behalf of Mr. Rodriguez, Ms. Mercado's deposition was taken.  It occurred in two installments.  By the second installment, I had received from the State's Attorney's Office --

THE COURT:  Excuse me.  You say "installments," you mean the deposition was taken in two parts?

MR. KATON:  Correct.

THE COURT:  Okay.  I'm with you.

MR. KATON:  By the second installment, I had obtained from the State's Attorney's Office, through their own voluntary action -- I don't control the State's Attorney's Office -- the witness protection materials.  They were disclosed to Mr. Ward, who was Mr. Session's counsel at that time.

316

And it's in the transcript that he asked for a break to review them.

THE COURT:  All right.  Now, Mr. Pinheiro, if I assume what Mr. Katon just said is reflected by the deposition transcript and the representations that he made or related thereto, do you have any reason to doubt him, that that's what occurred?  Now, you weren't there.

MR. PINHEIRO:  I wasn't.

THE COURT:  I'm sorry?

MR. PINHEIRO:  I was not there.

THE COURT:  Okay.  But do you have any reason to doubt what he said?  And would you like to have some time to just go make sure from your review of the deposition that that's exactly what the deposition reflects as far as the turnover and about time to review it?

I mean, if you'd like that -- if you think that's necessary, and I'm not saying one way or the other if you do, but -- and again, this is limited, only Rule 37 section.  It may get in on other grounds that I go to.  But I'm just trying to make sure we're all on the same page because none of us were here except Mr. Katon.  I mean, neither you or I were.

317

And again, I guess, do you accept his representation, or would you like to go look at it? That won't be a reflection on your belief as to his credibility. Certainly, he'd be in serious trouble with me if he just misrepresented it and maybe further than just me.

MR. PINHEIRO: I don't think Mr. Katon misrepresents anything to His Honor, but I would like an opportunity because I am very familiar -- I've been reading Mayra Mercado's depositions for three, four years now. And I'd just like to check on a different issue that may be relevant.

THE COURT: I would like for you to do this for me. We'll address it tomorrow morning before we bring the jury in.

You say, Gee, Judge -- and that's if I don't already rule -- well, I will reserve ruling, because that won't come up today, right, Mr. Pinheiro?

MR. PINHEIRO: No.

THE COURT: This is a Defendant's Exhibit that'll be in your case if it gets in.

MR. ZEHE: Your Honor, I do believe, if Officer Canning testifies today, it may come up because he did prepare one of the documents in Exhibit F.

THE COURT: So you may -- when you take him in your case, so we don't have to bring him back the way we discussed yesterday if it was okay with me -- I think that's what we talked about yesterday -- you may put on your portion of the case with me giving the jury instructions that you-all agreed to do that and I'm allowing it.

MR. ZEHE: Yes.

THE COURT: So it could come up that way. Now, does anybody have the document? What witness would that be through if it comes up today?

MR. ZEHE: Officer Canning.

THE COURT: That's not one of the three witnesses that I instructed yesterday.

MR. PINHEIRO: No, Your Honor.

THE COURT: So more likely, it'd be this afternoon.

Does anybody have a copy of what Mr. Pinheiro said he'd like to just look at so he can -- as it relates only to a Rule 37 possible sanction -- so he could look at it today over the lunch hour before we get into the noon session?

Now, Mr. Katon, you're looking through something.

Is that what you're looking for?

319

MR. KATON:  I'm looking through my summary of that deposition for the reference to prior counsel's statement on the record.

THE COURT:  All right.  Well, let me ask you this, Mr. Pinheiro:  I want to give you every opportunity.  But it may come down to the best I can do to say, Well, don't call that witness today.  Call him tomorrow so you can -- he can give you exactly where it is in the deposition so you can look at it because if you don't have it here today and he doesn't have it here today, I can't split the baby in two any better than that.  So if that comes down to that, then you have to make a choice, Gee, I'll go with the witness.  I don't need to look at that.

And again, my -- this may all be mooted out in a sense based on what I do here.  But maybe not, because I would look at it most seriously if it turns out that Mr. Katon's wrong or Mr. Zehe is wrong about, gee, it wasn't turned over and here we are.

But again, at this juncture, I have every reason to believe, just as you do, that they're exactly on the money on it.  But I don't blame you for wanting to look.  Okay?

MR. PINHEIRO:  If I may, Your Honor.

THE COURT:  You may.

MR. PINHEIRO:  If I may refer Your Honor's attention to Defendant's F, Bates 884, that's part of the package.  I believe that 884 would be independent of whatever ruling that you make regarding the admissibility of F, because I think that -- the middle paragraph is redacted.

MR. ZEHE:  Your Honor, we will withdraw that page if that's Counsel's objection to Exhibit 7.

THE COURT:  I don't want to spend a lot of time on it, but Mr. Pinheiro, you're talking about Bates 884, the 2/26/01 entry?

MR. PINHEIRO:  That's correct.  I wasn't withdrawing my objection to the entire exhibit.  But in the event that Your Honor overrules my objection, then I just want to make sure that we're covered on 884 independently, if my objection is overruled, that this would be, as Mr. Zehe offered, to take the page out.

THE COURT:  Okay.  So you agreed to do that.

MR. ZEHE:  Yes, Your Honor.

THE COURT:  I got you.  So in any event, 88 -- Bates stamp 884 of Exhibit F is out.

MR. PINHEIRO:  Thank you.

THE COURT:  Now, let me move on to the

next question for Mr. Zehe here, if I can remember what it was.

Now, I think Defendant made the assertion that this was hearsay.  And I'm not sure if I got that right, but it seems like Federal Rule of Evidence 803(8)(iii) says this is a statement by a recording officer and a public record under that statute and -- I mean, it seems like it gets in.  Is that your point.

MR. ZEHE:  Yes, Your Honor.

THE COURT:  And, Mr. Pinheiro, what have you got to say about 803(8) Section 3 -- small "i" three?  Seems like it gets in to me.

MR. PINHEIRO:  Your Honor, what exhibit are you referring to?

THE COURT:  Still on F.

MR. PINHEIRO:  Oh, I'm sorry.  I thought we went to the next one.

THE COURT:  No, no.  That's why I do it -- I said I was handling --

MR. PINHEIRO:  I understand.

THE COURT:  I was handling just Rule 37, first sanction, and now I'm on this one now on hearsay.  You said it was hearsay.  Seems to me it's not, and I gave you the Federal Rule of Evidence.

MR. PINHEIRO:  Well, I would have to say,

322

Your Honor, it's grounds of relevancy and the prejudicial effect it would have on the jury.

THE COURT:  I'll reserve that until just a moment.  Okay?  But in other words, you're rolling on the hearsay.  It's covered by the rule I cited, or do you want to argue that it's not?

MR. PINHEIRO:  I would have difficulty arguing that, Your Honor.  I would have difficultly arguing against that, to be honest with you.

THE COURT:  I appreciate your candor.

The next issue for me is -- now, again, I think Plaintiff says that that statement is -- was the subject of Plaintiff's motion on prior convictions, arrests, which was granted by the Court's December 19th, 2012, minute entry, which is Record Document 357, Mr. Zehe.  And it -- to me, it -- it's not -- clearly not the subject.  But why is it relevant now, Mr. Zehe?  So we'll address what Mr. Pinheiro just had.

MR. ZEHE:  Your Honor, the documents are relevant because these are the documents that are prepared by the State's Attorney's Office with the witness to admit her into the program.  We are calling the witnesses that prepared these documents.  This is the standard business protocol for getting a witness

323

into the Witness Protection Program.  So that...

THE COURT:  Mr. Pinheiro, it sure seems like it's relevant to me, which you put at issue or your client put at issue in the case.

MR. PINHEIRO:  Your Honor, I'm going to cut to the chase.  We're going to withdraw the objection to Defendant's F in lieu of your ruling on the redaction of that certain page, Your Honor.

THE COURT:  Okay.  So in other words, I don't have to address the Second Circuit inclusion rule --

MR. PINHEIRO:  That's correct.

THE COURT:  -- Rule 3 analysis.

MR. PINHEIRO:  I can see where it's going.  It's coming in.  So I don't want to waste the Court's time.

THE COURT:  Again, I just want to make sure that it's a full withdrawal, voluntarily given, because the only thing that you had -- again, let me just say, I think -- well, I don't think you'd say anything.  You're saying, Judge, I understand.  It's not just where it's going.

But the only thing I think you had to hang your hat on was possibly the Rule 37 violation, which we conceded probably didn't happen, or you

324

believe --

MR. PINHEIRO:  I'm not in a position to argue that.

THE COURT:  All right.  So you're withdrawing it?

MR. PINHEIRO:  Yes.

THE COURT:  So what's the next one?

MR. PINHEIRO:  884 is out, page 884, that one page?

THE COURT:  Yes.  You already made that clear, right, Mr. Zehe?

MR. ZEHE:  Yes, Your Honor.

MR. PINHEIRO:  Thank you.

THE COURT:  What's the next one, Brendan?

THE CLERK:  Our Number 6, Number L.

THE COURT:  I've got a very light copy, but let me just see if I can read it all.

Now, this appears to be a handwritten note.  I think my copy -- I think it's from Ms. Mercado.  The first name is kind of blanked out, but the last name is clear enough on a light copy.

I can't make out what's to the right of that up -- a little higher up.  Maybe it says notes from 2 something '01 -- I think that's it -- then of Ms. Mercado.  And then it looks like question:  "Did

Shabazz say anything after the shooting?"  And then there's a little arrow drawn down, and it says:  When you fuck with one, you fuck with death.

MR. ZEHE:  "When you fuck with me," Your Honor.

THE COURT:  Okay.  I'm sorry.  Okay. Now, what, Mr. Zehe, is this -- well, let me just -- let me look back and see what I was thinking.

Brendan, come on up here.

All right.  Mr. Zehe, let's just talk about this.  I appreciate Mr. Pinheiro's objection.  I think it's hearsay.  And let's talk about how hearsay works given this situation here.  And I'll let Mr. Pinheiro address whatever else he wants to say about his objection.

MR. ZEHE:  Your Honor, this is a note that was prepared by Chris Alexy, who is testifying in this case.

THE COURT:  Prepared by?

MR. ZEHE:  Prepared by Chris Alexy, who is an assistant state's attorney who is testifying in this case.

THE COURT:  Okay.

MR. ZEHE:  Notes made during his interview of Mayra Mercado before the -- she testified

326

at the hearing on probable cause.  So these documents -- statements made by Mayra Mercado, this is in Chris Alexy's handwriting.

THE COURT:  I understand that.  So it's a public record exception.

But what about the statements made within the document about hearsay as to the statements?

MR. ZEHE:  The declarant of the statement -- the preparer of the notes and the declarant are going to testify in court.  And I'll just point out too, Your Honor, that this page is also part of the Plaintiff's Exhibits to which we did not object.

THE COURT:  What -- Plaintiff's Exhibit what?

MR. ZEHE:  Plaintiff's Exhibit 61, Bates Stamp Number 450, same page.  We both submitted the notes in this prosecutor's file, which recorded -- which were notes taken by the assistant state's attorney during the interview of Mayra Mercado.

THE COURT:  So your view is -- let's get past, and I'll ask Mr. Pinheiro in just a moment why he objects to his own exhibit, if that's what we got here.  But your position is, if I understand it, gee, Judge, this is in part what the state's attorney

327

relied on to go forward with the prosecution as part of their search for evidence, what have you. And the lady's going to be here to testify, saying that's all made up, if that's what she says. And the state's attorney is going to say, Gee, I wrote down what she said. I didn't have a dog in the hunt, or whatever she's going to say.

MR. ZEHE: Yes, Your Honor.

THE COURT: And the jury's either going to believe the state's attorney or the -- or Ms. Mercado, right.

MR. ZEHE: Yes, Your Honor.

THE COURT: All right.

MR. ZEHE: And it also shows his state of mind in forming the credibility of her fear of threat.

THE COURT: Right. Which is, it seems to me, certainly relevant in this case, because of what Plaintiff has put at issue in the case against the Defendant, seems to me.

Now, Mr. Pinheiro, what's wrong with that one, two, three logic of that?

MR. PINHEIRO: If I may address Your Honor first. When I put in Plaintiff's 61, I put the entire packet of notes in subject to certain redactions, which are the Judge's order, such as

328

Bates 422.  You'd ordered redactions.  I just wanted to make sure that it wouldn't misrepresent the Court to take documents out of a complete package of documents, and then bring it to the Court's attention, redactions that need to be made.  That's why I include that in there.

THE COURT:  Wait a minute.  I didn't follow that.

Are you representing to me that your Exhibit 61, I believe, does not include what Defendant's Exhibit L, their Bates Stamp Number 894, your 61 doesn't include that?

MR. PINHEIRO:  No.  It -- 61 includes that.  It includes 20 or 30 pages of notes.  I didn't want to arbitrarily take out from the complete packet.  I wanted to bring it to your attention for redaction, as your court -- the judge has ruled on Plaintiff's 61, Bates 422.

THE COURT:  Well, wait.  I'm having a little difficult time understanding, so forgive me.  But you just said, if I understood you, that, Gee, Judge, the reason I didn't take it out, because I thought we'd redact it at some point in the future.

MR. PINHEIRO:  No, Your Honor.  This is one complete packet of notes.  I didn't want to

329

separate from the complete package.  It would be incomplete.  But I had it subject to your Court's ruling to certain redactions from these notes, such as Bates 422, your order -- you ordered a redaction.

THE COURT:  What's that got -- what you just said, what's that got to do with the issue we're discussing now about Defendant's Exhibit L, Bates Stamp 894, which is contained, based on what you just said, in your Exhibit 61?  I mean, what's that -- what's the connection there?  You just said --

MR. PINHEIRO:  It should be subject to redaction.  That's what I'm saying, Your Honor.  I didn't want to submit a document in this court to Your Honor.  I thought it was best to submit the entire document subject to redaction.  I didn't want to take something out of the complete set.

THE COURT:  I understand you didn't want to -- you wanted the whole document, but subject to redaction as to 894 -- their 894?

MR. PINHEIRO:  Yes, Your Honor.

THE COURT:  And when did you think we were going to do that?

MR. PINHEIRO:  Well, you ordered redaction of any and all references to any prior bad acts or anything.

330

THE COURT:  And so your argument is, Judge, that's what you're deciding this instant, whether or not it should be redacted?

MR. PINHEIRO:  I believe, Your Honor, you made an order already that all kind of references of this type of language be redacted.

THE COURT:  I don't know what you're talking about, Mr. Pinheiro, frankly.

MR. PINHEIRO:  You made an order, Your Honor, concerning prior bad acts, arrests, convictions, or anything like that matter should be redacted from all documents.

THE COURT:  Well, let me just say this: I understand what you're saying now, but this is not in my view of what bad acts are.  It refers to prior or past acts.  This document -- this Bates 894 of Defendant's L is, to me, directly related to the alleged act that caused Defendant to arrest Plaintiff and initiate prosecution.  It's not about --

You know, to me, it's extremely relevant, and it goes to whether or not there was -- the Defendant can show that he developed probable cause in this case, or the state's attorney, whoever actually brought it -- whenever he hands the ball off to him, for -- in the case for the subsequent arrest of the

331

plaintiff.

And if I had to do the 403 analysis -- again, all evidence is prejudicial to somebody, I mean, prejudiced to somebody. The probative value significantly outweighs any prejudicial effect given the facts of the case as I appreciate them to be.

So that would be the Court's ruling, unless you got something else that you want to say to address that.

MR. PINHEIRO: I don't, Your Honor. That was the basis of my objection, hearsay and redactions.

THE COURT: I overruled the objection. Okay?

Now, Brendan, am I right that that's the end of it? All right.

Ken, would you go check to see if all our jurors are here? And if they're not, we're going to take a little break. So let us know as quick as you can. It won't be much of a break because we want to be true to what we told the jury yesterday. And if they're here, we're just going to rock on through it.

All right. Three-minute break.

(Recess)

THE COURT: What you got?

MR. PINHEIRO: During the break, Mr. Zehe

332

directed my attention to an issue that may come up

during the second witness's testimony.

THE COURT:  That issue is?

MR. PINHEIRO:  A prior felony conviction,

which I don't know if he intends to use it to attempt

to impeach my client's credibility, or the witness's

credibility, but it's of a sensitive nature and I

think that I should bring it up now.

THE COURT:  What's the person?

MR. PINHEIRO:  Albert McCann.

MR. ZEHE:  The witness is Albert McCann.

He was convicted within the last ten years of a

felony, sexual assault.  We're going to submit it to

the judge.

THE COURT:  I mean, what's the -- isn't

the rule right on point?  If it's within ten years, it

doesn't even have to be -- well --

MR. PINHEIRO:  Veracity, credibility.

THE COURT:  All right.

MR. ZEHE:  Any felony is admissible if

convicted within ten years or released from custody --

THE COURT:  Subject to my letting it in,

right?  I've got discretion on that.

This is a sexual assault?

MR. PINHEIRO:  Your Honor, the rule is

333

that --

THE COURT:  Okay.  Forget the rule.  I think I just said that.  But the sexual assault -- what's the nature of the allegation?  He pled guilty or was convicted at the trial?

MR. ZEHE:  He pled guilty.

THE COURT:  What was he accused of, and what did he plead guilty to?

MR. ZEHE:  A sexual assault in the second degree.

THE COURT:  Which means what?  What did he do?

MR. ZEHE:  I believe he had sex with a minor.

THE COURT:  Is that your best information, Mr. Pinheiro?

MR. PINHEIRO:  I just got it five minutes ago, Your Honor, from Mr. Zehe.

THE COURT:  Well, we'll check it.

Is that 609?  What is it?

We'll take a look at that before he gets here.  I want to get the jury in here right now.

MR. PINHEIRO:  I'll get the witness, Your Honor.

THE COURT:  Bring in the jury, please.

334

(Jurors present)

THE COURT:  Good morning, ladies and gentlemen of the jury.

Let me just say, first of all, I appreciate you-all being here again.  I would remind you again, if you could, do the best you can to leave a little early so we can start right on time, because stuff happens.  And then just stuff -- if compounded, stuff -- other stuff happens with the Court, because you're not here.  And so I made you a little later than you otherwise would have been late.  So I apologize for that.  But try to do the best you can.

Now, the other thing, I'll just make a quick comment.  When we come in -- it's always interesting to me when the jury comes in for the first time and we're all standing.  It's kind of like you guys all stood for me yesterday.  And the reason you did that, that you stood for me yesterday is the reason we're standing for you now, is the position that you hold in this proceeding.

And sometimes members of the jury will sit down.  Sometimes they'll stand.  Sometimes they do half and half.  And I want you all to know that, when you come in, you can stand if you'd like to, or you can plop yourselves down and some of you continue to

335

stand.  I'm always going to say, "The jury may be seated."  And then we'll still be standing until all of you are seated, and then I'll say, "The rest of you may be seated."  So that's why we are standing.  Feel free to do it any way you want.

Now, you will recall that when we broke yesterday that I told you that we reached that portion of the trial that the attorneys had made their opening statements, the Plaintiff would be permitted to call his first witness.  So we're at that point.

Mr. Pinheiro, who is your first witness?

MR. PINHEIRO:  Lily DeJesus, Your Honor.

THE COURT:  And I take it Ms. DeJesus is in the courtroom.  You may come up, Ms. DeJesus, and if you face this gentleman, he's going to administer the oath to you and then you can come around here and be seated.  And as soon as she's seated, Mr. Pinheiro, you may proceed with the questioning of the witness.

(Lily DeJesus, sworn by the clerk)

THE CLERK:  Would you state your name for the record, and spell your name and the town in which you reside.

THE WITNESS:  Lily Jinet DeJesus, L-I-L-Y, J-I-N-E-T, D-E-J-E-S-U-S, and I reside in New Haven.

336

MR. PINHEIRO:  If I may please the Court, Your Honor?

THE COURT:  I'm sorry?

MR. PINHEIRO:  If I may please the Court and begin?

THE COURT:  Yes.  I said, as soon as she's seated, you may proceed.

MR. PINHEIRO:  Thank you.

DIRECT EXAMINATION BY MR. PINHEIRO:

Q   Mrs. DeJesus, what is your occupation currently?  Are you employed?

A   I'm unemployed.

Q   In 1999, what was your occupation?

A   Police officer in The Hill section of New Haven.

THE COURT:  And, ma'am, if you don't mind, pull that microphone, if it moves, a little closer to you.  And my ears are old and I'm getting hard of hearing.  But maybe if I'm having a hard time, maybe some of the other people on the jury might be too.  So please feel free to belt it on out.  Okay?

THE WITNESS:  Okay.

BY MR. PINHEIRO:

337

Q    Were you employed by the New Haven Police Department on July 25th, 1999?

A    Yes, I was.

Q    And what was your -- what were you employed as?

A    Patrol officer in The Hill section.

Q    And that is the hull -- could you spell it please?

A    I'm sorry?

Q    H-A-L-L?

A    H-I-L-L.

Q    Hill section?

A    Um-hmm.

Q    Where did you grow up?

A    Port Chester, New York.

Q    And when did you relocate to Connecticut?

A    1989.

Q    And where did you come then?  Where did you locate to?

A    In the military for a little bit, and then my family moved to West Haven and I went to college.

Q    Where did you go to college?

A    Eastern Connecticut.

Q    Did you attain a degree there?

A    No, I did not.  I became a police officer

338

instead.

Q    How much college did you have?

A    Sophomore year.

Q    Do you remember what year that was, approximately?

A    Oh, my gosh, no.  Probably '89.  No.  I'm sorry.  '92.

Q    And then when did you enroll with the New Haven Police Department?

A    When?

Q    Yes.

A    1995.

Q    Did you undergo any type of training?

A    Yes.

Q    Could you please state to the jury what type of training you underwent?

A    The New Haven Police Academy.

Q    Where was that?

A    Right there located on site.  At the time they didn't have the academy, just that.

Q    How long was your training for?

A    Six months.

Q    Successfully complete it?

A    Yes.

Q    And after you successfully completed the

339

academy, what happened then?

A    You go with a field training officer, and then after a few weeks, you're on your own, basically.

THE COURT:  Excuse me, Mr. Pinheiro. Would you bring the mike down a little closer to your mouth?  Thank you.

BY MR. PINHEIRO:

Q    And do you remember what year you started as a New Haven police officer?

A    1995.

Q    Direct your attention -- were you working on July 25th, 1999?

A    Yes.

Q    Did you respond to the Anthony Lucky, Jr., homicide on July 25th, 1999?

A    When I responded it was a shooting, yes.

Q    I'm sorry.  What?

A    It was a shooting at that point.  It wasn't a homicide as yet.

Q    And then you responded to the shooting of Anthony Lucky, Jr.?

A    Right.

Q    Now, at that time were you aware of any rules or regulations promulgated by the New Haven Police Department regarding writing of case incident reports?

340

A    Yes.

Q    May I direct your attention to Plaintiff's 24. It's in your book right there.  Plaintiff's 24 is also known as Bates 186.

Do you have it in front of you?

A    Yes.

Q    All right.  Thank you.  Have you seen this general order of the Department of Police Service before --

A    Yes.

Q    -- Plaintiff's 24?  All right.

At that time while you're a New Haven police officer in 1999, were you familiar with this order?

A    Yes.

MR. PINHEIRO:  Your Honor, I offer it as a full exhibit.

THE COURT:  Defense?

MR. KATON:  Without objection, Your Honor.

THE COURT:  Okay, Plaintiff's Exhibit 24 is admitted without objection.

(Plaintiff's Exhibit 24, received in evidence)

THE COURT:  Now, you want to publish this to the jury now?

MR. PINHEIRO:  I am, Your Honor.

341

THE COURT:  And you're on the Elmo, and the jurors have screens in front of them where they can see it.  And I just ask you, Mr. Pinheiro, and also Mr. Katon and Mr. Zehe, when you want to publish something to the jury, let me know and make sure the jury's got it up and I've got it up.

MR. PINHEIRO:  I will.

THE COURT:  And I might need -- Ken, if you can help me.  I want to make it so I can see it.  It's in the left-hand corner, and I'm not familiar with this.  Okay.  There you go.  All right.

Proceed, Counsel.

MR. PINHEIRO:  Thank you.

BY MR. PINHEIRO:

Q   Ms. DeJesus, I direct your attention to Plaintiff's 24, and under section Roman Numeral, Number II, A-1.  Do you see that?

MR. PINHEIRO:  Your Honor, I'm not sure how you -- would you prefer the witness to read from the particular document, or do you want counsel?

THE COURT:  My preference would be for you to ask the question, and then if she needs to read a paragraph to answer the question, she may do it, because the jury's looking at it in real time.  But just ask the question.

342

BY MR. PINHEIRO:

Q    Ms. DeJesus, regarding case incident reports, what significance do they have, if any?

A    They have great significance.  Any report that you write, you may use to obtain a warrant in the future.

Q    Is accuracy an issue regarding when you're drafting a case incident report?

A    Yes.

Q    How so?

A    Anything that you write in the report and you sign under oath, it's a legal document.  So if it's not correct, if it's a false statement, then you're forging a legal document.

Q    Can you compare -- are they also known as "police reports"?

A    Right.

Q    Now, the police report, does it have any relationship to an affidavit?

        MR. KATON:  Objection, Your Honor.  Calls for expert opinion.

        THE COURT:  I think I'll overrule the objection.  The witness may answer, if she can.

        And I don't know if you can or not.  Can you answer that question?

343

THE WITNESS:  Can you repeat that?

BY MR. PINHEIRO:

Q   Yes.  The police report, can you state what its relationship to an affidavit is?

A   Well, the police report was the initial report taken by the officer.  When you want to obtain a warrant, you use that report to obtain a warrant.

Q   And is that reference to -- let me make reference to that in Number 1 on Plaintiff's 24, the general order in front of you, is that true?

A   Yes.

Q   And where am I --

THE COURT:  Mr. Pinheiro, I hate to interrupt you again.  It occurred to me -- and ladies and gentlemen of the jury, this is the first document that was allowed and introduced into evidence by either of the parties.  And I suspect I did, but I don't remember doing it, and I could have just gone on over it when the tender was made.

And ladies and gentlemen, so you know, of the jury, I've looked at all these documents with the lawyers before.  And I'm not sure that the proper foundation would have been laid about her recognizing the document.  And Counsel just made reference to it as a general order of the Department of Police

344

Service.

You were familiar with the document, right?

THE WITNESS:  Right.

THE COURT:  And that's a document that the New Haven Police Department used while you were there, is that right?

THE WITNESS:  Right.

THE COURT:  All right.  And, again, I think I may have messed that up.  If I did, I apologize to the jury and to you, Mr. Pinheiro, and to the witness.  Proceed.

MR. PINHEIRO:  Thank you, Your Honor.

BY MR. PINHEIRO:

Q   Now, Ms. DeJesus, when would you write a police report?

A   Anytime in response to an incident, if a witness -- I can recall writing a report for a 9-1-1 hang-up call.

Q   And when would you write it?  How soon after the incident?

A   As patrol officers, we wrote them right on -- as soon as we completed our task -- on scene, basically, before our shift ended.

Q   Now, regarding the Anthony Lucky, Jr.,

345

shooting at this time, did you happen to write a police report?

A    I wrote one, yes.

Q    And why did you write the police report?

A    I spoke to a witness on scene, and we also observed casings on scene, and we searched the area for the vehicles involved.

Q    Could you please state -- well, may I direct your attention to Plaintiff's Exhibit 1, and that would be Bates 001.

You have it in front of you?

A    Yes.

Q    Do you recognize this document?

A    Yes.  It's my police report.

Q    And is the -- you've seen this before.  You drafted it.

A    Yes.

Q    And is the information in it true and accurate?

A    Yes.

MR. PINHEIRO:  And I offer it as a full exhibit, Your Honor.

THE COURT:  Okay.  A little bit more. You recognize this as a document that you prepared?

THE WITNESS:  Yes.

346

THE COURT:  Okay.  And any objection to the tender?

