584

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GARY SESSION          )
    Plaintiff         ) 3:03-cv-00943 (TLM)
                      )
VS                    )  May 22, 2013
EDWIN RODRIGUEZ   ) Federal Building
    Defendant         ) Hartford, Connecticut

VOLUME 3

TRIAL HELD BEFORE
THE HONORABLE TUCKER L. MELANCON, U.S.D.J.

Reporter:  WENDY J. ALLEN, RPR, CRR, LSR #00221

585

Representing the Plaintiff

John Pinheiro, Esq.
374 Whalley Avenue
New Haven, CT  06511
Pinheirojohna@gmail.com


Representing the Defendant

Thomas Katon, Esq.
Sussman, Duffy & Segaloff
P.O. Box 1684
New Haven, CT  06507
Tkaton@sussmanduffy.com

Jeffrey R. Zehe, Esq.
Nielson, Zehe & Anas, P.C.
55 W. Monroe Street
Chicago, IL  60603
Jzehe@nzalaw.com

586

I  N  D  E  X

WITNESSES:                                              PAGE:

Stephen Coppola
    Direct Examination by Mr. Pinheiro........... 603
    Cross-Examination by Mr. Katon............... 657
    Redirect Examination by Mr. Pinheiro........ 694
Mayra Mercado
    Direct Examination by Mr. Pinheiro.......... 704
    Cross-Examination by Mr. Katon.............. 754
-------------------------------------------------------

587

THE COURT:  Good morning, ladies and gentlemen of the jury.  Thank you for being here timely.

There is a matter that I need to bring to your attention at this time.  There has been a stipulation regarding certain evidence in this case between the Plaintiff and the Defendant, and attorneys, and a stipulation means that both sides have agreed that what I'm about to read to you, the stipulation is correct, and that they don't have to put on any evidence regarding what's in the stipulation, and you are to accept it as having been presented and being, in essence, a fact.

Now, Mr. Pinheiro, did I state that correctly, about what a stipulation is, before I read the stipulation?

MR. PINHEIRO:  You did, Your Honor, as to that particular stipulation.

THE COURT:  Right.  That's the only one I'm talking about.

MR. PINHEIRO:  Yes, sir.

THE COURT:  All right.  Mr. Zehe?

MR. ZEHE:  Yes, Your Honor.

THE COURT:  Now, so I'm about to read the stipulation.  And the only thing I want to make sure,

588

again, as I did yesterday, fellows, I want to make sure, because we use the federal transcript, we use -- we talk about state court transcript, the only thing that's not in here, I want to make sure they understand this is the judicial officer was the state judicial officer.  Is that okay with you, Mr. Pinheiro?  I don't want to confuse the issue to the jury.

MR. PINHEIRO:  I'm a little confused, Your Honor.  State judicial officer, we're talking about?

THE COURT:  I wasn't going to -- you mention one word for the judicial officer.  I just want to make sure it's the -- it's in reference to the order -- I'm making a bigger deal -- doesn't make a tinker's damn worth of difference, except I don't want to confuse the jury, because we've been back and forth on two different proceedings.  Fair?

MR. PINHEIRO:  That's fine, Your Honor.

THE COURT:  So I'll read the stipulation. Not that that would have confused you-all.  I'm confused about half the time, so maybe some of you-all are like me.  This is the stipulation.

The parties in this matter have agreed to the submission of the following joint stipulation:

589

Pursuant to court order -- now, this is where I'm going to put state court order, State of Connecticut court order -- on February 25th, 2002, the physical and forensic evidence in connection with the Anthony Lucky, Jr. homicide investigation was to have been destroyed.  Thereafter, on October -- in October 2011 two tapes of a Mayra Mercado interview and certain documents that were not destroyed were found in the property room of the New Haven Police Department. This stipulation is provided to explain why some tapes and documents are available, and other physical and forensic evidence is not available.

Now, I don't want to get further than you guys have stipulated to, and maybe we ought to have a sidebar off the record, but I'd like to give a little bit of explanation about this.  So let's see each other, and if we agree to get on the record, then we'll get on the record, but we don't need to ask the court reporter to move over yet.

(Conference held at sidebar)

THE COURT:  We're on the record now, and the record prior to this would indicate that I didn't think it was necessary to have an on-the-record conversation about an addition to what I just read, the stipulation that the lawyers have agreed to, which

590

is that it is the custom and practice after the passage of whatever time, or whatever condition of the case, the procedural posture of the case, that in the State of Connecticut evidence is destroyed, and there's a statute that sets that up, and you need a judge, state court judge to sign it.  That's exactly what happened in this case.

And I think from my perspective -- and this stipulation was done, I'm going to say at least a year ago, and until I just read it -- and of course we're in the middle of the trial now -- I understand a lot more than I did a year ago.  I put holy water, if you would, on the stipulation that you guys worked it out, that's fine, but I don't think standing alone it's enough given the posture of the case now.

And the reason for that is, is that if we -- the stipulation that I just read that the jury's aware of, it doesn't say, well, I mean why was it destroyed?  And that could be -- and I don't want to leave that hanging.  I think it's important that they understand why it was destroyed.  This is not an extraordinary case.  It's not something they did unusually.  It was not unusual to do it.  It's what happens routinely.

Mr. Pinheiro is of the view -- and I'm

591

going to let him express it in a minute -- that that's not right, and he started to say something and I cut him off, but before I allow him to talk and the defense counsel to talk I'm going to instruct -- and I don't know, you-all must have the state statute because you-all have looked at it last year, you have it in your file, we can just get it relatively quickly today over lunch.  You got somebody in your office that could send it to you over at the noon hour?

MR. KATON:  I'd have to talk to somebody back at the office.  Frankly, I thought this whole issue was by the boards.

THE COURT:  I did, too, but I'm the one that opened this door.  Mr. Pinheiro, for good or not so good reason, is trying to do the best for his client, and I'll let him speak in just a minute.

It might be quicker -- can we find that quicker than Mr. Katon can get it from his office?

THE LAW CLERK:  I'm not sure that I'd know where to start.

THE COURT:  Why don't you do that over the lunch hour, and we'll come back this afternoon and I'll put the statute in the record, too.

And now, my first thought was that you need to -- and Mr. Pinheiro, I didn't like that idea

592

either, I don't think, but since I read the stipulation, I think I'm the one that ought to give the information. But when your witnesses come on, I'm sure they know, or assume they know that, about the statute and evidence is routinely destroyed. I don't know what level of police officers you have coming, but is that a fair assumption on my part? And if it's not, then I need to get the statute and I'm going to do just as I said. Unless Mr. Pinheiro, who's shaking his head, don't do that, the jury doesn't know what we're talking about.

MR. PINHEIRO: I'm sorry?

THE COURT: But depending on what he says, so I don't know. And I feel badly, because if this case wasn't so old and hadn't had Hurricane Sandy, maybe I'd have figured it out before.

So Mr. Pinheiro, tell me what's wrong in our search for the truth that what I just read to the jury they shouldn't know it's routine custom and practice in this state? Because it is, you-all acknowledged that a year ago. But go ahead and tell me the best you can.

MR. PINHEIRO: Your Honor, my understanding is it is not the routine custom and practice of a police department in the State of

593

Connecticut to destroy evidence in a murder investigation in which there has been no convictions, it's an open case still.  There's no convictions, and it's an open case, open murder investigation, no conviction, and it is not the custom and practice to destroy such evidence, and to have evidence destroyed an individual from the department has to fill out the proper forms and then present it to a superior court judge, the judge signs off on it, but it's not the custom and practice.

THE COURT:  Okay.  Well, let me rephrase what I was going to say, what I will say.  Let me ask you, is there any question in your mind as an officer of this court that there's a state statute that provides for the destruction of evidence?

MR. PINHEIRO:  I believe there is, Your Honor.

THE COURT:  All right.  I take it that's yes, Judge, there is.

MR. PINHEIRO:  Yes.

THE COURT:  And is there any question in this case that a state court judge signed an order to destroy the evidence?

MR. PINHEIRO:  I have a question about that, Your Honor.  Because when I read -- I can't read

594

the signature.

THE COURT: Well, how in the world did you just agree to that stipulation if that's true, counsel? You can't have it both ways. I'm telling you what, you're skirting here. I don't understand what you just said.

MR. PINHEIRO: I thought when we had the telephone conference, Your Honor, it would be in the best interests of this case to agree to that stipulation.

THE COURT: So you're disputing there was a state judge here?

MR. PINHEIRO: Your Honor, I just don't know because I can't read the signatures. It looks like a Robinson on there. But I agreed to the stipulation, I have no problem with that, Your Honor, to speed the case along.

THE COURT: Okay. Well, you did this a year ago, so we weren't speeding it along then. Any gain we got out of this we just lost. But at any rate, I don't care, because we're having a sidebar, but that's okay.

Now, well, I've got to say based on the representations that -- I don't have great memory -- but that Mr. Pinheiro has made to this Court specific

595

things be included with the stipulation.  I'm the one that added the state court so there wouldn't be confusion, because the way we're doing a federal transcript, you get to the federal transcript today, I believe you said yesterday, just not to confuse the jury, that Mr. Pinheiro knows that a state court judge did it, or should know, I mean he knows that.

MR. PINHEIRO:  I may, Your Honor --

THE COURT:  Just a minute.

MR. PINHEIRO:  -- concede that.

THE COURT:  Okay.  So we got a state court judge.  Now, I know the answer to this question because I've asked you before.

MR. PINHEIRO:  Yes, sir.

THE COURT:  Do you have any indication from anything you've done in this case, over whatever years you've had it, whatever previous lawyers did, anything you looked at that the Defendant in this case, Edwin Rodriguez, had the slightest thing to get to do with getting that state court judge to go ahead and sign an order to destroy the evidence?  Do you have any -- I know the answer because you've already told me.

MR. PINHEIRO:  Yes.

THE COURT:  You do?

596

MR. PINHEIRO:  I have a good faith belief.

THE COURT:  Well, you've changed what you told me.

MR. PINHEIRO:  I don't believe I have, Your Honor.  I'm sorry, Your Honor, I have told you that.  I'm sorry, there's a lot going on in my head.  Your Honor, I did tell you that, I'm sorry, but I still have reservations, but I did say that, Your Honor.

THE COURT:  You may have reservations, but do you have evidence?

MR. PINHEIRO:  Well, in the past he represented in the internal affairs investigation that he would have destroyed the tape if he knew that this would have been a big deal.  I mean that's sticks in the back of my mind, Your Honor.  And I did make those representations to you, as you stated.

THE COURT:  Okay.  Well, I'm going to -- you got anything else to say before I ask Mr. Katon and Mr. Zehe to express it from their perspective so the record's complete, anything else you want to add?

MR. PINHEIRO:  No, sir.

MR. KATON:  Your Honor, I agree with the comments that you suggested that you'd like to make to

597

the jury with respect to the stipulation. I think Mr. Pinheiro's got it backwards. I think that the judge signs the order pursuant to the statute, and then the property room department acts. It doesn't come from the property room department to the state court judge saying please authorize us.

THE COURT: And whatever application that might be made to the judge so the judge would know would come from the State's Attorneys office.

MR. KATON: Yes.

THE COURT: Wouldn't come from the law enforcement agent.

MR, KATON: Correct.

THE COURT: That's your good faith best representation as an officer of this court?

MR. KATON: Correct, Your Honor.

THE COURT: That was my basic understanding, before, or last year, whenever. And anything you want to say in response?

MR. PINHEIRO: I did not know that was the exact procedure, but we do have information from the State's Attorney, I believe, Gene Calistro, specifically, letters to the judge of the superior court asking for the evidence to be not preserved and not destroyed.

598

THE COURT:  I'm sorry?

MR. KATON:  Those letters weren't to the superior court.

THE COURT:  What did you just say?  What did he just say that you said they weren't sent to superior court judge?  We opening a whole other can of worms here.

MR. KATON:  There is a letter from a State's Attorney with respect to certain tapes and things in connection with the Santiago and Johnson case to preserve evidence that was in there, but the judge --

MR. ZEHE:  Which is a routine letter that's sent out at the beginning of a case so that the evidence is preserved.

THE COURT:  I got you.  This is how we opened it up.  You got any reason to think that's not true, it wasn't at the very beginning of the case?

MR. PINHEIRO:  I don't know.  Without looking, I just don't know.

THE COURT:  Okay.

MR. ZEHE:  Your Honor, we've had -- just so it's on the record, we briefed this for about six months.

THE COURT:  I remember.

599

MR. ZEHE: Every which way but loose on this.

THE COURT: And I'm going to say that the judge signed the -- so you'll know -- that the judge signed the order to destroy the evidence pursuant to the request -- pursuant to a statute that is -- happens on a regular basis in criminal cases, in the State of Connecticut. That's what I'm going to do. You want to -- I'll note your objection for you for the record, you think I'm making a reversible error here.

And based on the record, Mr. Pinheiro, I think when you go back and look at everything in this case, if the case doesn't go the way you'd like it to go and you try to brief this to the Second Circuit, I mean I make mistakes all the time, but this ain't one of them, I don't believe, and if it is, I'll buy you a state dinner somewhere. Let's go.

(Sidebar concluded)

THE COURT: I don't know if you all have heros. She's one of my heros right now, Wendy.

What I want to tell you-all is something further about the stipulation. In Connecticut there is a state statute that authorizes the destruction of evidence after whatever period of time upon a request

600

being made, whoever's bringing the case, thinks it's time to let it go, and -- did I mess that up? I may have confused that. I think that's right. But the judge signs the order, and then it goes to whatever the law enforcement agency is, and then the law enforcement agency is supposed to follow the order. And as the stipulation of the lawyers said, there was a time -- I mean some of the evidence was destroyed, and later on in 2011 -- and that might have even been pursuant to an order of this court.

Mr. Pinheiro, I think it was an order of this court to go look again. Maybe they didn't, they just came on their own, and maybe you don't remember, and Mr. Katon and Mr. Zehe, it was your client and maybe you both remember, I just don't remember. I remember shot, you-all know that.

MR. ZEHE: Your Honor, there was a search pursuant to the order of the court.

THE COURT: So it was a court order, okay. You agree with that, Mr. Pinheiro, it was a court order, he went and looked again and he found something?

MR. PINHEIRO: Your Honor, they found newly discovered evidence, we alerted Your Honor immediately.

601

THE COURT: And I got a court order. So it was pursuant to court order that it was turned over, and that's what's been held in Bridgeport at the courthouse, which we got, and I think you requested, or somebody requested, Brendan's got it today, right?

MR. PINHEIRO: That's correct.

MR. ZEHE: And Your Honor, just to answer your other question, it's the court clerk that generates the request to the judge to sign off on the order.

THE COURT: Okay. But anyhow, the court directs the law enforcement -- and I'm sorry, you know, this is the kind of thing we thought and Mr. Pinheiro and both defense lawyers thought we had saved a bunch of time for you-all so didn't have to put on evidence about it. Look, the judge screwed it up again, so I apologize to both the lawyers for both sides, and I think we're ready to go.

I'm going to ask that this stipulation -- and I think we may have -- I think there's more than one stipulation, so this would be filed stipulation 1, Mr. Pinheiro, is that, correct?

MR. PINHEIRO: That would be fine, Your Honor.

THE COURT: Doesn't matter if there's a

second one, it's going to be 1. So stipulation number 1.

Now, I believe we got to the point, Mr. Pinheiro, where you were going to call your next witness.

MR. PINHEIRO: That's correct, Your Honor.

THE COURT: And that was Ms. Mercado, I believe.

MR. PINHEIRO: Officer Coppola.

THE COURT: We changed it, that's right, I'm sorry. Okay. Well, thank you again for your patience, not so quick on his feet judge, I appreciate it.

(Stephen Coppola, sworn by the clerk)

THE CLERK: Please state your name and spell your name for us, and give us the town in which you reside.

THE WITNESS: Stephen Coppola, S-T-E-P-H-E-N, C-O-P-P-O-L-A, 300 Corporate Place, Rocky Hill, Connecticut.

THE COURT: And Mr. Pinheiro, you may proceed.

MR. PINHEIRO: Thank you, Your Honor.

603

DIRECT EXAMINATION BY MR. PINHEIRO:

Q    Good morning, Mr. Coppola.

A    Good morning, counsel.

Q    I understand that you informed me in the hallway that you have a hearing disability?

A    That's correct.

Q    All right then.

THE COURT:  I got it, too.  You don't have to look at me.  I got it, too.

BY MR. PINHEIRO:

Q    Any time you don't understand or can't hear, let me know, I'll raise my voice.

A    I will.  I appreciate it.

Q    Prior to today, sir, did you prepare for your case at all, your testimony today?

A    I did.

Q    How did you do that?

A    I did that with documents supplied to me by Attorney Tom Katon.

Q    What documents did he supply you with?

A    Statements, one police report that I wrote, a deposition, and I believe that's it.

Q    Was the deposition your deposition?

A    Correct.

604

Q    And there were two depositions, correct?

A    Two days, correct.

Q    And what's your current occupation?

A    I'm a police inspector for the Division of Criminal Justice.  At the present time I work for the office which falls under the Office of Chief State's Attorney.

Q    New Haven?

A    No, Rocky Hill.

Q    Oh, I'm sorry.

In 1999, sir, what was your occupation?

A    I was a detective for the New Haven Police Department.

Q    Now, are you prepared today to answer certain questions in connection with the murder investigation of Anthony Lucky, Jr.?

A    Yes.

Q    And what was your relationship to the murder investigation of Anthony lucky?

A    I assisted the lead investigator in that particular homicide.

Q    You assisted the investigator?

A    Correct.

Q    Who would the investigator be?

A    It would be Detective Rodriguez.

605

Q    Can you point him out for us?

A    That's Detective Rodriguez, right there.

MR. PINHEIRO:  Your Honor, may the record reflect the witness pointed out the Defendant?

THE COURT:  Thank you, Mr. Pinheiro.  I was looking at something else and I appreciate you straightening me out.  The record will so reflect.

BY MR. PINHEIRO:

Q    Weren't you his partner?

A    I wasn't just his partner.

Q    In regard to the Lucky investigation you were his partner.

A    I was one of his partners, correct.

Q    You had other partners?

A    There was four of us that were partnered up together.

Q    Did you ever inform us of that before?

A    Yeah, I believe I said that in my deposition, that there's four of us and we relate to each other as "my partner."

Q    Who are the four?

THE COURT:  Excuse me, Mr. Pinheiro, could you move that mike a little more directly in your face?  Thank you, sir.

BY MR. PINHEIRO:

606

Q    Who are the four?

A    It was myself, Detective Rodriguez, Detective Daryl Freeland, and Detective Donald Harrison.  And on any given night, because there's swing shifts in New Haven, where on certain nights there are approximately eight detectives, I could have been partners with one of the other four because our shifts overlap per week.

Q    Who was the lead detective?

A    Detective Rodriguez.

Q    And that's for the Lucky investigation?

A    Correct.

Q    What does lead detective mean?

A    Lead detective usually is -- gets assigned by the sergeant.  Each group of detectives that I just mentioned has a sergeant that they answer to.  The sergeant has -- let's say at a homicide scene or at a shooting scene, your particular sergeant would assign one detective out of that group that I just mentioned to be called the lead detective who would compile all the information that's obtained by other investigators and witnesses, and then at the end that particular investigator would complete an arrest application.

Q    When you were preparing for your testimony today, did you meet at the attorney's office, Mr. Katon's office?

607

A    Today?

Q    No, previously.

A    Oh, yes.

Q    How many times?

A    I believe twice.

Q    Did he go over questioning, preparing your testimony?

A    Yes, he did.

Q    And you provided responses to his questions?

A    Yes, I did.

Q    And did you have interaction with Mr. Katon as to what your responses should reflect?

A    Yes.

Q    Were one of the areas that you prepared, was it the information concerning the four partners?

A    I don't remember if he asked me about the four partners or not, sir.  He might have known it already because he was at the deposition.

Q    Do you know if anyone was arrested for the murder of Anthony Lucky, Jr.?

A    I believe several people were arrested.

Q    Who?

A    I believe Gary Session was arrested for it.

Q    The Plaintiff sitting right here?

A    Correct.

608

MR. PINHEIRO:  May the record reflect, Your Honor, that --

THE COURT:  Absolutely, so reflect.

BY MR. PINHEIRO:

Q    Who else?

A    I don't remember any other names, sir, of who might have been arrested.

Q    How many others you think?

A    I know there were several.  Jose Santiago. And there might have been one other one on a conspiracy charge, but I'm not sure.  I don't remember.

Q    Regarding the arrest of Mr. Session, was it an on-site arrest?

A    No.

Q    What was used to arrest the Plaintiff?

A    An arrest warrant application.

Q    Do you know who drafted the arrest warrant application?

A    Detective Rodriguez.

Q    Did you assist him in preparing the arrest warrant?

A    No, I did not.

Q    Do you know Mayra Mercado?

A    I know of her.

609

Q    Did you know Mayra Mercado before you were involved in the Lucky investigation?

A    No, I did not, sir.

Q    Did you ever use Mayra Mercado as an informant?

A    No.

Q    At any time in 1999 did you have any independent knowledge as to whether Mayra Mercado was or wasn't a registered informant for New Haven Police Department?

A    No.

Q    Did Mayra Mercado provide a recorded statement in this investigation?

A    I believe so, yes.

Q    Do you know how many?

A    Two.

Q    Were you present when Mayra Mercado provided the recorded statement?

A    Yes.

Q    Statements.

Do you know what a preinterview is?

A    Yes.

Q    What's a preinterview?

A    It's an interview with a suspect or a witness prior to putting any information that they're going to

610

provide on a taped statement.

Q    Do you know if a preinterview was done with Mayra Mercado before her first recorded statement?

A    Yes.

Q    Now, when did you come to the conclusion that you knew there was one done prior to her first statement?

A    When I what?  I'm sorry.

Q    When did you realize that there was a preinterview done with Mayra Mercado before her first recorded statement?

A    When I did all the reviews of the reports.

Q    And that was within the last couple years?

A    Correct.

Q    And prior to you doing the reviews of the report, did you know if there was a preinterview done?

A    I didn't even remember one of the interviews, because it's so much time had elapsed between the incident and when I got put up again.

Q    So at the time you took your deposition -- is it correct that your deposition was conducted in March 2008?

A    That's correct.

Q    At that time did you know whether or not a preinterview was done with Mayra Mercado?

611

A    No, I did not remember.

Q    Prior to the interview with Mercado had you ever heard of the Shawn Johnson before?

A    No.

Q    Did you ever question Gary Session in connection with the Lucky homicide?

A    No.

Q    Who was present during Mayra Mercado's first recorded statement?

A    Myself, Detective Rodriguez, I believe Mike, Sergeant Mike Canning, and Bryan Norwood, Sergeant Bryan Norwood.

Q    And when did you -- how did you come to that response?  Recently?

A    Correct.

Q    At the time -- and you realized that information during your preparation for this trial with Attorney Katon?

A    That's correct.

Q    And at the time that we took your deposition in March 2008, did you know that anyone else was there?

A    I didn't remember them being there.

Q    At the time of the deposition, your sworn deposition under oath, so far there was two questions

612

that you didn't know, but today you have an answer for, correct?

A    Correct.

Q    At any time since your deposition did you tell the Plaintiff that you changed your response from the deposition?

A    I spoke to no one about this.  Well, except Tom Katon, yes.

Q    And he's not your lawyer, correct?

A    No, no.

Q    Other than Mayra Mercado, do you know who else may have provided a recorded statement in connection with the Lucky investigation?