MR. KATON:  No objection, Your Honor.

THE COURT:  Admitted without objection as Plaintiff's Exhibit 1.

(Plaintiff's Exhibit 1, received in evidence)

MR. PINHEIRO:  Thank you.

BY MR. PINHEIRO:

Q   Ms. DeJesus --

THE COURT:  And the record will reflect that Plaintiff's counsel is publishing it to the jury.

MR. PINHEIRO:  I'm sorry, Your Honor.

THE COURT:  That's okay.  Members of the jury, every judge does it a little differently. Mr. Pinheiro and Mr. Katon and Mr. Zehe will probably get used to me sometime three or four days from now. I apologize to him and to them in advance.

Go ahead.

BY MR. PINHEIRO:

Q   Ms. DeJesus, could you explain the information that is located at the top of the report, the very top?

A   It has complaint number, the date.

Q   When was the date?

A   July 25, 1999.

347

Q    What's that date indicate?

A    I'm sorry?

Q    What's the significance of that date?

A    That's when we responded to the shooting.

Q    And the time?

A    1:53 in the morning.

Q    And the date of the report?

A    Same day.

Q    And what's the date directly to the right of that?

A    The date of the report?

Q    The time.  I'm sorry.

A    That's the time that I actually wrote the report, that I sat down and initially wrote it.

Q    At this time can you read the report, please?

THE COURT:  You want her to read it to herself?  I mean, the jury's going to have it.  If you want to ask her questions about that, you may.  But I don't think we need to let her read the whole report. You got specific questions?

MR. PINHEIRO:  All right.

BY MR. PINHEIRO:

Q    Would you like to have a moment to look at the report before I ask you a question?

THE COURT:  Let me ask you before you do

348

that, ma'am, because -- and members of the jury, I want to try to move this along as quick as we can, and you all have the document in front of you.

But have you read this recently?

THE WITNESS:  Yes, I did.

THE COURT:  Okay.  And I think he wants you to read it because it may help you with the questions he's about to ask you about the report.  Do you need time to do that, or since you read it recently --

THE WITNESS:  I can go back and forth if I need to, if that's all right.

THE COURT:  Why don't you just start asking your questions, Counselor.

BY MR. PINHEIRO:

Q    Ms. DeJesus, did you canvas the area?

A    Yes, I did.

Q    Why did you do that?

A    We were looking for the second vehicle involved, and also for shell casings, any type of evidence.

Q    At that time when you responded to the scene, what was your understanding of what happened?

A    There were shots fired.  Myself and Officer Teague went to one location, but

349

Officer Freeman called it in, that he had a vehicle that he believed was involved in the shooting. So we went to that location. I spoke with the passenger. He stated that the shooting had actually occurred at Columbus. So we went to Columbus, and that's where we found the shell casings.

Q    And you stated that you canvassed the area?

A    Yes.

Q    And would you please state to the jury the results of you canvassing the area?

A    We didn't locate the other vehicle, which was a two-door road vehicle, I believe it was, involved with the shooting. But we did find seven casings for a .38 caliber and 9 millimeters.

Q    Did you find any eyewitnesses?

A    Yes, I did.

Q    Did you interview this eyewitness?

A    Yes. I did speak with him.

Q    And the results of that interview is encompassed in your report?

A    Yes, it is.

Q    Was the eyewitness a male or female?

A    It was a male.

Q    And his ethnic background?

A    Hispanic.

350

Q    Did he speak English?

A    I don't believe he did.  I think that's why they called me.

Q    And why is that?

A    Because I speak Spanish.

Q    Did you speak with him in Spanish?

A    Yes.

Q    Did you get any information from him?

A    Yes.  He stated he was on his porch, and he observed a red Suzuki vehicle following a two-door blue vehicle, and they were shooting at each other. They were both in motion.  And then they both -- he lost them at Church Street South.  They were on Columbus, and they went to Church Street South, and then he lost sight.

Q    The witness stated to you that both vehicles were stationary or moving at the time of the gunshots?

A    No.  They were moving.

Q    Did the witness state to you as to the vehicle -- the other vehicle -- not the vehicle that Lucky was in, the other vehicle's -- was that -- were the occupants in that vehicle inside or outside the vehicle at the time the gunfire?

A    Inside.

Q    Did you find this information to be credible?

351

A    Yes.  He wasn't involved.  He didn't appear to be involved, I should say.  So...

Q    How does that have a bearing on your determination of whether or not he's credible?

A    If he's not involved, he's a neutral witness.

Q    Did you get his name?

A    He wanted to remain anonymous at the time.  So I couldn't document his name.

Q    Did you get his address?

A    239 Columbus.

Q    Back in 1999, were you able to identify this individual?

A    Yes.

Q    Now, when you responded to the crime scene, what exactly did you do?  When you responded to the crime scene, what exactly did you do at the crime scene?

A    Well, I can't recall in detail what we did, but we responded to the scene where Officer Freeman was at.  I remember there was a red Suzuki with the door open, that someone was shot.

I spoke with the passenger.  He told us that the shooting had occurred at Columbus and Howard.  So myself and Officer Teague went to Columbus and Howard, and we also looked in the area for the other vehicle

352

involved.  But the initial vehicle that they gave us was a gray Honda.  So that's what we covered in the area.

Q    Ms. DeJesus, did you gather any or see any physical evidence?

A    Bullet casings.

Q    Could you please describe in detail what you saw, your observation?  And if you need to make reference to your report, go ahead.

A    On Columbus and Howard, there was seven .380, and 9-millimeter bullet casings combined.  They were found at the intersection of Howard Ave. and the next block on Columbus.  And we also found three entry shots at Berney's Pharmacy, at the corner of Howard Avenue and Columbus.

Q    What did you do with that evidence?

A    We left it there.  The detectives came on scene and they handled the rest.

Q    Now, Ms. DeJesus, are you familiar with that area of New Haven where the shooting occurred?

A    Yes.

MR. PINHEIRO:  Your Honor, I'd like to make reference to a Defendant's exhibit that's a map, and I'm not -- I don't believe that Ms. DeJesus has it.  I have it.

THE COURT:  You can make reference to it. You can't show it to the jury until it's introduced.

MR. PINHEIRO:  That's right.

THE COURT:  And --

MR. PINHEIRO:  I want to give it to her.

THE COURT:  Are you asking me to allow you to introduce a defense exhibit in your case-in-chief?

MR. PINHEIRO:  Yes.  Unopposed.

THE COURT:  I'm sorry?

MR. PINHEIRO:  It's not objected to by me.

THE COURT:  And is there any reason that defense counsel can give that I shouldn't?

MR. KATON:  No objection.

THE COURT:  All right.  What's the document, first of all?

MR. PINHEIRO:  It's Defense Exhibit FF.

THE COURT:  And what's the Bates stamp number on it?

MR. PINHEIRO:  956.

THE COURT:  Ladies and gentlemen, some of you may not know.  Bates stamps -- we've got each of these pages with a number, because we've got -- you'll see when you go in the jury room and you'll see during

354

the trial, multiple-page documents.  So that's the way we can make easy reference and identify them for the record that this nice court reporter's taking down for us.

So it's part of Defendant's F?

MR. PINHEIRO:  Double F.

THE COURT:  Double F.  Bates stamp number?

MR. PINHEIRO:  956.

THE COURT:  956 that the Plaintiff is introducing in his case-in-chief without objection from the Defendant is admitted.

MR. PINHEIRO:  May I publish it?

THE COURT:  You may publish it.

MR. PINHEIRO:  Thank you, Your Honor.

(Defendant's Exhibit FF, received in evidence)

BY MR. PINHEIRO:

Q    Ms. DeJesus, can you clearly see what's been published as Defendant's FF on your TV?

A    Yes, I can.

Q    Do you see the point of the intersection of Howard and Columbus Avenue?

A    Yes.

Q    And directly to the right of it --

MR. PINHEIRO:  Your Honor, is it

permissible for me to point?

THE COURT:  Absolutely.

MR. PINHEIRO:  Okay.  Just want to make sure.

THE COURT:  Just don't permanently --

MR. PINHEIRO:  No.

THE COURT:  -- mark the exhibit.

BY MR. PINHEIRO:

Q    Do you see where I'm pointing?

A    Yes.

Q    Intersection of Howard and Columbus?

A    Right.

Q    And what was the address of the anonymous witness that you interviewed?

THE COURT:  Now, you're blocking what's written under there.  It says "Bullet holes, Berney's Pharmacy, 615 Howard."

You see that ma'am?

THE WITNESS:  Yes, I can.

THE COURT:  All right.  Go ahead and answer his question.

THE WITNESS:  The address of the person I spoke with?

BY MR. PINHEIRO:

Q    Yes.

356

A    239 Columbus.

Q    Now, as I move my pen, could you please tell me where that would be?

A    It would be to your right, about -- it's about four houses down from the Boys & Girls Club, actually.

Q    The Boys & Girls Club is --

A    On your left.

Q    Right there?

A    No, no.  On your left.  Or my left, I should say.  I'm sorry.  Right underneath where it says "Bullets found on Howard Ave.," that's where the Boys & Girls Club is.  And to my right, four houses down, is 239 Columbus.

Q    All right.  You see where the -- indication where it says "Adkins apartment, 246 Columbus"?

A    Right.

Q    Can you state in relation to that address where this anonymous witness address was -- is?

A    Pretty much directly -- it's like on an angle, but it's across the street.

Q    Right about here?

A    Right.

Q    So right where my pen is pointing.

A    Right.

Q    That's where the location was of the anonymous

357

witness that you interviewed?

A    Yes.

MR. PINHEIRO:  Your Honor, I have one more defense exhibit.  It's double E, Bates --

MR. KATON:  Without objection, Your Honor.

THE COURT:  I'm sorry.  You're saying you don't have an objection to him introducing your document in his case-in-chief?

MR. KATON:  Correct.

THE COURT:  And, again, what's the exhibit number?

MR. PINHEIRO:  Double E, EE, and I do not see a Bates number on it.

THE COURT:  Well, why don't you confer with your -- with counsel for the Defendant and make sure we got the right Bates stamp number so we can say what it is for the record and the jury may have a reference point later.

MR. KATON:  Your Honor, that would be 956.

MR. PINHEIRO:  Your Honor, that would be Bates 956.

THE COURT:  All right.  I'm going to instruct you to write down on the bottom of it so it

358

doesn't block anything you want them to see, the Bates stamp number, so it'll serve as future occasion may require.  And I want you -- when you get through doing that and it's admitted without objection -- I want you to identify for the record what it is that there's no objection to coming in.

(Defendant's Exhibit EE, received in evidence)

THE COURT:  Mr. Katon, you're still standing.

MR. KATON:  We have a misstatement.  The Bates stamp number is 0955.

THE COURT:  0955.  Okay?  And what does it purport to be, Mr. Pinheiro?

Or let me just ask, Mr. Katon, it was your exhibit.  What is it?

MR. KATON:  It is an aerial satellite map of the intersection of Howard and Columbus.

THE COURT:  A Google Earth-type thing?  Something like that?

MR. KATON:  Yes, Your Honor.

THE COURT:  Okay.  Proceed.

MR. PINHEIRO:  May I publish it?

THE COURT:  You may.  You have.

BY MR. PINHEIRO:

Q    Now, Ms. DeJesus, right here is a Boys & Girls

359

Club?

A    Right.

Q    And the address of the anonymous witness would be?

A    The last house.

Q    Over here?

A    Yes.

Q    Okay.  Move this over.  The last house in this photograph right here.

A    Right.

Q    That's the anonymous witness.

A    Yes.

Q    Now, from this photograph, can you please direct me where the 246 Columbus Avenue would be.

That would be across the street?

A    Across the street on an angle.

Q    Here?

A    Right.

Q    That would be 246, you believe?

A    I believe so, yes.  Yes.

Q    Ms. DeJesus, do you know the Defendant, Mr. Rodriguez?

A    Yes, I do.

Q    Did you know the Defendant in 1999?

A    Yes.

360

Q    Did you know him at the time of the shooting?

A    Yes.

Q    How did you know him?

A    I was patrol officer and he was a detective.

Q    At that time, on July 25th, 1999, did the Defendant ever request you to help him locate this anonymous witness for an interview?

A    No.

Q    At any time during this investigation into the Lucky shooting, did you discuss with the Defendant your involvement with the Lucky -- Anthony Lucky shooting homicide?

A    No.

Q    Did the Defendant ever contact you again after July 25th, 1999, regarding the Anthony Lucky shooting?

A    No.

Q    What did you do with your police report after you wrote it?

A    We submit it to our shift supervisor at the end of the night.

Q    Did you have any more involvement with the Anthony Lucky investigation after that?

A    No.

        MR. PINHEIRO:  No further questions, Your Honor.

361

THE COURT:  All right.  I think we've reached that portion of the trial where, based on the agreement of the lawyers in an effort to expedite the proceeding, I need to explain to the jury how we're going to proceed.

Is that true, Mr. Katon?

MR. KATON:  Correct, Your Honor.

THE COURT:  Is that right, Mr. Pinheiro?

MR. PINHEIRO:  Yes, Your Honor.

THE COURT:  Ladies and gentlemen of the jury, knowing that none of you have been on a jury before but you've probably seen enough TV jury movies, but the way it normally works in a proceeding is that the plaintiff will call their witnesses, or his witness or her witness.  The Defendant will then get to cross-examine the witness.

And to expedite the thing, by agreement of the lawyers -- and I thank the lawyers for their agreement in this case -- and certainly with my permission, Mr. Katon, defense counsel, was going to call this witness in his case-in-chief after the Plaintiff rested his case.

Well, what he's going to do now is to take -- he'll ask the witness anything that just came up in Mr. Pinheiro's questioning of her as well as

362

anything he would have asked when he brought her back in his case-in-chief.  Mr. Pinheiro will have the right to ask questions about what it is that the witness was asked about by Mr. Katon, and will then -- Mr. Katon will have the opportunity to question her again.

Now, this could go on forever, but I wouldn't let it go on forever.  And normally the proponent, or in this case, of the witness at this juncture, is Mr. Pinheiro, would get the last shot at the witness.  But under this system, the way we're doing it, Mr. Katon is likely to get it, unless there's something that comes up, and I can always extend it, like I say.

But that's why you'll see it a little differently.  But, again, I thank the lawyers for allowing to us proceed that way because it'll really save us some time.

So without further ado, Mr. Katon, you're at bat.

MR. KATON:  Thank you, Your Honor.

CROSS-EXAMINATION BY MR. KATON:

Q    Good morning, Ms. DeJesus.  My name is

363

Tom Katon. We haven't met before, but I represent Edwin Rodriguez in this case.

And the first thing I'd like to draw your attention to is the satellite photograph that was discussed by you in connection with your direct testimony.

THE COURT: All right. Now, Mr. Katon, just so we don't confuse the record and I don't stick my nose in it again and again, this is a document that was yours. It's been introduced in Plaintiff's case. You need to refer to it by the number that was assigned in Plaintiff's case, or you can introduce it now because you're in your case-in-chief, in essence, with this witness. And we don't need to do it unless you think it's appropriate, and I don't know what you think.

MR. KATON: Well, I'll move that exhibit as Defendant's Exhibit EE.

THE COURT: And you will have -- you will refer to it going forward -- this was also Plaintiff's Exhibit -- did we give it a number, Ken?

MR. PINHEIRO: I referred to it as Defendant's Exhibit double E.

THE COURT: So it just stays the same as in your case. And going forward, Mr. Katon, any

364

time -- I think there was one other document that he introduced. We'll do the same thing without any suggesting. Okay?

MR. KATON: Thank you very much, Your Honor.

THE COURT: Yes, sir.

BY MR. KATON:

Q    Drawing your attention, Ms. DeJesus, to what we have marked as Defendant's EE, I believe in your direct testimony you identified a location where you located this anonymous witness.

A    Right.

Q    And that street address you had noted in your report?

A    239.

Q    It was 239, and there was some effort on behalf of Plaintiff's counsel to try to locate that property on the photograph, is that correct?

A    Right.

Q    And am I correct in understanding that this is the general area of the property?

A    No.  That's the Boys & Girls Club.

Q    And is it closer to the intersection?

A    No.  It's to the other side.

Q    It's this over here?

A    It's the fourth house in.

Q    Right here?

A    So that one, yeah.  That's the one.

Q    And I understand that you believe that your obligation to create a report is one that requires accuracy on your behalf.

So is it fair for us to assume, then, that the report reflects the full extent of your involvement in the Anthony Lucky, Jr., homicide?

A    Yes.

Q    Now, you did indicate that when you arrived at the scene you found shell casings on the ground, correct?

A    Not initially, because we weren't to where Officer Freeman was.  When the passenger stated it occurred at Columbus and Howard, that's when we went to Columbus and Howard.  That's when we found the shell casings.

Q    So the shell casings were located at Columbus and Howard?

A    Right.

Q    Do I understand you correctly that there were two types of shell casings that were used -- that were found?

A    Right.

366

Q    And there were .380 shell casings?

A    As well as 9 millimeter.

Q    As well as 9 millimeter, and those are two different calibers, correct?

A    Right.

Q    Fired from two different guns?

A    Right.

Q    Do you recall or does your report reflect where the .380 casings were found?

A    No, it doesn't.

Q    And just similar question about the 9 millimeter casings.

Do you recall or does your report reflect where those 9 millimeter casings were found?

A    I would have to look.  Let me double-check that.

It just says Columbus and Howard, at the intersection and ending block on Columbus right before Salem.

Q    And your report has been marked as Plaintiff's Exhibit 1 in this case, correct?

A    Yes.

Q    And it's actually also a report that is part of an exhibit that's proposed by the Plaintiff here.

THE COURT:  You mean by the Defendant?

MR. KATON: Excuse me, the Defendant here. Thank you.

BY MR. KATON:

Q    That would be under A-5.

THE COURT: Mr. Katon, after she identifies A-5, do you want to introduce that?

MR. KATON: I am, Your Honor.

THE COURT: Ma'am, do you recognize that as being the same report that you referred to earlier as Plaintiff's 1?

THE WITNESS: I'm looking at -- you said 5? Detective Shelton's report?

BY MR. KATON:

Q    No. If you could look at the monitor, I have a copy of it there.

THE COURT: It's not in evidence yet.

Are we sure it's the same thing, Mr. Katon?

MR. KATON: I'm sure, Your Honor.

THE COURT: Well, I'll take you at your word. So we'll expedite this. Put it on. She's saying it looks like you're having a different -- looks the same to me.

Is that what you said?

THE WITNESS: Okay. Yes.

368

THE COURT:  So you may have been on a different one.

THE WITNESS:  Yes.

THE COURT:  I understand.

Proceed, Mr. Katon.

MR. KATON:  Thank you, Your Honor.

(Defendant's Exhibit A-5, received in evidence)

BY MR. KATON:

Q    And that bears a Bates Number 0011 and 0012, correct?  I'll show you the second page.

THE COURT:  It'll be stamped down at the bottom right, I believe.  That's where they'll be, right?

MR. KATON:  Right here.

THE COURT:  I'm sorry.  Bottom left.

Do you see those numbers, ma'am?

THE WITNESS:  Yes, I do.  They're a little faded on mine, but yes.

THE COURT:  Now, you're making a tender as Defendant's Exhibit 5?

MR. KATON:  That is part of Defendant's Exhibit 5, Your Honor.

THE COURT:  Okay.  So through this witness, those two Bates stamp numbers -- again, repeat them for the record.

369

MR. KATON: That would be Bates Stamp Number 0011 and Bates Stamp Number 0012.

THE COURT: All right. So that portion of Defendant's Exhibit 5 is admitted.

Mr. Pinheiro, I take it there'll be no objection from you?

MR. PINHEIRO: No objection.

THE COURT: All right. Without objection.

(Defendant's Exhibit 5, received in evidence)

THE COURT: Proceed.

BY MR. KATON:

Q   Am I correct that on page 2 of your report, which is actually Bates-stamped 0012, there is a description of your discussions with the anonymous Hispanic male witness that you document, correct?

A   Yes.

Q   And he indicated to you, as I understand it from reading your report, what he observed relative to the two vehicles, correct?

A   Right.

Q   And he told you that he observed a red Suzuki Samurai truck shooting at a two-door, royal blue vehicle with tinted windows from behind.

Now, that expression meant that shots were

being fired out the rear of the Suzuki Samurai toward the blue vehicle?

A    Well, the blue vehicle was in front.  It was being followed by the red Suzuki.

Q    Okay.  So you go on to say the blue vehicle which was being followed by the red Suzuki -- by the red vehicle also returned fire.

A    Right.

Q    So who is shooting whom from behind?

A    It sounds like the blue vehicle was shooting at the red vehicle, but they were both shooting at each other.

Q    They were simultaneously engaged in shooting?

A    Yes.

Q    But it's unclear, then, who was shooting whom from behind based on your prior sentence, which said: "He observed a red Suzuki truck shooting at a two-door, royal blue vehicle from behind."

A    All right.  I understand what you're saying, yes.

Q    And this gentleman that you spoke to at the scene didn't want to provide his name.

A    No.

Q    Did he indicate to you why he didn't want to provide his name?

371

A    I don't recall what he said at the time, but it's not uncommon.

Q    It's not uncommon in The Hill for people to not want to cooperate with the police, correct?

MR. PINHEIRO:  Objection.

THE WITNESS:  They don't want to be involved.

THE COURT:  What's the basis of objection, Counsel?

This is the first objection we've had, ladies and gentlemen of the jury.  And I want to remind the lawyers, under the Federal Rules of Evidence, you're supposed to state the basis of the objection.

Theoretically, I've been doing this long enough, I'm supposed to know, but I sure miss it.  So please tell me the basis of the objection, Counsel.

MR. PINHEIRO:  Speculation, foundation.

THE COURT:  And the question was?

MR. KATON:  Based on her experience, it's not uncommon for people --

THE COURT:  Overruled.  You may answer the question, ma'am.

THE WITNESS:  It's not uncommon.  It's a shooting.  They're afraid to state their name.

BY MR. KATON:

Q    Thank you.  And just one final question:  At the end of your report, you noted that "all information will be forwarded to the investigative unit for follow-up investigation," correct?

A    Yes.

Q    And that's standard operating procedure for a patrol person.

A    Right.

Q    And you filed your report in the normal course of business.

A    Right.

MR. KATON:  Thank you.  I have nothing further.

THE COURT:  All right, Mr. Pinheiro.  You may ask the witness questions about anything that Mr. Katon asked her about, and you may proceed, sir. As soon as Mr. Katon relocates, you may proceed.

MR. KATON:  Thank you, Your Honor.

REDIRECT EXAMINATION BY MR. PINHEIRO:

Q    Ms. DeJesus, the red Suzuki, was the deceased an occupant of the red Suzuki?

A    Yes, he was.

373

Q    Was there any indication that the vehicles were passing each other during this time?

A    I don't recall that.  I don't remember him saying that to me.

MR. PINHEIRO:  No further questions, Your Honor.  Thank you.

THE COURT:  All right.  I take it there's no further questions, Mr. Katon?

MR. KATON:  One question.

THE COURT:  Related to what he just asked?

MR. KATON:  Yes.

THE COURT:  All right.  You may proceed.

RECROSS-EXAMINATION BY MR. KATON:

Q    And in your description of what the male witness provided to you, he didn't tell you that it was a road rage incident, correct?

A    No.  Not that I recall.  It's not in the report.  So...

MR. KATON:  Thank you.

THE COURT:  Mr. Pinheiro, any follow-up to what he just asked and in which she just answered?

374

REDIRECT EXAMINATION BY MR. PINHEIRO:

Q   Ms. DeJesus, based on your training and experience as a police officer, would you have classified this as a road rage incident?

MR. KATON:  Objection, Your Honor.

THE COURT:  Basis?

MR. PINHEIRO:  It's a follow-up on Mr. Katon's --

THE COURT:  Just a minute.

What's the basis of the objection, Counsel?

MR. PINHEIRO:  Oh, I'm sorry.

MR. KATON:  It calls for expert opinion and there's inadequate foundation.

THE COURT:  Try to establish a foundation if you can, and we'll see where it goes.  And I'm not -- the expert, I'll overrule that portion of the objection.  But I'll allow you to establish a foundation if you can.

BY MR. PINHEIRO:

Q   Ms. DeJesus, how many years were you a New Haven police officer?

A   When this occurred?

Q   Yes.

A    Four years.

Q    And during that time, what would your duties include?

A    Patrolling the area.

Q    And was this exclusively on patrol during on those four years -- exclusively patrol during those four years?

A    Right.  Once in a while, they'd assign us to walking in the section, but for the most part, yes.

Q    Did you ever do any traffic investigations?

A    No.

Q    Now, during your time patrolling the area, have you encountered -- strike that.

Do you know what "road rage" is?

A    Yes, I do.

Q    Could you please explain to the jury in 1999 what you would consider to be road rage incidents?

A    Someone cut someone off in a lane, and they start arguing, fighting, shooting, whatever the case is.

Q    What you just said, was that a common occurrence in New Haven in 1999 during the time you were an officer?

A    Honestly, I couldn't say.  I couldn't say for sure.  I'm sure we have cases, but I couldn't give you

376

a pinpoint.  I couldn't give a number.

Q    Did you ever encounter road rage incidents?

A    Not that I recall, no.  Not myself, no.

MR. PINHEIRO:  I think it's an adequate foundation for the question, Your Honor.

May I ask the question?

THE COURT:  You can ask it, but don't answer it until I rule on any objection, if there is one, and I think about what the question you just asked based on what you just said.

BY MR. PINHEIRO:

Q    Ms. DeJesus, based on your information that's contained in your report and what you collected on July 29, 1999 [sic], would you classify the incident as -- in your report as a road rage incident?

THE COURT:  Mr. Katon?

MR. KATON:  I would like to renew my objection on the basis of foundation.

THE COURT:  I sustain the objection.

MR. PINHEIRO:  No further questions.

THE COURT:  Okay.  Mr. Katon, anything other?

MR. KATON:  Nothing else, Your Honor.

THE COURT:  All right.  Now, I assume this witness is excused for the duration, is that

377

right, Mr. Pinheiro?

MR. PINHEIRO:  Yes, sir.

THE COURT:  Is that right, Mr. Katon?

MR. KATON:  Yes, Your Honor.

THE COURT:  Thank you very much, ma'am. You may step down.

Now, Mr. Pinheiro, what's the name of your next witness?

MR. PINHEIRO:  Albert McCann.

THE COURT:  Okay.  You can get your associate to get Mr. McCann in the courtroom.  Let him have a seat right there.

I'd like to see the lawyers on the record for a sidebar for a brief moment, very brief.

(Conference held at sidebar)

THE COURT:  This relates to the intention of defense counsel on, I guess, cross-examination to ask the witness about a sexual assault that occurred within ten years.  That was mentioned on the record earlier.

And I think -- you know, I don't usually get them right -- but it is Article 609 of the Federal Rules of Evidence.  It goes to the witness's credibility.  I think that it's appropriate under the rule.

378

I also think that, under the 403 analysis, which I think duty bound, sometimes not duty bound, to make the analysis that the prejudicial effect -- I don't know what the witness is going to testify to. But as it goes to the witness's credibility, the prejudicial effect is outweighed by the probative value. That's my gut impression.

And what is it you're calling the witness for, Mr. Pinheiro, just to make sure, before I make a final ruling that -- what's the witness going to testify about?

MR. PINHEIRO: He was a driver of the vehicle Plaintiff supposedly was in. And he's going to testify as to his account of what happened that evening and interaction with the police officers at the police station and giving a voluntary statement.

THE COURT: I find the probative value does outweigh any prejudicial effect. The jury's going to hear him answer direct and cross, and they're going to be able to judge what it is as it relates to his credibility, which is certainly at issue here. So that's the Court's ruling.

MR. PINHEIRO: Can I make an offer of proof, Your Honor, as my objection -- make a proper record?

379

THE COURT:  Well, you object to the ruling?

MR. PINHEIRO:  Yes.