A    Yes.  Sharon Adkins, and a gentleman by the name of Larkland.  I don't remember his full name.

Q    And we know that two young individuals at the time of the shooting provided --

A    Correct, I'm sorry, Scruggs and McCann.

Q    Were you present during the audiotaped interview with Sharon Adkins?

A    Yes.

Q    The time period between when Juan Scruggs' statement was ended, and that would have been July 25th, 1999, and before the Sharon Adkins statement was given, which was November 7th, 1999, do you recall

613

doing anything with respect to the Lucky investigation in that time period?

A     Yes.  I typed a search warrant for the vehicle which Mr. Lucky was shot in, and I believe Mercado gave us a statement before Adkins did.

MR. PINHEIRO:  Your Honor, with your permission, I'm going to --

THE COURT:  Yes, sir.

MR. PINHEIRO:  Thank you.

THE COURT:  And ladies and gentlemen of the jury, that's a custom they have here in the State of Connecticut we don't have down in Louisiana, that that you seal these depositions and don't open them until right in front -- you may approach -- right in front of the jury, and I guess that goes back to -- I don't know.  It's not that you can trust people in Louisiana, you can trust them, I assure you.

MR. PINHEIRO:  Your Honor, I'll do my best to get this right.  I'll have it right by the end of the trial.

THE COURT:  We'll work on it together.

MR. PINHEIRO:  My next one with you I'll have it right, Your Honor.

THE COURT:  There you go.

BY MR. PINHEIRO:

614

Q   Mr. Coppola, may I direct your attention to a page in your deposition of March 17th, 2008, page 173. I'm sorry, I believe page 172 continuing onto page 173. So let me direct your attention to start of the page 172.

THE COURT:  Which line on 172?

MR. PINHEIRO:  Yes, sir.  You'd like a few other lines?

THE COURT:  Just so it's in context.  I don't have a copy, but you can do that.

MR. PINHEIRO:  Okay.

THE WITNESS:  Excuse me, sir, I don't have a 172 in here.  Mine goes from 171 to 173.

THE COURT:  He's right, he's got 171 and skips 172, Mr. Pinheiro.  You can approach if you got another copy you can let him have.  I don't know that you do.  Somebody does.

MR. PINHEIRO:  If I may, Your Honor, make sure I got the right one.

Thank you, Your Honor.

THE COURT:  That's not the copy you just took out.  He's got that one.

MR. PINHEIRO:  That's fine, Your Honor.

BY MR. PINHEIRO:

Q   Referring to page 172, sir.  And if you could

615

start -- read to yourself the lines prior to that from -- let's say line 15 through the end of page 172, and then if you continue onto the next page of 173 and you could read the first six lines.

THE COURT:  Through line 6?

MR. PINHEIRO:  Yes, sir.

THE COURT:  And as soon as you get through with that, sir, let me know, and I'll let him ask you the question he wants to ask.  And then again, this is based on his previous testimony you're trying to -- we'll do the same drill, okay.

MR. PINHEIRO:  Thank you, Your Honor.

THE WITNESS:  So from 172, 15 to 173, 6.

MR. PINHEIRO:  Yes.

THE WITNESS:  Okay.

Okay.

THE COURT:  All right.  You may proceed, sir.

BY MR. PINHEIRO:

Q    Mr. Coppola, the time period between when the Scruggs statement was --

THE COURT:  Does that refresh your recollection?

BY MR. PINHEIRO:

Q    I'm sorry.  Does that help refresh your

616

recollection as to your prior testimony, sir?

A    Correct.

Q    Now, Mr. Coppola, page 172 starting with line 17, I'll read the question.

THE COURT:  No.  Ask him a question. Because it's only read if he doesn't think it's -- if you get a different answer, or he doesn't give you a different answer.

MR. PINHEIRO:  All right.

BY MR. PINHEIRO:

Q    The time period between when the Scruggs statement was ended and before the Adkins statement --

THE COURT:  Okay, you asking a question now?

MR. PINHEIRO:  Yes, sir.

THE COURT:  I apologize.

BY MR. PINHEIRO:

Q    The time period between when the Scruggs statement was ended and before the Adkins statement was given, do you recall doing anything with respect to the Lucky investigation in that time period?

A    Yeah.  I said I sat at an interview with Detective Rodriguez and Sharon Adkins.

Q    May I direct your attention to 173, line 1.

A    Correct.

617

Q    And what is your answer to the question I just previously asked you at your deposition?

A    I told them that I didn't remember.

Q    So today in court you're giving a different response by saying that you helped type the search warrant and that you gave some other information, but at the time of your sworn deposition, 2008, your response to that question was you did not remember, correct?

A    I did not remember.

Q    But today at trial you remember?

A    Correct.

Q    So, so far we have three different responses, correct?

A    Well, I didn't remember, then I didn't get a chance to review any documents, it had been so long from the incident to when I gave my deposition, I didn't --

Q    It's been --

THE COURT:  Lets him finish.  Were you finished saying what you were going to say?

THE WITNESS:  When I gave the deposition I didn't remember a lot of facts concerning that case, because so much time had gone by, so I didn't remember what I did and what I didn't do.

618

BY MR. PINHEIRO:

Q    Well, it's been 14 years since the day of the incident now and you don't seem to have too much trouble remembering.

A    Because I've had a chance to review the documents from Mr. Katon's office and I've been studying them prior to coming here today.

Q    But in the past Mr. Katon was your attorney, correct, for some issues?

THE COURT:  Did you say Katon was his attorney?  Okay, I thought earlier you said he's not your attorney.

MR. PINHEIRO:  That's right, that's what he said.

THE COURT:  But I thought you asked him that, you asked the question in this case he's not the attorney.

MR. PINHEIRO:  Yes, and he said -- well, he said that, but --

MR. KATON:  Object on the grounds of relevance, Your Honor.

THE COURT:  I'm sorry?

MR. KATON:  Object on the grounds of relevance.

THE COURT:  I'm not sure it's relevant,

619

but I'll overrule the objection anyhow.  Has Mr. Katon been your attorney in any matter?

THE WITNESS:  I thought -- it's probably my fault.  I misunderstood you or I didn't hear you well.  He is not my attorney in this case.  I thought you were asking if he's representing me now.  No, he is not.  Prior he has.

BY MR. PINHEIRO:

Q    All right, I apologize.

A    And I apologize.  I misunderstood your question.

Q    That's all right, probably not how I asked the question.

So he was your attorney in the past?

A    Correct.

Q    What, if anything, do you know about how she, Sharon Adkins, came into contact with the New Haven Police Department the day of her recorded interview?

A    I would have no clue.

Q    At the time of Sharon Adkins' statement, do you know if she suffered from any medical problems?

A    According to what she said in her statement, yes.

Q    And what was that?

A    Mental issues, and as she was on some type of

620

medication.

Q    Did she say anything about memory disorder?

A    Correct, she did.

Q    Did she say anything about mental disorder?

A    She did.

Q    Did she say anything about her being a crack addict?

A    She did.

Q    Did she say anything about her needing prescription medication for her mental and memory disorders?

A    She did.

Q    And did she also say that she wasn't on her medication that day?

A    Correct.

Q    Now, Mr. Coppola, does someone who suffers from memory loss and mental disorder sound like an individual whose testimony would be credible and reliable in a murder investigation?  Yes or no?

A    Yes.

Q    Mr. Coppola, does someone who suffers from memory loss, mental disorder and who is a crack addict sound like an individual whose testimony would be credible and reliable in a murder investigation?  Yes or no, sir.

621

THE COURT:  It's asked and answered.

MR. PINHEIRO:  No, I added the --

THE COURT:  What was your objection?

MR. ZEHE:  He just asked the same question.

THE COURT:  And what did you add to it that makes it different?

MR. PINHEIRO:  Crack addict.

THE COURT:  Okay.  Go ahead.  You want to answer that question?

BY MR. PINHEIRO:

Q    Yes or no, sir?

THE COURT:  You can answer yes or no, and then I'll let you explain your answer.

THE WITNESS:  Okay.  Yes.

THE COURT:  Explain your answer.

THE WITNESS:  You could still be a crack addict and witness a serious incident.  In the City of New Haven the majority -- a lot of our -- I shouldn't say majority -- a lot of our witnesses and cooperators happen to have a crack addiction.  It's the inner city.  It doesn't necessarily mean that they didn't see what they saw because they have a crack problem.

Q    Pretty funny, isn't it?

A    It's sad.  It's a realty.  I mean I had a guy

622

give me a statement on a murder, and when I started the tape one of the questions was are you on any drugs at this point in time, he said yes, I said what, he said I smoked a joint prior to coming here.  I said do you know where you are?  He said yes.  Do you know why you're here?  Yes.  Do you know what we're here to discuss?  Yes.  I continued the statement.  His facts are corroborated by other witnesses.  So it's just because he had smoked marijuana didn't mean that he didn't see what he saw.

Q   Is your testimony today that you equate smoking a marijuana cigarette the same as smoking a crack cocaine pipe?

A   No, I am not, sir.

Q   Then why did you give that example?

A   I'm using it as a drug, because that's one of the cases that I had where that happened to come up.

Q   Well, in this particular case you had a little smile on your face.  Do you think it's funny --

A   No, I said to you.

THE COURT:  Let him finish his question.

THE WITNESS:  Sorry.

BY MR. PINHEIRO:

Q   You think it's funny that a man was arrested for murder of a 16 year-old boy and one of the

623

witnesses was a crack addict who suffered from memory loss and mental disorder?

A    No.

Q    A person using crack cocaine, are they essentially out of their mind when they're smoking crack?

A    Yes.

Q    So is your testimony today that someone who's smoking crack cocaine, essentially out of their mind, is a credible witness in a murder investigation?

A    I didn't say they were credible.  What I said was -- maybe I'm -- it's not coming across the right way.  Just because they may be on crack cocaine, they could still be a witness to something and see some of the facts.  That's what I'm saying to you.

Q    Didn't you just say, sir, that they would not necessarily be a credible witness then, if they're out of their mind on crack cocaine?  Yes or no, sir?

A    I need to explain.

THE COURT:  You can say yes or no, then I'll let you explain your answer.

THE WITNESS:  Yes.

THE COURT:  Now, explain your answer.

THE WITNESS:  Because that would depend on what time that they smoked crack cocaine.  They

624

could have done it in the morning. They're still considered on the street being a crack head, but if they smoked it like five minutes prior, I don't think they would be there personally to give a statement, but their answers would be totally different. It wouldn't be the same, is what I'm trying to explain.

BY MR. PINHEIRO:

Q    What about this individual's up for days, not eating and constantly smoking a crack pipe, would that influence your decision that that person was credible and reliable?

A    It's possible, very possible.

Q    Does the fact that the crack addict also have memory -- a mental disorder, and has not taken her medication, doesn't that reinforce the possibility that that person's testimony would not be credible to support information for the charge of murder?

A    It could be.

Q    You were the Defendant's partner in this, right?

A    I was.

Q    Are you friends with Mr. Rodriguez?

A    Yes.

Q    You don't want to see him get in any trouble at the end of this case, right? I mean you don't want

625

to see a verdict against him in this case, correct?

A    I would like justice.  I would have --

Q    That's all we all would like, sir.

A    Correct.

Q    And do you think in your honest opinion that justice is served in this country when an individual secures an arrest warrant for the charge of murder against a man whose corroborating witness is a crack addict, suffers from memory loss, and has mental disorders?

THE COURT:  Don't answer the question. There's an objection.  Mr. Katon is standing.

MR. KATON:  Objection.  Argumentative, Your Honor.

THE COURT:  I sustain the objection.  The jury has heard the dialogue the last ten minutes or so, and I sustain the objection.

MR. PINHEIRO:  Thank you, Your Honor.

BY MR. PINHEIRO:

Q    Mr. Coppola, moving on, did you follow up with Adkins, Sharon Adkins, and ask Adkins what mental disorder she had for which she was taking the medication?

A    I believe I did.

Q    May I refer your attention to your deposition

626

dated March 17th, 2008, page 203.  And when you get there I'll give you the line.

A    Go ahead.

Q    And you could read from page 203 -- you could read from line 8 and you could read through the end of the page, and when you're finished let me know, sir.

A    203?

Q    Page 203.

A    Right.

Q    Line 8, to the end of the page.

A    Okay.

Okay.

MR. PINHEIRO:  Probably get this wrong, Your Honor.

THE COURT:  You might get it right, Mr. Pinheiro.

MR. PINHEIRO:  By the end of the trial, Your Honor.

BY MR. PINHEIRO:

Q    Sir, did you follow up with Adkins -- does that help refresh your memory, sir?

A    Yes, it does.

Q    All right, thank you.

Did you follow up with Adkins and ask Adkins what mental disorder she had for which she was taking

627

the medication?

A    No, I didn't.  It was Inspector Rodriguez.  Or Detective Rodriguez, I'm sorry.

THE COURT:  Maybe you could get that mike a little closer to you.  My ears I told you were deficient, and I'm having a hard time understanding your answers.  So if I am -- I don't think anybody in the jury is hearing deficient, they said it wasn't, but I want to make sure everybody can hear you.

BY MR. PINHEIRO:

Q    Now, Mr. Coppola, I want to ask a question, and if you may, would you please read your response from the deposition of March 17th, 2008?

A    On 203?

Q    The question starts at line 17, on page 203.

A    From 17 on?

Q    And your response would be on line 20.  The question, sir, starting on line 17, "Did you follow up with Adkins?"

THE COURT:  Wait.  In other words, why don't you let him -- he's read that already.

MR. PINHEIRO:  Yes.

THE COURT:  And you've asked him if it refreshed his recollection.

MR. PINHEIRO:  Yes.

628

THE COURT:  You perceive a difference in what he said here today and what he said then?

MR. PINHEIRO:  Yes.

THE COURT:  Proceed.  You play your part and you play the lawyer, or not.  I don't know if you were the lawyer or not.

BY MR. PINHEIRO:

Q    "Did you follow up with Adkins and ask Adkins what mental disorder she had for which she was taking the medication?

A    "No."

Q    Thank you.

Mr. Canning.

A    I'm sorry?

Q    Mr. Coppola, did you and Rodriguez ever discuss the impact of Adkins' mental problems or use of crack cocaine and her selling crack cocaine on her reliability of a witness, as a witness?

A    No.

Q    Was Adkins shown any photographs during the interview?

A    I believe she was.

Q    Who prepared the photo array?

A    I don't know.

Q    Mr. Coppola, may I direct your attention to

629

your deposition, page 176.  And may I direct your
attention to -- would you please read to yourself line
6 through 13.

A    Okay.

Q    If I may.

Does that help to refresh your memory?

A    Yes, it does.

Q    My question to you, sir, who prepared the
photo arrays?

A    I said I believed it was Inspector Rodriguez.

Q    Did Sharon Adkins at any time tell you or
Detective Rodriguez what Anthony Lucky, Jr.'s date of
birth was?

A    Not that I could recollect.

Q    May I direct your attention to page 189.
Direct your attention to lines 1 through 12.

A    Okay.

Q    Does that help refresh your recollection?

A    Yes.

Q    Did Sharon Adkins at any time tell you or
Detective Rodriguez what Anthony Lucky, Jr.'s date of
birth was?

A    No.

Q    After you and Detective Rodriguez reviewed the
transcript of Adkins' statement, did either of you

630

contact Adkins regarding her statement?

A   I did not.

MR. PINHEIRO:  Your Honor, with your permission, at this time I would intend to offer into evidence an unobjected exhibit.

THE COURT:  Okay, the number, and make sure your adversary are familiar with these.

MR. PINHEIRO:  It's Plaintiff's number 8.

THE COURT:  Why don't you let them see it, walk on over there and save some time maybe.

MR. ZEHE:  No objection.

THE COURT:  So go ahead, tell us what it purports to be, and show it to the witness, and then you can show it to jury.

MR. PINHEIRO:  Plaintiff's 8, Bates 097, New Haven Police Department case incident report, date of report, 11/8/99.

THE COURT:  Approach the witness and make sure he's familiar with it before you put it on the screen.

THE WITNESS:  I'm sorry, sir, it's Plaintiff's 8?

BY MR. PINHEIRO:

Q   It's in the book.

A   It's in this book?

631

Q    Yes, sir, Plaintiff's number 8.  It's orange.

THE COURT:  He wants to know if you recognize that?

THE WITNESS:  Yes.

THE COURT:  You may proceed.

MR. PINHEIRO:  May I publish it, Your Honor?

THE COURT:  You may indeed.

MR. PINHEIRO:  Thank you.

BY MR. PINHEIRO:

Q    Mr. Coppola, before today have you seen this report?

A    Yes.

Q    Is this one of the reports that you reviewed in preparation for your trial testimony today?

A    Yes.

Q    And you did that with Attorney Katon, correct?

A    Correct.

Q    And he asked you some questions about this report?

A    I'm sorry?

Q    And he asked you questions about this report, and you prepared your testimony concerning this report?

A    Correct.

632

Q    Now, the first paragraph states that on November 7th, 1999, at approximately 7:05 p.m., the undersigned, along with Detective S. Coppola, conducted an interview Sharon Adkins regarding the homicide of Anthony Lucky.  During the interview Sharon provided both detectives with a taped statement."

Sir, with reference to the undersigned, who would that be?

A    Edwin Rodriguez.

Q    The Defendant, correct?

A    Correct.

Q    And it makes reference to you, correct?

A    Correct.

Q    Do you remember being there?

A    Yes.

Q    The second paragraph, the first sentence, "On November 8, 1999, at approximately 6 p.m., both detectives had the opportunity to read the transcribed statement."

Both detectives would be you and the Defendant?

A    Yes.

Q    Did you review the Adkins transcript of her recorded statement?

633

A   I did.

Q   Did you review it with Detective Rodriguez?

A   I believe I reviewed it after him.

Q   The next sentence, "While reviewing the statement we immediately recognized that the date of the incident occurring were mixed up with the victim's date of birth."

A   That's correct.

Q   "At approximately 6:30 p.m. Sharon Adkins responded to the Investigative Services Unit in order to sign the transcribed taped statement.  While at the police department we advised Sharon of the mistaken dates in our statement."

Did Sharon Adkins at any time tell you or Detective Rodriguez what Anthony Lucky, Jr.'s date of birth was?

A   No.

Q   Well, can you explain to me why, then, the second line of this report, Plaintiff's 8, says that she had mixed up the date of the incident with the victim's date of birth?

A   No.

Q   Where it says here that at approximately 6:30 p.m. Sharon Adkins responded to the Investigative Services Unit, does that mean that someone reached out

634

to contact her that day?

A    I would assume so.  I don't know how she got there.

Q    You don't know?

A    No, I do not.

Q    And you're the Defendant's partner, correct?

A    You're using the words partner again.

Q    Well, you were, weren't you?

A    I was partners with a lot of people.

Q    But in this investigation he was the lead defective and --

A    I helped --

THE COURT:  Let him finish the question, let him finish the answer.  Start over with the question, and you can answer, and if you need to explain your answer, you may.

BY MR. PINHEIRO:

Q    In the Lucky investigation you were the Defendant's partner and you were here at this time, correct?

A    I was one of his partners.  I was there at that time.

Q    And she just showed up out of thin air, came to the station, correct?

A    I don't know how she got there.

635

Q    Perhaps -- do you know how Adkins learned that she was being asked to come back to the Investigative Services Unit?

A    No.

Q    Do you know how she got there that day?

A    No.

Q    At this time, sir, were there any other persons who were present at Adkins' statement other than you and Detective Rodriguez?

A    When the statement was taken?  Is that what you're saying?

Q    At this time at the police department as reflected in Plaintiff's number 8.

A    I believe Lieutenant Norwood was there.

Q    May I direct your attention to your deposition, March 17, 2008, page 191, and if you'd please read to yourself lines 10 through 24.

A    Ten through what, I'm sorry?

Q    24, sir.

A    Okay.

Q    Does that help refresh your memory, sir?

A    Yes.

Q    Were there any other persons who were present at Adkins' statement other than you and Detective Rodriguez?

A    No.

Q    Now, during your recent preparation for the trial, is that when you came up with another individual there was present?

A    Correct.

Q    And as you know, we had already taken Officer Norwood's deposition years ago, correct?

A    Correct.

Q    And without knowing that he was now at the police station when Adkins came in concerning this issue, did you ever inform us of the change in your response?

A    When?

Q    At any time, since you found -- since you changed your answer from this 2008.

A    I haven't spoken to anybody about it.

Q    And you didn't tell us, did you?

A    No.

Q    So at the trial today is the first time that I know of it, right?

A    That's correct.

Q    What's the purpose of a deposition, sir, your understanding?

A    To my understanding, it's asking you questions pertaining to a particular incident, when that

637

incident occurred and all the fact and circumstances surrounding that incident.

Q   In an action pending in federal court you know that the attorney taking the deposition relies on your responses, correct?

A   Correct.

Q   And from your responses we then go out and -- we go out then and figure things out, correct?

A   That's correct.

Q   Search?

A   Correct.

Q   Prepare?

A   Correct.

Q   And if your responses change at trial, then the other party's at somewhat of a disadvantage, correct?

MR. KATON:  Objection, Your Honor.

THE COURT:  I'll sustain the objection.

MR. PINHEIRO:  Thank you, Your Honor.

BY MR. PINHEIRO:

Q   Mr. Coppola, what, if anything, did you do to verify the accuracy of Sharon Adkins' statement?

A   Nothing.

Q   So we have an audiotaped statement from a crack addict who suffers from memory loss and mental

638

disorders not taking her medication, and you did nothing to verify the accuracy of that individual's statement, correct?

A    I did not.

Q    Sir, did the two of you, you and the Defendant, ever have any discussions about verifying the accuracy of her -- Sharon Adkins' statement?

A    I don't recollect.  I don't remember.

Q    I'm not sure if I asked this.  If I did I apologize.  What, if anything, do you know about how Sharon Adkins came into contact with the New Haven Police Department?

A    I don't have any idea.

Q    Sir, what efforts, if any, did you make to verify the information provided by Mayra Mercado concerning the Lucky investigation?

A    None.

Q    And at the time that she gave her audiotaped statement, were you aware that she was a drug abuser?

A    Yes.

Q    And what type of drug did she use?

A    I believe it was crack, also.

Q    Another crack addict, correct?

A    Correct.

Q    So we have two crack addicts that you find

639

credible to support the warrant for the charge of

murder.

THE COURT:  Okay, I'd like you to ask

questions and not make statements.

MR. PINHEIRO:  I'll move on, Your Honor.

Thank you.

BY MR. PINHEIRO:

Q    Were you present at a statement given by Mayra

Mercado on December 5, 1999 concerning the Lucky

matter?

A    Yes.

Q    Did you make any effort to verify the

information Mayra Mercado provided in that statement?

A    No.

Q    Do you know an individual named Larkland

Martin?

A    No.

Q    Do you know this individual in connection with

the Lucky investigation?

A    I'm sorry?

Q    Do you know an individual by the name of

Larkland Martin in connection with the Lucky

investigation?

A    I do not know him.

Q    Have you ever even heard during the course of

640

this investigation the name of Larkland Martin?

A    Yes.

Q    And what's his relationship to this investigation?

A    I believe he was a witness.

Q    Did you have any contact with Larkland Martin at all?

A    No.

Q    Did you do anything to verify any information he had made -- he may have given in this investigation?

A    No.

Q    During your career as a New Haven police officer, up to the time in 1999, did you ever register anyone with the New Haven Police Department as a confidential informant?