THE COURT:  You think I'm committing a reversible error now?  What offer of --

MR. PINHEIRO:  Not offer, make an objection.

THE COURT:  Your objection is preserved for the record, absolutely.

MR. PINHEIRO:  Thank you.

(End of conference at sidebar)

THE COURT:  Mr. McCann is the witness. If you come up and please face the gentleman.  He'll administer the oath to you.

(Albert McCann, sworn by the clerk)

THE COURT:  All right.  And as the witness is being seated, I want to see the lawyers again.  It doesn't have to be on the record, or if it does, I'll let the court reporter know.

(Off record conference at sidebar)

THE CLERK:  Sir, could you state your name for the record, and spell your last name and give us the town in which you reside.

THE WITNESS:  Albert Lucky.  I changed it from McCann to Lucky.  And I live in Hamden,

380

Connecticut.

THE COURT:  I'm just looking at you, sir.
It has nothing to do with anything, but you can tell
I'm obviously a man that likes hair.  I like your hair
a lot.

THE WITNESS:  Thank you.


DIRECT EXAMINATION BY MR. PINHEIRO:


Q    Mr. Lucky, were you ever known by any other
name?

A    No.

Q    McCann?

A    Yes, McCann.

Q    And you stated just previously that you
changed your name?

A    To Lucky, my last name.

Q    Why is that?

A    Well, it was changed when my son was born, and
my father got it changed for me when my son was born
so he could be a third.

Q    Did you know Anthony Lucky, Jr., the deceased?

A    Yes.

Q    What relationship was he to you?

A    My first cousin.

381

Q   Now, are you employed, Mr. McCann?

A   Yes.

Q   Where are you employed?

A   McDonald's.

Q   What do you do there?

A   I'm the manager there.

Q   One store or several?

A   No.  One.

Q   What's your date of birth?

A   3/1/80.

Q   Do you remember the events of July 25th, 1999?

A   Yes.

Q   How old were you then?

A   Nineteen.

Q   Do you remember what happened to Anthony Lucky, Jr., that night?

A   Yes.

Q   Now, did you give a sworn audiotape statement regarding July 25th, 1999?

A   Yes.

Q   And where did you do that?

A   At the police station.

Q   There's a witness book right in front of you, I believe.

     Can you open it up, sir?  And could you

382

please -- you can open it up to Plaintiff's Number 4, and there's numbers on the bottom of each page that may aid you -- Bates 033.

Do you have that in front of you?

A    Yes.

Q    Take a look at that document.

Do you recognize that document?

A    Yes.

Q    And direct your attention to the very last page of that document, 0 --

THE COURT:  Why don't you get him to identify the document.  He says he recognizes it.

What is that document, sir?

THE WITNESS:  The statement.

THE COURT:  I'm sorry?

THE WITNESS:  Statement.

THE COURT:  Do you recognize whose statement it is?

THE WITNESS:  It's mine.

THE COURT:  Okay.  Proceed.

MR. PINHEIRO:  All right.  Offer it into evidence, Your Honor.

MR. ZEHE:  No objection, Your Honor.

THE COURT:  Admitted without objection as Plaintiff's Exhibit Number 4.

(Plaintiff's Exhibit 4, received in evidence)

BY MR. PINHEIRO:

Q    Now, may I direct your attention to page 3 of Plaintiff's Number 4?  That would be the Bates Number 035.

THE COURT:  And the Bates number are the big stamp numbers on there, Mr. Lucky.

THE WITNESS:  I got it.

THE COURT:  And you need to publish that? You've published it.

MR. PINHEIRO:  Sorry, Your Honor.

THE COURT:  All right.

MR. PINHEIRO:  May I publish it, Your Honor?

THE COURT:  You got it.

BY MR. PINHEIRO:

Q    Now, Mr. Lucky, can you please state to the jury as to what happened that night in regard to the shooting?  And take your time.

A    We was over a friend's house.  We left our friend's house.  And he lives right down the street.

I was taking my cousin home, and then some guys cut us off.  We was riding down Columbus, Columbus Avenue, and some guys came out of Arch Street and cut us off.

384

Then when we got to the light, I had pulled up beside of them, and then I asked them what was wrong when they cut us off.

So they was like, Oh, nothing.  Everything's good, and they apologized.  So I was like, all right.

So when the light turned green, I pulled off first.  We got to the next light, which was on Columbus and Howard.  And then I was going to take a right.  Basically, I was going to take a right, and they pulled up on my side.

And then they asked me what was the problem.  So then they -- the passenger pulled a gun out, started shooting, and so I pulled over.  I ducked.  I was pulling off and they were shooting and I was shooting back.

And Lucky told me that he was hit.  My cousin told me that he was hit, and he felt it in his back.  So I rushed him to the hospital.  Then we got pulled over.  And that's basically what happened.

Q   When you say -- could you please tell the jury what type of vehicle you were driving?

A   I was driving a Suzuki jeep, red.

Q   Who was in your vehicle?

A   It was me; my friend, Juan; and my cousin, Lucky.

385

Q    Is that Juan Scruggs?

A    Yes.

Q    Where was he sitting?

A    Passenger side front.

Q    And Lucky was sitting where?

A    In the back.

Q    When you gave this statement, where were you?

A    At the police station.

Q    And was anyone with you when you gave this statement?

A    No.

Q    Were there any police officers with you?

A    Yes.

Q    Do you know who they were?

A    One was Rodriguez.

Q    That's the individual here?

A    Yes.

Q    Any other police officers?

          THE COURT:  I'm sorry.  You've just asked him to identify the Defendant?

          MR. PINHEIRO:  I'm sorry.

          THE COURT:  This gentleman over here -- and I've done it twice -- but you were making reference to the gentleman seated to the right?

          THE WITNESS:  Yes.

386

THE COURT:  Our right --

THE WITNESS:  Yes.

THE COURT:  -- looking at him?

THE WITNESS:  Yes.

THE COURT:  The record will reflect that the witness has identified the Defendant, Detective Rodriguez.

BY MR. PINHEIRO:

Q    Was there any other officers present?

A    Yes, there was.

Q    Do you know their names?

A    There was a few.  I just remember one other name, Norwood, Detective Norwood.

Q    Now, at the time you first came encounter with the other vehicle, how many intersections did you go through until the shooting occurred?

A    After I got encounter with the --

Q    Initial contact with the other vehicle.

A    There was one intersection, and then the next light was when the shooting happened.

Q    Three intersections?

A    No.  There was two intersections.

Q    And the shooting occurred at the third?

A    The second intersection.

Q    During this time, were -- your vehicle and the

other vehicle had time to pass each other?

A    Say that again.

Q    When you're driving the vehicle, did you have the opportunity to pass the other vehicle during this time?

A    After the light.  After the red light.  The light had changed, then that's when I passed him.

Q    At any time did the other vehicle pass your vehicle?

A    No.  At the second light -- that's when he pulled up, at the second light.  And when the shooting was happening, he took a left and I went straight.

Q    At the time of the gunfire, the other vehicle, was it moving or stationary?

A    It was moving.

Q    At the time of the gunfire, were the occupants who were firing the weapon out of the other vehicle, was he inside the vehicle or outside the vehicle?

A    Inside.

Q    Could you please state to the jury how -- who returned fire from your vehicle?

A    Juan Scruggs.

Q    How did it come about -- please state to the jury how did Juan come about returning fire?  Did you see him do this?

388

A    Yes.

Q    Could you please state to the jury how that came about?

A    He pulled the gun out, then he reached over me out the window, and they shot back twice -- two shots.

Q    How many shots did Juan Scruggs fire from inside your vehicle?

A    Two.

Q    And could you please describe how he fired them?

A    Over me and out the window.

Q    You were the driver?

A    Um-hmm.

Q    He's the passenger?

A    Uh-huh.

Q    He reached over you?

A    Yes.

Q    He fired it out of your driver's side window?

A    Yes.

Q    So where was the pistol in relation to your head?

A    It was over my head.

Q    It was over your head?

A    Yeah.

Q    And you say you fired two shots?

389

A    Yes.

Q    Did he discharge any other rounds inside that vehicle?

A    No, sir.

Q    Did you tell the Defendant, Detective Rodriguez this?

A    Yes, sir.

Q    At the time when you were giving your statement?

A    Yes, sir.

Q    Individuals in the other vehicle, did you see them?

A    Yes.

Q    At that time in 1999, were you able to identify them if you were shown photographs of them?

A    Not really.  I just know that it was three Hispanics.

Q    When did you first realize your cousin was injured?

A    After I stopped hearing the gunshots, that's when he told me.

Q    What did he say?

A    He told me that he was hit and needed to go to the hospital.

Q    At this time where was the other vehicle?

390

A    It was gone.

Q    And when you said "gone," at this intersection, which direction did they make? straight? left? right?  What did they do?

A    They took a left.

Q    And what did your vehicle do?

A    I went straight.

Q    What did you do after Anthony Lucky told you he was shot?

A    Tried to get him to the hospital.  I was rushing.  I was panicky, scared.

Q    And what happened?

A    And I actually passed the hospital, and got pulled over.

Q    And who pulled you over?  Was it a police car?

A    Yes.

Q    What happened when you got pulled over?

A    Got pulled over.  They took us out the car.  I told them that my cousin was hit.  He needed to go to the hospital.  Then they put me in the police car.

After that, the ambulance came and put him in the ambulance.  And one officer told me that they didn't think he was going to make it, and he left the police car.  Few minutes later, he came back.  He said he didn't make it.

Q    And where was this?  Was this at the scene -- crime scene?

A    This was -- this wasn't at the crime scene.

Q    Where was this at this time?

A    This was by the highway.

Q    You were in the police car?

A    Yes.

Q    How did you feel when you found out that -- the police officer informed you that he didn't think your cousin was going to make it?

A    I was hurt.  I was scared.

Q    Could you please tell the relationship that you had with Juan Scruggs and your cousin, Lucky?

A    We were like brothers.

Q    At any time -- if you need time to review your sworn audiotaped statement, Plaintiff's 1 -- at any time did you inform the officers that a round discharged inside the vehicle?

A    No.

Q    Two rounds discharged, but they were fired outside, correct?

A    Yes.

Q    Were any other rounds discharged inside the vehicle?

A    No.

392

Q    Do you state that anywhere in your Plaintiff's -- or your statement?

A    That there was rounds?

Q    Other than those two, do you state that anywhere in your statement, that another round was discharged in the vehicle?

A    No.

Q    Prior to Juan firing the two rounds across your head, was there any rounds fired prior to that by Juan Scruggs?

A    No.

Q    At any time do you state in your statement Juan Scruggs accidentally shot --

A    No.

Q    -- Lucky?

     At the time when you were making your statement, did Officer Rodriguez question you at all?

A    Yes.

Q    And do you remember what his questions were?

A    Yeah.

Q    Do you remember if he made any statements to you, talking to you?

A    Yeah, he did.

Q    And what was that, if you remember?

A    If I remember -- I got to think about it.

393

It's been so long.  But I know he was asking me who shot the gun.

Q    And did you tell him?

A    Yeah.

Q    Did he ask you anything else?

A    He asked me how the gunshot -- was it inside the car.  He asked me a bunch a questions.

Q    Did he make any suggestions to you?  That would be the Defendant.

A    Yeah.  He was saying that -- that -- he was saying that Juan did it by mistake.  It was a mistake.

Q    What did you tell him?

A    Told him no.  I told him I know for a fact that he didn't do it.

Q    Do you remember approximately what time in the morning you were being questioned?

A    This was -- this happened late.  This happened late, like -- this happened after 2 o'clock in the morning.

Q    And how long were you questioned for?  Do you know approximately?

A    Two hours.

Q    If I may direct your attention to the front page of your statement.  So you stated your questioning started about 2 o'clock in the morning or

394

so?

A    Yeah.

Q    And do you see the time that the audiotaped statement started on top?

A    Says 10:10.

Q    And that would be the morning of the 25th, correct?  July 25th, 1999?  And the time it started -- time it ended was about 20 minutes afterwards, correct?

A    That's what it says.

Q    When you first arrived at the police station in the early hours of July 25th, did you have any time to sleep during this time at all?

A    No.

Q    Do you remember approximately what time you got to the police station?

A    Just after the incident.

Q    So within a half hour or so after the shooting?

A    Yeah.

Q    So by the time you got to -- between the time you were at the police station and between the time that you made this audiotaped statement, were you being questioned this entire time?

A    Yes.

395

Q    Mr. McCann, at this time, July 1999, did you know an individual named Mayra Mercado?

A    No.

Q    At this time did you know an individual named Sharon Adkins?

A    No.

Q    At this time, July 25th, 1999, did you know a DeShawn Johnson?

A    No.

Q    At this time did you know a Jose Santiago?

A    No.

Q    Did you know Efrain Mendez?

A    No.

Q    At any time were you shown a photograph or photographs of any individual suspected of being involved in this murder?

A    No.

Q    You were arrested, correct, regarding this incident?

A    Yes.

Q    Do you remember what you were arrested for?

A    A weapon in a vehicle, having a weapon in a motor vehicle.

Q    And at that time you were charged with that crime, correct?

396

A    Yes.

Q    What happened with that charge?  What happened when you went to court for that?

A    Did time.

Q    You pled guilty?

A    Yes.

Q    And do you remember how much time you did for that charge?

A    Sentenced to 18 months.

THE COURT:  I'm sorry.  What was your answer, sir?

THE WITNESS:  Eighteen months.

BY MR. PINHEIRO:

Q    Did you make bond after you were charged?

A    Yes.

Q    Now, at any time did you -- you retained counsel, I take it.  You hired a lawyer.

A    Yes.

Q    At any time did you ever go to the police station to see photographs?

A    Yes.

Q    How many times did you go to see photographs?

A    Like twice.

Q    And the first time you went to look at photographs, where was that?

397

A    I think it was one time in court and one time at the station.

Q    And what was the purpose for you to go look at photographs?

A    To try to identify who killed my cousin.

Q    Were you trying to identify the people in the other vehicle?

A    Yes.

Q    On those two occasions, you were shown photographs.

A    Yes.

Q    Were you able to identify anyone?

A    No.

Q    The photographs that you were shown, if you had recognized anyone in those photographs, would you have told the officers?

A    Yes.

Q    Why would you have told the officers?  Why would you have told the officers you would -- strike that.

Why would you have told the officers?

MR. ZEHE:  Objection, Your Honor.

THE COURT:  Hang on just a minute.  Don't answer the question until I rule on the objection.

State the question that you just asked.

Case 3:03-cv-00943-TLM   Document 394   Filed 02/04/14   Page 111 of 297

398

MR. PINHEIRO: Why would you have told the officers that?

THE COURT: "That" meaning?

MR. PINHEIRO: The previous question.

THE COURT: Tell me what the previous question was.

MR. PINHEIRO: If you had been able to identify anyone in those photographs, would you have told the officers?

THE COURT: All right. And then your follow-up question that's been objected to is: Why would you have done that?

MR. PINHEIRO: Why would you have done that?

THE COURT: And what's the basis of your objection?

MR. ZEHE: Speculation and foundation. He's speculating on something he didn't do and the reason he didn't do something. He just said he didn't do it.

THE COURT: But the question is: Had you recognized someone, would you have identified them? And then: Why would you have done that?

I'll overrule the objection. You can go ahead and answer.

BY MR. PINHEIRO:

Q   You understand the question, Mr. McCann?

A   Yes.

Q   All right.  Why would you have done that?

A   Because I wanted the person who killed my cousin caught.

Q   You wanted -- my hearing goes in and out.  You wanted to...

A   The person who killed my cousin to get locked up.

Q   And direct your attention to the Plaintiff, Gary Session.

THE COURT:  You can be seated, Mr. Session.

BY MR. PINHEIRO:

Q   At any time were you ever shown photographs of Gary Session?

A   No.

Q   In July 1999 did you know Gary Session?

A   No.

Q   At any time were you questioned by the Defendant, Officer Rodriguez, regarding stealing money and drugs from Gary Session?

A   No.

Q   At any time were you questioned by anyone else regarding stealing drugs and money from Gary Session?

400

A   No.

Q   Do you remember the first time you met Gary Session?

A   Yes.

Q   Do you remember what year it was?

A   It was last year.

Q   And how did that come about?

A   He came to my job.

MR. PINHEIRO:  Your Honor, we have an unobjected-to exhibit.  I believe both parties intend to submit it.

THE COURT:  What's the document? Identify it as to number.

MR. PINHEIRO:  Plaintiff's 16, Bates 160.

THE COURT:  And Mr. Katon, are you familiar with the document?

MR. KATON:  If I might just have a moment.

THE COURT:  Is this something you're going to show the witness and ask him if he can identify it or not?

MR. PINHEIRO:  It is a police report, but --

THE COURT:  Just a minute.

Mr. Katon, what's the deal?

401

MR. KATON:  Without objection, Your Honor.

THE COURT:  It has your number, too?  Is this a Defendant's exhibit, too?

MR. PINHEIRO:  I believe it is, Your Honor, but I don't know.

THE COURT:  Let's make sure we got it identified, because I think Mr. Katon, based on past history, is going to want to introduce it in his case-in-chief, if I'm correct.

So you want it identified as your Plaintiff number what?

MR. PINHEIRO:  16, Your Honor.

THE COURT:  Plaintiff's 16.  Hang on just a minute.

MR. KATON:  I cannot seem to locate it at this moment, Your Honor.

THE COURT:  All right.  When you do locate it, you'll identify it for the record to serve if any future occasion may require, right?

MR. KATON:  Thank you, Your Honor.

THE COURT:  So Plaintiff's number -- is it 16?

MR. PINHEIRO:  Yes, sir.

THE COURT:  Is admitted without

402

objection.  Right, Mr. Katon?

MR. KATON:  Yes, Your Honor.

THE COURT:  All right.  It's also a
Defendant's exhibit that will be referred to
forthwith, hopefully.

(Plaintiff's Exhibit 16, received in evidence)

(Defendant's Exhibit A-16, received in evidence)

THE COURT:  Proceed.

BY MR. PINHEIRO:

Q   Mr. McCann, may I direct your attention to
Plaintiff's 16?  There's a number on the bottom, 160,
if that helps you.

THE COURT:  Bates Stamp Number 160?

MR. PINHEIRO:  160, Your Honor.  May I
publish it?

THE COURT:  You may.

BY MR. PINHEIRO:

Q   Mr. McCann, let me ask you a question, and if
you need to refer to the document, you can do so.  Do
you know the date that you first went to the police
department to view photographs?

A   Do I remember the date?

Q   I'm sorry?

A   Do I remember the date?

Q   Yes.  If you don't know, you can refer to this

403

document.

MR. ZEHE:  Your Honor, objection. There's no foundation that this witness knows anything about a police report, and he's refreshing his recollection with --

THE COURT:  Well, is he trying to refresh his recollection as to what?  The date?

MR. PINHEIRO:  That's correct, Your Honor.  It's an admitted exhibit, and he doesn't remember the date he went to the police station.

THE COURT:  I'll overrule the objection.

You may look at the date of the report. Do you see it?  It's the third box over from the left on the top line, sir.  See where it says "Date of report," right after "Date of incident"?

THE WITNESS:  Yes.

THE COURT:  All right.

BY MR. PINHEIRO:

Q    What's the date?

A    March 10th.

Q    What year?

A    2000.

Q    And that's the date that you went to view photographs, correct?

A    Yes.

404

MR. PINHEIRO:  Your Honor, one more exhibit for this individual.  It's an unobjected to -- another police report, Plaintiff's 18.

THE COURT:  Plaintiff's 18.

I guess we got a Defendant's number on that one, too, Mr. Katon?

MR. KATON:  We do, Your Honor.  For the record, that report that was previously referred to is A-16 in the Defendant's exhibits.  And --

THE COURT:  I'm sorry.  Plaintiff's 16 is Defendant's exhibit what?

MR. KATON:  A-16.

THE COURT:  A-16?

MR. KATON:  Correct.

THE COURT:  So coincidentally, got two 16s.

MR. KATON:  Correct.

THE COURT:  And this document that he wants to introduce now, that's Plaintiff's --

MR. PINHEIRO:  18.

THE COURT:  18.  It's got a defense number too, sir?  Deal with it the same drill.  You look at it.  And it's going to be admitted without objection, Mr. Katon?  Is that right or not?

MR. KATON:  Yes, Your Honor.

THE COURT:  All right.  It's introduced as Plaintiff's 18, and we'll get a defense number once Mr. Katon has it.  Proceed.

MR. PINHEIRO:  May I publish it?

THE COURT:  You may indeed.

(Plaintiff's Exhibit 18, received in evidence)

BY MR. PINHEIRO:

Q    Mr. McCann, I direct your attention to Plaintiff's 18 in your book.  Do you have it in front of you?

A    Yes.

Q    Do you remember the date the second time you went to view photographs of suspects?

A    The second time?

Q    Yes.

A    I don't really remember the date.

Q    All right.  Well, will you please review Plaintiff's 18 in front of you, and see if that refreshes your memory as to whether or not you remember the date the second time you went to view photographs?

A    Says September 13th from 2001.

Q    Mr. McCann, from the time that you first encountered the other vehicle at the first intersection to the time that the gunshots were fired

and the other vehicle took a left and drove off, can you state to the jury approximately how much time elapsed?

A    From the time from the first intersection?

Q    Yes.

A    And I drove off?

Q    Yes.

A    To the shooting?

Q    Yes.  From when you first came in contact with the other vehicle until the time the shots were fired and the vehicles drove off, how much time elapsed?

A    A couple minutes.

MR. PINHEIRO:  No further questions, Your Honor.  Thank you.

THE COURT:  All right.  Mr. Zehe?

MR. ZEHE:  Yes, Your Honor.

A JUROR:  Excuse me, Your Honor.  May I please use the restroom?

THE COURT:  Yes.  I'm sorry.  Ladies and gentlemen of the jury, we're going to go ahead and break.  We'll break for let's say 10 minutes.  Let's say 15 minutes.  Okay?

And I'll remind you not to discuss the case among yourselves or with anyone else during the break.  And we thank you for your patience and

attention this morning.  And I ask for your -- I apologize for not thinking of you sooner.  All rise for the jury.

(Jurors excused)

THE COURT:  All right.  Be seated.

Mr. Lucky, I'm going to give you some instructions that I'm going to reiterate when the jury comes back in.

Yesterday the lawyers moved to place the witnesses, including you, under what we call the "Rule of Sequestration," which means witnesses can't sit here and listen to other witnesses testify, except the parties.  You know, the Plaintiff and Defendant can listen to the testimony.  They can't discuss the testimony they gave or will give with anybody, except the lawyers, and then only if they want to.

But now that your testimony has begun, you can't discuss your testimony with anybody, even the lawyers.  And the reason for that is not that we think you or the lawyers would do anything that you shouldn't, but in the perfect world, we would not have had to break for the -- from your testimony.  But you saw in real time one of the jurors needed to go to the restroom.  And so that's why we want to keep it just like you testified all the way through.

408

THE WITNESS:  Okay.

THE COURT:  Understood?

THE WITNESS:  Yes.

THE COURT:  And when I get back -- when we get back here, I'm going to ask you if you complied with that.  And I'm going to explain to the jury what had not been -- getting them out of there real quickly so the man could excuse himself, I would have said in front if of them.  Understood that?

THE WITNESS:  Yes.

THE COURT:  And I know the lawyers understand that's the rules of the road.  So okay.  We are in recess, and you guys, I said 15 minutes a few minutes ago.

Ken, did you happen to note what time it was on the big clock?

THE CLERK:  About 11:36, Judge.

THE COURT:  Okay.  So I was trying --

THE CLERK:  About two minutes ago.

THE COURT:  So 13 minutes, gentlemen. Make sure we're back here and we got the jury in here. Okay?  And when you come back in here, you come back to the witness stand.  We're in recess.

(Recess)

THE COURT:  We're back on the record.

409

What do you want to address?

MR. PINHEIRO:  Your Honor, 609(b)(2) if I may make a record and perhaps be given an opportunity to reargue your ruling on the impeachment.

THE COURT:  Let me just say this -- let me say this:  When the -- the witness, as I perceive his testimony, is in direct conflict of what it is that I understand the Defendant's position to be.  I think he testified suggesting the answer.  Isn't that what he said?  Did I hear that?

MR. PINHEIRO:  This witness, Mr. McCann, did not say that, Your Honor.

THE COURT:  What did he say?

MR. PINHEIRO:  I asked him the question. He couldn't give an answer.

THE COURT:  I don't have a read-back, but that's what I heard.  Jeff, am I wrong?  And this is an officer-of-the-court question, Defense Counsel.

MR. ZEHE:  Yes, Your Honor.  He said -- he may have suggested about the fact that Scruggs shot him.

THE COURT:  That's what I heard.

MR. PINHEIRO:  I'm sorry, Your Honor.

THE COURT:  So there's a conflict here. There's going to be a credibility issue here.  My

410

ruling relates to a witness under 609, it relates to credibility issues that are, I'm going to say, at the very heart of your client's claim here, appears to me.

And I've stated, after I gave you the opportunity to talk about what was it that this witness was going to testify to -- I don't recall exactly what you said -- but I was struck at the time at sidebar that the probative value outweighed the prejudicial effect under 403.

And now that I've heard the testimony that refreshed your recollection that I was right -- and what defense counsel agreed with it when they cited more precisely than I remembered -- what he had to testify to.  I mean, it's dead on.  And you want to say something?

I didn't give you the opportunity to tell me what the prejudice would be to your client other than all evidence is prejudicial, like we said.  And it's -- that's why we have the balancing test.  And so if you got anything you want to say as to prejudice first, then you can tell me what under 403 that you were making reference to.

But what's the prejudice to your client?

MR. PINHEIRO:  Nothing that I did not state already.  I don't want to be redundant, Your

411

Honor.

THE COURT:  All right.  So you got that done.  Okay.  Good.  And that'll just be the general rule.  It's going to hurt my guy because they going to think he's less than he is, and we want to believe him.

MR. PINHEIRO:  No, Your Honor.  It's Rule 609.

THE COURT:  But it's the prejudice we're talking now.  We'll get to 609 in a minute.  The there's two issues here.  So other than general rule -- a general concept that all evidence is prejudicial -- that's why we have 403.  I got to balance that as any district judge does.

And in this instance, I made that assessment.  You said you already spoke to the issue.  You don't want to be repetitive.  And I just said, other than just the general it's going make the jury think less of the witness's testimony, which goes directly to his credibility, which was my ruling, is there anything else that need be said other than that?  You said no, there wasn't.  I want to make sure we're on the same page.  Then I'll let you do the 609, whatever you want to do.

MR. PINHEIRO:  That's correct, Your

412

Honor.

THE COURT:  I'm right on that?

MR. PINHEIRO:  Yes, you are.

THE COURT:  What do you want to say about 609?

MR. PINHEIRO:  609(b)(2), Your Honor, limits on using evidence after 10 years.  The Subsection (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later.  Evidence of the conviction is admissible only if -- and you have Number 1 as probative value supported by specific facts and circumstances --

THE COURT:  Just a minute.  Let me interrupt you.  The information that was presented to me -- and I didn't know anything about it until it came up this morning just like you said you didn't -- which you just didn't, okay, is that it was less than 10 years.

Is that what the representation was?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  What was the date on the information you-all have of the sexual assault conviction?

MR. ZEHE:  2007.

413

MR. PINHEIRO:  That's the problem.  I thought it was 1999.  I just saw it.  I wasn't given this.

THE COURT:  It's okay.  It doesn't matter.  Are we ready to bring the jury in?

MR. PINHEIRO:  That's a problem of surprises, Your Honor, from opposing counsel.

THE COURT:  It's not a surprise in the sense we ain't got -- you got a witness.  This is your witness.

MR. PINHEIRO:  That's right.

THE COURT:  Again, you could have done your due diligence, whatever that was.  I'm not suggesting you did anything wrong, but that's not a surprise.  They knew he was going to be a witness.  They did some research on the witness.  It's within the rules.  And I made my ruling.