A    Register whom?

Q    Sorry?

A    Register an informant?

Q    Yeah, did you ever register anyone with the New Haven Police Department as a confidential informant?

A    Yes.

Q    Did you ever register any of the witnesses in this murder investigation as a confidential informant?

641

A   No.

Q   Is there any significance in an individual being classified as a confidential informant?

A   Yes.

Q   Could you please tell the jury what that is?

A   They wanted to remain anonymous, confidential, and they provide information.

Q   And is there anything -- any significance as to the reliability and credibility of a CI?

A   Is there what, I'm sorry?

Q   Confidential informants are commonly referred to as CIs?

A   Correct.

Q   Is there any significance to a CI's reliability and credibility as compared to someone who's not a CI?

A   I would say they're held to a higher standard.

Q   And is that because they have provided information in the past?

A   Correct.

Q   And is that because they provided reliable and credible information in the past to the department?

A   Correct.

Q   And does that mean that -- is that also -- is the significance also that that's someone who you can

642

trust to provide reliable, credible information?

A    Correct.

Q    And does it also mean it is someone that information has been useful to the police department?

A    Yes.

Q    And it also means that you want to keep that individual's identification secret, correct?

A    That's correct.

Q    And secret means that when an individual is charged with a particular crime, and on the police report and the warrant, the only indication is a CI, and whoever reads that warrant or report does not know the identification of that individual, correct?

A    Correct.

Q    Did either you or the Defendant ever attempt to verify the statements of Adkins and Mercado with any other witnesses in the case?

A    I did not.

Q    Do you know a Jose Santiago?

A    Yes, I do.

Q    Known him for quite some time, correct?

A    Yeah, I did.

Q    Since he was a kid?

A    That's correct.

Q    And Jose Santiago was charged with crimes in

643

relation to this case, correct?

A    Correct.

Q    Did you ever interview Jose Santiago before Mr. Session, the Plaintiff, was arrested?

A    I did not.

Q    Do you know, sir, if Detective Rodriguez interviewed anyone other than the witnesses named in the arrest warrant affidavit after Larkland Martin's second interview?

A    I do not.

Q    Did you interview anyone in connection with the Lucky matter after the December 5, 1999 interview of Mayra Mercado?

A    No.

Q    Did you do anything else with respect to the Lucky investigation after the second interview for Mercado on December 5, 1999?

A    No.

Q    You were done with it, correct?

A    That's correct.

Q    Was your involvement with the Lucky investigation -- I'm sorry, I just asked you that.

Sir, if you had spoken to someone or someone had volunteered pertinent relevant information to the Lucky homicide investigation, you would have created a

644

police report reflecting that, correct?

A    Yes.

Q    Sir, if there are no police reports that have been produced authored by you between July 25th, 1999, and November 8, 1999, would it be fair to say that during that time period you did not obtain any relevant important information regarding the Lucky homicide?

A    That's correct.

Q    Sir, do you know anything about how Larkland Martin came into contact with the New Haven Police Department in connection with the Lucky investigation?

A    I believe he came in contact with John Valecta.

Q    Referring to your March 17th, 2008 deposition, it's page 231, and then continuing on to page 232, and if you would read to yourself, sir, on page 231, line 19, finishing that page, and then continuing on page 232 up to line 6, sir.

A    To number 6 on 232?

Q    Yes, sir.

A    Yes.

Q    Does that help refresh your memory?

A    Yes.

Q    My question to you, sir, do you know anything

645

about how Larkland Martin came into contact with the New Haven Police Department in connection with the Lucky investigation?

A   No.

Q   And previously you just put out a name, Officer Valecta, correct?

A   Correct.

Q   Sir, do you know if the Defendant, Mr. Rodriguez, had any information regarding Mercado's children at the time of her statement?

A   I have no knowledge of that.

Q   Did you know if Mayra Mercado had any children with the Plaintiff, Gary Session?

A   I'm not sure if she said she did or she had a miscarriage with children, if they were Session's, I'm not sure.  I don't remember.

Q   Sir, did you do anything to verify if Mayra Mercado had any children with Gary Session?

A   No.

Q   Did Detective Rodriguez, the Defendant, ever tell you that he had learned that Larkland Martin was recanting portions of his statement?

A   Did he ever tell me that?

Q   Yes.

A   Yes.

646

Q    Were you or Detective Rodriguez ever asked to re-interview Larkland Martin?

A    Not me.

Q    What about Detective Rodriguez?

A    I don't know.

Q    Were either of you, you and your partner Rodriguez, ever asked to re-interview Sharon Adkins?

A    Not me.

Q    And what about --

A    I don't know.

Q    Were either of you, you and your partner, ever asked to re-interview Mayra Mercado?

A    Not me.

Q    What about Mr. Rodriguez?

A    I don't know.

Q    Were you in particular ever asked to re-interview Juan Scruggs?

A    No.

Q    Regarding your deposition of March 17, 2008, sir, at your deposition did you bring with you any documents, or through your attorney produce any documents at that time?

A    I did not.

Q    Were documents produced at that time at the beginning of the deposition?

647

A    From me?

Q    Well, at that time through you, or your lawyer gave it to other counsel at that time.

A    No.

Q    Can you please refer to your deposition of March 17, 2008, page 141.

THE COURT:  Mr. Pinheiro, let me ask you -- the reason I ask is because it's time -- close to time for the morning break.  How much longer -- and I'm not holding you to it -- but do you think you have with this witness?

MR. PINHEIRO:  About ten minutes.

THE COURT:  Maybe this will be a good time for a break, because we're going to roughly to 1:00 o'clock, and I don't want to do to the members of the jury what I did the other day, yet again.  Members of the jury --

Well, first, now that your testimony's begun you're not to discuss the testimony you have given or will give with anyone, including the lawyers, understood?

THE WITNESS:  Correct.

THE COURT:  And ladies and gentlemen of the jury, remember you're not to discuss the case among yourselves when you take our break.  And let me

648

just ask you, because I don't know the facility well enough, but should we do ten or 15 minutes?  And I just -- does it matter?  Would it accommodate everybody's needs if it's a ten minute break?  Everybody says yes.  We're going to break for ten minutes, folks, and thank you very much on behalf of the parties, the lawyers and the Court for your patience.

(Recess taken)

THE COURT:  All right, at this time, ladies and gentlemen of the jury, Mr. Pinheiro will be allowed to continue his cross-examination of Mr. Coppola.

You may proceed, sir.

MR. PINHEIRO:  Thank you, Your Honor.

BY MR. PINHEIRO:

Q    We left off, Mr. Coppola, with directing your attention to your deposition of March 17th, 2008. Page 411, lines 10 through 14.  Can you read that to yourself, sir.

A    Okay.

Q    Now, does it help refresh your recollection?

A    Yes.

Q    And at that time were any documents produced for invoices or goods and service in connection with

649

Mary DeLeon?

MR. KATON:  Objection, Your Honor.

THE COURT:  Basis?

MR. KATON:  Testimony refers to documents that are not in evidence in this case.

THE COURT:  Okay, I sustain the objection.

BY MR. PINHEIRO:

Q   Now, Mr. Coppola, a couple years ago this case was set for trial.  Do you remember?

A   Yes.

Q   And it was continued, and you and I had a telephone conversation.  You remember?

A   Me and you?

Q   Yes.

A   I do not remember.

Q   You don't remember me calling your office and speaking to you on the phone about Mary DeLeon?

A   I don't remember, sir.  Seriously, I don't remember.

Q   Do you remember my request of you, sir, if you had a copy of the receipt invoice that was paid to Mary DeLeon?

MR. KATON:  Again, I'm going to object, Your Honor.

650

THE COURT:  Basis?

MR. KATON:  Documents that are not in evidence.

THE COURT:  You know, I sustain the objection.

BY MR. PINHEIRO:

Q    Sir, did you ever previously testify in any legal proceeding that you had lied under oath?

MR. KATON:  Objection, Your Honor.  It's been the subject of a motion in limine.

THE COURT:  Let's have a sidebar on the record.

(Conference held at sidebar)

THE COURT:  So now you say it was the subject of a motion in limine, and Mr. Pinheiro, I know you just reacted, but don't -- you nodded your head like that in front of the jury.  Don't do that.

MR. PINHEIRO:  All right.

THE COURT:  If you can remember that.

MR. PINHEIRO:  I will.

THE COURT:  I don't know what the rules are here, I should maybe, but in the Western District of Louisiana we have a rule that, you know, not even just lawyers, but parties aren't supposed to --

MR. PINHEIRO:  Sorry, Your Honor.

651

THE COURT:  It's okay.  You didn't know. It was a spontaneous reaction.  It's a human condition.

Now, I don't have any recollection, big man says here he doesn't recall that.  Was it one of the referring judges?  Who was the referring judge in this case, Thomson?

MR. KATON:  Yes.

MR. PINHEIRO:  Yes.

THE COURT:  Did he do it or did I do it? I don't remember.

MR. KATON:  No, there was a motion in limine with respect to the internal affairs investigations and testimony in the Sullivan case and the --

THE COURT:  Is that what I did?  Did I do that?

MR. KATON:  Yes, and this is what this refers to, testimony that was elicited in that case.

THE COURT:  Is that the case you're talking about?

MR. PINHEIRO:  I don't know what -- I don't know, Your Honor, what case that he admitted to lying under oath in.  I refer to his deposition from this case, "Did you ever previously testify in a legal

652

proceeding where you lied under oath?  Yes."  That's all I wanted.  I don't know what case that was.  And I got this previous deposition, previous counsel.

MR. KATON:  This was within the testimony for the Sullivan case, or it could have been the Cusa case as well, and it falls within the ambit of --

THE COURT:  But let's -- tell me about -- your best belief, the motion that I resolved was to bring up anything about internal investigation.

MR. PINHEIRO:  Internal affairs.

MR. KATON:  Internal affairs, as well as any testimony regarding the internal affairs, and that was exactly what was elicited in the context --

THE COURT:  What does this deposition --

MR. KATON:  -- of the civil cases.

MR. PINHEIRO:  This is the deposition.

THE COURT:  I see that, but Mr. Katon, your representation to me is that he was under oath in what kind of proceeding?

MR. KATON:  He was under oath at a civil trial.

THE COURT:  What's that got to do with internal affairs investigation?

MR. KATON:  Because it was a question about his internal affairs investigation that elicited

653

that answer.

THE COURT:  Okay.  And he's in another civil case, though.

MR. KATON:  That's correct.

THE COURT:  I'll go with you on that one. I think it goes to his credibility, and I don't think it's subject to my ruling, and he can answer that, and you can move on.  You're not going to ask anything else other than did you ever, and of course if he says he didn't, then you can go do the drill.

MR. PINHEIRO:  I will, Your Honor.

THE COURT:  And tell me, Mr. Katon, just so it's real clear to me, it's credibility, it's the same issue we had on the other witness I've forgotten, but he said he lied under oath before, tell me why I'm wrong.

MR. KATON:  The context of the testimony was given while there was an ongoing State's Attorneys investigation into the behavior and the conduct of his superior officers.

THE COURT:  Well, let me interrupt you. Let me say this.  I'm going to let it in.  You'll have the right to have it on direct, let him explain it, if that helps.  If you think it adds more fuel to the fire you don't have to.  But I think it's important, I

654

think it's relevant, and certainly not in any way in my recollection was resolved by the motion in limine. If I said anything in writing or orally, I didn't know what I was talking about, because I didn't know this. You think I'm wrong about my recollection, wrong that I did know this and said no, he can't testify?

MR. PINHEIRO:  This never came up.

MR. KATON:  I viewed it as being within the ambit of the motion.

MR. PINHEIRO:  At the same time, Your Honor, my next question after this one, my question's going to be, Inspector Coppola, Officer Coppola, did you ever testify in a criminal trial.

THE COURT:  That is within the ruling.

MR. PINHEIRO:  Okay, then I won't ask it.

THE COURT:  You ask the question, he's going to answer yes or no, and if he says no, then you can say read that, does that refresh your recollection, and then did you, in fact, say -- just, you know, you got two sentences there.  You can read yours, and I'll let you do it that way, and he can read his answer.  Now, you can bring it up, Mr. Katon, on your direct, redirect, whatever it would be.  Okay?

MR. PINHEIRO:  Thank you.

(End of conference at sidebar)

655

THE COURT:  All right.  If you repeat your question, and the witness may answer your question.

MR. PINHEIRO:  I will, Your Honor.

BY MR. PINHEIRO:

Q   Mr. Coppola, did you ever previously testify in any legal proceeding that you had lied under oath?

A   Yes.

Q   Thank you.

MR. PINHEIRO:  Your Honor, may I return to counsel table to get two exhibits?

THE COURT:  Yes.

MR. PINHEIRO:  Thank you.

BY MR. PINHEIRO:

Q   Mr. Coppola, may I direct your attention to my exhibit book right there?  Yes, sir.  And it would be Plaintiff's 71, Bates number 466.

A   I got it.

Q   Consisting of two pages, 466 and Bates 467. Could you please review that, briefly.

THE COURT:  Excuse me, again, what is the exhibit number?

MR. PINHEIRO:  It's Plaintiff's Bates number 466 and 467.

THE COURT:  But exhibit number?

656

MR. PINHEIRO:  71, sir.

THE WITNESS:  Okay.

BY MR. PINHEIRO:

Q   Have you seen that document before?

A   No.

Q   May I direct your attention, sir, to Plaintiff's Exhibit 72.  That would be Bates 468 and 469.  A two-page document.  Once you locate it, can you briefly just review it?

A   Okay.

Q   Have you seen that document, Plaintiff's 72, before today?

A   No.

MR. PINHEIRO:  No further questions, Your Honor.

THE COURT:  All right.  Mr. Katon.  And I assume that you're going to take Mr. Coppola as we doing other witnesses, you'll be taking your case in chief as well as what would be redirect if it were straight up?

MR. KATON:  That is correct, Your Honor. Thank you.

THE COURT:  All right, thank you.  You may proceed.

MR. KATON:  Your Honor, with the Court's

657

permission, may I approach the witness with --

THE COURT:  Absolutely.

MR. KATON:  -- some exhibits?

THE COURT:  Proceed.

MR. KATON:  Thank you, Your Honor.

CROSS-EXAMINATION BY MR. KATON:

Q    Good morning, Mr. Coppola.

A    Good morning.

Q    As I understand your testimony, you're currently employed with the Chief State's Attorneys Office, is that correct?

A    That's correct.

Q    And you're employed as an inspector?

A    Police inspector.

Q    And do you have a particular assignment that you are attached to as a police inspector?

A    I am in the cold case violent crimes unit.

Q    And for what --

THE COURT:  Excuse me.  Move that mike.

THE WITNESS:  I'm sorry, Your Honor.

THE COURT:  There you go.

THE WITNESS:  Cold case violent crimes unit.

658

BY MR. KATON:

Q    Is that for a particular area?

A    Yes.  It's in the shooting task force in New Haven, Connecticut.

Q    And could you walk us through -- when did you receive that assignment?  Excuse me.

A    Recently, about four months ago, five months ago.

Q    And how long have you been an inspector with the Chief State's Attorneys Office?

A    Seven years.

Q    And was that subsequent to your retirement?

A    Correct.

Q    And could you give the jury a little bit of your history and background as to how you got into the New Haven police force and how you progressed through the ranks?

A    I became a police officer in New Haven in 1989.  I spent approximately three years in the patrol division operating a blue and white, a 9-1-1 vehicle. I was promoted to the plainclothes narcotic enforcement unit for several years, about three or four years.  During that time I was federally deputized in the FBI violent gang task force investigating Connecticut's top five street gangs.  I

659

also worked in an undercover capacity by narcotics in Hartford for the FBI. After that I went back to narcotics, and then in 1995 I received the Gold Shield. I became a detective with the New Haven Police Department. I was there about three, four years in the sex crime vice unit, then was promoted to -- not promoted -- I was transferred to general investigation, major crimes, where I investigated homicides and violent incidents. I spent my career there for 18 years, and then I retired from the New Haven Police Department after I applied to become a police inspector on March 17th of 2006, became a police inspector, worked in the office of the State's Attorney in Danielson, Connecticut for the State's Attorney there, and while I was there I spent approximately eight months to a year part-time in New London County cold case homicide unit, and I transferred, put in for a transfer to our corporate headquarters at Rocky Hill in the cold case violent crimes unit, and that's where I've been.

Q    Thank you. And I'd like to draw your attention, if I could, to the date of July 25th of 1999. Were -- or those hours just preceding midnight and the late hours, if you will, of July 24th of 1999. Do you have a recollection of the events that occurred

660

on or around that time period?

A    Yes.

Q    And could you first tell the jury what your assignment was as of July 24, 1999 to July 25th, 1999?

A    I was in the major crimes unit as a detective.

Q    And were you tasked to a particular squad within that unit?

A    Yes.

Q    And does it have a name?

A    It's called B squad, which is 4 do 12.  4 p.m. to 12 a.m.

Q    So had you worked on July 24th of 1999, the day immediately prior to the 25th?

A    Yes.

Q    And did you work a 4 to 12 shift?

A    I did.

Q    And at the conclusion of your shift what occurred?

A    I received a phone call at home from -- it was a communication from a supervisor at that time.

Q    And as a result of that communication, what did you do?

A    I went back to work.

Q    And what was the reason for you coming back to work?

661

A     A homicide.

Q     Now, when you arrived back at One Union Avenue, the address of the New Haven police station, what occurred next?

A     I went in my police car and my police radio and then went to the scene.

Q     Did you hook up with Detective Rodriguez at some point?

A     Yes.

Q     And was there any sort of briefing that occurred at One Union Avenue prior to your departure to the scene?

A     Not that I recollect, no.

Q     Fair enough.

Now, as I understand the facts in this case, there were, in fact, two scenes associated with the shooting on July 25th of 1999, is that correct?

A     Correct.

Q     And you said that you proceeded to the scene. Did you proceed to the scene with Detective Rodriguez?

A     I'm not sure if we went together or in separate cars.

Q     And which scene did you proceed to?

A     I went to the scene where the vehicle was secured.

662

Q    And what was the purpose of proceeding to the scene where the vehicle was secured?

A    Because I wanted to look at the scene.

Q    And based on the testimony that's occurred thus far, that was South Frontage Road?

A    Yes.

Q    And that's in close vicinity to Yale New Haven Hospital?

A    Correct.

Q    And what, if anything, did you do when you arrived at the scene of where the vehicle had come to rest?

A    What I did was just look at the crime scene itself, where everything was secured and taped off.

Q    Did you make any observations that you can recall at this point regarding that scene?

A    I remember seeing shell casings and blood in the vehicle.

Q    And did you then proceed somewhere else after viewing the spot where the red Suzuki Samurai had come to rest?

A    Yes.

Q    And where did you go next?

A    I went to the hospital.

Q    And what was the purpose of going to the

663

hospital?

A    The victim was there.

Q    Did you have any interaction with the victim, Anthony Lucky, Jr., when you arrived at the hospital?

A    No.  He was deceased.

Q    So he was deceased by the time you had arrived at the hospital?

A    Correct.

Q    And did you have the opportunity to view the deceased's body of Anthony Lucky, Jr. at that time?

A    I did.

Q    And tell the jury, if you could, how that came to pass?

A    There was a doctor working in the trauma room and I went to the body.  I spoke to the doctor, and he let me view the body.

Q    And if you could describe to the jury how much of the body you got to review, or view, would be a better term, at that point in time?

A    From the head down to his waist.

Q    And were you able to observe everything in terms of a wound on the front of Anthony Lucky, Jr.'s body?

A    Yes.

Q    And what did you observe?

664

A    There was a bullet hole, what appeared to be a bullet hole in the front of his body.

Q    And were there any conversations that transpired with any of the emergency room personnel regarding the nature of the wound suffered by Anthony Lucky, Jr.?

A    The doctor.

Q    And the doctor told you what?

A    He told me that he had a -- that that hole in his abdomen was an entry hole from a bullet.

Q    And is that the sole information you received regarding the nature of Anthony Lucky, Jr.'s wound in the early hours of July 25th of 1999?

A    Correct.

Q    After reviewing the body of Anthony Lucky, Jr. at the --

A    I believe he -- I looked -- I saw -- there were actually two holes; one in his -- in the back, and one in the front.

Q    And after you saw the body of Anthony Lucky, Jr., where did you go next?

A    I went up to the detective bureau of the New Haven Police Department.

Q    And what was the purpose for returning there?

A    Because there was two subjects inside the

665

vehicle with Anthony Lucky when he was shot and killed, and they were upstairs in the detective bureau.

Q    And were they under arrest at that point in time?

A    I believe so, yes.

Q    And what was the purpose of your -- withdrawn.

Did you go and interact with, speak with those subjects?

A    Yes.

Q    And can you identify for the jury who those subjects were?

A    I believe I just interviewed Scruggs.

Q    Do you recall if you obtained a statement from Mr. Scruggs?

A    Yes.

Q    And do you recall anything of the nature of what Mr. Scruggs told you in his statement?

A    He told us that he believed he shot Anthony Lucky by accident.

Q    And did you provide him with any coaching as to what his rendition of the events were?

A    No.

Q    If I could draw your attention to the witness --

666

A    Excuse me, I did talk to him about the shooting itself, you know, and my views of the body.

Q    And did you indicate to him what the doctor had told you about what the entry wound was?

A    Yes, I did.

Q    And I'd like to have you turn your attention, if you would, to the exhibit book that's been placed in front of you by me.  Is that mine?

A    Yes.

Q    Okay, thank you.  And I'd like to draw your attention to a document that's been marked A-39.  And the first page of that document bears a Bates stamp number of 0267.  Have you located that?

THE COURT:  Which document again, sir?

MR. KATON:  It is Defendant's A-39, beginning with the Bates stamp number 0267.

THE WITNESS:  Okay.

BY MR. KATON:

Q    Can you identify that document, sir?

A    It's an application affidavit for a search and seizure warrant.

Q    And who is the affiant or the person who applied for that search and seizure warrant?

A    Myself and Detective Schaller.

Q    And do you recognize your signature appearing

667

on the affidavit portion of that application?

A    I do.

MR. KATON:  I'd move the admission of A-39 as a full exhibit, Your Honor.

THE COURT:  Mr. Pinheiro?

MR. PINHEIRO:  No objection, Your Honor.

THE COURT:  Without objection, admitted as Defendant's A-39.

(Defendant's Exhibit A-39, received in evidence)

MR. KATON:  Thank you.

If I may, Your Honor, request permission to publish Bates number 0268 from that exhibit to the jury?

THE COURT:  You may.

MR. KATON:  Thank you.

BY MR. KATON:

Q    Mr. Coppola, Inspector Coppola, drawing your attention to what's been marked as Bates page 0268 from the exhibit that we've marked as A-39, and there is a narrative of events that occurred within the body of that document, correct?

A    Correct.

Q    And did you compose that narrative?

A    Correct, myself and Detective Schaller.

Q    And I would draw your attention to what has

668

been marked -- well, what is indicated as paragraph 4.
Do you see that?

A    Yes.

Q    And it indicates that Lucky was suffering from a single gunshot wound to the chest, correct?

A    Correct.

Q    And that was placed in this document based upon the understanding of what you had received from the ER personnel at Yale New Haven Hospital, correct?

A    Correct.

Q    And that was the only information that you and the New Haven Police Department had in the early hours of July 25th, 1999, as to the possible cause of Anthony Lucky, Jr.'s death, correct?

A    Correct.