We ready for the jury to come in?

MR. PINHEIRO:  I understand, Your Honor, but they did the research using police resources that we don't have.

THE COURT:  We don't need to get into that discussion.  I'm not saying that you did anything wrong, or you could have done something differently.  But that's not -- in itself, it doesn't change the

414

fact of the matter that the witness has that kind of background, and he's entitled to come in under the rule. And that's the Court's ruling. Okay?

Let's bring in the jury, and let's get the witness back in here, please.

MR. PINHEIRO: I will get him, Your Honor.

THE COURT: This nice lady is going to do it for you, Mr. Pinheiro.

(Jurors present)

THE COURT: Ladies and gentlemen, I promise you I'll try and never forget you again like I did a while ago. And we'll try to break -- and I've also mentioned to my wonderful court reporter, for her to please, if she needs a break -- and she's the one that's working hardest in the whole courtroom -- to let me know.

Also, I remind you, Mr. Lucky, you remained under the previous oath that you took here to tell the truth. Right?

THE WITNESS: Yes.

THE COURT: And also, after you left -- and I routinely say it in front of the jury -- I instructed the witnesses, as you heard yesterday, were placed under the Rule of Sequestration, which means

415

they can't sit in the courtroom and listen to testimony of other witnesses.  They can't discuss testimony they have given or will give with anybody, with the exception of a lawyer, but then only if they choose to do so.

The exception is that once a witness starts to testify, if we break for lunch, we break for just the morning break or evening break or for the evening, I instruct the witness that he or she is not to talk about the testimony he has given or will give to anybody, including the lawyers.  And the reason for that is, in a perfect world, we have the witness go all the way through unbroken.  And it would all be in real time back and forth.

Well, as you all have noticed, we don't live in a perfect world.  I didn't do that in this instance in your presence.  I will try to always do that, but I want you to know that I did give that instruction to Mr. Lucky.

Is that right, Mr. Lucky?

THE WITNESS:  Yes, sir.

THE COURT:  And did you follow my instruction?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  You may proceed,

416

Counsel.

MR. ZEHE:  Thank you, Your Honor.

CROSS-EXAMINATION BY MR. ZEHE:

Q    Mr. Lucky, you testified that you did go into the police station after the shooting and gave a statement to Detective Rodriguez, Sergeant Norwood, and another police officer, correct?

A    Yes.

Q    And during the course of that interview, Detective Rodriguez brought out a tape recorder, correct?

A    Yes.

Q    And the transcript that you identified as Plaintiff's Exhibit Number 4 for Mr. Pinheiro is a typed transcript of that tape, correct?

A    Yes.

Q    And that accurately reflects what you told the police officers that night, correct?

A    Yes.

Q    Now, at the time that you were giving this statement to the police, you were under arrest, weren't you?

A    No.

417

Q    Well, the gun that you say Mr. Scruggs used to shoot back at the blue vehicle was your gun, right?

A    Um-hmm.

Q    Is that a yes?

A    Yes.

Q    And --

THE COURT:  You have to answer yes.

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. ZEHE:

Q    And that was a gun that you had in your vehicle, your red Suzuki, prior to the shooting, correct?

A    Yes.

Q    It was wrapped up in a T-shirt under your seat, right?

A    I'm not sure.

Q    Well, it was in the car, correct?

A    Yes.

Q    And you knew it was in the car.

A    Yes.

Q    It was against the law to have that gun, right?

A    Yes.

Q    So you were under arrest when you were at the

418

police station, correct, for possession of a weapon?

A    I got under arrest for that.

Q    When you -- prior to being interviewed by the police officers, you were given your Miranda rights, correct?

A    Yes.

Q    And you know what those Miranda rights are, right?

A    Yes.

Q    They told you that you had a right to remain silent, that anything you could say could be used against you, and that you had a right to an attorney.

They told you all that, correct?

A    Yes.

Q    And then they also told you that you could stop the interview at any time that you wanted to, correct?

A    Yes.

Q    Isn't that right?  And you never stopped the interview, correct?

THE COURT:  Excuse me.  There's a document on the Elmo.  Has that been admitted?

MR. ZEHE:  Yes, Your Honor, as part of the police exhibit.

THE COURT:  You mean the report?

419

MR. ZEHE:  It's part of the statement.

THE COURT:  Oh, the statement.  I apologize.  And again, that was Plaintiff's Exhibit --

MR. ZEHE:  4.

THE COURT:  4.  And go ahead.

MR. ZEHE:  I apologize.  I'll get to it in just a second.

THE COURT:  You should have said, May I do that?  But it's there.  I want to make sure, I wouldn't have wasted our time.  Go ahead.

BY MR. ZEHE:

Q    They told you, you could stop the interview at any time, correct?

A    I think so.

Q    Yes.  Okay.  And you didn't stop the interview.  You voluntarily gave a statement to the police that was then recorded, correct?

A    Yes.

MR. ZEHE:  May I show the --

THE COURT:  Publish it.  Yes, you may.

BY MR. ZEHE:

Q    I'm going to ask you to turn to page 57 at the bottom of Exhibit 4.  It's the last page of that statement.  Do you see that?

A    57, you said?

420

Q    Yes.  Page 57.  Do you see that?

THE COURT:  You got it, Mr. Lucky?

THE WITNESS:  Yes.

THE COURT:  Okay.  Question?

BY MR. ZEHE:

Q    Do you remember seeing that page on the night you gave a statement?

A    I don't really remember.

Q    But it contains the Miranda rights that you were given by the police officers, correct?

A    Uh-huh.

Q    And is that your initials next to each of the Miranda rights?

A    Yes.

Q    "A.M.," you wrote those, right?

A    Yes.

Q    And at the bottom of the Miranda rights, you signed it, correct?

A    Yes.

Q    That signature, Albert McCann, is your signature, right?

A    Yes.

Q    Now, after you waived your Miranda rights, you gave a statement which was later taped, correct?

A    Yes.

421

Q    I just want to kind of review with you the story that you related or recounted to the police officers on that evening.

You admitted in the taped statement that you were driving your mother's red Suzuki, correct?

A    Yes.

Q    And that your cousin, Anthony Lucky, was in the rear seat, correct?

A    Yes.

Q    Juan Scruggs was in the passenger seat.

A    Yes.

Q    Then your description described three Hispanic males in a blue Honda that fired at you, correct?

A    Yes.

Q    The Honda was a light blue as you described it in your statement, correct?

A    Yes.

Q    And when the -- you described that when the Honda pulled up next to you, the passenger in the Honda got out a gun, correct?

A    Yes.

Q    And that was after -- while the car was next to you, you heard the driver say, "Get the heat," correct?

A    Yes.

Q    That's in your statement, right?

A    Um-hmm.

Q    Is that a yes?

A    Yes.

Q    Now, it was after that that you pulled forward ahead of the blue car, correct?

A    It was after what?

Q    After the driver of the blue car asked the passenger to get the heat.

A    No, sir.  It was after the shot.  He pulled it out and he shot.

Q    But you were ahead of the blue car when the shots first happened, correct?

A    No -- yes.

Q    The blue car was never in front of you with the passenger firing behind at you, correct?

A    No.

Q    That didn't happen, right?  That did not happen.

A    No.  I don't think so, no.

Q    You were always in front.  The passenger was shooting forward at your red Suzuki, correct?

A    Yeah.  He was -- he was turning and I was going straight.

Q    But he was pointing the gun forward, correct,

isn't that right?

A    Out.  He was pointing out the window.

Q    He was pointing --

A    Out sideways like this.

Q    Right.  He was pointing it out the window at your car in front, correct?

A    Yes.

Q    Now, you told the police officers that you kept your gun under -- in the car for your protection, correct?

A    Yes.

Q    Because The Hill area is a dangerous place, right?

A    Yes.

Q    Now, when the passenger of the blue Honda began firing, that's when Juan Scruggs asked for the gun in your car, right?

A    I told him where it was at.

Q    So you told him where the gun was hidden in the car, and then Juan Scruggs got the gun.

A    Yeah.

Q    And that's what you described in the statement, correct?

A    Yes.

Q    And you say that he -- did you see him unwrap

424

the gun from the T-shirt?

A    I didn't see that.

Q    But he only fired two shots, returning fire to the blue Honda, right?

A    Yes.

Q    Now, how many -- strike that.

When you gave the statement, you described that there was eight or nine shots fired by the passenger in the blue Honda, correct?

A    Yeah.  That I could remember, like six shots or something -- five or six shots.

Q    If you turn to page 44 of your statement. That's Exhibit Number 4.

A    What page you said?

Q    Page 44, down at the bottom.

A    All right.

MR. ZEHE:  Judge, may I publish that page?

THE COURT:  You may.

BY MR. ZEHE:

Q    At the top the page, do you read the question: "When he pulled out the gun, did he fire?"

You answered, "Yes."

The question:  "How many shots?"

Your answer:  "Had to be around eight or

425

nine."

Do you remember being asked that and giving those answers?

A    It was so long ago.  I don't really remember.

Q    But this is an accurate transcription of what you told him that night, right?

A    Yes.

Q    And that night you told him eight or nine shots, correct?

A    Yes.

Q    Now, after the shooting stopped, you said that you heard your cousin from the rear seat say that he was hit, right?

A    Yes.

Q    Didn't he, in fact, say that he was shot and that he could feel it in his back?

A    Yes.

Q    He used those words, correct?

A    Yes.

Q    And that's what you told the police officers that night, correct?

A    Yes.

Q    And you still had the gun, that Beretta handgun, in the car when the police pulled you over, correct?

426

A    Yes.

Q    And when they pulled you over, you were trying to get to the hospital, is that correct?

A    Yes.

Q    But you had missed the street that the hospital was on, right?

A    Yes.

Q    So you couldn't get Lucky to the hospital right away because you didn't know how to get there, right?

A    Yes.

Q    Now, when you gave the statement on July 29th, you described the three Hispanic males in the blue Honda, didn't you?

A    Yeah.

Q    And at the time you told Detective Rodriguez that you could recognize them, didn't you?

A    I told them I'd try.

Q    You did describe --

A    Try to identify them, yes.

Q    And you told them that you believed that you could identify them, correct?

A    Yes.

Q    But they didn't have photographs at that time, did they?

427

A    I don't remember.

Q    Well, you didn't know who they were by name, did you?

A    No.

Q    So they -- but you told Detective Rodriguez that you could identify them if you saw photographs, if they were able to find out --

A    I would try.

Q    -- who was in the car, correct?

A    I told them I'd try, yes.

Q    In fact, didn't you tell the police officer -- or Detective Rodriguez that you actually saw one of the Hispanic males in the blue Honda before?

A    Not that I remember.  I probably seen him around somewhere.  I don't know.

Q    But you recognized him from seeing him before on the street, correct?  So you assured him that you could identify him if you saw him again, right?

A    I said I would try.

Q    And didn't you even know that that Hispanic from the blue Honda that you could identify was from Fair Haven?

A    I said he might be.

Q    Well, let me direct your attention to page 52.

         MR. ZEHE:  May I publish 52, Your Honor?

428

THE COURT:  You may.

BY MR. ZEHE:

Q    On page 52 about halfway down, do you see the question:  "The Hispanic male that you talked to me about in the back seat of that Honda?

"Answer:  Yeah.  It looks like I had seen him before.

"Question:  And where was that?  What part of the area of the city did you see?

"Fair Haven."

Do you see that?

A    Yes.

Q    You gave those answers on July 25th, 1999, correct?

A    Yes.

Q    And you -- earlier on in the page, you were asked specifically:  "Could you identify the passenger who had the weapon who fired at you and your friends and your cousin?"

And you said, "Yes," correct?

A    Um-hmm.

Q    Is that a yes?

A    Yes.

Q    In fact --

MR. ZEHE:  If I may publish page 53, Your

429

Honor.

THE COURT:  You may indeed.

BY MR. ZEHE:

Q    On page 53 at the top, you were asked:  "Do you know where in Fair Haven he hangs out?"

And you said:  "The street, on Grand," right?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    Now, if I understand your testimony today, when the police asked you to come back and look at photographs some months later, you said -- you did go in to look at the photographs, correct?

A    Yes.

Q    And this was after you had been charged and were appearing in court on the gun charge, right?

A    Yes.

Q    And they showed you photographs -- photo boards, correct?

A    Yes.

Q    And the photo board, just so the jury understands, is a sheet of paper with eight photographs on it?

A    Um-hmm.

Q    Of similar looking men, correct?

430

A    Yes.

Q    And they had you look at those photo boards, correct?

A    Yes.

Q    And you said, "I can't identify anybody."

A    Correct.

Q    And you did that twice, right?

A    Yes.

Q    Once Detective Rodriguez showed you the photo boards, correct?

A    Yes.

Q    And that was in March of 2001 -- or I'm sorry's -- 2000, according to your testimony, correct?

A    Yes.

Q    And do you remember that it was later in September of 2001 that you went back to -- with your attorney and talked to the State's Attorney at the State's Attorney's Office?  Do you remember that, in September?

A    I think I talked -- I think I was locked up at the time.

Q    Do you remember the State's Attorney -- the Assistant State's Attorney arranging for you to look at the photo boards in September of 2000?

A    I don't remember if it was September or what.

431

I don't remember what date.

Q    But it was a State's Attorney, not Detective Rodriguez, right?

A    No, it was a State's Attorney who came to see me when I was locked up, actually.

Q    And actually he asked you about the incident, correct?  He wanted to ask you about what you saw that night, right?

A    Yes.  I think so.

Q    And you said you didn't want to talk about it, right?

A    I don't remember what was said in that interview.

Q    But you didn't give the State's Attorney the same story, or any kind of a story, like you did after your arrest, correct?

A    I don't remember, sir.

Q    Well, you had your attorney present, right?

A    This was the time the State's Attorney came to the jail?  I don't know if it's that same time.

Q    Okay.  But you were in jail.  You talked to the State's Attorney, and you couldn't identify photographs in a photo board, correct?

A    Correct.

Q    And you don't -- am I correct that you did not

432

give him any information about the night of the shooting?

A    I'm not sure, sir.

Q    Isn't it a fact that you actually refused to make any kind of identification at all to the State's Attorney?

A    No, sir.

Q    You don't remember that?

A    I don't remember that, sir.

Q    Now, at the time that you went through this incident on July 25th, 1999, you were using the name Albert McCann, right?

A    Yes.

Q    You were also using the nickname "E," right?

A    No, sir.

Q    Have you ever heard of the nickname "E"?

A    No, sir.

Q    Do you know anybody by the nickname "E"?

A    No, sir.

Q    Now, sir, you said you were convicted of a gun charge and sentenced to 18 months.  Is that what I understand you to say?

A    Yes.

Q    After that, in or about 2007, were you convicted of another felony?

433

A    Yes.

MR. ZEHE:  May I have a moment, Your Honor?

THE COURT:  You may.

MR. ZEHE:  Nothing further, Your Honor.

MR. PINHEIRO:  If I may, Your Honor.

THE COURT:  You may indeed.

MR. PINHEIRO:  Thank you.

REDIRECT EXAMINATION BY MR. PINHEIRO:

Q    Mr. McCann?

A    Yes.

Q    When you were at the police station on July 25th, 1999, immediately after your cousin was killed, and you gave a voluntary statement, correct?

A    Yes.

Q    You were 19 at the time, right?

A    Yes.

Q    You knew you were in trouble.

A    Yes.

Q    Had a gun in the car, right?

A    Yes.

Q    Not licensed?  Registered?

A    No.

434

Q    No permit?

A    No.

Q    You knew you were in trouble?

A    Yes.

Q    Big trouble?

A    Yes.

Q    Did you know that what you were saying then with your audiotaped statement that it was going to be used against you?

A    Not really.

Q    Well, you knew you were admitting to crimes, right?

A    Yes.

Q    And you broke the law.

A    Yes.

Q    Yet you chose to make a voluntary statement, correct?

A    Yes.

Q    Why?

A    I just am telling the truth.

Q    Even though the truth would hurt you.

A    Yes.

Q    And you went to jail for telling the truth.

A    Yes.

Q    You committed a crime.

435

A    Yes.

Q    And that statement's now some 14 years ago?

A    Yes.

Q    If I may direct your attention, Mr. McCann, to Plaintiff's 16 that's been admitted.

MR. PINHEIRO:  And if I may publish it, Your Honor?

THE COURT:  You may indeed.

MR. PINHEIRO:  Your Honor, my monitor just shut off.  I don't know how to turn it on.

THE COURT:  Ken, could you --

MR. PINHEIRO:  There we go.  Thank you.

BY MR. PINHEIRO:

Q    Now, Mr. McCann, Mr. Zehe just asked you some questions about being questioned by the State's Attorney during the photograph identification, correct?

A    Yes.

Q    The first time that you went to view photographs -- and I believe you stated 20 minutes ago that it was on March 10th, year 2000.

A    All right.

Q    Now, at that time who was present when you went to view those photographs?

A    You talking about at Union Avenue?

436

Q    Yes, sir.  And Union Avenue is what, for the jurors?

A    The police station.

Q    Okay.  Who was present with you, if you remember?

A    I think my lawyer.

Q    Who else?

A    Who came with me?

Q    Who was there at the time you viewed the photographs?

A    I think -- I remember Rodriguez was there.

Q    Police officers, correct?

A    Yes.

Q    Any State's Attorney there?

A    I don't think so.

Q    Any State's Attorney ask you any questions?

A    No.

        MR. PINHEIRO:  If I may publish, Your Honor, Plaintiff's 18.  It's been admitted.

        THE COURT:  You may.

BY MR. PINHEIRO:

Q    Mr. McCann, the second time you went to view photographs, you stated it was September 13th, 2001, correct?

A    Yes.  I think so.

437

Q   Do you remember who was with you at that time? Who was there at that time?

A   I don't remember.

Q   Do you remember being asked any questions from anyone?

A   I think I was asked questions.

Q   And what did you do?

A   I can't really remember.

Q   All right.  You don't remember, do you?

A   No.

MR. PINHEIRO:  No further questions, Your Honor.

THE COURT:  Any recross?

MR. ZEHE:  No, Your Honor.

THE COURT:  All right.  This witness is excused for the duration, Mr. Pinheiro?

MR. PINHEIRO:  Yes, sir.

THE COURT:  Same thing for you, Mr. Zehe?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  Thank you, sir.  You may step down.  Next witness, Mr. Pinheiro.

MR. PINHEIRO:  May I go get him?

THE COURT:  Okay.  Who is he?

MR. PINHEIRO:  Mr. Juan Scruggs.

THE COURT:  Okay.  Bring him on in.

438

MR. LUCKY:  Can I stay and watch?

THE COURT:  I'm sorry?  What's the question, sir?

MR. LUCKY:  Do I have to leave now?

THE COURT:  He wants to know if he can stay in here.  Unless there's somebody that's literally going to testify --

MR. PINHEIRO:  That is correct, Your Honor.

THE COURT:  Get your witness.

You can stay in here, Mr. Lucky.

And ladies and gentlemen of the jury, just so you'll know, we're going to break right around 1 o'clock.

MR. PINHEIRO:  Your Honor, if I may report, the judicial marshal just told me that Mr. Juan Scruggs went down the elevator five minutes ago.  So I don't know where he is.

THE COURT:  You got another witness?

MR. PINHEIRO:  We have Mr. --

THE COURT:  Do you have another witness here, Mr. Pinheiro, that you can call?  I'm not going to wait for a witness at the cost of the jury.

MR. PINHEIRO:  I would have to coordinate with Mr. Zehe because we have witnesses on --

439

THE COURT: All right. You all talk very quickly and let's get going.

MR. PINHEIRO: Your Honor, at this time I'd like to read the agreed-upon deposition excerpt of Patrick Redding.

MR. ZEHE: Your Honor, that's been the subject of an objection.

THE COURT: Well, let's don't go there. I didn't know that, because I would have sure resolved it before today, and we'll do that after we get through today or early in the morning.

MR. PINHEIRO: I was told it was agreed-upon.

THE COURT: I'm sorry?

MR. PINHEIRO: I was told it was an agreed-upon excerpt.

THE COURT: We don't need to get into that now. I'll decide that, and we don't need to discuss this in front of the jury.

Another witness?

MR. PINHEIRO: Is Mr. Brendan Canning here?

MR. ZEHE: Yes.

THE COURT: You come on up here, sir, and face this gentleman.

440

I saw that some nice lady left.  I guess she went to find Mr. Scruggs.  Is that his name?

MR. PINHEIRO:  Yes.  I don't know.  I didn't see.

(Brendan Canning, sworn by the clerk)

THE COURT:  And where I was going, Mr. Pinheiro, is that I would like whoever that is, when she returns, if that's in fact where she went, to get Mr. Scruggs, if she knows him -- do you know if he has somebody here that would know him?

MR. PINHEIRO:  I don't know, Your Honor. I had my back to him.  I don't know who went out.  I don't know who went out, Your Honor.

THE COURT:  Well, then -- because I want to tell Mr. Scruggs -- to bring him in here and tell him he needs to wait here outside, because we've just interrupted the trial.  And I thought we had an understanding yesterday, but apparently we didn't.

MR. PINHEIRO:  I don't like it any more than you, Your Honor.

THE COURT:  At any rate, is this a witness that is also a defense witness that we'll -- that you're going to take him right now, Mr. Zehe, after Mr. Pinheiro gets through with him?

MR. ZEHE:  Yes, Your Honor.

441

THE COURT:  All right.  Same drill we had on the other cases, then.

Proceed, Mr. Pinheiro.

THE CLERK:  Your Honor, let me get his name for the record.

THE COURT:  Yeah.  Go ahead and do that. I'm sorry.

THE CLERK:  Sir, can I get your name for the record, please.  State your name for the record, spell your last name, and town in which you reside.

THE WITNESS:  Brendan, M., as in Michael, Canning, C-A-N-N-I-N-G; town of New Haven.

THE COURT:  All right.  Proceed.


DIRECT EXAMINATION BY MR. PINHEIRO:


Q    Mr. Canning, what's your current occupation?

A    Court security officer, 141 Church Street, Federal Courthouse, New Haven.

Q    What was your position in 1999?

A    Sergeant in charge of New Haven narcotics enforcement unit.

Q    So you were a New Haven police officer?

A    Yes, sir.

Q    Are you prepared today to answer questions in

442

connection with the murder investigation of

Anthony Lucky, Jr.?

A    Yes.

Q    At the time when you were a New Haven police

officer, were you familiar with certain general orders

that had to do with authoring police reports?

A    Yes.

Q    May I direct your attention to -- you have my

exhibit book there, sir -- it'll be Plaintiff's 24.

THE COURT:  That document is not in

evidence yet, is it?

MR. PINHEIRO:  It is in evidence.

THE COURT:  It is?

MR. PINHEIRO:  Yes, sir.

THE COURT:  Okay.  You're right.  Go

ahead.  Which Bates number?  186, first page, is that

what you want?

MR. PINHEIRO:  It is Bates 186, Your

Honor.

THE COURT:  You there, sir?

THE WITNESS:  Yes, Your Honor.

THE COURT:  You recognize that document?

THE WITNESS:  Yes, I do, Your Honor.

THE COURT:  All right.  Proceed, Counsel.

MR. PINHEIRO:  May I publish, Your Honor?

443

THE COURT:  You may indeed.  You want to take that green sticky off?

MR. PINHEIRO:  Yes.

BY MR. PINHEIRO:

Q    Sir, may I direct your attention to Number 4?

A    Yes.

Q    Sir, do you know the purpose of accurately reflecting information concerning an episode in a police report?

A    Yes.

Q    What's that purpose?

A    The purpose?

Q    Yes, sir.

A    To put down in your report what you have seen and heard or taken from that particular incident at that particular time.

Q    Prior to today, sir, did you have an opportunity to prepare for today's trial?

A    Yes.

Q    Who did you speak with?

A    I spoke to the Defendant's attorney.

Q    Which one?

A    Both.

Q    How many occasions?

A    How many occasions?

444

Q    Yeah.  How many times prior to today?

A    This has been going back about two years.
Several times.

Q    Were you at his office or did they come over
to the --

A    Their office.

Q    More or less than five times over the last
couple years?

A    More or less.

Q    More or less?

A    Probably about five times.

Q    Every time you were preparing for trial,
right?  You go in --

A    Yes, sir.  To be prepared for trial, yes, sir.

Q    -- and you help them prepare for trial?

A    Did I help them?

Q    Yeah.

THE COURT:  Let me just say, ladies and
gentlemen of the jury, something you wouldn't know,
but since I've been the judge presiding for about two
and a half years, I know there was at least one
continuance because of Hurricane Sandy, which I know
you all remember last year.  And there may have been
other times.  I think that's what you alluded to,
right, Mr. Pinheiro?

445

MR. PINHEIRO:  Yes, sir.

THE COURT:  Okay, proceed.

BY MR. PINHEIRO:

Q    Well, did they help you prepare your testimony, or did you help them prepare the case?

A    I guess it was a combination of both.

Q    Right.  You know the Defendant, right?

A    Yes.

Q    How many years you know him?

A    Over 20 years.

Q    Friend of yours?

A    Acquaintance.

Q    Professional?

A    Professional.

Q    You don't want to see him get in any trouble, do you?

A    Absolutely not.

Q    Now, when you were preparing -- you and Defendant's attorneys both were preparing -- what documents did you review?

A    Numerous documents.

Q    For instance, you probably reviewed your deposition that you took in this case, right?

A    Yes.

Q    You know what a deposition is, right?

446

A    Yes.

Q    What is it?

A    It's disposed of a particular incident at a particular time.

THE COURT:  Ladies and gentlemen of the jury, a deposition -- I'll tell you what it is.  A deposition, you have a court reporter, like this nice lady, and you have a lawyer for each side, and you go to a location, and you bring in a witness -- could be a party or a witness in the case.  The witness is administered an oath, just like the witness is administered an oath in this courtroom, to tell the truth.  The testimony of the witness and the questions that the lawyers ask is taken down, and it's placed in booklet form.  And it's provided -- a copy is provided to each of the lawyers.

And I believe in the State of Connecticut, although I may be confused, the witness has a right to read and sign the deposition, right?

MR. PINHEIRO:  Yes, sir.

THE COURT:  Lawyers acknowledge that, to make any corrections that may be necessary.  And it's standard operating procedure during what they call the "discovery phase" to find out what witnesses are going to say in advance, so the lawyers can prepare their

447

cases.  That's what a deposition is.

I think I said that right, Mr. Pinheiro?

MR. PINHEIRO:  Yes, sir.

THE COURT:  Mr. Zehe, did I say that right?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  Proceed, sir.

BY MR. PINHEIRO:

Q    So you reviewed your deposition, right?

A    Yes.

Q    Did you review police reports?

A    Yes.

Q    Quite a few police reports?

A    Yes.

Q    Was the Defendant with you when you were at their office?

A    No, he was not.

Q    At no time?

A    Well, maybe he was initially three years ago when this first came about.

Q    Did the Defendant talk -- prepare your testimony for today?  I'm sorry.  Strike that.

Did the Defendant's attorneys help to prepare your testimony for today?

A    Prep, yes.

448

Q    They asked you questions?

A    Yes, sir.

Q    And you gave them responses?

A    Yes.

Q    Did they ever suggest to you maybe you should rephrase a response one way or the other?

A    No.

Q    Not at all?

A    No.

Q    And every time you made a -- gave a response to their prepping questions for your trial, they were satisfied, every time with your response?

A    For the most part, yes.

Q    Were they ever not satisfied with your response?

A    No, they were satisfied.

Q    And you took a deposition in this case, right?

A    Yes.  January 2008.

Q    How do you remember that date off the top of your head?

A    It's the deposition.

Q    When's in the last time you looked at your deposition?

A    Thursday, probably, of last week.

            THE COURT:  Ladies and gentlemen of the

449

jury, so you'll know, a deposition -- on the first page, they generally have the date of the deposition, the place of the deposition, and who attended the deposition, the lawyer for each side.  That's generally how it works.