Q    Now, I know there was some questioning by Mr. Pinheiro in the course of his examination of you regarding things you did in connection with the investigation, and he pointed to a particular time period running, I believe, from July 25th of 1999 to roughly November 8th of 1999.  Do you recall that line of questioning?

A    Yes.

Q    And he confronted you with a deposition that you gave in this case, correct?

669

A    Correct.

Q    And at the time that you gave your deposition, were you provided with any of the relevant reports that were generated prior to your deposition?

A    No.

Q    So essentially you were going cold into this deposition, correct?

A    Yes.

Q    And as I understand it, that deposition occurred some nine years after the shooting at issue?

A    Correct.

Q    And how many other crimes, if you could estimate, had you investigated in the time frame between July 25th, 1999, and the date of your deposition in 2008?

A    Many.

Q    Can you ballpark it for us?

A    It would be difficult because not only was I assigned homicides and shootings, but I also assisted in many others, so it would be difficult to put a number on it.

Q    Now, as a result of the application for a search and seizure warrant that you generated, that was signed by a judge of the superior court, correct?

A    Correct.

670

Q    And did you come to learn on July 26 of 1999 as to whether that warrant had, in fact, been executed?

A    Yes.

Q    And as a result of that execution, did you become aware of any information garnered by the Bureau of Identification with respect to the red Suzuki Samurai that was involved in the shooting incident?

A    I did.

Q    Now, before we go there, could you just explain to the jury -- I mentioned it, but I'd like to hear your description of it -- what does the B of I or Bureau of Identification do?

A    It processes crime scenes whenever there's a major incident like this one.  That vehicle was seized as evidence.  It's their responsibility to go there and process it, blood, DNA, ballistic evidence, whatever's written on the front page to be seized or examined, it's their job to process the vehicle, to process a crime scene.

Q    And while the B of I is part of the general Investigative Services Unit, correct?

A    Correct.

Q    It's separate and apart from what the detectives do, correct?

671

A    Correct.

Q    And do the detectives have any responsibility with respect to the cataloging and collecting of physical evidence at crime scenes?

A    No.

Q    What are the detective's responsibilities?

A    To investigate the crime itself.

Q    Now, let me ask you again another general question.  You've investigated homicides in New Haven before, correct?

A    Correct.

Q    And in connection with the investigation of a homicide, have you done so as a lead detective?

A    Yes.

Q    And the lead detective's responsibilities are to oversee in general the entire collection of evidence from all of the various elements of the department, is that fair to say?

A    Of that particular investigation, yes.

Q    And is there any sort of volume or compendium or document that is put together by the lead detective for presentation, or to document the investigation, to present in connection with an application for an arrest warrant for a particular individual?

A    Yes.

672

Q    And what is that volume called?

A    They just call it a binder there, you know, a book.

Q    Have you heard the expression "the book"?

A    The book.

Q    How about the homicide book?

A    Homicide book, that's another one.

Q    Have you had occasion in your career and when you were assigned as a lead detective to prepare a homicide book?

A    I have.

Q    Now, I took a minor diversion so I apologize, but there were a couple general concepts that I wanted the jury to get a general frame of reference for.  We left off on July 26th of 1999 post execution of the search warrant for the red Suzuki Samurai, correct?

A    Correct.

Q    And do you come to learn any information from the B of I on July 26 of 1999?

A    I do.

Q    And can you tell me what you learned?

A    I learned that in examining -- you're talking about in the examination of the vehicle itself?

Q    Well, I understand from what you said the vehicle had been seized as evidence.

673

A    Correct.

Q    And the warrant had been served, and certain investigative actions had been undertaken by the Bureau of Identification at the police garage on 730 Sherman Parkway, correct?

A    Correct.

Q    And as a result of those activities, were you informed of any evidence that was gleaned from the vehicle regarding the shooting trajectory at issue in the Anthony Lucky, Jr. homicide?

MR. PINHEIRO:  Objection, Your Honor.

THE COURT:  What's the basis of the objection?

MR. PINHEIRO:  Hearsay.

THE COURT:  Restate your question, or if it's hearsay just roll -- either restate your question, or if it's hearsay just roll over.

MR. KATON:  Well, it's not actually offered for the truth of the matter asserted.

THE COURT:  Ask the question again, and we'll talk back and forth about it.

MR. KATON:  Thank you, Your Honor.

BY MR. KATON:

Q    What information, if any, did you derive from the Bureau of Identification with respect to the

674

trajectory of the bullets that were shot at the red Suzuki Samurai on July 25th of 1999?

THE COURT:  Don't answer that.  Let's have a sidebar.

(Conference held at sidebar)

THE COURT:  I'm wrong as much as I'm right, but this is the first time that I really had to think.  Now, it seems like you can say did he get information from whatever, yeah, but then you're asking specifically the information he got from this agency about the trajectory of the bullet, and you're saying, well, it's not being offered for the truth of the matter that's asserted by that representation, but it is used for what purpose then?

MR. KATON:  It's going to inform the evolution of the investigation.

THE COURT:  Okay.  And this was because what you're trying to show is in the course of the investigation different documents came in at different times?

MR. KATON:  Correct.

THE COURT:  And that ultimately led to the arrest --

MR. KATON:  Correct.

THE COURT:  -- of the Plaintiff in this

675

case?

MR. KATON:  Correct.

THE COURT:  Mr. Pinheiro, I understand now, but I had to think about this one, because it wasn't as benign as the other ones.  What you got to say about that?

MR. PINHEIRO:  I think you should get the author of this investigation here, the people who did it, let them testify to their own scientific results.

THE COURT:  I'll overrule the hearsay objection.  I'll allow the witness to answer.  Ask the question again and it'll be answered, again, for the purposes I said, the explanation Mr. Katon gave.

(End of conference at sidebar)

THE COURT:  You may proceed and restate the question.

MR. KATON:  Thank you.

BY MR. KATON:

Q    Inspector Coppola, on July 26 of 1999, did you come to learn some information as a result of the investigation performed by the Bureau of Identification on the red Suzuki Samurai?

A    I did.

Q    And what was that information?

A    I was told that a bullet hole was located in

676

the rear tire, the back door of the Suzuki Samurai.

Q    And was any information conveyed to you in terms of how that determination was made?

A    I don't recollect.  I know through their examination, whatever they did, they located a bullet.

THE COURT:  You could move on, counselor.

MR. KATON:  Fair enough.

THE COURT:  That would be beyond the scope of the Court's ruling.

MR. KATON:  Fair enough, Your Honor. Thank you.

BY MR. KATON:

Q    Did you come to learn any information on July 26 of 1999 regarding the results of an autopsy performed by the chief medical examiner of the State of Connecticut?

A    I did.

Q    And what were the results that you learned?

A    That Anthony Lucky was shot in the back.

Q    Now, I want to bring forward in time your first encounter with Mayra Mercado.  Do you recall that?

A    Yes.

Q    And can you tell us where you first met Mayra Mercado with respect to the Anthony Lucky, Jr.

677

homicide investigation?

A    I believe it was at the police department.

Q    And do you recall what your interactions with her -- what interactions you had with her at that time?

A    I'm not sure if it was the police department, I know it was twice, so I get confused a little bit, which incident was which, because we met her one time in court.  It might have been court first.

Q    Okay.  Let's focus on your involvement at that meeting that occurred at court.  Were you there when Ms. Mercado gave her taped statement?

A    Yes.

Q    And did you have an opportunity to observe Ms. Mercado when you were there?

A    Yes.

Q    And did she show any signs of exhaustion?

A    No.

Q    And could you describe her demeanor?

A    She appeared fine.

Q    Did she exhibit any signs of intoxication on either alcohol or elicit drugs?

A    Not that I could recollect, no.

Q    And did she express a willingness to cooperate with the investigation of the Anthony Lucky, Jr.

678

homicide?

A    Correct.

Q    And during the course of her statement, do you recall who it was that actually took her statement?

A    I believe it was Inspector Rodriguez.

Q    And do you have any recollection of any threats lodged by Detective Rodriguez as to Ms. Mercado?

A    To be honest, I didn't even remember being there at first, and there was something that happened there that reminded myself of being at the court at that -- because I wasn't -- I didn't really participate in the questioning of her for that statement.

Q    And what was that particular thing that happened that tweaked your memory?

A    I remember being in the room, and I was leaning back on my chair, the chair fell over, so I knew it was at court, so that's how I remembered, it being in court that day, and that was the day that she was interviewed.

Q    And did you -- did there come a time where you participated with Detective Rodriguez in visiting Rosa Mercado at 156 West Street in New Haven, Connecticut?

A    No.

Q   Did you have any -- were you part of any effort to retrieve any notes from Rosa Mercado?

A   No.

Q   I'd like to draw your attention to what we've marked preliminarily here as Defendant's Exhibit A-10. And that bears Bates number 0029.  If you might take a moment to look at that exhibit.  Kindly let me know when you've had an opportunity to review it.

A   A-9 you said?

Q   A-10.

A   Oh, I'm sorry.

Okay.

Q   Have you read the entire document?

A   No.

Okay.

MR. PINHEIRO:  Your Honor, may --

BY MR. KATON:

Q   Does that document refresh your recollection?

THE COURT:  Sidebar.

(Conference held at sidebar)

THE COURT:  I might be wrong, is this the note that's the subject of the stipulation that we talked about based on the Court's ruling?

MR. KATON:  That is correct, Your Honor.

THE COURT:  And before I ask anything

680

else, did -- I'll get to what you got.  You showing me something, Mr. Pinheiro?

MR. PINHEIRO:  Yes, sir.

THE COURT:  I'm the one that called the sidebar.  Maybe you were getting ready to, but -- we showed you this, and Defendants were okay with it, Brendan's note last night, and you said you would look at it.  Are you okay with that?

MR. PINHEIRO:  Yes, sir.

THE COURT:  Okay.

MR. KATON:  And I have a finalized version of that that we can give to the Court.

THE COURT:  Okay.  Since we're over here and Mr. Pinheiro's got something he wants to show me --

MR. PINHEIRO:  I thought this was subject to the redaction order, any message regarding this.

THE COURT:  I don't recall that.  And I thought we were saying that the note -- that's what the purpose of the stipulation was.  Brendan, you look at it, because -- tell me if I'm wrong.

MR. KATON:  No, I believe you're correct, Your Honor.  I didn't believe that's subject --

THE COURT:  Brendan's got a better memory than all of us, maybe.  Certainly better than me.

681

MR. PINHEIRO:  All right, Your Honor.

THE COURT:  Okay, thank you.  So you got the finalized version?

MR. KATON:  I do, Your Honor.

THE COURT:  What I'm going to do, I'm just going to read this.  This goes in the record. I'm going to tell them about a stipulation again. Okay?

MR. PINHEIRO:  Thank you.

(End of conference at sidebar)

THE COURT:  All right, ladies and gentlemen of the jury, we have a document that's about to be tendered, to be offered into evidence, and there was a stipulation that was reached by the lawyers for the parties.  Remember, a stipulation is something that's agreed to, based on the Court ruling, a ruling that I made previously, and this is the stipulation. And this is in reference to Defendant's A-10, the note that you're about to offer.

MR. KATON:  To be specific, A-10 is the report regarding the note.

THE COURT:  Okay, I'm sorry.  But this is the appropriate time for us to read the stipulation, Mr. Katon?

MR. KATON:  Yes, Your Honor.

682

THE COURT:  Mr. Pinheiro?

MR. PINHEIRO:  Yes, sir.

THE COURT:  Okay.  So here's the stipulation.

Any copy of, reference to, or testimony regarding a certain note consisting of the following, "Junito is a good target, Myra better keep her mouth closed, Rosa, you know who," -- and that's the end of the quote -- is being offered for the limited purpose of establishing or demonstrating the state of mind of the law enforcement officers, state attorneys, investigators, and all other employees of the state attorneys office.  It is only entered into evidence to demonstrate what the law enforcement officers, state attorneys, investigators, and all other employees of the state attorneys office relied upon in conducting their investigation regarding the murder of Anthony Lucky, Jr., and in taking certain actions with respect to the witnesses in the criminal prosecution.  It's not, however, being entered into evidence in this case to establish the identity of the author or to establish whether the note contained a viable threat or for the truth of the matter asserted in the note.

Did I correctly read the agreed to stipulation, Mr. Pinheiro?

MR. PINHEIRO:  Yes, you did.

THE COURT:  Did I, Mr. Katon?

MR. KATON:  You did, Your Honor.

THE COURT:  All right.  Ken, if you'd go ahead, this will be stipulation number 2.

MR. PINHEIRO:  Your Honor, if I may, could we have a sidebar for a second?

THE COURT:  Yes.

(Conference held at sidebar)

THE COURT:  Yes?

MR. PINHEIRO:  That note does not contain this language, referring to --

THE COURT:  Let me just read this.  I was thinking about the -- let's just say this.  This is the third paragraph of Defendant's A-10.  It says, "Rosa believes the letter is from Mayra's boyfriend, Gary Session, also known as Shabazz, who Rosa states is a major drug dealer within the City of New Haven.  Rosa fears Shabazz and believes that he would harm her family if he knew that Mayra had spoken to the police.  The undersigned took custody of the letter, which was later placed into evidence within the police property room located at One Union Avenue."

Now, I don't think this has ever come up.  Or did it come up?

684

THE LAW CLERK:  It did, but we didn't fully address it, I don't think, specifically to this paragraph this way.

THE COURT:  Right.  So Mr. Pinheiro, state the basis of -- you said it should be redacted. What's your basis for just objecting to the third paragraph and why you want it redacted.

MR. PINHEIRO:  Allegations of prior bad acts, it was our motion in limine, prior bad acts, arrests, convictions, any kind of bad conduct, and that clearly is.

THE COURT:  Well, even if it's not that, Mr. Katon, why would it survive 403?

MR. KATON:  Your Honor, I didn't view it as being within the ambit of the prior bad act.

THE COURT:  Well, he brings it up whether it is or not.  I'm looking at this document now, and focusing on it now, and like I said, I can't say for sure had we not had the sidebar request if I'd have come back to it, but I might have, because I just -- the first time I really focused on it was the sidebar. To me it's just any kind of probative value that might have would be greatly outweighed by its prejudicial effect.

MR. KATON:  I would not seek then to

685

offer this exhibit at this time, but would offer a redaction of that particular paragraph.

THE COURT:  Okay.  So in other words, that means you won't publish it to the jury, you'll do it through another witness.

MR. KATON:  Correct.

THE COURT:  Okay.  Thank you all very much.

MR. PINHEIRO:  Thank you, Your Honor. Thank you for reconsidering.

THE COURT:  Yes, thank you for bringing it to my attention.

(End of conference at sidebar)

THE COURT:  You may proceed, Mr. Katon.

MR. KATON:  Thank you, Your Honor.

BY MR. KATON:

Q    Inspector Coppola, having reviewed that document, is your recollection refreshed at all as to events that occurred on November 6th of 1999 with respect to Rosa Mercado?

A    I don't remember going there.

Q    Fair enough.  Thank you.

THE COURT:  Look over there and see people rubbing their arms and saying my hands are really cold?  Look at the guys out there, they got

686

their arms all crossed.

You may proceed.

MR. KATON:  Thank you, Your Honor.

BY MR. KATON:

Q    Inspector Coppola, there was some discussion that you had engaged in this morning regarding credibility of people who offer information in connection with homicide investigations.  Do you recall that?

A    Yes.

Q    And I believe you were asked questions with respect to a witness's mental acuity, a witness's history of drug use, and a witness's history of prescription medication or things of that nature.  Do you recall that?

A    Yes.

Q    What's the process you go through in terms of evaluating whether or not that witness would be a functioning witness for purposes of relating events?

A    There's a list of questions you go to before you start the pertinent questions regarding the incident, like your name, your date of birth, where you live, can you speak, high school, there's a list of questions prior to that.

Q    Are they oriented to their surroundings, can

687

they communicate with you?

A    Yes.

Q    And do you look for active evidence of intoxication or influence of substances?

A    You can usually tell by looking at someone, slurring of speech, you know.

Q    Now, you were involved with the taped statement of a witness named Sharon Adkins.  Do you recall that?

A    Yes.

Q    And there came a point in time where Sharon Adkins was brought to Union Avenue in order to give her statement?

A    Yes.

Q    And you participated in connection with the recording of that statement?

A    Correct.

Q    And at that point in time did you have occasion to observe the demeanor of this witness, Sharon Adkins?

A    Yes.

Q    And could you describe her demeanor to the jury, please?

A    She appeared okay, good enough to give a statement to me.

Case 3:03-cv-00943-TLM  Document 395  Filed 02/04/14  Page 105 of 231

688

Q   Did she show any signs to you, based on your experience, of being under the influence of any sort of elicit substances?

A   No.

Q   Alcohol?

A   No.

Q   Was she showing any visible signs of withdrawal from chemical substances?

A   No.

Q   And did she conduct herself in a lucid manner?

A   Yes.

Q   And did anyone threaten or coerce her in any way to give her statement?

A   No.

Q   Inspector Coppola, could I ask you to please turn your attention to what has been marked as A-29 of the Defendant's exhibits.

THE COURT:  29 did you say, sir?

MR. KATON:  A-29, yes, Your Honor.  And it begins at Bates stamp 0137.

THE COURT:  0 what?

MR. KATON:  0137.

THE COURT:  I'm looking at C, excuse me. Proceed.

MR. KATON:  Thank you.

689

BY MR. KATON:

Q    Inspector Coppola, have you located that document?

A    I got it.

Q    Do you recognize that document?

A    Yes.

Q    And what is that document?

A    This is a typed transcribed statement of Sharon Adkins.

MR. KATON:  At this point in time, Your Honor, I move this as a full Exhibit A-29.

MR. PINHEIRO:  No objection.

THE COURT:  Admitted without objection, Defendant's A-29.

(Defendant's Exhibit A-29, received in evidence)

BY MR. KATON:

Q    Now, in the context of questioning from Plaintiff's counsel this morning you were asked about errors which may have occurred with respect to certain dates in the context of her statement.  Do you recall that?

A    Yes.

Q    And correct me if I'm wrong, but there was a realization the day after when the statement got back in timing that there were errors as to dates?

690

A    Yes.

Q    And what transpired, then, after the realization that there were errors as to dates in the Sharon Adkins statement?

A    She was called back in.

Q    And did she come back in?

A    Yes.

Q    Did she do so freely?

A    Yes.

Q    And when she came back in, do you recall if she signed off on the actual date mistakes --

A    Yes.

Q    -- that occurred in her transcribed statement?

A    Yes.

MR. KATON:  And if I might publish to the jury, Your Honor?

THE COURT:  You may.

MR. KATON:  Thank you.

BY MR. KATON:

Q    I'd like to call your attention, Inspector Coppola, to Bates stamp 0148, which is a page from Plaintiff's A-29.  And there's an indication toward the bottom of the page, third line from the bottom, that there was an answer that said August.  Do you see that?

691

A    Yes, I do.

Q    And do you see initials next to the August?

A    Yes.

Q    And those initials are SLA, correct?

A    Correct.

Q    And who did that represent?

A    Sharon Adkins.

Q    And then there's ER.  Who does that represent?

A    That would be Inspector Edwin Rodriguez.

Q    Now drawing your attention, if I could, to Bates stamp 0165, which is the second to the last page of that statement.

MR. KATON:  And with permission, may I publish that to the jury?

THE COURT:  You may.

MR. KATON:  Thank you.

BY MR. KATON:

Q    And about one-third of the way down in the course of the statement you'll see there's a reference to another date?

A    Yes.

Q    And there are initials that appear next to that answer as well?

A    Correct.

Q    And that SLA designation is there as well?

692

A    Yes.

Q    And I understand your prior testimony to mean that's the initials of Sharon Adkins?

A    Correct.

Q    And then there's an ER that's there as well.

A    Edwin Rodriguez.

Q    Okay.  Now, you were asked by Plaintiff's counsel if there was anyone else present, and the exact question was, at the statement of Sharon Adkins, and you answered no, correct?

A    Correct.

Q    Because at the statement, which occurred the day before, there was no one there but you and Defendant Rodriguez.

A    Correct.

Q    And when she came back the day after, she wasn't giving a statement, was she?

A    No.

Q    And at the time she came back, the supervisor, Bryan Norwood, was there, correct?

A    That's correct.

Q    And these errors as to dates were brought to Lieutenant Norwood's attention, correct?

A    Correct.

Q    And he as consented to this mechanism of

having Ms. Adkins address those errors by initialing the statement, correct?

A    Correct.

Q    Now, some discussion was also engaged in by Plaintiff's counsel with regard to the notion of the difference between a confidential informant, a registered informant, and a confidential registered informant, correct?

A    Correct.

Q    Now, registered informants are informants that have to exhibit these indicia of reliability that you spoke about in connection with Mr. Pinheiro's questioning, correct?

A    Correct.

Q    And those indicia of credibility for registered informants actually get set forth in the body of an arrest warrant application, correct?

A    Correct.

Q    And registered informants are informants that get paid for their information, correct?

A    Correct.

Q    And confidential registered informants are those informants who do not want their names known but are registered and getting paid, correct?

A    That's correct.

694

Q    And contrast that to what's otherwise known as a CI.

THE COURT:  You'll have to answer, sir.

THE WITNESS:  You want to know what the difference is?

BY MR. KATON:

Q    Yes.

A    It's one that just calls the police department and provides information.

Q    So for example, when a crime occurs in an environment where the populus is not accustomed or willing to put their name out there in connection with a police investigation, is it uncommon to use the designation CI to refer to that person?

A    Correct.

Q    Thank you.

MR. KATON:  I have nothing further.

THE COURT:  All right.  Recross.

Mr. Pinheiro, this would be what came up during direct of Mr. Katon, right?

MR. PINHEIRO:  Yes, sir.

REDIRECT EXAMINATION BY MR. PINHEIRO:

Q    Mr. Coppola, what was the date of Anthony

695

Lucky, Jr.'s date of death?

A    July 25th, 1999.

Q    Can I direct your attention to what was
Defendant's Exhibit -- you probably have it out.

A    I don't, but I'll get it.

Q    A-29, Sharon Adkins' statement.

A    Okay.

Q    What event was Sharon Adkins being questioned
about?

A    Pardon?

Q    What event was Sharon Adkins being questioned
about?

A    The Anthony Lucky homicide.

Q    On July 25th, 1999?

A    Correct.

Q    Would you please show the jury where in Sharon
Adkins' statement she states July 25th, 1999?

A    On what portion of it?

Q    Anywhere.

A    Anywhere?

Q    Anywhere.

A    I don't see it in there.

Q    It's not mentioned in there even once, is it?

A    No.

Q    Could you please tell the jury what date

696

Sharon Adkins is referring to in her statement?

A    She says August.

Q    August what?

A    I'd have to find it again.

Q    It's in there quite a few times.

A    August 16th.

Q    What year?

A    It just says August 16th.

Q    That's the statement that you used, you and your partner, Detective Rodriguez, used to corroborate Mayra Mercado's statement?

A    Correct.

Q    Sir, moving on to a different subject, I believe you stated to Attorney Katon when he asked you a few questions was that the first time you saw Mayra Mercado was at court when she gave her statement, correct?

A    I believe so.

Q    And do you know the date of her audiotaped statement?

A    The what?  I'm sorry.

Q    Do you know the date of her audiotaped statement?

A    I don't.

Q    Do you have my exhibit book out?

697

A    I can get it.

Q    May I direct your attention to Plaintiff's 9.

A    Okay.

Q    It's Bates 098.