Mr. Pinheiro, is there reason to believe that that's how it works in this case?

MR. PINHEIRO:  Yes, sir.

THE COURT:  All right.  Proceed.

BY MR. PINHEIRO:

Q    So last week you went over your deposition at their office.

A    Yes.

Q    And that wasn't the first time you went over it.

A    No, it was not.

Q    How many times before that?

A    Several.

Q    Now, Mr. Canning, regarding a case incident -- incident reports, they're also known as police reports, right?

A    Yes.

Q    Could you please state to the jury how they compare to an individual's affidavit?

A    For the most part, when you write your report,

the case incident report, you use that -- that usually reflects your -- we're assuming an arrest or an application?

Q    Anything.

A    Usually for an arrest warrant application, you take the majority of your work from your report and you place it -- or you put it on -- type it into your affidavit, whether it's an arrest warrant affidavit, sometimes search warrant affidavit.

Q    Did you go over that type of information with defense lawyers over the last few years?

A    Yes.

Q    Now, is it important that the information in the police report is true and accurate?

A    Yes.

Q    Why?

A    Well, in this particular case --

Q    Not in this case.  In general.

        THE COURT:  You interrupted --

        MR. PINHEIRO:  I'm sorry.

        THE WITNESS:  In this particular occasion, to prepare yourself with your notes, with your report to -- in a situation that's to testify in court.

BY MR. PINHEIRO:

451

Q    But in general, why is it important to have true and accurate information in a police report?

A    Well, you need the facts and circumstances when you take it from that particular person on that particular time.

Q    Is there any room for speculation?

A    Speculation?

Q    Yes, sir.

A    There may be.

Q    Now, how many years were you a New Haven police officer, sir?

A    Twenty-one and a half.

Q    What year did you start?

A    1987.

Q    And you retired when?

A    June 2008.

Q    Now, during your time as a New Haven police officer, did you have occasion to use any confidential informants?

A    Yes.

Q    And did you -- during that period of time, your years of service, did you rely upon information provided by way of those confidential informants in applications or arrest warrants?

A    Yes.

452

Q    Let me jump a little bit there.  In your tenure as a police officer, have you applied for arrest warrants?

A    Yes.

Q    Probably hundreds of them?

A    Yes.

Q    At the time during your tenure when you were a police officer, were you aware of any general orders promulgated by the New Haven Police Department as to how to register a confidential informant?

A    Yes.

Q    Are you able today to state to the jury the rules and regulations in effect in or about the year 1999 as to what was required of police officers or detectives when they want to use a confidential informant?

A    Okay.  It's an order of New Haven police, actually 76-3 -- actually it's part of this order that's on the -- or was on the computer screen.

When you register an informant -- first of all, in my particular position at the time as a sergeant, a detective or officer would also come to me, Sergeant, I want you to -- I want to introduce you to someone who has what I believe as "known information" for crimes in the City of New Haven.  I

453

would sit down with that individual, along with the detective or the officer, and interview them.

But there's a host of other things you have to do at that time. You have to do a background check on that particular person. See if they're working for another police department at that particular time. Did they have any failure to appear in court?

You have to measure their credibility and their reliability. It's something we are mandated by the Supreme Court, the Aguilar versus Spinelli case. So we have to have the reliability, credibility, and something I feel comfortable with that I can take information from them that we can hence put in search warrants or arrest warrants, so be it.

Once I finish the interview and we do a background check, I would introduce that particular person to my superior. I would get the stamp of approval. And then you have to put their information on a -- at that time it was a 3-by-5 card. If it was today, 05 for May, dash -- and let's say that that particular person is the 13th person that we're registering as an informant. So it would be the month, May, dash, 13.

Q    Thank you, sir.

A    You're welcome.

454

Q    In the past during your career, sir, did you follow the procedures that you just stated as set forth in General Order 76-3, Section B concerning the registration of the information and the name of the confidential informant?

A    Yes.

Q    You just gave us a lot of information.  What's the significance of doing a background check for a potential confidential informant?

A    You want to state it to the jury -- failure to appear is something pretty big in court.  If that person's reliable to go to court on a regular basis, then you take that reliability as a two-prong test.  You say if they're reliable to go to court, then they're reliable to meet myself and other officers at that particular location at that particular time.  And again, that develops their credibility with myself.

Q    You want them to show up for court?

A    Well, absolutely.  You want everybody to show up, but I also want them to make sure that they're going to show up and meet myself and an officer when we're doing something as -- at the high level of a controlled purchase when you have numerous people involved, when safety and security are a very high priority with the officer as well as the particular

455

person we're hopefully going to make the purchase from.

Q    And that's part of the background check for FTAs?

A    Yes.  That's one part.

Q    What's the other parts?

A    Again, a records check, something as -- if the -- if that particular informant worked for another police department, sometimes you don't want to, so to speak, you know, cross the line with what work someone's doing for another department, what's their motive for working -- or let's say the City of Bridgeport and then the City of New Haven.  So that's another part of that background we have to make sure is -- again, the reliability and credibility.

Q    You gave some information about credibility and reliability, and you gave a particular United States Supreme Court case that you seem to have considerable knowledge of.

What was the name of that case?

A    It was Aguilar versus Spinelli.

Q    What was the significance of that case, if you know?

A    Credibility and reliability.

Q    And how does that factor in?

456

A    Well, again, like I said, the credibility, we know what credibility is, if you're credible with me when it comes to their information.  And, again, like I said, reliability.  They have to be reliable enough to show up and meet myself, show up and, you know, if it comes to the point of testimony in a trial.

Q    How did you determine an individual's credibility?

A    You know, again, like I said, it's something I would have to -- it could be the face, just knowing the person's mannerism.  You know, sometimes you want to try to know, you know, what they're talking about ahead of time.  I want to say if, you know, I'm buying drugs out of a certain location in The Hill section of New Haven, or any section for that matter, you want to say a particular -- let's say 915 Lafayette Boulevard, the federal courthouse here.

So you're going to buy drugs out of 915 Lafayette Boulevard.  Well, what floor?  The third floor.  And then my answer would be, Well, I know that area, and I know for a fact that I sold drugs on 915 Lafayette Boulevard.  So again, knowing something that they know or they don't know so we could go look at reliability or credibility.

Q    What about a person's medical condition?

457

Would that affect the person's credibility, or could it?

A     It depends what the condition may be.

Q     What about someone who suffered from memory disorder?

A     That could be an issue.

Q     What about if someone suffered from mental disorder?

A     That could be an issue.

Q     What about someone who is a drug addict?

A     That could be an issue.

Q     Are there some drugs that are much more severe than others, illegal drugs?

A     I would say the amount of quantity that they've taken at that particular time.

Q     What about a person who's a crack addict that continuously uses -- smokes crack, stays up for days on end without eating, would that affect someone's credibility?

A     It could.

Q     Well, those three areas I just covered -- crack addict, memory, mental disorders -- all three of those, would that give you concern about that individual's credibility, sir?

                MR. ZEHE:  Just going to object to the

458

speculation nature of these questions.

THE COURT:  All right.  State your question again, Counselor.  Don't answer it.

MR. PINHEIRO:  Would someone who is a crack addict, suffers from mental and memory disorder, would that affect -- would that affect your decision as to whether or not she was credible?

THE COURT:  And the objection -- the question is would that affect his assessment as to their credibility.  So the objection is --

MR. ZEHE:  Judge, it's foundation, and calls for speculation.  Just in general, if these --

THE COURT:  Well, I'll sustain the objection, and I'll allow Plaintiff's counsel to see if he can lay a proper foundation --

MR. PINHEIRO:  I'll try.

THE COURT:  -- to put that in.

BY MR. PINHEIRO:

Q    Previous to that question, we just went over that, I believe, correct me if I'm wrong, that you stated that if someone had -- was a crack addict, then that would -- I forget your exact words, sir.  I'm going to use this, if it's wrong -- throw a red flag up to you about this individual's credibility?

A    Not a red flag.  You have to look at -- again,

459

you have to look at that whole person, you know, on the whole, you know.  If there's a crack addiction, you know, as a police officer, particularly in the street level, elicit narcotics trafficking game out there, you deal with a lot of undesirable people.  So then that's where, again, you have to see whether there's reliability, see in that particular case with a drug addict, how far is that addiction and...

Q    You know where I'm going with this, because witnesses in this case were -- suffered from those.

THE COURT:  Wait a minute.  Are you testifying?

MR. PINHEIRO:  I'm sorry, Your Honor.  Strike that.  I'll strike that.

BY MR. PINHEIRO:

Q    Mr. Canning, so someone who's a crack addict, would you do anything different to assess their credibility versus someone who is clean and sober?

A    You still have to follow -- like I said, you have to see the credibility, sir, as well as the reliability.

Q    Would you treat them exactly the same, then, a crack addict compared to someone who's clean and sober when assessing the credibility?

A    It all depends on the information.

460

Q   What about someone who has suffered from mental disorders?

A   Again, you have to -- again, you have to -- we get the information.  I have to see if that information is correct.  Is the person suffering -- they can be suffering from mental disorders at a particular time.  Were they on medication?  Were they not on medication?  But the information they gave at that particular time, that was truthful, you know, and the facts and circumstances there, then that's something I, you know, would further look into.

Q   What about this, sir?  I'm sorry for cutting you off.  What about if someone suffered -- was a crack addict, mental disorders, memory disorders, and doesn't take their medication for the memory and mental disorders?  Those four factors, how would that affect your assessment of the individual's credibility?

MR. ZEHE:  Same objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Well, I'm not a mental health physician.  All right?  I would take in, again, the circumstances, the person's reliability, and credibility.

BY MR. PINHEIRO:

461

Q    Did you go over this area of questioning with the defense lawyers over -- anytime over the past three years -- or anytime over the past ten years this case has been pending?

A    Yeah.  I'm sure we talked about it.

Q    So this is no surprise to you, this line of questioning.

THE COURT:  Ask a question.

BY MR. PINHEIRO:

Q    This line of question is no surprise to you, then, correct?

A    Not in -- such as this or any other testimony or investigation.

Q    So when you came to trial today, you were prepared for this line of questioning, correct?

A    Yes.  You have to be prepared yourself.

Q    Thank you.

Do you know an individual named Mayra Mercado?

A    Yes.

Q    During the time period when you were a New Haven police officer, was Mayra Mercado an informant of any kind for you, sir?

A    For me?  No.

Q    Do you know if Mayra Mercado was ever a registered informant for the New Haven Police

Department?

A    In the two years that I ran the narcotics room, from 1999 to 2000, she was not a registered informant.

Q    I'm sorry.  Sometimes my hearing goes. It's --

A    1999-2001, when I was in charge of the New Haven narcotics enforcement, she was not a registered informant.

Q    Thank you, sir.

A    You're welcome.

Q    Now, during that time period, 1999 to 2001, your response only covers that time period?

A    For?

Q    Mayra Mercado, sir.

A    For that time period, yes, I would say. Knowing of her or who or -- Counsel, you'll have to expound on that.  I mean, after 2001, after being, you know, familiar with this investigation?

Q    Yes.

A    Sure, I knew of her after 2001; knew of her after 2001.

Q    I understand.  Thank you.

A    You're welcome.

Q    Do you know if Mayra Mercado was ever an

463

informant of any kind for the New Haven Police
Department?

A   She may have been a confidential informant.

MR. PINHEIRO:  I have a deposition, Your
Honor.  All judges handle depositions differently.  I
don't know your procedures.

THE COURT:  Well, what I do -- if you're
attempting to use the deposition for impeachment
purposes, what I want you to do is to ask permission
to approach the witness, refer the witness to a page,
and lines, page or pages and lines, let the witness
read it and -- the questions and the answers in enough
context before the question and after the question,
and then ask the witness if that refreshes the
witness's recollection as to what he might have said
on the date of the deposition.  And if he says yes,
then you can ask him, what is your testimony, or ask
the question again, and we'll see if you get a
different answer.

MR. PINHEIRO:  It may take me a few
times.

THE COURT:  If he says no and you
perceive there to be a conflict, then we will let you
read the lawyer part and the witness read the witness
part, and the jury can determine if there's any

464

difference from what was said.  That's how I do it.

Defense counsel, you understand how I do it?

MR. KATON:  I do, Your Honor.

THE COURT:  All right.  Good.

MR. PINHEIRO:  It's going to take me a few times, Your Honor, to get --

THE COURT:  I'm sorry?

MR. PINHEIRO:  It'll probably take me a few times to get it right.

THE COURT:  Well, I got a lot of confidence in you, Mr. Pinheiro.  I think you'll probably get it right at least after one more mess-up.

MR. PINHEIRO:  Permission to approach the witness?

THE COURT:  You got page and line?

MR. PINHEIRO:  Yes, sir.  All ready to go.

THE COURT:  Read that for the record first.

MR. PINHEIRO:  The question?

THE COURT:  No, no.  Read the page and line you want him to read.

MR. PINHEIRO:  It would be page 35, lines 10 through 12.

465

THE COURT:  Okay.  Well, give him enough context before so he can read into it, not just two lines.  It won't give him the context of what he was asked in 2008, I believe -- what was testified to.  So give him a little coming in and going out so it'll make sense, and you can ask him your question about refreshing his recollection.

MR. PINHEIRO:  The question is --

THE COURT:  No, no.  Say it one more time, Mr. Pinheiro.  You mentioned two lines on a certain page you want him to read.  I said, Give him some more lines before that and give him some more lines after that so what he reads will be in a proper context, not just something sticking out that he gave five years ago.

MR. PINHEIRO:  That's fine, Your Honor.  Okay.

THE COURT:  You understand?

MR. PINHEIRO:  Yes, sir.

THE COURT:  All right.  Tell us what it is you want him to read, and then we'll proceed.  And I suggest to defense counsel that they make sure they read along, because sometimes, through no fault of the lawyer, it's cut off in the middle.  And maybe from the other side's perspective, it's more proper to

466

be -- to get more information.  All right?

So what you got, Mr. Pinheiro?

MR. PINHEIRO:  Your Honor, because I anticipate additional questions, I may be able to have him read a number of lines before and after that area.

THE COURT:  I don't know what you just asked me, Mr. Pinheiro.  Say it again.

MR. PINHEIRO:  In order to maybe speed things along, I could have the witness read several lines before and after that area.

THE COURT:  And the purpose of that you say was to speed it along.  I perceive -- and this was -- the discussions have been about -- you're attempting to impeach the witness by his prior testimony.

MR. PINHEIRO:  Yes.

THE COURT:  Or you're going to let him refresh his recollection, and we'll see what the witness has said.  Now, you're anticipating questions that haven't been asked yet, that you want him to read his deposition testimony first?

MR. PINHEIRO:  No, Your Honor.  I'll withdraw that request.

THE COURT:  So what lines do you want him to read now?

467

MR. PINHEIRO:  5 through 21.

THE COURT:  On page --

MR. PINHEIRO:  35.

THE COURT:  All right.  You read that to yourself.

You may approach.

You may read it to yourself.  Once you've finished reading it, let me know, sir, and then I'll tell Mr. Pinheiro to start asking questions.  Hand it to him, sir.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Sir, have you read the lines that you were requested to read?

THE WITNESS:  I believe he said lines 5 to 21 or page --

THE COURT:  5 to 21.

THE WITNESS:  Yes.

THE COURT:  Page 35.  Have you read them?

THE WITNESS:  35.  I thought you said page 5 through 21.

MR. PINHEIRO:  No.  I'm sorry.  Page --

THE COURT:  All right.  Listen.  It's on page 35, lines 5 through 21.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Yes, sir.

468

THE WITNESS:  Just for the record, it actually begins on page 34.

THE COURT:  I'm sorry?

THE WITNESS:  It begins on page 34, Your Honor.

THE COURT:  But he wants you to read -- he says 5 through 21.

THE WITNESS:  I understand that, but there was a question asked that was on that particular page.

THE COURT:  So tell us what you've read more than what the lawyer asked you to read or I instructed you to read.  Page 34, line what?

THE WITNESS:  Page 34, line 19.

THE COURT:  All right.  And at 25 lines on a page, right?

THE WITNESS:  Twenty-four on this particular page, Your Honor.

THE COURT:  That's interesting.  Okay. Go ahead and ask the question.

MR. PINHEIRO:  I will, Your Honor.

BY MR. PINHEIRO:

Q    Mr. Canning, do you know if Mayra Mercado was ever an informant --

THE COURT:  Does that refresh your

469

recollection?

MR. PINHEIRO:  I'm sorry, Your Honor.

BY MR. PINHEIRO:

Q    Does that refresh your recollection, Mr. Canning, as to the question I just asked.

THE COURT:  Does that refresh your recollection about -- what was the question, because he may remember it.  I don't remember it, and some of the jury members may not remember it since I don't.

BY MR. PINHEIRO:

Q    Mr. Canning, does that refresh your recollection as to this question:  Do you know if Mayra Mercado was ever an informant anytime for the New Haven Police Department?

A    As I stated earlier, she may have been.

THE COURT:  Does the deposition say she may have been?  That's what he's trying to find out.

THE WITNESS:  I understand, Your Honor. But apparently it says here:  "Was there a conversation regarding Mercado?"

THE COURT:  Slow it down, sir, so the court reporter can take it down.  My question to you, sir -- look at me, please -- you said here, I think earlier, before you started reading this, "She may have been."

470

THE WITNESS:  Yes, Your Honor.

THE COURT:  Is that true?  After having read what you just read, even though you read page 34, whatever it was, does that refresh your recollection as to whether or not this lady was a confidential informant for the New Haven Police Department?

THE WITNESS:  I stated she may have been, Your Honor, even after reading this.

THE COURT:  Just a minute.  Does your testimony that you just read say what it is -- saying what you said here today, she may have been?

THE WITNESS:  Yes.

THE COURT:  All right, let's start -- what was the first line you read on page 34?

THE WITNESS:  Page 34, first line, the question.

THE COURT:  No, no.

THE WITNESS:  Line 19.

THE COURT:  Line 19.  So it was question. And the last line that you read on page 35?

THE WITNESS:  35 was line 20.

THE COURT:  Okay.  That's an answer, right?

THE WITNESS:  Actually, yes, Your Honor.

THE COURT:  All right.  Mr. Pinheiro, I

471

want you to start on page 34.  You read the question, and I'm going to ask the witness to -- you read the answers you gave back in 2008 -- January, I believe you said, right?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  Mr. Pinheiro, you understand the drill?

MR. PINHEIRO:  I do, Your Honor, and I'll do my best.

THE COURT:  I'm sure you will.  Proceed.

MR. PINHEIRO:  This is on page 34, line 19, Your Honor.

THE COURT:  Question.

BY MR. PINHEIRO:

Q   Okay.  "The first sentence of Exhibit 2 states:  'During the week of October 25, 1999, Sergeant Canning of the narcotics enforcement unit informed Sergeant Norwood of the investigative unit that he had recently spoken to a registered informant, the informant, Mayra Mercado, close parentheses, told Sergeant Canning that she had information pertinent to the homicide of Anthony Lucky.

"Did that happen?"

THE COURT:  Answer.

THE WITNESS:  "No."

472

THE COURT:  Question -- next question.

MR. PINHEIRO:  Okay.  Line 7:  "Was Mercado ever a registered informant for the New Haven Police Department?"

THE COURT:  Answer.

THE WITNESS:  "No.  Not to my recollection."

THE COURT:  I'm sorry?

THE WITNESS:  "Not to my recollection."

THE COURT:  "Not to my recollection" was your answer?

THE WITNESS:  At my deposition, Your Honor, yes, sir.

THE COURT:  All right.  I'm sorry.  Your answer that you just read was "not to my recollection."  Is that what you said?

THE WITNESS:  Yes.

THE COURT:  All right.  Question.

MR. PINHEIRO:  "Okay.  Was Mercado ever an informant of any kind for the New Haven Police Department?"

THE COURT:  Answer.

THE WITNESS:  "Not to my recollection."

THE COURT:  Question.

MR. PINHEIRO:  "Sergeant Canning, the

473

first sentence of this report, Exhibit 2, states:
'During the week of October 25, 1999, Sergeant Canning
of the narcotics enforcement unit informed
Sergeant Norwood of the investigative unit that he had
recently spoken to a registered informant.

"Did you do that?"

THE COURT: Answer.

THE WITNESS: "No."

THE COURT: Okay. What line we on now
and what page now?

MR. PINHEIRO: We completed that line of
questioning, Your Honor, but the witness incorrectly
stated an answer from his sworn testimony.

THE COURT: Well, I wish you would have
pointed that out when he did it, and say, No, Judge,
that's not exactly what it says. Which line are
you --

MR. PINHEIRO: I don't want to interrupt,
His Honor.

THE COURT: Which lines are you making
reference to that you say he misstated what he said?

MR. PINHEIRO: The question which starts
on page 34, line 19, continues on to page 35 --

THE COURT: I know. But what's the
answer that he gave that wasn't consistent with what

474

he just read from the deposition?  Because what I understood you to say, Mr. Pinheiro, is, Judge, he was reading it, but that's not what he said.

MR. PINHEIRO:  That's right.

THE COURT:  What line?

MR. PINHEIRO:  Page 35, line 5.  "Answer: There was a conversation regarding Mercado but not as a registered informant."

THE COURT:  You didn't read that just now, did you, sir?  I didn't hear it if you did.

THE WITNESS:  No, Your Honor.

THE COURT:  Okay.  Why not?

THE WITNESS:  That's a fault in -- my fault.  It's there.  "There was a conversation regarding Mercado, not as a registered informant."

THE COURT:  Okay.  Are we through with this dialogue about what he was supposed to have read from your perspective, Mr. Pinheiro?

MR. PINHEIRO:  On this question, Your Honor, but I think there's more to come.

THE COURT:  Well, we're going to break for lunch right now, if you're through with that question.  But you got to ask questions before you get into the deposition, because you got to have a perception if you think he misspoke and just like you

did in this one.  And the jury heard what your questions were and what the answers were, and they're going to determine whether there was a contradiction with what he said earlier in his testimony. Understood?

MR. PINHEIRO:  I do, Your Honor.

THE COURT:  I'm going to instruct you, sir, now that your testimony's begun you're not to discuss the testimony you have given or will give in this case with anybody, including the lawyers.  You understand?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Ladies and gentlemen of the jury, we're going to go ahead and break, and we're going to break until 2:10.  That's about an hour and three minutes.  I probably have a couple of words to say to the lawyers, and we need to get an hour, too, and this fine court reporter certainly does.

I want to remind you, you're not to discuss the case among yourselves or with anyone else when you break for lunch, that you're to wear your juror badges while you're in the courthouse, and that you report directly back to the jury room at the designated time.  Thank you again on behalf of the parties and lawyers for your attention.  We'll see you

476

at 2:10.

The witness may step down.

And let me say this to the lawyers.  I think this is going to get easier.  God, I hope so.  It ought to be one, two, three.

And I will instruct the witness, you know, you better read exactly.  I mean you strike me as a really intelligent and educated fellow.  You got to read exactly what it is.

Counsel, if you think, or any of you think, during the course of the trial someone doesn't, we don't want to have to go back and revisit it.  You're not interrupting anybody.  But as soon as the witness -- before you start reading the next question, the lawyer, just say, Judge, I think the witness didn't give -- didn't read the answer correctly.  And that's the point where we correct it.  Okay, Mr. Pinheiro?

MR. PINHEIRO:  Yes.  I didn't want to interrupt, Your Honor.

THE COURT:  Mr. Katon and Mr. Zehe?

Interrupt.  You ask the next question after that.  That's the point.  You would interrupt yourself.  We're going to try to make sure the jury gets it in real time, okay?

477

We're in recess.

(Recess)

THE COURT:  Mr. Pinheiro, you may proceed.

MR. PINHEIRO:  Thank you, Your Honor.

THE COURT:  Again, you followed my instruction?  You understand you're under your same oath to tell the truth that you took earlier this morning, and then you followed my instruction about not talking to anyone, is that right?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  Proceed.

BY MR. PINHEIRO:

Q    Mr. Canning.

A    Yes.

Q    Did you inform Sergeant Norwood or the Defendant that the informant, Mayra Mercado, told you that she had information pertinent to the homicide of Anthony Lucky?

A    I told Sergeant Norwood that we had some of that information regarding the Lucky homicide.  Did not say "informant."

Q    I'm sorry, sir?

A    I did not say "informant."  I notified Sergeant Norwood -- told him we had some information

478

regarding the Lucky.

Q    But not as an informant, correct?

A    Correct.

MR. PINHEIRO:  If I may direct your attention, Your Honor, we have an unobjected to joint exhibit, same --

THE COURT:  Tell us what the Plaintiff's exhibit number is.

MR. PINHEIRO:  Plaintiff's Number 10, Bates 127.

THE COURT:  Does Defendant know what he's talking about?

MR. ZEHE:  Yes, Your Honor.  No objection.

THE COURT:  And what does it purport to be, Mr. Pinheiro?

MR. PINHEIRO:  Case Incident Report dated -- Incident Date:  12/5/99.  The date of report is 12/5/99.

THE COURT:  It's one of these incident reports that we've seen earlier?

MR. PINHEIRO:  Yes, sir.  Authored by the Defendant.

THE COURT:  All right.  It's admitted without objection.  And your number is what, again?

479

MR. PINHEIRO:  Plaintiff's 10, Bates 127.

(Plaintiff's Exhibit 10, received in evidence)

THE COURT:  Okay.  You may publish it, if that's what you want to do.

MR. PINHEIRO:  Thank you.

BY MR. PINHEIRO:

Q   Mr. Canning, may I direct your attention to Plaintiff's Number -- I'm sorry -- Plaintiff's Number 10.  Do you see that, sir?

A   Yes.

Q   The date of the report?

A   12/5/99.

Q   And who's it signed by?

A   Detective Edwin Rodriguez.

Q   The Defendant, correct?

A   Yes.

Q   If I may direct your attention to the first paragraph, sir.

A   Yes.

Q   Now, my last question to you before we went on the lunch break and the first question that I just asked you this afternoon, those two questions, where you made a response, no, to --

A   Yes.

Q   -- does that first paragraph accurately

480

reflect almost verbatim those two questions that I asked you?

A    It reflects the question asked me, but --

Q    That's all, sir.

A    -- the date on there is not the correct date.

Q    Well, so those two questions I asked you was accurately reflected in that first paragraph, correct?

THE COURT:  Wait.  The questions accurately reflect?  Ask if something happened and he -- I thought he gave an answer.  So you got me confused, and if I'm confused, maybe the jury is.  So ask another question, okay?

BY MR. PINHEIRO:

Q    The questions that I asked and you answered before lunch, you responded to, no, correct?

THE COURT:  And the question -- let's go ahead and do this so we all on the same page.

MR. PINHEIRO:  Okay.

BY MR. PINHEIRO:

Q    I asked a question immediately before lunch. During the week of October 25, 1999, did you, Sergeant Canning, of the narcotics enforcement unit inform Sergeant Norwood of the investigative unit that you had recently spoken to a registered informant?

THE COURT:  Do you remember being asked

481

that question, sir?

THE WITNESS:  Your Honor, if I can just clarify.

THE COURT:  No.  Do you remember being asked that question?

THE WITNESS:  Yes.

THE COURT:  Do you remember what your answer was?

THE WITNESS:  I believe it was no.

MR. PINHEIRO:  Correct.

THE COURT:  I'm sorry?

THE WITNESS:  I believe it was no.

THE COURT:  Okay.  Now, you had a second question.

MR. PINHEIRO:  Yes, sir.

BY MR. PINHEIRO:

Q    Did you inform Sergeant Norwood or the Defendant that the informant, Mayra Mercado, told you that she had information pertinent to the homicide of Anthony Lucky?

THE COURT:  Do you remember being asked that question?

THE WITNESS:  Yes.

THE COURT:  And do you remember what your answer was?

482

THE WITNESS:  Your Honor, I told him I had information.  I did not say that she was a registered informant.