A    Yes.

Q    Are you familiar with that document?

A    Yes.

Q    Does that help refresh your recollection as to the date of Mayra Mercado's audiotaped statement?

A    Yes.

Q    And what would that be?

A    11/8/99.

Q    Moving on to a different subject.  If I heard correctly, sir, regarding the police report that Mr. Katon referred to, which was a certain note, questions concerning a note from Rosa Mercado, do you remember the questions?

A    Yes.

Q    And was it your testimony, sir, that you have no recollection of that?

A    I don't remember going to see Rosa.

Q    Okay.  You stated previously that you had a process to determine if a witness is functioning properly?

A    Correct.

Q    And you stated that you would start first by asking the witness's date of birth, I think high school grad, address, correct?

A    Correct.

Q    When the witness then gave that information, would you then afterwards check to see if that person was right, does live at that address?

A    Not at that time.

Q    Would you ever do that, to make sure that they live there?

A    Possibly, yes.

Q    Well, if he gives you an address, you want to make sure that's correct?

A    Yes.

Q    And would you check to see if their date of birth was correct?

A    Yes.

Q    Why would you check those fundamental -- fundamental information about a person?

A    We probably would have had that before the statement.  If someone gave us a name of someone in particular, you check them in the computer, find out where they live and what their date of birth was, and usually print their picture, too, so when we go there we know exactly who we're looking for.

Q    If you did not have that information beforehand, would you then follow up with it to check on it, make sure it's accurate?

A    You should, yes.

Q    What about if a witness said that the witness had a child with the individual the witness is accusing, would you consider that to be relevant information?

A    You could, yes.

Q    Because the witness may have an ulterior motive, correct?

A    Correct.

Q    So was that something that you would want to check up on to make sure there was a child between the two, the witness and the accused?

A    Yes, you could.

Q    Did you do that in this case?

A    I did not, no.

Q    Do you know if your partner, Rodriguez, did?

A    I do not know.

Q    Getting back to the July 25th, 1999, you had a conversation with the emergency room doctor, correct?

A    Correct.

Q    And at that time, the morning, he gave you information that the bullet may have entered through

700

the front of the chest of Anthony Lucky, Jr., correct?

A    Correct.

Q    And that information would have coincided with Juan Scruggs' transcribed statement where he says he accidentally shot his friend, right?

A    Correct.

Q    And is that relevant information?

A    Yes.

Q    Solve the crime, right?

A    Did it solve the crime?

Q    Solve how Anthony Lucky got shot right there?

A    It helped.

Q    But at that time you had no other witnesses.

A    Correct.

MR. PINHEIRO:  No further questions, Your Honor.

THE COURT:  All right.  Redirect, Mr. Katon.

MR. KATON:  Nothing, Your Honor.

THE COURT:  All right.  The witness is excused for the duration, I suspect, then, Mr. Pinheiro?

MR. PINHEIRO:  Yes, sir.

THE COURT:  Mr. Katon?

MR. KATON:  Yes, Your Honor.

701

THE COURT:  Thank you very much, sir.

All right.  You may all remember, on the jury, George Gobel.  Anybody?  Probably not.  You do. Remember what he used to say?  I see by the old clock on the wall it's time to -- we're five minutes to 1. I tell you what, we're going to break, we'll use that five minutes, if you have a little more leisurely lunch.  We'll be back here at 2.  Thank you again on behalf of the parties, attorneys, and the Court for your patience and attention here today.  I hope you have a nice lunch.  Remember not to discuss the case among yourselves or with anyone else at lunch.  See you at 2 o'clock.

(Recess)

THE COURT:  Good afternoon, ladies and gentlemen.  You will recall Mr. Pinheiro was about to call his next witness.

MR. PINHEIRO:  That's correct, Your Honor.

THE COURT:  Who is that?

MR. PINHEIRO:  Mayra Mercado.

(Mayra Mercado, sworn by the clerk)

THE CLERK:  If you would please state your name for the record, spell your name, and give us the town in which you reside.

702

THE WITNESS:  Yes.  My name is Mayra Mercado, M-A-Y-R-A, M-E-R-C-A-D-O, and I reside in New Haven.

THE COURT:  You may proceed, Mr. Pinheiro.

MR. PINHEIRO:  Okay, thank you, Your Honor.

DIRECT EXAMINATION BY MR. PINHEIRO:

Q    Ms. Mercado, are you currently employed?

A    Yes, I am.

Q    And where is that?

A    I work for Popeye's at TA in Branford, New Haven, Connecticut.

Q    Is that TA Travel Centers?

A    Yes.

Q    What do you do there?

A    I'm an AGM.  I'm an assistant general manager.

Q    What's your highest level of education?

A    Ninth grade.

Q    And have you had any other training or education after ninth grade?

A    Yes.

Q    Could you please state it for the record?

703

A    Yes.  I got my GED when I was incarcerated, and I also went to training in Colorado for Popeye's. I was away for like six weeks, so I learned the basics of running a franchisee.

Q    When did you attend the management training?

A    In November.

Q    Did you successfully complete the training?

A    Yes, I did.

Q    What type of things did you learn there?

A    Financial, running a business, numbers, money, payroll, inventory, running the shift, dealing with the customers.

Q    Now, could you please state to the jury, what do you do at work?  What's your typical workday?

A    My typical workday is from 10 to 8 o'clock at night.  I run the shift.  I have about six employees during one shift.  I do count money, safe, I do a little bit of inventories, paperwork, so forth.

Q    Do you have any children presently?

A    Yes, sir, I do.

Q    How many?

A    I have one.

Q    Is it son or daughter?

A    It's a little girl.

Q    How old is she?

704

A    She's six years old.

Q    What's your typical morning like?

A    I get up in the morning, I get my daughter ready for school, I send her off to school, I get myself ready and I go to work.

Q    What's your daughter do after school?

A    She attends tap and ballet and karate classes.

Q    And then when you get out of work who picks her up?

A    My mom does, my mother.

Q    And in the evening what do you usually do on a typical work week?

A    I work, I take care of the baby.  On the weekends I attend church.

Q    You go out anymore?

A    No, I don't.

Q    What happened in the ninth grade?  Why did you -- what happened after the ninth grade with your education?

A    I started getting high.

Q    Did you drop out of high school?

A    Yes.

Q    You say you started getting high, how old were you, approximately, at that time?

A    About 17.

705

Q    And when you said you started getting high, would you please tell the jury what's "getting high" mean, what were you doing?

A    I was using drugs.

Q    What kind of drugs were you using at that age?

A    I was using cocaine and smoking crack.

Q    And how long did you use drugs for?

A    I used it from 17, and I went into a program in 2006.

Q    And do you know how long were using the drugs for?

A    Ever since I dropped out of school.

Q    Did there come a time where you stopped using drugs?

A    During the whole time, no, not until 2006.

Q    Oh, okay.  And how old were you in 2006?

A    I don't know, 25.

Q    About that age?

A    About that age.

Q    So about ten years you were using drugs?

A    Yes.

Q    During this time period did you have any kind of job?

A    No.

Q    How did you support yourself?

706

A    Selling drugs, in any way I could get it.

Q    Were you ever arrested?

A    Yes.

Q    Do you know how many times?

A    So many times.  Too many times.  I can't really count how many times.

Q    Do you know what you were arrested for?

A    Possession of narcotics.

Q    Mostly drug related offenses?

A    Yes, all drug related.

Q    Now, were you ever in jail?

A    Yes, I was.

Q    Do you know how many times?

A    I can't even -- more than once.

Q    A number of years?

A    Yes.

Q    Now, did you ever attend any type of drug treatment programs?

A    Yes.  While I was incarcerated I completed Tier 1 and Tier 2, and I also did Crossroads.

Q    Incarcerated, where would that be?

A    In Niantic, the women's jail facility.

Q    And you had some drug rehab there?

A    Yes.

Q    Was that a voluntary -- Mayra, any time you

707

don't understand a question, just let me know. Sometimes I have a habit of tripping over my words, so just let me know.

A    Sure.

Q    While you were incarcerated was the drug treatment program mandatory, did they make you do it, or did you do it on your own?

A    It was mandatory.  It was mandatory.

Q    How did you feel about that mandatory treatment at the time?

A    Well, at first it was like I just had to do it, I just had to do it, but I did it while I was incarcerated, I mean.

Q    Did it help?

A    Somewhat.

Q    You mentioned Crossroads.  Could you please explain to the jury what Crossroads is?

A    Crossroads is a drug facilitator for high tolerance people that are very drug addicted.  It's a family -- it's a family and women's center where they help you with various things, and working with your addiction.

Q    Was that while you were in jail or outside?

A    I was outside.

Q    Do you remember what year you went to

708

Crossroads?

A    Yes, I do.  2006 to 2007.

Q    And do you remember how long that program was for?

A    Six to nine months.

Q    Do you remember how long you were there for?

A    Approximately eight months.

Q    Why did you go to Crossroads?  How did it happen?

A    I was pregnant with my daughter, so I was getting high, and I just wanted to get my life together, and I was getting high, using drugs while I was pregnant, so I wanted to get myself together so I could try to be a good parent, a mother to my child.

Q    At that time do you remember what your status was in relation to your criminal charges that you had been serving time for?

A    Can you repeat that again?

Q    Sure.  When you went to Crossroads, were you on probation or parole?

A    I was on probation.

Q    Do you know the difference between probation and parole?

A    Parole you're still part of the Department of Correction.

709

Q   So what happened at that time with regard to your probation officer?

A   Well, I was still getting high, I was still using drugs heavily, and I just woke up one day and I just felt like I needed to get away, get myself together and get rehabilitated, so I talked to my probation officer, and he made the phone call, and I went to Crossroads.

Q   What kind of drugs were you using at that time?

A   I was using crack cocaine, cocaine and marijuana.

Q   You were pregnant at this time?

A   Yes, I was.

Q   And do you remember the date that your baby was born?

A   Yes.  10/7/2006.

Q   Where were you at that time?

A   I was in Crossroads.

Q   When you gave birth, in respect to the custody of your child, what happened?

A   DCF got involved because I still was using. They placed my daughter in foster care until I got myself together.

Q   At Crossroads would you please explain to the

710

jury what kind of -- what did you learn at Crossroads, what happened?

A    Wow.  I learned how to be clean and sober today, but just to take everything one step at a time, to be -- I got parenting skills, financial, how to manage my money, how to pay my rent, how to live on my own, and be an independent mother.

Q    Are you drug free today?

A    Yes.

Q    Do you remember the last time you used drugs?

A    Wow.  A long time ago.  About two thousand -- seven years.

Q    When you were using crack cocaine, how do you use crack cocaine?

A    I smoked it.

Q    When you smoke crack cocaine, how much do you smoke at a time?

A    A lot.  A very lot.  A lot.

Q    And how often -- now, my next question is going back to the time period 1999.  In around those years, were you using crack cocaine at that time period?

A    Heavily.

Q    Do you remember how often you would be smoking crack during that time?

711

A    From the time I got up until the time I passed out.

Q    Can you please state to the jury what it was like using crack cocaine at that time, what your life was like?

A    It was very horrible.  It ruined my life.  I lost so much behind it, that I can't pretend or get back or change.  And when I look at it today, I can't believe that I was that person.

Q    This time when you were using drugs, crack --

A    Yes.

Q    -- did you have like a normal day, during the day, go to bed at night?

A    No.

Q    What was it like?

A    It was rough.  I didn't have normal days.  I didn't have a normal life, like everybody in the world would have.  I didn't have that.  All I cared about was getting high, and I was getting my drugs and that was it.  Nothing else mattered.

Q    In 1999 do you remember where you were living?

A    On West Street.

Q    Were you living with your parents there?

A    Well, my parents lived on West Street, but I stayed anywhere drugs was at.

712

Q    Growing up were any members of your family involved in drugs?

A    Not that I know of.

Q    Now, do you recognize the Defendant?

A    Yes, I do.

Q    And do you know who he is?

A    He's Detective Rodriguez.

MR. PINHEIRO:  May the record reflect --

THE COURT:  He's the gentleman that's standing up?

THE WITNESS:  Yes, he is.  He's the gentleman right there.

THE COURT:  The record may reflect the witness has identified the Defendant.

BY MR. PINHEIRO:

Q    How do you know the Defendant?

A    He was the one that told me to state the statement that I gave, back in 1999.

Q    Do you know where you first met him?

A    Lockup.

Q    When you say lockup, where would that be?

A    New Haven lockup.

Q    Is that the courthouse lockup, do you know?

A    I think so.

Q    I don't mean to be funny, but --

713

A    Yes.

Q    I guess one jail cell is the same as another one.

A    Yeah, they all look the same, bars.

Q    When you saw him that day, did you have a court date?

A    Yes.

Q    Were you going to court for your drug offenses?

A    Yes.

Q    Do you remember the date when you first saw him?

A    November 8th, '99.

Q    Did you know the Defendant before November 8, 1999?

A    No, sir.

Q    The week or two prior to November 8, '99, do you remember where you were, what you were doing?

A    I was getting high, sir.  I was using drugs.

Q    And on November 8, 1999, do you remember how you got there?

A    No, I don't recall how I got there.

Q    Do you remember the date that you made -- that you were arrested in about that time?

A    No, I don't.

714

Q    Please state to the jury how -- in detail, how you met the Defendant that day?

A    I remember that I was detoxing, really bad, and the Defendant was telling me about a murder case, and he just kept on in my ear and kept on, wanting to know about this murder case, saying that I knew what happened, and he just kept on and just kept on with it in my ear.

Q    Were you in lockup at this time?

A    Yes.

Q    Was there anyone else with you other than you and the Defendant?

A    Nobody else, just me and him.

Q    What else did the Defendant say to you, if anything?

A    Just that I had to tell him about the murder, so I can go home.

Q    Did he tell you anything else?

A    No.  He just kept telling me about the murder, about this kid dying.

Q    What did you tell him?  Did you say anything to him at that time?

A    I didn't have anything to say.  At that time. He just kept on and insisting and naming the names, and kept saying these names that I had no recollection

715

of.  He just kept saying the names, kept saying about the shooting and kept on.

Q    When you say he kept saying about the shooting, he kept saying the names, what do you mean by that?

A    Well, he was just basically telling me about the murder, about the shooting, that I knew, I was there.  You know what I'm saying?  Like I knew of it, of the situation that happened that day.

Q    Did you know anything about it?

A    No.

Q    When you say he told you about it, what did he say?

A    Just he kept saying that Shabazz had shot this kid, but at that time I had no recollection of that.  Again, I was detoxing.  It was all just his voice just kept playing and playing.

Q    Did he mention any other names to you that you remember today?

A    I don't remember.

Q    Were there any other names he was talking about?

A    He said -- I don't remember.  He said a couple of names at that time.

Q    At that time did you know the Plaintiff, Gary

716

Session?

A    No.

Q    Do you have a brother?

A    Yes, I have a brother.

Q    What's his name?

A    Ismail Mercado.

Q    Did his name come up in the conversation?

A    Yes.

Q    Could you please explain to the jury what happened?

A    He said if I didn't help him, that something bad would happen to my little brother.

Q    And what did you -- how did you interpret that?

A    I interpreted it either I help this man, or something will happen to my little brother.

Q    Do you know what an audiotaped statement is?

A    No, sir.

Q    You know what a sworn statement is, right?

A    Yes.

Q    Do you know what a tape recorder is?

A    Yes.

Q    Okay.  A recorded statement using a tape recorder?

A    Yes.

717

Q    On that date, did you give an audiotaped statement, do you remember?

A    It was so foggy back then, but yes.

Q    There's a black book in front of you?

A    Yes.

Q    That's an exhibit book.  Would you please open it?

A    Yes.

Q    I direct your attention to what is marked as Plaintiff's number 9 with my orange tags, number 9, and it's Bates 098.  Got that?

A    Yes, I do.

Q    Why don't you look at the cover sheet.  Why don't you look at that.  You can look through the pages, too, take a moment.

While you're looking, when you're looking, could you also direct your attention to the bottom of the page where the signatures are?

A    Yes.

Q    I'm going to ask you to confirm that that's your signature on each of the pages?

A    Yes.

Q    You recognize your signature?

A    Yes.

Q    Do you remember signing that?

718

A    Yes.

Q    And the first page in the top, you see where it indicates "date"?

A    Where it says what?

Q    The date?

A    Yes.

Q    And what's the date?

A    11/8/99.

MR. PINHEIRO:  Offer it as a full exhibit, Your Honor.

MR. KATON:  Without objection, Your Honor.

THE COURT:  Without objection admitted as Plaintiff's number 9.

(Plaintiff's Exhibit 9, received in evidence)

BY MR. PINHEIRO:

Q    At the top of the statement you'll see over to the right-hand side where it says "Place of Statement."  Do you see that?

A    Yes.

Q    Does this help you remember exactly where you were that day?

A    It says 1/21 Elm Street GA 6.

Q    And what is that?

A    I believe that's the courthouse.

719

Q    And what time did the statement start?

A    At 3:43.

Q    And the time it ended?

A    4:09.

Q    Now, other than, for instance -- directing your attention to the first page, Bates 098, where you give some basic information such as your name, your date of birth, and your address, is that information, correct?

A    Yes.

Q    Other than that type of basic information, does the -- have you seen this before?

A    No, I don't remember.

Q    When's the last time you saw it?

A    I guess when I made it.

Q    Back 14 years ago?

A    Yes.

Q    Now, do you remember any part of what you said when you gave your statement?

A    No, sir.

Q    Ms. Mercado, do you know what a preinterview is?

A    No.

Q    When you were giving this taped statement, did you see any type of recorder there?

720

A    I don't remember.

Q    If I could direct your attention, Ms. Mercado, the number at the bottom of the page is called a Bates number, and I'd like to direct your attention to Bates Number 100.

Towards the bottom third of the page you're asked the question:  "And who is Shabazz?"

And you respond:  "My kid's father."

Do you see that?

A    Yes.

Q    Do you remember who asked you these questions?

A    He did.

Q    The Defendant?

A    The Defendant, he did.

Q    When you responded "My kid's father," did you have any children at this time?

A    No, I didn't.

Q    Have you ever, ever had any children with the Plaintiff, Gary Session?

A    I have no kids with him.

Q    Why did you say that at the time?

A    Because that gentleman over there told me what to say.

THE COURT:  You can refer to him as Detective Rodriguez, and you don't have to point,

721

"that gentleman," so the record's clear.

THE WITNESS:  Okay.  Detective Rodriguez.

BY MR. PINHEIRO:

Q    Thank you.  At the bottom of Bates 100 it says:  "Where was this taking place at?

"His house," referring to Shabazz.  You know now Shabazz is a nickname for the Plaintiff, correct?

A    Yes.

Q    And next page, Bates 101, "Where is that located?

"West Haven."

Had you ever been over to the Plaintiff's house at that time?

A    No.

Q    And why did you make the statement to that effect?

A    Because Detective Rodriguez told me what to say.

Q    Referring your attention to Bates 102.  The question from the Defendant is:  "Now, in the room or in the apartment with you there is yourself, Shabazz and Jose.  Do you know Jose's last name?"

And you responded:  "No, I don't know Jose's last name."

At any time did you know Jose's last name?

722

A    No, I didn't.

Q    Where did you get the name Jose from?

A    Detective Rodriguez told me what to say.

Q    Next page is Bates 103.  Towards the middle of the page it says -- the question is --

MR. PINHEIRO:  Your Honor, may I publish this to the jurors as I'm reading?

THE COURT:  You're going to read it?

MR. PINHEIRO:  No, I'm just making certain selections, that's all, as I've done.  I'm not going to read the whole statement, Your Honor.

THE COURT:  Which page are you going to do that?  Because we'll need to know each page for the record and so defense counsel knows.

MR. PINHEIRO:  Yes.  It would be Bates 103 of Plaintiff's 9.

THE COURT:  Okay.

BY MR. PINHEIRO:

Q    There's a question here, Detective Rodriguez, it says:  "You --" and then there's blank, "-- stated in the preinterview that Shabazz gave you $10,000, is that correct?"

And your response:  "Yeah, to go to New York."

Is that true?

A    No.

723

Q    Have you ever had $10,000 in your life?

A    Never.

Q    Have you ever even seen $10,000?

A    No.

Q    How did you come out with the number $10,000?

A    Because Detective Rodriguez told me what to say.

Q    If I may direct your attention to what would be Bates 108.

MR. PINHEIRO:  May I publish it, Your Honor?

THE COURT:  Yes.

BY MR. PINHEIRO:

Q    And starting at the top of Bates 108, "Once he received a call and finished talking with Shawn, what happened next?"

And your response was:  "Nothing.  He was just -- he was like over.

"When he meant niggers about to get assed out, what do you mean by that exactly?"

Then there's a blank.  And then you respond with "Fucked with the wrong person at the wrong time, fucking with his money and like fucking with his girlfriend or his mother."

Question:  "He was saying all this to you?

724

"No, he was saying to me.

"In general?"

Your response, "Speaking out loud."

And then next question, "What happened after that, the 24th?"

Do you see a response there, Ms. Mercado?

A    See no response.

Q    And then, question:  "Something happen later on that night?"

No response, right?

A    Yes.

Q    Question:  "You stated on the 25th something happened?"

No response.

"On the 25th and what time was this on the 25th?"

And your response was:  "During the nighttime that it happened, but during the daytime."

Mayra, as you sit here today, do you know what you meant, if you remember, when you responded to the question "On the 25th and what time was this on the 25th, during the nighttime that it happened, but during the daytime"?

A    I don't remember.

MR. PINHEIRO:  Your Honor, if I may

publish the joint exhibit, federal transcript?

THE COURT:  Let's talk about this.  This is the transcript of the tape that was played, the recording that was played yesterday for the jury?

MR. PINHEIRO:  Correct.

THE COURT:  Which page?

MR. PINHEIRO:  It would be page 13, and it would be lines 1 through 16.

THE COURT:  Okay.  Go ahead.

MR. PINHEIRO:  Thank you.

BY MR. PINHEIRO:

Q    Now, Mayra, going back to the same questions we just went over in the transcript out of New Haven Police Department, and this is a federal court transcript, the question was:  "Okay, what happened after that, the 24th?

"Nothing, he just do like that.  He didn't really -- nothing really happened.

"Something happened later on that night?

"I don't know what --" indiscernible "-- 24th. I --" indiscernible.

Question:  "What happened?  You stated that something happened."

Answer:  "Yeah," indiscernible.

And then the question is:  "On the 25th, and

726

what time was this on the 25th?"

Your response was:  "It was the nighttime, whatever, because during the daytime I was -- I was -- I went to the block --" indiscernible "-- to drop off the B loads."

Do you remember making that statement?

A    I don't recall that.

Q    If I could direct your attention to Plaintiff's 9, the transcript that you have in front of you, and it would be Bates 111.

MR. PINHEIRO:  May I publish that, Your Honor?

THE COURT:  You may.

BY MR. PINHEIRO:

Q    Ms. Mercado, if I could direct your attention to the question on top:  "When you arrived was anybody there?"

And you state:  "No.  Shawn came up to me.  Shawn's up in the truck."  And we have a blank.  "Shabazz should be coming behind me in a few.  Then he got a call on his cellphone from Sharon."

Question:  "Who is Sharon?"

You answer:  "Sharon, Sharon was one of his workers.  I don't know her last name or nothing like that, but I know she was working for."

Did you know who you were referring to at that time?

A    No.

Q    Where did you get the name Sharon from?

A    I got it from Detective Rodriguez.

Q    If I might direct your attention to Bates 113.