THE COURT:  Okay.  I'm sorry.  You said you told him that you -- that she wasn't a registered informant?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Now, you said you wanted to explain something, and I cut you off.  Explain what you wanted to right now.

THE WITNESS:  Thank you, Your Honor.

First of all, the date October 25th, 1999, there was no date that I'm aware of.  That particular search warrant occurred on November 4th, 1999, and that's when the witness, Mercado, stated to me that she had information regarding the Lucky homicide.  So the date is incorrect.  I stated earlier to the jury she was not a registered informant.

BY MR. PINHEIRO:

Q    Sir, that first paragraph of Plaintiff's 10, is that first paragraph true and accurate?  Yes or no?

A    No.

Q    Thank you.

Sir, did you prepare any case incident report containing any information about speaking to

483

Mayra Mercado about the Lucky homicide?

A    No, I did not.

Q    At that time when you spoke with her, did you know if Mayra Mercado had any outstanding warrants?

A    At that particular time of the search warrant, I believe I may have.

Q    Was Mercado arrested at that time?

A    Yes, she was.

Q    What was she arrested for?

A    I believe failure to appear.

Q    And didn't you just state earlier before lunch that failure to appear was one of the criteria that you would assess a person's credibility for?

A    Yes, I did.

Q    Do you know when Mayra Mercado volunteered information regarding the Lucky homicide?

A    When?

Q    Yes.

A    To myself?

Q    That's it.

A    Yes.

Q    Was it when she was being arrested?

A    It was shortly before she was removed from the household.

Q    Do you know why Mayra Mercado volunteered the

484

information regarding the Lucky homicide?

A   Apparently, she was a witness to it.

Q   Sir, may I direct your attention to your deposition, dated January 9th, 2008.

A   Yes.

Q   May I direct your attention to lines -- could you please read to yourself lines 4 through 23 -- the rest of the page.

A   On what page?

THE COURT:  What page?

MR. PINHEIRO:  Page 42, sir.

THE COURT:  Let me know once you finish reading that, sir.

THE WITNESS:  Yes, Your Honor.  Sorry. What was the sentence?

MR. PINHEIRO:  Lines 4 through 23.

THE WITNESS:  Okay.

BY MR. PINHEIRO:

Q   Sir, did Mayra Mercado tell you why she was volunteering this information to you?

A   No.

Q   Did you ask her why she was volunteering this information?

A   Yes.

Q   And what, if anything, did she say to you?

485

A    I believe she did not want to go back to Niantic -- and go to Niantic -- the woman's detention facility in Niantic.  In my deposition.

Q    Thank you.

MR. PINHEIRO:  No further questions, Your Honor.

THE COURT:  All right.  Defense counsel?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  And again, I think we've established that -- I've forgotten where we are, if this is what I guess would be redirect, or it would be cross?

MR. ZEHE:  We did cross and then direct.

THE COURT:  It is cross.  So we're doing the same thing on this witness, ladies and gentlemen, being called all at one time, Plaintiff's case-in-chief and now Defendant's case-in-chief.  Right?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  All right.  Proceed, sir.

CROSS-EXAMINATION BY MR. ZEHE:

Q    Mr. Canning, you indicated that you're currently employed as a security officer?

486

A    Yes.

Q    For the federal court system?

A    Yes, sir.

Q    What's your duties and responsibilities?

A    My duties are to screen all persons or property entering the courthouse to make sure no weapons, hazardous materials, contraband are brought into the courthouse.

Q    Are your duties and responsibilities similar to those security officers down --

A    Exactly like here, yes.

Q    In what courthouse do you work in?

A    141 Church Street, Federal Courthouse in New Haven, Connecticut.

THE COURT:  Now you said where?

THE WITNESS:  The federal courthouse in New Haven, Your Honor.

THE COURT:  I thought you said -- I thought we had another federal courthouse here in Bridgeport.  I was going to say...

BY MR. ZEHE:

Q    Mr. Canning, you gave on direct information that you were a sergeant in the narcotics division from 1999 to 2001?

A    Yes.

487

Q    Could you tell the jury a little bit about your background prior to that in the police department?

A    Prior to that, I graduated from the Police Academy in New Haven in 1987.  I was, I believe, transferred to the patrol division from '87 through '91.  I was transferred to the uniform narcotics unit.  From '92 to '93, I was in the plainclothes narcotic unit.  '94 to '99, I made sergeant, at which time in 1999, I took over the narcotic enforcement unit in New Haven.  Shortly thereafter, 2001, I was transferred to the detective bureau.  And in 2003 to 2008, I was transferred to the patrol division, where I hence retired.

Q    Were you a sergeant at patrol unit when you retired?

A    Yes, I was.

Q    And as head of the narcotic unit in 1999, what were your duties and responsibilities?

A    I supervised approximately 20 officers and detectives.  I reviewed search warrants, arrest warrants.  I was in charge of raid planning under controlled purchases of narcotics.

Q    Did you focus on one particular area of New Haven?

488

A    We have the entire city of New Haven.

Q    Are you familiar with the area called "The Hill"?

A    Yes, I am.

Q    Now, when you were a patrol officer, were you assigned to The Hill?

A    Yes, I was.

Q    So you were familiar with The Hill when you made sergeant?

A    Yes.

Q    And describe the neighborhood.

A    The Hill section is a minority area, urban, low income, high crime rate area.

Q    And is the corner of Howard and Columbus Avenue in The Hill section?

A    Yes, it is.

Q    Now, I'm going to direct your attention to November 4, 1999.  That date came up on direct examination.  Could you describe your assignment on that date?

A    I was supervisor in charge with the rank of sergeant of the narcotics enforcement unit.

Q    Did you have occasion on that date to serve a search warrant?

A    Yes.

489

Q    Who was working with you in the preparation and service of that search warrant?

A    Officers and detectives assigned to narcotics unit as well as a statewide narcotic task force.

Q    When you -- does the search warrant have a location that it was directed to?

A    Yes.

Q    And what address was that?

A    That was 156 West Street, New Haven.

Q    And what was the -- is that also in The Hill district?

A    Yes, it is.

Q    What's located at that address?

A    That was the location of the target in our investigation at the time.

Q    And who was that?

A    One Fish Mercado.

Q    Do you know what Fish Mercado's relationship was to Mayra Mercado?

A    Father.

Q    What was the subject of the search warrant?

A    Sales of heroin.

Q    So you were serving the search warrant to search for evidence of heroin?

A    Yes, sir.

490

Q   Now, what's the process, if you could tell the jury, for obtaining the search warrant?

A   Well, initially we go by information we get from brother and sister officers trying to get controlled purchases out of that location, as well as complaints made by district managers, the chief's office, block watch.  We take all that information and put it on our report, and then we transfer that to our search warrant.

I would review the search warrant, at which time we take it to an honorable judge, and the judge would sign off on it.  We have two officers sign two affidavits.

Q   And that search warrant is predicated on an affidavit that you prepared based on the information you collected?

A   Yes.

Q   And is that search warrant reviewed by an Assistant State's Attorney prior to --

A   Yes, it is.  Excuse me.  Yes, it is.

Q   And then you say after -- if they approve, then it's given to a judge for his review and approval?

A   Yes.

Q   Is that similar to the process for an arrest

491

warrant?

A    More or less.

Q    Now, you indicated that this was the residence of the Mercados?

A    Yes.

Q    When you went to the address, were members of the Mercado family present?

A    Yes.

Q    Did you serve -- at approximately 7:30 a.m., did you serve that search warrant?

A    Yes.

Q    And how many officers were with you at the service of the search warrant?

A    I'd say approximately 20.

Q    Now, what did you find when you went into the house?  Or if you could just describe for the jury briefly about service of the search warrant and what happened when you got in the house.

A    Initially, for no one that's unfamiliar, we arrive at the location.  We assign officers to the exterior of the location for safety purposes, and then we have a team of officers that go into the location itself.  We usually -- we're mandated to knock and announce.  We have to knock on the door and announce, "Police.  Search warrant."

492

And then shortly after that, if there's no response at the door or the door is not opened, then we physically force the door open. We gain entry, and then we have officers assigned basically to fan out throughout the apartment looking for the target, other people. If a person is in the household, we need to secure anyone trying to escape. And once we secure those particular people in a certain area, then we begin our search.

Q    And is that how you served the search warrant on November 4th?

A    Yes.

Q    When you got in the house, who did you find in the house?

A    We found the target, one Fish Mercado; his wife, Rosa Mercado; daughter, Mayra Mercado; and a younger brother, I believe, Ishmael.

Q    What did you do with the occupants of the house?

A    We have to detain them immediately. We handcuffed Fish due to the fact he was a target, and we detained the others.

Q    When you detain the others, do you run warrant searches?

A    Yes, we do.

493

Q    And while you're running a warrant search, do you remove the subjects from the house?

A    Once we confirm those -- if there are warrants in fact.

Q    And I believe you testified on direct that you were -- that you located a warrant on Mayra Mercado, correct?

A    Yes.

Q    Did you have a conversation with her once you determined that there was a warrant out for her arrest?

A    Prior to that, a statement was made.

Q    Who was present during that statement?

A    Myself.  I believe it was Detective Michael Quinn, and Detective Richard Pelletier.

Q    And what did you say to Mayra Mercado?  What did she respond?

A    It was a spontaneous utterance.  Just basically said to me, I know who killed or put a hit on Lucky.

Q    Were you familiar at the time with the Lucky homicide?

A    Yes.

Q    And were you investigating the Lucky homicide at the time?

494

A    No, I was not.

Q    Did you know who was investigating the Lucky homicide?

A    Yes.

Q    Who was that?

A    Detective Edwin Rodriguez.

Q    And who was his supervisor at the time?

A    Sergeant Bryan Norwood.

Q    After Mayra told you that she knew who shot Lucky, what else did she tell you, if anything?

A    She told me --

MR. PINHEIRO:  Objection, Your Honor. Hearsay.

THE COURT:  Restate the question, Counsel, and don't answer it.

BY MR. ZEHE:

Q    What, if anything else, did Mayra Mercado tell you during that conversation?

THE COURT:  And your objection is hearsay, Mr. Pinheiro?

MR. PINHEIRO:  Yes, sir.

THE COURT:  And help me why that's not hearsay, Mr. Zehe?

MR. ZEHE:  Your Honor, the declarant is going to be testifying in court.  This is also

495

information that will explain what this officer did next after receiving the information from Mayra Mercado.

THE COURT:  So what exception to the hearsay rule is that?  Because it's --

MR. ZEHE:  State of mind, Your Honor.

THE COURT:  -- being asserted for the truth of the matter?

MR. ZEHE:  Yes, Judge.

THE COURT:  And exception is which?

MR. ZEHE:  The state of mind.  It'll explain what this officer did next.

THE COURT:  And again, the question is: What did she say...

MR. ZEHE:  What did she say after she said she knew who shot Lucky?

THE COURT:  Okay.  I overrule the objection.  Answer the question, sir.

THE WITNESS:  Well, she told me who shot Lucky.

BY MR. ZEHE:

Q    Who did she tell you?

A    She said Shabazz.

Q    Were you familiar with the name "Shabazz"?

A    Yes.

Q    Did you become familiar with it during your

496

employment as a police officer?

A    Yes.

Q    Who did you know Shabazz to be?

MR. PINHEIRO:  Objection, Your Honor.

THE COURT:  Okay.  Just a minute.  First, restate the question, because I'm having a hard time picking you up.  And don't answer.  And then you can state the objection and the basis just after that, Mr. Pinheiro.

So what was the question, sir?

MR. ZEHE:  Based on his experience as a police officer, he testified he was familiar with who Shabazz was.  And I was asking him who he understood Shabazz to be.

THE COURT:  And, Mr. Pinheiro, what's the basis of your objection?  Because he's asking what this officer thinks that he knows.  So you're asking him who was it, based on what you thought you knew.

So what's the basis?

MR. PINHEIRO:  The basis is your prior rulings on this issue, Your Honor.

THE COURT:  Well, let's have a sidebar because I'm not sure what you're making reference to, sir.

(Conference held at sidebar)

497

THE COURT: Okay. Mr. Pinheiro, what are you making reference to?

MR. PINHEIRO: Allegations of prior bad acts, drug dealing, all that.

THE COURT: But to me -- well, go ahead. Say what you want to say first. Then I'll say what I want to say.

MR. ZEHE: Judge, it's a nickname that he's familiar with, and it's just identifying who it is. We've been hearing it throughout the trial.

MR. KATON: Associated with a name and bad act.

MR. PINHEIRO: How did he get -- next thing is, does he know about the judge's ruling on that?

MR. ZEHE: I'm not going to get into any bad acts.

THE COURT: I think we're dealing with apples and oranges here. I don't think that's inconsistent with any ruling that I made prior. Okay?

MR. PINHEIRO: Okay.

(End of conference at sidebar)

THE COURT: You may continue, Counselor.

BY MR. ZEHE:

Q    When Mayra Mercado told you that Shabazz did

498

it, you recognized that name.  Who did you recognize that name to be?

A    Gary Session.

Q    Now, when Mayra gave you this information, what was her demeanor?

A    She was physically and emotionally upset.

Q    At that point did you tell her that she was under arrest for an outstanding warrant?

A    Shortly thereafter, she was told.

Q    Now, you said that you knew that there was a homicide investigation being conducted into the Lucky killing, correct?

A    Yes.

Q    Did you do anything with the information that Mayra gave you about that homicide?

A    I merely contacted my supervisor, Sergeant Bryan Norwood.

Q    And then after contacting your supervisor, Sergeant Norwood, did you take Mayra anywhere?

A    She was taken to One Union Avenue, New Haven Police Department.

Q    Now, on the way to the station with Mayra, did she give you any additional information regarding what she knew about the Lucky homicide?

A    No.

499

Q    When you got to the station, did she give you any further information?

A    No.

Q    Do you recall, when you got to the station, taking Mayra anywhere shortly thereafter?

A    She did mention she knew what she believed to be the weapon used for the Lucky homicide.

Q    And when you got to the station, did you do anything with that information?

A    Yes.

Q    What's that?

A    Again, I referred her to Sergeant Norwood and at which time myself, Sergeant Norwood, Detective Frank Robbins went to the location where she said she believed the gun was at.

Q    And what location was that?

A    St. Francis Cemetery.

Q    You actually took her to the cemetery?

A    Yes.

Q    And what did she do -- or what did you do when you got to the cemetery?

A    We did a daylight search.  She wasn't a hundred percent sure where the weapon was but in the general vicinity of the -- more in the center of the cemetery.  It's not a very large cemetery.  So we did

a search of it.

Q   And how did she indicate where -- locations that she thought the gun might be?

A   She believed it was right in that general area.  She didn't really have direct...

Q   Approximately how much time did you spend with her and the other detectives searching for the gun?

A   I would say maybe approximately an hour.

Q   Now, you said she was originally upset when you first took her into custody?

A   Yes.

Q   Did she calm down during this -- the time of the search?

A   Yes, she did.

Q   And did you return her after this -- were you able to locate the gun?

A   No.  We had negative results.

Q   Did you return to the station with her?

A   Yes.

Q   And what did you do with her when you returned to the station?

A   At that time she was just handed over back to Sergeant Norwood and Rodriguez.  My point at that particular time was I was done with it.

Q   So at the time you returned from the cemetery,

501

had Rodriguez arrived at the station?

A    I believe so.

Q    Now, did you -- where did you put her in the -- within the station once you brought her back?

A    She would have been in the -- they have a holding cell and an interview room on the third floor of the detective division.

Q    And at that point did Detective Rodriguez and Sergeant Norwood take over the further interview of --

A    Yes.

Q    -- Mayra Mercado?

A    Yes.

Q    And you said you went back to other duties --

A    Yes.

Q    -- that had to do with the service of the search warrant and any arrests you had with this?

A    Yes.

Q    Now, at any time during your contact with Mayra Mercado, from the time you first served the search warrant until the time you left to return to your duties in narcotics, did Mayra complain about her condition or her treatment?

A    No.

Q    Now, did you -- what next did you do in relation to the Lucky homicide or Mayra Mercado?

A    I believe it was November 4th when --

Q    Well, November 4th is when you brought her in.

MR. PINHEIRO:  Objection, Your Honor.

THE COURT:  Just a minute.  What's the basis of your objection?

MR. PINHEIRO:  Counsel was interrupting the witness before he answered.

THE COURT:  All right.  To the extent that that's correct, don't do it again.

Finish your answer, sir.

THE WITNESS:  Can you restate the question?

BY MR. ZEHE:

Q    Sure.  After your November 4th contact with Mayra Mercado, what next -- or how did you next get involved in the Lucky homicide investigation?

A    I was contacted by Mercado's mother on that Saturday.

Q    Would that be November 6th?

A    Yes.

Q    And what was her name?

A    Rosa Mercado.

Q    How were you contacted by her?

A    By the telephone.

Q    And after she contacted you by telephone, what

503

did you do?

A    I contacted Detective Rodriguez.

Q    Why did you contact Detective Rodriguez?

A    Rosa Mercado stated to me --

MR. PINHEIRO:  Objection, Your Honor.

THE COURT:  And the basis for the --

MR. PINHEIRO:  Hearsay.

THE COURT:  Why is that not hearsay?

MR. ZEHE:  Your Honor, he's explaining why he recontacted Detective Rodriguez.

THE COURT:  But the question was what, Counselor?

MR. ZEHE:  Why did you recontact Detective Rodriguez after the phone call with Rosa Mercado?

THE COURT:  And what was the answer that you were going to give that's not hearsay?  You understand "hearsay."

THE WITNESS:  Yes, Your Honor.

THE COURT:  What was the answer?  Why is it you called up Detective Rodriguez?

THE WITNESS:  There was further information developed regarding the homicide investigation.

THE COURT:  But the question was:  Why

504

did you call Detective Rodriguez?

THE WITNESS:  I called Detective Rodriguez because of the information I received from the mother that pertained to the homicide investigation.

MR. ZEHE:  I'll move on, Your Honor.

BY MR. ZEHE:

Q    Did you return to the station at all on the 6th after forwarding the information regarding Rosa Mercado's call?

A    No, I did not.

Q    When were you next back in the station?

A    I believe that Monday.

Q    Would that be November 8th?

A    Yes.

Q    And why did you go back to the station in relation to the Lucky homicide investigation?

A    I was a witness to a taped statement.

Q    Did you go back for purposes of witnessing the statement?

A    My general duties were to work that day, and I was also a witness to the statement.

Q    Now, where was Mayra Mercado when you went back for purposes of the statement on November 8th?

A    121 Elm Street.

Q    Who else was present?

505

A    Myself, Detective Rodriguez, Sergeant Norwood.

Q    And did you have contact with Mayra Mercado at that time?

A    Yes.

Q    And was she -- well, how would you describe her demeanor?

A    She was -- appeared to be at ease, calm, collected.

Q    Did you then take -- or were you present when a statement was taken of her that was recorded on tape?

A    Yes.

MR. ZEHE:  Now, Your Honor, I have a joint exhibit which is a transcript of the taped statement that was done by a court reporter.  Mr. Pinheiro's agreed to make it a joint statement -- or a joint exhibit.  And I'd like to be able to show the witness.

THE COURT:  This is the transcript of the --

MR. ZEHE:  -- of the tape that was taken of the statement on November 8th.

THE COURT:  Of?

MR. KATON:  1999.

THE COURT:  Is that correct,

506

Mr. Pinheiro?

MR. PINHEIRO:  Yes, Your Honor.  That's the federal transcript of it.

THE COURT:  And so the jury will understand, there was a transcript made pursuant to an order I made or one of the judges in this case entered.  And the actual tape was available to the lawyers, I think, and they heard it here in the courthouse.  I think that's right.  And then a transcript, like a deposition testimony, or the statements made during the tape recording were typed out.

And that's the transcript form we have now, right, Mr. Zehe?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  Right, Mr. Pinheiro?

MR. PINHEIRO:  Yes, Your Honor.

THE COURT:  What do you propose to do with it?  What's the number on it?

MR. ZEHE:  Your Honor, we're marking it Joint Exhibit Number 1.

THE COURT:  Okay.  And how many pages is it?

MR. ZEHE:  It's 31 pages.

THE COURT:  And how do you propose to get

507

that before the jury other than here it is and you guys go read it when you deliberate? You going to read it now?

MR. ZEHE: Your Honor, I'm going to show the witness, who has had the opportunity to look at it before today's testimony, along with the tape, and will testify that the transcript is an accurate transcription of the tape.

THE COURT: But is the jury going to read the transcript and listen to the tape?

MR. ZEHE: Yes, Your Honor.

THE COURT: And is that going to be done here in open court?

MR. ZEHE: Yes, Your Honor.

THE COURT: All right.

MR. ZEHE: With your permission.

THE COURT: Okay. And let me -- well, that'll be okay, but let me say this: Ladies and gentlemen of the jury, I don't know because I have not heard -- to my best belief, I haven't heard that -- the quality of the tape of what you'll be hearing. But it's important that you realize if what you hear in any way contradicts what you read, even though it was done under the auspices of a federal court reporter or the federal court system, it's what you

508

hear that counts.

I'm not suggesting there will be anything like that, but that's just the general rule, so you'll know. And of course, if you want to, you'll have not only the transcript when you begin your deliberations, but also the recording, if you'd like to.

Now, a 31-page transcript probably translates to what, a 40-minute tape?

MR. ZEHE: It's actually about 20 minutes, a little bit longer.

THE COURT: Like I said, I'm going the wrong way. So go ahead and -- it's admitted without objection, Joint Exhibit 1. It's Joint Exhibit 1. So it's admitted.

You want to show it to him right now?

MR. ZEHE: May I approach?

THE COURT: You may approach, yes, sir.

(Joint Exhibit 1, received in evidence)

BY MR. ZEHE:

Q    Mr. Canning, do you recognize Joint Exhibit Number 1?

A    Yes.

Q    Is that the true and accurate copy of the transcript that you read along with the tape to confirm accuracy of the tape?

A    Yes.

MR. ZEHE:  Your Honor, may I at this time move Joint Exhibit 1 into evidence and --

THE COURT:  You can, but I already let it in.  And now you want to admit the disc of the recording?

MR. ZEHE:  Yes, Your Honor.

(Joint Exhibit 2, received in evidence)

BY MR. ZEHE:

Q    Mr. Canning, I'm going to show you --

MR. ZEHE:  -- Joint Exhibit Number 2?

MR. PINHEIRO:  That's correct.

BY MR. ZEHE:

Q    And ask you if this is the disc of the taped statement that you reviewed when you reviewed the Joint Exhibit Number 1?

A    Yes.

MR. ZEHE:  Your Honor --

BY MR. ZEHE:

Q    And this is a true and accurate copy of the statement of Mayra Mercado that was given on November 8th, 1999?

A    Yes, sir.

MR. ZEHE:  Your Honor, may I at this time publish the tape to the jury?

THE COURT:  Yes.  But how are we going to do the transcript?  I thought they were going to get to look at the transcript and listen to the tape.

MR. ZEHE:  I have that worked out, Your Honor.  We have a technician who can play real time the transcript with the tape.

THE COURT:  We got a really smart guy here.  Okay.

MR. ZEHE:  As I understand it, it will appear on the screen.

THE COURT:  If your technological guru's got it right, I suspect it will.

MR. ZEHE:  May I proceed, Your Honor?

THE COURT:  You may.

(Audiotape played)

BY MR. ZEHE:

Q    We've now listened to the tape, Mr. Canning.  Is that a true and accurate copy of the same conversation that you witnessed on November 8th, 1999?

A    Yes.

Q    There was mention during the statement of photo boards that were shown to the witness.  And the first photo board, she made an identification of DeShawn Johnson.

Do you recall that in the statement?

511

A    Yes.

Q    That was the driver of the CRX, blue CRX?

A    Yes.

Q    There was an indication that she made of the photo boards just before the tape was taken.  Were you present during her identification?

A    Shortly thereafter.

Q    Shortly before the photo --

A    Right.  Right.

Q    Were you present when she identified the photo board?

A    Yes.

Q    The second photo board that she made an identification was a photo board of eight female blacks, correct?

A    Yes.

Q    And she made an identification as indicated in the statement of one of the female blacks, correct?

A    Yes.

Q    Sharon Adkins?

A    Yes.

Q    And that was the individual describing the statement referred to as "Sharon" who made the call to Johnson regarding the three occupants of the red Suzuki?

512

A    Yes.

Q    The fourth -- the third photo board that she was shown, did you see her make an identification of the Plaintiff in this case, Gary Session?

A    Yes.

Q    And that was the individual described in the statement, according to Mayra Mercado, that had an argument over money being taken by McCann, and he then handed a gun on the street to Bebe.

A    Yes.

Q    And then a fourth photo board was done of eight male blacks where the identification of Albert McCann was made, correct?

A    I believe so.

Q    The cousin of the victim?

A    Yes.

Q    And you were present for that identification as well?

A    Yes.

Q    Could you describe her -- well, we've all heard the tape now.  Can you describe her demeanor during -- before, during, and after the tape?

A    Calm.  Attentive.

Q    Did she appear tired or exhausted?

A    No.

513

Q   Did she indicate or did she appear hungry?

A   No.

Q   Was there anything about her behavior before, during, or after the statement that caused you to doubt her credibility?

A   No.

Q   Now, during your contact with Mayra, did she ever express to you that she was in fear for her own safety?

A   Yes.

Q   And was that a result of getting information on the Lucky homicide?

A   Yes.

Q   After her taped statement, did you or any of the detectives involved do anything with respect to her concern about her safety?

A   Yes.

Q   What was that?

A   Sergeant Norwood contacted the State's Attorney, Michael Dearington, regarding witness protection.

Q   Were you familiar with the Witness Protection Program?

A   Yes.

Q   Is that a voluntary program?

514

A    Yes.

Q    Did you -- do you know whether or not arrangements were made with the State's Attorney's Office to admit Mayra Mercado into the Witness Protection Program?

A    Yes.

Q    Did you have any involvement in the preparation of any forms to begin that process?

A    Yes.

Q    What -- can you tell the jury what involvement you had?

A    My involvement was I met with an Inspector Timothy Reardon, State's Attorney's Office, where Mercado voluntarily signed off on her agreement with the State's Attorney's Office, and I witnessed that signature.

Q    Was this after the taped statement was made?

A    Yes.

Q    And were you aware that the following day Mayra Mercado reviewed that transcript of the statement and signed it -- her statement?

A    Yes.

Q    And was this arrangement for the witness protection made after she had reviewed her statement?

A    Yes.

515

Q    So it would have been November 9th?

A    Yes.

Q    You indicated that you transported Mayra to the -- Tim Reardon of the State's Attorney's Office?

A    Yes.  Myself and Sergeant Norwood.

Q    Who's Tim Reardon?

A    An inspector with the State's Attorney's Office in New Haven.

Q    And what was the purpose for you taking Mayra to his office?

A    Inspector Reardon, he oversees the Witness Protection Program at the time, and I transported her with Sergeant Norwood to that location for the agreement to be signed.

MR. ZEHE:  Your Honor, I'd like to make reference and show the witness page number 875 and 876 of Defendant's Exhibit F.

THE COURT:  Is that already in evidence?

MR. ZEHE:  Yes, Your Honor, subject to -- well, it has been admitted into evidence.

THE COURT:  Mr. Pinheiro, are you on page with that?

MR. PINHEIRO:  Not yet, Your Honor.  I need one second.

THE COURT:  All right.  Why don't you

516

show him what you got and maybe make it a it little quicker for all of us?

MR. ZEHE:  Sure.

MR. PINHEIRO:  We went over this, Your Honor.

THE COURT:  All right.  It's in evidence. You want to publish it?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  All right.  Can we get the green arrows off?

THE CLERK:  I can't do that from here, though.

Thank you.

THE COURT:  Thank you.

Proceed, Counselor.

BY MR. ZEHE:

Q    I'm going to show you the first page of -- which is page 875 of Exhibit F.  Do you recognize what that is?

A    Yes.

Q    What is it?

A    It's a Witness Protection Agreement.