MR. PINHEIRO:  And Your Honor, may I publish it?

THE COURT:  You may.

BY MR. PINHEIRO:

Q    Ms. Mercado, in the middle of the page, question:  "And you had your daughter with you, you took your daughter?

"Yeah, I took my daughter."

Is that the same -- you did not have a daughter back then, 1999?

A    No.

MR. PINHEIRO:  I believe this is the last one, Your Honor, Bates 118.  May I publish it, Your Honor?

THE COURT:  You may.

BY MR. PINHEIRO:

Q    Question is:  "First of all, when you said the car, what car started turning out?"

You respond:  "The CRX."

728

Do you see that?

A    Yes.

Q    Mayra, you understand when you give a false statement under oath it's a criminal -- it's a crime?

A    Yes.

Q    And you can get arrested and go to jail for that?

A    Yes.

Q    So you know -- did you know back in 1999 that you were giving a false statement?

A    No.

Q    How is that?

A    Well, I knew I was giving a false statement, but at that time I just wanted to get out and get high.

Q    Now, in or about that time, were you released from jail?

A    Yes.

Q    Do you know what a Witness Protection Program is?

A    It's a program where they put you away.

Q    For your safety?

A    Yes.

Q    Do you remember going into a Witness Protection Program?

729

A    I remember going to a hotel.

Q    Do you remember where the hotel was?

A    No.

Q    Was it in New Haven?

A    No.

Q    Do you remember -- your statement was November 8th, 1999.  Do you remember was it before or after the statement you went to the hotel?

A    I believe it was after.

Q    Do you remember how many days you went to this hotel, how many days after?

A    No, I don't recall.

Q    Did anyone give you any money when you went to the hotel?

A    They gave me some money.

Q    Do you know who gave it to you?

A    I don't recall who it was, but they came out to the hotel and brought me some money.

Q    Was it a check or cash?

A    I believe it was cash.

Q    Do you remember how much you got?

A    No, I don't.  I don't recall what was the amount.

Q    And was any -- did you have anybody with you when you stayed at the motel?

730

A    No, I was by myself.

Q    Do you remember any police officers making inquiry about where your children are or anything, do you remember anything like that?

A    No.

Q    How long did you stay at the motel for?

A    Until I received the money.

Q    And what did you do then?

A    I left.

Q    Where did you go?

A    I went back to New Haven.

Q    How did you get there?

A    I believe I hitched a ride.

Q    Why did you leave the motel?  You had shelter, a place to stay.

A    I was an addict and I wanted to get high.

Q    So what did you do with the money that they gave you?

A    I bought crack cocaine with it.

Q    And you started getting high again?

A    Yes, I did.

Q    After you left the hotel and got back to New Haven, do you remember if you had any court dates?

A    I don't recall.

Q    Do you remember ever going back to jail again?

731

A    Yes.

Q    So you must have got picked up by the police, right?

A    Yes.

Q    Do you remember when that occurred?

A    I don't know.  I don't recall.

Q    Do you remember ever testifying in any legal proceedings involving the Plaintiff, Gary Session, being charged with the crime of murder for the death of Anthony Lucky, Jr.?

A    Yes.

Q    Do you remember what kind of legal proceeding that was?

A    No, I don't remember the legal proceeding.

Q    Were you in jail at that time when you had to go back to court, go to court?

A    Yes.

Q    And do you remember how you got into jail or anything?

A    I don't recall how I got there.

Q    So you remember testifying at this legal proceeding?

A    Yes.

Q    Does the term hearing on probable cause ring a bell?

732

A    Hearing -- can you read that again?

Q    A hearing on probable cause.  If you know.

A    No.

Q    Well, you testified in something, right?

A    Yes.

Q    You do you remember testifying that day?

A    I remember, I recall vivid, but not --

Q    Do you remember testifying as to what you said in the statement?

A    Yes.

Q    Did you give the same testimony?  Was it --

A    I don't recall what I said that day.

Q    All right.  Do you know that your statement, Plaintiff's number 9, you know what it's all about?

A    No.

Q    After you testified at the hearing on probable cause, did you go back to jail?

A    I don't remember.  I don't think so.

Q    Did you go back to a Witness Protection Program?

A    No.

Q    Do you know what a promise to appear is?

A    Promise to appear is when they let you out on your word.

Q    Do you think you -- do you know how you got

733

out of jail?

A    I don't recall how I got out of jail, sir.

Q    In or about this time did you receive any more money from the state?

A    No.

Q    Did there come a time that you did receive any more money from the state?

A    No.

Q    Did there come a time after this first when you went to testify, did you have to go back to jail any other time?

A    Yes.

Q    Now, Ms. Mercado, at this time in 1999, did you ever know of Efrain Mendez?

A    No.

Q    Jose Santiago?

A    No.

Q    DeShawn Johnson?

A    No.

Q    Juan Scruggs?

A    No.

Q    Albert McCann?

A    No.

Q    Anthony Lucky, Jr.?

A    No.

734

Q    I think I asked you, did you know Gary Session?

A    No, I didn't.

Q    Do you recognize the name Mary DeLeon?

A    No, I don't remember.

Q    When you gave your recorded statement on November 8th, 1999, Plaintiff's Number 9, do you remember being shown any photographs?

A    I believe I was shown a couple of photographs, yes, I do.

Q    All right.  Now, may I direct your attention to Bates 120 of Plaintiff's 9.

MR. PINHEIRO:  May I publish that, Your Honor?

THE COURT:  You may.

BY MR. PINHEIRO:

Q    And do you see where it states the question: "The first photo board, the first photo board I showed you in the preinterview was of eight black males, is that correct?"

And you respond:  "Yes.

"Do you recognize anyone there?

"Yes, number 4.

"And who is that?"  Then it's a blank.

Did you identify anyone in the photographs?

735

A    I don't -- at that time?

Q    Did you pick anybody out?

A    I don't remember.  I was signing so many papers, I don't remember.  I don't recall who was -- I'm looking for my answer.  I have no answer.

MR. PINHEIRO:  And if I may continue, Your Honor, to publish the next page.

THE COURT:  You may.

BY MR. PINHEIRO:

Q    Bates 121, and question:  "Is this the same person who related to Shabazz?"

And you say:  "Um-hmm.

"Isn't it true that you signed this photograph, Mayra?

"Yes, I did.

"Isn't it true that myself and Sergeant Norwood also signed it?

"Yes.

"And that we gave it to you at the time?"

Question:  "Do you know Shawn's real name?"

Answer:  "No."

Do you remember how you were pointing out -- do you know how you were identifying these photographs?

A    Yes.

736

Q   How were you?

A   The whole time Detective Rodriguez was telling me.

Q   How was he telling you?

A   I can't remember.  Like, I can't recall actual things of what happened that day, but he told me which ones to sign.  I didn't know these people.  And I still don't know these people to this day.

Q   Is that what happened with all the photographs you were shown that day?

A   Yes.

Q   When you testified in that court proceeding involving the Plaintiff, were you truthful then?

A   No.

Q   Why were you lying then at the court proceeding?

A   Because I was an addict and I wanted to get out of jail.

Q   Ms. Mercado, may I direct you to Plaintiff's 72?  It's at the end of the book, and that'll be Bates 468.

I'm sorry, I'm going to start with Plaintiff's 71 first, and that'll be Bates 466.

Ms. Mercado, Plaintiff's 71, Bates 466, do you recognize this letter?

A    Yes.

Q    Is that your handwriting?

A    Yes.

Q    And the second page, Bates 467, do you recognize your signature?

A    Yes.

MR. PINHEIRO:  I'd like to offer it as a full exhibit, Your Honor.

MR. KATON:  Without objection, Your Honor.

THE COURT:  Without objection, Plaintiff's 71 is admitted.

(Plaintiff's Exhibit 71, received in evidence)

MR. PINHEIRO:  May I publish it, Your Honor?

THE COURT:  You may.

BY MR. PINHEIRO:

Q    Mayra, is this your handwriting?

A    Yes, it is.

Q    Did you write it?

A    Yes.

Q    It starts off by -- on the right-hand side is a date of January 2nd, 2001, correct?

A    Yes.

Q    Do you remember if this was written before or

738

after you testified in the legal proceeding you spoke

about regarding the Plaintiff, if you remember?

A    I don't recall.

Q    It starts off by saying, "Get me out with

probation.  Dear, Eddie Rodriguez.  Listen, why did

you said you was going to help me and did not.

Listen, this is your murder case, but this is what's

going on.  I caught Cruz and Rivera are two dirty cops

and willing to testify against them."  It looks like,

correct me if I'm wrong, "But listen, I'm in trouble

in jail.  There are a few bitches in here who pick a

fights with me as I write in Canning letter, they

broke my ribs and --" I would say "-- fucked up my

face, too.  I know there's a hit out for me in jail

cause my people told me don't tell me how people found

out."  No, I'm sorry.  "I know there's a hit out for

me in jail cause my people told me.  Don't tell me how

people found out but they did.  Remember Shawn has

people to and I know Shabazz is in jail too.  Come and

get me probation and get me out before my next court

date is March 14, 2000.  Please.  I'm afraid for my

life.  Please.  I know I could feel it, I won't make

it alive to my next court date.  I don't get out my

room, I don't eat because I'm scared.  Please talk to

whoever but get me out.  Oh if you can.  But I knew

739

you could.  Please get me probation for my --" I want to say "-- next court date which is March 1st --" I'm sorry "-- March 14, '01.  Please.  I am going to testify against them."

MR. PINHEIRO:  The next page, may I publish it, Your Honor?

THE COURT:  Yes.

BY MR. PINHEIRO:

Q    "Shawn, Shabazz, Willito and Lucy son."  I don't know what that word is.  Maybe "But please but get me out, please, I'm scared for my life.  Remember, a favor for a favor.  Just do something.  Talk to the state.  Please, Rodriguez.  I promise you I won't let you down this time.  Please.  I remember everything and willing to testify but only if you get me out.  Please.  I know I won't make it --" I'm not sure "-- and to see my son.  I won't make it out of here to see my son or family.  Love always, Mayra Mercado."

Mayra, do you remember writing that letter while you were incarcerated?

A    I don't recall.

Q    I'm sorry?

A    I wrote this.  No.

Q    You gave some information about Cruz and Rivera.  Who are they?

740

A    Two New Haven police cops.

Q    You said you had -- you were willing to testify against them.  What did you mean by that?

A    They were dirty cops.

Q    What do you mean by dirty?

A    They would be in the neighborhood, pull you over, take your drugs, take your money, and let you go and keep it.

Q    How do you know that?

A    They did it to many people.  Did it to me one time.

Q    The part here that says you got beat up and you had a broken rib, I'm having trouble finding it, but was that true?

A    No.

Q    The part here where it says remember, a favor for a favor, what's that mean?

A    That meant I lied for him, so a favor for a favor.  I lied for you, you get me out of jail.

Q    What do you mean by you lied for him?

A    Well, he told me what to say, so I basically went on with a lie that never happened.

Q    And that's the information that you gave him in your sworn statement, Plaintiff's number 9?

A    Yes.

741

Q    Going over this letter, does this help refresh your recollection whether this letter was written before or after the court date for the Plaintiff?

A    I still don't recall it.

Q    All right.  Did Mr. Rodriguez ever get back to you after you wrote this letter to him?

A    I don't recall, no.

Q    You eventually did get out of jail, right?

A    Yes.

Q    Did you serve any time, or were you put on probation, if you know?

A    I didn't serve no time, but I was on probation.

Q    And that was after this letter?

A    Yes.

Q    Did there come a time after that that you got arrested again, do you remember?

A    I believe, yes.

Q    Drug related offense?

A    Yes.

Q    Directing your attention to 72, and that would be Bates 468.  Have you got that, Mayra?

A    Yes, I do.

Q    And it's two pages 468, 469.  That's your handwriting?

742

A    Yes.

Q    This is your letter to Mr. Mike Canning?

A    Yes.

MR. PINHEIRO:  Offer it as a full exhibit, Your Honor.

MR. KATON:  Without objection.

THE COURT:  Admitted as Plaintiff's 72 without objection.

(Plaintiff's Exhibit 72, received in evidence.)

MR. PINHEIRO:  And Your Honor, did I offer 71 as a full exhibit?  My notes don't indicate.

THE COURT:  I think you offered it and it was admitted.  Right, Ken?

THE CLERK:  Yes, Your Honor, it's a full exhibit, number 71.

MR. PINHEIRO:  Thank you.

May I publish Plaintiff's 72?

THE COURT:  You may.

BY MR. PINHEIRO:

Q    Do you remember seeing this letter before, Mayra?

A    No.

Q    And it starts out by "Get me out I'm afraid I won't come home alive," dated January 2, '01.  "Dear Mike Canning, whass up.  For me I'm in jail.  Listen

743

to --" this looks like "-- stan this letter.  I'm telling you that yes I'm in jail.  Listen, to start I knew I had a warrant on, and Officers Cruz and Rivera knew I had a warrant.  They never did anything to me, only until the day on December 19th, 2000 when they both arrest me Cruz they stop two friends of mine and two --" looks like "-- blocks of heroin on them, and I saw them take it from them and I saw them put it in their pocks and let them go.  Then I watched them give it to their cousin who used to work heroin out of the red building on Congress.  Then I told them, oh, shit, you both are dirty cops.  Then they said that you are going to jail, for the warrant, for not minding your own business.  But Canning, please, I'm begging you, please forgive me for fucking up."  I don't know what that says, but "Please get me out.  I know Shabazz is in jail cause a group of ladies up here jumped me in the lunch room and broke one of my ribs and fucked my --"

MR. PINHEIRO:  May I publish the next page, Your Honor?

THE COURT:  Yes.

BY MR. PINHEIRO:

Q    "-- face up.  Please, people are all ready, now I don't know how but they know.  I'm in big

744

trouble up here and my friend told me that there's a contract out on me in this jail, so his girlfriend to tell their peoples up here in jail to put a hit out on me. I don't come out to eat. I'm so sick. I'm hurting back. Please get me out. I do anything, but I know I won't make it alive to see my next court date which is March 14th, 2001 alive. I know I won't come out alive to see my son or family. Trust me, he's want me dead. Please get me out, Canning, please. Love always, Mayra Mercado. p.s., please get me out with probation. I'm willing to testify against him. Please get me out. I'm telling you I won't get out alive. Talk to my public defender and the state you can please. His name is Mr. Shepherd. See you soon, I hope. God bless." I can't read that.

Mayra, in both of the letters you speak about you won't be able to come out, get out and see your son. Did you have a son?

A    No.

Q    Do you remember writing this letter?

A    I don't recall writing this letter.

Q    But that is your handwriting?

A    But it is my handwriting.

Q    Ms. Mercado, years after this incident and your release, did anyone approach you concerning this

745

case?

A    I don't recall.

Q    Any private investigator approach you at any time, maybe when you were incarcerated or afterwards, do you know?

A    Maybe incarcerated, but I don't recall.  I don't --

Q    Do you recall Mr. O'Donnell possibly, a private the investigator?

A    I don't recall.

Q    When was the first time you did meet the Plaintiff, Gary Session, if you remember?

A    I don't recall.

Q    You gave certain depositions, you were at a deposition?

A    Hmm.

Q    When you go to an attorney's office and there's a court reporter there taking everything down?

A    Yes.

Q    Do you remember giving a deposition in this case?

A    Yes.

Q    And that was some years ago, correct?

A    Yeah.

Q    You met Gary Session at that time?

746

A    Yes.

Q    Did you have occasion to meet Gary Session at any time before that?

A    No.

Q    Do you remember who contacted you about going to the deposition?

A    It's been a long time, so I can't recall who.

Q    Ms. Mercado, would you please take out Plaintiff's 9, your sworn statement.

MR. PINHEIRO:  Your Honor, may I publish just a couple more?

THE COURT:  This is Exhibit 9?

MR. PINHEIRO:  Yes, sir.

THE COURT:  In evidence?  Yes.

BY MR. PINHEIRO:

Q    Bates 102, Ms. Mercado, bottom of the page, 102, direct your attention to that.

The question was put to you, "And once you counted up the 10,545?"

Your answer:  "That's when Shabazz -- you know what I'm saying?  They was talking about the kids that had the bundles that Jose gave to the -- Jose said that he -- they never came back, they never seen them again.  They were supposed to meet up with -- meet up Howard -- I mean Howard -- I mean Hallock to tell him

747

what was going on because --" it's blank.

Do you have any idea what you're talking about there?

A    No.

MR. PINHEIRO:  If I may publish, Your Honor, Bates 103.

THE COURT:  You may.

BY MR. PINHEIRO:

Q    We left off with this question.

Question:  "You stated at the preinterview that Shabazz gave you $10,000, is that correct?

"Yes, to go to New York.

"New York to go where?

"To cop.

"What do you mean by cop?

"To get some drugs."

Do you remember saying that?

A    Yes.

Q    Where did you get that information from?

A    Got it from Detective Rodriguez.

MR. PINHEIRO:  If I may publish one before, Your Honor?

THE COURT:  You may.

BY MR. PINHEIRO:

Q    Question:  "How much drugs?"

748

You state, "With $10,000 I was supposed to get probably like a half a key, depending on how much.

"What kind of drugs?

"Crack cocaine, depending how much the grams were.

"When he gave you the $10,000, what did you do then?

"I went to New York.

"But did you leave the apartment right after that?

"No, I didn't leave the apartment right after that because I stood there.  Cause Jose and him was coming downstairs to talk about something, you know what I'm saying?

"Did you stay upstairs?

"No, I went downstairs right after."  Blank. "Turn up the music cause Shabazz started arguing so he went downstairs to listen to what was going on, and I know they was -- they were -- Shabazz was mad. Shabazz was arguing to Jose.  Shabazz said, well --"

THE COURT:  Slow down a little bit.

MR. PINHEIRO:  I'm sorry, Your Honor.

"Shabazz was arguing with Jose."  Blank. "Shabazz said, well, find him and hit him up.  Hit him up, meaning -- you know what I'm saying?  Pistol whip

749

him or whatever."

Question:  "So Shabazz was telling Jose this downstairs and you were not present but you were behind the door?

"Yeah, the door was closed.

Publish the next page, Your Honor?

THE COURT:  Yes.

BY MR. PINHEIRO:

Q    "And when he said hit him up, hit up who?

You response, blank, "I don't know who had it. I just know that somebody owed him on the strip $900. They asked," blank, "it's the man," blank.

"When you're saying the ones who owed him the money, is that the same young guys who owed him the $900?

"Yeah.

"And he told Jose to do this?"

Your answer:  "He said Jose, get somebody to hit him up, pistol whip him and bring him to the spot work it off penny by penny.  If not then dead him if they don't.

"What do you mean by dead him?

"Kill him."

Where did you get that information from?

A    I got that information from Detective

750

Rodriguez.

Q    Is that information true and accurate?

A    No.

Q    Did that actually happen?

A    No.

Q    Were you anywhere --

MR. PINHEIRO:  If I may, Your Honor?

BY MR. PINHEIRO:

Q    In regards to July 25th, 1999, the early morning hours, were you anywhere in the vicinity of Howard and Columbus Avenue, New Haven, Connecticut?

A    No.

Q    Continue on page 105.  The question that Mr. Rodriguez gives you is that "Back on September 24th, in the preinterview you told me something happened on September 24th.  Do you remember what happened?"

You say, "Shabazz got a call from Shawn from the Getty gas station over here," blank, "telling him and they --"

Do you remember meeting with Detective Rodriguez on September 24th?

A    No.

Q    This was the first time that you met with him, November 8, 1999?

A    Yes.

751

Q   Do you know what that is all about, the reference to September 24th at the preinterview?

A   I'm sorry, I have no recollection.

Q   If I may direct your attention to Bates 099.

MR. PINHEIRO:  If I may publish it, Your Honor?

THE COURT:  You may.

BY MR. PINHEIRO:

Q   "Back on August, excuse me, July 24th, you stated to myself and Sergeant Norwood and Sergeant Canning that you heard about something that is going to go on, is that correct?"

A   Yes.

Q   Did you meet with Detective Rodriguez back on July 24th, 1999, the day before the Lucky shooting?

A   No.

Q   Did you ever, ever have any knowledge whatsoever about the Anthony Lucky shooting?

A   No, I didn't.

Q   If you had any knowledge that you did have, where did you get it from?

A   I got it from Detective Rodriguez.

MR. PINHEIRO:  No further questions, Your Honor.  Thank you.

THE COURT:  All right, Mr. Katon.

752

Let's go ahead and take a break, ladies and gentlemen of the jury. We are going to break, let's say until 3:30. I have to talk to the lawyers for a couple minutes, and it'll give us roughly ten minutes.

So I remind you not to discuss the case among yourselves when you retire to the jury room.

Ms. Mercado, I want to tell you, now that your testimony has begun, you're not to discuss that testimony with anyone, including the lawyers. You understand?

THE WITNESS: Yes, I do.

THE COURT: All right. I thank you members of the jury. All rise for the jury.

(Jurors excused)

THE COURT: Let me ask Mr. Pinheiro, where are we now compared to where you thought we'd be in getting through the trial?

MR. PINHEIRO: I'm considering this evening, Your Honor, eliminating some of the witnesses to speed things along. I think I may be able to. I intend to put Sharon Adkins on the stand today, and start off tomorrow with a full day of testimony. Mr. Lawlor has a conflict this afternoon, he has to attend graduation, so I'm going to try and put him on first

thing in the morning.  I would normally put Detective Rodriguez, the Defendant, on next, I think he's going to be lengthy, but Attorney Zehe has a witness flying in from Virginia that he says he has to get on and off tomorrow.  I don't mind accommodating him.

THE COURT:  This case is not likely to finish Friday, though.

MR. PINHEIRO:  I think I'm going to go to Friday.  I think Friday I'll finish my witnesses. Depends on Rodriguez, how long it takes.

THE COURT:  And then the Defendant has some witnesses that are standalone witnesses that haven't been called yet?

MR. ZEHE:  Yes, Your Honor.  We have -- well, with tomorrow's witness we have five all together.

THE COURT:  Okay, but some of them will be taken out of the way counting the guy --

MR. ZEHE:  Tomorrow we'll take care of one.

THE COURT:  Okay.  And the other thing I wanted to ask you all was -- I didn't tell you so I can't remember.  Must not have mattered.  I don't remember.  We'll see you guys back here in ten minutes.

754

MR. ZEHE:  Thank you, Your Honor.

(Recess)

THE COURT:  All right, ladies and gentlemen, Mr. Pinheiro I believe will call the next witness, or we taking the witness out of turn, I forgot.

MR. PINHEIRO:  Mr. Katon is going to do cross.

THE COURT:  Ma'am, you followed my instruction, you didn't talk to anybody, right?

THE WITNESS:  No.

THE COURT:  You realize you remain under the same oath to tell the truth in this matter, right?

THE WITNESS:  Yes.

THE COURT:  Ladies and gentlemen of the jury, if you think I'm bad now, wait until tomorrow and Friday and the next day.

All right, Mr. Katon.

MR. KATON:  Thank you, Your Honor.

CROSS-EXAMINATION BY MR. KATON:

Q    Good afternoon, Ms. Mercado.  My name is Tom Katon, and I represent Edwin Rodriguez.

THE COURT:  By bad I meant remembering

755

things.  I know you-all understood that.  Never mind.

Go ahead, Mr. Katon.

MR. KATON:  Thank you, Your Honor.

BY MR. KATON:

Q    Ms. Mercado, I'm a little confused.  You testified on direct that you only had one child, correct?