Q    Is this the document that was presented to Mayra Mercado in Tim Reardon's office by you and Mr. Reardon?

517

A    Yes.

Q    I'm going to show you this second page of the Witness Protection Agreement.  Do you recognize that page?

A    Yes, I do.

Q    And that was filled out by Inspector Reardon?

A    Yes.

Q    Now, you said this was a voluntary program. Is this agreement for the purpose of having Mayra Mercado agree to the rules of the Witness Protection Program?

A    Yes.

Q    And during your meeting, did Inspector Reardon read these rules to Mayra Mercado?

A    Yes.

Q    And was she attentive and alert during the reading of these rules?

A    Yes, she was.

Q    Did she sign the agreement after Inspector Reardon read her the rules?

A    Yes.

Q    And is that her signature, "Mayra Mercado"?

A    Yes, it is.

Q    Dated November 9th?

A    Yes.

518

Q    And did you witness that signature?

A    Yes.

Q    Do you see your signature underneath?

A    Yes, I do.

Q    What line is it?

A    The second line.

Q    Sergeant Mike Canning?

A    Yes.

Q    And just so we're clear, in the statement that we read, the introduction referred to a "Detective Cane."  Do you remember reading that?

A    Yes.

Q    First page of the statement?  That's -- Cane is referring to Canning?

A    Right.  It says "Sergeant Cane," but it's Sergeant Canning.

MR. ZEHE:  May I have one moment, Your Honor?

THE COURT:  You may.

BY MR. ZEHE:

Q    After Mayra signed the agreement into the Witness Protection Program, did you take her anywhere?

A    Yes.

Q    Where was that?

A    Myself and Sergeant Norwood took her to a

519

location in the city of Norwalk.

Q    For what purpose?

A    For her protection.

Q    And that was a hotel that she was to stay at under the protection of the program?

A    Yes.

Q    And did you drop her off there?

A    Yes.

MR. ZEHE:  I have nothing further, Your Honor.

THE COURT:  All right.  We're going to go ahead -- before you get to do your recross, Mr. Pinheiro, we're going to take our afternoon break.

Ladies and gentlemen of the jury, I think we're going to do ten minutes, if it's all right. We're going to break sometime around 4:45ish.  It just depends on where we are.

And I want to remind you, you're not to discuss the case among yourselves during the recess. I'm going to remind the witness that you're not to discuss the testimony you have given or will give in this case with anyone, including the lawyers. Understood?

THE WITNESS:  Yes, Your Honor. Understood.

520

THE COURT:  All right.  Thank you again for your patience and attention, members of the jury.

All rise for the jury.

(Jurors excused)

THE COURT:  All right.  The witness may step down.

Let's just quickly for a minute -- a few minutes here -- Mr. Pinheiro, best guess, I'm not holding you to it, but your recross here based on what came out, how long do you think?

MR. PINHEIRO:  Ten minutes, at the most.

THE COURT:  Okay.  And we'll just see what you got left after he finishes his recross.  Then the next witness would be Mr. Scruggs.  I suspect that's the gentleman -- where he went was to put money in the meter.  That was the issue.

MR. PINHEIRO:  Yes, sir.

THE COURT:  But at any rate, I talked to him at lunch and said, Just stay here.  I don't want him to get a ticket, because -- but he'll be here forever if he keeps going out.  And you got a sense of how long you're going to be with him on direct?  Just a sense, not holding you to it.

MR. PINHEIRO:  Half hour.

THE COURT:  All right.  And we'll just

521

see where you go with it and he goes with it and how long we'll be.

But I really do think sometime around quarter of five we're going to break for the day. And I hate to get Mr. -- his name escapes me -- Scruggs back here for a third day, but it may be unavoidable. So do what you can, all of you, to try to not to do that.

But the important question to me, Mr. Pinheiro, where are you in your case compared to where you thought you might be? Are you, in fact, behind?

MR. PINHEIRO: A little longer.

THE COURT: When we say this, I told the jury I think by the 29th, whatever the last day that I've got alive for you in this case, but certainly be over by that. I've forgotten what the date was on the calendar when they were being selected.

I don't want to start working earlier or later, if I can help it. But if after tomorrow if I'm not feeling good about it, I'm going to be living up to my commitment to them. I'm going to -- we'll have to do that. We just got to do what we got to do to finish.

MR. PINHEIRO: May I add, Your Honor, but

defense is not calling all the witnesses on the will-call list.  So I mean, I think that's going to shorten the trial considerably.

THE COURT:  I don't understand what you just said.

MR. PINHEIRO:  I think when we picked the days, we anticipated all the witnesses on Defendant's will-call list.  They're not calling all those.  So I think -- and they're getting their case-in-chief done through our witnesses.

THE COURT:  So you're saying you might be behind on where you thought you might be, but when you look at the total circumstances of the case, we're actually at least where we'd be to finish on that deadline maybe?

MR. PINHEIRO:  I think we're doing okay.

THE COURT:  All right.  You guys concur?

MR. ZEHE:  I think so, Your Honor.

THE COURT:  All right.  Thank you.

MR. PINHEIRO:  If I may, Your Honor, may I raise these other witnesses?  Because we have several here.  Some came from out of town.

THE COURT:  I hate to do it, but just tell them, again, you got a really lame judge, and he's screwing up everything, whatever you need to say

523

to cover yourself.

MR. PINHEIRO:  The only remaining witness I'm going to keep here is Juan Scruggs, Your Honor.

THE COURT:  Hopefully get through him today, but there's no guarantee.

MR. PINHEIRO:  I understand.  Thank you.

THE COURT:  All right.  Now, we're in recess.

(Recess)

THE COURT:  Mr. Pinheiro, you may proceed.

MR. PINHEIRO:  Thank you, Your Honor.

REDIRECT EXAMINATION BY MR. PINHEIRO:

Q    Mr. Canning, do you know what a leading question is?

A    Leading?

Q    A leading question?

A    I believe so.

Q    Could you please tell us what you think it is?

A    When you're trying to lead or get something out of someone.

Q    Is it at times when you insert the answer to your question within the question?  You're providing

524

the answer to the question in your question?

A    You're trying to -- I believe you're trying to, correct.

THE COURT:  Counselor, I'm not sure where you're going, but let me just say for the jury's benefit -- and I think the lawyers on the panel are familiar with it whether they practice or try cases or not -- and probably most of the panel is because of the TV and movies.  But a "leading question" is one which suggests an answer.  I think that's the hornbook definition.  And so now that we've established in some form or fashion what it is, ask your questions.

MR. PINHEIRO:  Thank you.

BY MR. PINHEIRO:

Q    Now, when you interview a witness, you're trying to gather information from the witness, correct?

A    Correct.

Q    You want their firsthand account, correct?

A    Correct.

Q    Not tainted by any other -- any other third-party information that's going on at the time.

A    Correct.

Q    Is it a proper police practice when you're interviewing a witness to use a leading question?

525

A    You should not use a leading question, no.

Q    Thank you.

Now, I don't have the federal transcript on me -- that's for another day -- but if I can just direct your attention to your federal transcript --

THE COURT:  Now, when you say "the federal transcript" or "your federal transcript," you're referring to what the jury just listened to --

MR. PINHEIRO:  Yes, sir.

THE COURT:  -- and read.

MR. PINHEIRO:  Yes, sir.

THE COURT:  Okay.

MR. PINHEIRO:  Yes, sir.  And I don't have one to put on the overhead, Your Honor.  That'll be tomorrow.

BY MR. PINHEIRO:

Q    Could you please state to the jury the date that that federal transcript was transcribed?  I'm sure it's somewhere on that document.

A    The date on the front page I have is November 8th, 1999.

Q    That's the date of Mayra Mercado's audiotaped statement, correct?

A    Yes.

Q    But the date that the federal court

526

transcribed the tape.

A   23rd day of October, 2011.

Q   All right.  So that actual document, that actual writing, was not available to Detective Rodriguez when he drafted the warrant, correct?

A   This particular document here?

Q   Yes, sir.

A   No.

Q   Now, if I could just direct your attention to one particular part of that federal transcript, I believe it will be page 10 of your federal transcript that you have in front of you.  And may I direct your attention to lines 7 through 9.

A   Yes.

Q   And we heard the audiotape and question that Mr. Rodriguez asked of Mayra Mercado:  Back on September 24th, in the preinterview, you told me something happened on September 24th, 1999.  Do you remember what happened?

What's Mr. Rodriguez talking about there?

A   Apparently, it was July 24th, 1999.

Q   What does the transcript say?

A   September 24th.

THE COURT:  Let me just say, members of the jury, I think I said this, but I want to make sure

that you don't get confused.  And Mr. Pinheiro's referred to it as a "federal transcript."

My best recollection was I'm the one that ordered that that be -- the tape be transcribed.  And I think I said it was held here at the courthouse in Bridgeport where the recording was located and the lawyers had an opportunity to listen to it.

So I don't want you to misconstrue that it had anything to do, the transcription of the tape, with any state criminal charge or state civil charge or anything else.  It's because for this lawsuit that I had it transcribed.

Did I say that right, Mr. Pinheiro?

MR. PINHEIRO:  Yes, sir.

THE COURT:  Did I say that right, Mr. Zehe?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  All right.  Proceed.

BY MR. PINHEIRO:

Q    Now, Mr. Canning, it's either on the first -- the bottom of the first page or the second page of that federal transcript -- and I'm sorry I don't have the page number -- but there's a question that is -- if I may, that's directed to July 24th.

Do you see that, sir?

528

A    Yes.

Q    And the question is -- from Mr. Rodriguez: That's it.  The CM on this statement is going to be 46990.  46990.

Mayra, back on August -- excuse me -- July 24th, you stated to myself and Sergeant Norwood and Sergeant Canning that you heard about something that is going to go on, is that correct?  And she responds yes.

Do you see that, sir?

A    Yes.

Q    Is Mr. Rodriguez referring to the day before the shooting of Anthony Lucky, Jr., that you met with Mayra Mercado on July 24th, that she gave the information before the day of the shooting?

A    Did I meet with Mayra Mercado?

Q    No, no.  That's not it, sir.  If I may, that question that Mr. Rodriguez is asking Mayra Mercado, is stating that you all three met with her on July 24th, the day before the shooting, correct?  That's what it says, correct?

A    You could read it that way, I believe.

Q    If I may, sir, July 24th is July 24th, correct?

A    July 24th.

529

Q    That's the day before the shooting?

A    Yes.

Q    Well, did you officers have information about the shooting beforehand?

A    No.

MR. PINHEIRO:  Thank you.  No further questions.

THE COURT:  Mr. Zehe?

MR. ZEHE:  Just briefly, Your Honor.

RECROSS-EXAMINATION BY MR. ZEHE:

Q    It's procedure in the New Haven Police Department, before a taped statement is taken, a preinterview is conducted, correct?

A    Correct.

Q    So when Detective Rodriguez took the taped statement, he had already performed a preinterview of Mayra Mercado, correct?

A    Yes.

Q    And so he -- at the time of the statement, he had the information she was giving about the homicide, correct?

A    Correct.

MR. ZEHE:  I have nothing further, Judge.

530

THE COURT:  Mr. Pinheiro, any follow-up on those three questions and answers?

MR. PINHEIRO:  Yes, Your Honor.  One.

REDIRECT EXAMINATION BY MR. PINHEIRO:

Q    Is it a fact that the preinterviews took place immediately before the audiotape statement on November 8th, 1999?

A    Did it take place --

Q    -- immediately before the audiotaped statement of --

A    Preinterview usually takes place before the taped statement, correct.

Q    In this particular case, sir, do you have any independent knowledge to state that the preinterview did not take place immediately before the audiotaped statement on November 8th, 1999?

A    It took place November 8th, 1999.

Q    Thank you.

MR. ZEHE:  Just briefly.

RECROSS-EXAMINATION BY MR. ZEHE:

Q    And you're also aware that Detective Rodriguez

531

and Sergeant Norwood interviewed Mayra Mercado on November 4th, correct?

A    Correct.

MR. ZEHE:  Nothing further.

MR. PINHEIRO:  No further questions.

THE COURT:  All right.  The witness is excused, and I assume for the duration, unless otherwise advised.  Right, Mr. Zehe?  Mr. Pinheiro?

MR. ZEHE:  Yes, Your Honor.

MR. PINHEIRO:  Yes, Your Honor.

THE COURT:  Thank you very much, sir.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Next witness.

MR. PINHEIRO:  It will be Juan Scruggs, Your Honor; however, if I may request from the Court that there's one witness we're going to try get to today, Mayra Mercado.  She took the day off from work, and she's worried about her employment.

Is there some way that you could instruct her to be here tomorrow morning?

THE COURT:  Yeah.  I'll do that when we excuse the jury.

MR. PINHEIRO:  Thank you, Your Honor. I'll get the next witness.

THE COURT:  Come on up here, sir, and

532

face this gentleman.  He's going to administer an oath to you.

(Juan Scruggs, sworn by the clerk)

THE CLERK:  Please state for us your name, and spell your name for us and the town in which you reside.

THE WITNESS:  Juan Scruggs, J-U-A-N, S-C-R-U-G-G-S, Hamden, Connecticut.

MR. PINHEIRO:  May I begin, Your Honor?

THE COURT:  Yes, sir.

DIRECT EXAMINATION BY MR. PINHEIRO:

Q    Mr. Scruggs, did you ever have a nickname "Duras"?

A    Never, no.

Q    Are you married?

A    I am.

Q    How many years?

A    Now two.

Q    Any children?

A    I do.

Q    How many?

A    Five.

Q    Are you employed?

A    I am.

Q    For who?

A    McDonald's Corporation.

Q    And what do you do for McDonald's?

A    I'm an area supervisor there -- supervise several locations.

Q    Briefly explain your duties with McDonald's to the jury.

A    Oh, I'm an area supervisor for McDonald's.  I go to and from each location, make sure that they're following procedure, and they have staffing.  Basically, I run them all.

Q    How many McDonald's?

A    Three.

Q    As part your duties, are you responsible for making cash deposits?

A    Oh, absolutely.

Q    How often do you do that?

A    Daily.

Q    How many -- once a day, daily?

A    Actually, I'm responsible for making sure that they get to the bank.  Sometimes, up until recent, I did them personally, yes.

Q    At one time -- how much cash deposits would you make at one time?

534

A    Ten thousand, fifteen thousand.

Q    How many years have you been working for McDonald's?

A    Eleven years.

Q    And how many hours a week do you work?

A    Supposedly 45, but sometimes I work in the area of 55, 60.

Q    You get paid extra for that?

A    No.

THE COURT:  Since you're a supervisor, are you excluded from the Fair Labor Standards Act or do they pay you overtime?

THE WITNESS:  No overtime, sir.  Salary.

BY MR. PINHEIRO:

Q    Did you know Anthony Lucky, Jr.?

A    I did, yes.

Q    What was your relationship to him?

A    He was a friend.

Q    And do you remember the events of the evening of July 24th, 1999?  Do you remember where you were?

A    Yes, I do.

Q    And you remember the date of Lucky's death -- the next day?

A    Pretty much.  It's --

Q    July 25th?

535

A    -- so long ago, yeah.

Q    That evening, the 24th, where were you?

A    At a girlfriend of mine's house, Ebony.

Q    Who was with you?

A    Anthony Lucky, Jr. and Albert.

Q    You three were pretty close?

A    Me and Albert Lucky is, but Anthony was his cousin.  And -- I mean, we were pretty cool, but I wouldn't say as close as me and Albert was.

Q    Did you ever give a sworn audiotaped statement regarding events of July 25th, 1999?

A    I did -- of the incident?

Q    Yes.

A    I did, yes.

Q    And where did you give that statement?

A    The police department.

Q    There's a book in front of you.

A    Okay.

Q    And I direct your attention to Plaintiff's Number 3.

THE COURT:  Number 3?

MR. PINHEIRO:  Number 3, Your Honor, Bates 006.

THE WITNESS:  I'm sorry.  You're referring to this over here?

536

THE COURT:  You see these little yellow tabby things?  We're looking for Number 3.

BY MR. PINHEIRO:

Q   At the front of the book.  Close it up and Number 3.

THE COURT:  And down at the bottom, when you open that page -- you get to the right page -- it's going to have 006 stamped on it.

THE WITNESS:  I have it.

THE COURT:  Okay.

BY MR. PINHEIRO:

Q   Mr. Scruggs, you've seen this before, correct?

A   I have, yes.

Q   And it's a transcript of your sworn audiotaped statement?

A   Um-hmm.

Q   You have to speak.

A   Yes, I do.

Q   And where did this take place?

A   Police department.

Q   Might I direct your attention to the last page, which will be Bates 032.  Do you recognize that document?  Take a look at it.  Do you recognize your signature at the bottom of the page?

A   I do recognize my signature, yes.

537

Q   Do you know what your "Miranda rights" are?

A   At that point, I didn't.

Q   But today you know?

A   Today I'm familiar with it, yes.

Q   In that document, you're waiving your right to remain silent.

A   I know that now, yes.

MR. PINHEIRO:  Admit this into evidence, Your Honor, Plaintiff's 3.

THE COURT:  Okay.  Without objection, right, Counsel?

MR. KATON:  That is correct, Your Honor.

THE COURT:  Admitted as Plaintiff's Exhibit 3 without objection.

MR. PINHEIRO:  Thank you.

(Plaintiff's Exhibit 3, received in evidence)

BY MR. PINHEIRO:

Q   Mr. Scruggs, can I direct your attention to page 3, Bates 008.  Do you see that, sir?

A   I do.

MR. PINHEIRO:  May I publish that, Your Honor?

THE COURT:  You may indeed.

BY MR. PINHEIRO:

Q   Now, when you gave this statement, how old

538

were you?

A    16.

Q    And how old are you today?

A    I'm 30.

Q    When you gave this statement, did you request -- now, who was interviewing you?

A    Detective Rodriguez.

Q    Do you recognize Detective Rodriguez in the courtroom today?

A    I do.

Q    And that's the individual that just stood up?

A    Yes.

THE COURT:  The record will reflect that the witness has identified the Defendant.

BY MR. PINHEIRO:

Q    When you gave the statement, did you make any request to have anyone else there with you?

A    No, I didn't.

Q    Now, you gave the statement freely and voluntarily, correct?

A    I did, yes.

Q    Why did you do that?

A    I thought I had to.

Q    Now, there came a time you left your girlfriend's house, correct?  Ebony's house?

539

A    That's correct.

Q    What vehicle were you occupying?

A    The red Suzuki.

Q    Who was driving?

A    Albert was driving.

Q    And was Lucky in the vehicle -- Lucky --
Anthony Lucky in the vehicle?

A    Yes.  He was in the back seat.

Q    Where were you?

A    In the passenger.

Q    Front?

A    Front passenger, yes.

Q    When you left Ebony's house, where were you
going?

A    I believe we were going home at the time.

Q    And do you remember approximately what time in
the morning this was?

A    You know what?  I can't be certain.  I do know
it was late, though.

Q    After midnight?

A    Had to have been, yes.

Q    Could you please state to the jurors what
happened after you left Ebony's house?

A    When I left Ebony's house, we was driving down
Columbus Avenue, and there was a car that cut us off.

540

And when they cut us off, we almost hit that car from them cutting us off.  So we pulled on the side of them, and asked, you know, what was that all about, because they had to have run a light to cut us off.

We really don't know what the deal was, wasn't sure if they were intoxicated or what the case was.  But it became a verbal altercation.  And we were at another light, at that time, a few feet from the first time we, you know, had the verbal altercation.

And after that, they -- we actually sped ahead because they were in a turning lane and we wanted to continue to go straight.  So we went ahead of them again, and that's when they pulled on the left-hand side of us, because that was the turning lane, and they had more words.  And at that point, one of the gentlemen pulled out a gun and started shooting.

Q    The gentleman in the other vehicle.

A    In the other vehicle, yes.

Q    When the other vehicle started shooting at your vehicle, was the other vehicle stationary or moving?

A    It was moving.

Q    When the other vehicle started shooting at you, the individual in the other vehicle, was that individual inside the vehicle or outside the vehicle?

541

A    They was inside.

Q    Could you please state to the jury what happened then after the gunshots on the other vehicle started?

A    When they started shooting, you know, the first reaction was duck.  So we ducked -- I ducked. And I asked where the weapon was that I knew was in our vehicle.

So I got that weapon, and I stuck it out the window towards where they were going, which at that point, they was just about turning off, going down the street, because they were already in the turning lane. So they turned off and that's when I shot twice.

Q    How many rounds from the weapon you shot discharged within the vehicle?

A    None.

Q    Now, when you shot at the other vehicle, could you please explain to the jury where your hands were and the gun in relation to the interior of your vehicle?

A    Well, I reached over.  They were on the left-hand side of our vehicle.  I reached over the driver and shot twice.

Q    Was the gun inside your vehicle or outside the vehicle when you shot?

542

A    This pistol was outside the vehicle.

Q    So you were able to reach over and put the pistol out the window.

A    Yes, sir.

Q    At any time, other than those two rounds, did your weapon fire any additional rounds?

A    No, sir.  Only because the weapon only had two rounds.

Q    Explain that.

A    The weapon only was able to load two rounds. It -- I mean, I'm not a gun kind of guy, but we would only be able to fit two bullets in that gun.

Q    Was it an automatic?

A    Yes.

Q    And you were 16 at the time?

A    16, yes, sir.

Q    If I may direct your attention, Mr. Scruggs, to Plaintiff's 3, your transcript, and that would be Bates 017.

        MR. PINHEIRO:  May I publish it, Your Honor?

        THE COURT:  Yes, sir.

        MR. PINHEIRO:  Thank you.

BY MR. PINHEIRO:

Q    Now, how did you know Albert had a gun in the

543

vehicle?

A    I'm sorry?

Q    How did you know your friend Albert had a gun in the vehicle?

A    Because he told me.  I knew.

Q    Did you ask him where the gun was?

A    During the time of the shooting, yes.

Q    And what did he say?

A    It's in the back, in the shirt.

Q    And then did you get the gun?

A    I did.

Q    Now, how was the gun --

            THE COURT:  You're turning these pages.

            Which page you on now?

            MR. PINHEIRO:  018 Bates.

BY MR. PINHEIRO:

Q    Where was the gun?  Was it wrapped in anything?

A    Wrapped in a shirt, yes.

Q    Now, I direct your attention to 018.

            Question was:  "Okay.  You state you take the gun out.  What's the first thing you do when you take the gun out?"

            Your answer was:  "Well, as I take the gun out, I unravel it from in the T-shirt while taking the

544

safety off.  I accidentally shoot Anthony Lucky in the right nipple."

When you say -- Question:  "When you're saying 'the right nipple,' in the preinterview, you were told that Anthony Lucky -- Anthony was shot in the right nipple.

"Yes.

"Is that correct?

"Yes.

"Okay.  Did you see Anthony shot in the chest at all?  Do you remember?  Do you recall seeing that?

"Yes.

"Okay.  But you didn't know nipple until myself" -- which would be the Defendant -- "and Detective Coppola told you he was shot, right?"

You stated that in the audiotaped statement, correct?

A     Correct.

Q     But your testimony today is different, correct?

A     Correct, yes.

Q     Is what you said on the audiotaped statement back on July 25th, 1999, as reflected in Plaintiff's 3, Bates 018, true and accurate?

A     No.  That's false.

545

Q    Why did you give a false statement when you were 16 years old just hours after your friend was shot and killed?

A    I was scared, I was tired, and I wanted to go home.  Up until the time I actually said these things, I told the truth.  I told exactly what I am telling you now, but it wasn't accepted at all.

Q    Who did you tell the truth to?

A    I told it to Detective Rodriguez.

Q    How long were you questioned for?  Do you know?

A    A number of hours.  A number of hours.

Q    When Detective Rodriguez was questioning you, was it a continuous line of questioning?

A    It was nonstop.  It was nonstop.  But I originally said exactly what I'm telling you today, and he didn't want to hear that.

Q    What do you mean "he didn't want to hear that"?

A    Well, I guess, for him, it had to happen something else.  He came up with the right nipple story.  He came up with the -- I had to have shot him in the seat when I told him I didn't.

So me, being tired and wanting to go home and being scared out of my mind, I went along with it,

546

thinking that he was going to do what he said he was going to do, which was let me go home. He said it was no big deal. He said it was a mistake, but I knew that wasn't true.

Q   You knew the statement you were giving wasn't true?

A   Wasn't true, yes.

Q   How long were you questioned before you actually gave this?

A   A number of hours before we actually got to this.

Q   Directing your attention to 019 --

MR. PINHEIRO:  May I publish, Your Honor?

THE COURT:  Yes, sir.

MR. PINHEIRO:  Thank you.

BY MR. PINHEIRO:

Q   Do you see, Mr. Shrugs, the question about a third of the way down: "Okay. Getting back with the gun, you said you pulled a gun out and it was on safety."

Your response: "Yes, it was.

"Was your finger on the trigger at this time?

"Yes.

"Okay. When you pulled the safety off --

first of all, what type of weapon was this?"

547

No response.

"Was it an automatic?  Was it a revolver?

"Yes.  It was automatic.

"Okay.  What color?

"Black."

Was that -- did that actually happen like that?

A    No.  Actually, I think there was a few pauses in between giving the statement.

Q    Why is a pause -- what do you mean?

A    I felt like I was being coached to saying what he wanted me to say.

Q    Did you know your statement was being recorded?

A    I did.

Q    How did you know?

A    They had a tape recorder there.

Q    Did you see it there?

A    Yes.

Q    Did the tape recorder run continuously throughout your statement?

A    I believe, if I recall correctly, there was a time when he shut it off and put it back on.

Q    Well, when it was shut off and put back on, what happened between that time?

548

A    That's when he was doing the coaching with what he wanted me to say.

Q    And what did he want you to say?

A    That I did it.  He wanted me to believe that I did it.  I wouldn't believe it.  I refused to believe I did it for as long as I could.  But, again, his response was, no big deal.  It was an accident.  Once we do this you can go home, which didn't happen.

Q    What do you mean "didn't happen"?  What happened?

A    I was incarcerated after that.

Q    Were you charged with a crime?

A    I was, but it wasn't what I should have been charged with based on what he was telling me happened.

Q    Were you charged with -- were you charged with murder?

A    Absolutely not.

Q    Manslaughter?

A    Not even.

Q    A weapons offense?

A    Yes.

Q    And after you were charged with that weapons offense, what happened with your case?  How did it turn out?

A    I was sent to prison, and I actually made bond

549

at that point, which --

Q    I'm sorry.

A    -- which the -- the lawyer I had, public defender, told me that I shouldn't be contacted by any of the detectives.  And I was.  They actually came to my house attempting to speak to me.

Q    You pled guilty, correct, eventually?

A    To the weapons charge, yes.

Q    And you did some time?

A    I did.

Q    Do you remember how long?

A    I believe around two and a half years.

Q    Did you do that time in a juvenile detention center or adult?

A    I did half and half.

MR. PINHEIRO:  If I may publish, Your Honor, Bates 020?

THE COURT:  Yes, sir.

BY MR. PINHEIRO:

Q    Direct your attention to 020, your statement, Mr. Scruggs.

The question from the Defendant:  "Okay.  So when you pulled the safety off, what do you mean by 'pull the safety off'?  Did you press a button?  Did you pull something?  What?"

550

Your answer:  "Hmm.  Actually, I pulled a lever from one end to the next.

"Okay.  At this time your finger was on the trigger?

"On the trigger.

"Was the hammer back?

"No, it was not.

"Okay.  When you took" --

THE COURT:  Slow down, Mr. --

MR. PINHEIRO:  I'm sorry, Your Honor.

BY MR. PINHEIRO:

Q    "Was the hammer back?

"No.  It was not.

Question:  "Okay.  When you took the safety, what happened?"

Your answer:  "The gun accidentally went off.

"Inside the vehicle?

"Inside the vehicle.

"Do you recall where you were pointing at when the gun went off?

"No, I do not.

"Okay.  But it definitely went off inside the vehicle?

"Yes."