A    Yes.

Q    Isn't it true you have a son as well?

A    No.

Q    You don't have a son named Josh?

A    No.

Q    You never gave birth to a child named Josh?

A    No.

Q    You never lost Josh to DCF?

A    No.

Q    Do you remember taking a deposition in my office, Ms. Mercado, you came to my office, there was a court reporter there, you sat down and you were put under oath much like you were today?

A    I don't recall that day.

MR. KATON:  With the Court's permission, may I approach the witness?

THE COURT:  You may.

BY MR. KATON:

756

Q   I show you a copy of a deposition, Ms. Mercado.

A   Yes.

Q   And it's dated February 4th of 2008, and it indicates that it's the continued deposition of Mayra Mercado.  Do you recognize that?

A   Yes.

Q   Now, if you would, could you turn to page 30 of the transcript that I've placed in front of you.

I'm sorry, did I give you the wrong volume?

A   I believe you gave me the wrong one.

Q   I apologize.  I did indeed, you're correct.

MR. KATON:  May I approach the witness again, Your Honor, with the first volume of --

THE COURT:  You may do that.  Go ahead, Mr. Katon.

MR. KATON:  Thank you, Your Honor.

BY MR. KATON:

Q   May I have that one?  I apologize.  Thank you.

If you would, ma'am, referring now to Volume 1 of the deposition of Mayra Mercado, and could you turn to page 30, please.  And the lines are 9 through 12.  Would you kindly read that to yourself.

A   What page was it?

Q   It's page 30.  And actually why don't you

757

start at line 6 and read to yourself through line 13.

Have you read those lines, ma'am?

A     Yes.

Q     Does that refresh your recollection as to your testimony regarding your son on the day of your deposition?

A     I don't recall.

Q     Well, ma'am was the question asked at line 6, "You were speaking about your son prior to the break," and your answer was?

THE COURT:  What does that line say?

THE WITNESS:  It says umm.

BY MR. KATON:

Q     And his name is Josh?

A     And I said umm.

Q     You said umm-hmm, didn't you?

A     Umm-hmm.

THE COURT:  Just like you just said, umm-hum.

THE WITNESS:  Uh-huh.

THE COURT:  Okay.

BY MR. KATON:

Q     And it's true that you did lose Josh to DCF, correct?

A     And it says uh-huh.

758

Q    And that was because when you were pregnant with Josh you were using drugs, correct?

A    It says uh-huh.

Q    So when you testified regarding a letter, I believe it was marked as Plaintiff's Exhibit 71, a letter to Eddie Rodriguez, and you concluded that you want to make it out alive to see my son or family, that wasn't a lie, correct?

A    Said what?  Can you give me that again?

Q    Sure.

MR. KATON:  If I may approach the witness, Your Honor.

THE COURT:  You may.

MR. KATON:  Actually I can do it probably based on what you have.

BY MR. KATON:

Q    I'd like to show you this letter, ma'am.  And isn't it true you identified that as a letter that you wrote to Detective Rodriguez from prison?

A    Yes.

Q    And in fact, you identified your signature on the back of that letter, correct?

A    Yes.

Q    And that letter is identical in all respects to the letter that was put before you by Plaintiff's

759

counsel marked Exhibit 71?

A    Yes.

            THE COURT:  You may, Mr. Katon.

            MR. KATON:  I'm sorry.  Thank you.

            May I now publish this to the jury?

            THE COURT:  You may, too.

            MR. KATON:  Thank you.

BY MR. KATON:

Q    And ma'am, you concluded this letter, if I'm reading your writing correctly, that "Please, I know I won't make it alive to see my son or family," correct?

A    Correct.

Q    And the son you were referring to was Josh, correct?

A    I guess.  I don't recall.

Q    Okay, you don't recall.

Do you now recall, however, that you had a son named Josh?

A    I don't have a son named Josh.

Q    And did you give birth to a son named Josh?

A    No.  I only gave birth to a little girl.

Q    So when you testified at your deposition that you had a son named Josh, that was incorrect?

A    I don't recall even saying that.  I mean --

Q    So your answer is you don't recall?

760

A    No.

THE COURT:  You can approach again.

MR. KATON:  May I approach again?

BY MR. KATON:

Q    Thank you, ma'am, just going to grab that.

Now, as I understand it, in July -- excuse me -- in 1999, you were living at 156 West Street?

A    Yes.

Q    And that's a location that's in the Hill?

A    Yes.

Q    And your mother lived there?

A    Yes.

Q    And her name's Rosa?

A    Yes.

Q    And is it fair to say that Rosa's a drug addict, too?

A    Back then she wasn't.

Q    Was she selling drugs?

A    Not to -- I didn't know.

Q    How about your father, Ismail?

A    My father?

Q    Yes.  Is his nickname Fish?

A    Yes.  His nickname.

Q    His nickname is Fish?

A    Yes, but his real name is Ismail.

761

Q    His real name is Ismail?

A    Yes.

Q    Just like your younger brother, Ismail, correct?

A    Yes.

Q    And Ismail, your younger brother, is also known as Geno, correct?

A    Yes.

Q    Now, my question, however, was, was your father a drug dealer?

A    I have no recollection of that.

Q    No recollection of that.

Now, you also wrote a letter to Sergeant Canning, which Plaintiff's counsel spoke to you about. Do you recall that?

A    Yes.

Q    And how is it that you came to know Sergeant Canning?

A    I don't even remember.  I remember his name, but I don't -- I don't remember.

Q    Isn't it true, ma'am, that Sergeant Canning served a search warrant at 156 West Street in 1999 and came upon you in the house at that time?

A    There was many officers.

Q    There were many officers?

762

A    Yes.

Q    So but you can recall a search warrant being served on the home?

A    Yes.

Q    And do you recall being taken into One Union Avenue at that point in time by the officers who served the search warrant?

A    I don't recall.

Q    You don't recall that?

A    Un-un.

Q    Now, ma'am, you were shown extensively a transcribed statement by Plaintiff's counsel.  Do you recall that?

A    Yes.

Q    Now, I believe my notes are correct, that transcribed statement was marked as Plaintiff's Exhibit 9, correct?

A    Yes.

Q    Ma'am, to your right is a book of exhibits. Those would be exhibits that have been proposed by the Defendant.  Could you take a look at that book?

     Thank you.  Could you draw your attention to what has been marked as Exhibit A-30.

A    I have a paper that says Sharon Adkins here.

Q    The tab that's marked 30.

A    Yes.  There's no tab.

Q    Ma'am, could I ask you to review A-30 before I ask the next question.

Do you recognize that to be an identical copy of what was otherwise marked as Plaintiff's Exhibit 9 when you were questioned by Plaintiff's lawyer?

A    Yes.

Q    And just so we're clear here, your signature appears on this transcribed statement, correct?

A    Yes.

Q    And it appears on each and every page of that transcribed statement, correct?

A    Yes.

Q    Thank you.

And now, the gist of what I took away from your testimony is that you're claiming that everything in that document, except for your introductory information, is a total pack of lies, correct?

A    Yes.

Q    And it was all information that was supplied by you, excuse me, supplied by Detective Rodriguez to you?

A    Yes.

Q    And you conceded to signing all of this because you felt that you were detoxing at the time?

764

A    I signed it so I could get out of jail, and that's what he offered me, at the time, when this was going on, sir.

Q    So it wasn't because you were detoxing, it was because you wanted to get out of jail, that you signed it?

A    Of course.

Q    And as I understand it, your testimony is that Detective Rodriguez made a threat against your brother.

A    Excuse me?  Can you repeat that again?

Q    Sure.  My understanding of your testimony --

A    Umm-hmm.

Q    -- is that at the time you gave the statement --

A    Umm-hmm.

Q    -- it was because Detective Rodriguez had made a threat against your brother.

A    Threat against my brother?

Q    Yeah.

A    The threat was something was going to happen to my brother.

Q    So Detective Rodriguez was afraid that something was going to happen to your brother?

A    That's what he told me.

765

Q   Well, if your father's involved in drugs and your mother's not there and if you were to go to jail, something might happen to your younger brother, correct?

A   Exactly.

Q   Now, you gave a second statement to Detective Rodriguez, did you not?

A   Yes.

Q   And Detective Coppola?

A   Detective who?

Q   Coppola?

A   Yes.

Q   And you didn't talk about the second statement that you gave in your direct testimony, correct?

A   I don't understand.

Q   Sure.  Maybe my recollection's imperfect, but I didn't hear that you talked at all about your second statement when you were answering questions from the Plaintiff's lawyer.  Is that correct?

A   Correct.

Q   But you remember giving that second statement, correct?

A   I gave so many, I can't remember which one.

Q   And do you remember the content of that?

A   No, I have no recollection of the contents of

766

it.

Q    Well, we have two exhibits marked as joint exhibits here, and one of them is a transcript from the federal court reporter, and another is a tape that's actually a CD, and both contain the statement that you gave on the second occasion.  So what I'm going to do right now is play that for you, and ask you if that refreshes your recollection as to what you said.

A    Sure.

(Audiotape played)

THE COURT:  Stop just a minute.

Ladies and gentlemen of the jury, let me just remind you what I said yesterday.  If what you hear is different from what you read, it's what you hear is what counts.  Okay?  It's almost nonsensical, but that's also the law, so I need to tell you that.

Proceed.  I'm sorry to interrupt.

(Audiotape continued)

BY MR. KATON:

Q    Ms. Mercado, does listening to that tape and watching the transcript scroll on the monitor refresh your recollection as to the statement you provided to Edwin Rodriguez on December 5th of 1999?

A    I don't remember giving it.  I don't.  It's my

voice.

THE COURT:  I'm sorry, I didn't understand what you said.

THE WITNESS:  I said it was my voice on there, I gave it, but I don't have -- like I don't remember what date or --

BY MR. KATON:

Q  And ma'am, growing up in the Hill, is Berney's located at the corner of Columbus and Howard?

A  Yes.

Q  Now, is it your testimony, Ms. Mercado, that that statement was all a pack of lies, too?

A  Yes.

Q  You don't remember it, but you can judge it to be a pack of lies here today?

A  Yes, because nothing happened.

Q  Ma'am, if you could, I believe -- let me --

MR. KATON:  If I may approach the witness, I have another set of exhibits.

THE COURT:  You may.

BY MR. KATON:

Q  Ms. Mercado, if you could please direct your attention to what's designated as Defendant's Exhibit F.  There's a tab there.

Were you are able to locate tab F, ma'am?

768

A     Yes, I did.

Q     Okay, thank you.

And ma'am, if I could ask you to turn to Bates number 0875 and Bates number 0876.  The Bates number appears in the lower right-hand corner of the document.

A     0875?

Q     Yes, and 0876.  And that's been marked previously as Defendant's Exhibit F.

A     Yes.

Q     Now, referring, if you would, to page 0876, ma'am.

A     Umm-hmm.

Q     There's a signature on that page, correct?

A     Yes.

Q     That's your signature, correct?

A     Yes.

Q     And it's dated November 9th of 1999, correct?

A     Yes.

Q     And if you would, ma'am, would you take a moment to read through the document.

A     I read it.

Q     And as I understand your testimony, you recognize your signature on page 0876?

A     Yes.

769

MR. KATON: And with permission, may I publish this to the jury, Your Honor?

THE COURT: You may.

BY MR. KATON:

Q    And this is a document that bears the title Witness Protection Agreement, correct, ma'am?

A    Yes.

Q    And in reviewing the document, did it refresh your recollection as to whether, in fact, you did enter the Witness Protection Program?

A    Yes.

Q    And after you entered the Witness Protection Program you were taken from the City of New Haven and brought to a motel in Norwalk, correct?

A    Yes.

Q    And is part of the reason that you went into witness protection due to the fact that threats had been made against your brother, Junito?

A    I went because they gave me a place to stay and money.

Q    Okay. So no part of Junito's safety or security played any role in your decision to enter witness protection?

A    No. No.

Q    Now, ma'am, could you -- sorry.

770

Could you turn to what's been marked as Defendant's Exhibit L in the exhibit book before you.

A    Yes.

Q    And could you turn your attention to page 0895.

A    Yes.

Q    Do you recognize that signature on that document?

A    Yes, I do.

MR. KATON:  May I publish that to the jury?

THE COURT:  You may.

BY MR. KATON:

Q    Now, this is a document that's dated February 23rd of 2001, correct?

A    Yes.

Q    And this was a document that you authored for State's Attorney Christopher Alexy, isn't it?

A    Yes.

Q    And could you please read to the jury what that says above your signature?

A    "I promise that I will give the tape that says Shabazz killed Lucky and the gun."

Q    What tape were you referring to?

A    There was no tape.

771

Q   Isn't it true that you reported to the State's Attorney that Mr. Session, otherwise known as Shabazz, had made a wrap tape where he bragged about killing Anthony Lucky, Jr.?

A   I don't recall saying it.  I don't recall that.

MR. KATON:  Your Honor, I'd move the admission of this document as a full exhibit.

THE COURT:  Mr. Pinheiro?

MR. PINHEIRO:  Subject to the previous objection, Your Honor.

THE COURT:  Is this something I've ruled on?

MR. PINHEIRO:  Yes, it is.

THE COURT:  And your record is preserved.

MR. PINHEIRO:  Thank you.

THE COURT:  And it's admitted based on the Court's previous ruling.

(Defendant's Exhibit L, received in evidence)

BY MR. KATON:

Q   Ma'am, if you could, would you turn to page numbered Bates 0894 in, within the body of Exhibit L?

A   Yes.

Q   And these are some notes.  And under the heading "Mayra Mercado" at the top of the page there's

772

some writing.  Did you ever tell Christopher Alexy that Shabazz said "When you fuck with me, you fuck with death"?

A    I don't remember.

Q    Okay, thank you.  Now, counsel representing Mr. Session asked you some questions about a Connecticut judicial proceeding that you attended where you offered some testimony with respect to the Anthony Lucky, Jr. homicide investigation.  Do you recall that?

A    Yes.

Q    And you don't remember the title of the proceeding, correct?

A    No.

Q    But you remember going down to the courthouse in New Haven to give that testimony, correct?

A    Yes.

Q    And you were, in fact, habeased out of your correctional facility for that testimony, correct?

A    Yes.

Q    And prior to that testimony you sat down with State's Attorney Christopher Alexy, didn't you?

A    I don't remember.

Q    You have no recollection of that?

A    Un-un.

Q    You simply didn't sit down with Detective Ed Rodriguez, did you?

A    Excuse me, can you repeat that again?

Q    Prior to your testimony at that proceeding, ma'am, you did not sit down with Detective Edwin Rodriguez, correct?

A    I don't understand what you're trying to --

Q    Let me back up.

A    Umm-hmm.

Q    You were habeased down to this court proceeding where you gave testimony with respect to the homicide prosecution arising out of the Anthony Lucky, Jr. shooting, correct?

A    Correct.

Q    And those are proceedings that were brought by State of Connecticut against Mr. Gary Session, correct?

A    Correct.

Q    And you offered testimony at that hearing, correct?

A    Correct.

Q    And you did it of your own free will and accord, correct?

A    Say what?

Q    Did you do it of your own free will and

774

accord?

A   Yes.

Q   And when you were habeased down, you first met with the State's Attorney before you gave your testimony, correct?

A   I don't remember meeting with him.

Q   You don't remember meeting with anyone?

A   Un-un, I don't remember meeting with the name that you're telling me.

Q   Okay.

MR. KATON:  At this point in time, Your Honor, I'd like to move the introduction of what has been marked as Defendant's Exhibit C-34.  It's a certified copy of the transcript proceedings of the hearing on probable cause dated March 1, 2001, in the case of State versus Gary Session.

THE COURT:  All right.  Mr. Pinheiro?

MR. PINHEIRO:  No objection.

THE COURT:  Without objection, Defendant's C-34?

MR. KATON:  Correct.

THE COURT:  It is admitted.

MR. KATON:  Thank you.

(Defendant's Exhibit C-34, received in evidence)

BY MR. KATON:

775

Q    Ma'am, again, if you could turn to that book so you could follow along with us.

A    Which page?

Q    C-34 is the tab.

A    Umm-hmm.

Q    And I'd like to draw your attention to what's been marked as Bates 0641, ma'am.

A    Yes.

Q    And if you could read the first half of the page to yourself.

Have you done that?

Now, this is a transcript of your testimony at the hearing on probable cause in the State's case against Gary Session, and at that proceeding you were administered an oath, correct?

A    Correct.

Q    And you stood in the witness box as much as you do here today and took that oath, correct?

A    Yes.

Q    And you swore to tell the truth.

A    Yes.

Q    And there was a judge in that court just as there is today, correct?

A    Yes.

Q    And you confronted Mr. Gary Session sitting

776

behind counsel table at that point in time as well, correct?

A    Yes.

Q    And questions were asked to you by the State's Attorney who was handling the matter, is that correct?

A    Yes.

MR. KATON:  And may I publish to the jury, Your Honor?

THE COURT:  You may.

BY MR. KATON:

Q    Ma'am, drawing your attention to Bates stamp 0641, a question was asked to you, "First of all --" excuse me.  "Ms. Mercado, I'm going to start by asking you -- first of all, do you recognize the Defendant in the courtroom today?"

And your answer was what, ma'am?

A    "Yes, I do."

Q    And the question was posed, "How do you know him?"

A    "I used to work for him on Hallock Street."

Q    And that Defendant that you recognized in that hearing on that day was, in fact, Mr. Gary Session, correct?

A    Yes.

Q    And Mr. Gary Session is otherwise known in the

Hill neighborhood as Shabazz, correct?

A    Correct.

Q    And that statement would be consistent with your transcribed statement that we previously talked about, correct, ma'am?

A    Correct.

Q    And then the question was asked, "Do you have children by him?"  And what was your answer?

A    "Yes."

Q    And the question was posed, "How many?"

A    "One."

Q    And then the question was asked, "Now, directing your attention back to July of 1999 --"

            MR. KATON:  And if I may, with the Court's permission, publish 0642?

            THE COURT:  You may.

            MR. KATON:  Thank you.

BY MR. KATON:

Q    The question asked, "Now, was this -- was the Defendant --" that is Gary Session -- "was he working for somebody else?"

     And you responded?

A    "No."

Q    And then the question was asked, "Okay.  Who was in charge?

A    "He was.

Q    "Okay.  And that's Gary Session?

A    "Yes.

Q    "Now, in July of 1999, do you know a person named DeShawn Johnson?

A    "Yes.

Q    "Did he have any relationship to this -- the drug selling business?

A    "Yes.

Q    "What was his relationship to that?

A    "He used to do everything for him.

Q    "For whom?

A    "For Shabazz.

Q    And Shabazz is Gary Session, correct?

A    Yes.

Q    "And when you say Shabazz, who are you referring to?

A    "Gary Session.

Q    "Shabazz is Gary Session's nickname?

A    "Yes.

Q    "And when you say DeShawn Johnson used to do everything for Shabazz, what do you mean by that?

A    "He used to hand bag it there for him, for his business.

Q    "Did he handle money?

779

A    "Yes.

Q    "Would he handle the drugs himself?

A    "Yes."

MR. KATON:  And now, with the Court's permission, I'm going to publish, if I would, page 0643.

THE COURT:  You may.

MR. KATON:  Thank you, Your Honor.

BY MR. KATON:

Q    And your response was "Yes"?

A    "Yes.

Q    "Would he collect the money?

A    "Yes."

Q    Now, these are your responses that you've given under oath, ma'am, correct?

A    Correct.

Q    "I'm going to show you a picture that's been marked as State's Exhibit 1 for identification, and I'm going to ask you to look at the one on the top, from your side, right-hand corner."

Your answer was?

A    "Uhm-hmm.

Q    "It has writing on it.  Do you recognize who that is?

A    "Yes."

780

Q    And your answer was, "DeShawn Johnson?"

A    "Yes."

Q    And then it goes on, and if I could call your attention down further on the page, page 0643, line 23, "I'm going to show you State's Exhibit 5 for identification, ask you to look again at the photograph on the top right-hand corner," and you answered?

A    "Uhm-hmm.

Q    "Is that the same photograph of DeShawn Johnson?

A    "Yes."

          MR. KATON:  And with the Court's permission, page 0644?

          THE COURT:  You have it.

BY MR. KATON:

Q    "I'm going to show you now a picture that's been marked State's Exhibit 2 for identification.  And this the third from the left on the top row, the one with the writing on it.

A    "Yes.

Q    "Do you recognize that picture, or the person in that picture?

A    "I recognize the person.

Q    "Okay.  How do you know that person?

781

A    "That kid's cousin.

Q    "Okay.  You're going to have to speak a little bit louder.

A    "Yes.

Q    "When you say that kid, who are you referring to?

A    "Lucky's cousin."

Q    And is Lucky's cousin Albert McCann?

A    Yes.

Q    And how did you -- how are you familiar with Lucky's cousin?

A    "I don't know him like that.  I just seen him on the streets."

MR. KATON:  And proceeding, with the Court's permission, to page 0645.

THE COURT:  You have it.

BY MR. KATON:

Q    "Just seen him what?

A    "I used to see him around -- around the street."

Q    And the question was posed, "Was he in any way involved, do you know, with Defendant's drug selling?"

And your answer was?

A    "Yeah, he used to sell for Shawn and him."

Q    Okay.  And then we can proceed down to line 12

when a question is posed:  "When you say Shawn, is that Shawn in the two pictures --

A    "Yes."

Q    And the question "-- I showed you earlier? And who would Shawn get the narcotics from?"

And your answer?

A    "Gary."

Q    And then the question was asked, "The Defendant?

A    "Yes."

MR. KATON:  And if I could proceed now, Your Honor, to publish page 0647?

THE COURT:  You may.

MR. PINHEIRO:  Thank you, Your Honor.

BY MR. KATON:

Q    The direct examination continues on page 0647, ma'am.  Could you find that?

A    Yes.

Q    Now, again in July of 1999."

And your answer is "Uhm-hmm," correct?

A    Correct.

Q    "I'm going to ask you if you're aware of any problem that developed between --" and the question was cut off -- "any problem that developed either between or as a result of this person you identify as

783

Lucky's cousin --"

Your answer was?

A    "Uhm-hmm".

Q    The question was "-- and Shawn?

A    "From what I heard, it was a sad --

Q    And then the questioning continues.

"Did you hear the Defendant discussing a problem with this person?

A    "The Defendant.  He bought a package."

Q    Question, "It's a yes or no answer.

A    "Yes.

Q    "And I'll -- just to be more specific, on July 16 of 1999, were you at the Defendant's house when he was discussing being short money from his person?"

MR. KATON:  And with the Court's permission, I'll move on to page 0648.

THE COURT:  You may.

MR. KATON:  Thank you, Your Honor.

BY MR. KATON:

Q    Your answer was?

A    "Yes.

Q    "And you heard what the Defendant said on it?

A    "Yes.

Q    "And who was he talking to?

A    "To DeShawn.

784

Q    "And what did the Defendant tell DeShawn?

A    "Something about a package being messed up.

Q    "What kind of package?

A    "Drug package.

Q    "And what did he say about it being messed up?

A    "The money wasn't -- didn't come back right.

Q    "How much money?

A    "900.

Q    "$900?

A    "Yes.

Q    "And were you supposed to do something with that $900?

A    "Supposed to go to New York.

Q    "What were you supposed to do in New York?

A    "Cop drugs.

Q    "$900 worth?

A    "No, 10,000."

Q    Then the Court interjected.

     MR. KATON:  And the with the Court's permission, I will move on to page 0649.