Is that a true and accurate account of what

551

happened in that vehicle that night?

A   No.  It's false.

Q   And there's quite a few references to that type of account in your statement, correct?

A   Yes.

Q   At any time did you argue with the Defendant about your hesitation to put this in your statement?

A   Well, the whole time, again, like I said, I was telling the truth about what happened.  And throughout the course of the night, it was just -- you had to have done it.  This is what happened.  You didn't mean to do it, but this is what happened.  This is what you did.

And I didn't realize how much trouble you can actually get in for making that kind of mistake.  So I believe I was manipulated.

Q   Mr. Scruggs, you saw the other vehicle, correct?

A   Briefly.

Q   Do you know what kind of vehicle it was?

A   I took a quick glance at it, and it looked like a Honda to me.

Q   Getting back to the shootout, when the shots were fired, did you say anything to the people in the other vehicle?

552

A    No.

Q    When Lucky got shot, did he say anything?

A    Yes.  He said he was hit.

Q    And then what did you and Albert do at that time -- Albert McCann, the driver?

A    Actually, being in the situation for the first time, he was scared.  We was very scared.  So, you know, we kept driving.  And unfortunately, we missed the hospital.  We missed the turn, just out of being scared.  We didn't know what to do.

Q    Did there come a time you got pulled over by the police?

A    Yes.

Q    And what happened at that time?

A    They took us out of the car.  They asked was there a weapon in the car?  We told them yes.  They asked me where.  We told them where, and they put us in separate vehicles.

Q    How did you find out your friend passed away that night?

A    One of the officers just told me in the back seat.  When I was in the back seat, one of the officers told me.

Q    I may have asked you this but I'm not sure -- excuse me, Your Honor -- did you get a good look at

553

the occupants in the other vehicle?  The Honda?

A    Not really, because they weren't on my side for the majority of the time.  And when they were, I didn't really look up to take a look at them at all.

Q    And the weapon that you fired, do you know what type of weapon it was?

A    I know now.  It's a .38.

Q    And it only contained two bullets?

A    It only contained two bullets.

Q    Did you tell Mr. Rodriguez that?

A    Not that I can remember.

Q    At this time on July -- these following questions are going to pertain to July 25th, 1999.  On that date, did you know a Mayra Mercado?

A    Who?

Q    Mayra Mercado?

A    No.  Never.

Q    Sharon Adkins?

A    No.

Q    DeShawn Johnson?

A    No.

Q    Jose Santiago?

A    Never.

Q    Efrain Mendez?

A    No, sir.

554

Q   At any time were you ever shown photographs of those individuals?  I'm sorry.  Strike that.

At any time were you ever shown photographs of individuals suspected of being involved in this murder?

A   Not that I can remember.

Q   Were you ever shown photographs of Gary Session?

A   Not that I can remember.

Q   On July 25th, 1999, did you know Gary Session?

A   No.  Never.

Q   When was the first time you met him?

A   I'd have to say a year or two back, when he reached me at one of my restaurants.

Q   Did Mr. Rodriguez ever ask you -- did he ever ask you if you knew Mayra Mercado?

A   No.

Q   Did he ask you -- ever ask you if you knew Sharon Adkins?

A   No.

Q   Did you shoot your friend Anthony Lucky, Jr.?

A   No, I did not.

Q   Did Mr. Rodriguez ever ask you if you were involved in stealing money --

A   No.  Never.

555

Q    -- from Gary Session?

A    Never.

Q    Did Rodriguez ever inform you that an alleged confidential informant implicated you in the Lucky murder?

A    No.  Never.

Q    Was this incident a drug-related crime?

A    No.  Not at all.

Q    What do you believe was the cause of this incident?

A    It was road rage, if you ask me.  Yes.

Q    Did the Defendant, Mr. Rodriguez, ever request you to testify in any court proceedings involving Gary Session?

A    No.

Q    Mr. Scruggs, from the time that you first encountered the other vehicle at the intersection to the time that there was the shootout, can you please tell the jury how much time elapsed?

A    I'd have to say about probably, roughly, five minutes.

MR. PINHEIRO:  No further questions, Your Honor.  Thank you.

THE COURT:  All right.  Mr. Katon?

MR. KATON:  Thank you, Your Honor.

556

Before I begin, Your Honor, I'd like to note that the statement that was referred to in the course of Mr. Scruggs's testimony, which was entered as an exhibit for the Defendant, is also --

THE COURT:  You mean for the Plaintiff?

MR. KATON:  Excuse me.  For the Plaintiff, is also an exhibit offered by the Defendant.

THE COURT:  And the number is?

MR. KATON:  A-27.

THE COURT:  A-27?

MR. KATON:  Correct.

THE COURT:  And I take it that you want to append the record because that's what you've been doing, and, Mr. Pinheiro, I take it that you have no objection.  Right?

MR. PINHEIRO:  No objection, Your Honor.

THE COURT:  All right.  So Defendant's A-27 is now in too.

(Defendant's Exhibit A-27, received in evidence)

MR. KATON:  And also, Your Honor, A-40 is the waiver that was referred to.  It's Bates-Numbered 0293.

THE COURT:  A-40 on -- wait now.  You confuse me.

MR. KATON:  It Bates Number 0293 in A-40.

THE COURT:  What does that have to do with what's been admitted as Plaintiff's 3 or in your 827?

MR. KATON:  It was also part of the exhibit offered by the Plaintiff.  It's the last page of his offer.

THE COURT:  Okay.  And what exhibit is that in yours?

MR. KATON:  This would be Bates Number 0293 appearing under Exhibit A-40.

THE COURT:  And, Mr. Pinheiro, again, no objection to that, right?

MR. PINHEIRO:  No objection.

THE COURT:  All right.  Let's go.

(Defendant's Exhibit A-40, received in evidence)

CROSS-EXAMINATION BY MR. KATON:

Q    Good afternoon, Mr. Scruggs.  How are you?

A    I'm good.

Q    Good.  I'm Tom Katon.  I represent the Defendant, Edwin Rodriguez.  I'm going to ask you a few questions about some of your testimony here today.  And the first is regarding what's been marked as

558

Defendant's A-40, Bates page 0293.

MR. KATON:  May I publish that?

THE COURT:  Yes, sir.

BY MR. KATON:

Q   Now, Mr. Scruggs, I take it from your direct testimony that you recognize your signature on this document, correct?

A   Yes, I do.

Q   And that's signed and it's witnessed by two individuals, correct?

A   Yes.

Q   Steven Coppola, do you recognize that?

A   Yes.  I do see that.

Q   And Detective Edwin Rodriguez, correct?

A   Correct.

Q   And both were present in the course of your statement, correct?  It just wasn't Detective Rodriguez.

A   It was sometimes Detective Rodriguez, and I guess they would -- it would be more than him at one point sometime.

Q   So was that when you were questioned prior to giving your statement or during the course of your statement?

A   I'm sorry?

559

Q    Were several police officers involved in questioning you prior to your statement or during the course of your statement?

A    I think both.

Q    And can you identify any other police officers that were involved in your questioning?

A    No.  Just for some reason, Mr. Rodriguez.

Q    And can you identify any other police officers that were involved when you gave your tape-recorded statement?

A    No.  I remember Detective Norwood.

Q    You remember Detective Norwood?

A    I do.

Q    And did Detective Norwood question you?

A    No.

Q    He was there to observe?

A    I believe I saw him there at times too.

Q    Now, this exhibit contains several series of initials.  Do you see those?

A    I do, yes.

Q    Do you recognize those to be your initials?

A    Yes, they are.

Q    And at the time you say you were 16 years old, correct?

A    Yes, I was.

560

Q    And were you intoxicated?

A    No, I wasn't.

Q    Under the influence of any kind of drugs?

A    No.

Q    You understood English when you were 16?

A    I did understand English, yes.

Q    And you could read and write English?

A    I could read and write English, yes.

Q    Now, I would like to draw your attention to what has been identified as your statement and which appears as Defendant's Exhibit A-27.  Now, is it your claim that this entire statement is a falsehood?

A    No, that's not my claim.

Q    Well, let's try to walk through what is and isn't false.

A    Okay.

Q    Now, you were asked what your full name was, correct?

A    Yes.

Q    And I'm showing you the first page of your statement now.  And you answered Juan Arick Scruggs, is that correct?

A    Yes.

Q    And the date of your birth, was that correct?

A    That is correct, yes.

561

Q   And your home address, was that correct?

A   At the time, yes.

Q   And you lived in Ansonia at the time, correct?

A   Yes.

Q   So did Mr. McCann, correct?

A   No.  I don't think so.

Q   Where did Mr. McCann live?

A   I don't know.

Q   He's your best friend.

A   Yes, he is.

Q   You didn't know where he lived?

A   To and from -- he had no stable, I suppose.

Q   And at this point we can go on to the second page of your statement, and you were asked if you could read and write and understand the English language.  And you answered yes, correct?

A   Yes.

Q   And you also admitted that you were not under the influence of any narcotics, medication, or alcohol, correct?

A   Um-hmm.

Q   Okay.  And now there's some questions asked to you about that form that we talked to previously, correct?

A   Okay.  Yes.

562

Q    "Juan, prior to the statement you did a preinterview, is that correct?"

A    Whatever you would consider a preinterview.

Q    You talked to police officers prior to the taped statement.

A    Okay.

Q    Let's define that as the "preinterview."

A    Yes.

Q    And you answered yes.

"And during the preinterview, isn't it true that you were given a New Haven Police Department Miranda form?"  And your response was?

A    You want me to read it?

Q    Sure.

A    It says "yes.

Q    "With your rights, correct?

A    "Yes."  I suppose.

Q    And you read it, correct?

A    Guess so, yes.

Q    And if I can move to the next page of your statement -- that would be page 3 of 26.  The question is asked:  "And isn't it true that you understood your rights?"

And your answer was:  "Yes."

A    Yes.

563

Q   "And by understanding your rights, you did initial each of them."

A   "Yes."

Q   And that was your response.

A   At the time, yes.

Q   And at the time -- and, in fact, as we know from looking at the form, in fact, you did initial that you were waiving all those rights.

A   Yes.

Q   Now, I want to draw your attention to the answer that you provided to the question at the bottom of the page.  Can I draw your attention to that?

A   Yes, sir.

Q   Let me see if I can bring it into view.

"Well, after leaving a girlfriend's house," -- excuse me.  The question was asked:  "In your own words, can you tell me what happened?

"Well, after leaving a girlfriend's house, we, on the way to the stop sign of the, well, the light of Columbus and Howard, we were cut off by some Puerto Rican fellows, and the driver of the vehicle I was in cut them back off, so they cut us back off, and they exchanged words with the driver of the vehicle I was in.  And after we got halfway past Berney's on Columbus Avenue, shots were fired from the other

564

vehicle.  And during that time, people in our vehicle ducked.  And in the same breath, I came after pulling a .380 gun from the T-shirt and accidentally pulling the trigger and not knowing, shooting my friend, Anthony Lucky, in the right nipple."

That was your answer, correct?

A    Wrong.

Q    Was that the answer provided in the course of the statement?

A    No.  I told you just like I told them.  I was telling the truth from the beginning in reference to what happened.

Q    So this statement, you claim, just materialized out of thin air.

A    No.  I wouldn't say that.  This was the words from Eddie Rodriguez.

Q    So you're denying that you made that particular statement?

A    I did make that statement with a promise to go home, like it wasn't no big deal.  You made a mistake and you could go after this.  So I said whatever he wanted me to say.

Q    Fine.  So you had no knowledge that you had pulled a .380 gun.

A    I had a lot of knowledge of pulling a .380 gun

565

and sticking it out of a window.

Q    All right.

A    And firing it --

THE COURT:  Let him finish his answer. Go ahead.  Continue.

THE WITNESS:  I took the gun out and stuck it out the window and fired it twice.

BY MR. KATON:

Q    Okay.  So you knew there was a .380 gun in the Suzuki.

A    I did know that, yes.

Q    And you knew as a fact that your best friend, Albert McCann, frequently carried this illegal gun around with him, correct?

A    Not all the time.  He had just gotten that gun.

Q    He had just gotten that gun.  Who did he happen to get that gun from?

A    I don't know.

Q    You don't know who your best friend got his gun from?

A    That's a strange question, but no, I don't know where he got the gun from.

Q    And so it's your testimony that you reached under the seat, correct?

566

A    From the back.

Q    From the back.

A    I'm reading --

Q    You're seated in the passenger side?

A    Yes, I am.

Q    And is it your left hand that you reached with?

A    I'm right-handed, so my right hand.

Q    So you twisted over?

A    Yes, I did, sir.

Q    And stuck your hand back underneath?

A    And grabbed it.

Q    And was it in plain view?

A    I unraveled it from under the T-shirt.

Q    So did you feel around in there for it?

A    It wasn't much to feel around for.  It was just a Suzuki jeep.  It wasn't a lot of cubby holes or spaces there.  It was just there.

Q    So it's in the -- it's in a T-shirt, according to your testimony, correct?

A    Yes, sir.

Q    Okay.  And you got to unwrap it from a T-shirt, right?

A    Um-hmm.

Q    And all the time bullets are flying at you,

567

correct?

A    Um-hmm.

Q    And the vehicle that you're in is moving away from the intersection of Howard and Columbus, correct?

A    That's correct.

Q    And so then you unwrap the T-shirt, and what did you do next?

A    Stick it out the window and fire twice.

Q    Well, do you take the safety off?

A    I did.

Q    And what did you do to take the safety off?

A    You click the button to take the safety off.

Q    You click the button.  And you fired this gun before, correct?

A    No, I didn't fire it before.  No.

Q    How did you know where the safety was?

A    Because it's a gun.

Q    It's a gun, but you're not a gun guy by your own words.  How did you know where the safety was?

A    I'm not really a gun guy, but you have the safety there.

Q    And my question is:  If you're not a gun guy and you haven't shot this gun before, how did you know where the safety was?

A    Every gun has a safety.

568

Q    How did you know how the safety operated?

A    How could I not know?

Q    That's my question to you.  You apparently had knowledge of how to operate an automatic handgun.

A    Well, I'm under the assumption maybe it's somewhat of second nature.

Q    It was second nature?

A    Maybe.

Q    And where did you gain this natural instinct from?

A    From being scared out of my mind.

Q    And so after you take the safety off, do you chamber a round?

A    No.

Q    How did you know it was loaded?

A    Because, like I said, I knew it was in the back and I knew there were only two bullets in it.  I never fired the gun before.

Q    Well, let's talk about the two bullets.  Do you know what the capacity of the magazine was for that gun?

A    No.  Not really.

Q    And how did you know there was two bullets in the magazine?

A    Because I was told that it would only fit two.

569

Q    If, in fact, it was a multiple-round magazine, would that surprise you?

A    Would it surprise me?

Q    Yes.

A    That it was only two?

Q    No.  That it was a multiple-round magazine.

THE COURT:  Define "multiple," please, for the witness, Mr. Katon.

BY MR. KATON:

Q    Sure.  Over eight rounds.

A    Okay.

Q    That surprise you?

A    Repeat the question for me.

Q    Sure.  Would it surprise you if the pistol which you removed from under the seat had a multiple-round magazine?

A    If it was full, would that surprise me?

Q    No.  Would it surprise you the capacity of the weapon that you said had two bullets, had more?

A    Yeah.  At that particular time, I would have been surprised, yes.

Q    So how, again, did you know there was just two bullets in there?

A    I knew.  I was told there was two bullets in there.

Q   So wait a minute.  You knew there were two bullets in there.

A   Um-hmm.

Q   You knew it was loaded, correct?

A   Um-hmm.

Q   You didn't have to chamber a round.

A   No, I didn't.

Q   So where did you get all this information?

A   By my best friend.  I don't know where he bought the gun, but I knew the gun was in the car. That's why it was so easy for me to reach around and grab the gun.

Q   Well, he tells you to get the gun.  Does he tell you it's in the T-shirt?

A   I knew it was in the T-shirt.

Q   You knew it was in the T-shirt.

A   Um-hmm.

Q   And you knew it was loaded based on prior conversations with Mr. McCann?

A   Maybe prior conversation, yes.

Q   And in those conversations, Mr. McCann told you, I take it, that, you know, I drive around with two bullets in the magazine.

A   I guess so.

Q   Now, you gave an answer with respect to where

571

Anthony Lucky, Jr., was in the vehicle in your statement, correct?  I'd liked to draw your attention to page 6 of page 26 of your statement.

MR. KATON:  May I publish that?

THE COURT:  You may.

BY MR. KATON:

Q    And there's a question asked in the middle of page:  "Is he on the right back or in back of the driver's side?"  Do you see that question?

A    Yes, I do.

Q    And your answer was:  "Well, he was sort of in the middle."

Now, is that correct?

A    Yeah.

Q    Okay.  So he's not behind you directly, and he's not behind Mr. McCann directly.  He's in the middle of the Suzuki's rear seat, correct?

A    Sort of.

Q    Now, as the bullets are flying and you're getting instructions as to where the gun is and taking the safety off and pointing it -- you pointed it over Albert McCann?

A    Over the driver, yes.

Q    How close was that gun to his head?

A    Not very close.  He's pretty tall.

572

Q    Was it behind his head?

A    No.  It was in front.

Q    On top of his head?

A    In front of his whole body.

Q    In front of his whole body.  So you stuck it in front of his face to get out the window?

A    Across from where he is.

Q    While he's driving.

A    While he's driving.

Q    Okay.  And so you fire off rounds with it right in the front of his face?

A    Um-hmm.  Out the window.

Q    Out the window.  And is it your testimony that you got your whole hand and the weapon out the driver's side window?

A    Shot it right out the window.

Q    And who were you shooting at?

A    The car as it scurried off down Howard Avenue.

Q    So how far had the car scurried off down Howard Avenue by the time that you leave the stop sign -- stoplight -- pardon me -- at Howard and Columbus?

A    Not very far.

Q    Well, give me your best estimate.  A hundred yards?

573

A    A little bit, maybe.

Q    All right.  And so at that point in time, with the blue vehicle approximately a hundred yards down Howard Avenue, how far down Columbus had you driven?

A    We were getting down past Berney's by that point.

Q    Okay.  So past Berney's, the pharmacy.

A    Yeah.

Q    Okay.  I'd like to show you what is part of your statement, which is page 18 out of 28.

THE COURT:  Mr. Katon, it's right at quarter to five.  We're going to go ahead and break for the day.

MR. KATON:  May I ask this final question, and I'll conclude.

THE COURT:  You got one question, and, of course, we may break right after that.  But go ahead.

MR. KATON:  Thank you, Your Honor.

BY MR. KATON:

Q    I'm showing that page, Mr. Scruggs.  A question was asked:  "Okay.  When he told you he was shot, what did you think happened?"

And you answered, "Actually, I thought the three Hispanic males had hit him," correct?

A    That's correct.

574

MR. KATON:  Okay.  Nothing further.

THE COURT:  All right.  We'll return tomorrow.  I take it, Mr. Pinheiro, unless you advise me otherwise, that you have a number of questions you'd like to ask the witness.

MR. PINHEIRO:  I do not, Your Honor.  No further questions for Mr. Scruggs.

THE COURT:  All right.  Well, you're excused, and I assume for the duration, right, Mr. Pinheiro?

MR. PINHEIRO:  Yes, Your Honor.

THE COURT:  Thank you very much.  You may step down.

Ladies and gentlemen of the jury, we're going to go ahead and break for the day.  We'll reconvene tomorrow at 10 o'clock.  I'm going to ask you again that all of you try to be here at 10 so we can start at 10.  Be here a little bit before 10.  So make your plans to leave a little early, if you would.

I don't know if it'll help any of you, but according to the radio, the train's supposed to be running again regularly.  So hopefully that's true.

And lastly, I want to remind you, you're not to discuss the case among yourselves or with anyone else, including your family members, friends,

575

or people you work with tonight.  When you go home, you're not the read, watch, or listen to any news coverage of the trial.  And I remind you, again, that your decision in this case can only come from what you see and hear in the courtroom.

And I do, again, thank you on behalf of the parties, the lawyers, and certainly the Court for your patience and attention here.  And we'll see you tomorrow morning 10 o'clock.

All rise for the jury.

(Jurors excused)

THE COURT:  You can come on up here, ma'am.  Come on and face this gentleman, please.

MS. MERCADO:  How are you?

THE COURT:  I'm doing well.  How about yourself?

(Mayra Mercado, sworn by the clerk)

THE COURT:  All right.  I just want to ask you if you -- I want to tell you where we are, because I know you've been out here, I think, all day, and the trial's going a little slower than I anticipated.  And you were here pursuant a subpoena.

MS. MERCADO:  Yes.

THE COURT:  I need to continue that subpoena until tomorrow.

Mr. Pinheiro, is Ms. Mercado going to be the first witness?

MR. PINHEIRO:  Yes, sir.  I just want to confer with counsel that I agreed to take an officer, but Mayra Mercado will be the first witness.

THE COURT:  All right.  And we're going to start at 10 o'clock.  So please be here at 10 o'clock.

MS. MERCADO:  Yes.

MR. PINHEIRO:  I'm sorry, Your Honor. I'm sorry, Your Honor.  It'll be Steven Coppola first. She will not be the first witness.

THE COURT:  Well --

MR. PINHEIRO:  Steven Coppola.  She would not be the first witness.

THE COURT:  What time do I want to have this nice lady here tomorrow?

MR. PINHEIRO:  11 o'clock.

THE COURT:  I'm sorry?

MR. PINHEIRO:  11 o'clock.  Be on the safe side.  11 o'clock in the morning.

THE COURT:  You sure we going to be through with the witness in an hour?

MR. PINHEIRO:  I just want to make sure that when Your Honor says have your witness ready,

577

she's ready.

THE COURT:  That's what I'm trying to say.  But is 11 o'clock -- are you going to go at least an hour with this other witness?  That's what my question is, Counselor.

MR. PINHEIRO:  Why don't we play it safe.  Mayra, be here for 10 o'clock and just wait.

THE COURT:  Be here at 10:30, ma'am.

MS. MERCADO:  Yes.

THE COURT:  And, again, I regret that if the judge had been a little smarter and figured this out a little better, maybe I'd have got Mr. Pinheiro to get you here a little later.  Okay?

MS. MERCADO:  Okay.  Thank you so much.

THE COURT:  Thank you very much and have a good evening.

(Mayra Mercado excused)

THE COURT:  You know, I'm not bragging and I'm not complaining, but I can't tell you how many times over the last 20 -- almost 20 years I've fallen on the sword for some lawyer.  So I was the heavy-weight guy, the bad guy, but it didn't look like the lawyer, anyhow.

All right.  Brendan, tomorrow, will you have the jury instructions that we talked about before

578

for the lawyers and the jury interrogatory?

THE CLERK:  They're printed.  I just have to bring them up.

THE COURT:  We'll have them tomorrow morning.  This stuff, you've already approved and it's going -- I just wanted you to have them.

And so we're still on track, right, Mr. Pinheiro.

MR. PINHEIRO:  Yes.

THE COURT:  Right, Mr. Katon?

MR. KATON:  Yes, Your Honor.

THE COURT:  All right.

Yes, sir.

MR. PINHEIRO:  May we have the stipulations read to the jury perhaps at the beginning of the evidence tomorrow, Your Honor?

THE COURT:  Which stipulation?

MR. PINHEIRO:  We have the stipulation about the evidence not being available to both parties.

THE COURT:  I don't recall -- this is the one that we were -- not the one we did today.

MR. PINHEIRO:  No, it isn't, Your Honor.

THE COURT:  Speaking of that, you gave us an earlier stipulation, right?  I remember now.  But

579

seems like two years ago, but it wasn't.  At any rate, you saw the addition that Brendan made to what you guys submitted.  Is everybody okay with that?

MR. PINHEIRO:  I haven't had a chance to review the addition, Your Honor.

THE COURT:  All right.

MR. ZEHE:  We are, Your Honor.

THE COURT:  All right.  Well, why don't you let the defense counsel tell me what stipulation you want to read tomorrow, and then you can tell me right now.  Read the one-line addition to you-all's stipulation on that, other than that it was filed by the -- it was provided to us today based on what we've done yesterday.

And yes, sir.  Could you tell us what stipulation Mr. Pinheiro's talking about?  Do you have a copy of it?

MR. ZEHE:  I believe we do, Your Honor. It's just the stipulation regarding the missing evidence.

THE COURT:  I've forgotten what it was, but you guys got a copy?

MR. ZEHE:  Yes, sir, Judge.

THE COURT:  And if there's any reason I shouldn't read it before we start testimony -- okay.

580

Get it to me tomorrow.  Get it to Brendan, and remind me, because I'd sure hate to forget.  Okay?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  All right.  Now, Mr. Pinheiro, have you looked at what Brendan etched on there after talking to me?

MR. PINHEIRO:  Yes, I did, Your Honor.

THE COURT:  Does that work for you?

MR. PINHEIRO:  It certainly does.

THE COURT:  Okay.  Whoever's got it in their computer or word processor, just add that language.  And then I will read that at the appropriate time.  And the original, which will be signed by you guys, will be filed on the record.  I won't read the whole thing, but that'll be filed on the record.  What I'll read is what's indented and single spaced.  Okay?

MR. PINHEIRO:  Your Honor, we had discussed a stipulation regarding that Mayra Mercado and Sharon Adkins were not registered confidential informants in this matter, and we had discussions about --

THE COURT:  If you guys get a stipulation, you know, I'll -- during your -- read anything to the jury except that you-all stipulate the

581

trial's over, unless you settle.  So...

MR. PINHEIRO:  Okay.

THE COURT:  That was supposed to be funny.  It's only the second day and I'm really tired.  You-all got to be real tired.  And it's going to be a long haul this next week and a half, or whatever it's going to be.

So do anything you can do to stipulate -- anything you do to streamline, that'd be great, consistent with whatever obligations you got to present your client's case in the light most desirable to the client.

Got something else?

We had the warrant issue about the redaction, and somebody thought my redaction was better than your redaction and that kind of thing.  We supposed to have a copy so I could look at it.  I don't think we've gotten those.  Anybody got those?  You can give them to Brendan right now so we can get that done, or you want to wait until tomorrow morning?

MR. PINHEIRO:  I have Plaintiff's, Your Honor.

THE COURT:  Well, if you don't have a copy, is it likely to come up tomorrow?  If it doesn't, we'll do it tomorrow morning.

MR. PINHEIRO:  I have it, Your Honor.

THE COURT:  All right.  We're in recess. If you all don't mind me saying so, off the record, I don't care if it's all on the record, get the hell out of here.  I'll see you-all in the morning.  Maybe you ought to get here at 9:45.  I'll be here then.

MR. PINHEIRO:  I'm here every day, Your Honor.

THE COURT:  I'm not saying that because I need to get here early myself.  I'd rather not, but if I need to, if you guys would like to have another matter for me to consider out of the presence of the jury.

MR. PINHEIRO:  I really can't think of anything right now.

MR. ZEHE:  There was an issue that came up today.  Mr. Pinheiro was going to offer the transcript of Chief Redding, and it all had to do with that one spreadsheet with the registered informant that you ruled was to be excluded, and you sustained our objection to it.

So when he mentioned it today, I tried to stop the proffer.  Maybe that's something that you'd want to deal with in the morning.

THE COURT:  I'll see you-all at 9:45.  I

583

don't want to stay.  I'm brain-dead.  But I don't know what the hell you're talking about.

        MR. ZEHE:  Fair enough.  I'm not sure I know how to explain it either.

                (Court adjourned)

584

CERTIFICATE OF REPORTER

I Hereby certify that the foregoing 296 pages are a complete and accurate computer-aided transcription of my original stenotype notes taken in the Matter of Gary Session VS Edwin Rodriguez, which was held before The Honorable Tucker Melancon, U.S.D.J., at U.S. District Court, 915 Lafayette Boulevard, Bridgeport, Connecticut on May 21, 2013.

Wendy Allen, RMR, CRR

Notary Public

My commission expires:  April 15, 2015