     THE COURT:  You may.

     MR. KATON:  Thank you.

BY MR. KATON:

Q    And the question is asked, "How much, you know, quantity or weight is 10,000 that you would buy?

785

And your answer was?

A   "It depends."

Q   And the question was asked, "Did you have the full 10,000?

A   "No.

Q   "And how much were you short?

A   "900.

Q   "And is this what the conversation was about with the Defendant and DeShawn?

A   "Yes.

Q   "Did the Defendant say anything about how to collect his money?

A   "To have him work it off.  If not, then just to see him.

Q   "Okay.  And you're familiar with the Defendant's --" that would be Gary Session "-- running of his drug operation, correct?

A   "Yes.

Q   "If he said work it off, what does that mean?

A   "Pay him back.

Q   "And if he didn't pay him, what did it mean then to go see him?

A   "Go see him meant a lot of things at that time.  I really don't know at that time.

Q   "Okay.  Was he calmly saying these things?

786

A    "He was kind of angry.

MR. KATON:  And with the Court's permission, I'll move on to page 0650.

THE COURT:  You may.

MR. KATON:  Thank you.

BY MR. KATON:

Q    And the question is posed at the top of that page, "Without the $900 you were not able to go to New York to buy the drugs, is that right?

A    "Yes.

Q    "And would the drugs --"

I'll skip that one because there was an objection posed by Mr. Session's counsel.  But I'll proceed on to line 10 where the question was posed, "What would you do with these drugs when you bought them from New York?

A    "Bag it up and sell it.

Q    "Now we're going to move ahead a few days to July 25th, 1999, about one or two o'clock in the morning."

A    And I answer "Uhm-hmm.

Q    "Where were you at that time?

A    "About -- the post office.

Q    "You got speak up, please.

A    "I was by the post office.

787

Q    "Which post office?

A    "By the Six Corners.

Q    "Where is the Six Corners?

A    Columbus -- Columbus, Hallock.  I don't know the other side street."

Q    Question:  "That's the Hill section of New Haven?

A    "Yes.

Q    "What were you doing at the post office at one or two --"

MR. KATON:  And with permission, I'll move on to the next page, page 0651, Your Honor.

THE COURT:  You may.

BY MR. KATON:

Q    "-- in the morning?

A    "Waiting.

Q    "For whom?

A    "Shawn.

Q    "Why were you waiting for Shawn?

A    "To get a package.

Q    "What package were you expecting?

A    "Money.

Q    "From what?

A    "The drugs.

Q    "And did Shawn show up at the post office?

788

A    "Yes.

Q    "Was he by himself?

A    "Yes.

Q    "Was there -- were you in a car when you were there?

A    "Yes.

Q    "What kind of car?

A    "Blue truck.

Q    "A blue truck?

A    "Yes.

Q    "Anybody else with you at the time in the blue truck?

A    "No.

Q    "Where were your children at this time?

A    "My daughter was with me.

Q    "How old was your daughter at that time?

A    "Three -- two years old.

Q    "Was this the daughter that you had with the Defendant?"  And proceeding to page 52.

A    "Yes.

Q    "Now, when Shawn arrived what happened?

A    "He asked to use the phone.

Q    "Whose telephone?

A    "Mine.

Q    "Is that a cellphone?

789

A    "Yes.

Q    "And what did he do?

A    "He called the Defendant.

Q    "He called Shabazz?

A    "Yes.

Q    "And did he place this telephone call, you know, in front of you?  Was he in front of you when he called?

A    "Yes.

Q    "And what happened then?

A    "He called to tell him to call him, to say that he seen them Getty and Kimberly.

Q    "You have to -- say the last part louder.

A    "He called to tell him to call to say that he seen them Getty, Kimberly."

Q    I'm sorry, your answer at line 21 to that, "You have to say the last part louder," could you repeat from line 21 what you said?

A    "He said he seen the guy on Kimberly and Getty gas station."

Q    And then at line 22 the question's asked, "Did you know what guys he was talking about?

A    "No."

Q    And then the question was asked, "How was Shawn acting or behaving at this time when he was

calling?

A    "Excited.

Q    "He was calling Shabazz, he was excited?

A    "Uhm-hmm."

Q    Moving on to page 0653.  And your answer was?

A    "Uhm-hmm.

Q    "And what happened after he called Shabazz and said he saw the -- did he say guys, is that the word he used?

A    "Yes.

Q    "When he said he saw the guys at the Getty gas station --

A    "Yes.

Q    "-- what happened next?

A    "Nothing.  He just said, whatever.  The other truck came rumbling and jumbling, and he hung up the phone.

Q    "Okay.  After Shawn hung up the phone, what happened after that?

A    "I had got out of the truck.  His two friends pulled up in the CRX.

Q    "These are the two friends of Shawn's?

A    "Yes.

Q    "That CRX, what kind of car is that?

A    "I don't really know.  I know it's just a blue

791

CRX two-door blue.

Q    "Blue CRX, two-door?

A    "Yes.

Q    "Is that a Honda CRX?

A    "Yes.

Q    "Now the -- did you know the two people that pulled up in the car?

A    "Yes.

Q    "Who were they?

A    "Efrain and Moleto."

Q    Now, before I move on, do you know Efrain and Moleto?

A    No.

Q    Did you not represent that you were going to testify against an Efrain and Moleto in your letter that you wrote to Detective Rodriguez?

A    I don't --

Q    You don't know.

        MR. KATON:  With the Court's permission I'll move on to page 0654.

        THE COURT:  You may.

BY MR. KATON:

Q    The Court then jumped in and said "Say that again," and you said what?

A    Excuse me, where are you at?

792

Q    I'm sorry, I'm at Bates page 0654.

A    What number?

Q    Well, there's two numbers.  The upper number is page 17, but it bears Bates stamp 0654 at the bottom.  Do you see that page?

A    Yes.

Q    The Court says "Say that again," and your response is what, ma'am?

A    "Yes.

Q    And question, "Efrain, is that spelled E-F-R-A-I-N?

A    "Yes.

Q    And question, "And Moleto is the second person, right?

A    "Yeah."

Q    And then you were shown State's Exhibit 6 for identification, and you were asked to look at the person in the top right-hand corner.  And then you were asked, "Do you recognize who that is?

A    "Yes.

Q    "And who is that?

A    "Efrain."

Q    Going to move down the page.  To line 19.

    "Now, do you know if Efrain or Moleto worked for, first of all, Shawn?

793

A    "Yes.

Q    "And if they worked for Shawn, that meant they worked for who?

A    "They didn't work for the Defendant, they worked for Shawn.

Q    "Okay.  Worked for Shawn?

A    "Yes.

MR. KATON:  With the Court's permission, proceeding to 0655.

THE COURT:  You may.

BY MR. KATON:

Q    Question:  "So did Shawn give them narcotics to sell?

A    "Yes, I think.

Q    "For his own?

A    "Yes.

Q    "Just so we understand, Shawn worked for the Defendant?

A    "Yes."

Q    The Defendant in that case was Gary Session, correct?

A    Yes.

Q    All right, back to the transcript.

Question:  "Is that right?

A    "Yes."

794

Q    Question:  "But he sold some on his own, is that right?

A    "Yes.

Q    "And Efrain and Moleto just sold for Shawn, is that right?

A    "Yes.

Q    "What areas did the Defendant sell in?

A    "On Hallock.

Q    "On Hallock Street?

A    "Yes.

Q    "Anyplace else?

A    "That's it.

Q    "Now, what happened after Efrain and Moleto pulled up in the blue Honda CRX?

A    "They pulled up.  They pulled up and I was talking to Shawn.  Minutes later the Defendant pulled up in his truck.  I was -- blank.

Q    "What kind of truck -- what kind of truck did the Defendant have?

A    "An Expedition.

MR. KATON:  Okay, with the Court's permission, I'm moving forward to page 0656.

THE COURT:  You may.

BY MR. KATON:

Q    And the question was posed after your answer

795

"An expedition.

"Do you remember what color?

A    "Gold."

Q    And question, "What did he do when he pulled up?

A    "Him and Shawn was talking.

Q    "Did you hear the conversation?

A    "Yes.

Q    "What did the Defendant say?

A    "He really didn't, basically said not much. Shawn was really the one talking.

Q    "What did Shawn say?

A    "That he seen them.  He said, What's up.

Q    "That he seen them?

A    "That he seen them and said what to do."

Q    Question:  "What happened next then after he asked what to do?

A    "The Defendant said, Do what you got to do.

Q    "Then what happened?

A    "The Defendant passed a gun and that's it."

Q    And who was the Defendant that you were referring to, ma'am, in that exchange?

A    Excuse me?

Q    Who was the Defendant you were referring to in that exchange, ma'am?

796

A    Gary Session.

Q    Drawing your attention to line 22, next question begins, "Where was the Defendant sitting when he told them, Do what you got to do?

A    "In his passenger side of the truck.

Q    "Of the Expedition?

A    "Yes.

Q    Question:  "Where were you sitting or where were you when he said that?

A    "I was in the passenger side, he was in the driver's side.

MR. KATON:  And with the Court's permission, moving on to publish 0657.

BY MR. KATON:

Q    Question:  "So you're in Defendant's Expedition?

A    "Yes.

Q    "Passenger seat?

A    "Yes.

Q    "In the front?

A    "Yes.

Q    "Where is Shawn?

A    "In the window by the door.

Q    "Whose window?

A    "My door on the passenger side."

797

Q    Question:  "So this conversation is going on across you, right?

A    "Yes.

Q    "Now, the Defendant says, Do what you got to do, and then what does the Defendant do?

A    "Pass him a gun and that's it.

Q    "Did you see where the gun came from?

A    "It left from the Defendant's hands to Shawn's hands.

Q    "Did the Defendant have the gun in his hands the whole time before that?

A    "No.  I didn't -- no, he didn't.  He pulled it out from somewhere.

Q    "Pulled it out from somewhere?

A    "In his truck.

Q    "In the vehicle?

A    "Yes.

Q    "And passed it to?

A    "Shawn.

Q    If you could turn to 0658.

MR. KATON:  And with the Court's permission, I'll publish that as well.

THE COURT:  You may.

BY MR. KATON:

Q    Question:  "Shawn, is that right?

798

A    "Yes.

Q    "Did this gun -- Shawn was at your window and the Defendant was on the driver's side, this gun passed in front of you?

A    "Yes.

Q    "Do you remember what color it was?

A    "Black.

Q    "How was Shawn behaving at this time?

A    "Excited.

Q    "And what did Shawn do then after -- did he take the gun, first of all?

A    "Yes, he did.

Q    "What did he do?

A    "Nothing.  That's when Bebe came up on the scooter.

Q    Bebe is the individual that you previously identified in your statement as Jose Santiago, correct?

A    Yes.

Q    Question:  "Okay.  You said Bebe, right?

A    "Yes.

Q    "I'm going to show you State's Exhibit number 3."

And your answer was?

A    "Uhm-hmm."

799

Q    Question:  "Look at the person in the top right-hand corner.  Do you recognize who that is?

A    "Bebe.

Q    "Okay.  That's Bebe?

A    "Yes.

Q    "And while I'm here I'm going to also show you State's Exhibit 4.  Again, same picture, top right-hand corner.

A    "Yes."

MR. KATON:  And moving on to page 0659.

BY MR. KATON:

Q    Question:  "Who was that?

A    "Bebe."

Q    And we can skip a few lines down to page -- excuse me, of page 0659, we can move on to where Mr. Alexy begins his questioning again at line 9, and do you see that, ma'am?

A    Yes.

Q    "Now, you said Bebe pulls up and drives up on a scooter?

A    "Yes."

Q    Question:  "Okay.  Is that like a motor scooter or --

A    "Yeah, a motor scooter."

Q    Question:  "What happens now that you have --

800

Bebe is there, correct?

A    "Yep.

Q    "DeShawn Johnson?

A    "Yep.

Q    "Is Efrain still there?

A    "Yes.

Q    "Is Moleto still there?

A    "Yes.

Q    "And you're still in the car with -- in the Expedition with the Defendant, is that right?

A    "Yes.

Q    "Okay.  What happens next?

A    "Nothing.  They get in the car and we drive off.

Q    "Who get -- okay.  Stop right there for a second."

                MR. KATON:  And moving on to page 0660, with the Court's permission.

                THE COURT:  You have it.

BY MR. KATON:

Q    And you responded, "All right."

                The questioning resumes, "Who gets in which car?

A    "Bebe gets in the CRX with DeShawn, Efrain and Moleto.  After that, there were just shots fired and I

801

don't know nothing else."

Q    Question:  "Okay.  So Bebe gets in the car with Efrain, Moleto and DeShawn, right?

A    "Yes."

Q    And the answer was, sorry?

A    "Yes.

Q    "Does DeShawn still have the gun?

A    "Yes.

Q    "And this is the gun that the Defendant gave him, correct?

A    "Yes.

Q    "And they pull off, and you don't see them after that, is that right?

A    "Yes.

Q    "How long after they pull off is it until you hear shots?

A    "I don't remember.

Q    "Were you still in the Expedition?

A    "Yes.

Q    "Were you still parked at the same place?

A    "No, we was driving off.

Q    "You were driving off?

A    "Yes.

Q    "Was it say less than an hour?

A    "No.

802

Q    "More than an hour?"

Moving on to page 0661.  The question was asked about the time frame, and your answer appears to be "Seconds," is that correct?

A    Yes.

Q    And then the question's posed, "I'm sorry, I can't hear you," and your answer was, "About minutes," and the question was asked, "Well, yeah, minute to --" excuse me -- "Minutes?"  And your answer was?

A    "Minutes."  No.  "But you were saying it was --"

Q    Wait, we switched places.  I apologize.

The question was asked at line 4, "Minutes?" And your answer was?

A    "Well, yeah, about a minute or two.  I don't know.  I wasn't timing it."

Q    And then the question was asked, "But you're saying it was --

A    "I would assume it was not -- it wasn't no half an hour later.

Q    "It was not a half hour later, it was within a few minutes?

A    "Yes.

Q    "And did the Defendant say anything to you after the shots were fired?

803

A    "No.

Q    "At some point did you learn that Anthony Lucky was killed that night?

A    "Yes.

Q    "Did the Defendant say anything about that?

A    "No.

Q    Question:  "When shots were fired that night on the 25th -- after the shots were fired that night on the 25th, did you run into Bebe?

A    "I ran into him on Congress Avenue, the 24-hour store.

Q    "And what happened when you ran into him?

A    "Nothing.  He was just acting like he was a big man now, now that he popped somebody.

Q    "Did he show you anything?

A    "Yep, he showed me a gun."

Q    I'm sorry, just for the record, ma'am, I'm just moving on, with the Court's permission, to Bates page number 0662.

        THE COURT:  Mr. Katon, I noticed a while ago you didn't ask for permission, and I was thinking to myself, I wonder when we have two of them consecutive pages you don't need to state for the record that you're on the next page.

        MR. KATON:  Well, I was getting the

804

impression that I might be proving tiresome to Your Honor.

THE COURT:  I wish I would have said that earlier.  How much longer you think you have?  Because we're getting close to the witching hour, and I just --

MR. KATON:  I believe the witness's direct testimony at the hearing for probable cause concludes in approximately 15 lines.

THE COURT:  We'll see where we are somewhere around before 5, ladies and gentlemen of the jury.

Thank you, sir.  Proceed.

MR. KATON:  Thank you, Your Honor.

BY MR. KATON:

Q    Ma'am, I'm just going to take back just a bit the last line.  The last question on page 0651 was, "Did he show you anything?"

And then your answer appears at the top of what is now 0662, is that correct?

A    Yes.

Q    And what was your answer?

A    "Yep, he showed me a gun.

Q    "Do you remember what color it was?

A    "It was a black one.

805

Q    "And when you say he was acting like a big man because he had popped someone, what do you mean by that?

A    "Just thought he was big and bad now."

Q    Question:  "And did you know which -- which shooting he was talking about?

A    "Yeah.

Q    "Which one?

A    "The one that happened on Howard Street.

Q    "On Howard Street?

A    "Yes.

Q    "And that's the one you learned that Anthony Lucky was shot, right?

A    "Yes."

Q    And then your direct testimony concludes.

Now, ma'am, that's your recorded testimony at the hearing on probable cause, is it not?

A    Yes.

Q    And that is consistent with the typewritten statement that you provided to Detective Rodriguez, correct?

A    Yes.

MR. KATON:  No further questions.

THE COURT:  All right.  Where do you think we are?  How much time you think --

806

MR. PINHEIRO:  I need a considerable amount, Your Honor.  I have to cover everything that we just went over.

THE COURT:  All right.  Well, I'm wondering if it makes any sense not to break here.  I hate to keep the jury in later if it's not going to serve a useful purpose.

What you got, sir?

MR. KATON:  Pardon me, Your Honor, if I may reopen my cross.  There is one item briefly.

THE COURT:  You may do that indeed, sure.

MR. KATON:  Thank you.  I apologize.

BY MR. KATON:

Q   Ma'am, the book in front of you, could you turn to what's been marked as Plaintiff's Exhibit DD.

A   Yes.

Q   And do you see the first page, which is Bates stamped number 0950?

A   0950, yes.

Q   And that's a page that is apparently the cover of an envelope, correct?

A   Yes.

Q   Okay.  And do you recognize the return address that appears on the envelope?

A   Yes.

807

Q    And whose return address is on the envelope?

A    Mine.

Q    And within the body of the exhibit -- and I note this copy is illegible, but we will be able to produce the original.  Do you recognize your signature on page 0953?

A    Yes.

Q    Thank you.

Now, you were writing a letter to Mr. Dearington, correct?

A    Yes.

Q    And Mr. Dearington is the State's Attorney for the Judicial District of New Haven, correct?

A    Yes.

Q    And this is a copy -- albeit illegible at this juncture, but an original will be submitted -- of the letter that you wrote to Mr. Dearington, correct?

A    Yes.

MR. KATON:  And I'm going to offer that as a full exhibit as Defendant's Exhibit DD, and with the Court's permission I will substitute the original when the State's Attorney testifies in the case.

THE COURT:  Okay.  Mr. Pinheiro?

MR. PINHEIRO:  We never got the original, Your Honor, only got this copy.

808

THE COURT:  Well, he's introducing that now, and he says the State's Attorney has, I guess, the original, he's going to introduce that in connection with the State's Attorney's testimony at some future time in this trial.  And so I don't know -- I mean there's no objection to this, you got this, right?

MR. PINHEIRO:  Well, Your Honor, I made no objection to this particular document that you could barely make out.  If they had the original years ago they could have gave us a better copy so that we'd be able to know what was on it.

THE COURT:  Well, my perception, Mr. Pinheiro, is that the State's Attorney's office has retained the custody of the letter.  I don't know, Mr. Katon, am I wrong?  Have you ever had possession of the original?

MR. KATON:  No, Your Honor.  I have viewed the original, but only at the State's Attorneys office.  It is a part of their materials.

THE COURT:  And of course there's nothing on the table right now except introducing this letter that you did have a copy of, as illegible as it must be because Mr. Katon said it was, but the witness could identify who it was to and her signature.

809

Right, ma'am?

THE WITNESS:  Yes.

THE COURT:  Any objection to this coming in?

MR. PINHEIRO:  Your Honor, there's no objection to it.  I'm just saying we never had the legible copy.

THE COURT:  That's fine.  So it's admitted as what exhibit?  What is the number of the exhibit?

MR. KATON:  The exhibit is DD, and ranges Bates stamp numbers 0950 to 0954.

THE COURT:  Okay.  It's admitted without objection.

MR. KATON:  Thank you.

(Defendant's Exhibit DD, received in evidence)

BY MR. KATON:

Q    And ma'am, isn't it true that you wrote this letter to Mr. Dearington begging him that you did not want to testify at the trial of Gary Session?

A    Yes.

Q    Okay, thank you.

MR. KATON:  No further questions.

THE COURT:  All right.  Ladies and gentlemen of the jury, we're going to go ahead and

810

break for the day.  When we come back tomorrow -- and I'm not sure of this.  I don't want to misspeak.  I know we're going to take one witness out of turn tomorrow, is that true?

MR. ZEHE:  That's correct, Your Honor.

THE COURT:  Well, based on whatever agreement you guys have made and where we are, will we have Ms. Mercado as the first witness under Mr. Pinheiro's redirect, or will it be this witness out of turn?

MR. PINHEIRO:  I would prefer to take Ms. Mercado immediately.

MR. ZEHE:  We'll wait until after.

THE COURT:  So ma'am, I remind you that you're not to discuss the testimony you have given or will give in this case with anyone, including the lawyers, and that you need to be back here promptly at 10.  We'll start at 10.

And ladies and gentlemen, I appreciate your patience and attention today.  We'll see you tomorrow at 10.  All rise for the jury.

Remember, do not discuss the case among yourselves or with your family and friends, people you work with, you're not to read or watch or listen to any news coverage of the trial.

811

(Jurors excused)

THE COURT:  All right.  Mr. Clegg tells me that he has provided you-all with copies of the documents for the jury instructions and interrogatories for all phases of the trial, and that were previously agreed to.

And where are we now, Mr. Pinheiro, as far as where you thought we would be and where we're likely to be?

MR. PINHEIRO:  We're a little behind, Your Honor, to be honest with you.  I think we're a little behind.  I'm going to finish Mayra Mercado first thing in the morning, then we're going to take Mr. Norwood out of turn, and then I'll put Sharon Adkins on and -- look at my list -- and then I will put the Defendant on.

THE COURT:  And I think you said you were going to try to fine-tune your witness list and maybe some of them will be omitted so maybe we can make up some time?

MR. PINHEIRO:  Yes.

THE COURT:  Well, just do the best you can, each of you, and, you know, to quote the Reverend Jackson, keep our eyes on the prize here, and focus. And I didn't mean to make light of that, to the jury,

but we're at the end of the third day, I'm getting a little punch drunk, and you guys are the ones doing the work, so I'm sure we get tired during the trial, so focus if you can. If you can make it faster, we'll do it faster, and if you can't, we'll just do the best we can.

So thank you all. Have a good evening.

MR. ZEHE: Your Honor, I just had a suggested jury instruction. Attorneys talk to witnesses prior to the preparation of trial, they use it in some, I wonder if I could have you take a look at it.

THE COURT: Yeah. You shared that with Mr. Pinheiro?

MR. ZEHE: I will, and give Brendan a copy.

THE COURT: All right. Mr. Pinheiro?

MR. PINHEIRO: Yes, sir.

THE COURT: You got to look at something else in light of the testimony that's come up during trial, about witnesses talking before, for preparation. That's what you're talking about?

MR. ZEHE: Yes, Your Honor.

THE COURT: Okay. Take a look at it. Is that a Seventh Circuit pattern instruction?

813

MR. ZEHE:  Yes, Your Honor.

THE COURT:  They don't have pattern instructions in the Second Circuit, do they?

MR. ZEHE:  No.

THE COURT:  I don't understand that, you know?  Got to get them in this circuit.

(Court adjourned)

814

CERTIFICATE OF REPORTER

I Hereby certify that the foregoing 230 pages are a complete and accurate computer-aided transcription of my original stenotype notes taken in the Matter of Gary Session VS Edwin Rodriguez, which was held before The Honorable Tucker Melancon, U.S.D.J., at U.S. District Court, 915 Lafayette Boulevard, Bridgeport, Connecticut on May 22, 2013.

Wendy Allen, RMR, CRR

Notary Public

My commission expires:  April 15, 2015